**Nos. 23-11528, 23-11644**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

————————————

STATE OF FLORIDA,

Plaintiff-Appellee,

v.

ALEJANDRO MAYORKAS, Secretary
of Homeland Security, in his official
capacity; et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the Northern District of Florida

————————————

## TIME SENSITIVE MOTION FOR ADMINISTRATIVE STAY AND STAY PENDING APPEAL

————————————

<div style="margin-left:40%">

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*
WILLIAM C. PEACHEY
  *Director*
EREZ REUVENI
  *Assistant Director*
  U.S. Dep't of Justice, Civil Division
  Office of Immigration Litigation,
  District Court Section
  P.O. Box 868, Ben Franklin Station
  Washington, DC 20044
SARAH S. WILSON
  *Assistant Director*
JOSEPH A. DARROW
  *Trial Attorney*

</div>

*State of Florida v. Alejandro Mayorkas, et al.*, Nos. 23-11528, 23-11644

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendants-Appellants

certify that the following have an interest in the outcome of this appeal:

Boynton, Brian M.

Christmas, Natalie

Darrow, Joseph A.

DeSantis, Ronald

Guard, John M.

Hart, Joseph E.

Hudak, Matthew

Mayorkas, Alejandro

Moody, Ashley

Ortiz, Raul

Patel, Anita J.

Peachey, William C.

Percival, James H.

Reuveni, Erez

Ryan, Erin T.

Ward, Brian C.

*State of Florida v. Alejandro Mayorkas, et al.*, Nos. 23-11528, 23-11644

Wetherell, T. Kent

Whitaker, Henry C.

Wilson, Sarah S.

Dated:  May 19, 2023          */s/ Erez Reuveni*
                              EREZ REUVENI

# TABLE OF CONTENTS

**INTRODUCTION**.................................................................................... **1**

**STATEMENT** .......................................................................................... **3**

Legal Background. ....................................................................................... 3

Factual and Procedural Background. ........................................................... 3

District court proceedings .......................................................................... 6

**ARGUMENT**.......................................................................................... **7**

**I.**    **Defendants are likely to succeed on appeal**.................................. **8**

Standing. ....................................................................................................... 8

Contrary to law. ........................................................................................... 9

Arbitrary and Capricious.............................................................................. 13

Notice and Comment .................................................................................. 15

**II.**   **Equitable factors overwhelmingly favor a stay** ....................... **18**

**III.**  **The injunction is invalid and overbroad**.................................... **22**

**CONCLUSION** ....................................................................................... **23**

**CERTIFICATE OF COMPLIANCE** ....................................................

**CERTIFICATE OF SERVICE** ...........................................................

# TABLE OF AUTHORITIES

## CASE LAW

*Adams v. Vance*,
    570 F.2d 950 (D.C. Cir. 1978) ........................................................ 22

*Ahrens v. Rojas*,
    292 F.2d 406 (5th Cir. 1961) ..................................................... 12, 13

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987) ...................................................................... 22

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) .................................................................. 22

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983) ...................................................................... 13

*California v. Texas*,
    141 S. Ct. 2104 (2021) .................................................................... 8

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ...................................................................... 10

*Clark v. Martinez*,
    543 U.S. 371 (2005) ...................................................................... 12

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ........................................................... 4

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) .................................................................. 15

*Dep't of the Navy v. Egan*,
    484 U.S. 518 (1988) ...................................................................... 18

*Florida v. Mayorkas*,
    No. 23-cv-9962, 2023 WL 3398099 (N.D. Fla. May 11, 2023) .......................... 1

*Florida v. United States*,
    No. 3:21-cv-01066, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) ...................... 1

*Garland v. Aleman Gonzalez*,
    142 S. Ct. 2057 (2022) ...................................................................... 22

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022) .......................................................... 23

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ...................................................................... 23

*Grand River Enterprises Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005) ......................................................... 10, 11

*Innovation Law Lab v. McAleenan*,
    924 F.3d 503 (9th Cir. 2019) ........................................................ 16, 22

*INS v. Aguirre-Aguirre*,
    526 U.S. 415 (1999) .......................................................................... 10

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004) ........................................................ 17

*LabMD, Inc. v. Federal Trade Comm'n*,
    678 F. App'x 816 (11th Cir. 2016) ...................................................... 8

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ............................................................................ 8

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) .......................................................................... 23

*Nat'l Min. Ass'n v. Sec'y of Lab.*,
    589 F.3d 1368 (11th Cir. 2009) ..................................................... 15, 16

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................ 7

*Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Engineers*,
  87 F.3d 1242 (11th Cir. 1996) ............................................................... 13

*Sampson v. Murray*,
  415 U.S. 61 (1974) ............................................................................... 21

*Sure-Tan, Inc. v. NLRB*,
  467 U.S. 883 (1984) ............................................................................... 8

*Swain v. Junior*,
  961 F.3d 1276 (11th Cir. 2020) ............................................................. 10

*U.S. v. Dean*,
  604 F.3d 1275 (11th Cir. 2010) ............................................................. 17

*United States v. Cortez*,
  449 U.S. 411 (1981) ............................................................................. 18

## FEDERAL STATUTES

5 U.S.C. § 553(b)(B) ............................................................................... 16

5 U.S.C. § 553(d)(3) ............................................................................... 16

8 U.S.C. § 1103(a)(1) ............................................................................. 10

8 U.S.C. § 1103(a)(3) ............................................................................. 10

8 U.S.C. § 1182(d)(5) ..................................................................2, 3, 15, 19

8 U.S.C. § 1182(d)(5)(A) ..................................................................... 4, 12

8 U.S.C. § 1252(f) ................................................................................. 22

8 U.S.C. § 1225(a)(1) ............................................................................. 3

8 U.S.C. § 1225(b)(1) ............................................................................. 3

8 U.S.C. § 1225(b)(2)(A) ....................................................................... 3

8 U.S.C. § 1225(B)(2)(C) ................................................................... 3

## FEDERAL REGULATIONS

8 C.F.R. § 212.5(e)(2)(i) ................................................................ 12

8 C.F.R. § 212.5(b)(1) ................................................................... 10

8 C.F.R. § 212.5(b)(5) ................................................................... 10

8 C.F.R. § 235.2(c) ....................................................................... 10

8 C.F.R. § 235.3(b)(2)(iii) ............................................................. 10

8 C.F.R. § 235.3(b)(4)(ii) .............................................................. 10

## FEDERAL RULES FOR APPELLATE PROCEDURE

Fed. R. App. P. 27(d)(1)(E) ............................................................. 1

## FEDERAL REGISTER

86 Fed. Reg. 42,828 ...................................................................... 4

**INTRODUCTION**

This Court should stay, pending completion of appellate proceedings, the challenged district court orders preventing the Department of Homeland Security (DHS) from using two policies it adopted to more quickly process individual noncitizens during exigent circumstances, to avoid overwhelming limited detention capacity, and to ensure the safety and welfare of U.S. Border Patrol (USBP) agents and noncitizens in government custody. The district court's orders in *Florida v. United States*, No. 3:21-cv-01066, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) Appendix ("A") 41-149, vacating the Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations (Parole+ATD) memorandum (A234-37), and in *Florida v. Mayorkas*, 23-cv-9962, 2023 WL 3398099  (N.D. Fla. May 11, 2023) (A203-09), enjoining the Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (PWC) memorandum, A157-66, irreparably harm the United States and are unlikely to be upheld, given their deep intrusion into executive authority to consider noncitizens for release in appropriate circumstances.

The orders frustrate the most effective measures available to DHS to secure the border while protecting the health and welfare of USBP agents and noncitizens during periods of increased border encounters that require immediate action by USBP to avoid overwhelming DHS capacity. DHS faces an exigent situation at the

southwest border. Over the last two weeks, record numbers of noncitizens sought to unlawfully enter the country, seriously challenging the immigration system. The number of noncitizens in custody has been dangerously high. A215-16. In recent days, the number of crossers has decreased, but at any moment the flow of noncitizens could return to where it was immediately before May 11. DHS seeks the Court's intervention to restore its full statutory authorities to quickly address these dynamic circumstances. DHS's options are now significantly limited. DHS can no longer expel noncitizens to Mexico under Title 42, and, during periods of increased encounters, DHS at times lacks the resources to detain all noncitizens during the period necessary to issue charging documents. And because of the court's orders, the government cannot rely on its discretionary parole authority under 8 U.S.C. § 1182(d)(5), as implemented through Parole+ATD and PWC, to manage the sustained increase in border encounters.

The district court's orders leave DHS only inferior options for addressing future, sudden spikes in border encounters. For example, DHS could apprehend individuals and release them with just notices to report later. But releasing noncitizens—without imposing conditions requiring them to obtain a Notice to Appear (NTA) for removal proceedings or imposing monitoring requirements— risks allowing numerous noncitizens to abscond. In a worst-case scenario, absent the

2

enjoined parole processes, DHS might have to decline to apprehend certain border-crossers altogether. *Id.*, ¶ 22.

A stay is warranted in these circumstances. The government is likely to prevail on the merits, the equities strongly favor a stay, the district court lacked authority to issue the orders, and the orders are overbroad in any event. The Court should issue an immediate administrative stay and then stay the district court's orders pending appeal, as well as consolidate and expedite both appeals.

## STATEMENT

Legal Background. Congress delegated to the Executive Branch the authority and discretion to inspect and process "applicants for admission"—noncitizens who are present without being admitted or "who arrive[] in the United States." 8 U.S.C. § 1225(a)(1). Congress authorized several options for processing these noncitizens. *See id.* § 1225(b)(1) (expedited removal for certain applicants for admission identified at or near the border); *id.* § 1225(b)(2)(A) (removal proceedings for applicants who are "seeking admission" not "clearly and beyond a doubt entitled to be admitted"); *id.* § 1229(a) (removal proceedings for noncitizens present in the United States); *id.* § 1225(b)(2)(C) (return to contiguous territory pending removal proceedings for applicants described in section 1225(b)(2)(A)). Further, section 1225 "does not limit the authority of DHS to determine whether to pursue the removal of the [noncitizen]" in the first place. *Crane v. Johnson*, 783 F.3d 244, 249

3

(5th Cir. 2015). DHS also has the discretion to release applicants for admission on parole following an individualized case-by-case assessment "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

Factual and Procedural Background. From March 20, 2020, through May 11, 2023, a series of public health orders entered by the Centers for Disease Control and Prevention under its Title 42 authority were in effect to combat the COVID-19 pandemic. The orders suspended the introduction of "persons traveling from Canada or Mexico … who would otherwise be introduced into a congregate setting in a [land port of entry] or [USBP] station at or near the U.S. land and adjacent coastal borders." Public Health Reassessment and Order, 86 Fed. Reg. 42,828 (Aug. 5, 2021). Covered noncitizens were expelled to Mexico or their home countries without processing under our immigration laws. The public health emergency expired on May 11, 2023, which caused the Title 42 order to expire. Defendants anticipated that absent any policy change, Title 42's expiration would be followed by an unprecedented increase of migrants seeking to illegally cross the southwest border. A214-15.

Notwithstanding Title 42, DHS has encountered historically high numbers of noncitizens in recent years. To address the resulting serious overcapacity issues at border facilities, DHS has tried several approaches. In March 2021, DHS began releasing border arrivals through Notices to Report (NTRs). A232-33. Noncitizens

4

were released from custody without an NTA, but with instructions to check in at an U.S. Immigration and Customs Enforcement (ICE) office to be processed for an NTA or other appropriate process at a later date. *Id.* Shifting time-consuming NTA processing to the interior helped decompress USBP facilities (where noncitizens would otherwise be held until processing was complete) and allowed limited personnel resources to focus on border enforcement, but DHS subsequently concluded that a policy with stronger safeguards was required." A234-37.

DHS formally replaced NTRs with Parole+ATD in November 2021. A200-02. Under this initiative, USBP received temporary authority in border sectors experiencing defined overcapacity to temporarily parole new arrivals, consistent with section 1185(d)(5)(A)'s requirements. A234-37. Noncitizens paroled under this policy were enrolled in ICE's ATD program and instructed to check in with ICE in the interior for NTA processing. *Id.* ICE monitored and supervised noncitizens' appearances via electronic ankle monitors and other supervision technology. *Id.*

After Parole+ATD was vacated, DHS undertook multiple initiatives to prepare for Title 42's end, A212-14, but as that date approached, U.S. Customs and Border Protection (CBP) began to face exigent circumstances. On May 10, 2023, facing unprecedented migration flows, DHS issued its PWC policy. A203-09. PWC allowed specific border sectors to receive approval for USBP agents to use their discretionary parole authority to temporarily parole noncitizens, who have been

5

inspected, vetted, and checked for national security and public safety concerns, for the limited period of 60 days, to permit them to schedule an appointment with ICE to complete their NTA processing or request an NTA by mail. A207-08. The policy is limited to specific periods of potentially unsafe overcrowding, and parole under the policy is permitted only after an "individualized case-by-case" assessment of the "urgent humanitarian reasons" or "significant public benefit" requirement. A206-08. Using this exigent measure during border encounter spikes allows USBP officials to safeguard the health and safety of individual noncitizens in its custody by expediting processing and thereby reducing overcrowding. A204, A207. Moreover, absent use of this policy, USBP officials might devote a disproportionate amount of their limited resources to NTA processing, at the expense of other critical national security and public safety functions, including deterring criminal organizations and traffickers and intercepting unlawful entrants. *Id*.

District court proceedings. Florida challenged Parole+ATD and PWC in separate proceedings under the Administrative Procedure Act (APA) as contrary to law, arbitrary and capricious, and issued without notice-and-comment procedures. The district court issued a final judgment concerning Parole+ATD on March 8, 2023, A40-149, and a preliminary injunction enjoining PWC on May 11, 2023, A157-66. In the court's view, the two memoranda were indistinguishable. A161-62, A174. The court held both memoranda exceeded the government's authority under section

1182(d)(5)(A), were arbitrary and capricious for failing to consider what the court viewed as relevant factors, and were legislative rules improperly issued without notice-and-comment procedures. A127-142, A161-62, A174-180. As to PWC, the court also held that Florida would suffer irreparable injury, and that the equitable and public interest factors supported an injunction. A162-64, A174-75, A178-79. The district court vacated the Parole+ATD policy and remanded it to DHS, A148-49, and enjoined DHS "from implementing or enforcing" the PWC memorandum. A165. The government moved to stay both orders, and the court denied those requests. The court then converted the TRO into a preliminary injunction, adopting the TRO's reasoning. It had already denied a stay of that order when it denied a stay of the TRO.

## ARGUMENT

A stay of both orders pending appeal is warranted. The government is likely to prevail and will be irreparably harmed without a stay, Florida will not be substantially harmed by a stay, and the public interest supports a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Where, as here, the balance of equities weigh so "heavily in favor of granting" relief, a stay may be "granted upon a lesser showing of a substantial case on the merits." *LabMD, Inc. v. Federal Trade Comm'n*, 678 F. App'x 816, 819 (11th Cir. 2016).

7

I.  **Defendants are likely to succeed on appeal**.

The district court erred in finding Florida has standing to challenge the policies and in its three merits holdings. A121-142, A161-62.

<u>Standing</u>. Florida lacks standing to pursue its claims in either case. The district court concluded Florida had standing to challenge Parole+ATD because it believed more "immigrant children and youth" had enrolled in Florida schools since January 2021, and assumed Florida had standing to challenge PWC for the same reasons. A161, A174-78. For its part, Florida speculated that "tens of thousands" of noncitizens "will be released" under the challenged policy "and will likely make their way to Florida." A661.

Both contentions fail. Florida does not allege direct injury, but asserts indirect injuries premised on the speculative actions of third parties—migrants. Its claims fail for that reason alone. *See California v. Texas*, 141 S. Ct. 2104, 2117 (2021). Moreover, a party—sovereign or otherwise—generally "lacks a judicially cognizable interest in the prosecution or nonprosecution of another," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), including "enforcement of the immigration laws," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). And the district court wrongly concluded that Florida suffered injury from Parole+ATD, based on general information about school enrollments that *preceded* the policy by nine months. A93.

8

Regardless, Florida may not bootstrap asserted injuries from Parole+ATD onto PWC.

<u>Contrary to law</u>. Section 1182(d)(5)(A) provides that the Secretary of Homeland Security may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." The noncitizen must return to the "custody from which he was paroled" "when the purposes of such parole shall, in the opinion of the [Secretary], have been served," and "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id*. The challenged policies fully comply with these requirements.

Under the policies, parole is available only where there is an urgent humanitarian reason or significant public benefit for an individual exercise of parole authority related to maintaining safe conditions in USBP facilities during high-encounter periods. During these periods, the policies employ a case-by-case analysis to prioritize individuals for parole based on the significant public benefit from paroling low-priority individuals to allow for the continued detention of higher-risk individuals. The Secretary (acting through Chief Ortiz) correctly determined that this assessment supports the statutory standard by allowing CBP to maximize its limited detention space, and therefore the benefit to the public, while avoiding the significant

9

humanitarian concerns associated with attempting to detain all encountered individuals during high-encounter periods.

Congress did not define "urgent humanitarian reasons or significant public benefit," and therefore delegated to the agency the role of determining the appropriate contours of its case-by-case assessment. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); 8 U.S.C. § 1103(a)(1), (3); 6 U.S.C. § 202(4). The Secretary's interpretation is reasonable and entitled to deference. *See INS v. Aguirre-Aguirre,* 526 U.S. 415, 424-25 (1999). The regulations implementing section 1182(d)(5)(A) have long recognized a significant public benefit to paroling noncitizens whose detention is not in the public interest due to the need to prioritize agency enforcement resources and the need to prevent disease and other health and safety concerns created by overcrowding in congregate settings. *See* 87 Fed. Reg. 18,078, 18,107-08 & nn.46-49 (2022). The Secretary's interpretation, as reflected in both policies and longstanding regulatory authority, is consistent with the views of this Court and others. *E.g.*, *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (noting "it doubtlessly advances the public interest to stem the spread of COVID-19"); *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (identifying the promotion of "public health" as a "significant public interest[]").

The policies require that these factors be considered in individualized, case-by-case assessments to determine whether parole will serve a significant public benefit or urgent humanitarian reason. A207, A236-37. Each applicant is individually considered for parole and prioritized, in part, based on the benefit of their continued detention as compared to other individuals encountered during the same period. The PWC memorandum specifies that urgent humanitarian reasons may not be determined solely based on generic factors but must be particularized to individual circumstances. *See, e.g.*, A204, A216-17. The memoranda also contemplate an individualized re-assessment after 60 days (PWC) or when the NTA is issued (P+ATD). A208; 8 C.F.R. § 212.5(e)(2)(i), (ii).

The district court erred in concluding, without record evidence, that these individualized assessments are "pretextual." A131, A161, A177. The assessment is not pretextual simply because it may result in more parole grants when there is a significant increase in encounters. In that circumstance, a case-by-case assessment is still undertaken and it allows for individualized prioritization so that available bedspace may be assigned in a way that maximizes the public benefit. Congress did not set any numerical limitations on the Secretary's exercise of his parole authority, and instead entrusted it to the Secretary's "discretion." 8 U.S.C. § 1182(d)(5)(a). The court's criticism of the policies on these grounds is therefore unsupported. A131-33, A161, A176-78.

11

The policies are also consistent with section 1182(d)(5)(A)'s conditional requirement that a paroled noncitizen "be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." That requirement is triggered only by "the opinion of the [Secretary]" that "the purposes of such parole have been served." *Id.* By regulation, pre-NTA parole terminates "when a charging document is served on the alien … unless otherwise specified," or "at the expiration of the time for which parole was authorized." 8 C.F.R. 212.5(e)(2). Thus, absent further action by ICE, parole will terminate (1) with service of the NTA, or (2) within 60 days. Under either policy, the intent is that parolees will receive an NTA and then have a removal "case" that may "be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.*

Contrary to the district court's decisions, the statute does not require an ongoing removal case as a prerequisite to parole eligibility. The Supreme Court rejected that approach in *Clark v. Martinez*, 543 U.S. 371, 386 (2005), when it determined that noncitizens with final orders of removal remain eligible for parole after their proceedings are over. *See Ahrens v. Rojas*, 292 F.2d 406, 407-08 (5th Cir. 1961) (noncitizen with final deportation order nevertheless paroled indefinitely for health reasons). Such a requirement would invalidate over half a century of immigration parole practice, A472-75 (discussing multiple such policies, A715-58),

12

long ratified through Congressional acquiescence. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) (Congress's clear awareness of, but failure to address, widely known agency action "when enacting other and related legislation make out an unusually strong case of legislative acquiescence").

Arbitrary and Capricious. The policies readily satisfy the highly deferential APA review standard, as they are reasonable and reasonably explained. *Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996). The memoranda give DHS the flexibility to address the health and public safety exigencies caused by increased border encounters at the southwest border. A204-06, A235-36. They explain that the federal government lacks the resources to safely detain the record numbers of noncitizens that may enter the United States, and that without a mechanism for expedited processing of low-risk noncitizens, government employees, noncitizens, and the public face potentially serious health and safety risks from massive overcrowding in CBP facilities. A204-07, A235-36. And the memoranda allow DHS to safely address future increased border encounter numbers as they arise. *Id.*

As to PWC, the only deficiency the court identified was that the memorandum "does not reflect any consideration of the additional backlog that will likely be created by releasing aliens into the country without initiating immigration proceedings and then having to track them down to do so if they do not report to

13

ICE." A177; *see* A162 n.4. To the contrary, the memorandum considers the costs and impacts the agency might accrue by paroling noncitizens, due to this exigency, rather than issuing an NTA. A204-05, 208. The memorandum describes CBP's efforts to streamline processing and requires that both CBP and ICE share in the subsequent processing burden. *Id*. Moreover, the memorandum reflects DHS's conclusion based on the evidence before it that the costs that result if some number of released noncitizens do not report to ICE are outweighed by the urgent humanitarian reasons and significant public benefit justifying the release of some individuals prior to NTA issuance in exigent situations, given the present unprecedented border circumstances.

As to Parole+ATD, the district court similarly held that the policy failed to adequately consider the "backlog caused by earlier iterations of the policy." A136-38. But that disregards the significant evidence in the administrative record acknowledging and addressing the issue. A238-355. The court's criticism of the memorandum's precatory statement that it would be "used sparingly" and not as a "primary processing tool," A137-39, is improperly premised on extra-record evidence concerning a single month's encounter data. A356-360. Even putting that aside, the policy says that it "should" be used sparingly, A235, and an exhortation of that kind, by definition, cannot be "untrue." A138. Finally, the court faulted DHS for failing "to acknowledge its decision to expand Parole+ATD to include single

adults rather than only family units." A137-39. But no iteration of the Parole+ATD policy expressly precluded its application to single adults, and like PWC, the policy was to be used only in exigent circumstances. Regardless, the court erred in "second-guessing" the government's "weighing of risks and benefits." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019).

<u>Notice and Comment</u>. Both memoranda are exempt from notice-and-comment rulemaking because they are statements of policy, and, as to PWC, because good cause excused notice-and-comment rulemaking.

Both memoranda are "general statement[s] of policy," because they do not establish any "binding norm," and instead "leave[] the agency free to exercise its discretion to follow or not follow that general policy in an individual case," such that "the agency remains free to consider the individual facts in the various cases that arise." *Nat'l Min. Ass'n v. Sec'y of Lab.*, 589 F.3d 1368, 1371 (11th Cir. 2009). Both memoranda directly track the discretionary language of the parole statute, 8 U.S.C. § 1182(d)(5), providing, for example, that release may only be granted "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," if certain criteria, as assessed by individual line officers, are present. A206, A236-37. Nothing in either memorandum requires any individual officer to release any individual noncitizen; each officer remains free to consider facts on a case-by-case basis. A205-07, A236-37; *see Nat'l Min. Ass'n*, 589 F.3d at 1371; *Innovation Law*

*Lab v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019) (policy directing officers to consider whether they "may return" noncitizen to Mexico was statement of policy "because immigration officers designate applicants for return on a discretionary case-by-case basis").

The district court concluded that each policy is a legislative rule because it "establishes a generally applicable policy to determine whether aliens are detained or paroled, it instructs agents how to exercise their discretionary authority under § 1182(d)(5), it sets criteria for granting parole, and it affects Florida's obligations to paroled aliens." A140, A161-6 A177. But both memoranda leave it to USBP agents to determine, without any preordained result, whether to parole individual noncitizens. And the memoranda certainly have no "binding effect" on Florida, since they do not govern Florida at all. *National Min.*, 589 F.3d at 1371. Any obligations that Florida has towards released noncitizens stem from other sources of law.

With respect to PWC, notice-and-comment procedures were not required because the agency for "good cause" found "that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B), (d)(3). "Emergencies, though not the only situations constituting good cause, are the most common." *U.S. v. Dean*, 604 F.3d 1275, 1281 (11th Cir. 2010). "[E]mergency situation[s]" include those where delayed implementation would pose "a possible imminent hazard to [] persons, and

property." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004). PWC readily meets that standard. The memorandum explains that the sustained high border encounters that occurred immediately before May 11 was "quickly evolving into exigent circumstances," with encounters at "an all-time high," averaging nearly 9,000 a day in the week leading up to the memorandum's issuance. A209. That increase significantly challenged limited enforcement resources, created dangerous overcrowding in CBP facilities, and stretched capacity and staffing past reasonable limits. A214-15.

The district court found this argument "unpersuasive because defendants have known ... when the Title 42 Order was going to expire and what was likely to happen," and therefore had time "to go through notice and comment." A174-75 n.3. The government respectfully suggests that criticism is misplaced. DHS undertook a host of enforcement and policy actions in the months leading up to Title 42's termination in an effort to prevent an increase in border encounters of this magnitude. A212-14. The sustained increased border encounters in the days before the termination of the Title 42 order, however, necessitated further action to ensure that USBP had the ability to parole noncitizens to manage sudden and unpredictable increases in border encounters. In spite of DHS's extensive efforts, the number of individuals in CBP custody as of May 9 was 27,000, with the potential to increase

to 45,000, both well beyond CBP capacity. A214-15. Notice-and-comment rulemaking was excused in these circumstances.

## II.    Equitable factors overwhelmingly favor a stay.

The serious and irreparable harms to the government and public from the district court's orders outweigh any harm Florida might suffer from a stay. The government's border-management interests here—which relate to efforts to address an evolving migration situation at our southwestern border ahead of Title 42's termination that was overwhelming CBP facilities, risking widespread health and safety risks to noncitizens, and government employees—are indisputably weighty.

The district court's orders undermine the Executive Branch's constitutional and statutory authority to implement its immigration priorities and secure the border based on its "[p]redictive judgment[s]." *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988). The orders prevent two of the government's chosen means of addressing increased border encounters that frustrate the "public interest in effective measures to prevent the entry" of unauthorized noncitizens at the Nation's borders, *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981), by significantly limiting options for releasing individuals posing no threat to public safety to decompress detention facilities and to ensure that resources may be deployed on more pressing public safety and national security threats.

18

The most immediate consequence of the orders will likely be overcrowding in CBP facilities during increases in border encounters, which threatens harm to the health, safety, and security of USBP officers, migrants, and the general public. Because ICE must prioritize bedspace for public safety threats, national security threats, and others found not suitable for parole by CBP, there may not be space for those who would otherwise be transferred from CBP to ICE. A228-29. The public interest is served by allowing CBP officials to employ their experience and judgment during exigent situations, and use all tools at their disposal to ensure the continued safe, effective, and humane enforcement and administration of U.S. immigration law, including through the government's well-settled discretionary parole authority under 8 U.S.C. § 1182(d)(5). The orders block two parole processes deemed necessary by DHS to address unprecedented encounters at the southwest border that strained CBP capacity well beyond its limits. A214-19. Those processes allow CBP to more expeditiously process noncitizens for release by avoiding the significantly more time-consuming process of issuing a NTA consistent with regimented documentary and notice requirements. *Id.* And they allow CBP to safely address future increases in encounters as they arise, recognizing that increases can occur suddenly without warning, creating dangerous opportunities for transnational criminal organizations and smugglers to take advantage of CBP having to focus its limited resources on overcrowding instead of other border concerns. *Id.*;

Declaration of Raul Ortiz (Exhibit A) ¶¶ 9-15. Indeed, at minimum, tens of thousands of noncitizens are heading to the southwest border now, and CBP anticipates that at some point some of them "will attempt to illegally enter" the country. *Id.*, ¶ 12.c. A "crisis point could occur with little to no warning." *Id.*, ¶ 14.

To alleviate overcrowding now and in the future, DHS will likely have to resort to other approaches that are substantially less effective than Parole+ATD or PWC in ensuring that noncitizens are appropriately screened for public safety threats and that they report to be formally charged following their release. Those options potentially include (1) releasing noncitizens with NTRs to an ICE office in the future, but without imposing conditions requiring them to do so or monitoring measures, or (2) in a worst-case scenario, not apprehending certain noncitizens at all. Ex. A, ¶ 13; A218-21. Release without conditions or monitoring provides less incentive for noncitizens to make an appointment with ICE or request an NTA. Indeed, Florida has made clear it would immediately seek to enjoin any such policy, ECF 164, 21-cv-1066 (N.D. Fl.), further demonstrating clear irreparable injury to the government from the two orders on appeal. Transnational criminal organizations may spread misinformation that CBP is releasing without enforcement, which may increase encounter rates. Ex. A, ¶¶ 11(a), 12(a). And failing to apprehend altogether would present enormous public safety and national security concerns. *Id.*, ¶¶ 11-13. When individuals are not apprehended by USBP there is a possibility that those

20

individuals will simply enter the United States. *Id.*, ¶ 13(c). Without processing individuals, it is impossible to know the demographics, vulnerabilities, and national or public safety risk of those individuals entering the United States. *Id*. USBP takes seriously its mission and this option must be avoided.

The timing of the government's stay request, approximately two months after the order vacating Parole+ATD, does not weigh against a stay. Parole+ATD, like PWC, was promulgated to address unusual and exigent overcrowding. Since January 2023, until May 10, DHS managed its detention capacity using the many other tools at its disposal. A211-14. But the increase in border encounters preceding Title 42's end was a significant break from DHS's experience, and raised detention capacity concerns anew. After multiple days of unprecedented encounters and overcapacity, it became clear that the NTA streamlining measures were no longer sufficient. At that point, DHS faced an urgent situation and took action to address the fluid migration circumstances.

Moreover, the significant harms the United States faces as a result of the court's orders and the unavailability of PWC and Parole+ATD as processing options significantly outweigh any harm the Florida may face from a stay. Florida asserts nothing more than speculative injuries "in terms of money, time and energy"—but those are not irreparable. *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Any alleged error from not engaging in notice-and-comment rulemaking is likewise

21

insufficient. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). And even if Florida's alleged harms are credited, they would not outweigh the harm imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), undermining "efficient administration of the immigration laws at the border," *Innovation Law Lab*, 924 F.3d at 510.

**III.    The injunction is invalid and overbroad.**

The district court lacked jurisdiction to enter the injunction and vacatur. And even if it had jurisdiction, both orders were overbroad.

First, the court lacked authority to issue the orders. Section 1252(f) of Title 8—which bars courts from "enjoin[ing] or restrain[ing] the operation of" certain covered INA provisions—precludes injunctive relief, including vacatur, interfering with the government's chosen mean of operating under section 1225(b). *See Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064–65 (2022).

Although the court's orders appear to be directed at section 1182(d)(5), which is not a covered provision, section 1182(d)(5) is a critical part of how the government implements section 1225(b)'s detention provisions. *See Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022). By limiting the government's use of section 1182, the court necessarily "restrain[s] the operation of" section 1225. *Aleman Gonzalez*, 142 S. Ct. at 2064. In particular, the orders effectively require the government to

detain noncitizens under section 1225, or utilize other release mechanisms, thus prohibiting "actions that ([] in the Government's view) are allowed by" that provision. *Id.* at 2066; *see also* 8 U.S.C. § 1252(a)(2)(B)(ii) (barring review of discretionary decisions).

Second, the orders exceeded the court's constitutional and equitable authority. Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018); *see Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (same, rule in equity). Immigration law is not a special context warranting a different rule. All injunctions—even ones involving "national rules and policies"—must be narrowly tailored to remedy the specific harm shown. *Georgia v. President of the United States*, 46 F.4th 1283, 1304 (11th Cir. 2022). Even assuming Florida's asserted harms warrant any relief touching upon the parole processes, Florida fails to show that "complete relief" could not be provided to it by a "non-nationwide" order limited to precluding DHS's implementation of the policies as to noncitizens indicating a final address in Florida. *See id.* at 1308.

## CONCLUSION

The Court should issue an immediate administrative stay, stay the district court's orders pending appeal, and consolidate and expedite the appeals.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
    *General*
WILLIAM C. PEACHEY
  *Director*
/s/ *Erez Reuveni*
EREZ REUVENI
  *Assistant Director*
  U.S. Dep't of Justice, Civil Division
  Office of Immigration Litigation,
  District Court Section
  P.O. Box 868, Ben Franklin Station
  Washington, DC 20044
SARAH S. WILSON
  *Assistant Director*
JOSEPH A. DARROW
  *Trial Attorney*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,196 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Erez Reuveni*
EREZ REUVENI

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system. Plaintiffs' counsel was also notified of this motion by email.

*/s/ Erez Reuveni*
EREZ REUVENI