**Nos. 23-11528, 23-11644**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

STATE OF FLORIDA,

Plaintiff-Appellee,

v.

ALEJANDRO MAYORKAS, Secretary
of Homeland Security, in his official
capacity; et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the Northern District of Florida

---

### APPENDIX TO STAY MOTION

---

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
U.S. Dep't of Justice, Civil Division
Office of Immigration Litigation,
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
SARAH S. WILSON
*Assistant Director*
JOSEPH A. DARROW
*Trial Attorney*

# TABLE OF CONTENTS

Document                                                    Appendix ("A") Page(s)

1. Florida v. United States, No. 21-cv-1066
   District Court Docket Sheet                                          1-26

2. Florida v. Mayorkas, No. 23-cv-9962,
   District Court Docket Sheet                                          27-33

3. Florida v. United States, No. 21-cv-1066,
   Notice of Appeal                                                     34-36

4. Florida v. Mayorkas, No. 23-cv-9962,
   Notice of Appeal                                                     37-39

5. No. 21-cv-1066 Judgment                                              40

6. No. 21-cv-1066 Opinion and Order of Mar. 8, 2023                     41-149

7. No. 21-cv-1066 Order Denying Stay, May 13, 2023                      150-156

8. No. 23-cv-9962 Preliminary Injunction Order                         157-166

9. No. 23-cv-9962 Order Granting TRO                                    167-183

10. No. 23-cv-9962 Order Denying Stay, May 15, 2023                     184-199

11. "Parole Plus Alternative to Detention," Nov. 2, 2021               200-202

12. "Policy on Parole with Conditions in Limited
    Circumstances Prior to Issuance of a Charging Document,"
    May 10, 2021                                                       203-209

13. Declaration of Matthew J. Hudak, May 12, 2023                       210-222

14. Declaration of Daniel A. Bible, May 12, 2023                        223-231

15. "Prosecutorial Discretion," Mar. 19, 2021                          232-233

16. "Policy on the Use of Parole Plus Alternatives to
    Detention to Decompress Border Locations," July 18, 2022          234-237

17. Administrative Record for July 18, 2022
    Parole+ATD Memorandum (excerpt)                                   238-355

18. No. 21-cv-1066, Order of June 6, 2022                             356-360

19. No. 21-cv-1066, Plaintiff's Proposed Findings
    and Post Trial Memorandum                                         361-451

20. No. 21-cv-1066, Defendants' Proposed Findings
    and Post Trial Memorandum                                         452-656

21. No. 23-cv-9962, Plaintiff's Motion for a TRO                      657-673

22. No. 23-cv-9962, Defendants' Opposition to a TRO                   674-714

23. Parole Project for Asylum Seekers at Ports of Entry
    and INS Detention (Apr. 20, 1992)                                 715-718

24. DHS, Implementing the President's Border Security and
    Immigration Enforcement Improvements Policies (Feb. 20, 2017)     719-731

25. ERO, Implementing the President's Border Security and Interior
    Immigration Enforcement Policies (Feb. 21, 2017)                  732-735

26. ICE Parole Directive 11002.1 (Dec. 8, 2009)                      736-745

27. ICE Transportation, Detention and Processing
    Requirements (Jan. 11, 2005)                                      746-747

28. INS, Detention Guidelines Effective October 9, 1998               748-758

# U.S. District Court
## Northern District of Florida (Pensacola)
## CIVIL DOCKET FOR CASE #: 3:21-cv-01066-TKW-ZCB

STATE OF FLORIDA v. UNITED STATES et al
Assigned to: JUDGE T KENT WETHERELL II
Referred to: MAGISTRATE JUDGE ZACHARY C BOLITHO
Case in other court:  ELEVENTH CIRCUIT COURT OF
                      APPEALS, 23-11528-C
Cause: 46:1156 Administrative Procedure Act

Date Filed: 09/28/2021
Date Terminated: 03/08/2023
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**STATE OF FLORIDA**                    represented by    **ANITA J PATEL**
                                                          FLORIDA ATTORNEY GENERALS
                                                          OFFICE
                                                          COMPLEX LITIGATION
                                                          PL-01 THE CAPITOL
                                                          TALLAHASSEE, FL 32399
                                                          850-414-3694
                                                          Email: anita.patel@myfloridalegal.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **BILAL AHMED FARUQUI**
                                                          OFFICE OF THE ATTORNEY GENERAL
                                                          THE CAPITOL PL-01
                                                          TALLAHASSEE, FL 32399-1050
                                                          850-414-3757
                                                          Email: Bilal.Faruqui@myfloridalegal.com
                                                          *TERMINATED: 12/19/2022*

                                                          **JOSEPH EDWARD HART**
                                                          OFFICE OF THE ATTORNEY GENERAL
                                                          EXECUTIVE STAFF
                                                          PL-01 THE CAPITOL
                                                          TALLAHASSEE, FL 32399-1050
                                                          850-245-0160
                                                          Email: joseph.hart@myfloridalegal.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **KAREN ANN BRODEEN**
                                                          OFFICE OF THE ATTORNEY GENERAL
                                                          - TALLAHASSEE FL
                                                          THE CAPITOL STE PL-01
                                                          400 S MONROE ST
                                                          TALLAHASSEE, FL 32399
                                                          850-414-3665
                                                          Fax: 850-488-4872
                                                          Email: karen.brodeen@myfloridalegal.com
                                                          *ATTORNEY TO BE NOTICED*

**A001**

**NATALIE CHRISTMAS**
FLORIDA ATTORNEY GENERALS
OFFICE
PL-01 THE CAPITOL
TALLAHASSEE, FL 32399
850-245-0147
Email:
natalie.christmas@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**JAMES HAMILTON PERCIVAL , II**
FLORIDA ATTORNEY GENERALS
OFFICE
OFFICE OF THE ATTORNEY GENERAL
Pl-01
THE CAPITOL
TALLAHASSEE, FL 32399
850-414-3300
Email: james.percival@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UNITED STATES**                        represented by   **ELISSA FUDIM**
DOJ-CIV
CIVIL DIVISION
PO BOX 868
BEN FRANKLIN STATION
WASHINGTON, DC 20044
202-451-7460
Email: elissa.p.fudim@usdoj.gov
*ATTORNEY TO BE NOTICED*

**ERIN T RYAN**
DOJ-CIV
OFFICE OF IMMIGRATION
LITIGATION
PO BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
202-532-5802
Email: erin.t.ryan@usdoj.gov
*ATTORNEY TO BE NOTICED*

**JOSEPH ANTON DARROW**
DOJ-USAO
CIVIL DIVISION - IMMIGRATION
LITIGATION
PO BOX 868
BEN FRANKLIN STATION
WASHINGTON, DC 20044
202-598-7537

**A002**

Email: joseph.a.darrow@usdoj.gov
*ATTORNEY TO BE NOTICED*

**MARIE ARMSTRONG MOYLE**
DOJ-USAO
111 N ADAMS STREET
4TH FLOOR
TALLAHASSEE, FL 32301
850-942-8430
Email: marie.moyle@usdoj.gov
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**TROY MILLER**                    represented by    **ELISSA FUDIM**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **ERIN T RYAN**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **JOSEPH ANTON DARROW**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**US CUSTOMS AND BORDER**          represented by    **ELISSA FUDIM**
**PROTECTION**                                       (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **ERIN T RYAN**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **JOSEPH ANTON DARROW**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**UR M JADDOU**                    represented by    **ELISSA FUDIM**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **ERIN T RYAN**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **JOSEPH ANTON DARROW**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**A003**

**US CITIZENSHIP AND**                    represented by **ELISSA FUDIM**
**IMMIGRATION SERVICES**                                 (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **ERIN T RYAN**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **JOSEPH ANTON DARROW**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**ALEJANDRO MAYORKAS**          represented by **ELISSA FUDIM**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **ERIN T RYAN**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **JOSEPH ANTON DARROW**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF HOMELAND**      represented by **ELISSA FUDIM**
**SECURITY**                                   (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **ERIN T RYAN**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **JOSEPH ANTON DARROW**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**TAE D JOHNSON**               represented by **ELISSA FUDIM**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **ERIN T RYAN**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

                                               **JOSEPH ANTON DARROW**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**A004**

**US IMMIGRATION AND CUSTOMS ENFORCEMENT**

represented by **ELISSA FUDIM**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ERIN T RYAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOSEPH ANTON DARROW**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Immigration Reform Law Institute**

represented by **MATT A CRAPO**
IMMIGRATION REFORM LAW
INSTITUTE - WASHINGTON DC
25 MASSACHUSETTS AVENUE NW
SUITE 335
WASHINGTON, DC 20001
571-435-3582
Email: mcrapo@irli.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/28/2021 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AFLNDC-6362480.), filed by STATE OF FLORIDA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons) (PERCIVAL, JAMES) (Entered: 09/28/2021) |
| 09/28/2021 | 2 | DOCKET ANNOTATION BY COURT: The parties in the above-referenced case were added to the docket incorrectly and will be corrected by the clerk. Party names are to be entered in all caps and without punctuation. For future reference: Please review the procedure for adding/creating new parties in the "Style Guide for Electronic Case Filing" and/or chapter 10 of the "CM/ECF Attorney User's Guide," available at www.flnd.uscourts.gov. (mb) (Entered: 09/28/2021) |
| 09/28/2021 | 3 | Summons Issued as to UNITED STATES (Attachments: # 1 Summons - ALEJANDRO MAYORKAS, # 2 Summons - TAE JOHNSON, # 3 Summons - TROY MILLER, # 4 Summons - UR M JADDOU, # 5 Summons - US CITIZEN AND IMMIGRATION SERVICES, # 6 Summons - US CUSTOMS AND BORDER PROTECTION, # 7 Summons - US DEPT OF HOMELAND SECURITY, # 8 Summons - US IMMIGRATION AND CUSTOMS ENFORCEMENT), U.S. Attorney and U.S. Attorney General. (mb) (Entered: 09/28/2021) |
| 10/18/2021 | 4 | NOTICE *of Service* by STATE OF FLORIDA re 3 Summons Issued as to USA, 1 Complaint (Attachments: # 1 Exhibit A. Certified Mail Receipts, # 2 Exhibit B. Delivery Confirmation) (PERCIVAL, JAMES) (Entered: 10/18/2021) |
| 12/03/2021 | 5 | MOTION to Transfer Case to Tallahasee Division by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Internal deadline for referral to judge if response not filed earlier: **12/17/2021**). (Attachments: # 1 Memorandum in Support of Motion to Transfer, # 2 |

USCA11 Case: 23-11644      Document: 13      Date Filed: 05/19/2023      Page: 9 of 763

| | | Exhibit A - November 2, 2021 CBP Memorandum) (DARROW, JOSEPH) Modified on 12/6/2021: terminated due to Amended Motion(jfj). (Entered: 12/03/2021) |
|---|---|---|
| 12/03/2021 | 6 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND LACK OF JURISDICTION* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Memorandum in Support of Defendants' Motion to Dismiss, # 2 Exhibit A - November 2, 2021 CBP Memorandum, # 3 Text of Proposed Order) (DARROW, JOSEPH) (Entered: 12/03/2021) |
| 12/03/2021 | 7 | Amended MOTION to Transfer Case to Tallahasee Division *(amended to include proposed order)* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Internal deadline for referral to judge if response not filed earlier: **12/17/2021**). (Attachments: # 1 Memorandum in Support of Motion to Transfer Venue, # 2 Exhibit A - November 2, 2021 CBP Memorandum, # 3 Text of Proposed Order) (DARROW, JOSEPH) (Entered: 12/03/2021) |
| 12/03/2021 | | Set Deadlines Re: 6 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND LACK OF JURISDICTION (Internal deadline for referral to judge if response not filed earlier: **12/17/2021**). (jfj) (Entered: 12/03/2021) |
| 12/10/2021 | 8 | NOTICE of Appearance by NATALIE CHRISTMAS on behalf of STATE OF FLORIDA (CHRISTMAS, NATALIE) (Entered: 12/10/2021) |
| 12/10/2021 | 9 | Joint MOTION for Extensions of Time and Leave to File a Reply Brief by STATE OF FLORIDA. (CHRISTMAS, NATALIE) (Entered: 12/10/2021) |
| 12/13/2021 | 10 | ORDER Granting 9 Parties' Joint Motion for Extension of Time and Leave to File Reply Brief. Plaintiff shall have until December 27, 2021, to respond to Defendants' motion to transfer. Defendants may file a reply in support of the motion to transfer on or before January 10, 2022. The reply shall be limited to 3,200 words. Plaintiff shall have 14 days after the Court rules on the motion to transfer to respond to Defendants' motion to dismiss or to file an amended complaint. Signed by JUDGE T KENT WETHERELL II on 12/13/21. (jfj) (Entered: 12/13/2021) |
| 12/13/2021 | | Set Deadlines/Hearings. (Internal deadline for referral to judge if response not filed earlier: re: Plaintiff's Response to Defendant's Motion to Transfer due by **12/27/2021**) . Defendant's Reply in Support of Motion to Transfer due by **1/10/2022**. (jfj) (Entered: 12/13/2021) |
| 12/27/2021 | 11 | RESPONSE in Opposition re 7 Amended MOTION to Transfer Case to Tallahasee Division *(amended to include proposed order)* filed by STATE OF FLORIDA. (CHRISTMAS, NATALIE) (Entered: 12/27/2021) |
| 01/10/2022 | 12 | REPLY to Response to Motion re 7 Amended MOTION to Transfer Case to Tallahasee Division *(amended to include proposed order)* filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 01/10/2022) |

**A006**

| 01/11/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 12 Reply to Response to Motion, 11 Response in Opposition to Motion, 7 Amended MOTION to Transfer Case to Tallahasee Division (jfj) (Entered: 01/11/2022) |
|---|---|---|
| 01/18/2022 | 13 | ORDER DENYING MOTION TO TRANSFER VENUE. Defendants' amended motion to transfer venue (Doc. 7 ) is DENIED. Plaintiff has 14 days from the date of this Order to respond to Defendants' motion to dismiss (Doc. 6 ) or to file an amended complaint. Signed by JUDGE T KENT WETHERELL II on 01/18/22. (Plaintiff to file response to motion to dismiss or an amended complaint by **2/1/2022**.) (jfj) (Entered: 01/18/2022) |
| 01/27/2022 | 14 | NOTICE of Appearance by MARIE ARMSTRONG MOYLE on behalf of UNITED STATES (MOYLE, MARIE) (Entered: 01/27/2022) |
| 02/01/2022 | 15 | NOTICE of Appearance by HENRY CHARLES WHITAKER on behalf of STATE OF FLORIDA (WHITAKER, HENRY) (Entered: 02/01/2022) |
| 02/01/2022 | 16 | FIRST AMENDED COMPLAINT against All Defendants All Defendants., filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 02/01/2022) |
| 02/01/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 16 FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. (jfj) (Entered: 02/01/2022) |
| 02/02/2022 | 17 | ORDER. Defendants' 6 motion to dismiss is DENIED as moot. Defendants shall have 14 days from the date of this Order to answer or otherwise respond to the 16 amended complaint. Signed by JUDGE T KENT WETHERELL II on 02/02/22.(Answer due by **2/16/2022**.) (jfj) (Entered: 02/02/2022) |
| 02/07/2022 | 18 | Consent MOTION for Extension of Time to File Answer re 17 Order,, Set Deadlines/Hearings, by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Text of Proposed Order) (DARROW, JOSEPH) (Entered: 02/07/2022) |
| 02/08/2022 | 19 | ORDER GRANTING EXTENSION OF TIME re 18 Consent MOTION for Extension of Time to File Answer. Defendants shall have until March 2, 2022, to answer or otherwise respond to the amended complaint. Signed by JUDGE T KENT WETHERELL II on 02/08/22. (jfj) (Entered: 02/08/2022) |
| 02/24/2022 | 20 | MOTION to Stay *Case Pending Supreme Court's Decision in Texas v. Biden* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Supplement Memorandum in Support of Motion to Stay Case) (DARROW, JOSEPH) (Entered: 02/24/2022) |
| 02/24/2022 | | Set Deadlines/Hearings re 20 Motion to Stay the Case Pending the Supreme Court's Decision in Texas v. Biden. (Internal deadline for referral to judge if response not filed earlier: **3/10/2022**). (alb) (Entered: 02/25/2022) |
| 03/01/2022 | 21 | MOTION for Extension of Time to File Answer re 16 Amended Complaint *Unopposed Motion for Extension of Time by Five Days to File Answer or Response to First Amended Complaint* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER |

**A007**

| | | PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 03/01/2022) |
|---|---|---|
| 03/02/2022 | 22 | ORDER GRANTING EXTENSION OF TIME. Defendants' unopposed motion for extension of time (Doc. 21 ), is GRANTED, and Defendants shall have until **March 7, 2022**, to answer or otherwise respond to the amended complaint. Signed by JUDGE T KENT WETHERELL II on 03/02/22. (jfj) (Entered: 03/02/2022) |
| 03/07/2022 | 23 | MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Internal deadline for referral to judge if response not filed earlier: **3/21/2022**). (Attachments: # 1 Memorandum in Support of Motion, # 2 Proposed Order) (DARROW, JOSEPH) (Entered: 03/07/2022) |
| 03/09/2022 | 24 | RESPONSE in Opposition re 20 MOTION to Stay *Case Pending Supreme Court's Decision in Texas v. Biden* filed by STATE OF FLORIDA. (CHRISTMAS, NATALIE) (Entered: 03/09/2022) |
| 03/10/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 20 MOTION to Stay Case Pending Supreme Court's Decision in Texas v. Biden and 24 Response in Opposition to Motion. (jfj) (Entered: 03/10/2022) |
| 03/11/2022 | 25 | ORDER DENYING STAY. Defendants' motion to stay 20 is DENIED. Signed by JUDGE T KENT WETHERELL II on 03/11/22. (jfj) (Entered: 03/11/2022) |
| 03/11/2022 | 26 | INITIAL SCHEDULING ORDER: Fed.R.Civ.P. 7.1 Corporate Disclosure Statement Deadline set for **3/25/2022**. Rule 26 Meeting Report due by **4/25/2022**. Discovery due by **7/11/2022**. Signed by JUDGE T KENT WETHERELL II on 03/11/22. (jfj) (Entered: 03/11/2022) |
| 03/16/2022 | 27 | NOTICE of Appearance by KAREN ANN BRODEEN on behalf of STATE OF FLORIDA (BRODEEN, KAREN) (Entered: 03/16/2022) |
| 03/17/2022 | 28 | Consent MOTION for Extension of Time to File Response/Reply as to 23 MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim* by STATE OF FLORIDA. (CHRISTMAS, NATALIE) (Entered: 03/17/2022) |
| 03/18/2022 | 29 | ORDER GRANTING EXTENSION OF TIME re 28 Consent MOTION for Extension of Time. The motion is GRANTED, and Plaintiff shall have until March 28, 2022, to file its response to Defendants' motion to dismiss. Signed by JUDGE T KENT WETHERELL II on 03/18/22. (Response to motion due by by **3/28/2022**.) (jfj) (Entered: 03/18/2022) |
| 03/22/2022 | 30 | NOTICE of Appearance by ERIN T RYAN on behalf of DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (RYAN, ERIN) (Entered: 03/22/2022) |
| 03/25/2022 | 31 | RESPONSE to Motion re 23 MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 03/25/2022) |
| 03/28/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 23 MOTION to Dismiss for Lack of |

**A008**

| | | |
|---|---|---|
| | | Jurisdiction *And Failure To State A Claim* and 31 Response to Motion. (jfj) (Entered: 03/28/2022) |
| 03/28/2022 | 32 | Consent MOTION for Leave to File re 31 Response to Motion, 23 MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim Motion for Leave to File Reply in Support of Motion to Dismiss the Amended Complaint* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 03/28/2022) |
| 03/28/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 32 CONSENTED-TO MOTION FOR LEAVE TO FILE REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT. (jfj) (Entered: 03/28/2022) |
| 03/29/2022 | 33 | ORDER AUTHORIZING REPLY. Upon due consideration of Defendants' unopposed motion for leave to file reply (Doc. 32 ), it is ORDERED that the motion is GRANTED, and Defendants shall have 7 days from the date of this Order to file a reply in support of their motion to dismiss. The reply shall comply with the word limit in Local Rule 7.1(I). Signed by JUDGE T KENT WETHERELL II on 03/29/22. (Reply due by **4/5/2022**.) (jfj) (Entered: 03/29/2022) |
| 03/31/2022 | 34 | MOTION to Appear Pro Hac Vice by Matt A. Crapo.( Filing fee $ 208 receipt number AFLNDC-6890907.) by Immigration Reform Law Institute. (Attachments: # 1 Certificate of Good Standing) (CRAPO, MATT) (Entered: 03/31/2022) |
| 04/01/2022 | 35 | ORDER re 34 MOTION to Appear Pro Hac Vice. The motion is GRANTED, and attorney Matt A. Crapo is authorized to appear pro hac vice for potential amicus curiae Immigration Reform Law Institute. Signed by JUDGE T KENT WETHERELL II on 04/01/22. (jfj) (Entered: 04/01/2022) |
| 04/01/2022 | 36 | Consent MOTION for Leave to File *Brief of Immigration Reform Law Institute as Amicus Curiae in Opposition to Defendants' Motion to Dismiss* by Immigration Reform Law Institute. (Attachments: # 1 Brief of Immigration Reform Law Institute as Amicus Curiae in Opposition to Defendants' Motion to Dismiss) (CRAPO, MATT) (Entered: 04/01/2022) |
| 04/03/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 36 Consent MOTION for Leave to File *Brief of Immigration Reform Law Institute as Amicus Curiae in Opposition to Defendants' Motion to Dismiss* (jfj) (Entered: 04/03/2022) |
| 04/04/2022 | 37 | ORDER. The motion is GRANTED, and the Immigration Reform Law Institute's amicus brief (Doc. 36 -1) is accepted. Defendants shall address the arguments raised in the amicus brief in their reply in support of their motion to dismiss, and on the Court's own motion, the deadline for the reply is extended by 7 days to April 12, 2022. No further extensions will be granted. Signed by JUDGE T KENT WETHERELL II on 04/04/22. (Reply due by **4/12/2022**.) (jfj) (Entered: 04/04/2022) |
| 04/06/2022 | 38 | REPORT of Rule 26(f) Planning Meeting. (CHRISTMAS, NATALIE) (Entered: 04/06/2022) |
| 04/06/2022 | 39 | FINAL SCHEDULING ORDER Re: 38 Report of Rule 26(f) Planning Meeting: Discovery due by **7/11/2022**. Dispositive Motions to be filed by **8/1/2022**. Signed by JUDGE T KENT WETHERELL II on 04/06/22. (jfj) (Entered: 04/06/2022) |

**A009**

| | | |
|---|---|---|
| 04/12/2022 | [40](#) | REPLY to Response to Motion re [23](#) MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim*, [32](#) Consent MOTION for Leave to File re [31](#) Response to Motion, [23](#) MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim Motion for Leave to File Reply in Support of Motion to Dismiss the Amended Complaint Defendants' Reply in Support of Motion to Dismiss the First Amended Complaint* filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 04/12/2022) |
| 04/13/2022 | [41](#) | RULE 26 Disclosures by STATE OF FLORIDA. (CHRISTMAS, NATALIE) (Entered: 04/13/2022) |
| 04/13/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: [23](#) MOTION to Dismiss for Lack of Jurisdiction And Failure To State A Claim, [31](#) Response to Motion, and [40](#) Reply to Response to Motion. (jfj) (Entered: 04/13/2022) |
| 04/19/2022 | [42](#) | NOTICE *of Supplemental Authority* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (Attachments: # [1](#) Exhibit Stay Decision in Arizona v. Biden, No. 22-3272 (6th Cir. Apr. 12, 2022)) (DARROW, JOSEPH) (Entered: 04/19/2022) |
| 04/20/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: [42](#) NOTICE OF SUPPLEMENTAL AUTHORITY. (jfj) (Entered: 04/20/2022) |
| 04/20/2022 | [43](#) | NOTICE *of Supplemental Authority Response* by STATE OF FLORIDA re [42](#) Notice (Other), (CHRISTMAS, NATALIE) (Entered: 04/20/2022) |
| 04/21/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: [43](#) FLORIDA'S RESPONSE TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY. (jfj) (Entered: 04/21/2022) |
| 04/21/2022 | [44](#) | RULE 26 Disclosures by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 04/21/2022) |
| 05/04/2022 | [45](#) | ORDER DENYING MOTION TO DISMISS. Defendants' motion to dismiss (Doc. [23](#) ) is DENIED. Defendants shall have 14 days from the date of this Order to answer the amended complaint. See Fed. R. Civ. P. 12(a)(4)(A). Signed by JUDGE T KENT WETHERELL II on 05/04/22. (Answer due **5/18/22**.) (jfj) (Entered: 05/04/2022) |
| 05/05/2022 | [46](#) | NOTICE of Appearance by ANITA J PATEL on behalf of STATE OF FLORIDA (PATEL, ANITA) (Entered: 05/05/2022) |
| 05/19/2022 | [47](#) | MOTION to Supplement the Administrative Record for the Parole + ATD Policy by STATE OF FLORIDA. (Attachments: # [1](#) Certified Administrative Record, # [2](#) CBP Email re CDC Guidance, # [3](#) Email re FL Lawsuit, # [4](#) Enforcement Priorities AR Index, # [5](#) MPP AR Index, # [6](#) Epoch Times Article) (CHRISTMAS, NATALIE) (Entered: 05/19/2022) |

**A010**

USCA11 Case: 23-11644    Document: 3-3    Date Filed: 05/19/2023    Page: 14 of 763

| | | |
|---|---|---|
| 05/19/2022 | 48 | Joint MOTION for Extension of Time to Complete Discovery by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 05/19/2022) |
| 05/19/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 47 MOTION to Supplement the Administrative Record for the Parole + ATD Policy, MOTION to Supplement the Administrative Record for the Parole + ATD Policy, 48 Joint MOTION for Extension of Time to Complete Discovery. (alb) (Entered: 05/19/2022) |
| 05/20/2022 | 49 | ORDER re 48 Joint MOTION for Extension of Time to Complete Discovery 47 MOTION to Supplement the Administrative Record for the Parole + ATD Policy. The joint motion to enlarge time to complete discovery is GRANTED and the discovery deadline is extended to August 10, 2022. All deadlines in the scheduling order tied to the discovery deadline are extended likewise. Defendants shall have 7 days from the date of this Order to respond to Plaintiff's motion to supplement the administrative record. (Internal deadline for referral to judge if response not filed earlier: **5/27/2022**). Dispositive Motions to be filed by **8/31/2022**. Discovery due by **8/10/2022**.) Signed by JUDGE T KENT WETHERELL II on 05/20/2022. (alb) (Entered: 05/20/2022) |
| 05/20/2022 | 50 | Consent MOTION for Extension of Time to File Answer re 16 Amended Complaint *respectfully requesting a brief nunc pro tunc extension of time to answer* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (RYAN, ERIN) (Entered: 05/20/2022) |
| 05/22/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 50 DEFENDANTS' CONSENT MOTION FOR A NUNC PRO TUNC EXTENSION OF TIME TO ANSWER THE COMPLAINT. (jfj) (Entered: 05/22/2022) |
| 05/23/2022 | 51 | ORDER GRANTING EXTENSION OF TIME re 50 Consent MOTION for Extension of Time. The motion is GRANTED, and Defendants shall have until **May 24, 2022**, to answer the amended complaint. Signed by JUDGE T KENT WETHERELL II on 05/23/22. (jfj) (Entered: 05/23/2022) |
| 05/23/2022 | 52 | ORDER REASSIGNING CASE. Case reassigned to MAGISTRATE JUDGE ZACHARY C BOLITHO for all further proceedings. MAGISTRATE JUDGE ELIZABETH M TIMOTHY no longer assigned to case. Signed by CHIEF JUDGE MARK E WALKER on 5/23/2022. (erl)**Please use the new judge's initials for all future filings: 3:21cv1066-TKW-ZCB. (Entered: 05/24/2022) |
| 05/24/2022 | 53 | ANSWER to 16 Amended Complaint by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 05/24/2022) |
| 05/27/2022 | 54 | RESPONSE in Opposition re 47 MOTION to Supplement the Administrative Record for the Parole + ATD Policy MOTION to Supplement the Administrative Record for the Parole + ATD Policy filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (RYAN, ERIN) (Entered: 05/27/2022) |

**A011**

| | | |
|---|---|---|
| 05/30/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 47 MOTION to Supplement the Administrative Record for the Parole + ATD Policy and 54 DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTIONTO SUPPLEMENT THE ADMINISTRATIVE RECORD. (jfj) (Entered: 05/30/2022) |
| 06/06/2022 | 55 | ORDER DENYING MOTION TO SUPPLEMENT ADMINISTRATIVE RECORD. Florida's motion to supplement the administrative record for the parole + ATD policy (Doc. 47 ) is DENIED. Signed by JUDGE T KENT WETHERELL II on 06/06/22. (jfj) (Entered: 06/06/2022) |
| 06/10/2022 | 56 | RULE 26 Disclosures by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 06/10/2022) |
| 07/01/2022 | 57 | MOTION for Protective Order *for certain topics listed in plaintiff's 30(b)(6) deposition notice* by DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Exhibit A) (RYAN, ERIN) (Entered: 07/01/2022) |
| 07/05/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 57 DEFENDANTS' MOTION FOR A PROTECTIVE ORDER WITH RESPECT TO TOPICS 3, 9, 14, AND 15 LISTED IN PLAINTIFF'S NOTICE OF 30(b)(6) DEPOSITION. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 07/05/2022) |
| 07/05/2022 | 58 | ORDER entered re 57 Motion for Protective Order. Defendants request an order directing Plaintiff to file any response to their Motion for a Protective Order within seven days and indicate that Plaintiff has consented to filing its opposition within that time frame. (See Doc. 57 at 3). Accordingly, Plaintiffs response to Defendants' Motion for a Protective Order is due on or before July 8, 2022. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 7/5/2022. (hmw) (Entered: 07/05/2022) |
| 07/06/2022 | | Set Deadlines re: 57 Motion for Protective Order. (Internal deadline for referral to judge if response not filed earlier: **7/8/2022**). (jfj) (Entered: 07/06/2022) |
| 07/07/2022 | 59 | RESPONSE in Opposition re 57 MOTION for Protective Order *for certain topics listed in plaintiff's 30(b)(6) deposition notice* filed by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 07/07/2022) |
| 07/07/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 57 MOTION for Protective Order *for certain topics listed in plaintiff's 30(b)(6) deposition notice*, 59 Response in Opposition to Motion. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 07/07/2022) |
| 07/08/2022 | 60 | MOTION to Compel *Production of Documents* by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 07/08/2022) |
| 07/08/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 60 MOTION to Compel *Production of Documents*. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 07/08/2022) |
| 07/08/2022 | | Set Deadlines re: 60 MOTION to Compel Production of Documents by STATE OF FLORIDA. (Internal deadline for referral to judge if response not filed earlier: **7/22/2022**). (jfj) (Entered: 07/08/2022) |
| 07/08/2022 | 61 | Minute Entry for proceedings held before MAGISTRATE JUDGE ZACHARY C BOLITHO:Motion Hearing held on 7/8/2022 re 57 MOTION for Protective Order *for certain topics listed in plaintiff's 30(b)(6) deposition notice* filed by DEPARTMENT OF |

A012

| | | HOMELAND SECURITY and State of Florida's Response in Opposition. (Court Reporter DCR.) (kli) (Entered: 07/08/2022) |
|---|---|---|
| 07/08/2022 | 62 | STATUS REPORT *Parties' Joint Notice Regarding Defendants' Motion for Protective Order* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 07/08/2022) |
| 07/11/2022 | 63 | ORDER entered 60 Motion to Compel. Plaintiff requests an order directing Defendant the Department of Homeland Security (DHS) to file any response to the Motion to Compel within seven days. Plaintiff indicates that DHS consents to filing its opposition within that time frame. (See Doc. 60 at 2, 10). Accordingly, DHS's response to Plaintiffs Motion to Compel is due on or before July 15, 2022. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 7/11/2022. (hmw) (Entered: 07/11/2022) |
| 07/11/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 62 JOINT NOTICE REGARDING DEFENDANTS' MOTION FOR A PROTECTIVE ORDER WITH RESPECT TO TOPICS 3, 9, 14, AND 15 LISTED IN PLAINTIFF'S NOTICE OF 30(b)(6) DEPOSITION. (jfj) (Entered: 07/11/2022) |
| 07/11/2022 | | Set Deadlines re: 60 Motion to Compel. (Internal deadline for referral to judge if response not filed earlier: **7/15/2022**). (jfj) (Entered: 07/11/2022) |
| 07/12/2022 | 64 | ORDER. Defendants' Motion for Protective Order (Doc. 57 ) is: GRANTED with respect to Topic 3; DENIED with respect to Topic 9; DENIED with respect to Topic 14; GRANTED with respect to Topic 15. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 07/12/22. (jfj) (Entered: 07/12/2022) |
| 07/12/2022 | 65 | NOTICE of Appearance by BILAL AHMED FARUQUI on behalf of STATE OF FLORIDA (FARUQUI, BILAL) (Entered: 07/12/2022) |
| 07/13/2022 | 66 | RULE 26 Disclosures by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 07/13/2022) |
| 07/15/2022 | 67 | RESPONSE in Opposition re 60 MOTION to Compel *Production of Documents* filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J) (RYAN, ERIN) (Entered: 07/15/2022) |
| 07/18/2022 | 68 | ORDER. The Court ORDERS counsel to confer telephonically or in person regarding the issues raised in the 60 Motion to Compel. That conference shall occur on or before July 20, 2022. During that conference, the Court expects counsel to endeavor in good faith to resolve any remaining issues raised in the Motion to Compel. By 5:00 p.m. on July 20, 2022, counsel should file a joint notice advising the Court of the status of the issues raised in the Motion to Compel. The notice should include the date that the in person or telephonic conference occurred, as well as the duration of the conference. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 07/18/22. (Joint Notice due by **7/20/2022 5:00 pm**.) (jfj) (Entered: 07/18/2022) |
| 07/20/2022 | 69 | STATUS REPORT *Joint Status Report Regarding Plaintiff's Motion to Compel* by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 07/20/2022) |

**A013**

| | | |
|---|---|---|
| 07/20/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 69 JOINT STATUS REPORT REGARDING PLAINTIFF'S MOTION TO COMPEL. (jfj) (Entered: 07/20/2022) |
| 07/20/2022 | 70 | MOTION re 49 Order,,,, Set Deadlines/Hearings,,, by STATE OF FLORIDA. (Attachments: # 1 Exhibit 1. Barker Deposition, # 2 Exhibit 2. July 18 Memo) (PERCIVAL, JAMES) (Entered: 07/20/2022) |
| 07/21/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 70 FLORIDA'S UNOPPOSED MOTION TO EXTEND DEADLINE TO AMEND PLEADINGS AND ALL REMAINING DEADLINES AND FOR A NEW TRIAL DATE. (jfj) (Entered: 07/21/2022) |
| 07/21/2022 | 71 | ORDER EXTENDING DEADLINES AND RESCHEDULING TRIAL. Upon due consideration of Plaintiff's unopposed motion to extend deadlines and for a new trial date (Doc. 70 ), it is ORDERED that the motion is GRANTED, and: The deadline for amending the pleadings is extended to August 12, 2022. The discovery deadline is extended to September 12, 2022, and all deadlines in the scheduling order (Doc. 39 ) tied to the discovery deadline are extended likewise. The Court has blocked January 9-11, 2023, on its calendar for a potential bench trial, and counsel shall do so as well. (SEE FULL ORDER.) Signed by JUDGE T KENT WETHERELL II on 07/21/22. (Discovery due by 9/12/2022. Dispositive Motions to be filed by 10/3/2022.) (jfj) (Entered: 07/21/2022) |
| 07/21/2022 | 72 | ORDER denying 60 Motion to Compel. Pursuant to the Joint Status Report Regarding Plaintiff's Motion to Compel (Doc. 69), the parties have resolved the issues raised in the motion. In light of this, the Court denies Plaintiff's Motion to Compel (Doc. 60) as moot. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 7/21/2022. (hmw) (Entered: 07/21/2022) |
| 07/21/2022 | 73 | RULE 26 Disclosures by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 07/21/2022) |
| 08/12/2022 | 74 | SECOND AMENDED COMPLAINT *by written consent* against DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT, filed by STATE OF FLORIDA. (Attachments: # 1 Redline) (CHRISTMAS, NATALIE) (Entered: 08/12/2022) |
| 08/15/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 74 Second Amended Complaint. (jfj) (Entered: 08/15/2022) |
| 08/19/2022 | 75 | MOTION to Quash , MOTION for Protective Order by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (RYAN, ERIN) (Entered: 08/19/2022) |
| 08/22/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 75 MOTION to Quash MOTION for Protective Order. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 08/22/2022) |

**A014**

| | | |
|---|---|---|
| 08/22/2022 | 76 | NOTICE OF HEARING. Telephonic Status Conference set for **8/31/2022 at 03:00 PM** in U.S. Courthouse Pensacola before MAGISTRATE JUDGE ZACHARY C BOLITHO. *NOTE: If you have questions in advance of the hearing, feel free to contact me at (850) 470-8141 or via email Sylvia_Williams@flnd.uscourts.gov.* <u>/s/ Sylvia Williams</u> Courtroom Deputy Clerk (sdw) (Entered: 08/22/2022) |
| 08/22/2022 | 77 | MEMORANDUM Conference Call Instructions. (sdw) (Entered: 08/22/2022) |
| 08/22/2022 | | Set Deadlines re 75 Motion to Quash: (Response due **8/26/2022**. Reply due by **8/30/2022**.) (jfj) (Entered: 08/22/2022) |
| 08/26/2022 | 78 | RESPONSE in Opposition re 75 MOTION to Quash MOTION for Protective Order filed by STATE OF FLORIDA. (Attachments: # 1 Exhibit A. DHS Leadership Webpage, # 2 Exhibit B. Barker 30b6 Transcript Vol. II, # 3 Exhibit C. Ortiz Individual Transcript, # 4 Exhibit D. Guadian 30b6 Transcript, # 5 Exhibit E. Barker Individual Transcript, # 6 Exhibit F. Barker Email Exchange) (PERCIVAL, JAMES) (Entered: 08/26/2022) |
| 08/26/2022 | 79 | ANSWER to 74 Amended Complaint, by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 08/26/2022) |
| 08/30/2022 | 80 | REPLY to Response to Motion re 75 MOTION to Quash MOTION for Protective Order filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit F, # 2 Exhibit G) (RYAN, ERIN) (Entered: 08/30/2022) |
| 08/30/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 75 MOTION to Quash MOTION for Protective Order, 78 Response in Opposition to Motion, 80 Reply to Response to Motion. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 08/30/2022) |
| 08/31/2022 | 81 | Minute Entry for proceedings held before MAGISTRATE JUDGE ZACHARY C BOLITHO: Telephonic Motion Hearing held on 8/31/2022 re 75 MOTION to Quash MOTION for Protective Order . Order to be entered. (Court Reporter CD.) (sdw) (Entered: 08/31/2022) |
| 09/02/2022 | 82 | ORDER granting in part and denying in part 75 Motion to Quash, Motion for Protective Order. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 9/2/2022. (hmw) (Entered: 09/02/2022) |
| 09/15/2022 | 83 | NOTICE OF TELEPHONIC HEARING. Telephonic Status Conference set for **9/21/2022 03:00 PM CT** before JUDGE T KENT WETHERELL II. All parties are directed to call the AT&T Conference Line. (SEE FULL NOTICE.) (jfj) (Entered: 09/15/2022) |
| 09/21/2022 | 84 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Telephonic Status Conference held on 9/21/2022. Defense request to increase word limit to 11,000 words on Summary Judgment - Granted. Parties to file exhibits in hard copy with Response (Court Reporter Julie Wycoff). (pmc) (Entered: 09/21/2022) |
| 10/03/2022 | 85 | NOTICE *of Filing Summary Judgment Exhibits* by STATE OF FLORIDA (Attachments: # 1 Exhibit Kynoch Declaration, # 2 Exhibit Stanford Declaration, # 3 Exhibit Lloyd |

<center>A015</center>

USCA11 Case: 23-11644    Document: 3-5    Date Filed: 05/19/2023    Page: 19 of 763

Declaration, # 4 Exhibit Oliva Declaration, # 5 Exhibit Bottcher Declaration, # 6 Exhibit Heckman Declaration, # 7 Exhibit CBP FY 2021 Statistics, # 8 Exhibit CBP FY 2022 Statistics, # 9 Exhibit Letter to Governor DeSantis, # 10 Exhibit ICE Data, # 11 Exhibit Defs' Response to Plf's Interrogatories, # 12 Exhibit Email re Prosecutorial Discretion, # 13 Exhibit Price Deposition, # 14 Exhibit Barker Deposition, # 15 Exhibit Guadian Deposition) (CHRISTMAS, NATALIE) (Entered: 10/03/2022)

| 10/03/2022 | 86 | MOTION for Partial Summary Judgment by STATE OF FLORIDA. (Internal deadline for referral to judge if response to summary judgment not filed earlier: **10/24/2022**). (CHRISTMAS, NATALIE) (Entered: 10/03/2022) |
| 10/03/2022 | 87 | NOTICE *of Filing of Defendants' Summary Judgment Exhibits* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21) (RYAN, ERIN) (Entered: 10/03/2022) |
| 10/03/2022 | 88 | MOTION for Summary Judgment *As To All Claims* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Internal deadline for referral to judge if response to summary judgment not filed earlier: **10/24/2022**). (Attachments: # 1 Supplement Memorandum of Law in Support of Motion for Summary Judgment, # 2 Text of Proposed Order) (DARROW, JOSEPH) (Entered: 10/03/2022) |
| 10/06/2022 | 89 | MOTION *to reopen discovery for limited purposes* by STATE OF FLORIDA. (Attachments: # 1 Exhibit Scott Memo, # 2 Exhibit Discovery Response, # 3 Exhibit Discovery Email) (PERCIVAL, JAMES) (Entered: 10/06/2022) |
| 10/06/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 89 MOTION to reopen discovery for limited purposes. (Motion contains request for an order expediting response time.) (jfj) (Entered: 10/06/2022) |
| 10/06/2022 | 90 | NOTICE *of Intent to Oppose Motion to Reopen Discovery and Request for Expedited Response* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT re 89 MOTION *to reopen discovery for limited purposes* (DARROW, JOSEPH) (Entered: 10/06/2022) |
| 10/06/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 90 NOTICE OF INTENT TO OPPOSE MOTION TO REOPEN DISCOVERY FOR LIMITED PURPOSES. (jfj) (Entered: 10/06/2022) |
| 10/17/2022 | 91 | NOTICE of Appearance by JOSEPH EDWARD HART on behalf of STATE OF FLORIDA (HART, JOSEPH) (Entered: 10/17/2022) |
| 10/20/2022 | 92 | RESPONSE in Opposition re 89 MOTION *to reopen discovery for limited purposes* filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, |

**A016**

| | | |
|---|---|---|
| | | ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (DARROW, JOSEPH) (Entered: 10/20/2022) |
| 10/20/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 89 MOTION to reopen discovery for limited purposes, 92 DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REOPEN DISCOVERY. (jfj) (Entered: 10/20/2022) |
| 10/20/2022 | 93 | AMENDED DOCUMENT by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. Amendment to 92 Response in Opposition to Motion, *Defendants' Corrected Response in Opposition to Plaintiff's Motion to Reopen Discovery for Limited Purposes*. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (DARROW, JOSEPH) (Entered: 10/20/2022) |
| 10/21/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 93 Amended DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REOPEN DISCOVERY. (jfj) (Entered: 10/21/2022) |
| 10/21/2022 | 94 | ORDER DENYING MOTION TO REOPEN DISCOVERY. This case is before the Court based on Plaintiff's motion to reopen discovery (Doc. 89 ) and Defendants' amended response in opposition (Doc. 93 ). Upon due consideration of these filings, their attachments, and the entire case file, the Court finds no good cause to reopen discovery. Accordingly, it is ORDERED that Plaintiff's motion to reopen discovery is DENIED. Signed by JUDGE T KENT WETHERELL II on 10/21/22. (jfj) (Entered: 10/21/2022) |
| 10/24/2022 | 95 | NOTICE *of Filing Exhibits in Opposition to Summary Judgment* by STATE OF FLORIDA re 88 MOTION for Summary Judgment *As To All Claims* (Attachments: # 1 Exhibit Custody and Transfer Statistics FY2020, # 2 Exhibit Biden Campaign Immigration Plan, # 3 Exhibit Flores July 2022 ICE JC Annual Report, # 4 Exhibit May 5 2021 Email re FMUAs, # 5 Exhibit August 2022 Operational Update, # 6 Exhibit FY 2021 DHS Budget in Brief, # 7 Exhibit FY 2023 ICE Budget Justification, # 8 Exhibit Webpage for FY 2023 Budget Justifications, # 9 Exhibit FY 2022 ICE Budget Justification, # 10 Exhibit Border Report, # 11 Exhibit Operation Horizon Phase One Plan, # 12 Exhibit Operation Horizon Phase Two Plan, # 13 Exhibit CBP Processing Pathways, # 14 Exhibit August 1 2022 Email from Joseph Darrow, # 15 Exhibit February 2021 Email re FRC Changes, # 16 Exhibit GAO Report, # 17 Exhibit Barker Depo 1 Excerpts, # 18 Exhibit Barker Depo 2 Excerpts, # 19 Exhibit Guadian Depo Excerpts, # 20 Exhibit Ortiz Depo Excerpts, # 21 Exhibit Price Depo Excerpts, # 22 Exhibit ICE Training Video 1, # 23 Exhibit ICE Training Video 2, # 24 Exhibit Custody and Transfer Statistics FY2022 (Updated)) (PERCIVAL, JAMES) (Entered: 10/24/2022) |
| 10/24/2022 | 96 | NOTICE *of Filing of Exhibits in Support of Defendants' Opposition to Plaintiff's Partial Motion for Summary Judgment* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (Attachments: # 1 Exhibit 1 - Excerpts of Individual Deposition of Corey Price) (DARROW, JOSEPH) (Entered: 10/24/2022) |
| 10/24/2022 | 97 | RESPONSE in Opposition re 86 MOTION for Partial Summary Judgment filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP |

USCA11 Case: 23-11644   Document: 33   Date Filed: 06/19/2023   Page: 21 of 763

| | | |
|---|---|---|
| | | AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 10/24/2022) |
| 10/24/2022 | 98 | RESPONSE in Opposition re 88 MOTION for Summary Judgment *As To All Claims* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 10/24/2022) |
| 10/25/2022 | | Set Deadline re: 97 DEFENDANTS' OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT. Reply due by **10/31/2022**. (jfj) (Entered: 10/25/2022) |
| 10/25/2022 | | Set Deadline re: 98 FLORIDA'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. (Reply due by **10/31/2022**.) (jfj) (Entered: 10/25/2022) |
| 10/25/2022 | 99 | DOCKET ANNOTATION BY COURT: Re 95 NOTICE of Filing Exhibits in Opposition to Summary Judgment by STATE OF FLORIDA. (CD containing Exhibits 22 & 23 received on 10/25/22 and are located in file in Clerk's Office.) (jfj) Modified on 11/2/2022. CD provided to Chambers. (jfj). Modified on 1/19/2023. CD returned to Clerk's Office. (jfj). (Entered: 10/26/2022) |
| 10/27/2022 | 100 | MOTION for Leave to File Excess Pages *requesting 400 extra words for Defendants' summary judgment reply brief* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (RYAN, ERIN) (Entered: 10/27/2022) |
| 10/27/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 100 MOTION for Leave to File Excess Pages *requesting 400 extra words for Defendants' summary judgment reply brief*. (jfj) (Entered: 10/27/2022) |
| 10/28/2022 | 101 | MOTION to File Amicus Brief *in opposition to Defendants' motion for summary judgment* by Immigration Reform Law Institute. (Internal deadline for referral to judge if response not filed earlier: **11/14/2022**). (Attachments: # 1 Brief of amicus curiae Immigration Reform Law Institute in opposition to Defendants motion for summary judgment) (CRAPO, MATT) (Entered: 10/28/2022) |
| 10/28/2022 | 102 | ORDER EXPANDING WORD LIMIT. Upon due consideration of Defendants' motion for enlargement of the word limit for reply (Doc. 100 ), it is ORDERED that the motion is GRANTED, and Defendants may file a reply of up to 3,600 words. Signed by JUDGE T KENT WETHERELL II on 10/28/22. (jfj) (Entered: 10/28/2022) |
| 10/28/2022 | 103 | DOCKET ANNOTATION BY COURT: Binder containing documents 85 & 86 received and Binder containing documents 95 & 98 received. Both binders will be provided to Chambers. (jfj) (Entered: 10/28/2022) |
| 10/28/2022 | 104 | ORDER ACCEPTING AMICUS BRIEF. The motion for leave to file an amicus brief (Doc. 101 ) is GRANTED, and the Immigration Reform Law Institute's amicus brief (Doc. 101-1) is accepted. The parties may address the arguments raised in the amicus brief in their replies by the deadline established in the existing briefing schedule. Signed by JUDGE T KENT WETHERELL II on 10/28/22. (jfj) (Entered: 10/28/2022) |
| 10/31/2022 | 105 | REPLY to Response to Motion re 86 MOTION for Partial Summary Judgment filed by STATE OF FLORIDA. (Attachments: # 1 Exhibit August 23, 2022 Email) (PERCIVAL, JAMES) (Entered: 10/31/2022) |
| 10/31/2022 | 106 | NOTICE *of Filing of Exhibits in Support of Defendants' Reply in Support of their Motion for Summary Judgment* by DEPARTMENT OF HOMELAND SECURITY, UR M |

**A018**

USCA11 Case: 23-11644   Document: 3-2   Date Filed: 05/08/2023   Page: 22 of 763

| | | |
|---|---|---|
| | | JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (Attachments: # 1 Exhibit 1 - Excerpt of Rule 30(b)(6) Deposition of Tony Barker, # 2 Exhibit 2 - ICE Detention Statistics) (DARROW, JOSEPH) (Entered: 10/31/2022) |
| 10/31/2022 | 107 | REPLY to Response to Motion re 88 MOTION for Summary Judgment *As To All Claims* filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 10/31/2022) |
| 10/31/2022 | 108 | NOTICE *of Filing of Acronym Chart for Administrative Record* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (DARROW, JOSEPH) (Entered: 10/31/2022) |
| 11/01/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 86 MOTION for Partial Summary Judgment, 97 Response in Opposition to Motion, 105 Reply to Response to Motion. (jfj) (Entered: 11/01/2022) |
| 11/01/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 88 MOTION for Summary Judgment *As To All Claims*, 98 Response in Opposition to Motion, 107 Reply to Response to Motion. (jfj) (Entered: 11/01/2022) |
| 11/02/2022 | 109 | DOCKET ANNOTATION BY COURT: Spiral bound copies of documents 87 , 88 , 96 , 97 , and 106 received and have been provided to Chambers. (Entered: 11/02/2022) |
| 11/08/2022 | 110 | ORDER. It is ORDERED that within 7 days from the date of this Order, the parties shall confer and advise the Court of multiple mutually agreeable dates and times between November 28 and December 16, 2022, for an in-person oral argument on the summary judgment motions. The Court anticipates reserving 3 hours for the argument and the potential pretrial conference, unless the parties believe that additional time is needed. Signed by JUDGE T KENT WETHERELL II on 11/08/22. (Parties to advise Court by **11/15/2022**.) (jfj) (Entered: 11/08/2022) |
| 11/15/2022 | 111 | NOTICE *of Compliance* by STATE OF FLORIDA re 110 Order,,, Set Deadlines/Hearings,, (PERCIVAL, JAMES) (Entered: 11/15/2022) |
| 11/15/2022 | 112 | MOTION alternative pretrial scheduling order by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (RYAN, ERIN) (Entered: 11/15/2022) |
| 11/15/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 111 JOINT NOTICE OF COMPLIANCE WITH THE COURT'S NOVEMBER 8 ORDER. (jfj) (Entered: 11/15/2022) |
| 11/15/2022 | 113 | RESPONSE in Opposition re 112 MOTION alternative pretrial scheduling order filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 11/15/2022) |

**A019**

| 11/15/2022 | 114 | NOTICE OF TELEPHONIC HEARING set for **11/18/2022 at 2:00 PM** in U.S. Courthouse Pensacola before JUDGE T KENT WETHERELL II (see Notice for Instructions). (pmc) (Entered: 11/15/2022) |
|---|---|---|
| 11/16/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 112 MOTION alternative pretrial scheduling order, 113 Response in Opposition to Motion. (jfj) (Entered: 11/16/2022) |
| 11/17/2022 | 115 | MOTION to Supplement the Summary Judgment Record by STATE OF FLORIDA. (Attachments: # 1 Exhibit March 19 Memo, # 2 Exhibit Lankford Letter) (CHRISTMAS, NATALIE) (Entered: 11/17/2022) |
| 11/17/2022 | | Set Deadlines/Hearings re 115 Florida's Motion to Supplement the Summary Judgment Record. (Internal deadline for referral to judge if response not filed earlier: **12/1/2022**). (alb) (Entered: 11/18/2022) |
| 11/18/2022 | 116 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Telephone Conference held on 11/18/2022. Court grants 115 Motion to Supplement and will accept the memo at doc 115-1 to substitute the 3/20/2021 email on Summary Judgment. Court will enter an order summarizing the rulings denying both 86 , 88 Motions for Summary Judgment. Court denies 112 Motion, Pre-trial conference set for 12/16/2022 at 9am. (3 hours reserved). Bench trial scheduled for 1/9/2023 (4 days); (Court Reporter Julie Wycoff). (Modified, Document 116 replaced on 11/18/2022) (pmc). (Entered: 11/18/2022) |
| 11/18/2022 | 117 | ORDER RULING ON PENDING MOTIONS AND ESTABLISHING PRETRIAL CONFERENCE DATE. Plaintiff's motion to supplement the summary judgment record (Doc. 115 ) is GRANTED, and the memorandum attached to the motion (Doc. 115-1) is included in the summary judgment record with the limitation described above. Defendants' motion for alternative pretrial scheduling order (Doc. 112 ) is DENIED. Plaintiff's motion for partial summary judgment (Doc. 86 ) is DENIED. Defendants' motion for summary judgment is (Doc. 88 ) is DENIED. An in-person pretrial conference is scheduled for December 16, 2022 at 9:00 a.m. (central time) in Pensacola. Signed by JUDGE T KENT WETHERELL II on 11/18/22. (Pretrial Conference set for **12/16/2022 09:00 AM** in U.S. Courthouse Pensacola before JUDGE T KENT WETHERELL II.) (jfj) (Entered: 11/21/2022) |
| 11/18/2022 | 118 | ORDER SCHEDULING TRIAL AND PRETRIAL CONFERENCE AND ESTABLISHING PRETRIAL DEADLINES AND PROCEDURES: Bench Trial set for **1/9/2023 at 09:00 AM** in U.S. Courthouse Pensacola before JUDGE T KENT WETHERELL II. Pretrial Conference set for **12/16/2022 at 09:00 AM** in U.S. Courthouse Pensacola before JUDGE T KENT WETHERELL II. Attorney Conference to take place by **11/25/2022**. Pretrial Stipulation due by **12/9/2022**. Motions in limine and other pretrial motions due by **12/2/2022**. (SEE FULL ORDER) Signed by JUDGE T KENT WETHERELL II on 11/18/22. (jfj) (Entered: 11/21/2022) |
| 11/29/2022 | 119 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, TELEPHONIC STATUS CONFERENCE, held on 11/18/22, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549-5886; julieawycoff@gmail.com.<br><br>*Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* |

**A020**

USCA11 Case: 23-11644    Document: 27-2    Date Filed: 05/19/2023    Page: 24 of 763

| | | |
|---|---|---|
| | | Redaction Request due 12/6/2022. Redacted Transcript Deadline set for 1/6/2023. Release of Transcript Restriction set for 3/6/2023. (jaw) (Entered: 11/29/2022) |
| 12/02/2022 | [120](#) | MOTION in Limine *Defendants' Omnibus Motions in Limine* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # [1](#) Exhibit A - Nov. 18, 2022 Hearing Transcript) (DARROW, JOSEPH) (Entered: 12/02/2022) |
| 12/05/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: [120](#) MOTION in Limine *Defendants' Omnibus Motions in Limine* (jfj) (Entered: 12/05/2022) |
| 12/07/2022 | [121](#) | NOTICE of Appearance by ELISSA FUDIM on behalf of DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (FUDIM, ELISSA) (Entered: 12/07/2022) |
| 12/09/2022 | [122](#) | PRETRIAL Stipulation by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 12/09/2022) |
| 12/09/2022 | [123](#) | RESPONSE in Opposition re [120](#) MOTION in Limine *Defendants' Omnibus Motions in Limine* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 12/09/2022) |
| 12/11/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: [122](#) Pretrial Memorandum, [120](#) MOTION in Limine *Defendants' Omnibus Motions in Limine*, [123](#) Response in Opposition to Motion. (jfj) (Entered: 12/11/2022) |
| 12/12/2022 | [124](#) | ORDER. Any objections to Rule 26(a)(3) designations shall be filed before the pretrial conference or they may be deemed waived. Signed by JUDGE T KENT WETHERELL II on 12/12/2022. (alb) (Entered: 12/12/2022) |
| 12/13/2022 | [125](#) | NOTICE *of Deposition Designations* by STATE OF FLORIDA (Attachments: # [1](#) Exhibit Price Depo, # [2](#) Exhibit Ortiz Depo, # [3](#) Exhibit Barker Depo, # [4](#) Exhibit Guadian Depo, # [5](#) Exhibit Davies Depo) (HART, JOSEPH) (Entered: 12/13/2022) |
| 12/13/2022 | [126](#) | NOTICE *of Deposition Designations at Trial* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (Attachments: # [1](#) Exhibit A - Barker July 13, 2022 Depo, # [2](#) Exhibit B - Barker Aug 25, 2022 Depo) (RYAN, ERIN) (Entered: 12/13/2022) |
| 12/15/2022 | [127](#) | NOTICE *of Filing Objections and Counter Designations* by STATE OF FLORIDA re [126](#) Notice (Other), (Attachments: # [1](#) Exhibit Barker July Deposition Counter Designations, # [2](#) Exhibit Barker August Deposition Counter Designations) (PERCIVAL, JAMES) (Entered: 12/15/2022) |
| 12/15/2022 | [128](#) | NOTICE *of Objections and Counter Designations* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT re [125](#) Notice (Other) (Attachments: # [1](#) Barker designation excerpts, |

**A021**

| | | Davies designation excerpts, # 3 Oladian designation excerpts, # 4 Ortiz designation excerpts, # 5 Price designation excerpts) (RYAN, ERIN) (Entered: 12/15/2022) |
|---|---|---|
| 12/16/2022 | 129 | Consent MOTION to Withdraw as Attorney by STATE OF FLORIDA. (FARUQUI, BILAL) (Entered: 12/16/2022) |
| 12/16/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 129 Consent MOTION to Withdraw as Attorney (jcw) (Entered: 12/16/2022) |
| 12/16/2022 | 131 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Final Pretrial Conference held on 12/16/2022. Bench Trial remains scheduled for 1/9/2023 at 9:00 AM. See Final Pretrial Order entered (Court Reporter Julie Wycoff). (pmc) (Entered: 12/20/2022) |
| 12/19/2022 | 130 | FINAL PRETRIAL ORDER re granting 129 Motion to Withdraw as Attorney; granting in part and denying in part 120 Motion in Limine. The bench trial will begin at 9:00 a.m. on Monday, **1/9/2023**, as previously ordered. [See Order] Signed by JUDGE T KENT WETHERELL II on 12/19/2022. (jcw) (Entered: 12/19/2022) |
| 12/22/2022 | 132 | Consent MOTION for Protective Order by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Text of Proposed Order Proposed Stipulated Protective Order) (DARROW, JOSEPH) (Entered: 12/22/2022) |
| 12/22/2022 | 133 | STIPULATED PROTECTIVE ORDER RE: 132 UNOPPOSED MOTION FOR PROTECTIVE ORDER. This protective order is entered into between the Parties in this litigation to facilitate the Court-ordered disclosure of the address and telephone number of non-party Tony Barker (Mr. Barker's Contact Information) by Defendants to Plaintiff. See ECF No. 130 . (SEE FULL ORDER) Signed by JUDGE T KENT WETHERELL II on 12/22/22. (jfj) (Entered: 12/22/2022) |
| 12/27/2022 | 134 | Consent MOTION for Clarification re 130 Pretrial Order, by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 12/27/2022) |
| 12/28/2022 | 135 | ORDER OF CLARIFICATION re 134 Consent MOTION for Clarification. Accordingly, it is ORDERED that Plaintiff's motion for clarification is GRANTED, and the final pretrial order is clarified as reflected above. Signed by JUDGE T KENT WETHERELL II on 12/28/2022. (jcw) (Entered: 12/28/2022) |
| 01/02/2023 | 136 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, PRETRIAL HEARING, held on 12/16/22, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850.549.5886 julieawycoff@gmail.com. *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* Redaction Request due **1/9/2023**. Release of Transcript Restriction set for **4/10/2023**. (jaw) (Entered: 01/02/2023) |
| 01/03/2023 | 137 | MOTION re 122 Pretrial Memorandum *motion to amend Defendants' witness list* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US |

**A022**

| | | |
|---|---|---|
| | | IMMIGRATION AND CUSTOMS ENFORCEMENT/RYAN, ERIN. Modified/Terminated on 1/9/2023. Order 141 granting motion filed 01/05/23. (jfj). (Entered: 01/03/2023) |
| 01/04/2023 | 138 | MOTION to Amend Exhibit List re 122 Pretrial Memorandum by STATE OF FLORIDA. (Attachments: # 1 Exhibit January 28 email, # 2 Exhibit Florida's FOIA request) (PERCIVAL, JAMES) (Entered: 01/04/2023) |
| 01/04/2023 | 139 | RESPONSE in Opposition re 137 MOTION re 122 Pretrial Memorandum *motion to amend Defendants' witness list* filed by STATE OF FLORIDA. (Attachments: # 1 Exhibit Emails between counsel, # 2 Exhibit Emails between counsel) (PERCIVAL, JAMES) (Entered: 01/04/2023) |
| 01/04/2023 | 140 | NOTICE OF TELEPHONIC HEARING. TAKE NOTICE that a telephonic hearing in this case has been set before Judge T. Kent Wetherell as described below: DATE: Thursday, January 5, 2023, TIME: 10:00 A.M. C.T. (SEE FULL NOTICE) Signed by JUDGE T KENT WETHERELL II on 01/04/23. (Telephonic hearing set for **1/5/2023 10:00 AM** before JUDGE T KENT WETHERELL II.) (jfj) (Entered: 01/04/2023) |
| 01/04/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 138 FLORIDA'S MOTION TO SUPPLEMENT ITS EXHIBIT LIST, 137 DEFENDANTS' MOTION TO AMEND THEIR TRIAL WITNESS LIST, 139 Response in Opposition to Motion. (jfj) (Entered: 01/04/2023) |
| 01/05/2023 | 141 | ORDER. Defendants' 138 motion to amend witness list is GRANTED. (Please see order.) Signed by JUDGE T KENT WETHERELL II on 01/05/2023. (alb) (Entered: 01/05/2023) |
| 01/05/2023 | 142 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Telephonic Hearing held on 1/5/2023, 138 Motion to Amend Exhibit list **-** Granted, 137 Motion to Amend Witness list **-** Granted. Order to be entered (Court Reporter Julie Wycoff). (pmc) (Entered: 01/05/2023) |
| 01/08/2023 | 143 | NOTICE *of Supplemental Deposition Designations, Objections, and Stipulations* by STATE OF FLORIDA (Attachments: # 1 Bottcher Excerpts, # 2 Heckman Excerpts) (PERCIVAL, JAMES) (Entered: 01/08/2023) |
| 01/09/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 143 JOINT NOTICE OF SUPPLEMENTAL DEPOSITION DESIGNATIONS, OBJECTIONS, AND STIPULATIONS. (jfj) (Entered: 01/09/2023) |
| 01/09/2023 | 144 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Bench Trial (Day 1) 1/9/2023, evidence entered. Trial continues (Court Reporter Julie Wycoff). (pmc) (Entered: 01/10/2023) |
| 01/10/2023 | 145 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Bench Trial (Day 2) 1/10/2023, evidence entered. Trial continues (Court Reporter Julie Wycoff). (pmc) (Entered: 01/11/2023) |
| 01/11/2023 | 146 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Bench Trial (Day 3) 1/11/2023, evidence entered. Trial continues (Court Reporter Julie Wycoff). (pmc) (Entered: 01/12/2023) |
| 01/12/2023 | 147 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Bench Trial (Day 4) 1/12/2023, evidence entered (2 boxes Exhibits). Trial concluded, Counsel to file briefs by 2/9/2023. Order to be entered on findings (Court Reporter Julie Wycoff). Attachment: # 1 Exhibit Lists. (pmc) (Entered: 01/17/2023) |

A023

| | | |
|---|---|---|
| 01/20/2023 | [148](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, BENCH TRIAL - DAY 1, held on 1/9/23, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549-5886; julieawycoff@gmail.com. *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* Redaction Request due **1/27/2023**. Release of Transcript Restriction set for **4/27/2023**. (jaw) (Entered: 01/20/2023) |
| 01/20/2023 | [149](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, BENCH TRIAL - DAY 2, held on 1/10/23, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549-5886; julieawycoff@gmail.com. *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* Redaction Request due **1/27/2023**. Release of Transcript Restriction set for **4/27/2023**. (jaw) (Entered: 01/20/2023) |
| 01/20/2023 | [150](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, BENCH TRIAL - DAY 3, held on 1/11/23, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549-5886; julieawycoff@gmail.com. *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* Redaction Request due **1/27/2023**. Release of Transcript Restriction set for **4/27/2023**. (jaw) (Entered: 01/20/2023) |
| 01/24/2023 | [151](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, BENCH TRIAL - DAY 4, held on 1/12/23, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549-5886; julieawycoff@gmail.com. *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* Redaction Request due **1/31/2023**. Release of Transcript Restriction set for **5/1/2023**. (jaw) (Entered: 01/24/2023) |
| 01/27/2023 | [152](#) | Consent MOTION for Extension of Time to File *the parties' post-trial briefs* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (RYAN, ERIN) (Entered: 01/27/2023) |
| 01/27/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: [152](#) Consent MOTION for Extension of Time to File the parties' post-trial briefs. (jfj) (Entered: 01/27/2023) |
| 01/30/2023 | [153](#) | ORDER GRANTING EXTENSION OF TIME. Upon due consideration of Defendants' consent motion for extension of time (Doc. [152](#) ), it is ORDERED that the motion is |

**A024**

| | | |
|---|---|---|
| | | GRANTED; and the parties shall have until February 16, 2023, to file their proposed findings of fact and conclusions of law. Signed by JUDGE T KENT WETHERELL II on 01/30/23. (Proposed Findings of Fact and Conclusions of Law due by **2/16/2023**.) (jfj) (Entered: 01/30/2023) |
| 02/14/2023 | 154 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, TELEPHONIC HEARING, held on 1/5/23, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549-5886; julieawycoff@gmail.com.<br><br>*Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.*<br><br>Redaction Request due **2/21/2023**. Release of Transcript Restriction set for **5/22/2023**. (jaw) (Entered: 02/14/2023) |
| 02/16/2023 | 155 | Proposed Findings of Fact by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 02/16/2023) |
| 02/16/2023 | 156 | Proposed Findings of Fact by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit A - Complaint in Smith v. Meese) (DARROW, JOSEPH) (Entered: 02/16/2023) |
| 02/17/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 155 Proposed Findings of Fact, 156 Proposed Findings of Fact. (jfj) (Entered: 02/17/2023) |
| 03/08/2023 | 157 | OPINION AND ORDER. The deferred portion of Defendants' motion for summary judgment (Doc. 88 ) is DENIED. The Parole+ATD Policy is VACATED under the APA, and that policy is REMANDED to DHS for further proceedings consistent with this Opinion and Order. The Clerk shall enter a final judgment. The Judgment is STAYED for 7 days from this date to allow Defendants to seek appellate review. The Clerk shall close the case file.(SEE FULL ORDER) Signed by JUDGE T KENT WETHERELL II on 03/08/23. (jfj) (Entered: 03/08/2023) |
| 03/08/2023 | 158 | CLERK'S JUDGMENT re 157 Order. Pursuant to and at the direction of the Court, Judgment is entered in favor of Plaintiff on Counts 2, 4, and 6 of the second amended complaint, and the Parole+ATD Policy is vacated and remanded to the Department of Homeland Security for further proceedings consistent with the Opinion and Order entered on this date. Judgment is entered in favor of Defendants on Counts 1, 3, 5, 7 and 8 of the second amended complaint and those claims are dismissed with prejudice. (90 Day Exhibit Return Deadline set for **6/6/2023**) (jfj) (Entered: 03/08/2023) |
| 05/05/2023 | 159 | NOTICE OF APPEAL as to 158 Clerk's Judgment,, 157 Order,, by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. ( (DARROW, JOSEPH) (Entered: 05/05/2023) |
| 05/09/2023 | 160 | Appeal Instructions re: 159 Notice of Appeal: The Transcript Request Form is available on the Internet at https://www.flnd.uscourts.gov/form/eleventh-circuit-transcript-information-form |

**A025**

USCA11 Case: 23-11654   Document: 2-2   Date Filed: 05/19/2023   Page: 29 of 763

| | | |
|---|---|---|
| | | PLEASE NOTE: Separate forms must be filed for each court reporter in both the district court and the appeals court. Transcript Order Form due by **5/23/2023**. (jfj) (Entered: 05/09/2023) |
| 05/09/2023 | [161](#) | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re [159](#) Notice of Appeal. (jfj) (Entered: 05/09/2023) |
| 05/09/2023 | | Set Deadlines re [159](#) Notice of Appeal: Clerk to check status of Appeal on **8/3/2023**. Certificate of Readiness (FRAP 11) due by **5/23/2023**. (jfj) (Entered: 05/09/2023) |
| 05/09/2023 | [162](#) | USCA PROCEDURAL LETTER re: [159](#) NOTICE OF APPEAL as to [158](#) Clerk's Judgment, [157](#) Order. USCA Appeal # 23-11528-C. (jfj) (Entered: 05/12/2023) |
| 05/12/2023 | [163](#) | Emergency MOTION to Stay re [158](#) Clerk's Judgment,, [157](#) Order,, *and Temporary Restraining Order in No. 23-9962 Pending Appeal* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # [1](#) Exhibit A - May 12, 2023 Declaration of Matthew Hudak, # [2](#) Exhibit B - May 12, 2023 Declaration of Daniel Bible, # [3](#) Proposed Order) (DARROW, JOSEPH) (Entered: 05/12/2023) |
| 05/13/2023 | [164](#) | RESPONSE to Motion re [163](#) Emergency MOTION to Stay re [158](#) Clerk's Judgment,, [157](#) Order,, *and Temporary Restraining Order in No. 23-9962 Pending Appeal* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 05/13/2023) |
| 05/13/2023 | [165](#) | ORDER DENYING STAY. ORDERED that Defendants' emergency motion to stay (Doc. [163](#) ) is DENIED. Signed by JUDGE T KENT WETHERELL II on 5/13/2023. (pmc) (Entered: 05/13/2023) |
| 05/16/2023 | [166](#) | NOTICE OF CROSS APPEAL by STATE OF FLORIDA. Filing fee $ 505, receipt number AFLNDC-7872142. (CHRISTMAS, NATALIE) (Entered: 05/16/2023) |

---

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/17/2023 13:16:14 | | | |
| **PACER Login:** | jdarrow1 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cv-01066-TKW-ZCB |
| **Billable Pages:** | 24 | **Cost:** | 2.40 |

**A026**

# U.S. District Court
## Northern District of Florida (Pensacola)
### CIVIL DOCKET FOR CASE #: 3:23-cv-09962-TKW-ZCB

STATE OF FLORIDA v. MAYORKAS et al                    Date Filed: 05/10/2023
Assigned to: JUDGE T KENT WETHERELL II               Jury Demand: None
Referred to: MAGISTRATE JUDGE ZACHARY C BOLITHO      Nature of Suit: 899 Other Statutes:
Cause: 05:551 Administrative Procedure Act           Administrative Procedures Act/Review or
                                                     Appeal of Agency Decision
                                                     Jurisdiction: U.S. Government Defendant

**Plaintiff**

**STATE OF FLORIDA**                  represented by   **ANITA J PATEL**
                                                       FLORIDA ATTORNEY GENERALS
                                                       OFFICE
                                                       COMPLEX LITIGATION
                                                       PL-01 THE CAPITOL
                                                       TALLAHASSEE, FL 32399
                                                       850-414-3694
                                                       Email: anita.patel@myfloridalegal.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **DANIEL WILLIAM BELL**
                                                       FLORIDA ATTORNEY GENERALS
                                                       OFFICE
                                                       PL-01 THE CAPITOL
                                                       TALLAHASSEE, FL 32399
                                                       786-473-2923
                                                       Email: daniel.bell@myfloridalegal.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **HENRY CHARLES WHITAKER**
                                                       FLORIDA OFFICE OF THE ATTORNEY
                                                       GENERAL
                                                       PL-01 THE CAPITOL
                                                       TALLAHASSEE, FL 32399-1050
                                                       850-414-3688
                                                       Email: henry.whitaker@myfloridalegal.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **JOHN MATTHEW GUARD**
                                                       FLORIDA ATTORNEY GENERAL'S
                                                       OFFICE
                                                       EXECUTIVE STAFF
                                                       PL-01 THE CAPITOL
                                                       TALLAHASSEE, FL 32399
                                                       850-245-0140
                                                       Email: john.guard@quarles.com
                                                       *ATTORNEY TO BE NOTICED*

**A027**

JOSEPH EDWARD HART
OFFICE OF THE ATTORNEY GENERAL
EXECUTIVE STAFF
PL-01 THE CAPITOL
TALLAHASSEE, FL 32399-1050
850-245-0160
Email: joseph.hart@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**NATALIE CHRISTMAS**
FLORIDA ATTORNEY GENERALS
OFFICE
PL-01 THE CAPITOL
TALLAHASSEE, FL 32399
850-245-0147
Email:
natalie.christmas@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**JAMES HAMILTON PERCIVAL , II**
FLORIDA ATTORNEY GENERALS
OFFICE
OFFICE OF THE ATTORNEY GENERAL
Pl-01
THE CAPITOL
TALLAHASSEE, FL 32399
850-414-3300
Email: james.percival@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ALEJANDRO MAYORKAS**                    represented by  **JOSEPH ANTON DARROW**
DOJ-USAO
CIVIL DIVISION - IMMIGRATION
LITIGATION
PO BOX 868
BEN FRANKLIN STATION
WASHINGTON, DC 20044
202-598-7537
Email: joseph.a.darrow@usdoj.gov
*ATTORNEY TO BE NOTICED*

**SARAH B FABIAN**
DOJ-CIV
OFFICE OF IMMIGRATION
LITIGATION
BEN FRANKLIN STATION
PO BOX 868
WASHINGTON, DC 20044
202-532-4824

**A028**

USCA11 Case: 23-11644    Document: 3-3    Date Filed: 05/19/2023    Page: 32 of 763

Email: sarah.b.fabian@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**RAUL ORTIZ**                          represented by    **JOSEPH ANTON DARROW**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **SARAH B FABIAN**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES**                       represented by    **JOSEPH ANTON DARROW**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **SARAH B FABIAN**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 05/10/2023 | 1 | COMPLAINT *for Temporary Restraining Order, Preliminary and Permanent Injunctive Relief, and Declaratory Relief* against All Defendants ( Filing fee $ 402 receipt number AFLNDC-7864201.), filed by State of Florida. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit Proposed Summons) (PERCIVAL, JAMES) (Entered: 05/10/2023) |
| 05/10/2023 |   | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 1 COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND DECLARATORY RELIEF. (jfj) (Entered: 05/10/2023) |
| 05/11/2023 | 2 | Emergency MOTION for Temporary Restraining Order by State of Florida. (Attachments: # 1 Exhibit Emails with Counsel) (PERCIVAL, JAMES) (Entered: 05/11/2023) |
| 05/11/2023 |   | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 2 Emergency MOTION for Temporary Restraining Order. (jfj) (Entered: 05/11/2023) |
| 05/11/2023 | 3 | ORDER REQUIRING EXPEDITED RESPONSE. Florida shall email a copy of this Order on the attorneys who represented the defendants in Florida. Defendants shall have until 4:00 p.m. eastern time to respond to Florida's emergency motion for a TRO (Doc. 2 ). The response shall be e-filed through CM/ECF and emailed to flnd_wetherell@flnd.uscourts.gov. Signed by JUDGE T KENT WETHERELL II on 05/11/23. (jfj) (Entered: 05/11/2023) |
| 05/11/2023 | 4 | Summons Issued as to Alejandro Mayorkas, Raul Ortiz, United States. (Attachments: # 1 Summons, # 2 Summons) (jfj) (Entered: 05/11/2023) |
| 05/11/2023 | 5 | NOTICE *of Filing Copy of Challenged Policy* by State of Florida re 2 Emergency MOTION for Temporary Restraining Order (Attachments: # 1 Exhibit The Challenged Policy) (PERCIVAL, JAMES) (Entered: 05/11/2023) |
| 05/11/2023 |   | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT |

A029

WETHERELL II notified that action is needed Re: 5 Notice. (jfj) (Entered: 05/11/2023)

| 05/11/2023 | 6 | NOTICE of Appearance by JOSEPH ANTON DARROW on behalf of All Defendants (DARROW, JOSEPH) (Entered: 05/11/2023) |
|---|---|---|
| 05/11/2023 | 7 | MOTION for Extension of Time to File Response/Reply as to 3 Order, *Notice of Receiving Complaint and TRO* by Alejandro Mayorkas, Raul Ortiz, United States. (Attachments: # 1 Exhibit A - May 10, 2023 Memorandum) (DARROW, JOSEPH) (Entered: 05/11/2023) |
| 05/11/2023 | 8 | ORDER. Defendants' motion for extension of time (Doc. 7 ) is GRANTED in part, and Defendants shall have until 5:00 p.m. eastern time today to respond to Plaintiff's emergency motion for a TRO. Signed by JUDGE T KENT WETHERELL II on 05/11/23. (jfj) (Entered: 05/11/2023) |
| 05/11/2023 | 9 | RESPONSE in Opposition re 2 Emergency MOTION for Temporary Restraining Order filed by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES. (Attachments: # 1 Exhibit A - Policy on Parole With Conditions, # 2 Exhibit B - Matthew Hudak Declaration) (DARROW, JOSEPH) (Entered: 05/11/2023) |
| 05/11/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 9 OPPOSITION TO EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER. (jfj) (Entered: 05/11/2023) |
| 05/11/2023 | 10 | TEMPORARY RESTRAINING ORDER re 2 Emergency MOTION for Temporary Restraining Order. ORDERED that: DHS is enjoined from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum from U.S. Border Patrol Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)." This TRO will take effect at 11:59 p.m. eastern time to correspond with the expiration of the Title 42 Order and to give Defendants an opportunity to seek an emergency stay from a higher court. This TRO will expire 14 days from the date of this Order. See Fed. R. Civ. P. 65(b)(2). A preliminary injunction hearing is scheduled for May 19, 2023, at 9:00 a.m. in the United States Courthouse, 1 North Palafox Street, Courtroom 4 North, Pensacola, Florida. Signed by JUDGE T KENT WETHERELL II on 5/11/2023. (pmc) (Entered: 05/11/2023) |
| 05/11/2023 | | Set Hearing: Preliminary Injunction Hearing set for **5/19/2023 at 9:00 AM** in U.S. Courthouse Pensacola before JUDGE T KENT WETHERELL II. (pmc) (Entered: 05/11/2023) |
| 05/12/2023 | 11 | MOTION to Compel Production of Administrative Record and for Limited Discovery by STATE OF FLORIDA. (Attachments: # 1 Exhibit Conferral with counsel) (PERCIVAL, JAMES) (Entered: 05/12/2023) |
| 05/12/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 11 MOTION to Compel Production of Administrative Record and for Limited Discovery. (alb) Modified on 5/12/2023 (jfj) Motion now referred to Magistrate Judge. (Entered: 05/12/2023) |
| 05/12/2023 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 11 TIME SENSITIVE MOTION FOR LIMITED DISCOVERY AND TO COMPEL PRODUCTION OF THE ADMINISTRATIVE RECORD. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 05/12/2023) |
| 05/12/2023 | 12 | ORDER entered re Florida's 11 Motion to Compel Production of Administrative Record and for Limited Discovery. Defendants shall have until May 15, 2023 at 12:00 p.m. (EST) to respond to Florida's motion. The Court will hold a telephone hearing on Florida's motion on May 15, 2023 at 3:30 p.m. (EST). Call-in instructions will be circulated by the Court |

the morning of May 13, 2023. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 5/12/2023. (hmw) (Entered: 05/12/2023)

| 05/12/2023 | 13 | Emergency MOTION to Stay re 10 Temporary Restraining Order,,, and *Vacatur Pending Appeal* by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES. (Attachments: # 1 Exhibit A - May 12, 2023 Declaration of Matthew Hudak, # 2 Exhibit B - May 12, 2023 Declaration of Daniel Bible, # 3 Text of Proposed Order Proposed Order) (DARROW, JOSEPH) (Entered: 05/12/2023) |
|---|---|---|
| 05/13/2023 | 14 | RESPONSE to Motion re 13 Emergency MOTION to Stay re 10 Temporary Restraining Order,,, and *Vacatur Pending Appeal* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 05/13/2023) |
| 05/13/2023 | 15 | ORDER SHORTENING RESPONSE PERIOD - Plaintiff shall have until noon central time on Monday, May 15, 2023, to respond to Defendants' motion to stay 13 and explain why the TRO should not be converted into a preliminary injunction. By that same deadline, **5/15/2023**, each party may submit a proposed preliminary injunction for the Court's consideration in the event the Court decides to deny the motion to stay and grant Plaintiff's request to convert the TRO into a preliminary injunction. (Internal deadline for referral to judge if response not filed earlier: **5/15/2023**). Signed by JUDGE T KENT WETHERELL II on 5/13/2023. (erl) (Entered: 05/13/2023) |
| 05/14/2023 | 16 | NOTICE of *Joint Stipulation Regarding Further Proceedings* by STATE OF FLORIDA (PERCIVAL, JAMES) (Entered: 05/14/2023) |
| 05/15/2023 | 17 | ORDER TO SHOW CAUSE. It has come to the Court's attention that there are published news reports stating that DHS "paroled" 2,500 aliens after the Court entered its temporary restraining order. No later than 2:00 p.m. central time today, Defendants shall file a report with the Court addressing the allegations in the article referenced above, and if the allegations are true, Defendants shall show cause why they should not be held in contempt for violating the temporary restraining order. (SEE FULL ORDER) Signed by JUDGE T KENT WETHERELL II on 05/15/23. (Show Cause Response due by 2:00 p.m. central time on **5/15/2023**. (jfj) (Entered: 05/15/2023) |
| 05/15/2023 | 18 | ORDER. The preliminary injunction hearing scheduled for May 19, 2023, is cancelled. The parties shall confer in an effort to reach a stipulation regarding the number of daily encounters during the days or weeks leading up to the expiration of the Title 42 Order and the number of daily encounters since. The stipulation shall be filed as soon as possible today, preferably by the deadline for the proposed preliminary injunctions. If the parties cannot reach a stipulation, they shall explain in their proposed preliminary injunctions why the Court cannot take judicial notice of the statements that have been attributed to the DHS Secretary about the lower- than-expected number of encounters in evaluating the weight of the evidence currently before the Court and in determining whether to stay the TRO and/or enter a preliminary injunction. (SEE FULL ORDER) Signed by JUDGE T KENT WETHERELL II on 05/15/23. (jfj) (Entered: 05/15/2023) |
| 05/15/2023 | 19 | According to the parties' 16 Notice of Joint Stipulation Regarding Further Proceedings, Florida has withdrawn its 11 Motion to Compel Production of Administrative Record and for Limited Discovery without prejudice to filing a similar motion later in the proceedings as may be appropriate. The Clerk of Court, therefore, is directed to terminate the motion 11 . The hearing scheduled for today at 3:30pm (EST) is canceled. (See Doc. 12). Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 5/15/2023. (hmw) (Entered: 05/15/2023) |
| 05/15/2023 | 20 | NOTICE of Appearance by SARAH B FABIAN on behalf of All Defendants (FABIAN, SARAH) (Entered: 05/15/2023) |

| 05/15/2023 | 21 | RESPONSE in Opposition re 13 Emergency MOTION to Stay re 10 Temporary Restraining Order,,, *and Vacatur Pending Appeal* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 05/15/2023) |
| 05/15/2023 | 22 | NOTICE *of Filing Proposed Order* by STATE OF FLORIDA (PERCIVAL, JAMES) (Entered: 05/15/2023) |
| 05/15/2023 | 23 | NOTICE of Appearance by DANIEL WILLIAM BELL on behalf of STATE OF FLORIDA (BELL, DANIEL) (Entered: 05/15/2023) |
| 05/15/2023 | 24 | NOTICE *filing Proposed Order* by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES (FABIAN, SARAH) (Entered: 05/15/2023) |
| 05/15/2023 | 25 | NOTICE by STATE OF FLORIDA re 21 Response in Opposition to Motion, 22 Notice (Other) (PERCIVAL, JAMES) (Entered: 05/15/2023) |
| 05/15/2023 | 26 | RESPONSE TO ORDER TO SHOW CAUSE by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES. (Attachments: # 1 Exhibit) (FABIAN, SARAH) (Entered: 05/15/2023) |
| 05/15/2023 | 27 | NOTICE *Declaration - Attachment A* by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES re 26 Response to Order to Show Cause (FABIAN, SARAH) (Entered: 05/15/2023) |
| 05/15/2023 |  | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 21 FLORIDA'S RESPONSE TO DEFENDANTS' EMERGENCY STAY MOTION, 22 FLORIDA'S PROPOSED ORDER, 25 Notice (jfj) (Entered: 05/15/2023) |
| 05/15/2023 |  | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 24 NOTICE filing Proposed Order by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES. (jfj) (Entered: 05/15/2023) |
| 05/15/2023 |  | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 26 Response to Order to Show Cause, 27 NOTICE Declaration - Attachment A by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES re 26 Response to Order to Show Cause. (jfj) (Entered: 05/15/2023) |
| 05/15/2023 | 28 | NOTICE *Joint Notice of Compliance with ECF No. 18* by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES re 18 Order,,, (FABIAN, SARAH) (Entered: 05/15/2023) |
| 05/15/2023 | 29 | ORDER DENYING STAY. DHS's motion to stay the TRO (Doc. 13 ) is DENIED. The Court will rule on DHS's request to convert the TRO into a preliminary injunction in the next day or so. Signed by JUDGE T KENT WETHERELL II on 5/15/2023. (pmc) (Entered: 05/15/2023) |
| 05/16/2023 | 30 | PRELIMINARY INJUNCTION. DHS is enjoined from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum from U.S. Border Patrol Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)," pending disposition of this case or further order of the Court. The parties shall file a status report 14 days from the date of this Order explaining how they intend to proceed with this case in this Court pending resolution of DHS's expected appeal of the preliminary injunction, and unless the parties agree that this case should be stayed pending appeal, the status report shall include a proposed scheduling order. Signed by JUDGE T KENT WETHERELL II on 05/16/23. (Status Report due by **5/30/2023**.) (jfj) (Entered: 05/16/2023) |

| 05/16/2023 | 31 | ORDER. The Order to Show Cause is discharged as to the 2,576 aliens released under the Parole with Conditions policy after the TRO went into effect, but DHS shall file periodic reports on the status of those aliens containing the information described above. The first report is due 60 days from the date of this Order, which roughly corresponds to the period within which those aliens are required report to ICE to be issued NTAs under the Parole with Conditions policy. Consideration of the Order to Show Cause is deferred as to the 167 aliens who may have released under the Parole with Conditions policy even though their processing may not have been fully complete when the TRO took effect, and DHS shall file supplemental information about the circumstances of those aliens' releases on or before Friday, May 19, 2023. Signed by JUDGE T KENT WETHERELL II on 05/16/23. (Report due by **7/17/2023**.) (jfj) (Entered: 05/16/2023) |
| 05/17/2023 | 32 | NOTICE OF APPEAL as to 30 Preliminary Injunction,,,, Set Deadlines/Hearings,,, by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES. ( (DARROW, JOSEPH) (Entered: 05/17/2023) |

<table>
<tr><td colspan="4" align="center">**PACER Service Center**</td></tr>
<tr><td colspan="4" align="center">**Transaction Receipt**</td></tr>
<tr><td colspan="4" align="center">05/17/2023 13:12:47</td></tr>
<tr><td>**PACER Login:**</td><td>jdarrow1</td><td>**Client Code:**</td><td></td></tr>
<tr><td>**Description:**</td><td>Docket Report</td><td>**Search Criteria:**</td><td>3:23-cv-09962-TKW-ZCB</td></tr>
<tr><td>**Billable Pages:**</td><td>6</td><td>**Cost:**</td><td>0.60</td></tr>
</table>

**A033**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

STATE OF FLORIDA,

     Plaintiff,

v.                                    Case No.  3:21-cv-1066

The UNITED STATES OF AMERICA;
et. al,

     Defendants.

_____


**<u>NOTICE OF APPEAL</u>**


Pursuant to Federal Rule of Appellate Procedure 3, notice is hereby given

that all Defendants appeal to the United States Court of Appeals for the Eleventh

Circuit from the Court's Opinion and Order of March 8, 2023, ECF No. 157, and

Judgment, ECF No. 158, as well as any and all associated opinions and orders.

Date:  May 5, 2023

JASON R. COODY
*United States Attorney*

MARIE A. MOYLE
*Assistant United States Attorney*
Northern District of Florida

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
ERIN T. RYAN
ELISSA FUDIM
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

*Counsel for Defendants*

1

**A035**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 5, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which provided an electronic notice and electronic link of the same to all attorneys of record.

<div align="right">
By: <u>/s/ Joseph A. Darrow</u><br>
JOSEPH A. DARROW<br>
Trial Attorney<br>
United States Department of Justice<br>
Civil Division
</div>

2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

STATE OF FLORIDA,

     Plaintiff,

v.                                                    Case No.  3:23-cv-9962

ALEJANDRO MAYORKAS;
et. al,

     Defendants.

_____

## NOTICE OF APPEAL

Pursuant to 8 U.S.C. § 1292(a)(1) and Federal Rule of Appellate Procedure 3, notice is hereby given that all Defendants appeal to the United States Court of Appeals for the Eleventh Circuit from the Court's Order of May 16, 2023, ECF No. 30, entering a preliminary injunction, as well as any and all associated opinions and orders.

Date:  May 17, 2023

JASON R. COODY
*United States Attorney*

MARIE A. MOYLE
*Assistant United States Attorney*
Northern District of Florida

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

*Counsel for Defendants*

**A038**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 17, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which provided an electronic notice and electronic link of the same to all attorneys of record.

<u>By:</u> */s/ Joseph A. Darrow*
JOSEPH A. DARROW
Trial Attorney
United States Department of Justice
Civil Division

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA,

     Plaintiff,

v.                                  Case No. 3:21-cv-1066-TKW-ZCB

UNITED STATES OF
AMERICA, et al.,

     Defendants.

_____/

## JUDGMENT

Pursuant to and at the direction of the Court,

Judgment is entered in favor of Plaintiff on Counts 2, 4, and 6 of the second amended complaint, and the Parole+ATD Policy is vacated and remanded to the Department of Homeland Security for further proceedings consistent with the Opinion and Order entered on this date. Judgment is entered in favor of Defendants on Counts 1, 3, 5, 7 and 8 of the second amended complaint and those claims are dismissed with prejudice.

                                       JESSICA J. LYUBLANOVITS
                                       CLERK OF COURT

March 8, 2023_____     s/ Jennifer F. Johnson, Deputy Clerk___
DATE                          Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**STATE OF FLORIDA,**

    **Plaintiff,**

**v.**                   **Case No. 3:21-cv-1066-TKW-ZCB**

**UNITED STATES OF
AMERICA, et al.,**

    **Defendants.**

_____/

## OPINION AND ORDER

After due notice, the Court held a bench trial in this case on January 9-12, 2023. Based on the testimony and evidence presented at the trial, the parties' oral arguments and post-trial filings (Docs. 155, 156), and the supplemental administrative record for the Parole Plus Alternative to Detention (Parole+ATD) policy (Doc. 87-1), the Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

### I.    Executive Summary

There is an immigration "crisis" at the Southwest Border. The Chief of the U.S. Border Patrol (USBP) candidly admitted it in his

testimony and the overwhelming weight of the evidence confirms it. The crisis has been ongoing for over two years and shows no sign of abating.

The evidence establishes that the current status quo at the Southwest Border is unsustainable, but it is not the Court's job to solve the immigration crisis—that is the job of the political branches.[1] Nor is it the Court's job to decide whether the policies challenged by Florida in this case (or the underlying immigration laws) are good or bad public policy—that too is the job of the political branches. Instead, the Court's only job is to determine based on the evidence presented whether challenged policies comply with the immigration laws, as written.

\* \* \*

The Supreme Court has recognized that immigration officials have "broad discretion" in carrying out the immigration laws, *see Arizona v.*

---

[1]  It is noteworthy that the President made his first visit to the Southwest Border the day before the trial in this case started. That visit was preceded by the announcement of a new immigration policy that is intended to dissuade aliens from continuing to simply show up at the Southwest Border. However, it does not appear that this new policy will repeal the Parole+ATD policy or mandate detention of aliens who do show up at the Southwest Border in contravention of the new policy, and Defendants have not argued the new policy moots or otherwise has any bearing on this case. Moreover, the legality the new policy has been already challenged by a group of 20 states, including Florida, in *Texas v. Department of Homeland Security*, Case No. 6:23-cv-007 (S.D. Tex.).

*United States*, 567 U.S. 387, 396 (2012).   But that discretion must be exercised within the confines established by Congress because, as the Supreme Court has repeatedly held, Congress—not the President or Executive Branch officials—has the "complete and absolute power" over the subject of immigration and "plenary power" over the admission and exclusion of aliens.[2]   *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)); *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 343 (1909).

Congress exercised that power by enacting the Immigration and Nationality Act (INA), which is codified as amended in 8 U.S.C. §1101 et seq.  Most pertinent to this case is 8 U.S.C. §1225, which establishes the policies and procedures for processing what the statute refers to as "applicants for admission"—that is, aliens arriving in the United States at ports of entry or other locations.

---

[2]  The Court uses the term "alien" because that is the term used by Congress in the immigration laws.  *See* 8 U.S.C. §1101(a)(3).  Also, "alien" is also more accurate than Defendants' preferred—and allegedly less "dehumanizing"—term, "non-citizen," because the statutory definition of "alien" excludes U.S. nationals even though nationals can be "non-citizens."  *See Miller v. Albright*, 523 U.S. 420, 467 n.2 (1998) (Ginsberg, J., dissenting) ("Nationality and citizenship are not entirely synonymous; one can be a national of the United States and yet not a citizen.").

Under §1225(b)(1)(A), certain arriving aliens, including those who lack proper admission documents, are subject to expedited removal "without further hearing or review." However, if such an alien indicates an intention to apply for asylum or a fear of persecution, the alien "**shall be detained**" pending a final determination of asylum or credible fear of persecution. *See* 8 U.S.C. §1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV) (emphasis added). For all other arriving aliens, unless an immigration official determines that the alien is clearly and beyond a doubt entitled to be admitted, the alien "**shall be detained**" for removal proceedings. *See* 8 U.S.C. §1225(b)(2)(A) (emphasis added).

In 2018, in *Jennings v. Rodriguez*, the Supreme Court held that "§§1225(b)(1) and (b)(2) <u>mandate detention</u> of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin." 138 S. Ct. 830, 845 (2018) (emphasis added). Last year, in *Biden v. Texas*, the Supreme Court assumed without deciding that the federal government was violating §1225(b)(2)(A) by not detaining aliens arriving at the Southwest Border, *see* 142 S. Ct. 2528, 2542 (2022), but the Court left unanswered the question of "whether the detention requirement in section 1225(b)(2)(A) is subject to principles of

law enforcement discretion, as the Government argues, or whether the Government's current practice simply violates that provision," *id.* at 2542 n.5. This case requires that question to be answered.

The State of Florida contends that Defendants[3] are violating the statutory detention mandates in §1225(b)(1) and (b)(2) by releasing aliens arriving at the Southwest Border into the country *en masse* through various "non-detention policies," including the Parole+ATD policy and the exercise of "prosecutorial discretion" under 8 U.S.C. §1226(a). Defendants respond that there is no overarching "non-detention policy"; that they have the discretion not to detain aliens notwithstanding the mandatory language in §1225(b)(1) and (b)(2); and that Florida does not have standing to challenge their discretionary decisions to release aliens into the country on parole or otherwise.

For the most part, the Court finds in favor of Florida because, as detailed below, the evidence establishes that Defendants have effectively turned the Southwest Border into a meaningless line in the sand and

---

[3] The United States of America and various federal immigration agencies and officials, including the Department of Homeland Security (DHS), Customs and Border Patrol (CBP), and Immigration and Customs Enforcement (ICE). At times in this Opinion and Order, the Court refers to Defendants collectively as "DHS."

little more than a speedbump for aliens flooding into the country by prioritizing "alternatives to detention" over actual detention and by releasing more than a million aliens into the country—on "parole" or pursuant to the exercise of "prosecutorial discretion" under a wholly inapplicable statute—without even initiating removal proceedings. The evidence further establishes that Florida is harmed by the challenged policies because well over 100,000 aliens have been released into Florida under the policies and the state has incurred substantial costs in providing public services to aliens, including those who should have been detained under §1225(b)(1) and (b)(2) and would not have been in the state but for the challenged policies. However, the Court only has the authority to vacate the Parole+ATD policy because the overarching "non-detention policy" is not discrete "agency action" that is subject to judicial review under the Administrative Procedure Act (APA).

## II.   Findings of Fact

The Court adopts and incorporates by reference the facts agreed to by the parties, *see* Doc. 122 at 16-24 (¶¶1-63); Doc. 143 at 1-2 (¶¶71, 72)), but for sake of brevity, only the facts most pertinent to the Court's analysis are set forth below. The findings related to the merits of the

Parole+ATD policy are based on the documents in the supplemental administrative record, *see* Doc. 55; Doc. 117 at 2; Doc. 130 at 3-4 (¶8.b.i), whereas the findings on other issues are based on a thorough assessment of the weight and credibility of the entire evidentiary record.

## A.    Immigration Enforcement, Generally

DHS is the cabinet-level agency that is primarily responsible for implementing and enforcing the immigration laws.

CBP and ICE are component agencies within DHS.

CBP is generally responsible for immigration enforcement at the borders—with CBP's Office of Field Operations (OFO) having responsibility for the ports-of-entry and the USBP having responsibility between ports-of-entry.

ICE is generally responsible for immigration enforcement in the interior of the country—with ICE's Enforcement and Removal Operations (ERO) having responsibility for detaining and removing aliens.

CPB and ICE both have detention facilities, but the CBP facilities are only intended for temporary detention of up to 72 hours, after which continued detention requires a transfer to ICE custody.

The length of time that an arriving alien can be detained in CBP or ICE custody is also impacted by judicial decisions.  For example, the consent decree and subsequent orders in *Flores v. Garland*, No. 2:85-cv-4544 (C.D. Cal.), effectively limit the detention of minors (and, thus, family units) to 20 days—although the evidence establishes that period is more than enough time to at least initiate removal proceedings.

There is nothing inherently inhumane or cruel about detaining aliens pending completion of their immigration proceedings.  The CBP and ICE witnesses admitted as much in their testimony and there is no contrary evidence in the record.

Detention is the surest way to ensure that an alien will not abscond pending completion of their immigration proceedings.

B.    Alien Apprehensions and Releases at the Southwest Border

CBP maintains monthly data on the number of arriving aliens apprehended at the Southwest Border and the "processing disposition"

for those aliens.  *See* P.Ex.[4] 1 through 4 (monthly data from January 2020 through November 2022).  The data only includes "Title 8 apprehensions" and does not include aliens excluded under the "Title 42 Order."[5]

The data shows that in the three months before the COVID-19 pandemic (January through March 2020), about 25,000 aliens per month were being apprehended at the Southwest Border.  The monthly apprehensions dropped significantly (to less than 1,200) in April 2020 because of the pandemic and the Title 42 Order, and they remained at relatively low levels through January 2021.

Apprehensions returned to their pre-pandemic levels in February 2021 and increased dramatically thereafter.  By July 2021, monthly apprehensions reached 100,000, and for the most part, they have stayed at or above that level since then.

In the last three months for which there is data in the record (September to November 2022), monthly apprehensions averaged about

---

[4]  "P.Ex." refers to the exhibits introduced by Florida.  "D.Ex." refers to the exhibits introduced by Defendants.

[5]  As explained in more detail below, the Title 42 Order was issued by the Centers for Disease Control (CDC) to prohibit certain aliens from entering the country during the COVID-19 pandemic.

135,000.  These numbers are expected to increase significantly when the Title 42 Order is no longer in place.

USBP agents routinely arrest aliens in the field without a warrant, as authorized by 8 U.S.C. §1357.  An arrest warrant is not issued (if at all) until after the alien is in custody, and unless the alien is going to be detained for prosecution, the warrant is merely a Form I-200 "administrative warrant" that is issued in conjunction with a notice to appear (NTA).[6]

The monthly data also includes different categories of "processing dispositions."  The most pertinent dispositions for this case are Notice to Appear/Own Recognizance (NTA/OR), Parole+ATD,[7] and Warrant of Arrest/Notice to Appear (Warrant/NTA).

The Warrant/NTA category includes the aliens who were detained for prosecution or removal.  The other two categories are comprised of

---

[6]   The NTA is the document that formally initiates a removal proceeding against an alien.  *See* 8 C.F.R. §1239.1(a) ("Every removal proceeding conducted under [8 U.S.C. §1229a] to determine deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the immigration court.").

[7]   The data for fiscal year 2021 included releases on parole in the "other" category, but that category clearly included releases on Parole+ATD because the numbers in that category increased significantly starting in August 2021 after the Parole+ATD program was created.

aliens who have been released pending completion of their immigration proceedings, either under the Parole+ATD program, the predecessor Notice to Report (NTR) program, or "prosecutorial discretion" under §1226(a).

The data shows that the Warrant/NTA category has remained relatively consistent since the "surge" of arriving aliens started in March 2021. The data reflects that typically more than 20,000 arriving aliens per month are being detained.

The data also shows that a substantial number of aliens have been released each month since March 2021. For example, in the first month of the NTR program (March 2021) there were more than 26,000 releases categorized as NTA/OR, and by the time that program was terminated in November 2021, there had been over 256,000 releases under the NTA/OR category.

In total, between March 2021 and November 2022, the data shows that more than 1.16 million aliens have been released under the NTA/OR and Parole+ATD categories.

DHS has never had sufficient funding to apprehend and detain every alien illegally in the country.  As a result, DHS must make "tough decisions" about which aliens to detain and which aliens to release.

The fact that DHS must make those "tough decisions" does not mean that it has free rein to adopt policies that contravene the clear mandates in the INA or create "processing pathways" that contort statutory language to effectuate its preferred policy of "alternatives to detention" over actual detention.

Likewise, the fact that prior Administrations (may have[8]) utilized similar "processing pathways" as those being challenged in this case does not make those policies lawful because, as Saint Augustine and William Penn said, "wrong is wrong even if everyone is doing it."

---

[8]   Defendants post-trial brief quoted and provided Internet links to "policy memoranda" and "guidance" issued by various immigration officials from 1992 to 2019 that purport to show that prior Administrations (including the Trump Administration) prioritized detention of aliens who posted a threat to public safety and used parole to release lower-risk inmates.  *See* Doc. 156 at 22-24.  Some of those documents are in the record (e.g., D.Ex. A, I, K), but others are not.  Defendants argue that the Court can take judicial notice of all these documents under Fed. R. Evid. 201, but the Court declines to do so because Defendants had ample opportunity to present this evidence at trial if they thought it was important to their case, and at this stage of the case, the Court is not inclined to surf the Internet looking for these (or other) facts that might be relevant to the issues in this case.

That said, the detention policies that were in effect before January 20, 2021, provide necessary background and context for the current policies and they are relevant to the Court's assessment of whether, as Florida claims, the current Administration adopted a new "non-detention policy" that should have been formally adopted pursuant to the APA.

### C.    Detention Policy During the Trump Administration

Shortly after taking office in January 2017, President Trump issued Executive Order 13767 (P.Ex. 54), which instructed DHS to "take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings."  This directive was intended to "terminat[e] the practice commonly known as 'catch and release' whereby aliens are routinely released in the United States shortly after their apprehension for violations of immigration law."

The following month, then-DHS Secretary Kelly issued a memorandum to implement the directive in Executive Order 13767.  *See* D.Ex. K.  The memorandum acknowledged that because "detention of all [aliens subject to §1225(b)] may not be immediately possible" due to limited detention capacity, "detention resources should be prioritized

based upon potential danger and risk of flight if an individual alien is not detained." However, the memorandum made clear that "[p]olicies that facilitate the release of removable aliens apprehended at and between the ports of entry [i.e. 'catch-and-release'] shall end" because those policies "allow [aliens] to abscond and fail to appear at their removal hearings [and] undermine the border security mission."

The memorandum stated that "parole determinations will be made in accordance with current regulations and guidance" pending establishment of additional processing and detention facilities. However, the memorandum made clear that the parole authority "should be exercised <u>sparingly</u>" (emphasis added) on a case-by-case basis because "[t]he practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration."

Consistent with the directives in Executive Order 13767 and Secretary Kelly's implementing memorandum, USBP Chief Raul Ortiz testified that aliens encountered at the Southwest Border during the

Trump Administration were only released under "very exigent circumstances." This was true both for releases under the parole authority in 8 U.S.C. §1182(d)(5) and "prosecutorial discretion" or NTA/OR releases under §1226(a).

USBP Chief Ortiz's testimony that aliens apprehended at the Southwest Border during the Trump Administration were rarely released is borne out by the data. For example, in February 2020 (before the COVID-19 pandemic), USBP apprehended around 30,000 aliens at the Southwest Border and only released 91. And, in the entire month of December 2020, USBP released only 17 aliens.

### D.    Changes in Detention Policy Under the Biden Administration

One of the issues presidential candidate Joe Biden campaigned on was taking a different approach to immigration enforcement and border security than President Trump. His official campaign website included an extensive discussion of immigration, titled "The Biden Plan for Securing Our Values as a Nation of Immigrants." P.Ex. 45 (hereafter "the Biden Plan").[9]

---

[9] The "Biden Plan" provides background and context for the events that follow, but it has no bearing on the legality of the challenged policies. *See Trump v. Hawaii,*

The Biden Plan described the border wall championed by President Trump as "a waste of money" and "not a serious policy solution," and it also promised to end the Migrant Protection Protocols (MPP) that was commonly known as the "Remain in Mexico" program.   And, most pertinent to this case, the Biden Plan promised to "[e]nd prolonged detention" by utilizing "alternatives to detention" that "enable migrants to live in dignity and safety while awaiting their court hearings."

President Biden was true to his word.   He issued a series of Executive Orders during his first two weeks in office, including one that set the stage for the termination of the "Remain in Mexico" program[10] and rescinded Executive Order 13767.    *See* P.Ex. 53 (Executive Order No. 14010).

Even before Executive Order 13767 was formally rescinded, DHS had already started to move away from it.   Most significantly, on President Biden's first day in office, the Acting Secretary of DHS issued

---

138 S. Ct. 2392, 2417–18 (2018) (acknowledging but not giving any significance to President Trump's campaign statements about a "Muslim travel ban" when evaluating the validity of his executive orders limiting travel from certain countries).

[10]   The termination of this program was the subject of the litigation that culminated in the Supreme Court's decision in *Biden v. Texas, supra.*

a memorandum rescinding the guidance implementing Executive Order 13767 and establishing more restrictive "enforcement priorities" that applied to a "broad range of … discretionary [immigration] enforcement decisions," including "whom to detain or release" and whether to issue an NTA.  *See* P.Ex. 16 ("the Pekoske Memo").[11]

On its face, the Pekoske Memo states that border security and removal of aliens illegally entering the United States was a priority, but CBP officials credibly testified that they understood that was not actually the case—at least for illegal border crossers who were not deemed to be a threat to public safety.  Indeed, USBP Chief Ortiz testified that it was his understanding based on communications from DHS officials that releases were no longer limited to "very exigent circumstances" and that USBP was now authorized to release aliens who were not deemed to be a threat to public safety into the country irrespective of the detention mandates in §1225(b).

Around the same time, DHS started closing family detention facilities—either by converting them to detention facilities for single

---

[11]  Substantially similar enforcement priorities to those in the Pekoske Memo are contained in the "guidelines" issued by the Secretary of DHS that are currently under review by the Supreme Court in *United States v. Texas*, No. 22-58.

adults or closing them altogether.  Although DHS claimed that it took these steps to address the increase in single adults that were being encountered at the border, the practical effect of closing the family detention facilities was to guarantee that family units arriving at the border would have to be released into the country rather than being detained.  This, in turn, contributed to the overcrowding of CBP facilities as family unit encounters increased during the first six months of the Biden Administration—from just over 7,000 in January 2021 to nearly 83,000 in July 2021.

Collectively, these actions were akin to posting a flashing "Come In, We're Open" sign on the southern border.[12]  The unprecedented "surge" of aliens that started arriving at the Southwest Border almost

---

[12]  The Court uses this analogy not only because it is a fair characterization of what Defendants did but also because Defendants elicited testimony and argued at trial that they could not simply hang a "Closed" sign on the border.

Moreover, although Defendants' argument that they could not simply "close" the border to arriving aliens may be technically accurate, it is somewhat disingenuous because 8 U.S.C. §1182(f) specifically authorizes the President to "suspend the entry of all aliens" whenever he finds that their entry would be "detrimental to the interests of the United States."  That statute "exudes deference," *Hawaii*, 138 S. Ct. at 2408, and if it is broad enough to authorize the President to "establish a naval blockade that would ... deny illegal Haitian migrants the ability to disembark on our shores," *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993), it would certainly seem to authorize the President to close the border to arriving aliens one it became apparent that CBP and ICE facilities were not going to be able to handle the "surge" of aliens coming to the border.

**A058**

immediately after President Biden took office and that has continued unabated over the past two years was a predictable consequence of these actions. Indeed, USBP Chief Ortiz credibly testified based on his experience that there have been increases in migration "when there are no consequences" and migrant populations believe they will be released into the country.

High-ranking immigration agency officials were made aware of the impact of these actions on border security as early as January 28, 2021, when CBP officials prepared an email about the "release of migrants along border" in advance of a briefing with the Assistant Secretary of DHS. *See* P.Ex. 98.

The email explained that CBP was seeing "a stark increase in monthly illegal migration into the U.S., especially in the South Texas area" that was expected to "immediately overwhelm USBP's short-term detention capacity"; that "[t]he pause on processing pathways[13] … and recent policy changes have also impacted USBP's ability to expeditiously

---

[13]    The pathways referred to in the email—MPP, Asylum Cooperation Agreement (ACA), and Prompt Asylum Claim Review (PACR)—were formally terminated in the first weeks of the Biden Administration, although they had been "paused" towards the end of the Trump Administration due to the COVID-19 pandemic.

process and remove those encountered" (emphasis added). The email also warned that "USBP will be required to promptly process and release [aliens] due to lack of adjudication pathways and the necessity to maintain the health and safety of the workforce and those in detention during the pandemic."

The email did not specifically identify the "recent policy changes" that it was referring to, but USBP Chief Ortiz (who was on the email chain) testified that it was his understanding that the policy changes referred to in the email were the Pekoske Memorandum and move away from detention to "alternatives to detention." The record contains no contrary evidence on this point.

The email provides some support for Defendants' position that the need to release rather than detain aliens arriving at the Southwest Border was attributable, at least in part, to COVID-related issues, but it provides more support for Florida's position that Defendants' "pause on processing pathways … and recent policy changes" led to DHS's subsequent inability to comply with the statutory detention mandates in §1225(b)(1) and (b)(2).

The greater weight of the evidence establishes that the dramatic increases in the number of aliens being released at the Southwest Border was attributable to changes in detention policy, not increases in border traffic.  Indeed, this can be seen by comparing the apprehension and release data for February 2020 (the last month of the Trump Administration before the COVID-19 pandemic) and February 2021 (the first full month of the Biden Administration) because that data shows that nearly 8,800 aliens were released at the Southwest Border in February 2021 even though apprehensions in that month were 20% <u>lower</u> than in February 2020 when only 92 aliens were released.

There were undoubtedly geopolitical and other factors that contributed to the surge of aliens at the Southwest Border, but Defendants' position that the crisis at the border is not largely of their own making because of their more lenient detention policies is divorced from reality and belied by the evidence.  Indeed, the more persuasive evidence establishes that Defendants effectively incentivized what they call "irregular migration" that has been ongoing since early 2021 by establishing policies and practices that all-but-guaranteed that the vast majority of aliens arriving at the Southwest Border who were not

excluded under the Title 42 Order would not be detained and would instead be quickly released into the country where they would be allowed to stay (often for five years or more) while their asylum claims were processed or their removal proceedings ran their course—assuming, of course, that the aliens do not simply abscond before even being placed in removal proceedings, as many thousands have done.

It is particularly noteworthy that USBP Chief Ortiz testified that the current surge differs from prior surges that he seen over his lengthy career in that most of the aliens now being encountered at the Southwest Border are turning themselves in to USBP officers rather than trying to escape the officers. It is reasonable to infer (and just plain common sense) that aliens are doing this because they are aware that they will be expeditiously processed and released into the country. Indeed, on this point, Chief Ortiz credibly opined based on his experience that the aliens are likely "turning themselves in because they think they're going to be released."

## E.   NTR Policy

By the middle of March 2021, CBP facilities were becoming increasingly overcrowded as a result of the increases in border traffic, the

time it takes to issue an NTA to initiate removal proceedings, and CBP's failure to transfer aliens to ICE custody for continued detention—often because ICE refused to accept custody.

On March 19, 2021, in an effort to reduce overcrowding at CBP facilities, then-USBP Chief Rodney Scott issued memoranda authorizing the use of "prosecutorial discretion" to release arriving aliens into the country "without placing them in removal proceedings." *See* P.Ex. 20 ("the March Memo").

The March Memo stated that "[p]rocessing an alien for release without entering them into proceedings is not taken lightly," but the only authority cited in the memo for the policy was 8 C.F.R. §287.3.

That regulation does not come close to providing legal support for the March Memo because it expressly contemplates that the alien will be placed in some form of immigration proceeding if there is "prima facie evidence that the arrested alien was entering, attempting to enter, or is present in the United States in violation of the immigration laws." 8 C.F.R. §287.3(b). The regulation does authorize the official examining the alien to take other action as "appropriate or required under the laws or regulations applicable to the particular case," *id.*, but the March Memo

did not identify any law or regulation that authorizes arriving aliens to be released without first being placed in some form of removal proceeding—and there is none.

The March Memo allowed USBP agents to release aliens into the country more quickly with only minimal processing and without initiating removal proceedings.  As one ICE official described it, USBP was releasing aliens at the border under the March Memo with nothing more than a "piece of paper that said 'go find somebody at ICE.'"  The "piece of paper" was a Notice to Report (NTR) and, thus, the Court refers to the March Memo as the NTR policy.

The NTR policy was aptly described by Florida in its original complaint as "immigration enforcement by the honor system" because, under the policy, arriving aliens were not placed in removal proceedings and, instead, they were simply released into the country with direction to self-report to an ICE office to be placed in removal proceedings.

Not surprisingly, "only a fraction … (approximately 30%)" of the aliens released under the NTR policy reported to ICE as directed.  This ultimately led DHS to establish a program called "Operation Horizon,"

pursuant to which ICE officials tried to locate the aliens who had not reported so they could be served with an NTA.

The "surge" of aliens continued unabated while the NTR policy was in effect, and by July 2021, CBP was apprehending more than 100,000 aliens per month at the Southwest Border.  The mass release of aliens likewise continued over that period—with over 170,000 aliens being released between March and July 2021.

Instead moving away from "alternatives to detention" to dissuade aliens from continuing to come to the Southwest Border, Defendants doubled down on that approach to border enforcement by adopting the Parole+ATD policy.

### F.    Parole+ATD Policy

The Parole+ATD policy was formally adopted through a memorandum issued by USBP Chief Ortiz on November 2, 2021.  *See* Doc. 87-1 at SAAR0093 ("the November Memo").  However, the administrative record for that policy establishes that USBP started using "parole" as a means of improving "processing efficiencies" several months prior.

Specifically, in an email dated July 31, 2021, an assistant chief of CBP stated that "[e]ffective immediately and until further notice [CBP] will begin to include considering certain non-citizens for processing utilizing the Parole pathway."  *Id.* at SAR0117 (emphasis in original). The email stated that CBP agents may "issue a Parole to family units or single adults on a case-by-case basis" after considering four factors:  (1) whether ICE will accept custody of the alien; (2) whether the alien poses a threat to national security, border security, or a heightened public safety risk; (3) the border sector's total detention capacity exceeds 75% and arrivals exceeded discharges over a 24-hour period; and (4) the average time-in-custody (TIC) of unprocessed aliens exceeds 48 hours and the arrivals over the next 24-hour period are projected to exceed the discharges.

An alien released on "parole" received an alien registration number but was not issued a NTA for removal proceedings.  The only condition of the "parole" was that the alien "REPORT TO THE [ICE] OFFICE NEAR YOUR FINAL DESTINATION WITHIN 60 DAYS OR FACE REMOVAL FROM THE UNITED STATES" (capitalization in original).  The 60-day period was subsequently reduced to 15 days.

The July 31 email did not mention COVID-19 or health issues as a reason for authorizing the use of "parole" as a processing "pathway," nor did the email mention §1182(d)(5) as authority for the "parole" determination.  Agents were directed to document "why" the alien was paroled on the I-213 form[14] by stating "[s]ubject was paroled due to time in custody constraints at the [CBP facility]."  Subsequently, in an effort "to strengthen the validity of the Parole" agents were directed to stamp the alien's I-94 form[15] "PAROLED" with the notation "212(d)(5)."[16]

The November Memo differed from the July 31 email in several material respects, most notably that it only applied to family units (and not single adults), it specifically referred to §1182(d)(5) as a source of authority for the policy, and it identified COVID-19 as a justification for the policy.

---

[14]  This form, titled "Record of Deportable/Inadmissible Alien," is prepared by immigration officials for aliens who will be placed in removal proceedings and contains basic biographical information about the alien; the date, place, time, and manner of entry to the United States; and immigration and criminal history.

[15]  This form, titled "Arrival/Departure Record," is provided to nonimmigrant aliens who are admitted into the country with a visa, are adjusting their status while in the country, or are extending their stay in the country.

[16]  "212(d)(5)" refers to section 212(d)(5) of the INA, which is codified in 8 U.S.C. §1182(d)(5).

The November Memo started by providing a post-hoc justification for CBP's use of NTRs—i.e., "to relieve overcrowding in congregate settings, thus better protecting both the workforce and noncitizens in [CBP] custody"—and the memo boasted that the use of NTRs "decreased processing times significantly" as compared to the "much more time consuming" issuance of a NTA.

Despite these benefits, the November Memo stated that CBP is ceasing the use of NTRs "[e]ffective immediately" and that it will "prioritize resources to issue noncitizens NTAs immediately." However, the memo also established "an alternative processing pathway," Parole+ATD, to use to "address urgent crowding and excessive [TIC] in USBP facilities."

From a practical standpoint, the Parole+ATD "pathway" described in the November Memo is indistinguishable from the NTR pathway because the memo explained that an alien released under Parole+ATD is not issued an NTA and only condition of the release on "parole" is that the alien "report to ICE within 15 days to be processed for an NTA."

The November Memo explained that the Parole+ATD pathway was necessary because of the "urgent humanitarian need to protect the

workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities." The memo only authorized the use of this pathway in two sectors (Del Rio and Rio Grande Valley) when certain TIC and capacity issues were present, but it also stated that the CBP chief and commissioner could authorize its use in other sectors in which "capacity constraints or conditions in custody show that there is an urgent humanitarian reason to release [family units] in a more expeditious fashion in order to avoid crowding in CBP facilities and the resulting COVID-19 health risks to the workforce and migrants in custody."

The November Memo concluded by stating that "when COVID-19 conditions eventually improve, it is expected that there will no longer be a need for this alternative pathway."

In April 2022, CDC determined in the "Title 42 Order" that the public health order entered in August 2021 suspending the entry of certain aliens in the country under the Public Health Services Act should

be terminated because it was no longer justified by COVID-19 pandemic.[17]

Despite the CDC's determination that the pandemic no longer justified the Title 42 Order, CBP did not eliminate the Parole+ATD pathway. Instead, the Parole+ATD policy was effectively reauthorized in a July 18, 2022, memorandum jointly issued by CBP and ICE titled. "Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations." Doc 87-1 at SAR0001, SAR0158 ("the July Memo").

The July Memo expands the Parole+ATD policy to single adults, rather than only family units. It also abandons the COVID-19 rationale in the November Memo, stating more generally that avoiding overcrowding in CBP facilities is necessary for "disease-mitigation."

The supplemental administrative record for the July Memo is comprised of 160 pages complied and certified by CBP (Doc. 87-1 at SAR0001-SAR0160) and 120 pages complied and certified by ICE (*id.* at SAR0161-SAR0280). Collectively, the supplemental administrative

---

[17]   The Supreme Court is currently considering a case involving the termination of the Title 42 Order, *see Arizona v. Mayorkas*, No. 22-592, as is the Fifth Circuit, *see Louisiana v. CDC*, No. 22-30303.

record contains "all of the non-privileged documents and materials considered by [CBP and ICE] in issuing the [November memo]."

The supplemental administrative includes considerably more information than the administrative record for the original Parole+ATD policy.[18] Of particular significance, the portion of the supplemental administrative record compiled by CBP includes the permanent injunction entered by a federal judge in the District of Arizona in April 2020 mandating conditions of confinement for certain individuals in CBP custody (hereafter "the *Nielsen* injunction"), the CDC notice explaining its decision to terminate the Title 42 Order in April 2022, and the preliminary injunction entered by a federal judge in the Western District of Louisiana in May 2022 enjoining the termination of the Title 42 Order.

The *Nielsen* injunction enjoined CBP from detaining aliens for more than 48 hours in Tucson Sector Border Patrol stations unless certain

---

[18] The original administrative record—which is included in the supplemental record (Doc. 87-1 at SAR0093-SAR0123)—was comprised of only 31 pages did not come close to justifying the establishment of the Parole+ATD "pathway." *See* Doc. 55 at 3 (describing the administrative record as "paltry" and noting that "an inadequate or incomplete record will presumably work in Florida's favor because if the parole + ATD policy is not sufficiently supported by the record, it will be invalidated"). Notably, the original administrative record did not include any information about COVID-19 that might justify the creation of a "pathway" to ameliorate the impacts of the virus and it only provided minimal information about capacity constraints or TIC statistics.

conditions of confinement were met for beds, showers, food, water, and medical needs. The injunction provided that compliance with its requirements could be temporarily excused in "exigent circumstances," but it stated that "[p]eriodic surges that occur along the border are a chronic condition that do not constitute Exigent Circumstances."

The CDC notice terminating the Title 42 Order recounted the history of the COVID-19 pandemic, detailed the current status of the pandemic, and outlined the "mitigation measures" being taken by CBP. The mitigation measures included vaccination of the CBP workforce and a program started in March 2022 to vaccinate aliens arriving at the southern border. The notice explained that the Title 42 Order was intended to be temporary and that it was not a substitute for processing aliens under the INA. The notice concluded that "the danger of further introduction, transmission, or spread of COVID-19 into the United States from covered noncitizens … has ceased to be a serious danger to the public health."

The portion of the supplemental administrative record complied by ICE included information about the percentage of aliens released under the Parole+ATD that checked in with ICE as directed, information about

the "Operation Horizon" program, and information about the processing backlog created by the failure to issue an NTA before the alien is released on parole.

This information reflected that as of May 2, 2022, approximately 65% of aliens released under the Parole+ATD policy checked-in with ICE as directed, which means that 35% (almost 50,000) did not. Of the aliens who did not check-in, approximately 20% were "noncompliant" because they had not checked in with ICE within 60 days of their release.

The Operation Horizon program was created November 2021 to mail NTAs to aliens "who have been paroled or released under prosecutorial discretion by [CBP]." As of April 22, 2022, the program had mailed more than 72,000 NTAs at a cost of over $15.3 million.

The information about Operation Horizon reflected that as of April 26, 2022, there had been over 226,000 aliens released under "prosecutorial discretion" under the NTR and Parole+ATD policies. More than 110,000 of those aliens had not been issued NTAs and more than 66,000 were outside the period that they were supposed to have reported to ICE to be issued an NTA.

ICE officials estimated that it would take nearly 3 years (and $25 million) to clear the "backlog" and issue NTAs to these 110,000 aliens if the Parole+ATD policy was stopped at that point.  For every 30 days that the policy continued in place, approximately an additional year and $8 million were added to the time and cost of clearing the backlog.

In the first few months following the November Memo, CBP continued to use §1226(a) as its principal release mechanism.   For example, in November 2021, CBP released 34,705 aliens under §1226(a) (i.e., NTA/OR) and only 5,683 under Parole+ATD.

Parole+ATD became CBP's primary release mechanism starting in April 2022, when 39,918 aliens were released under Parole+ATD as compared to 22,523 released under §1226(a).

Defendants continue to make heavy use of Parole+ATD even though the COVID-19 pandemic has been over for quite some time and the November Memo creating the Parole+ATD "pathway" stated that "when COVID-19 conditions eventually improve, it is expected that there will no longer be a need for this alternative pathway."

In November 2022, which is the last month of data in the record, almost 89,000 aliens (out of the 141,000 apprehended) were released into the country under the Parole+ATD "pathway."

Although DHS says it is screening arriving aliens released on Parole+ATD to determine if they are a public safety threat, the more persuasive evidence establishes that DHS cannot reliably make that determination. Indeed, according to Defendants own witnesses, DHS has no way to determine if an alien has a criminal history in his home country unless that country reports the information to the U.S. government or the alien self-reports. Therefore, DHS is mainly only screening aliens at the border to determine if they have previously committed a crime in the United States, and because many of these aliens are coming to the United States for the first time, DHS has no idea whether they have criminal histories or not.

Use of "alternatives to detention" (ATD) are unquestionably more cost-effective for the federal government than actual detention. It costs $125 per day to detain a single adult and $235 per day to detain a family unit, whereas enrolling an alien in an ATD costs less than $8 per day.

There are three primary types of ATD, but only one of which (ankle monitor with GPS monitoring) can fairly be characterized as detention-like.   The other types of ATD simply involve the alien periodically "checking in" with ICE remotely though a smart phone app or over the telephone.  The record does not reflect how many aliens are on each type of ATD.

The "absconder rate" for aliens on ATD is better than it was for aliens who were simply issued an NTR.  But, in 2022, the absconder rate for aliens on ATD was still 14.8%, which equates to tens of thousands of unaccounted-for aliens in the country.

ATD is less effective in ensuring that aliens will not abscond during their immigration proceedings than detention.   Indeed, ERO Director Corey Price acknowledged in his testimony that all forms of release have a risk of absconding and that the "surest way" to be able to remove inadmissible aliens is to "keep them in detention."  This is common sense.

### G.    Existence of a "Non-Detention Policy"

Florida contends that the Non-Detention Policy it is challenging in this case was created "in late January or early February of 2021 when

DHS leadership told CBP that strict limits on the release of aliens at the border were no longer in place and that aliens should only be detained if they are a public safety risk or flight risk."[19]

Defendants contend that there is no such policy and, to be sure, their witnesses testified that they received no blanket instruction not to detain aliens at the Southwest Border and that they are unaware of any formal policy that prioritizes release over detention. However, the more persuasive evidence establishes that aliens arriving at the Southwest Border are no longer being detained as a matter of course unless they are deemed to be a public safety risk or flight risk.

This is unquestionably a change from the policy that was in place during the Trump Administration, as USBP Chief Ortiz acknowledged in his testimony. Moreover, DHS Secretary Mayorkas effectively confirmed the change in policy (and, thus, the existence of the Non-Detention Policy challenged by Florida) when he testified to Congress in May 2022 that "detention has been misused in the immigration system for many years"

---

[19] The Court did not overlook Defendants' argument that Florida did not clearly articulate the precise nature of the "non-detention policy" that it claimed to exist until after the trial ended. However, Florida's description of the policy in its closing argument and its post-trial brief is consistent with how Florida described the policy in the Pre-trial Stipulation that supplanted the pleadings and framed the issues for trial. *See* Doc. 122 at 26.

and he explained that DHS is "increasing [its] use of alternatives to detention, and … using detention when it's a public safety imperative or an imperative to the continued appearance of individuals in immigration enforcement proceedings."

The fact over a million aliens have been released rather than detained at the Southwest Border since January 2021 is further evidence of a change in detention policy.   The testimony from Defendants witnesses that the increased number of aliens being released is attributable to something other than a change in policy (such as the post-pandemic increase in migration, either generally or from specific countries) is simply not credible and is contrary to the weight of the evidence.

Thus, notwithstanding Defendants' denials, the Court finds that the Non-Detention Policy challenged in this case does, in fact, exist.

## H.    Detention Capacity Reductions by Defendants

The evidence establishes that Defendants do not have sufficient detention capacity to detain all arriving aliens, but that does fact alone is not justify the Non-Detention Policy because, as discussed above, the policy itself contributed to "surge" of aliens arriving at the Southwest

Border, which, in turn, exacerbated to the capacity issues.  Additionally, despite the historic increases in border traffic, President Biden terminated the "Remain in Mexico" program authorized by 8 U.S.C. §1225(b)(2)(C) and Defendants took steps to reduce detention capacity, including closing all of DHS's family detention facilities and requesting less detention capacity from Congress.

During the last immigration surge in 2019, DHS maintained sufficient capacity to detain an average daily population (ADP) of as high as 55,000.

In 2020 (during the Trump Administration), DHS anticipated that border traffic would increase again when the COVID-19 pandemic ended so it requested an increase to 60,000 ADP in its fiscal year 2021 budget request.

Shortly after President Biden took office, DHS requested a reduction to 32,500 ADP for fiscal year 2022.  And for fiscal year 2023, DHS requested a further reduction to 25,000 ADP.

It is true that Congress is ultimately responsible for allocating the funds that are required to detain more aliens.  However, DHS led Congress to believe that it did not need more detention capacity because

it represented in its fiscal year 2022 and 2023 budget requests that "a reduction in detention capacity level will not impede ICE's ability to apprehend, detain, and remove noncitizens that present a threat to national security, border security, and public safety."

The fact that DHS continued to ask for less detention capacity and more money for "alternatives to detention" is another indication that the Non-Detention Policy challenged by Florida exists because it confirms Defendants' prioritization of "alternatives to detention" over actual detention.

Thus, like a child who kills his parents and then seeks pity for being an orphan, it is hard to take Defendants' claim that they had to release more aliens into the country because of limited detention capacity seriously when they have elected not to use one of the tools provided by Congress in §1225(b)(2)(C) and they have continued to ask for less detention capacity in furtherance of their prioritization of "alternatives to detention" over actual detention.

Likewise, it is hard to take seriously Defendants' argument that there would be "disastrous consequences" if the challenged policies were enjoined or vacated because the evidence establishes Defendants have

chosen to combat the historic "surge" of aliens arriving at the border with one hand tied behind their back by not taking advantage of all of the statutory tools provided by Congress—such as returning aliens to a contiguous territory under §1225(b)(2)(C) or, potentially, closing the border to particular classes of aliens under §1182(f).

This is particularly true now that the COVID-19 pandemic is "over" and people are able to congregate at sporting events, concerts, and other crowded venues. Indeed, at this point, the health risks associated with overcrowding at CBP facilities is simply no excuse for releasing an arriving alien without first initiating removal proceedings.

## I.     Impact of the Challenged Policies on Florida

The immigration crisis at the Southwest Border most significantly affects border states and communities, but its impacts are not limited to those areas. Florida and other states are also impacted by the border crisis because arriving aliens are being released at the border into the interior of the country in historic numbers. Indeed, the stated purpose of the challenged policies is to "decompress" CBP's border facilities and shift the processing of arriving aliens to ICE facilities around the country that are closer to the aliens' final destinations.

Since President Biden took office on January 20, 2021, USBP has released more than one million aliens at the Southwest Border. That figure does not include releases by OFO because OFO does not publicly report its releases, nor does it include releases by ICE because ICE does not distinguish between interior enforcement and border enforcement in its publicly released data. And that figure does not include "get aways"—i.e., aliens who get into the country without being apprehended. Thus, the actual number of additional aliens that have come into the country since President Biden took office is unknown.

DHS provided information in discovery estimating that about 160,000 of the aliens released into the country between January 2021 and July 2022 provided a Florida address or are on the Miami ERO docket, which covers Florida, Puerto Rico, and the Virgin Islands. That number does not account for aliens released after July 2022, which is notable because DHS's monthly releases have increased since then.

This evidence does not establish with absolute certainty the precise number of aliens who have been released into Florida under the challenged policies, but the Court has no trouble finding from this

evidence that well over 100,000 aliens released at the Southwest Border under the challenged policies ended up in Florida. [20]

Florida claims that it has expended millions of dollars of public funds on these aliens, but it is impossible to determine with any certainty how much was actually spent on aliens who are in the state as a result of the challenged policies because Florida does not track alien-related expenditures in a manner that allows it to identify expenditures on specific aliens released under the challenged policies.

The fact that Florida cannot tie a specific public expenditure to a specific alien impacted the weight the Court gave to the evidence from Florida's agency witnesses, but the Court did not discount that evidence in its entirety.

---

[20] During oral argument at the end of trial, Defendants' counsel suggested that the Court could only "assume" from this data that aliens released under the challenged policies were in Florida because the addresses were "self-reported" and an alien "may give a Florida address but may not reside there." However, when the Court pressed counsel on why the self-reported addresses were good enough for DHS to rely on to keep tabs on the released aliens but not good enough for the Court to rely on in making a finding that the aliens are where they said they were going to be, counsel was initially stumped (although the long pause and blank look on counsel's face does not come through in the transcript) before conceding that it would not be unreasonable to rely on this data to conclude that aliens released under the challenged policies were in Florida. *See* Doc. 151 at 192-94.

For example, the Court gave no weight to the evidence of public expenditures that pre-dated the challenged policies; expenditures that could not have applied to aliens who were released into Florida under the challenged policies because of eligibility requirements of the applicable statutory program (e.g., food stamps and standard Medicaid); or expenditures on programs that were fully funded by the federal government (e.g., refugee assistance program). However, the Court gave some weight to the other agency expenditure evidence (e.g., costs of incarceration, unemployment benefits, and emergency Medicaid) and it gave substantial weight to the testimony and evidence from the Florida Department of Education (DOE) witness.[21]

DOE does not maintain data about where and when alien students entered the country (or their immigration status) that would allow the Court to determine with absolute certainty that children of aliens

---

[21] The Court expressed a more jaded view of Florida's standing evidence during the oral argument after the close of evidence and the Court adheres to the view that some of Florida's standing evidence was "useless," some of it was "not particularly helpful," and some of it (namely, the DOE evidence) was fairly compelling. To the extent that there is any inconsistency in what the Court said at oral argument and what the Court is saying now about Florida's standing evidence, the findings in this Opinion and Order control because they are based on the Court's further consideration of the evidence based on the case law cited by the parties and discussed below.

released under the challenged polices enrolled in Florida schools. However, DOE does keep data on the number of "immigrant children and youth"[22] enrolled in Florida's public schools and that data provides sufficient information from which the Court can draw reasonable inferences about the number of alien children released under the challenged polices that are enrolled in Florida public schools.

In the 2020-21 school year there were just over 95,000 immigrant children and youth in Florida's public schools.  That number increased by more than 17,000 in the 2021-22 school year, and although there is no direct evidence establishing exactly how many of these children were released into the country under the challenged policies, it can be reasonably inferred from the testimony of the DOE witness (who personally visited schools and met with families) that a good number of these children were released into Florida under the challenged policies.

---

[22]  This term refers to individuals between the ages 3 and 21 who were not born in the United States and have not attended school in the United States in the last three academic school years.  *See* 20 U.S.C. §7011(5).

Florida spends roughly $8,000 per public school student per year, and an increase in the number of students in Florida's schools requires the state to spend more money over time.

Thus, even considering the other factors that might have contributed to an increase in immigrant children and youth in Florida's public schools (e.g., the fact that Florida and its schools were more "open" than other states during the COVID-19 pandemic), the Court has no trouble finding that at least some of the aliens released under the challenged policies have enrolled their children in Florida's public schools and caused the state financial harm.

The same is true with respect to the other programs under which Florida expends funds for aliens that are not fully reimbursed by the federal government—e.g., costs of incarceration, unemployment benefits, and emergency Medicaid—because it implausible that none of the more than 100,000 aliens released into Florida under the challenged policies have committed crimes or received benefits under those programs. Thus, although the evidence is not sufficient to establish with absolute certainty that Florida has expended public funds on specific aliens

released under the challenged policies, the evidence is sufficient for the Court to infer that it is more likely than not that it has done so.

It is unknown whether the costs that Florida spends on aliens released under the challenged policies are more or less than any revenue Florida derives from those aliens.  However, there is no evidence (or at least none that the Court found credible) that aliens released into Florida under the challenged policies provide any meaningful amount of revenue to the state.

In sum, despite the shortcomings in the evidence presented by Florida on public expenditures, the Court finds that at least some of the aliens released under the challenged policies have caused the Florida to incur additional expenses.  And, based on the large number of aliens released into Florida under the challenged policies and the breadth of the public benefits available to them (and the likelihood that at least some of them will commit crimes[23]), the Court further finds that these expenses will increase absent relief in this case.

---

[23]  This is an unfortunate reality, as ERO Director Price acknowledged in his testimony.  It is also not particularly surprising because, as noted above, DHS has no way of knowing whether the aliens being released under the challenged policies have

# III.   CONCLUSIONS OF LAW

Before getting to the merits of Florida's claims, the Court must address two "threshold" issues raised by Defendants—standing and justiciability.

## A.   Standing

Defendants have argued from the outset of this case that Florida lacks standing to sue over the challenged policies.  The Court has rejected this argument twice—first at the motion to dismiss stage, *see* Doc. 45 at 11-18, and again at the summary judgment stage, *see* Doc. 117 at 2; Doc. 119 at 21-26.  The third time is not the charm for Defendants.

### 1.   *Article III Standing*

"Federal courts have authority under the Constitution to decide legal questions only in the course of resolving 'Cases' or 'Controversies.'" *Hawaii*, 138 S. Ct. at 2416 (quoting Art. III, §2).  "One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue." *Id.*

---

committed crimes in their home country unless that information happens to be shared by the home country or the alien self-reports his or her criminal history.

"Standing requires more than just a 'keen interest in the issue.'" *Id.* (quoting *Hollingsworth v. Perry,* 570 U.S. 693, 700 (2013)). "It requires allegations—and, eventually, proof—that the plaintiff 'personal[ly]' suffered a concrete and particularized injury in connection with the conduct about which he complains." *Id.* (quoting *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016)).

To establish its "Article III standing," Florida must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant [and not the result of independent action of some third party], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338; *accord Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

An "injury in fact" must be "concrete and particularized, and actual or imminent, not conjectural of hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). However, injuries to "state sovereignty" can be real and concrete even though they are "intangible." *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023).

Additionally, states are entitled to "special solicitude" in establishing standing because, as the Eleventh Circuit recently held,

"[s]tates 'are not normal litigants for purposes of invoking federal jurisdiction.'"  *Id.* (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)); *see also Massachusetts*, 549 U.S. at 520; *Texas v. United States*, 787 F.3d 733, 753 (5th Cir. 2015) [hereafter *DAPA*],[24] *aff'd by an equally divided court*, *United States v. Texas*, 579 U.S. 547 (2016).

To invoke that special solicitude, a State must show (1) a procedural right and (2) a quasi-sovereign interest.  *See Massachusetts*, 549 U.S. at 519–20.  Once a State does so, the requirements of traceability and redressability are relaxed.

Here, Florida has procedural right under the APA, *see DAPA*, 787 F.3d at 751–52; *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1032 (M.D. Fla. 2021); and, Florida has a quasi-sovereign interests in its territory, in the presence of unauthorized aliens within that territory, and in the effect those aliens have on the public fisc, *see DAPA*, 787 F.3d at 752; *Arizona*,

---

[24] The Court did not overlook Defendants' argument that this case is more like *Arizona v. Biden*, 40 F.4th 375 (6th Cir. .2022), than *DAPA*, because this case is merely "a challenge to an amalgamation of policies and decisions."  *See* Doc. 156 at 74-75 n.21.  The Court finds this argument unpersuasive for three reasons:  first, although the challenged "non-detention policy" is a bit abstract, the Court found as a matter of fact that it exists; second, the Parole+ATD policy is indisputably an articulatable, concrete policy; and, third, the Eleventh Circuit's articulation of state standing and the special solicitude doctrine in *West Virginia* is more like the Fifth Circuit's decision in *DAPA* than to the Sixth Circuit's decision in *Arizona*.

567 U.S. at 422, 436 (Scalia, J., concurring in part and dissenting in part) (recognizing that controlling immigration "is an inherent attribute of sovereignty" and questioning whether the States, which "jealously guarded" their sovereignty during the Constitutional Convention, would have ratified the Constitution if it had provided that limits on immigration "will be enforced only to the extent the President deems appropriate").   Thus, Florida is entitled to special solicitude in the standing analysis.

If special solicitude is to have any meaning, it must apply in the immigration context because the states are dependent on the federal government to keep inadmissible aliens out of their territories since they ceded their sovereign right to do so to the federal government when they joined the Union.  Thus, if the DHS ignores the detention mandates in the INA and releases aliens into the country that Congress said it should be detaining, then the sovereign interests of states are concretely harmed because they cannot do anything to keep those aliens out of the state.

Not only that, but Defendants' failure to detain arriving aliens as required by the INA also requires states to spend a considerable amount of public money—which is unquestionably a concrete harm.  Indeed, on

that issue, the Supreme Court has recognized that states "bear[] many of the consequences of unlawful immigration," *Arizona*, 567 U.S. at 397, and that commonsensical proposition was also established by the evidence in this case—including the testimony of ERO Director Price that "that's been the way our immigration system has worked" for the 24 years that he's worked in the system.

Before applying the special solicitude standard to Florida's evidence, the Court briefly reviews how the Supreme Court applied special solicitude in *Massachusetts*.  In that case, the states alleged that global warming would cause a "rise in sea levels," lead to "severe and irreversible changes to natural ecosystems," "increase . . . the spread of disease," and "contribute to the ferocity of hurricanes." *Massachusetts*, 549 U.S. at 521–22.  The Supreme Court recognized that the states' traceability and redressability arguments were in many ways speculative—for example, "China and India" were likely to "offset any marginal domestic decrease" in greenhouse gas emissions. *Id.* at 523–24. Nonetheless, the Supreme Court applied the relaxed special solicitude standard and found that the states established their standing because the risk of harm to the states' sovereign interests in their territories

"would be reduced to some extent if [the states] receive the relief they seek." *Id.* at 526.

Florida's standing evidence in this case is far stronger than the states' evidence in *Massachusetts*, particularly with respect to impact of the challenged policies on its public education expenditures.

Like all states, Florida is required to include inadmissible aliens in the state's free public education. *Plyler v. Doe*, 457 U.S. 202, 230 (1982); *see also* §1003.21(1)(a), Fla. Stat. (requiring that all children ages six to sixteen attend school). And because Florida spends roughly $8,000 per student per year on primary and secondary education, an increase in alien children in the state will result in the state having to spend more money on education.

The evidence presented by Florida at trial, which the Court found credible and persuasive, established that Florida has and will continue to expend funds on aliens who were released under the challenged policies and would not otherwise be in the state. Specifically, the evidence showed that the number of "immigrant children and youth" enrolled in Florida schools have increased by more than 17,000 students since January 2021, which is corresponds to the timeframe within which

more than 100,000 aliens (including many family units with children) were released into Florida under the challenged policies.  Although the Court recognizes that "immigrant children and youth" include aliens other than those released under the challenged policies, the increase of 17,000 such students since January 2021, along with the other evidence in this case, establishes to the Court's satisfaction that at least some aliens released under the challenged policies are enrolling their children in Florida's schools and it is reasonable to expect that they will continue to do so as long as the challenged polies are in place.

This evidence is sufficient to establish each of the required elements for standing—injury in fact, traceability, and redressability—as discussed below.

As to injury in fact, "[e]conomic detriment . . . is the epitome of an injury in fact." *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989); *see also Plyler*, 457 U.S. at 228 n.23 (noting that "unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service").  Florida's public education expenditures plainly qualify as economic detriment.

As to traceability, these additional public education costs are traceable to the challenged policies because the increase in alien children in Florida schools corresponded to the dramatic increase in the number of aliens being released into Florida under the challenged policies. The fact that Florida cannot tie specific education expenditure to particular children released under the challenged policy is not required *without* special solicitude, *see Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280–81 (11th Cir. 2015) (agreeing that a plaintiff's injury need not "be traced to specific molecules of pollution emitted by the alleged polluter," only "that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged" (quotations omitted)), so Florida certainly need not make this showing *with* the benefit of special solicitude, *see Texas v. United States*, 50 F.4th at 517–18 (applying the special solicitude standard and finding standing even though "[t]he record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients").

Finally, as to redressability, "redressability and traceability overlap" in this case "as two sides of a causation coin." *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997). Florida seeks

declaratory relief, vacatur under the APA, and, consistent with the limits on injunctive relief in 8 U.S.C. §1252(f), permanent injunctive relief limited to DHS's violations of §1182(d)(5). Each form of relief would provide Florida at least partial redress. *See Massachusetts*, 549 U.S. at 518 (recognizing that a litigant has standing when "there is some possibility that the requested relief will prompt the injury-causing party to reconsider" its unlawful decisions); *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (explaining that a plaintiff need not show that its injuries will be completely redressed). Specifically, vacatur under the APA would "deprive" the challenged policies "of force," *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (quoting 91 C.J.S. *Vacate* (1955)), and is akin to an injunction in that it will prevent DHS from continuing to apply the policies at the Southwest Border and it will preclude DHS from using "parole" to release aliens *en masse* without initiating removal proceedings. This, in turn, will remedy (or at least reduce) the harm to Florida by reducing the number of aliens released into the state  *Cf. Chiles*, 865 F.2d at 1209–10 (finding that an injunction against the United States would remedy the injury to a local government caused by persons escaping from a federal detention center).

DHS contests redressability on the ground that released aliens who enroll their children in school are typically family units, and DHS's ability to detain family units for more than 20 days is limited by the *Flores* consent decree.  Thus, DHS argues, even absent the challenged policies, applicants for admission subject to mandatory detention under §1225(b) will be released after 20 days.  The Court finds this argument unpersuasive for two reasons.

First, if Florida prevails in its argument that §1225(b) mandates detention for aliens apprehended at the Southwest Border—and if DHS insists that *Flores* is causing the agency to violate that statute—one would expect DHS to bring that to the attention of the *Flores* court.  *Cf. Flores v. Lynch*, 828 F.3d 898, 908–09 (9th Cir. 2016) (holding that *Flores* does not "grant release rights to parents"); *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022) (clarifying that district courts may not enjoin the operation of §1225(b) on a class-wide basis).  To instead insist that DHS may consent to violate the law and that doing so eliminates Article III jurisdiction is just plain wrong.

Second, the evidence at trial showed that *Flores* does not categorically prevent DHS from detaining family units in a way that

would negate redressability. The purpose of the *Flores* 20-day presumption is to allow DHS to apply expedited removal to family units under §1225(b)(1), which can be completed in that short window. And even if DHS fails to complete removal in 20 days, the agency has ample time to at least *initiate* removal proceedings prior to release—which could result in those proceeding concluding sooner and thereby reducing the total time the aliens are enrolled in Florida's schools.

Accordingly, the Court finds that Florida has established Article III standing based on the funds it spends providing public education to alien children. Florida's remaining standing evidence, which is from four other state agencies, bolsters Florida's standing because the Court can infer from that evidence that Florida likely has and will continue to spend some amount of public funds on aliens released under the challenged policies.

The Court did not overlook Defendants' argument that Florida derives more revenue from aliens released into the state under the challenged policies than it incurs in costs. However, there is no evidence that revenues generated from aliens released under the challenged policies exceeded the costs incurred by Florida on those aliens. Moreover,

A098

as the Fifth Circuit has explained, once the plaintiff has shown that it has suffered an injury, it is not the role of the Court to engage in the "accounting exercise" of weighing costs and benefits for standing purposes. *See Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022); *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015) (quoting *NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013)).

## 2.    *Statutory Standing*

In addition to Article III standing, Florida must also establish that it has "statutory" standing under the APA.  That requires Florida to show that its claims fall within the "zone of interests" of the statutes on which the claim is based—here, the INA.  *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). The zone of interests test "is not meant to be especially demanding," *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and "the benefit of any doubt goes to the plaintiff," *Patchak*, 567 U.S. at 225.

Florida satisfies that test because "[i]t's clear that the INA aimed, at least in part, to protect States from" harms to their fisc.  *See Texas v. Biden*, 20 F.4th 928, 975 (5th Cir. 2021), *rev'd on other grounds*, *Biden v. Texas*, 142 S. Ct. 2528 (2022); *accord Cook Cnty., Ill. v. Wolf*, 962 F.3d

208, 220 (7th Cir. 2020) (holding that a county was within the zone of interests of the INA); *see also Demore v. Kim*, 538 U.S. 510, 517–21 (2003) (explaining that the 1996 amendments to the INA were motivated in part by the costs caused by the government's failure to remove deportable aliens).  Indeed, several provisions of the INA specifically seek to protect the States from the injuries the federal government causes when it fails to fulfill its duties.  *See, e.g.*, 8 U.S.C. § 1231(i) (granting the States partial reimbursement for the costs of incarcerating criminal aliens).

\*   \*   \*

In sum, for the reasons stated above, the Court finds that Florida has standing under Article III and the APA to challenge the policies at issue in this case.

## B.    Justiciability

Defendants argue that Florida's claims are non-justiciable "political questions" and that the challenged policies are not subject to judicial review under the APA.  The first argument is unpersuasive, but the second argument is in part.

### 1.    *Political Question*

Defendants "political question" argument relies primarily on *Chiles v. United States*, in which the Eleventh Circuit held that questions about whether the Executive Branch "is adequately guarding the borders of the United States" are nonjusticiable "political questions."  69 F.3d 1094, 1096–97 (11th Cir. 1995).  However, *Chiles* is distinguishable because, in that case, Florida officials were challenging the Attorney General's failure to perform his <u>general</u> duty under 8 U.S.C. §1103(a) (1993), "to control and guard the boundaries and borders of the United States against the illegal entry of aliens."  Here, by contrast, Florida is challenging Defendants' alleged noncompliance with statutes that contain <u>specific</u> requirements, including one, §1225(b), that "mandates" detention, *see Jennings*, 138 S. Ct. at 845, and another, §1182(c)(5), that according to the Supreme Court, is not "unbounded" and contains standards that are susceptible to judicial evaluation, *see Biden v. Texas*, 142 S. Ct. at 2543 ("Importantly, the [parole] authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'

And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained.").

Moreover, not every case that has significant political overtones (as this one certainly does) presents a non-justiciable political question. *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (explaining that the doctrine "is one of 'political questions,' not one of 'political cases'"). Thus, although it would certainly be much easier for the Court to simply say that elections have consequences and that the parties' disagreement over proper immigration policy should be resolved in Congress or at the ballot box rather than in court, the Court sees no jurisdictional or prudential reason why it should not exercise its duty to "say what the law is" in this case and then let the political chips fall where they may.

That said, there is nothing particularly surprising about the fact that the Biden Administration had different immigration policy preferences and priorities than the Trump Administration. That fact alone does not make the challenged policies illegal because "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for any executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, C.J., concurring in part and dissenting in part); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (explaining that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better") (emphasis in original); *Dep't of Com.*, 139 S. Ct. at 2573 ("[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 979 (9th Cir. 2015) (Smith, J., dissenting) (noting that "[e]lections have legal consequences" and "policies of the new president will occasionally clash with, and supplant, those of the previous president, often leading to changes in rules promulgated pursuant to the [APA]"). However, that does not mean that every policy change that is influenced by a change in Administrations is immune from judicial review because a new Administration may not simply "choose not to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its

regulatory functions." *State Farm*, 463 U.S. at 59 n.* (Rehnquist, C.J., concurring in part and dissenting in part); *see also Fox Television*, 556 U.S. at 515 (explaining that an agency "may not … depart from a prior policy *sub silentio* or simply disregard rules that are still on the books").

## 2.   *APA Reviewability*

"The APA establishes a basic presumption of judicial review." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quotations omitted); *accord Dep't of Com.*, 139 S. Ct. at 2567 ("The Administrative Procedure Act embodies a basic presumption of judicial review." (quotations omitted)).  To overcome that presumption, DHS argues that the challenged policies (a) are not "final agency action" under 5 U.S.C. §704 and (b) are "committed to agency discretion by law" under 5 U.S.C. §702(a)(1), and that (c) review is barred by §§1252(a)(2)(B)(ii) and 1226(e).  Each argument will be addressed in turn.

### a.   *Final Agency Action*

DHS presents two arguments as to why the challenged policies are not final agency action:  first, it argues that the challenged policies are

not agency action at all; and second, it argues that even the challenged policies are agency action, they are not final under the APA.

The APA defines "agency action" as "the whole or a part of an agency rule,[25] order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C §551(13); *see also* 5 U.S.C. §701(b)(2) (explaining that the APA incorporates the definition of "agency action" in 5 U.S.C §551).  An agency action is "final" if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted).

### i.     *Non-Detention Policy*

Florida characterizes the Non-Detention Policy as Defendants' decision to replace the "very exigent circumstances" standard for releasing arriving aliens into the country with the "not a public safety or flight risk" standard.  The evidence undoubtedly shows DHS's expressed

---

25     A "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."  5 U.S.C. §551(4).

preference for release of arriving aliens over detention.   However, the
Non-Detention Policy is not a judicially reviewable agency action because
the policy preference embodied in the policy was not imposed as a blanket
mandate but rather it was implemented through a series of discrete
policies, including the NTR policy and the various iterations of the
Parole+ATD policy.   Those discrete policies are (or were) subject to
judicial review under the APA, but the overarching Non-Detention Policy
is not.  *See Biden v. Texas*, 142 S. Ct. at 2545 (holding that the lower court
erred in reviewing an abstract decision instead of each individual
operative agency action); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–
91 (1990) (rejecting a wholesale challenge to an entire "program" under
the APA because that program was not an agency action, but rather was
made up of many individually challengeable agency actions); *Whitewater
Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011–12 (9th
Cir. 2021) (rejecting a broad APA challenge to immigration policies that
the plaintiffs labelled a "program" to try to challenge them all in "one fell
swoop," and instead requiring the plaintiffs to either "identify a
particular action … that they wish to challenge under the APA, or …
pursue their remedies before the agency or in Congress"); *Brnovich v.*

*Biden*, -- F. Supp. 3d --, 2022 WL 4448322, at *10 (D. Ariz. Sept. 23, 2022)

(applying *Biden v. Texas* to reject a challenge to the defendants' "policy of programmatically mass-granting parole to unauthorized aliens" because the plaintiffs "d[id] not challenge a particular, discrete agency action, but rather some generalized and amorphous conception of Defendants' detention and parole policies"). Thus, the Non-Detention Policy is not subject to review under the APA.

### ii.    *Parole+ATD Policy*

Unlike the Non-Detention Policy, the Parole+ATD policy is a discrete agency action. The policy is contained in the July Memo, which is signed by the heads of ICE and CBP, and it instructs agents how to exercise their discretionary authority under the parole statute and sets criteria by which aliens are eligible or ineligible for parole. It is also "final" because it established "new marching orders" by which immigration officials would determine whether or not to detain arriving aliens, *see City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007), and it effectively determined Florida's obligations with respect to those aliens—including its constitutional obligation to provide education and its statutory obligations under Medicaid. The fact that

CBP officers retain discretion to detain or parole individuals does not negate the finality of the agency action embodied in the July Memo. *See Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 614–15 (7th Cir. 2003). Thus, the Parole+ATD Policy is subject to judicial review under the APA.

### b. *Committed to Agency Discretion*

The "committed to agency discretion" exception is read "quite narrowly" and applies only where the relevant statute leaves "no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quotations omitted); *accord Dep't of Com.*, 139 S. Ct. at 2568 (explaining that the agency's discretion must be "unbounded" for §701(a)(2) to apply). This exception does not apply to either of the challenged policies. Specifically, with respect to the Parole+ATD policy, Supreme Court indicated—albeit in dicta—that DHS's use of the parole authority in §1182(d)(5) is not categorically exempt from judicial review because the "exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden v. Texas*, 142 S. Ct. at 2543.

## c. *Review Precluded by the INA*

Defendants' argument that judicial review of the challenged policies is precluded by the INA is essentially the same argument that they made—and the Court rejected—at the motion to dismiss stage. *See* Doc. 45 at 26-27. Defendants' arguments are no more persuasive now than they were then, and they are again rejected for the reasons stated in the Order denying Defendants' motion to dismiss. *See also Jennings*, 138 S. Ct. at 841 (rejecting argument that §1226(e) precludes a challenge to the extent of the Government's detention authority under the statutory framework as a whole).

\*   \*   \*

Having determined that Florida has standing to assert its claims and that the claims related to the Parole+ATD Policy are justiciable, the Court will now turn to the merits of the claims. The Court will also discuss the merits of the Non-Detention Policy—both for sake of completeness and to avoid a remand if a higher court determines that the policy is judicially reviewable under the APA.

C.    Merits

The Court must separately analyze the claims related to the alleged "non-detention policy" and the claims related to the Parole+ATD policy because the former is based on the entire evidentiary record whereas the latter is based on the supplemental administrative record.[26]

---

[26]    The Court anticipated that the claims related to the Parole+ATD policy would be decided on cross-motions for summary judgment, but only Defendants sought summary judgment on that policy.  This created a procedural quandary because if the Court determined at the summary judgment stage that the Parole+ATD policy contravened the law or was not supported by the evidence in the supplemental administrative record, the Court could only deny Defendants' motion and it could not enter summary judgment in Florida's favor.

The Court sought to address this procedural quandary by scheduling oral argument on the parties' motions for summary judgment before trial to "give the parties an opportunity to address whether the Court could grant summary judgment for Florida on its challenge to the Parole + ATD policy under Fed. R. Civ. P. 56(f)(1) if the Court … determines that the record does not support the policy."  Doc. 110 at 1 (footnote omitted).  For various reasons, *see* Doc. 119 at 18-21, the oral argument could not be scheduled before trial, so the Court deferred review of the Parole+ATD policy "until at or after trial so all of the issues in this case can be resolved at the same time," Doc. 117 at 2.

At the conclusion of the trial, the Court afforded the parties an opportunity to present oral argument addressing both how the Court should view the evidence presented at trail and how the Court should assess the Parole+ATD policy based on the supplemental administrative record.  The oral argument lasted for more than five hours, and the Court extensively questioned both sides about the legality of the Parole+ATD policy and the evidentiary support for the policy in the supplemental record.  The Court finds that the oral argument (coupled with the opportunity to file post-trial briefs) afforded Defendants the "reasonable time to respond" contemplated by Rule 56(f)(1).

Thus, notwithstanding the fact that Florida did not file a motion for summary judgment with respect to the Parole+ATD policy, the Court can now grant judgment in favor of Florida on that policy if that is what the law requires.  Alternatively, if the Court determines that Defendants are entitled to summary judgment on the Parole+ATD motion, the Court can grant their motion.  On the latter point, the Court

### 1.    *Non-Detention Policy*[27]

The evidence establishes that in late January or early February of 2021, DHS made a discrete change in detention policy from "release only if there is a compelling reason to" to "release unless there is a compelling reason not to."  Specifically, before January 2021, DHS limited the release of aliens at the Southwest Border to very exigent circumstances, but under the new policy—what Florida characterizes as the Non-Detention Policy—DHS began instructing agents to release aliens at the Southwest Border unless the alien is a public safety or flight risk.

Florida claims that this Non-Detention Policy is (a) contrary to law and in excess of statutory authority in violation of 5 U.S.C. §706(2)(A) and (C); (b) arbitrary and capricious in violation of 5 U.S.C. §706(2)(A);

---

did not overlook that it previously "denied" Defendants' motion for summary judgment, *see* Doc. 117 at 2 (¶4), but upon reflection, that disposition should have stated that the motion was "denied in part and deferred in part" because, as the body of the Order denying the motion explains, the Court was deferring judicial review of the Parole+ATD policy until at or after trial, *id.* at 2.  That Order is hereby amended *nunc pro tunc* to reflect that disposition.

[27] The Court recognizes that this discussion of the merits of the Non-Detention Policy is effectively dicta based on the conclusion that the policy is not "agency action" subject to judicial review.  However, because the "agency action" issue was a close question in the Court's mind, the Court elected to include a robust analysis of the merits of the Non-Detention Policy to avoid the need for a remand in the event that a higher court determines that the Court erred in concluding that the Non-Detention Policy was not "agency action."

and (c) promulgated without notice and comment as required by 5 U.S.C §553.  Each claim will be considered in turn.

### a.      *Contrary to Law (Count 1)*

Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. §706(2)(A), or "in excess of statutory . . . authority, or limitations, or short of statutory right," *id.* at §706(2)(C).

Florida contends that the Non-Detention Policy is contrary to law because §1225(b) requires DHS to detain aliens apprehended crossing the Southwest Border, but the Non-Detention Policy instructs DHS's officials to release these aliens except under narrow circumstances.   DHS responds that detention under §1225(b) is discretionary, and that even if detention under that statute is mandatory, it has discretion to release arriving aliens under either §1226(a) or §1182(d)(5).

Under the INA, certain aliens are "deemed . . . applicant[s] for admission."  8 U.S.C. §1225(a)(1).  Specifically, applicants for admission include aliens "who arrive[] in the United States . . . whether or not at a designated port of arrival" and aliens "present in the United States who

ha[ve] not been admitted." *Id.* Section 1225 imposes certain duties on immigration officers to "[i]nspect" applicants for admission, regardless of whether the aliens are "arriving in the United States" or whether they are present without having "been admitted or paroled." 8 U.S.C. § 1225(b); *see also* 8 U.S.C. §1225(a)(3) (explaining that "[a]ll aliens . . . who are applicants for admission . . . shall be inspected").

This broad definition of applicants for admission is a relatively recent addition to the INA. Before 1996, the INA only contemplated inspection of aliens arriving at ports of entry. *See* 8 U.S.C. § 1225(a), (b) (1995). Other aliens, such as those who entered illegally, were not subject to §1225(b). *See* 8 U.S.C. §1251(a)(1)(B) (1995) (explaining that an alien "who entered the United States without inspection . . . is deportable" rather than being subject to inspection and exclusion).

In 1996, however, Congress expanded §1225 by adding the broad definition of "applicant for admission" quoted above. Pub. L. No. 104-208 § 302, 110 Stat. 3009-579 (1996). In doing so, Congress subjected a broader category of aliens to the inspection regime that applied to aliens who showed up at a port of entry seeking admission. *See Jennings*, 138 S. Ct. at 836–37 ("Applicants for admission must be 'inspected by

73

**A113**

immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law." (quoting 8 U.S.C. §1225(a)(3)).

All parties agree, and the Court has found, that the aliens at issue in this case meet the statutory definition for applicants for admission and are subject to inspection under §1225. *See* Doc. 87-1 at SAR0001 (explaining that what DHS refers to as "processing" of illegal border crossers is an "inspect[ion] . . . consistent with 8 U.S.C. §1225(a)"). The Court therefore turns to the three points of contention relevant to the lawfulness of the Non-Detention Policy: (1) whether detention of applicants for admission under §1225(b) is mandatory; (2) whether and when DHS may release applicants for admission at the Southwest Border under §1226(a); and (3) whether and when DHS may release these aliens under §1182(d)(5).

Section 1225(b) governs the inspection process for applicants for admission. Certain applicants are subject to "expedited removal" under §1225(b)(1), pursuant to which they are to be removed "without further hearing" unless they seek asylum or establish a credible fear persecution in their home country. All other applicants are subject to "standard"

removal proceedings under §1225(b)(2).  The nuances of each type of proceeding are immaterial to the issues in the case because, regardless of the specific proceeding the applicant is subject to, he or she "shall be detained" pending immigration proceedings, *see* 8 U.S.C. §§1225(b)(1)(B)(ii), 1225(b)(1)(B)(iii)(IV), 1225(b)(2)(A), and the detention mandate continues "until [the applicable removal] proceedings are complete." *Jennings*, 138 S. Ct. at 842.

Notwithstanding the plain text of §1225(b) and the Supreme Court's holding in *Jennings*, DHS argues that detention of applicants for admission is discretionary.  In DHS's view, §1225(b)'s mandatory language flows in only one direction—the statute prevents aliens from obtaining release, but it does not create obligations for DHS.  In other words, DHS interprets the "shall" language in § 1225(b) to limit the rights of aliens but not to limit its discretion.

The Court rejects DHS's argument and concludes that §1225(b)'s "shall be detained" means what it says and that is a <u>mandatory</u> requirement.  This conclusion flows directly from *Jennings* in which the Supreme Court explicitly stated that "§1225(b)(1) and (b)(2) … <u>mandate</u> detention," 138 S. Ct. at 842 (emphasis added), and explained that "the

word 'shall' usually connotes a requirement," *id.* at 844 (quotations omitted); *see also United States v. Quirante*, 486 F.3d 1273, 1275 (11th Cir. 2007) (explaining that "[t]he word 'shall' does not convey discretion" and that "where Congress uses the word 'shall' to describe a party's obligation, Congress intends to command rather than suggest"). This conclusion is confirmed by the heading for §1225(b)(1)(B)(iii)(IV), which describes that provision as creating "[m]andatory detention." *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (explaining that "statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute" (quotations omitted)).

Moreover, Congress's use of the discretionary the word "may" in other similar provisions of the INA bolsters the Court's conclusion that §1225(b)'s detention requirements are mandatory. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (quotations omitted)). For example, §1226(a) states that certain other aliens "*may* be arrested and detained" (emphasis added). And in other

provisions of §1225, Congress recognized the difference between a discretionary option and a mandatory command. *See, e.g.*, 8 U.S.C. §1225(b)(2)(C) ("[T]he Attorney General *may* return the alien to [a contiguous territory] pending" removal. (emphasis added)).

DHS argument that "shall" in the detention statutes actually means "may" relies primarily on *Town of Castle Rock v. Gonzales* and the "deep-rooted nature of law-enforcement discretion." 545 U.S. 748, 761 (2005).[28] But nothing in that case undermines the settled principles that the concept of law-enforcement discretion does not "set agencies free to disregard legislative direction" and that Congress is free to cabin enforcement discretion by providing "guidelines for the agency to follow in exercising its enforcement powers." *Heckler v. Cheney*, 470 U.S. 821, 832-33 (1985); *see also Texas v. United States*, 40 F.4th 205, 225–26 (5th Cir. 2022) (distinguishing *Castle Rock* because it concerned a singular, individualized instance of nonenforcement, not any agency-wide policy of nonenforcement in the face of an "incontrovertibly mandatory" statutory

---

[28] DHS also suggests that it has discretion to forego any immigration enforcement against a particular alien altogether, which in turn, would allow it to avoid §1225(b)'s detention requirements. *See* Doc. 156 at 160. However, even if that is true (and politically feasible), the evidence in this case establishes that DHS is initiating removal proceedings against the aliens subject to the challenged policies.

command to the contrary).  Here, as explained above, Congress cabined DHS's discretion in §1225(b) when it commanded the agency, in clear and unambiguous language, to detain applicants for admission pending removal proceedings.

Having concluded that §1225(b) is mandatory rather than discretionary, the Court turns to whether either of the release mechanisms DHS invokes are permissible.  As detailed in the findings of fact, DHS has applied the Non-Detention Policy in some instances by releasing aliens under §1226(a) and in other instances by releasing aliens under §1182(d)(5).

The Court begins with § 1226(a).  That statute begins by stating that, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed."  It then states that, following such arrest, the Attorney General "may continue to detain the arrested alien" or "may release the alien" either "on bond" or on "conditional parole."  8 U.S.C. §1226(a)(2).

DHS contends that §1226(a) applies to aliens arriving at the Southwest Border once the alien reaches U.S. soil.  And because §1225(a)'s definition of applicants for admission also includes these

aliens, DHS contends that Congress gave the agency a choice—if DHS wants to detain an alien at the Southwest Border, it can apply §1225(b), but if DHS wants to release the alien, it can apply §1226(a).

The Court rejects DHS's argument for two reasons.  First, §1226(a) does not apply to applicants for admission apprehended at the Southwest Border.  Second, even if the statute could apply under some circumstances, the evidence at trial showed that DHS is initially processing applicants for admission at the Southwest Border under §1225, and there is nothing in the INA that contemplates that processing can switch between §1225 and §1226.

Starting with the first point, §1225(a) treats a specific class of aliens as "applicants for admission," and §1225(b) mandates detention of these aliens throughout their removal proceedings. Section 1226(a), by contrast, states in general terms that detention of aliens pending removal is discretionary unless the alien is a criminal alien.

As the Supreme Court stated in *Jennings*, §1226 applies to "certain aliens *already in the country*." 138 S. Ct. at 837–38 (emphasis added). And even if an alien crossing the Southwest Border fell within §1226(a)'s general language, §1225(b)'s specific mandatory language would trump

§1226(a)'s general permissive language.  Indeed, "it is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).  And this canon squarely applies to §1225 and §1226, as it is "most frequently applied to statutes in which a general permission . . . is contradicted by a specific prohibition." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Moreover, DHS's position would render mandatory detention under §1225(b) meaningless.  Indeed, the 1996 expansion of §1225(b) to include illegal border crossers would make little sense if DHS retained discretion to apply §1226(a) and release illegal border crossers whenever the agency saw fit.  *Cf. Demore*, 538 U.S. at 518 (explaining that "wholesale failure[s]" by the federal government motivated the 1996 amendments to the INA).  In fact, as the Attorney General has explained, "section [1225] (under which detention is mandatory) and section [1226(a)] (under which detention is permissive) can be reconciled only if they apply to different classes of aliens." *Matter of M-S-*, 27 I. & N. Dec. 509, 516 (Att'y Gen. 2019); *see also Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1116 (9th Cir. 2007) (holding that an alien who was apprehended within the

interior of the United States necessarily must have been paroled under §1226(a), not §1182(d)(5)(A), because he was not apprehended at the border as a §1225 arriving alien, as is required to be eligible for parole under §1182(d)(5)(A)).

That brings the Court to the second point. Even if DHS were correct that §1225(b) and §1226(a) overlap, and even if DHS were correct that it has discretion to decide which provision to apply, what DHS certainly may not do is initiate an inspection under §1225 and then, at some later time, attempt to shift the alien's detention to §1226(a).

DHS's initial apprehension and processing of applicants for admission at the Southwest Border is an "inspection" under §1225. During that inspection, if DHS decides to release an alien under §1226(a), it initiates a removal proceeding against the alien under 8 U.S.C. §1229a by serving a NTA and then relies on those pending removal proceedings as a basis to shift the alien's detention from §1225(b) to §1226(a). At closing argument, counsel for DHS described the agency's position that the decision to place an applicant for admission in standard removal proceedings under §1229a, instead of expedited removal proceedings under §1225(b)(1), causes §1226(a) to govern the alien's detention. The

problem with this argument (and what makes DHS's application of §1226(a) in this manner unlawful) is that §1225(b)(2), not §1226(a), governs the detention of applicants for admission whom DHS places in standard removal proceedings following in inspection under §1225. *See* 8 U.S.C. §1225(b)(2)(A) (explaining that if the immigration officer determines that the alien is not clearly and beyond a doubt entitled to admission, "the alien shall be detained for a proceeding under §1229a").

In *Jennings*, the plaintiffs made the same basic argument DHS advances here—i.e., that "for a proceeding" in §1225(b)(2) means "only until the *start* of applicable proceedings" and that §1226(a) governs detention once those proceedings begin. *See* 138 S. Ct. at 844. The Supreme Court, however, rejected the plaintiffs' position that §1226(a) governs the detention of applicants for admission once removal proceedings begin, holding that "(b)(2) mandate[s] detention of aliens *throughout the completion of applicable proceedings* and not just until the moment those proceedings begin." *Id.* at 845 (emphasis added).

Another problem with DHS's reliance on §1226 is that the statute is not even triggered unless an arrest warrant is issued. *See* 8 U.S.C. §1226(a) ("<u>On a warrant issued by the Attorney General</u>, an alien may be

arrested and detained pending a decision on whether the alien is to be removed from the United States.") (emphasis added). If the alien has not been arrested on a warrant, then the subsequent provisions giving the Attorney General discretion to detain or release "the arrested alien" are likewise not triggered. *See* 8 U.S.C. §1226(a)(1), (a)(2).

Here, the evidence establishes that DHS is not obtaining warrants for aliens apprehended at the Southwest Border. Instead, it relies on the warrantless arrest authority in 8 U.S.C. §1357(a)(2) to take the aliens into custody for inspection and processing. Even if DHS is putting an "administrative warrant" in the alien's file when the NTA is issued the alien is released,[29] that is not happening for aliens released under the Parole+ATD policy until (or if) they report to an ICE office for issuance of an NTA. But, by that point, the decision to release the alien has already been made.

Additionally, as the Supreme Court noted in *Jennings*, what DHS claims to be doing makes little sense. *See* 138 S. Ct. at 845 ("If respondents' interpretation of § 1225(b) were correct, then the

---

[29] Conflicting evidence on this point was presented at trial, but the Court credits the testimony of DHS's Rule 30(b)(6) witness who testified that a warrant (administrative or otherwise) is not obtained before the alien is released.

Government could detain an alien without a warrant at the border, but once removal proceedings began, the Attorney General would have to issue an arrest warrant in order to continue detaining the alien.  To put it lightly, that makes little sense.").  The warrants required by §1226(a) are *arrest* warrants, but by the time DHS puts the "administrative warrant" in the alien's file (if it is even doing so), the alien has already been arrested under §1357 and the warrant is only being issued to the alien can be *released*.  This sleight of hand—using an "arrest" warrant as de facto "release" warrant—is administrative sophistry at its worst.

Having concluded that §1225(b) requires detention of applicants for admission at the Southwest Border and that DHS may not release these aliens under §1226(a), the Court must next address whether DHS's releases under §1182(d)(5) are lawful.  However, because Florida separately challenges the Parole+ATD policy, and because that policy explains how DHS is using §1182(d)(5) at the Southwest Border, the Court will address that question when it discusses the Parole+ATD policy.  Suffice it to say at this point, if the Non-Detention Policy was "agency action" subject to judicial review, the Court would find that it is

unlawful insofar as it allows aliens arriving at the Southwest Border to be released under §1226(a).

<center>*   *   *</center>

In sum, although the Non-Detention Policy is "not in accordance with law" and is "in excess of statutory authority" under 5 U.S.C. §706(2)(A) and (C), Defendants are entitled to judgment in their favor on Count 1 of the second amended complaint because the Non-Detention Policy is not discrete "agency action" that is subject to judicial review.

### b.     Arbitrary and Capricious (Count 3)

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. §706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Indeed, meaningful judicial review requires an agency to "disclose the basis of its action." *See Dep't of Com.*, 139 S. Ct. at 2573 (quotations omitted).

Here, Florida contends that DHS's refusal to acknowledge its change in policy renders the Non-Detention Policy arbitrary and

<center>85</center>
<center></center>

capricious.   The Court agrees.   As Justice Scalia explained in *Fox Television*, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."  556 U.S at 515.  And an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *Id.*  DHS's issuance of the Non-Detention Policy was a distinct change in detention policy, and DHS's failure to acknowledge that change, or to provide a decisional document or administrative record for this Court to review, is fatal because the Court has no way to assess whether the agency's actions are reasonable and reasonably explained.

Nevertheless, because the policy is not "agency action" subject to judicial review, Defendants are entitled to judgment in their favor on Count 3 of the second amended complaint.

### c.      *Notice and Comment (Count 5)*

The APA "specifies that an agency shall afford interested persons general notice of proposed rulemaking and an opportunity to comment before a substantive rule is promulgated."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979) (discussing 5 U.S.C §553).  The APA distinguishes

between interpretive rules, which are not subject to notice and comment, and substantive rules, which are. *Id.* at 301–03. A rule is substantive and thus subject to notice and comment if it "affect[s] individual rights and obligations." *Id.* at 302 (quoting *Morton v. Ruiz*, 415 U.S. 199, 232 (1974)). For similar reasons that the Non-Detention Policy is not final agency action subject to judicial review, it is not a substantive rule subject to notice and comment. Accordingly, Defendants are entitled to judgment in their favor on Count 5 of the second amended complaint.

### 2.    *Parole+ATD Policy*

The latest iteration of the Parole+ATD Policy is contained in the July Memo. As with the Non-Detention Policy, Florida claims that the Parole + ATD Policy is contrary to law, arbitrary and capricious, and subject to notice and comment. The legal standards that govern each of these claims are set forth above in the discussion of the Non-Detention Policy, and for the most part,[30] the Court reviews these issues based on

---

[30] The Court can look beyond the administrative record where the absence of evidence "effectively frustrates judicial review" by failing to present a clear picture of the agency's actions. *See Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.1 (11th Cir. 1996). Here, there is undisputed extra-record evidence showing that DHS has been using Parole+ATD as its primary processing pathway since April 2022—with almost 89,000 releases under the policy in November 2022 alone. *See* Pl. Ex. 3, 4. This evidence blatantly

the supplemental administrative record prepared by DHS.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

### a.     *Contrary to Law (Count 2)*

Florida argues that the July Memo is contrary to law because it ignores the plain language of §1182(d)(5).  That statute provides in pertinent part:

> The Attorney General may … in his discretion <u>parole</u> into the United States temporarily under such conditions as he may prescribe <u>only on a case-by-case basis for urgent humanitarian reasons or significant public benefit</u> any alien applying for admission to the United States, … <u>and when the purposes of such parole shall … have been served the alien shall forthwith return or be returned to the custody from which he was paroled</u> and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

(emphasis added).

---

contradicts the statements in the July Memo that "Parole + ATD is a tool that should be used sparingly" and that it is "not meant to be a primary processing tool."  Doc. 87-1 at SAR003.  Without considering this extra-record evidence, judicial review of the Parole+ATD policy would be frustrated because the Court would not be able to fairly assess whether the July Memo complies with the case-by-case requirement in §1182(d)(5).  *See Biden v. Texas*, 142 S. Ct. at 2554 (Alito, J., dissenting) ("But the number of aliens paroled each month under that provision—more than 27,000 in April of this year—gives rise to a strong inference that the Government is not really making these decisions on a case-by-case basis.").

For the reasons that follow, the Court concludes that the July Memo is contrary to law in three ways: (1) it does not contemplate a return to custody once the purposes of parole have been served; (2) it does not comply with the case-by-case requirement; and (3) it does not limit parole to urgent humanitarian reasons or significant public benefit.

### *i.      Return to Custody Requirement*

The July Memo does not even acknowledge the requirement that an alien be returned to DHS custody when "the purposes of such parole shall . . . have been served." 8 U.S.C. §1182(d)(5)(A). As counsel for DHS conceded during oral argument, the "purpose" of parole contemplated by the July Memo is moving aliens out of CBP facilities faster than would occur if the alien were processed consistent with the requirements of §1225.[31]   In doing so, the July Memo seeks to shift the inspection

---

[31]   DHS argues for the first time in its post-trial brief that decompression of CBP facilities was not the only purpose of the Parole+ATD policy. *See* Doc. 156 at 102-04.   This argument is refuted by face of the July Memo, which states that "Parole+ATD is … a safety valve to address overcrowding" and is a "processing mechanism to address situations in where there is not appropriate detention space available, and there are operation concerns about the number of people present in … USBP facilities along the Southwest Border." Doc. 87-1 at SAR0002.   Moreover, although the ATD component of the policy may help ensure compliance without court appearances, etc., the supplemental record as a whole leaves no doubt that the sole purpose of the policy was to relieve overcrowding at CBP border facilities by shifting the processing of "removal paperwork" to ICE field offices around the country.

contemplated by §1225 to an ICE field office in the interior of the country. That being the case, the purpose of the parole is served when the alien has his first encounter with ICE.   However, nothing in the July Memo or the supplemental administrative record contemplates a return to custody at that time or any time thereafter—indeed, the supplemental administrative record shows that aliens are all-but-guaranteed that they "will not be taken into custody" when they report to ICE for issuance of an NTA.  *See* Doc. 87-1 at SAR 0168.

Relatedly, §1182(d)(5) contemplates that the alien would have a "case" pending because it provides that once the purpose of parole has been served and the alien is returned to custody, "his case shall continue to be dealt with in the same manner as that of any other applicant for admission."  However, the entire purpose of the Parole+ATD policy is to expedite the processing of aliens at CBP facilities without initiating an immigration proceeding against them.   Thus, at the time the alien is released under the Parole+ATD policy, he has no immigration "case" that can "continue to be dealt with" upon a return to custody.

<u>*ii.*</u>     <u>*Case-by-Case Requirement*</u>

With respect to the second point, the "case-by-case" requirement in §1182(d)(5) requires DHS to conduct an individualized assessment of each alien to determine whether to grant parole.  This requirement was added to the statute in 1996 "to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." *Texas v. Biden*, 20 F.4th at 947; *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that the current language in the §1182(d)(5) was the result of amendments animated by concerns that the parole authority "was being used by the executive to circumvent congressionally established immigration policy").

The process set forth in the July Memo violates the case-by-case requirement because although the memo pays lip service to assessments of individual aliens, it is largely focused on DHS's *operational circumstances* rather than an individual alien's circumstances.  *See* Doc. 87-1 at SAR0002 (explaining that Parole+ATD should only be used "when justified by an urgent humanitarian reason or because it yields a significant public benefit <u>in the form of disease mitigation, as a safety valve to address overcrowding</u>" (emphasis added)).  Moreover, any case-

by-case consideration of the alien's circumstances—to the extent it occurs at all—focuses on whether the alien is a public safety risk or flight risk, not on whether the alien meets the exceedingly high parole standard.

Additionally, the July Memo turns the parole standard on its head by providing *ineligibility* criteria rather than *eligibility* criteria. In other words, the July Memo essentially establishes a presumption of parole when the relevant "triggers" are met.

The time estimates in the supplemental administrative record confirm that USBP is not conducting meaningful case-by-case analysis before placing releasing an individual under the Parole+ATD policy. The supplemental administrative record indicates that the "processing time" for issuing a NTA is between 2 to 2.5 hours, whereas Parole+ATD only takes 15 to 30 minutes. It is implausible that USBP could meaningfully assess an alien's individual circumstances in 15 to 30 minutes.

On this issue, the Court finds persuasive Justice Alito's discussion of the case-by-case requirement in *Biden v. Texas*, 142 S. Ct. at 2555 (Alito, J., dissenting). There, Justice Alito explained that "simply . . . going through a brief checklist for each alien" is "inconsistent with the ordinary meaning of 'case-by-case' review." *Id.* Further, Justice Alito

noted that the number of aliens paroled each month "gives rise to a strong inference that the [g]overnment is not really making these decisions on a case-by-case basis." *Id.* at 2554. Notably, at the time Justice Alito made this observation, DHS was paroling 27,000 aliens per month—whereas DHS released more than three times that number of aliens under the Parole+ATD policy in November 2022.

### iii.   *Urgent Humanitarian Reasons or Significant Public Benefit Requirement*

The July Memo also violates §1182(d)(5)'s requirement that parole only be granted "for urgent humanitarian reasons or significant public benefit." Before 1996, §1182(d)(5)(A) permitted parole "for emergent reasons or reasons strictly in the public interest." 8 U.S.C. §1182(d)(5)(A) (1995). The addition of "urgent" and "significant" required a higher level of exigency to justify a grant of parole.

The primary "public benefit" that the Parole+ATD policy sought to achieve was speeding up the inspection mandated by §1225 to "decompress" overcrowded CBP facilities. However, even if there may be circumstances where an individual alien might be eligible for parole based on overcrowding and health and safety concerns, creating an

entirely new "processing pathway" to avoid the process mandated by §1225 is inconsistent with the narrow language in §1182(d)(5).

DHS argues that the standard in the July Memo conforms to standard in 8 C.F.R. §212.5, which Florida has not directly challenged and which provides that parole is "generally justified" for aliens "whose continued detention is not in the public interest" so long as "the aliens present neither a security risk nor a risk of absconding." 8 C.F.R. §212.5(b)(5). The main problem with this argument is that it flips the INA on its head. Section §1225(b) requires *detention* unless parole is justified based on "urgent humanitarian reasons" or "significant public benefit" under §1182(d)(5), whereas the regulation effectively allows any alien to be *released* on parole whenever continued detention is not "in the public interest"—whatever that means—and the alien is not a security or flight risk. Another problem with this argument is that the supplemental administrative record does not explain how it CBP officers can make a meaningful determination as to whether the alien is a security risk (as contemplated by the regulation) if the alien's home country does not share its criminal history databases with the United States.

The Court did not overlook Defendants' argument that the legislative history of the 1996 amendment to §1182(d)(5) shows that Congress chose the language that is now in the statute over more narrow alternative language that would have limited parole to specific circumstances. Putting aside the limited weight the legislative history is due, the Court fails to understand how the fact that Congress apparently rejected more narrow language so DHS had "flexibility to deal with compelling immigration situations" justifies the creation of an entirely new processing pathway that has led to the mass release of aliens in the country with minimal processing merely for sake of administrative expediency.

\*   \*   \*

For these reasons, the July Memo is "not in accordance with law" and is "in excess of statutory authority" under 5 U.S.C. §706(2)(A) and (C). Accordingly, Florida is entitled to judgment in its favor on Count 2 of the second amended complaint.

### b.    *Arbitrary and Capricious (Count 4)*

As explained above, the arbitrary and capricious standard "requires that agency action be reasonable and reasonably explained." *Prometheus*, 141 S. Ct. at 1158.  The reviewing court must look to see "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. And "[t]o determine if an agency considered all the relevant factors and important aspects of the problem, a court may look to the language of the relevant statutes, regulations, the administrative record, and even beyond the administrative record." *Bidi Vapor LLC v. U.S. FDA*, 47 F.4th 1191, 1202 (11th Cir. 2022) (quotations and citations omitted).

Florida contends that the Parole+ATD policy is arbitrary and capricious because DHS: (1) failed to adequately consider the ever-worsening backlog caused by earlier iterations of the policy; (2) failed to acknowledge the extraordinary expansion of the agency's use of parole under §1182(d)(5) as compared to the agency's historical practice; (3)

ignored the evidence when it concluded that Parole + ATD will only be "used sparingly" and that it is "not meant to be a primary processing tool"; (4) failed to consider whether the Parole + ATD policy would increase migration flows; and (5) failed to acknowledge its decision to expand Parole + ATD to include single adults rather than only family units, much less explain why it did so.  The Court agrees with the first, third, and fifth points.

With respect to the first point (backlog), the supplemental administrative record contains estimates regarding the number of individuals released on Parole+ATD against whom DHS must still initiate removal proceedings.  These projections show that for every 90 days Parole + ATD continues, the policy creates a backlog that takes 5.5 years and $49 million to clear.  And this backlog only accounts for the time needed to *begin* removal proceedings—not the additional time required to complete those proceedings and remove aliens.  By these estimates, the backlog created by Parole+ATD will take *decades* to overcome.

The July Memo does not expressly discuss the backlog, much less explain why the problems created by the backlog did not outweigh the

perceived benefits of continuing the Parole+ATD program.  The fact that the supplemental administrative record contains information about the backlog suggests that DHS was at least aware of it, but that does not satisfy DHS's obligation to explain its consideration of the problem so the Court can determine whether the decision to continue the Parole+ATD program notwithstanding the backlog it was creating was reasonable and reasonably explained.   Indeed, putting aside the fact that the Court cannot conceive of a reason to continue a program that increased delays and costs associated with initiating immigration proceedings, the Court cannot "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

With respect to the third point (ignoring evidence), the July Memo asserted that Parole+ATD will only be "used sparingly" and that it is "not meant to be a primary processing tool."  Those statements turned out to be untrue, and they were also contrary to "the evidence before the agency" when the July Memo was issued because in preceding month (June 2022), CBP released over 40,000 applicants for admission under that policy, which was more than 40% of total apprehensions at the Southwest

Border that month.  And that was before the July Memo *expanded* the eligibility for Parole+ATD to single adults rather than just family units.

With respect to the fifth point (expansion to single adults), the July Memo reflected a significant expansion of the Parole+ATD program because it no longer limited eligibility to family units.  The July Memo does not offer any explanation as to why the program was expanded or even acknowledge the policy change reflected in the expansion of the program.  Those failures render the July Memo arbitrary and capricious because "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox Television*, 556 U.S. at 515.

Accordingly, the July Memo is arbitrary and capricious, and Florida is entitled to judgment in its favor on Count 4 of the second amended complaint.

### c.      Notice and Comment (Count 6)

Florida claims that the July Memo is an agency rule affecting rights and obligations that was subject to notice and comment.  DHS responds that the July Memo is not subject to notice and comment because it is

merely an interpretive rule, a general statement of policy, or a statement of agency organization—all of which are excepted from notice and comment under 5 U.S.C. §553(b)(A).

The July Memo is subject to notice and comment because it establishes a generally applicable policy to determine whether aliens are detained or paroled, it instructs agents how to exercise their discretionary authority under §1182(d)(5), it sets criteria for granting parole, and it affects Florida's obligations to paroled aliens. *See Jean v. Nelson*, 711 F.2d 1455, 1476–77 (11th Cir. 1983 (rejecting government's argument that a new policy concerning detention and parole of Haitian immigrants was not subject to notice-and-comment rulemaking because "the fact that an agency need not employ rulemaking in order to exercise its discretion [under §1182(d)(5)] on a case-by-case basis does not mean it cannot or has not resorted to a rule of general applicability which limits its discretionary function").[32]

---

[32] The Court did not overlook that this panel opinion was effectively vacated when the case was reheard en banc. *See Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc). However, the en banc opinion did not repudiate the panel's analysis of the notice-and-comment issue (the issue was moot at that point, *id.* at 984), and even if the panel opinion is not binding precedent, the Court finds its analysis of the notice-and-comment issue persuasive here.

None of the exceptions relied on by DHS exempt the Parole+ATD policy from notice-and-comment.

First, the July Memo is not an interpretive rule. An interpretive rule is a "statement[] as to what the administrative officer thinks the statute or regulation means." *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979)[33] (quoting *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952)). The July Memo does not "purport to interpret a statute or regulation," *id.*, or try to explain the meaning of §1182(d)(5), so it cannot be an interpretive rule.

Second, the July Memo is not merely a general statement of policy. "A general statement of policy . . . is merely an announcement to the public of the policy which the agency hopes to implement" and "presages an upcoming rulemaking." *Id.* at 701 (quoting *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974)). The July Memo does none of these things. It establishes a substantive change in policy

---

[33] Fifth Circuit decisions issued before the close of business on September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

that took effect immediately by creating a new "processing pathway" for aliens arriving at the Southwest Border.

Third, the July Memo is not a rule of agency organization. That exception applies where a rule is "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (quotations omitted). Here, the July Memo "alter[s] the standards imposed" on aliens and the criteria by which parole may be granted to affected parties. *Id.* at 1024 (emphasis removed).

Accordingly, the July Memo is subject to notice and comment and Florida is entitled to judgment in its favor on Count 6 of the second amended complaint.

### 3.   *Florida's Remaining Claims*

The Court does not consider Florida's constitutional claim (Count 8) or its claim that the Non-Detention Policy is agency action unlawfully withheld under 5 U.S.C. §706(1) (Count 7), because Florida concedes (and Defendants do not dispute) that the Court need not reach those claims.

That said, with respect to the constitutional claim, although Florida makes a compelling <u>political</u> case that the President and DHS leadership were derelict in their duties by releasing over a million aliens into the country in contravention of the detention mandates in the INA, Florida has not made a <u>legal</u> case under the Take Care Clause because (1) as Defendants persuasively argue in their post-trial brief, it is unclear whether there is even a private cause of action under the Take Care Clause, *see* Doc. 156 at 164-73, and (2) to the extent a private cause of action exists, Florida would have to show that the executive branch "completely abdicated" its statutory responsibilities, *see* Doc. 45 at 33-34 (deriving this standard from cases like *Heckler*), which it has not done here. Specifically, although the evidence established that Defendants have adopted policies that prioritize "alternatives to detention" over actual detention, they have not "completely abdicated" their detention responsibilities because the evidence establishes that they continue to detain a substantial number of arriving aliens each month.

## D.    Remedy

Having determined that the Parole + ATD Policy violates the APA on several grounds, the Court must consider the appropriate remedy.

Florida asks the Court to vacate the policy and issue declaratory relief. DHS argues that 8 U.S.C §1252(f)(1) bars both injunctive relief and APA vacatur and that declaratory relief would have to be narrowly tailored so as not to circumvent §1252(f)(1) or violate separation of powers principles. Alternatively, DHS argues that any remedy would need to be limited to Florida and the harm it suffered and not a "universal injunction."

Under the APA, a court must "hold unlawful and set aside agency action" that violates the APA. 5 U.S.C. §706(2). In the Eleventh Circuit, "[v]acatur . . . is the ordinary APA remedy." *Black Warrior Riverkeeper*, 781 F.3d at 1290 (quotation omitted). Vacatur typically operates to set aside a rule generally, not as a partial remedy for the plaintiffs. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (explaining that "the ordinary result" of a successful APA claim is that "the rules are vacated" and not that "their application to the individual petitioners is proscribed" (quotation omitted)).

Even if the party-specific vacatur DHS seeks were a proper remedy under the APA, complete vacatur is "necessary to grant complete relief to" Florida here. *Health Freedom Def. Fund, Inc. v. Biden*, 599 F. Supp.

3d 1144, 1177 (M.D. Fla. 2022).  Once released at the Southwest Border, aliens are free to travel throughout the United States.  If the Court were to adopt DHS's request—which would essentially involve DHS asking aliens where they are going and applying the challenged policies to aliens who don't respond with "Florida"—released aliens would be free to travel to Florida.  *See id.* at 1178 (denying a request for partial vacatur where there were "no adequate assurances that the government can provide that its agents . . . will not violate this Court's order and deprive Plaintiffs of their relief").  Moreover, if DHS only detained applicants for admission who say they are traveling to Florida and released other aliens, the Court expects that it would not take long for immigration law violators to figure out how to ensure their own release.

DHS also argues that §1252(f)(1) precludes the Court from vacating either of the challenged policies.  That statute provides in pertinent part that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter."  DHS contends that because vacatur of the policies would violate this statute because it would effectively enjoin or restrain the manner in which the referenced provisions of the INA operate.

The Supreme Court explained that §1251(f)(1) "generally prohibits lower courts from entering <u>injunctions</u> that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 142 S. Ct. at 2065 (emphasis added); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (explaining that §1252(f)(1) is "nothing more or less than a limit on injunctive relief"). Neither the Supreme Court nor the Eleventh Circuit has decided whether this statute precludes vacatur under the APA, although the Supreme Court is poised to answer that question this Term in *United States v. Texas*, No. 22-58.

Vacatur is "a less drastic remedy" than an injunction, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010), and the Fifth Circuit concluded in the opinion currently on review at the Supreme Court that §1252(f)(1) does not preclude vacatur under the APA because vacatur "does nothing but re-establish the status quo absent the unlawful agency action" and "neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th at 220. The Court finds the Fifth Circuit's reasoning persuasive. Thus, the Court finds that

§1252(f)(1) does not strip it of the authority to vacate either of the challenged policies under the APA.

Moreover, even if the Supreme Court quashes the Fifth Circuit's decision, that will likely[34] only impact the availability of vacatur with respect to the Non-Detention Policy because that policy implicates DHS's exercise of its authority under §1225 and §1226, which are both in part IV of the INA.  By contrast, §1182(d)(5), which is the statute on which the Parole+ATD policy is based, is contained in part II of the INA, not part IV, and any indirect impact that vacatur of that policy might have on how DHS exercises its authority under part IV of the INA does not equate to the Court having "enjoin[ed] or restrain[ed]" the operation of that part.

Accordingly, vacatur of the Parole+ATD policy is not precluded by §1252(f)(1) and is the appropriate remedy under the circumstances.  A separate declaration that the Parole+ATD policy is unlawful is

---

[34] The Court says "likely" because it is possible that the Supreme Court might go along with the Solicitor General's argument (echoed by Defendants in their post-trial brief, *see* Doc. 156 at 186), and hold that 5 U.S.C. §706(2) does not authorize vacatur.  However, based on the Justices' comments at oral argument, that seems highly unlikely.

unnecessary because that is implicit in the Court's finding that the policy violated §706(2)(A) and (C) of the APA.

## IV.   CONCLUSION

In sum, for the reasons stated above, the Court finds that (1) the Non-Detention Policy exists but is not discrete "agency action" that is subject to judicial review under the APA—although if it was, it would be subject to vacatur because it contravenes the INA; and (2) the Parole+ATD Policy is unlawful and is due to be vacated under the APA. Accordingly, it is

**ORDERED** that:

1. The deferred portion of Defendants' motion for summary judgment (Doc. 88) is **DENIED**.

2. The Parole+ATD Policy is **VACATED** under the APA, and that policy is **REMANDED** to DHS for further proceedings consistent with this Opinion and Order.

3. The Clerk shall enter a final judgment stating:

> Judgment is entered in favor of Plaintiff on Counts 2, 4, and 6 of the second amended complaint, and the Parole+ATD Policy is vacated and remanded to the Department of Homeland Security for further proceedings consistent with the Opinion

and Order entered on this date.  Judgment is entered in favor of Defendants on Counts 1, 3, 5, 7 and 8 of the second amended complaint and those claims are dismissed with prejudice.

4. The Judgment is **STAYED** for 7 days from this date to allow Defendants to seek appellate review.

5. The Clerk shall close the case file.

**DONE and ORDERED** this 8th day of March, 2023.

_____
**T. KENT WETHERELL, II
UNITED STATES DISTRICT JUDGE**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

**STATE OF FLORIDA**,

> **Plaintiff**,

**v.**                                                              **Case No. 3:21cv1066-TKW-EMT**

**UNITED STATES OF AMERICA**,
et al.,

> **Defendants**.

_____/

## <u>ORDER DENYING STAY</u>

This case is before the Court based on Defendants' emergency motion to stay

(Doc. 163).[1]  No response is necessary as the motion is borderline frivolous.[2]

---

[1]  The same motion requested a stay of the temporary restraining order (TRO) entered last week in Case No. 3:23cv9962.  That request remains under advisement and will be ruled on in due course.

[2]  Florida filed a response (Doc. 164) after the Court put this Order in the internal folder to be posted.  The Court has not reviewed the response, but it will do so when ruling on the motion in Case No. 3:23cv9962.  That, however, will not occur until Monday because the Court has already wasted more than half of this beautiful Saturday in Pensacola dealing with the motion in this case and it does not intend to waste the rest of Saturday (or Mother's Day Sunday) dealing with the motion in Case No. 3:23cv9962.  The Court did not overlook Defendants' threat to seek relief in the Eleventh Circuit if the Court does not grant its motion by Monday at 2:00 p.m., but Defendants do not get to dictate when the Court rules.  The Court understands that it needs to rule quickly (and it will do so, as it has done with every other filing in these cases), but these cases are not death penalty cases that require 24/7 attention or immediate rulings and it is unreasonable for Defendants to expect a ruling before the close of business Monday because they had all day Friday to file a motion to stay in Case No. 3:23cv9962, but they waited until nearly midnight eastern time to do so.

Florida filed suit against Defendants (collectively "DHS") in September 2021, challenging DHS's policy of not detaining aliens arriving at the Southwest Border as required by 8 U.S.C. §1225(b).  DHS's policy evolved as the case progressed, and by the time the case went to trial in January 2023, the two policies at issue were the "Parole+ATD policy" and a somewhat-amorphous "non-detention policy."  The Court had no trouble finding that both policies were contrary to the immigration laws (it was not even close),[3] but the Court concluded that only the Parole+ATD policy could be vacated because the non-detention policy was not a discrete "agency action" subject to judicial review.  *See* Doc. 157.

The Order vacating the Parole+ATD policy was issued more than 60 days ago, on March 8, 2023.  The judgment (Doc. 158) was entered the same day, but was stayed for 7 days to allow DHS to seek appellate review.  *See* Doc. 157 at 109 (¶4).  DHS did not appeal during that period and, instead, it waited until late in the afternoon of May 5, 2023—the next to last business day of the appeal period—to file a notice of appeal.  *See* Doc. 159.  DHS did not immediately seek a stay pending appeal, but rather it waited another full week—until 10:36 p.m. CDT on May 12, 2023—to file its "emergency motion" for a stay.

---

[3]  In short, the Court found that the immigration laws clearly and unambiguously <u>mandate</u> detention of aliens arriving at the border and rejected DHS's argument that it had the discretion to release aliens into the country without at least initiating removal proceedings against them simply because there is not enough space (or money) to detain all arriving aliens.

In ruling on a motion for a stay pending appeal, the Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 425–26 (2009)). "The first two factors … are the most critical." *Nken*, 556 U.S. at 434.

Here, none of the factors weigh in favor of granting a stay, but DHS's 65-day delay in seeking a stay undercuts any claim that it will be irreparably harmed absent a stay. That alone is enough to justify denying the "emergency" stay request. But there is more—the affidavit filed by DHS in support of its motion represents that DHS stopped using the Parole+ATD policy on January 2, 2013, two months before the Court vacated the policy. *See* Doc. 163-1 at 2 (¶4). If that is true,[4] then it defies credibility for DHS to claim that the Order vacating the Parole+ATD policy needs to be stayed pending appeal.

---

[4] The Court does not recall DHS's counsel informing the Court at the trial in this case or in their post-trial filings that DHS had already stopped using the Parole+ATD policy, which is troubling to say the least.

The Court did not overlook DHS's argument that the practical effect of the Order in this case is that it cannot use the Parole+ATD policy to deal with the surge of aliens seeking entry into the country now that the Title 42 Order has expired. The Court finds this argument unpersuasive for two reasons.

First, the affidavit attached to the motion indicates that DHS planned to use a different policy ("Parole with Conditions") to deal with the post-Title 42 Order surge. There is no indication in DHS's filings in this case or the case challenging the Parole with Conditions policy (Case No. 3:22cv9962) that it had or has any intention to use the Parole+ATD policy in addition or in lieu of the Parole with Conditions policy.

Second, DHS's Chicken Little arguments about the impact of it not being able to (mis)use "parole" under either policy as a processing tool for the surge of aliens arriving at the border are hard to square with the DHS Secretary's recent comments that only "a fraction of the people that we encounter" would be paroled into the country and that "the vast majority will be addressed in our border patrol facilities and our ICE detention facilities."[5]  Either the Secretary was not being truthful (or

---

[5]  These comments were reported in the NBC news article referenced in the complaint in Case No. 3:23cv9962, which described the policy challenged in that case.  *See* https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-trackrcna83704 (May 10, 2023, 8:44 a.m. CDT).

maybe he was misquoted) or DHS's inability to use "parole" as a processing pathway is not as big of a deal as Defendants are now making it.[6]

Moreover, even if DHS had shown that it will be irreparably harmed if the Order vacating the Parole+ATD policy is not stayed, DHS has not shown that it is likely to prevail on the merits of its appeal.  On that issue, DHS argues that it only needs to show that it has a "substantial case on the merits" (rather than the normal "strong showing" of a likelihood of success on appeal) "because  the  balance of equities  so  overwhelmingly  favors  the government," Doc. 163 at 11 (citing *LabMD, Inc. v. Federal Trade Comm'n*, 678 F. App'x 816, 819 (11th Cir. 2016)), but for the same reason that DHS has not shown that it will be irreparably harmed if a stay is not granted, it has not shown that the balance of equities weighs in its favor. However, even if the lesser standard applies, the Court finds that DHS has not met it because although DHS identifies a number of issues on which it claims that it is likely to prevail on appeal, *see* Doc. 163 at 12-15, the Court finds that DHS is unlikely to succeed on any of those issues for the same reasons that the Court rejected those arguments in the Order vacating the Parole+ATD policy.

---

[6]  Given what the evidence in this case showed about DHS's excessive number of releases under the Parole+ATD policy that, on its face, said it was only to be used "sparingly," see Doc. 157 at 87-88 n.30, 98-99, the Court expresses a healthy degree of skepticism about the veracity the Secretary's comments.  But because he is the ultimate boss of DHS, the Court also has reason to question the veracity of statements in the affidavit submitted by a lower-level DHS bureaucrat.

Indeed, in the Court's view, the merits on the Parole+ATD policy are not even close.  That policy purports to implement 8 U.S.C. §1182(d)(5), but the authority provided by that statue is extremely narrow—it only authorizes DHS to release arriving aliens from custody "temporarily … only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" and it requires the alien to be "returned to custody" "forthwith" "when the purposes of such parole … have been served."  That statutory language does not in any way shape or form authorize "parole" to be used as it was in the Parole+ATD policy—i.e., as a "processing pathway" that facilitated the release of hundreds of thousands of aliens into the country without even initiating formal immigration proceedings merely for sake of administrative expediency.  *See* Doc. 157 at 88-95 (explaining why the Parole+ATD policy is contrary to law).

The Court understands that Defendant think that its rulings are "sabotaging" DHS's efforts to deal with the surge of aliens into the country after the expiration of the Title 42 Order.[7]  However, as explained in the TRO entered last week in Case No. 3:22cv9962, DHS has known that this surge was coming for quite some time

---

[7] This ignorant (and dangerous) rhetoric ignores the fact that the evidence presented in this case showed that the "chaos" that the President recently acknowledged has been going on at the Southwest Border "for a number of years" is largely a problem of Defendants' own making because they effectively incentivized the "irregular migration" that has been ongoing since early 2021 through the adoption and implementation of immigration policies that prioritized "alternatives to detention" over actual detention.  *See* Doc. 157 at 21-22.  Moreover, if it is "sabotage" for a federal court to tell the federal government that it must comply with the law—or at least that it cannot misuse the limited parole authority provided by Congress—then so be it.

and it has known since early March that it would not be able to use the Parole+ATD policy (or anything like it) to deal with the surge.  Thus, the situation DHS now finds itself in is effectively one of its own making.

Accordingly, for the reasons stated above, it is **ORDERED** that Defendants' emergency motion to stay (Doc. 163) is **DENIED**.

**DONE and ORDERED** this 13th day of May, 2023.

_____
**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**STATE OF FLORIDA**,

     **Plaintiff**,

**v.**                              **Case No. 3:23cv9962-TKW-ZCB**

**ALEJANDRO MAYORKAS**, et al.,

     **Defendants**.

_____/

## <u>PRELIMINARY INJUNCTION</u>

This case involves a challenge to an immigration policy known as "Parole with Conditions."[1]  The case has proceeded at a breakneck pace since it was filed last Wednesday, with extensive briefing and multiple orders being issued on an expedited basis.  Currently, the issue before the Court is whether the temporary restraining order (TRO) issued last Thursday should be converted into a preliminary injunction that will remain in effect during the pendency of this case.  This, in turn, will allow Defendants (collectively, "DHS") to seek review of the Court's decision enjoining the challenged policy from a higher court—first, the Eleventh Circuit, and then, if necessary, the Supreme Court.

---

[1]  The policy is contained in a May 10, 2023, memorandum issued by U.S. Border Patrol (USBP) Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)."  *See* Doc. 5-1.

## Background

For sake of brevity, the Court will not repeat here what it has said on multiple prior occasions about the ongoing immigration "crisis" at the Southwest Border and the circumstances that contributed to it.  Suffice it to say, the Parole with Conditions policy is the latest in a series of policies adopted by DHS over the past two years to expedite the release of aliens arriving at the Southwest Border into the country instead of detaining them until their immigration proceedings are concluded as required by 8 U.S.C. §1225(b).

The Court vacated one of the prior policies—the "Parole+ATD" policy—in an earlier case filed by Florida against DHS.  *See Florida v. United States*, Case No. 3:21cv1066, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023).  DHS did not appeal the decision in that case until May 5, 2023—the next to last business day of the appeal period and five days before it adopted the Parole with Conditions policy.[2]

On Wednesday, May 10, Florida filed a complaint in this Court challenging the legality of the Parole with Conditions policy.  The case was randomly assigned to me.

The next morning, Florida filed an emergency motion for a TRO.  DHS was ordered to file a response that afternoon, which it did.  That night, after considering

---

[2]  Florida filed a cross-appeal today, presumably so it can argue on appeal that the Court also should have vacated DHS's overriding "non-detention policy" that the Court found to be contrary to the immigration statutes but not subject to judicial review.

the parties' filings, the Court entered a TRO enjoining DHS from "implementing or enforcing" the Parole with Conditions policy.  *See* Doc. 10.

Over the weekend, DHS filed a motion to stay the TRO.  Florida was ordered to file a response by mid-day yesterday, which it did.  Last night, the Court entered an order denying the stay.  *See* Doc. 29.

The Court scheduled a hearing for this Friday, May 19, to consider whether to convert the TRO into a preliminary injunction, but the Court cancelled the hearing yesterday after the parties entered into a stipulation (Doc. 16) waiving their rights to a hearing and agreeing on the evidence that the Court could consider in deciding whether to convert the TRO into a preliminary injunction.

The Court has carefully considered the parties' filings in support of and in opposition to preliminary injunctive relief, including the parties' stipulation, the declarations and other evidence submitted by DHS (*see* Docs. 9-2, 13-1, 13-2, 26-1, 27), the USBP statistical data (*see* Doc. 28), the parties' proposed orders (*see* Docs. 22, 24), and the relevant portions of the trial record in the *Florida* case.[3]  The Court

---

[3]  The parties agreed that the Court may consider evidence from the trial record in the *Florida* case "only to the extent relevant here."  Doc. 16 at 2.  The parties agree that the evidence in the *Florida* case is relevant to the issue of standing, but DHS disputes whether that the evidence establishes standing here, and it also appears to dispute that evidence about the Parole+ATD policy at issue in *Florida* is relevant to the balancing of the equities in this case.  *Id.* at 2-3.  The Court rejected DHS's position on the issue of standing in the order denying a stay of the TRO, *see* Doc. 29 at 6-7, and the Court finds that the circumstances of the *Florida* case (including the vacatur of the Parole+ATD policy) are relevant to various injunction factors, as discussed below and in the prior orders entered in this case.

sees no need for a lengthy order because the Court has entered multiple orders over the past few days analyzing the facts under the same legal standard that governs the issuance of a preliminary injunction. Thus, in the interest of brevity and an expeditious ruling, this order will simply incorporate by reference the analysis in those prior orders, except in a few instances where additional discussion is warranted based on the new data or arguments that were not specifically addressed in the prior orders.

## Analysis

The Court has the authority to issue a preliminary injunction under Fed. R. Civ. P. 65(a).

Both parties have asked the Court to enter a preliminary injunction. Florida requested a preliminary injunction in its complaint and the parties agreed that its filings to date can be treated as its motion for preliminary relief, *see* Doc. 16 at 1; and even though DHS does not agree that a TRO should have been entered, it asked the Court to convert the TRO into a preliminary injunction so it can seek appellate review of the Court's decision to enjoin the Parole with Conditions policy, *see* Doc. 13 at 15-17.

To obtain a preliminary injunction, Florida has the burden to prove that "(a) there is a substantial likelihood of success on the merits; (b) the … preliminary injunction is necessary to present irreparable injury; (c) the threatened injury

outweighs the harm that the ... preliminary injunction would cause to the non-movant; and (d) the ... preliminary injunction would not be averse to the public interest." *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001).  The Supreme Court has stated that "the first two factors ... are the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), but the Eleventh Circuit has suggested that "[t]he first of the four prerequisites to temporary injunctive relief is generally the most important," *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005).  Here, as discussed below, all four factors weigh in favor of granting a preliminary injunction.

With respect to the first factor (substantial likelihood of success), Florida alleged in the complaint that the Parole with Conditions policy violates the Administrative Procedure Act (APA) because it is contrary to law (Count 1), arbitrary and capricious (Count 2), and was not adopted through "notice and comment" procedures (Count 3).  The Court has no trouble finding that Florida has a substantial likelihood of ultimately showing that it has standing to challenge the Parole with Conditions policy and that it is likely to succeed on its claim that the policy is contrary to law for the reasons more fully stated in the TRO (*see* Doc. 10 at 8-11), the order denying a stay of the TRO (*see* Doc. 29 at 4-8), and the *Florida* decision invalidating the materially indistinguishable Parole+ATD policy (*see* 2023 WL 2399883 at *16-20, *29-31).  The Court also finds that Florida has a substantial

likelihood of success on its "notice and comment" claim for the reasons stated in the TRO (*see* Doc. 10 at 8 n.5).[4]   The Court does not find persuasive any of DHS's arguments to the contrary on these points for the same reasons that the Court found in the order denying a stay of the TRO that DHS was not likely to succeed on its appeal.  *See* Doc. 29 at 4-8.

With respect to the second factor (irreparable harm to the movant), the Court finds that a preliminary injunction is necessary to prevent irreparable harm to Florida for the reasons stated in the TRO (*see* Doc. 10 at 12-13) and reaffirmed in the order denying a stay of the TRO (*see* Doc. 29 at 11-12).

With respect to the third factor (harm to the non-movant), the Court finds that the harm to Florida is not outweighed by the harm that the preliminary injunction will allegedly cause DHS because, as explained in the order denying a stay of the TRO, the Court is simply not persuaded that enjoining the Parole with Conditions policy is as big of a deal as DHS is making it.  *See* Doc. 10 at 8-11.  The finding on this point in the order denying a stay of the TRO is bolstered by the USBP data filed

---

[4]  The Court is not in a position to say at this point whether the Parole with Conditions policy is arbitrary and capricious because that determination will likely be made based on the administrative record, which has not yet been produced.  That said, the Court will be interested to see how DHS justifies the policy in light of the evidence in the *Florida* case showing that similar prior policies that relied on aliens to self-report to Immigration and Customs Enforcement facilities to receive charging documents forced DHS to expenditure of considerable time and money down the road to track down the substantial number of aliens who (not surprisingly) did not self-report.

after that order was posted,[5] which shows that encounters at the border have dropped significantly after the expiration of the Title 42 Order.  Indeed, as of two days ago, the number of aliens arriving the border was about one-third of the number predicted in the declaration that DHS relied on in support of its argument that the sky will fall if it cannot release aliens under the Parole with Conditions policy.  *Compare* Doc. 13-1 at 6 (¶11) (predicting "an average of 12,000-14,000 noncitizen [encounters] per day" after the Title 42 Order expires on May 11) *with* Doc. 28 at 4 (showing that alien encounters dropped from 9,649 on May 11, to 6,251 on May 12, to 4,335 on May 13, to 4,193 on May 14).  Likewise, contrary to the prediction in the declaration that USBP was projected to grow to "over 45,000 individuals in custody by the end of [May]," Doc 13-1 at 6 (¶12), the USBP data shows that the number of individuals in custody has declined every day since the Title 42 Order expired, and as of May 14, only 22,259 aliens were in custody, *see* Doc. 28 at 6.[6]

---

[5] Technically, the USBP data was filed before the order was posted, but the Court put the order in the internal electronic folder to be posed by the Clerk and left the courthouse before seeing that the USBP data had been filed.  The USBP data would not have changed the Court's ruling on the motion to stay and, as discussed above, it bolsters the Court's decision not to give much weight to the declaration predicting dire consequences if USBP was prohibited from using the Parole with Conditions "processing pathway."

[6] The Court did not overlook that the data shows an increase in the average time-in-custody (TIC) after the expiration of the Title 42 Order and the entry of the TRO, but the most recent figure is just slightly above the 72-hour period that USBP facilities are designed to accommodate, according to the evidence in the *Florida* case.  Also, the most recent TIC figure is well below the 20-day period in the *Flores* case that DHS repeatedly pointed to in the *Florida* case as compelling expedited release of children and family units.  Moreover, it is unclear whether these TIC figures include the amount of time aliens spend in custody between the completion of their processing and their physical release.  This may be significant because DHS claimed in its response to the Order

With respect to the fourth factor (public interest), the Court finds that a preliminary injunction is in the public interest for the reasons stated in the TRO (*see* Doc. 10 at 13-14) and the order denying a stay of the TRO (*see* Doc. 29 at 13-16), and because it would promote respect for the rule of law by not allowing DHS to achieve what amounts to an end-run around this Court's decision in *Florida* through the adoption of a functionally identical policy to the Parole+ATD policy invalidated in that case. *See* Doc. 10 at 11 (agreeing with DHS that the *Florida* decision did not preclude DHS from using its parole authority in other ways, but explaining that "what DHS cannot do is adopt a functionally identical policy as the one the Court vacated in *Florida* and then expect a different outcome when the policy is challenged").

The Court did not overlook DHS's argument that the Court does not have the authority to enjoin the Parole with Conditions policy under the immigration statutes and/or that the TRO was overbroad and must be narrowed, but the Court finds those arguments unpersuasive for the reasons stated in the order denying a stay of the TRO. *See* Doc. 29 at 7-8. The Court also did not overlook Florida's request that the Court

---

to Show Cause that it did not violate the TRO by releasing more than 2,500 aliens after the TRO went into effect because "implementation" of the Parole with Conditions policy is complete when the alien is "fully processed" even though the alien may not be physically released until the following morning. *See* Doc. 26-1 at 3 (¶¶9-10) (claiming that aliens "have been granted parole effective as of the time they are fully processed" even though they may remain in physical custody longer because USBP "generally does not release individuals overnight"). Thus, if the TIC figures include the time that aliens sometimes remain in custody after they are "paroled," those figures are likely overstated to some degree.

treat its filings as both a request for preliminary injunction and a request for a stay under the APA, 5 U.S.C. §705, but the Court tends to agree with DHS that an APA stay is unavailable because the Parole with Conditions policy was already in effect when Florida filed its complaint and that statute refers to "postpon[ing]" the effective date of the agency action.[7]

## Conclusion

In sum, for the reasons stated above, the Court finds that Florida is entitled to a preliminary injunction prohibiting DHS from "paroling" aliens into the country under the Parole with Conditions policy. No bond is required for the reasons stated in the TRO. *See* Doc. 10 at 15 n.8. A stay of the preliminary injunction is not warranted for the reasons stated in the order denying a stay of the TRO. *See* Doc. 29 at 3 n.3.

Accordingly, it is **ORDERED** that:

1. DHS is enjoined from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum from U.S. Border Patrol Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)," pending disposition of this case or further order of the Court.

---

[7] That said, the Court need not definitively decide that issue because an APA stay would not give Florida any more relief than it is getting through the preliminary injunction

2.      The parties shall file a status report 14 days from the date of this Order explaining how they intend to proceed with this case in this Court pending resolution of DHS's expected appeal of the preliminary injunction, and unless the parties agree that this case should be stayed pending appeal, the status report shall include a proposed scheduling order.

**DONE and ORDERED** this 16th day of May, 2023.

_____

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**STATE OF FLORIDA**,

    **Plaintiff**,

**v.**                                                    **Case No. 3:23cv9962-TKW-ZCB**

**ALEJANDRO MAYORKAS**, **et al.**,

    **Defendants**.

_____/

## <u>TEMPORARY RESTRAINING ORDER</u>

This case is before the Court based on Florida's emergency motion for a temporary restraining order (TRO) (Doc. 2) and Defendants' response in opposition (Doc. 9). No hearing is necessary to rule on the motion, and upon due consideration of the parties' filings and the entire case file, the Court finds for the reasons that follow that the motion is due to be granted.

### Background

The Southwest Border has been out of control for the past 2 years. And it is about to get worse because, at midnight tonight, the Title 42 Order expires.[1]

---

[1] The Title 42 Order allowed immigration officials to turn arriving aliens away at the border without placing them in immigration proceedings or considering their asylum claims. The expiration of the Title 42 Order has been a long time coming because it was put in place by the Center for Disease Control to address public health concerns about COVID-19, and it is common knowledge that the COVID-19 pandemic has been "over" for quite some time. *See Arizona v. Mayorkas*, 143 S. Ct. 478, 479 (2022) (Gorsuch, J., dissenting) (noting that there was no serious

The expiration of the Title 42 Order is expected to result in a "surge" of aliens seeking to enter the country because there are reportedly tens of thousands of aliens staged at the Southwest Border waiting for the Title 42 Order to expire so that they can seek to enter the country.  And that is on top of the tens of thousands of aliens that have reportedly crossed the border into the country each day over the past few weeks in anticipation of the Title 42 Order expiring.

The current situation at the border underscores the Court's recent finding that there is an immigration "crisis" at the Southwestern Border.  *See Florida v. United States*, 2023 WL 2399883, at *1 (N.D. Fla. Mar. 8, 2023).  And, consistent with the Court's finding, President Biden reportedly acknowledged within the past few days that there has been "chaos at the border for a number of years" and warned that the situation at the Southwest Border is going to be "chaotic for a while" after the Title 42 Order expires.

The Biden Administration blames Congress for the immigration crisis and the chaos coming to the border.   Congress blames President Biden and his Administration.  In the *Florida* decision, the Court pinned much of the blame for the crisis at the border on the "non-detention policies" put in place by the Biden

_____

dispute that the public-health justification undergirding the Title 42 orders has lapsed, that "the current border crisis is not a COVID crisis," and that "courts should not be in the business of perpetuating administrative edicts designed for one emergency only because elected officials have failed to address a different emergency").

Administration—but the Court noted that it is the responsibility of the political branches (collectively), not the Court, to solve the immigration crisis.  *Id.*; *see also id.* at *21 (noting that the Court's job was to merely "to 'say what the law is' … and then let the political chips fall where they may").

The Court hoped that after issuing the decision in *Florida*, it would be able to go back to its normal docket and simply watch the political finger-pointing about the immigration crisis from afar.  That, however, was not to be.

Yesterday afternoon, I was randomly assigned a new lawsuit filed by Florida against DHS Secretary Mayorkas, U.S. Border Patrol (USBP) Chief Ortiz, and the United States of America, alleging that "DHS plans to immediately restart the *en masse* parole of aliens at the Southwest Border."  Doc. 1 at 2 (¶6) (citing an NBC news article[2] quoting a DHS spokesperson's summary of the plan).  Florida claimed that this "new policy" violates this Court's decision in *Florida* that vacated DHS's "Parole+ATD policy" and is contrary to the Immigration and Nationality Act (INA).  *Id.* (¶7).  Among other things, Florida's complaint asks the Court to declare the new policy unlawful and enjoin DHS from enforcing or implementing it.  *Id.* at 9.

This morning, Florida filed an emergency motion asking the Court to enter a TRO "preventing DHS from implementing the new parole policy or otherwise using

---

[2]  *Biden admin to allow for the release of some migrants into the U.S. with no way to track them*, https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-trackrcna83704 (May 10, 2023 8:44 a.m. CDT).

[8 U.S.C.] §1182(d)(5) as a tool of operational convenience, to relieve overcrowding, or to facilitate faster processing at the Southwest border." Florida thereafter filed a copy of the challenged policy with the Court. *See* Doc. 5-1. Defendants were ordered to file a response to Florida's emergency motion on an expedited basis, which they did.

### The Challenged Policy

The policy challenged by Florida in this case is set forth in a memorandum issued by U.S. Border Patrol Chief Raul Ortiz yesterday, titled "Policy on Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions)." The memorandum explains how U.S. Customs and Border Patrol (CBP) will exercise its parole authority under 8 U.S.C. §1182(d)(5) to release arriving aliens into the country "conditioned on [the alien], within 60 days, scheduling an appointment to appear at an U.S. Immigration and Customs Enforcement (ICE) facility for initiation of appropriate removal proceedings or requesting service, via designated online location, of a Notice to Appear (NTA) by mail." *See* Doc. 5-1 at 1.

The memorandum explains that CBP will exercise its parole authority under the policy when "there are conditions requiring the expeditious processing of [aliens] in exigent circumstances in order to ensure (1) appropriate and safe conditions for the health and safety of individual [aliens] in custody and (2) USBP's continued

ability to carry out its critical border security and enforcement mission." *Id.* at 2. The policy states that it is a "tool that should only be used when one of the limited triggers below are met." *Id.* The triggers include processing capacity and time-in-custody thresholds at CBP facilities and periods when there are more than 7,000 apprehensions per day across the Southwest Border. *Id.* at 4.[3]

When those triggers are met, the policy requires an "individual assessment" of the alien for parole eligibility. *Id.* at 5-6. That assessment includes, among other things, a "biometric identity verification," an evaluation of the alien's "immigration background," and "vetting of any national security or criminal concerns." *Id.* at 5. The policy also requires USBP to collect and document a physical address for each alien, *id.* at 6, but it does appear to require any action to verify the legitimacy of the address.

The memorandum states that the parole policy may not be used for aliens who "pose a national security risk, unmitigable flight risk, public safety threat," or who are unaccompanied children. *Id.* at 6. Nor may the policy be used if the alien is subject to the mandatory detention requirements in 8 U.S.C. §1226(c). *Id.*

---

[3]  It is noteworthy that the affidavit submitted by Defendants explains that eight of nine sectors are already over capacity and predicts that there will be 12,000 to 14,000 encounters per day over the coming weeks, which suggests that these triggers will be readily met and that use of the challenged policy will be widespread and immediate.

The memorandum claims that the aliens "are not simply released into the community" because "they are required to schedule an appointment with ICE for the initiation of … removal proceedings, as appropriate, or, at a designated online location, request service of an NTA by mail," *id.* at 2, but the grant of parole under the challenged policy does not place any restrictions on where the aliens can go or require electronic monitoring or any other safeguard to track the aliens' locations once released into the country.  The memorandum states that the "initial" grant of parole "should generally be for 60 days," *id.* at 5, which suggests that there could be circumstances where parole could initially be granted for more than 60 days and/or that the parole could be extended through subsequent grants.

The memorandum states that the purpose of the parole is to "allow[] the [alien] to schedule an appointment to appear at an ICE facility for the initiation of appropriate removal proceedings of an NTA by mail," and it states that the parole is "automatically terminated upon expiration of the period for which parole was authorized."  *Id.*  The memorandum states that "CBP and ICE will equally share responsibility and work jointly to streamline and complete charging document issuance" for aliens paroled under the policy, *id.*, but it does not explain who is responsible for tracking down any aliens who do not check in with ICE as required as a condition of parole.

The memorandum concludes by asserting that the new parole policy is not subject to notice and comment under the Administrative Procedure Act (APA) because the situation at the border is "quickly evolving into exigent circumstances" and "urgent action" is required based on the "surge" that USBP is experiencing at the Southwest Border over the past week.  *Id.* at 6-7.  However, the memorandum does not explain how this surge was unexpected or why DHS waited until the day before the Title 42 Order was scheduled to end before issuing the new parole policy.

## Analysis

The Court has authority to issue a TRO under Fed. R. Civ. P. 65.

"A TRO … is appropriate where the movant demonstrates that (a) there is a substantial likelihood of success on the merits; (b) the TRO … is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the TRO … would cause to the non-movant; and (d) the TRO … would not be averse to the public interest."  *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001).

A TRO "is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites," *see United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Authority v. Callaway,* 489 F.2d 567 (5th Cir.1974)), but "the first two factors … are the most critical," *Niken v. Holder*, 556 U.S. 418, 435 (2009); *see also Schiavo*

*ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) ("The first of the four prerequisites to temporary injunctive relief is generally the most important.").

The Court finds for the reasons that follow that Florida has carried its burden of persuasion.

With respect to the first factor, the Court has no trouble concluding that Florida has a substantial likelihood of success on the merits because the challenged policy appears to be materially indistinguishable from the Parole+ATD policy vacated in *Florida*—both in its purpose (reducing overcrowding at border patrol facilities) and manner of operation (releasing aliens into the country without first issuing a charging document placing them in immigration proceedings and simply directing the aliens to report to ICE within a specified period for further processing).[4] The Court determined in *Florida* that the Parole+ATD policy was final agency action under the APA, that Florida had standing to challenge the policy, and that the policy violated the APA because it was contrary to law, arbitrary and capricious, and adopted without notice and comment.[5] The Court sees nothing materially different

---

[4] One curious difference is that, under the Parole+ATD policy, aliens were given only 15 days to report to an ICE facility to be issued an NTA, but under the new policy, aliens are given four times as long (60 days) to report to an ICE facility. The memorandum adopting the new policy does not explain the rationale for this extended period, and it would seem that the longer the alien is in the country, the greater the chance that he or she will disappear and the more difficult it will be to find him or her for removal proceedings.

[5] Defendants' arguments on these points (Doc. 9 at 15-19, 28-38) largely rehash the arguments that (rightly or wrongly) the Court rejected in *Florida*, and their new argument that "good cause" excuses compliance with notice and comment (*id.* at 32-36) is unpersuasive because

about the new policy or the parties' arguments that would compel a different result with respect to the policy challenged in this case.

One of the fundamental flaws with the Parole+ATD policy is that it did not contemplate that the alien would be returned to custody once the purposes of parole had been served, as required by the plain language of 8 U.S.C. §1182(d)(5). *See Florida*, 2023 WL 2399883, at *29-30. The same appears to be true of the challenged policy, which is primarily intended to relieve overcrowding at border patrol facilities by more quickly releasing aliens into the country for further processing when (or if) they report to an ICE facility. The policy does not contemplate that the alien would be taken into custody at the ICE facility and, as was the case with the Parole+ATD policy, aliens released under the challenged policy would not have an immigration "case" that can "continue to be dealt with" after the purposes of the parole have been served. *Id.* at *30.

---

Defendants have known for quite some time when the Title 42 Order was going to expire and what was likely to happen when it did. *See Florida*, 2023 WL 2399883, at *3 (finding that the encounters at the border "are expected to increase significantly when the Title 42 Order is no longer in place"); *Arizona*, 143 S. Ct. at 479 (Gorsuch, J., dissenting) (noting in an opinion issued in December 2022 that "[e]ven the federal government acknowledges that the end of the Title 42 orders will likely have disruptive consequences") (internal quotations omitted). Moreover, it appears that there was ample time for DHS to go through notice and comment if it wanted to—as it did with the new asylum rules initially noticed in February 2023 and finalized yesterday as part of DHS's strategy to deal with the expiration of the Title 42 Order.

The challenged policy appears to do a better job than the Parole+ATD policy in explaining how it conforms to the "case-by-case" requirement in §1182(d)(5).[6] However, like the Parole+ATD policy, the new policy does not explain how a meaningful evaluation of the criteria that determine whether the policy may be utilized (e.g., the alien's "national security risk" and "public safety threat") could possibly occur in light of the the evidence in *Florida*, which established that DHS "has no idea whether [the arriving aliens] have criminal histories or not" because it "has no way to determine if an alien has a criminal history in his home country unless that country reports the information to the U.S. government or the alien self-reports." *Id.* at *12; *see also id.* at *31 (rejecting DHS's argument that the Parole+ATD policy conforms to the parole regulation, 8 C.F.R. §212.5, because "the supplemental administrative record does not explain how it CBP officers can make a meaningful determination as to whether the alien is a security risk (as contemplated by the regulation) if the alien's home country does not share its criminal history databases with the United States").  Moreover, whenever the policy discusses individual, case-

---

[6] That said, given that the stated purpose of the policy is to move aliens out of border patrol facilities and into the country more quickly, it seems unlikely that the "case-by-case" assessment will be meaningful. *See Florida*, 2023 WL 2399883, at *30 (finding that it was "implausible" that the border patrol could meaningfully assess an alien's individual circumstances in 15 to 30 minutes); *Biden v. Texas*, 142 S. Ct. 2528, 2254-55 (2022) (Alito, J., dissenting) (noting that "simply ... going through a brief checklist for each alien" is "inconsistent with the ordinary meaning of 'case-by-case' review" and that the sheer number of aliens paroled each month "gives rise to a strong inference that the [g]overnment is not really making these decisions on a case-by-case basis").

by-case consideration of each alien, it does so with reference to overcrowding and the CBP's resource constraints, not with regard to any characteristics of that specific alien that might constitute a legally sufficient reason for parole, which strongly suggests that the repeated "case-by-case," "individualized" language is (as it was in the Parole+ATD policy) pretextual.

Additionally, the memo adopting the challenged policy does not reflect any consideration of the additional backlog that will likely be created by releasing aliens into the country without initiating immigration proceedings and then having to track them down to do so if they do not report to ICE—as DHS had to do in the "Operation Horizon" program discussed in the *Florida* decision. *Id.* at *11, *32.

The Court did not overlook Defendants' arguments as to why Florida is unlikely to succeed on the merits and why the new policy is different from the vacated Parole+ATD policy. *See* Doc. 9 at 20-36. However, the Court simply does not find those arguments persuasive. That said, the Court agrees with Defendants that the *Florida* decision "did not preclude DHS from using its parole authority in other ways," *id.* at 22, but what DHS cannot do is adopt a functionally identical policy as the one the Court vacated in the *Florida* decision and then expect a different outcome when that policy is challenged.

With respect to the second factor, the evidence presented in *Florida* established that Florida suffers substantial harm—both to its sovereignty[7] and its public fisc—when the federal government releases aliens into the country on "parole" (or otherwise) rather than detaining them as required by the INA. *See Florida*, 2023 WL 2399883, at *17-18. That same harm will flow from the new policy because, as was the case with the Parole+ATD policy vacated in *Florida*, the new policy is intended to "shift the processing of arriving aliens to ICE facilities around the country that are closer to the aliens' final destinations." *Id.* at *14. The harm to Florida is irreparable because it "cannot be undone through monetary remedies," *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990), because the United States has sovereign immunity from damages claims, *see Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *see also State of Florida v. Becerra*, 544 F. Supp. 3d 1241, 1300 (M.D. Fla. 2021) (observing that in an APA action, sovereign immunity bars the recovery of monetary damages from the federal government, thereby making the state's financial injury irreparable), and there is no

---

[7] The Eleventh Circuit has recognized that even though injuries to state sovereignty are "intangible," they are real and concrete. *See W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023). And, as Justice Scalia explained in *Arizona v. United States*, controlling immigration "is an inherent attribute of sovereignty" and it is questionable whether the States would have ratified the Constitution if it had provided that limits on immigration "will be enforced only to the extent the President deems appropriate" because the States "jealously guarded" their sovereignty during the Constitutional Convention. 567 U.S. 387, 422, 436 (2012) (Scalia, J., concurring in part and dissenting in part).

way to remedy the impact on state sovereignty that flows from the Florida's inability to exclude aliens who were improperly "paroled" into the country from its territory.

The third and fourth factors "merge when the Government is the opposing party." *Niken*, 556 U.S. at 435. "The public interest in enforcement of the immigration laws is significant," *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981), and it is even more significant here because DHS's decision to "parole" aliens into the country without first initiating immigration proceedings is precisely what the Court told DHS it could not lawfully do in *Florida*. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("[F]rustration of federal statutes and prerogatives are not in the public interest…."); *see also Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends."); *Becerra*, 544 F. Supp. 3d at 1304 (concluding that the state's high likelihood of success on the merits showed that injunctive relief preventing the likely unlawful agency action was in the public interest).

The Court did not overlook Defendants' argument that the new policy "comes in response to a moment of crisis at the border," Doc. 9 at 13, and that "[a]n order restricting DHS's parole authority on the eve of the crisis has the serious potential

to cause chaos and undermine the security of the border and the safety of border officials," *id.* at 5.   Putting aside the fact that even President Biden recently acknowledged that the border has been in chaos for "a number of years," Defendants' doomsday rhetoric rings hollow because, as explained in detail in *Florida*, this problem is largely one of Defendants' own making through the adoption an implementation of policies that have encouraged the so-called "irregular migration" that has become fairly regular over the past 2 years.

Nor did the Court overlook the assertion in the affidavit submitted by Defendants with their response in opposition to the motion for a TRO that "[t]he public safety and national security impacts of [enjoining the Parole with Conditions memorandum] would be extraordinary" because it would force USBP to "violate court orders" and possibly leave USBP with "only untenable options such as declining to fully process individuals at all and potentially not even apprehend them to start."   Doc. 9-2 at 9-10.   However, USBP has been in essentially that same position since March when the Court vacated the substantially identical Parole+ATD policy.   Moreover, the Court fails to see a material difference between what CBP will be doing under the challenged policy and what it claims that it would have to do if the policy was enjoined, because in both instances, aliens are being released into the country on an expedited basis without being placed in removal proceedings and with little to no vetting and no monitoring.

Finally, although the Government did not make the argument, the Court did not overlook that 8 U.S.C. §1252(f)(1) prohibits any court other than the Supreme Court from "enjoin[ing] or restrain[ing] the operation" of certain aspects of the INA. However, §1252(f)(1) specifically refers to Part IV of the INA, and the parole statute that Defendants purport to implement through the challenged policy is in Part II of the INA.  Thus, as explained in *Florida*, §1252(f)(1) does not preclude the Court from enjoining DHS's misuse of its parole authority.  2023 WL 2399883, at *35 (rejecting DHS's argument that §1252(f)(1) precludes the Court from enjoining the Parole+ATD policy and noting that "any indirect impact that vacatur of that policy might have on how DHS exercises its authority under part IV of the INA does not equate to the Court having 'enjoined or restrained' the operation of that part") (alterations adopted).

## Conclusion

In sum, for the reasons stated above, the Court finds that Florida is entitled to a TRO enjoining the implementation and enforcement of DHS's newly adopted parole policy.  No bond is required.[8]  Accordingly, it is

---

[8] Rule 65(c) states that the court may issue a TRO "only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," but it is well established in this Circuit that "the amount of security required by the rule is a matter within the discretion of the trial court" and "the court 'may elect to require no security at all.'" *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (quoting *Corrigan Dispatch Co. v. Casaguzman, F.A.*, 569 F.2d 300, 303 (5th Cir. 1978)).  Here, Defendants do not identify any monetary costs or damages they might suffer if the new parole policy is temporarily enjoined, so the Court sees no

**ORDERED** that:

1.     DHS is enjoined from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum from U.S. Border Patrol Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)."

2.     This TRO will take effect at 11:59 p.m. eastern time to correspond with the expiration of the Title 42 Order and to give Defendants an opportunity to seek an emergency stay from a higher court.

3.     This TRO will expire 14 days from the date of this Order.  *See* Fed. R. Civ. P. 65(b)(2).

4.     A preliminary injunction hearing is scheduled for May 19, 2023,[9] at 9:00 a.m. in the United States Courthouse, 1 North Palafox Street, Courtroom 4 North, Pensacola, Florida.

─────────────────

reason to impose a bond as a condition of the TRO.  *Accord Texas v. United States*, 524 F. Supp. 3d 598, 668 (S.D. Tex. 2021) (requiring no security bond for preliminary injunction barring DHS from pausing removals).

[9]  The hearing was scheduled for this date because the Court has two long-overdue criminal trials scheduled for the following week.  The Court understands that Fed. R. Civ. P. 65(b)(3) states that the preliminary injunction hearing is to "tak[e] precedence over all other matters except other matters of the same character," but the Court is not inclined to reschedule those trials when it has an earlier date available for the preliminary injunction hearing.  And, if the May 19 date is not convenient to the parties, they can agree to a brief extension of the TRO under Rule 65(b)(2) to allow the preliminary injunction hearing to occur the following week—perhaps on May 30.  Or, if the parties have no other evidence or argument that they think might change the Court's mind on application of the preliminary injunction factors, they can agree to convert this TRO into a preliminary injunction so they can seek appellate review sooner rather than later.

**DONE and ORDERED** this 11th day of May, 2023.

_____

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**STATE OF FLORIDA**,

    **Plaintiff**,

**v.**                                                        **Case No. 3:23cv9962-TKW-ZCB**

**ALEJANDRO MAYORKAS**, **et al.**,

    **Defendants**.

_____/

## <u>ORDER DENYING STAY</u>

This case is before the Court based on Defendants' emergency motion to stay (Doc. 13) and Florida's response in opposition (Doc. 21).  Upon due consideration of these filings, the parties' stipulation (Doc. 16), and the entire case file, the Court finds for the reasons that follow that the motion to stay is due to be denied.

### Background

On Wednesday, May 10, 2023, Florida filed suit against Defendants (collectively, "DHS"), alleging that "DHS plans to immediately restart the *en masse* parole of aliens at the Southwest Border."  Doc. 1 at 2 (¶6) (citing an NBC news article[1] quoting a DHS spokesperson's summary of the plan).  The following day,

---

[1] Julie Ainsley, *Biden admin to allow for the release of some migrants into the U.S. with no way to track them*, https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-trackrcna83704, *NBC News*, May 10, 2023.

Florida filed a motion for a temporary restraining order (TRO) "preventing DHS from implementing the new parole policy or otherwise using [8 U.S.C.] §1182(d)(5) as a tool of operational convenience, to relieve overcrowding, or to facilitate faster processing at the Southwest border." Doc. 2 at 11.  The motion was briefed on an expedited basis, and at 8:45 p.m. CDT on Thursday, May 11, the Court granted Florida's motion and entered a TRO.  *See* Doc. 10.

The TRO "enjoined [DHS] from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum[2] from U.S. Border Patrol Chief Raul Ortiz, titled 'Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions).'"  *Id.* at 16 (¶1).  The Order took effect at 11:59 p.m. eastern time and, in accordance with Fed. R. Civ. P. 65(b)(2), it is only effective for a period of 14 days.  *Id.* (¶¶2, 3).  The Court scheduled a hearing for this Friday, May 19, to determine whether to convert the TRO into a preliminary injunction.  *Id.* (¶4).

On Friday, May 12, at 10:36 p.m., DHS filed a single motion to stay both the TRO in this case and the March 2023 judgment in *Florida v. United States*, Case No. 3:21cv1066, which vacated a parole policy known as Parole+ATD.  On Saturday, the Court summarily denied the motion to stay the judgment in the *Florida*

---

2  It is undisputed that this memorandum (Doc. 5-1) was what created the policy described in the NBC News article referenced in the complaint and that it is the policy challenged by Florida in this case.  The parties refer to this policy as the "Parole with Conditions" policy.

case because it was "borderline frivolous" and it "defie[d] credibility" for DHS to claim that it would suffer irreparable harm if the judgment was not stayed since DHS waited 58 days to appeal the judgment (and 65 days to request a stay) and a DHS official submitted a sworn declaration in this case stating that DHS had stopped using the Parole+ATD policy in January 2023, before the Court vacated it.  *See Florida v. United States*, Case No. 3:21cv1066, ECF No. 165 (May 13, 2023). However, the Court noted in a separate order (also entered on Saturday) that "there are different factual and procedural considerations at play" in this case and that "the motion [to stay] at least presents a non-frivolous argument as to why a stay of the TRO might be warranted."  Doc. 15 at 2.  Thus, the Court directed Florida to respond to the motion to stay on an expedited basis—by noon today.  *Id.* at 3 (¶1).

Florida timely filed its response, so the motion to stay in this case is now ripe for resolution.  No hearing is necessary to rule on the motion.

## Analysis

When ruling on a motion for a stay pending appeal,[3] the Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed

---

[3]  An appeal has not yet been filed in this case.  It is unlikely that an appeal can be filed at this point because a TRO is generally not appealable and the Court intends to separately enter a preliminary injunction within a day or so, after considering the proposed orders (Docs. 22, 24) submitted by the parties earlier today.  *See McDougald v. Jenson*, 786 F.2d 1465, 1472-73 (11th Cir. 1986).  However, because the parties have stipulated that the Court can covert the TRO into a preliminary injunction without further proceedings—and because DHS threatened to seek relief in the Eleventh Circuit if the Court did not promptly rule on its motion to stay—the Court finds that it is in the interest of justice for the Court to rule on the motion to stay at this time even though no

on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 425-26 (2009)).  "The first two factors … are the most critical." *Nken*, 556 U.S. at 434.

Here, as in the *Florida* case, the Court finds that none of the factors weigh in favor of granting a stay.

<u>Likelihood of Success on the Merits</u>

With respect to the first factor (likelihood of success), for the same reason that the Court found in the TRO that Florida was likely to succeed on its challenge to the Parole with Conditions policy, the Court finds that DHS is not likely to succeed in its appeal of the order enjoining that policy.[4]  The Parole with Conditions policy is "materially indistinguishable" from the Parole+ATD policy vacated in *Florida*, and

---

appeal has been filed.  If and when DHS appeals the forthcoming preliminary injunction, this Order shall be deemed to have denied any request to stay the preliminary injunction.

[4] DHS argues that it only needs to show that it has a "substantial case on the merits" (rather than the normal "strong showing" of a likelihood of success on appeal) "because the balance of equities so overwhelmingly favors the government," Doc. 13 at 11 (citing *LabMD, Inc. v. Federal Trade Comm'n*, 678 F. App'x 816, 819 (11th Cir. 2016)).  However, for the same reasons that DHS has not shown that it will be irreparably harmed if a stay is not granted, it has not shown that the balance of equities weighs in its favor.  And even if the lower "substantial case on the merits" standard applies, the Court finds that DHS has not met that standard for the reasons discussed below.

for the same reasons that the narrow authority in the parole statute, 8 U.S.C. §1182(d)(5)(A),[5] did not authorize the Parole+ATD policy, it does not authorize the Parole with Conditions policy. *See Florida v. United States*, 2023 WL 2399883, at *29-31 (N.D. Fla. Mar. 8, 2023) (explaining why the Parole+ATD policy is "contrary to law").

Like the Parole+ATD policy, the Parole with Conditions policy is a "processing pathway" designed to relieve overcrowding at Border Patrol facilities and release large numbers of aliens into the country on "parole" without even initiating immigration proceedings. *See* Doc. 5-1 at 3 (explaining that the policy is an "additional mechanism[] to ensure that individual noncitizens are processed expeditiously and released from or transferred out of [U.S. Border Patrol] custody in a safe, swift, humane, and orderly fashion"). The Parole with Conditions policy operates in precisely the same manner as the Parole+ATD policy—by allowing immigration officials to "parole" arriving aliens into the country on the condition that they schedule an appointment at an Immigration and Customs Enforcement (ICE) facility (or check-in online) within a specified period to be placed in an

---

[5]   This statute provides in pertinent part that "[t]he Attorney General may … in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, … and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."  8 U.S.C. §1182(d)(5)(A).

immigration proceeding.[6]   And, like the Parole+ATD policy, the Parole with Conditions policy contravenes the plain language of the parole statute because even though it pays lip service to the "case-by-case" requirement in the statute, it does not require the alien to be "returned to custody" "forthwith" "when the purposes of such parole … have been served," and there is no "case" to "continue to be dealt with" even if the alien was returned to custody because an immigration "case" is not even initiated until the alien is issued a notice to appear when (or if) he or she reports to or checks-in with ICE.   Moreover, the fact that the Parole with Conditions policy allows "paroled" aliens to check-in with ICE online and receive a Notice to Appear by mail all but ensures that the aliens will not be taken back into custody after the purpose of the parole (i.e., being issued a Notice to Appear) has been served.

The Court did not overlook DHS's arguments that it is likely to succeed on appeal of the TRO because Florida lacks standing to challenge the Parole with Conditions policy and because Florida's substantive and procedural challenges to that policy under the Administrative Procedure Act (APA) are destined to fail.   The

---

[6]   As pointed out in the TRO, one difference between the Parole with Conditions policy and the Parole+ATD policy is that aliens were required to check-in with ICE in 15 days under the Parole+ATD policy, but they are given 60 days under the Parole with Conditions policy. *See* Doc. 10 at 8 n.4.  Another difference is that the Parole+ATD policy required the alien to actually report to an ICE facility whereas the Parole with Conditions policy only requires the alien to "schedule an appointment" (or check-in online) with ICE.   Those differences do not do anything to help bolster the legality of the Parole with Conditions policy—and, if anything, they seem likely to cause more problems down the road and require DHS to spend additional time and money tracking down aliens who fail to check in with ICE as it was forced to do in the "Operation Horizon" program discussed in the *Florida* decision. *See Florida*, 2023 WL 2399883, at *11.

Court rejects those arguments because they are no more persuasive with respect to the Parole with Conditions policy than they were with respect to the materially identical Parole+ATD policy at issue in the *Florida* case, *see* 2023 WL 2399883, at *16-20, 29-31, 23-33, and the new "notice and comment" arguments are unpersuasive for the reasons stated in the TRO, *see* Doc. 10 at 8 n.5.  Moreover, as Florida argues, Doc. 21 at 10-11, DHS is unlikely to succeed on its argument that Florida lacks standing to challenge the Parole with Conditions policy because, based on the evidence presented in the *Florida* case, it is reasonable to expect that the Parole with Conditions policy will have the same impact on Florida as did the Parole+ATD and non-detention policies at issue in the *Florida* case.[7]

The Court also did not overlook DHS's argument that it is likely to succeed on appeal because the Court lacked the authority to issue a TRO based on 8 U.S.C. §§1252(f)(1) and 1252(a)(B)(ii).  Doc. 13 at 12-14.  Putting aside the fact that DHS did not make these arguments in its response in opposition to the TRO, the Court finds that these arguments are unpersuasive for the same reasons that the Court

---

[7] The Court did not overlook DHS's argument that the standing evidence in *Florida* related to a different policy and a different timeframe, *see* Doc. 16 at 3, but by the time that case went to trial, there was several years' worth of data showing the number of aliens who had been paroled or otherwise released into Florida.  Here, the Parole with Conditions policy was enjoined the day after it was implemented, but there is no reason to believe that the policy would not have similarly resulted in aliens who otherwise should have been detained being "paroled" into Florida if it had not been enjoined.

rejected them in the *Florida* case.  *See Florida*, 2023 WL 2399883, at *21, 34-35;

*Florida v. United States*, 2022 WL 2431414, at *11 (N.D. Fla. May 4, 2022).

Finally, the Court did not overlook DHS's argument that it is likely to succeed

on appeal because the TRO is overbroad since Florida could be provided "'complete

relief' … by an order limited to precluding DHS's implementation of the [Parole

with Conditions policy] as to noncitizens indicating a final address in Florida." *See*

Doc. 13 at 15.  The Court finds this argument unpersuasive for the same reason that

the Court determined in the *Florida* case that partial vacatur of the Parole+ATD

policy would not provide "complete relief" to Florida.  *See Florida*, 2023 WL

2399883, at *34 ("Once released at the Southwest Border, aliens are free to travel

throughout the United States.  If the Court were to adopt DHS's request—which

would essentially involve DHS asking aliens where they are going and applying the

challenged policies to aliens who don't respond with "Florida"—released aliens

would be free to travel to Florida.  Moreover, if DHS only detained applicants for

admission who say they are traveling to Florida and released other aliens, the Court

expects that it would not take long for immigration law violators to figure out how

to ensure their own release.") (internal citation omitted).

<u>Injury to the Movant if a Stay is Denied</u>

With respect to the second factor (injury to the movant), the essence of DHS's

argument is that it will be unable to handle the expected post-Title 42 Order "surge"

of aliens arriving at the Southwest Boarder without the ability to quickly "parole" them into the country under the Parole with Conditions policy.  The Court finds that argument unpersuasive for several reasons.

First and foremost, the Court does not give much weight to the declaration relied on by DHS to support this argument because some of the representations in the declaration are directly contradicted by public statements made by the DHS Secretary.  For example, before the Title 42 Order expired, the DHS Secretary reportedly stated that only "a fraction of the people that we encounter" would be paroled into the country and that "the vast majority will be addressed in our border patrol facilities and our ICE detention facilities."[8]  And, after the Title 42 Order expired, the DHS Secretary reportedly stated that the number of aliens encountered at the Southwest Border "are markedly down over what they were prior to the end of Title 42."[9]  Thus, it appears that DHS's inability to release aliens under the Parole with Conditions policy is not as big of a deal as it was made out to be in the declaration attached to the motion to stay.[10]

---

[8] These comments were reported in the NBC news article referenced in the complaint.  *See* note 1, *supra*.

[9]  Nouran Salahieh, *End of Title 42 immigration policy brought fewer migrants than expected, but communities are still on high alert*, CNN, May 14, 2023 (https://www.cnn.com/2023/05/14/us/title-42-border-immigration-sunday/index.html).

[10]  The parties were given an opportunity to explain why the Court could not at least take judicial notice of the public statements that have been attributed to the DHS Secretary about the lower-than-expected number of encounters in evaluating the weight of the evidence currently

Second, DHS made similar dire predictions in the *Florida* case. It argued that vacatur of the Parole+ATD policy would have "disastrous consequences … starting the day after [the policy] was ended." *Florida v. United States*, Case No. 3:21cv1066, ECF No 151 at 184. That, however, did not happen, and it has now come to light that DHS stopped using the Parole+ATD policy several months <u>before</u> the Court vacated it.[11] If the sky did not fall then, the Court has no reason to believe that the sky will fall now—despite what the DHS witness claims in his declaration.

---

before the Court. Florida stated that it had no objection to the Court doing so and DHS did not address the issue one way or the other. The Court sees no reason to ignore the Secretary's public comments because it is not entirely clear that the rules of evidence apply at this stage of the case and even though the court elsewhere expressed a "healthy degree of skepticism about the Secretary's comments," the Court also noted that "he is the ultimate boss of DHS" and his public comments give the Court "reason to question the veracity of statements in the [declaration] submitted by a lower-level DHS bureaucrat." *Florida v. United States*, Case No. 3:21cv1066, ECF No. 165, at 5 n.6 (May 13, 2023).

[11] DHS has not argued that the challenge to the Parole+ATD policy was moot or that there was not "case or controversy" with respect to the policy when the Court entered the Opinion and Order in *Florida*, and it would be hard-pressed to make that argument at this point. *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (holding that a case may only become moot by a defendant's voluntary cessation of the challenged practice when the defendant meets the "'heavy burden of persuading' the court" that "the allegedly wrongful behavior could not reasonably be expected to recur") (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)); *Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1285 (11th Cir. 2004) ("[A] challenge to a government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated."); *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267-70 (11th Cir. 2020) (similar); *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1265-67 (11th Cir. 2010) (holding that a case against a governmental actor was not moot because "the record neither yields absolute certainty that the challenged conduct has permanently ceased, nor … supports the conclusion that the … policy was 'unambiguously terminated'"). Judicial review of agency action should not be a game of "whack-a-mole" whereby the agency is able to avoid review of its actions by discontinuing its reliance on a policy only to replace it with another policy that has a different name but operates functionally the same.

Third, "self-inflicted injury" does not establish irreparable harm. *See Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (citing 11A Charles Alan Wright, et al., Federal Practice and Procedure §2948.1 (2021), for the proposition that "a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted"). The Court will not belabor this point here because, as thoroughly explained in the *Florida* decision, the TRO, and other orders entered over the past few days, the more persuasive evidence showed that Defendants brought the immigration "crisis" at the border on themselves (and the country) by adopting immigration policies that incentivized "irregular migration" by prioritizing "alternatives to detention" over actual detention and that they have known since early March that they would not be able to rely on "parole" as a "processing pathway" to avoid their statutory detention requirements and facilitate release without initiating immigration proceedings.[12]

<u>Injury to the Non-movant if a Stay is Granted</u>

With respect to the third factor (injury to the non-movant), issuance of a stay will injure Florida in the same way that it would have been injured if a TRO was not entered. Specifically, as explained in the TRO:

---

[12] The Court did not overlook DHS's argument that it surged resources to the border and have taken other steps (including adopting new asylum rules) to prepare for the expiration of the Title 42 Order and discourage aliens from simply showing up at the Southwest Border. That is all well and good, but it begs the question as to why these steps were not taken long before now to slow or stop the flow of aliens into the country over the past two years.

the evidence presented in *Florida* established that Florida suffers substantial harm—both to its sovereignty[FN7] and its public fisc—when the federal government releases aliens into the country on "parole" (or otherwise) rather than detaining them as required by the INA. *See Florida* [*v. United States*], 2023 WL 2399883, at *17-18 [(N.D. Fla. Mar. 8, 2023)]. That same harm will flow from the new policy because, as was the case with the Parole+ATD policy vacated in *Florida*, the new policy is intended to "shift the processing of arriving aliens to ICE facilities around the country that are closer to the aliens' final destinations." *Id.* at *14. The harm to Florida is irreparable because it "cannot be undone through monetary remedies," *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990), because the United States has sovereign immunity from damages claims, *see Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *see also State of Florida v. Becerra*, 544 F. Supp. 3d 1241, 1300 (M.D. Fla. 2021) (observing that in an APA action, sovereign immunity bars the recovery of monetary damages from the federal government, thereby making the state's financial injury irreparable), and there is no way to remedy the impact on state sovereignty that flows from … Florida's inability to exclude aliens who were improperly "paroled" into the country from its territory.

> [FN7] The Eleventh Circuit has recognized that even though injuries to state sovereignty are "intangible," they are real and concrete. *See W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023). And, as Justice Scalia explained in *Arizona v. United States*, controlling immigration "is an inherent attribute of sovereignty" and it is questionable whether the States would have ratified the Constitution if it had provided that limits on immigration "will be enforced only to the extent the President deems appropriate" because the States "jealously guarded" their sovereignty during the Constitutional Convention. 567 U.S. 387, 422, 436 (2012) (Scalia, J., concurring in part and dissenting in part).

Doc. 10 at 12-13.

<u>Public Interest</u>

With respect to the fourth factor (public interest), "[t]he public interest in enforcement of the immigration laws is significant," *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981), and "our system does not permit agencies to act unlawfully even in pursuit of desirable ends," *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021).  Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), and "frustration of federal statutes and prerogatives are not in the public interest…." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see also Becerra*, 544 F. Supp. 3d at 1304 (concluding that the state's high likelihood of success on the merits showed that injunctive relief preventing the likely unlawful agency action was in the public interest).

Here, as discussed above, the evidence in the *Florida* case established that DHS was misusing its statutory parole authority by creating a new "processing pathway," Parole+ATD, pursuant to which aliens arriving at the Southwest Border would be released into the country with minimal vetting and without being placed into removal proceedings simply to expedite processing at CBP facilities.  The Parole with Conditions policy is materially indistinguishable in its purpose and effect, and just like the Parole+ATD policy, the Parole with Conditions policy

contravenes the narrow authority provided in the parole statute and undermines the general proposition that, under the plain language of 8 U.S.C. §1225(b), arriving aliens are supposed to be detained, not released (on parole or otherwise), during the pendency of their immigration cases.  Thus, staying the TRO and allowing the Parole with Conditions policy to be implemented would contravene the public interest.

The Court did not overlook DHS's argument that a stay is in the public interest because the Supreme Court has frequently stayed district court injunctions in immigration cases and has "necessarily determined [in those cases] that the Government's border-management interests outweighed the plaintiffs' interests." Doc. 13 at 5.  However, the Court does not read those decisions as standing for the proposition that a TRO must be stayed (or that a preliminary injunction cannot be entered) whenever the federal government claims that such action would interfere with its "border-management interests" even if (as the Court found in *Florida*, and appears to be the case here) the manner in which the federal government is "managing" the border contravenes the authority provided by Congress.

Nor did the Court overlook DHS's argument that a stay is in the public interest because it is entitled to "the utmost deference" when its border-enforcement policies are challenged.   *Id.* at 6-7.   The Court does not disagree with that general

proposition,[13] but as explained in the *Florida* decision, DHS's deference is not unbounded.  *See* 2023 WL 2399883, at *1 (explaining that the immigration officials' "'broad discretion' in carrying out the immigration laws … must be exercised within the confines established by Congress").

Finally, the Court did not overlook DHS's argument that a stay is in the public interest because, without a stay, the TRO will lead to overcrowding in CBP and ICE facilities—which will endanger the health and safety of aliens and border patrol staff and require DHS to resort to other forms of release or simply not apprehend aliens. *See* Doc. 13 at 7-10.  The Court finds this argument unpersuasive because, as discussed above, it appears that the number of post-Title 42 Order "encounters" of aliens arriving at the Southwest Border is considerably less than what was projected in the declaration on which this argument is based.  Moreover, putting aside the political ramifications of DHS officially stating that it might not apprehend or process aliens who entered the country illegally, the Court finds it highly implausible that DHS will do so or re-implement policies (such as the short-lived Notice to

---

[13] DHS cites *Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1380-81 (S.D. Fla. 2002), aff'd, 321 F.3d 1336 (11th Cir. 2003), for the proposition that the "standard for reviewing Executive's policies under §1182(d)(5) is extremely deferential and [that the] court must avoid overriding the agency's policy determination, regardless of whether the court agrees with the policymaker's choice or approves of the policy reasons underlying it" (alterations adopted and internal quotations omitted).  To the extent DHS is suggesting that the Court vacated the Parole+ATD policy and/or enjoined the Parole with Conditions policy simply because the Court disagreed with the policy choices underlying that decision, the Court makes clear that those decisions were based on the Court's view of what the law required—nothing more, nothing less.

Report policy) that it effectively abandoned during the course of the *Florida* case and that its witnesses, including U.S. Border Patrol Chief Ortiz, had a hard time trying to defend from an operational perspective in light of the significant processing time and cost that was required to track down aliens who failed to report.

### Conclusion

In sum, for the reasons stated above, DHS's motion to stay the TRO (Doc. 13) is **DENIED**.  The Court will rule on DHS's request to convert the TRO into a preliminary injunction in the next day or so.

**DONE and ORDERED** this 15th day of May, 2023.

_____
**T. KENT WETHERELL, II
UNITED STATES DISTRICT JUDGE**

1300 Pennsylvania Avenue NW
Washington, DC 20229

HQBOR 50/10-C

NOV 0 2 2021



U.S. Customs and
Border Protection

MEMORANDUM FOR:    All Chief Patrol Agents
                   All Deputy Chief Patrol Agents

FROM:              Raul L. Ortiz
                   Chief
                   U.S. Border Patrol

SUBJECT:           Parole Plus Alternative to Detention

This memorandum supersedes previous guidance relating to prosecutorial discretion and
issuance of Notices to Report (NTR), as issued in March 2021, and establishes conditions for the
implementation of parole plus Alternative to Detention (Parole + ATD), a processing pathway
that will replace the use of NTR unless that pathway is explicitly authorized by the U.S. Border
Patrol (USBP) Chief.

USBP takes very seriously its mission of creating a secure border while ensuring the health and
safety of migrants in its custody, as well as the health of the workforce. Earlier this year, when
encounters were consistently high, operational capacity strained, and COVID-19 acute, USBP
began issuing NTRs, a significantly faster mechanism for processing noncitizens, particularly
when used for family units (FMU). NTRs were used for certain noncitizens following initial
processing and collection of biometric and biographic information. The use of this processing
pathway enabled USBP to relieve overcrowding in congregate settings, thus better protecting
both the workforce and noncitizens in our custody. Importantly, use of an NTR decreased
processing times significantly compared with processing families for a Notice to Appear (NTA),
thus ensuring that families were more expeditiously moved out of U.S. Customs and Border
Protection (CBP) custody. The process of issuing NTAs is much more time consuming, given the
level of detail and interagency coordination required to establish A-files and finalize the charging
documents. Those released with NTRs, however, were directed to report to ICE for further
processing, including for an NTA, as appropriate.

Effective immediately, USBP is ceasing the use of NTRs. When noncitizens will be processed
for release from USBP facilities, USBP will prioritize resources to issue noncitizens NTAs
immediately. NTAs formally initiate immigration proceedings, and it is USBP's goal to
maximize NTA issuance from USBP facilities and eliminate the need for use of alternative
processing pathways in the future.

In circumstances where an alternate path is necessary to address urgent crowding and excessive
Time-In-Custody (TIC) in USBP facilities, Border Patrol has developed an alternative processing
pathway: the use of Parole + ATD. This pathway includes enrollment of FMUs in ICE ATD
programs to ensure individuals are accounted for after release from USBP facilities. Parole +
ATD is a rigorous enforcement process that is effective and includes accountability measures to

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

Parole Plus Alternative to Detention
Page 2

require noncitizens to report to ICE for issuance of an NTA and continue through the formal immigration process.

To deal with situations in which capacity constraints or conditions in custody warrant the more expeditious processing, USBP may consider use of Parole + ATD on a case-by-case basis for FMUs when certain conditions, laid out below, exist. The use of Parole + ATD in these circumstances will ensure that the USBP can continue to meet its mission requirements, such as border security operations, by maximizing deployments of agents to the field. Use of Parole + ATD is consistent with 8 U.S.C. § 1182(d)(5), which provides that certain noncitizens may be paroled temporarily "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit"—namely, the urgent humanitarian need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities.

All individual members of a FMU who are processed for Parole + ATD, will, as a condition of their parole, be required to report to ICE within 15 days to be processed for an NTA. Effective immediately:

In the Del Rio (DRT) and Rio Grande Valley (RGV) Sectors, Chief Patrol Agents may authorize the processing of FMUs for Parole + ATD on a case-by-case basis when the temporary staffing support to the sector is maximized, the seven-day average of encounters is greater than the sector's Fiscal Year 2019 May daily average,[1] and when one or more of the following is true:

- The average TIC in the sector exceeds 72 hours AND the number of subjects who were taken into custody in the sector during the preceding 48 hours exceeds the number of individuals booked out in the same period.

- The sector exceeds 100% of the total non-COVID detention capacity AND the number of subjects who were taken into custody in the sector during the preceding 48 hours exceeds the number of individuals booked out in the same period.

Outside of the DRT and RGV Sectors, any sector seeking to utilize the Parole + ATD pathway must obtain approval from the USBP Chief and the CBP Commissioner prior to implementation. The USBP Chief and CBP Commissioner may authorize the use of this pathway in situations in which capacity constraints or conditions in custody show that there is an urgent humanitarian reason to release FMUs in a more expeditious fashion in order to avoid crowding in CBP facilities and the resulting COVID-19 health risks to the workforce and migrants in custody, taking into account the factors identified above.

The use of Parole + ATD pathway in DRT and RGV Sectors will be reassessed by USBP HQ on a daily basis in accordance with the conditions established above.

---

[1] The Fiscal Year 2019 May daily average in RGV was 1,607 and in DRT was 276. This month saw the highest encounter numbers that year.

Parole Plus Alternative to Detention
Page 3

Parole + ATD may not be used for noncitizens who pose a national security or public safety threat. Furthermore, Parole + ATD may only be issued when an individual is not covered by or is excepted from, on a case-by-case basis, the U.S. Centers for Disease Control and Prevention (CDC) Title 42 Order.

In sectors in which the use of the Parole + ATD pathway has been approved, if parole is appropriate based on a consideration of the above factors (as well as any other applicable urgent humanitarian reasons or significant public benefit considerations), USBP agents may exercise their discretion to process the noncitizen(s) with Parole + ATD, after initial enrollment processing is complete, rather than issuing an NTA.

Under no circumstances will a noncitizen who claims to be, is suspected to be, or is determined to be a noncitizen unaccompanied child as defined by 6 U.S.C. § 279(g)(2), be processed through this pathway.

As the processing landscape and the nature of the current COVID-19 pandemic remains fluid and may change over time, updated guidance will be disseminated to the field via email to reflect the latest changes. In particular, when COVID-19 conditions eventually improve, it is expected that there will no longer be a need for this alternate pathway.

Staff may direct their questions to the Immigration, Prosecutions, and Custody Operations Unit at Headquarters by emailing ImmigrationProsecution&CustodyOPS@cbp.dhs.gov.

**FOR OFFICIAL USE ONLY**

1300 Pennsylvania Avenue, NW
Washington, DC 20229



**U.S. Customs and
Border Protection**

HQBOR 90/16.38

**MAY 1 0 2023**

TO:                                        All Chief Patrol Agents
                                          All Directorate Chiefs

MEMORANDUM FROM:            Raul L. Ortiz
                                          Chief
                                          U.S. Border Patrol

SUBJECT:                          Policy on Parole with Conditions in Limited Circumstances
                                          Prior to the Issuance of a Charging Document (Parole with
                                          Conditions)

To outline how U.S. Customs and Border Protection (CBP) utilizes the longstanding authority
under section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(d)(5), to
temporarily parole certain noncitizens on a case-by-case basis for urgent humanitarian reasons or
for significant public benefit. This memorandum describes the policy when that authority may, in
certain circumstances, be used to consider individuals for parole after United States Border
Patrol (USBP) has conducted an inspection of the noncitizen and prior to the issuance of a
charging document where that parole is subject to the imposition of conditions on parole, as
contemplated in the INA (hereinafter, Parole with Conditions). Specifically, this policy addresses
when parole is conditioned on a noncitizen, within 60 days, scheduling an appointment to appear
at an U.S. Immigration and Customs Enforcement (ICE) facility for the initiation of appropriate
removal proceedings or requesting service, via a designated online location, of a Notice to
Appear (NTA) by mail. This document describes the general policy of when such paroles may be
considered and continues to require that each parole be considered individually, based on the
facts and circumstances known to the Border Patrol Agent (BPA) at the time of processing. All
paroled noncitizens will go through appropriate vetting and national security checks.

USBP conducts an inspection of each noncitizen it apprehends or arrests consistent with its
authorities, including INA § 287, 8 U.S.C. § 1357 and INA § 235(a), 8 U.S.C. § 1225(a), often
referred to as "processing." Processing noncitizens includes steps such as, among other things,
identification of the noncitizen, review of immigration and criminal history, an assessment of
any national security concerns, and an individualized evaluation of what processing pathway is
most appropriate for the individual noncitizen, such as removal proceedings under INA § 240, 8
U.S.C. § 1229a; expedited removal; reinstatement of removal; permitting the individual to
voluntarily withdraw their application for admission; and/or parole. This policy provides general
guidance on when BPAs may consider parole for an individual who the agent expects is
otherwise amenable for removal proceedings under INA § 240, 8 U.S.C. § 1229a. This

memorandum in no way removes agents' discretion to examine all appropriate processes for any particular noncitizen.

Pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A), the Secretary of Homeland Security has the discretionary authority to parole applicants for admission into the United States "temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." As part of an overall inspection of a noncitizen under INA § 235(a), 8 U.S.C. § 1225(a), CBP may exercise its discretion to parole a noncitizen on a case-by-case basis into the United States, including during the initiation of or to facilitate ICE's initiation of removal proceedings under section 240 of the INA, 8 U.S.C. § 1229a. Parole with Conditions provides a processing mechanism to allow for more expeditious processing of individuals who agents determine would be appropriate for section 240 removal proceedings.

This memorandum describes a policy concerning when CBP may exercise its discretionary parole authority for urgent humanitarian reasons or a significant public benefit, including where there are conditions requiring the expeditious processing of noncitizens in exigent circumstances in order to ensure (1) appropriate and safe conditions for the health and safety of individual noncitizens in custody and (2) USBP's continued ability to carry out its critical border security and enforcement mission. During periods of sustained high encounter numbers, it is significantly more efficient for USBP to process individuals, consistent with INA § 235(a), 8 U.S.C. § 1225(a), for Parole with Conditions as opposed to issuing an NTA or other charging document at the time of encounter. Those subject to Parole with Conditions are not simply released into the community; they are required to schedule an appointment with ICE for the initiation of section 240 removal proceedings, as appropriate, or, at a designated online location, request service of an NTA by mail.

Parole with Conditions is a tool that should only be used when one of the limited triggers below are met and only on a case-by-case individualized review of each noncitizen. Parole with Conditions permits CBP to prioritize the health and safety of individual noncitizens in its custody through reducing overcrowding, and to maintain adequate enforcement resources along the border to deter the efforts of criminal organizations and traffickers and intercept persons seeking to enter the United States unlawfully. It also allows for USBP to maintain safe and humane holding conditions, compliant with all applicable court orders and other legal obligations, for each noncitizen in its custody. It should be used only where USBP determines that there are urgent humanitarian reasons that warrant parole of a particular person, given the health and safety of individuals in custody, or that there is significant public benefit in paroling the particular person in order to allow for USBP to continue to process those it has in its custody or utilize its limited personnel to process and maintain border security.

Parole with Conditions will be utilized with the other steps USBP has already taken to ensure that processing is as efficient as possible. For instance, USBP has streamlined the NTA/on own recognizance (OR) process, while ensuring legal sufficiency for processing. Moreover, USBP has taken steps to automate the A-file processes and to make forms electronic where possible to further reduce processing times. With the rollout of mobile field processing, USBP has further provided agents with tools to improve processing times. Additionally, adding Border Patrol

Processing Coordinators who perform administrative work in supporting BPAs and engaging in a contract for data entry processors has allowed USBP to focus its BPA time and resources to its important border mission and immigration officer functions. USBP has taken steps to increase its short-term holding capacity. For example, USBP has opened new soft sided facilities and other facilities that allow for initial processing outside USBP stations. USBP continues to use all of its resources to achieve its mission needs, using remote agents for virtual processing, while also receiving assistance where available, from the immigration officers in Office of Field Operations for their processing of noncitizens on the Southwest border (SWB), the U.S. Department of Homeland Security (DHS) Volunteer Force, which permits federal employees to assist CBP in processing noncitizens along the SWB, and utilizing Department of Defense personnel to assist in non-immigration officer functions, such as data entry and warehouse duties.

Notwithstanding these efforts, USBP's resources, including personnel and physical space and equipment, are finite. USBP still needs additional mechanisms to ensure that individual noncitizens are processed expeditiously and released from or transferred out of USBP custody in a safe, swift, humane, and orderly fashion, in order to provide for appropriate and safe conditions for noncitizens.

It is the policy of CBP and USBP to hold noncitizens in appropriate short-term holding conditions upon apprehension, consistent with all applicable court orders and other legal obligations. It is important to ensure that conditions of short-term custody are appropriate for the nature and length of detention. USBP makes every effort to hold noncitizens for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible. This is because, as USBP's facilities reach capacity, it becomes more difficult to ensure the safety, health, and security of individual noncitizens, monitor medical needs, sanitation, mental health considerations, and other important factors for appropriate short-term custody conditions.

CBP understands that the DHS Office of Health Security has assessed that efforts to reduce overcrowding in DHS facilities to avoid preventable harm and mitigate health and welfare risks to both noncitizens and the DHS workforce should be prioritized.

Moreover, there are requirements such as *Flores*, regarding treatment of minors in DHS custody, and *Doe*, requiring certain detention conditions for those in custody longer than 48 hours in the Tucson sector, which mandate particular conditions for those in CBP custody. USBP recognizes that short-term custody conditions may have a disproportionate impact on different populations such as those with medical conditions or other vulnerabilities. Therefore, it is USBP's policy to apply the most appropriate processing pathway for an individual noncitizen, taking into account all appropriate factors including short-term holding conditions and the impact of conditions that could potentially impact the safety, health, and security of noncitizens in CBP custody.

*Approval Process*

Use of Parole with Conditions is not authorized unless it is specifically requested by a sector and authorized by the CBP Commissioner. In no circumstance does the authorization to apply Parole with Conditions for a particular sector mean that all noncitizens in a particular sector should be

paroled. Instead, it simply authorizes the BPA inspecting an individual noncitizen to consider one of several processes. As explained more fully below, the decision to parole a noncitizen must still be made on a case-by-case individualized basis, examining all of the facts and circumstances at the time of the noncitizen's inspection, and only if there is an urgent humanitarian reason, such as ensuring the safety, health, and security of the individual noncitizen, or significant public benefit justifying parole.

 A sector may request authorization for the use of Parole with Conditions on a case-by-case individualized basis from the Commissioner due to exigent circumstances if one of the following exists:

- A sector or centralized processing center's (CPC) capacity in custody total exceeds 125%; OR
- USBP has apprehended 7,000 noncitizens per day across the SWB over a 72-hour period; OR
- The average time-in-custody (TIC) for noncitizens is over 60 hours.

Use of Parole with Conditions is only authorized during exigent circumstances, and as such may only be utilized to the extent necessary. If a sector or CPC reaches 95% capacity, then Parole with Conditions should not be utilized in that sector and other Title 8 processing pathways should be utilized. Once a sector or CPC is at 95% capacity, the concerns regarding health and safety of noncitizens in short-term custody are more likely mitigated for the reasons discussed below.

Based on USBP's long experience and expertise, USBP expects that the circumstances listed above reflect situations where it will become increasingly difficult for USBP to process noncitizens as quickly as they are apprehended while ensuring that custody conditions are consistently safe, humane, and orderly and consistent with applicable court orders and other legal obligations.

As short-term holding conditions become more crowded, USBP faces increasing challenges regarding maintenance of sanitation, medical needs, and mental health of noncitizens, among other short-term custody standard considerations. These circumstances do not require the parole of any particular noncitizen but instead are factors considered that USBP determines it is appropriate to request the use of Parole with Conditions from the Commissioner for urgent humanitarian reasons in addition to considering other processing pathways. Moreover, short-term custody conditions remain only one factor in the determination to parole. As discussed above, USBP continues to fully assess each individual on a case-by-case basis to determine the best processing pathway for that particular individual.

Approval of Parole with Conditions may be granted only on a sector-by-sector basis, and Parole with Conditions may not be used for noncitizens transferred laterally from a sector that has not met the threshold criteria above. Additionally, approval for use of Parole with Conditions is time limited, must be reassessed every week by the Commissioner or Deputy Commissioner, and is expected to be used sparingly even when approved. Lastly, CBP must obtain a valid mailing address using an address validation tool for every noncitizen paroled under this authority.

Nongovernmental organization and shelter addresses are not sufficient for a noncitizen address. USBP is not authorized to process noncitizens via Parole with Conditions when these criteria are not met, and when a sector or CPC is below 95% capacity, absent extraordinary circumstances as determined by the Commissioner.

The initial grant of Parole with Conditions should generally be for 60 days, for the purpose of allowing the noncitizen to schedule an appointment to appear at an ICE facility for the initiation of appropriate removal proceedings or to request service of an NTA by mail, via a designated online location. Parole is automatically terminated upon expiration of the period for which parole was authorized.

*Individual Assessment*

Each noncitizen is individually processed consistent with INA § 235(a), 8 U.S.C. § 1225(a), after encounter. This inspection process includes, but is not limited to, an assessment of the individual's identification and immigration background, review and vetting of any national security or criminal concerns, and consideration of which immigration processing pathway is best applicable to the noncitizen. This memorandum describes when Parole with Conditions may be appropriate in advance of the issuance of an NTA where the BPA expects that section 240 removal proceedings is likely the appropriate pathway.

Once the Parole with Conditions initial criteria are met, the decision to parole any individual noncitizen must be assessed on a case-by-case, individualized basis.

Prior to a noncitizen's processing via Parole with Conditions, CBP must conduct biometric identity verification. The BPA making determinations regarding Parole with Conditions must evaluate any potential national security and public safety concerns. Any assessment must consider all of the facts and circumstances known to the BPA at the time, including but not limited to, the noncitizen's immigration history, criminal history, community or family ties, medical concerns, role as a caregiver or provider, and other factors known to the BPA. The assessment may begin as early as the initial encounter in the field, and there is no limitation on the time period in which this individual evaluation must occur. BPAs must make determinations about national security and public safety based on the facts and circumstances known at the time of processing.

In addition, the BPA must consider whether, given the time the individual has been in custody, and the availability of ICE detention space, there is an urgent humanitarian reason or significant public benefit to parole the individual from custody, such as where a noncitizen has medical, mental health, or other care needs that cannot reasonably be provided in USBP custody given the prolonged time in custody due to encounter numbers. Additionally, because BP personnel and resources are finite, BP must consider whether processing personnel and resources are necessary to process other noncitizens in BP custody or accomplish enforcement actions that are immediately critical to border security for the greater public benefit. If so, the individual may be considered for Parole with Conditions.

USBP must collect and document a physical address for each noncitizen processed via parole with Conditions. In doing so, USBP is making a determination to temporarily pause the completion of the paperwork necessary for the initiation of removal proceedings under INA § 240, 8 U.S.C. § 1229a, which will instead be completed at a later date.  It is expected that the individual noncitizen would receive the same initiation of removal proceedings pursuant to INA § 240, 8 U.S.C. § 1229a, regardless of whether the completion of that paperwork was to occur.

*Cases in Which Parole with Conditions May Not Be Utilized*

Parole with Conditions may not be used for noncitizens who, based on an individualized assessment, pose a national security risk, unmitigable flight risk, public safety threat, or who claim to be, are suspected to be, or are determined to be unaccompanied children as defined by 6 U.S.C. § 279(g)(2) or appear likely subject to the mandatory detention requirements of INA § 236(c), 8 U.S.C. § 1226(c), if processed for removal proceedings pursuant to INA § 240, 8 U.S.C. § 1229a.

*Subsequent Processing*

CBP and ICE will equally share responsibility and work jointly to streamline and complete charging document issuance for individuals processed via Parole with Conditions. The final processing and placement into removal proceedings pursuant to INA § 240, 8 U.S.C. § 1229a is expected to utilize the standard processing, regardless of whether that paperwork occurs as a part of the Parole with Conditions processing or another pathway.

CBP is closely coordinating with ICE on this policy to ensure appropriate communication regarding those CBP is processing via Parole with Conditions and will be jointly responsible for the same. CBP understands that noncitizens will either check in with ICE for an NTA or receive an NTA by mail, upon request. CBP also understands that in circumstances in which DHS processes noncitizens for Parole with Conditions, DHS will make a separate, independent determination, after processing the individual for appropriate removal proceedings, whether to release the individual on parole during the pendency of such proceedings.

CBP must notify ICE in writing each time Parole with Conditions is authorized in a sector, with information regarding data and statistics.  Such notification must occur before processing for Parole with Conditions begins in the authorized border sector(s).

CBP will continuously coordinate with ICE and understands that ICE will be issuing guidance to its operators based on this policy in the near term.

This policy, which may be modified, superseded, or rescinded at any time without notice, is for CBP internal use only and is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, by any party. Moreover, as a general statement of policy and agency organization, procedure, or practice, this policy is not subject to the Administrative Procedure Act's requirement of notice and comment.[1] But, even if it were, the

---

[1] 5 U.S.C. § 553(b)(A).

situations in certain sectors are quickly evolving into exigent circumstances, constituting good cause for bypassing notice and comment rulemaking, as contrary to the public interest.[2] Encounters reached an all-time high of 2.2 million for noncitizens attempting to cross the SWB between ports of entry and without authorization in Fiscal Year 2022 and remain extremely high. The health, safety, and security of noncitizens in USBP custody is paramount to USBP's ability to effectively carry out its mission to secure the border, which in turn is important to protecting public safety. Moreover, on Thursday, May 11, 2023, at 23:59 ET, the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order will end. For the past 7 days, USBP has averaged over 8,750 encounters per day. This is over double the average daily encounters of 4,285 in May of 2019, the highest month of the 2019 surge. Even with significant personnel along the SWB, a significant detention capacity, and interagency resources supporting the effort, this situation requires urgent action.

cc:  Corey Price, Executive Associate Director, ICE Enforcement and Removal Operations

---

[2] 5 U.S.C. § 553(b)(B); *see also Jifry v. F.A.A.*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004); *Haw. Helicopters Operators Ass'n v. F.A.A.*, 51 F.3d 212, 214 (9th Cir. 1995).

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| STATE OF FLORIDA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) Civil Action No. 3:22-cv-9962 |
| | ) |
| ALEJANDRO MAYORKAS, | ) |
| Secretary of the | ) |
| Department of Homeland Security, | ) |
| in his official capacity; *et. al* | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**DECLARATION OF MATTHEW J. HUDAK**

I, Matthew J. Hudak, pursuant to 28 U.S.C. § 1746, and based upon my personal

knowledge, and documents and information made known or available to me as of the time of

signature from official records and reasonably relied upon in the course of my employment,

hereby declare as follows:

1. I am employed with the U.S. Customs and Border Protection (CBP) as the Deputy Chief

   of the United States Border Patrol (USBP) and have served with USBP since 1997. I have

   held this position since December 19, 2021. Prior to being the Deputy Chief of USBP, I

   was the Chief Patrol Agent of the Laredo Sector, which covers approximately 84,000

   square miles and 136 river miles along the international boundary with Mexico and

   managed a workforce of over 1,900 employees spread over one sector complex and nine

   stations. Prior to that, I was the Chief Patrol Agent of Big Bend Sector. I have also served

   in various other leadership positions in USBP, including Laredo Sector's Division Chief

1

for Operational Programs, Deputy Chief Patrol Agent of Del Rio Sector, Patrol Agent in
Charge of the Laredo South Station, Assistant Patrol Agent in Charge of the Cotulla
Station in the Laredo Sector, and as the Acting Patrol Agent in Charge (PAIC) of the
Laredo Sector Intelligence Unit. I also established and led the Enforcement and
Information Technology Division.

2. In my position as the Deputy Chief of USBP, I am responsible for executing the missions
of the U.S. Department of Homeland Security, CBP, and USBP.  The USBP is the
primary federal law enforcement organization responsible for preventing the entry of
terrorists and their weapons and for preventing the illicit trafficking of people and
contraband between ports of entry.  USBP has a workforce of 19,000 agents who patrol
more than 6,000 miles of the United States land borders.  As Deputy Chief, I am also
responsible for the daily operations of USBP, including the development and
implementation of all nationwide policy decisions.

3. I am familiar with the *Policy on Parole with Conditions in Limited Circumstances Prior
to Issuance of a Charging Document*, Raul L. Ortiz, (May 10, 2023), as well as the
implementing guidance to the field.

4. I am also familiar with the March 8, 2023, U.S. District Court for the Northern District of
Florida, Pensacola Division, decision vacating the *Policy on the Use of Parole Plus
Alternatives to Detention to Decompress Border Locations* (July 18, 2022) memorandum.
CBP has not utilized Parole + Alternatives to Detention (ATD) since January 2, 2023,
and has disseminated guidance to the field instructing that Parole + ATD not be utilized
due to the court's vacatur.

2

5.  I also understand that on May 11, 2023, the U.S. District Court for the Northern District of Florida, Pensacola Division, issued a temporary restraining order enjoining the *Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document* memorandum. That order took effect at 11:59 ET on May 11, 2023.

6.  I submit this declaration to inform the court of the operational challenges USBP has faced, the measures CBP has undertaken to increase the speed at which noncitizens depart CBP facilities, including by decreasing processing times during periods of high encounters since March 8, 2023, and the effects of the Court's May 11, 2023 order temporarily enjoining the Parole with Conditions policy.

7.  USBP has taken numerous steps to address periods when there are high encounters, and in particular, in anticipation of the termination of the Centers for Disease Control and Prevention's Title 42 public health Order.

    a.  CBP has been engaging in A-file digitization, to streamline review and expedite processing for Notice to Appear/Own Recognizance (i.e., the processing of noncitizens for removal proceedings under section 1229a of the Immigration and Nationality Act (INA) and release under section 1226(a) of the INA on a case-by-case basis) that was previously paper-based. This process is live in a number of sectors across the Southwest border, including El Centro, Yuma, San Diego, and Tucson.

    b.  CBP is increasing mobile intake, which is an application installed on CBP Mobile devices that replaces the paper field intake forms used by USBP to document biographical data from the non-citizens encountered. The application greatly

3

reduces the time needed to perform this function as it transmits the information directly to the CBP database, Enforce 3rd Generation (e3) upon submission.

c.  CBP has relied upon DHS employees detailed to the Southwest border through the DHS volunteer force to respond to the border crisis and to stabilize the region. Volunteers are assigned to one of five roles that provide services to migrants and detainees: meal distribution, medical assessment, hospital watch, personal property management, or high-capacity transport. These actions allow a greater number of immigration officers, including Border Patrol Agents, to be available to engage in activities such as processing noncitizens.

d.  CBP is engaging in virtual and mobile processing technologies to make processing functions more efficient. This includes the use of laptops and other mobile devices that allow agents to begin the processing and screening of migrants in the field when possible.

e.  CBP has been utilizing Border Patrol Processing Coordinators (BPPC), who are not immigration officers but are employed by USBP, to perform administrative tasks related to processing individuals apprehended by Border Patrol agents. This position may also assist in the transportation of individuals and property in USBP custody, as well as assisting with custodial watch of detainees in hospitals. The BPPC position allows Border Patrol agents to more effectively focus on their mission of border security and safeguarding the American public.

f.  CBP has also streamlined its Notice to Appear/Own Recognizance process to be able to utilize this processing pathway to the greatest extent possible, ensuring

4

while all steps required for legally sufficient processing are taken, that the process only includes those steps legally and operationally required.

    g. USBP has received assistance from CBP's Office of Field Operations, the operational component of CBP that normally operates at the Ports of Entry, in multiple Southwest border sectors for transportation, security, and processing noncitizens initially apprehended by USBP.

8. Finally, the Biden Administration has deployed Department of Defense 1,500 military personnel to the Southwest border to assist CBP in non-immigration officer functions, such as ground-based detection, monitoring, data entry and warehouse support duties.

9. Understanding that there have been an increasing number of migrant encounters, and in anticipation of even higher encounter numbers in connection with the with the termination of Title 42, CBP has also taken action to increase its holding capacity.

    a. CBP has increased its soft-side facilities (SSF), to include opening two new SSF in El Paso and San Diego sectors in January 2023. DHS is seeking additional funding for SSF in the FY2024 budget.

    b. Yuma has recently increased their SSF capacity to accommodate a larger number of noncitizens for processing and an expansion is underway in El Paso.

10. I understand that Mexico currently is not accepting any returns under the Migrant Protection Protocols (MPP).

11. While USBP has been putting these additional steps mentioned above in place, encounters remain at a historic high. As of May 9, 2023, USBP was holding more than 27,000 noncitizens in custody. This is overcapacity in eight of nine Southwest border sectors. Currently, the USBP is on pace to surpass the 2.1 million encounters recorded in

5

Fiscal Year (FY) 2022. During FY23 to date, USBP has encountered approximately 1.33 million noncitizens. The termination of Title 42 is expected to lead to a further surge in migrants, with number of encounters predicted at an average of 12,000-14,000 noncitizen per day. Over the last week, the ten day average encounters is 9,087, with May 8, 9, 10 and all surpassing 10,000 apprehensions with a daily in custody average of 23,646. On balance, daily encounters have been outpacing daily bookouts, that is a final release from a CBP holding facility, to include transfer to ICE custody, release, repatriation, or expulsion from the United States, by approximately 950 noncitizens over the last seven days.

12. At the current operational pace, and without any additional measures such as Parole with Conditions, USBP could have over 45,000 individuals in custody by the end of the month.  The Parole with Conditions policy is an important tool for USBP because it allows USPB to process and release noncitizens (who are deemed appropriate for release) more quickly than alternative approaches. This allows USBP to reduce the number of noncitizens in detention at times when USBP custody is significantly exceeding capacity posing health and safety concerns.

13. Generally, noncitizens who are not going to be detained pending their removal proceedings are issued a Notice to Appear (NTA) for their removal proceedings and then released on their own recognizance.  Parole with Conditions is an alternative to this "NTA/OR" approach, explained in paragraph 7a.  Prior to the Court's recent order, Parole with Conditions was used when there was an urgent need to process noncitizens more rapidly than under the NTA/OR approach.  The NTA/OR processing pathway generally takes around an hour and a half to two hours currently to complete per person. To

6

complete NTA/OR processing for a family unit takes many hours, depending on the composition of the family unit. There are specific required steps in the NTA/OR process, and those steps, with added volume of people, require a more regimented approach. For example, supervisory review and explanation and service of each document is required for every NTA/OR. In contrast, the Parole with Conditions processing pathway generally takes around only twenty minutes for the head of household of the family unit and approximately five minutes for each additional family member. Thus, the processing for a family unit under Parole with Conditions should only take approximately an hour depending on the family composition. Once the Form I-94, the paperwork that is issued for parole, is signed and stamped, USBP can immediately process the noncitizen for release from custody.

14. On May 10, 2023, Chief Ortiz signed the *Policy on Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions)* memorandum given the increasing noncitizen encounters, high custody numbers, and USBP's dedicated attempts in the last few months to increase throughput and decrease processing times for each noncitizen.

15. This memorandum has numerous significant differences from the *Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations* (July 18, 2022) memorandum.

    a. Parole under this policy "is automatically terminated upon expiration of the period for which parole was authorized." Parole generally terminates in 60 days.

7

b.  This memorandum emphasizes that Parole with Conditions is simply one available pathway and each decision for parole must be made on an individualized case-by-case basis.

c.  This memorandum emphasizes that even where a Sector has been approved to utilize the Parole with Conditions, that it must be used only after a case-by-case individualized determination for each noncitizen. Such approval in no way permits blanket paroles from a Sector.

d.  This memorandum has more stringent factors for a Sector to even be considered for approval to consider Parole with Conditions. Moreover, it requires that when the Sector has fallen below the 95% capacity mark, whether or not the time period for approval has run, the Sector should cease considering individuals for Parole with Conditions.

e.  This memorandum emphasizes that parole decisions must be made based on the circumstances facing an individual, not just overall system efficiency concerns. The policy recognizes that individual noncitizens in USBP's custody are entitled to appropriate and safe detention conditions and focuses on the concerns for a noncitizen, including the urgent humanitarian reasons related to custody conditions, rather than the overall USBP concerns about potential overcrowding.

f.  This memorandum is supported by the analysis of the DHS Office of Health Security with respect to the noncitizen's experience in overcrowded conditions and takes those concerns into consideration.

16. Although there has not been sufficient time to fully review the operationalization of the Parole with Conditions memorandum, initial indications are that these changes to Parole

8

+ ATD were operationally significant. For instance, not all sectors along the Southwest border have been approved to utilize the Parole with Conditions pathway.

17. The health and safety of individual noncitizens are at risk, posing an urgent humanitarian reason for parole. The DHS Chief Medical Officer has opined that "[b]ased upon the data, current conditions pose an increased risk of adverse health outcomes." *Southwest Border Facilities – Overcrowding Health Concerns,* DHS Acting Chief Medical Officer and Senior Medical Officer (May 9, 2023). Conditions, such as overcrowding and increased movement of noncitizens between facilities, may result in adverse health outcomes of individual noncitizens, including the spread of communicable diseases (e.g., Measles, Varicella, etc.) among noncitizens held in these facilities. Noncitizens held in overcrowded facilities are not only vulnerable to communicable diseases, but this vulnerability is likely to be compounded by some aspects of the noncitizens' journey including poor health and nutrition, lack of access to health care, and/or inadequate water, sanitation, and hygiene services while migrating to the Southwest border.

18. CBP is under obligation to provide certain short-term holding conditions in the Tucson Sector, pursuant to a court order in *Unknown Parties v. Nielsen*, 611 F. Supp. 3d 786 (D. Ariz. 2020) (*Doe*). For instance, individuals must be provided mats, blankets, and the ability to privately wash or clean themselves within twelve hours of arriving at a USBP facility. They must also be provided a raised bed, a cloth blanket showers, adequate food, potable water and a medical assessment within forty-eight hours of arriving at a USBP facility.

19. CBP is also under obligation consistent with *Flores v. Sessions,* 862 F.3d 863 (9th Cir. 2017)  , the longstanding *Flores* settlement to ensure that custody conditions for minors

9

are safe and sanitary. Moreover, pursuant to this settlement, DHS must expeditiously release from its custody all minors, including those who enter with their parents.

20. Given all the above information, it is critical that USBP be able to take steps to reduce detention capacity when necessary.

21. The Court's order temporarily enjoining the use of Parole with Conditions has a significant negative impact on USBP's ability to reduce detention capacity when necessary to prevent significant health and safety concerns or to ensure compliance with legal obligations.

22. Indeed, given all of the steps that USBP has already undertaken to streamline the processing of individuals, increase processing capacity, surge resources and increase its capacity to temporarily detain people for processing, while we continue to assess all options as circumstances evolve, at present the alternatives appear limited. With the Parole with Conditions memorandum enjoined, it is possible that USBP will be left with only untenable options such as declining to fully process individuals and potentially not even apprehending them to start. The public safety and national security impacts of such an impact would be extraordinary.

    a. One alternative to using Parole with Conditions would be to process noncitizens via Notice to Report (NTR). This approach would be an exercise of prosecutorial discretion rather than a use of parole. Rather than paroling individuals, USBP would simply exercise discretion not to pursue removal proceedings against them and release them, with merely a notice that they should report to immigration officials. While biometrics and vetting on the noncitizen would still occur with NTRs, there would be no conditions attached to a release as exists with Parole

with Conditions or Parole + ATD. NTRs have no enforcement mechanism associated with processing, and therefore provide less of an incentive for noncitizens to make an appointment with ICE or request service of NTA by mail. Therefore, there is less accountability for NTRs, and transnational criminal organizations may message that CBP is releasing noncitizens without enforcement mechanism which may increase already high encounter numbers. Parole + ATD and Parole with Conditions, by contrast, require noncitizens to comply with their obligation to report.

b. Another alternative for reducing detention numbers in urgent situations would be to actively not apprehend noncitizens.  But this alternative would have severe negative consequences and should be avoided if at all possible.  USBP needs to minimize unlawful border crossers who are observed making an unlawful entry into the United States, not apprehended, and not turned back.  Any potential active decision to not apprehend such individuals contravenes USBP's mission to detect and prevent the illegal entry of individuals in the United States. Moreover, if USBP were to actively decline to detain such individuals, transnational criminal organizations and human smugglers would be able to direct noncitizen traffic to those areas, and there would be a serious life and safety concern for noncitizens. It is critical to understand that when individuals are not apprehended by USBP there is a possibility that those individuals will simply enter the United States. Included within any such group that USBP is unable to apprehend could be those linked with terrorist organizations, those with criminal records, human smugglers, those actively trafficking other members of the same group (which could include

11

children), and vulnerable children not accompanied by their parents, as well as those entering seeking protections like asylum. Without processing individuals, it is impossible to know the demographics, vulnerabilities, and national or public safety risk of any person.

23. Finally, while CBP conducts extensive open-source research and information gathering and closely coordinates with other countries' government partners, it cannot know with certainty the universe of individuals coming to the United States. For example, in 2022, USBP experienced a historic surge of noncitizens, mostly from Haiti, who entered in between the port of entry in Del Rio sector. Within less than a week, this singular surge in Del Rio exceeded 18,000 migrants at one location. Preliminary intelligence did not predict this surge. Our Central American governmental partners also were unable to provide advanced warning on this surge. Despite CBP's best efforts, it cannot ascertain on any given day, exactly how many individuals, or their nationality and specific vulnerabilities, will enter the United States between ports of entry. Given this operational reality, CBP needs a mechanism that allows USBP to thoroughly but quickly process individuals on a case-by-case basis considering the urgent humanitarian reasons and significant public benefit outlined in the Parole with Conditions memorandum.

24. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, as of the time of signature.

Executed this 12th day of May, 2023.

12

Matthew J. Hudak
Deputy Chief of the U.S. Border Patrol
U.S. Border Patrol
U.S. Customs and Border Protection
U.S. Department of Homeland Security

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

STATE OF FLORIDA,

*Plaintiff,*

v.

ALEJANDRO MAYORKAS, Secretary of
Homeland Security, in his official capacity;
RAUL ORTIZ, Chief of Border Patrol, in his
official capacity; the UNITED STATES OF
AMERICA.

*Defendants.*

Civil Action No. 3:23-cv-09962-TKW-ZCB

**DECLARATION OF DEPUTY EXECUTIVE ASSOCIATE DIRECTOR**
**DANIEL A. BIBLE**

I, Daniel A. Bible, pursuant to 28 U.S.C. § 1746, and based upon my personal

knowledge, experience as a law enforcement officer, and documents and information made

known or available to me from official records and reasonably relied upon in the course of my

employment, hereby declare as follows:

1. I am currently employed by the U.S. Department of Homeland Security (DHS), U.S.

   Immigration and Customs Enforcement (ICE), Enforcement and Removal

   Operations (ERO) as the Deputy Executive Associate Director. I held this position

   in an acting capacity starting February 14, 2022, and I formally entered on duty in

   the position on May 8, 2022. As Deputy Executive Associate Director, I oversee the

Page 1 of 9

**A223**

mission of ERO's eight headquarters divisions: Enforcement, Removal, Non-Detained Management, Custody Management, Field Operations, ICE Health Service Corps, Law Enforcement Systems and Analysis, and Operations Support.

2.  Prior to this position, I served as the Acting Assistant Director for Field Operations, which I started on January 16, 2022. In this capacity, I was responsible for the oversight, direction, and coordination of immigration enforcement activities, programs, and initiatives carried out by ERO's twenty-five field offices, including sub-offices and other locations with an ERO presence. I further managed ERO Headquarters components, including Domestic Operations and Special Operations.

3.  I have been employed with ICE and the former Immigration and Naturalization Service since 1998, when I was hired as an Immigration Agent in Huntsville, Texas. From 2001 to 2006, I served as a Deportation Officer in Oakdale, Louisiana. In 2006, I was promoted to the position of Supervisory Detention and Deportation Officer (SDDO) in San Francisco, California. During my tenure as SDDO, I was responsible for supervisory oversight of two fugitive operations teams: the non-detained section and the Alternatives to Detention section. In 2009, I was promoted to the position of Assistant Field Office Director (AFOD) for the Washington Field Office. During my tenure as AFOD, I had supervisory oversight of SDDOs in charge of what is now the Criminal Apprehension Program (CAP), the 287(g) program, the Field Office's command center, the office currently titled the ERO criminal prosecutions unit, and two fugitive operations teams. In 2012, I was promoted to the position of Deputy Field Office Director for the New York Field Office. From June 2015 to June 2016, I served as the Field Office Director (FOD) in

the Salt Lake City Field Office. From June 2016 to June 2020, I served as FOD in

the San Antonio Field Office. From June 2020 until January 16, 2022, I served as

FOD for the Houston Field Office. I am a member of the Senior Executive Service,

and I report directly to ERO Executive Associate Director Corey Price.

4. ICE is the principal investigative arm of DHS, and its primary mission is to promote

homeland security and public safety through the enforcement of criminal and civil

federal laws governing border control, customs, trade, and immigration. Within ICE,

ERO oversees programs and conducts operations to identify and apprehend

removable noncitizens, detain these individuals when necessary, and remove

noncitizens with final orders of removal from the United States. ERO manages and

oversees all aspects of the removal process within ICE, including domestic

transportation, detention, Alternatives to Detention programs, bond management,

supervised release, and removal to more than 170 countries around the world. As

part of the removal process, ERO manages a non-detained docket of more than 5.4

million cases, which includes noncitizens currently in removal proceedings and

those who have already received removal orders and are pending physical removal

from the United States.

5. ERO is currently using existing personnel in Southwest Border Field Offices to

support DHS's response to the ongoing surge of migrants attempting to enter the

United States. Most of these Southwest Border Field Offices have been forced to

reassign personnel from other programs, like CAP and Fugitive Operations, to

support and sustain detention, releases, and decompression efforts. To further

support these efforts, ERO currently has 133 personnel deployed to support these

Southwest Border Operations. ERO continues to evaluate the impacts of the lifting of the Centers for Disease Control and Prevention's Title 42 public health Order (Title 42 Order) and may increase the number of deployed staff as necessary to address activity along the Southwest Border.

6. The support ERO provides at the Southwest Border includes but, is not limited to: transporting; processing; enrollment in Alternatives to Detention; removals; bedspace management of those taken into custody, including those subject to expedited removal proceedings pursuant to 8 U.S.C. § 1225(b)(1); and transfers of those taken into custody.

7. On May 10, 2023, U.S. Customs and Border Protection (CBP) announced a policy memorandum from Raul L. Ortiz, Chief, U.S. Border Patrol, *Policy on Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions)* (May 10, 2023), addressing case-by-case exercise of the agency's discretionary parole authority for urgent humanitarian reasons or significant public benefit.

8. I am providing this declaration in support of the Emergency Motion to Stay Temporary Restraining Order Pending Appeal filed in *Florida v. Mayorkas*, No. 23-9962 (N.D. Fla. filed May 10, 2023). I have read and am familiar with the Temporary Restraining Order issued by the U.S. District Court for the Northern District of Florida, Pensacola Division. As discussed in more detail below, implementing the terms of the temporary restraining order would be unreasonably and unduly burdensome.

9. ICE lacks the capacity to immediately detain every noncitizen encountered by CBP.

The is relevant because ERO manages the only longer-term immigration detention capacity in the United States. During FY23 to date, USBP has encountered approximately 1.33 million noncitizens. The termination of the Title 42 Order is expected to lead to a further surge in migrants, with the number of encounters predicted at an average of 12,000-14,000 noncitizen per day. CBP's inability to parole pursuant to the court's order could prompt CBP to request bedspace, personnel, and other resources from ICE that it simply cannot provide. ERO is currently appropriated sufficient funding for approximately 34,000 detention beds nationwide to support its mission to enforce immigration law. ICE's access to its full inventory of bedspace is limited due to various court orders and state laws limiting the intake and detention of noncitizens, detention facility contract terminations, and detention facility contract modifications. Due to this finite number of detention beds, to meet the Department's important mission, ERO must prioritize its limited detention resources to facilitate the detention of certain noncitizens, including those who are convicted criminals and public-safety threats and those who are otherwise subject to mandatory detention. If CBP is forced to transfer to ICE custody thousands of noncitizens vetted and identified on a case-by-case basis by U.S. Border Patrol (USBP) as amenable to release on parole, ICE detention capacity would quickly diminish to the point where CBP requests for bedspace would have to be denied. Not only would ICE's interior enforcement mission be compromised, but this would also lead to CBP holding more migrants for longer periods of time. Alternatively, were CBP to actively not apprehend unlawful border crossers, ICE's interior mission would be further compromised by increasing

the number of unprocessed removable noncitizens in the interior. This would be significantly more burdensome on ICE than Parole with Conditions because such noncitizens would have no obligation or incentive to report to ICE. Alternatively, use by CBP of the Notice to Report (NTR) processing pathway would result in more removable noncitizens in the interior who have not checked in to receive in person or electronically a Notice to Appear for removal proceedings. This is because the Parole with Conditions pathway, which grants a limited period of parole and imposes conditions requiring reporting, is more likely to cause noncitizens to report than using NTRs.

10. ERO took a number of proactive efforts in planning for the end of the enforcement of the Title 42 Order, including: (1) coordinating with foreign governments to increase repatriation flights; (2) introducing technical solutions and coordinating with U.S. Citizenship and Immigration Services and DOJ's Executive Office for Immigration Review to build efficiencies and reduce timelines for review of credible fear claims by noncitizens in ICE custody; (3) transferring detainees from ICE facilities along the Southwest Border to facilitate orderly transfer of cases from CBP; (4) coordinating between ERO field offices and ground transportation contractors to ensure that ground transportation bringing noncitizens from the border to interior facilities not return empty, but rather carry noncitizens who are prepared for removal to Mexico; and (5) co-locating noncitizens with executable final orders of removal to the same country to increase the cadence of repatriation flights, among other efforts.

11. As of May 10, 2023, ICE had 21,967 noncitizens in custody, comprising

approximately 64% of its 34,000 funded beds. This is because, in addition to the measures noted above, ICE proactively reduced its population over the last several weeks by conducting a case-by-case review and, when appropriate, releasing or removing noncitizens, in order to prepare for the lifting of the Title 42 Order on May 11, 2023. The purpose of this move was to enable ERO to continue with its interior enforcement mission and ensure sufficient detention bedspace remains available for public safety threats, national security threats, and others found not suitable for release, including release on parole by CBP. For this to remain workable, and for ERO to continue delivering consequences for unlawful migration, CBP would need to have access to all available processing pathways. However, if CBP is not permitted to parole noncitizens pursuant to its May 10, 2023 memorandum, and if it were determined that the only feasible operational pathway were to be detention, then ICE's detention capacity could be quickly overwhelmed. As noted by USBP Deputy Chief Matthew J. Hudak, over the last week CBP's ten-day average of daily encounters is 9,087, with May 8-10 surpassing 10,000 daily encounters. CBP predicts this will only get worse with the end of the Title 42 Order, with an anticipated average of 12,000-14,000 daily encounters. If CBP were unable to release noncitizens on parole pursuant to its May 10, 2023 memorandum, and those noncitizens were instead transferred to ICE custody rather than being released pursuant to some other pathway, it would only be a matter of days before ICE reaches full saturation of its limited detention capacity.

12. Limitations on the ability of CBP to parole these noncitizens, and the other pathway were to be detention, could also have a significant impact on ICE transportation

resources. If CBP sectors become overwhelmed to the point where their transportation assets and contracts are insufficient to manage the flow, ICE would have to divert its transportation resources from interior and removal operations to assist CBP. This would include the use of ICE Air Charters that are normally needed for removal and interior movements to decompress the border, an increase in ICE Air Commercial removals, and increased ground transportation for removals to Mexico. With its assets committed to assisting CBP, ERO could become unable to carry out its core enforcement mission of apprehending and removing noncitizens from the interior of the United States. If ICE becomes unable to transfer and remove noncitizens in ICE custody, bedspace would become completely unavailable for any interior or border enforcement activity. Ultimately, ICE would be left with no other legal option than to release noncitizens who have been ordered removed – including, potentially, public safety threats – back into the interior of the United States.

13. Surging resources to assist CBP with the processing of noncitizens or custodial transfers would add more stress to local ERO field offices who are short-staffed and whose enforcement teams are being temporarily realigned to assist with local processing of noncitizens. ERO employs approximately 6,000 immigration officers nationwide, including executive leadership, the supervisory chain of command, and all field officers. Since 2021, the non-detained docket has grown from 3.6 million to more than 5.4 million, with an average non-detained caseload to officer ratio of 2,700:1, though some offices have a much higher ratio. If resources continue to be diverted from core functions, then ERO's ability to manage the non-detained and detained populations will diminish while immigration court delays and backlogs will

be exacerbated, leading to increased absconder rates and reduced capacity to detect and mitigate potential threats. As of May 7, 2023, ERO had a fugitive backlog of 654,389 at-large noncitizens. Focusing more resources at the border could adversely impact the ability of ICE to take immediate enforcement action against noncitizens who pose a security threat or other real harm to U.S. communities. And, given the limited detention capacity described above, detaining such individuals may well prevent ICE from arresting other individuals who would become subject to detention under section 1226(c) or section 1231(a)(2), and individuals who otherwise present a danger to the community or a flight risk. It is critical that ICE focuses its finite law enforcement resources on its public safety mission and targeted enforcement operations.

Executed this 12th day of May, 2023 in Washington, D.C.

Daniel A. Bible
Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

1300 Pennsylvania Avenue NW
Washington, DC 20229

HQBOR 170/6



**U.S. Customs and
Border Protection**

MAR 1 9 2021

MEMORANDUM FOR:   Troy A. Miller
                         Senior Official Performing the Duties of the Commissioner
                         U.S. Customs and Border Protection

FROM:                Rodney S. Scott **(b) (6)**
                Chief
                U.S. Border Patrol

SUBJECT:          Prosecutorial Discretion

The U.S. Border Patrol (USBP) is experiencing a high-volume of encounters of persons illegally entering the United States along the southwest border. Due the prolonged detention of specific populations, like unaccompanied alien children (UAC), the USBP will exercise its discretionary authority to release subjects without placing them in removal proceedings, to prioritize our limited assets to national security events. Pursuant to 8 C.F.R. § 287.3, agents retain discretion to place a removable alien in proceedings. We will exercise prosecutorial discretion (PD) to release persons illegally in the U.S when at least one of the following triggers are met:

- When a USBP Sector reaches 100% of total permanent detention capacity;
- When a USBP Sector reaches 75% total permanent detention capacity and the number of subjects arriving in custody exceeds the discharge of persons out of custody;
- When the average time-in-custody (TIC) of unprocessed persons exceeds 24 hours in USBP custody and the number of subjects arriving in custody is projected to exceed the discharge of persons out of custody;
- When mandatory detention populations (e.g., UACs) meet 50% of total permanent detention capacity and placement into Health and Human Service / Office or Refugee Resettlement (HHS/ORR) exceeds 48 hours from the time of referral;
- When a USBP Sector notifies Immigration and Customs Enforcement Removal Operations (ICE/ERO) and referral was denied or when no response is received within 1 hours of notification;
- When the loss of Title 42 authorities is nationwide and any previous trigger is met; or
- When a Sector Chief Patrol Agent, in coordination with USBP HQ, determines the circumstances dictate the need to exercise prosecutorial discretion.

Agents already retain the discretion to not place a removable alien into proceedings. As a general rule, agents do not exercise this option. Due to the challenges set on by COVID-19, UAC encounters, custody challenges and finite resources, agents must consider the release of non-UACs. Agents will consider whether the subject poses a threat to National Security, Border Security, or heightened Public Safety risk, as outlined in the interim enforcement priorities, prior to making this decision. Custody decisions will be documented in the I-213 narrative. Under no

circumstances will an alien who claims to be, is suspected to be, or is determined to be a UAC as defined by 6 U.S.C. § 279(g)(2), be processed for release.

Processing an alien for release without entering them into proceedings is not taken lightly. Only under circumstances outlined above will agents categorically use their discretionary authority to release family units or single adults. All subjects processed for release will be searched and enrolled into the biometric system. Records checks will be run to insure no prior criminal or immigration history that would categorize them as a heightened security or safety risk prior to release. Subjects will have their biographic, family, entry, arrest, and release information documented on a narrative (I-213). The custody redetermination for subjects released will fall under "Prosecutorial Discretion" and any current removal proceedings in which the subject is enrolled in will be documented.

Once PD is exercised, persons will be released in accordance with local Sector protocols to the fullest extent possible.

FOR OFFICIAL USE ONLY

 **U.S. Immigration and Customs Enforcement**

 **U.S. Customs and Border Protection**

July 18, 2022

MEMORANDUM FOR:    Raul L. Ortiz
Chief
U.S. Border Patrol

Corey A. Price
Executive Associate Director
Enforcement and Removal Operations

FROM:    Chris Magnus
Commissioner
U.S. Customs and Border Protection

Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

SUBJECT:    Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations

**Purpose**

To require that certain processing be completed, and certain capacity criteria be met, before noncitizens may be released from custody along the Southwest border via Parole plus Alternatives to Detention (Parole + ATD). This memorandum rescinds and replaces all prior guidance regarding the use of Parole + ATD, including but not limited to the November 2, 2021, memorandum from USBP Chief Raul L. Ortiz, titled *Parole Plus Alternative to Detention*.

**Background**

Undocumented noncitizens who are not expelled pursuant to the court-ordered implementation of the Centers for Disease Control & Prevention's Title 42 public health Order are inspected by U.S. Customs and Border Protection (CBP), U.S. Border Patrol (USBP) upon encounter, consistent with 8 U.S.C. § 1225(a); this is often referred to as "processing." Processing includes, among other things, identification, review of immigration and criminal history, an assessment of national security concerns, and an evaluation of what pathway is most appropriate for the individual noncitizen, to include removal proceedings under section 240 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1229. expedited removal, permitting an individual to voluntarily return, and/or parole.

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 2

Pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A), the Secretary of Homeland Security has the authority to parole certain noncitizens into the United States "temporarily . . . on a case-by-case basis for urgent humanitarian reasons or significant public benefit." When, pursuant to an inspection of a noncitizen under 8 U.S.C. § 1225(a), CBP exercises its discretion to parole noncitizens on a case-by-case basis into the United States, including during the initiation of or to facilitate the initiation of removal proceedings under section 240 of the INA, those noncitizens may be eligible to be enrolled in the U.S. Immigration and Customs Enforcement (ICE) ATD program.

The goal of the ICE ATD program is, for a portion of the enrolled non-detained population, to increase compliance with release conditions, court appearances, and final orders of removal. ATD is an alternative to detention and allows ICE to exercise increased supervision over noncitizens who, on a case-by-case basis, are not detained, but are potentially subject to removal. The level of supervision and technology assigned to noncitizens enrolled in the ATD program is determined on a case-by-case basis based on each individual's current immigration status, criminal history, compliance history, community or family ties, role as a caregiver or provider, and other humanitarian or medical factors. ICE may adjust the level of supervision and technology required as the level of the noncitizen's compliance either increases or decreases.

Generally, CBP standards allow for short-term detention of fewer than 72 hours in CBP facilities, after which time CBP is expected to transfer the noncitizen to ICE if CBP believes continued custody is required. While this time period may sometimes be exceeded, CBP facilities are not structured or equipped for long-term detention. This yields numerous challenges, including the ability to provide appropriate medical care and to treat and control contagious illnesses. In sum, crowding in border facilities poses risks to both individuals in custody and those working there. Border encounters remain at historic highs. With a record number of displaced persons in the hemisphere, high encounter rates and the associated challenges are expected to continue. It is incumbent on CBP to transfer noncitizens to ICE or if discretion warrants, to release the noncitizen under appropriate conditions.

Parole + ATD provides a processing mechanism to address situations in which there is not appropriate detention space available, and there are operational concerns about the number of people present in, and potentially subject to a prolonged time-in-custody at, USBP facilities along the Southwest border. It is significantly more efficient—approximately 60 minutes faster—to process individuals, consistent with 8 U.S.C. § 1225(a), for Parole + ATD as opposed to issuing a Notice to Appear (NTA) or other charging document at the time of encounter. Use of Parole + ATD also allows ICE to exercise increased supervision over certain noncitizens who are released from CBP custody pending the initiation of removal proceedings. Those subject to Parole + ATD are not simply released into the community; they are subject to supervision and are subsequently issued an NTA under INA § 240.

That said, Parole + ATD is a tool that should be used sparingly—only when justified by an urgent humanitarian reason or because it yields a significant public benefit in the form of disease-mitigation, as a safety valve to address overcrowding.

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 3

## Policy

Over the last several months, CBP and ICE have made deliberate efforts to prioritize the health and safety of noncitizens and the workforce. The use of Parole + ATD provides one such tool— allowing for the more rapid decompression of facilities that otherwise may be overcrowded in ways that promote health and safety. That said, and as this guidance makes clear, the use of Parole + ATD is not meant to be a primary processing tool; its use is permitted only in those situations in which threshold criteria are met, and its use is subject to appropriate approvals and oversight — thus ensuring that its application is limited to those situations in which the relevant health and safety conditions justify its use.

*Threshold Criteria and Approval Process*

Parole + ATD may be authorized by the Commissioner of CBP only when the following criteria exist:

- There are more than 15,000 noncitizens in USBP custody across all Southwest border sectors OR a sector or centralized processing center's in-custody total exceeds 100% of its full capacity; AND
- CBP has encountered more than 6,000 noncitizens per day across the Southwest border over a 72-hour period.

When these scenarios exist, they create urgent crowding and excessive time-in-custody concerns that justify application of ICE's limited ATD resources to support CBP's use of parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

To use Parole + ATD in a specific border sector, the relevant USBP Sector Chief must request approval from the Commissioner of CBP, through the USBP Chief.

Approval for Parole + ATD may be granted only on a sector-by-sector basis and Parole + ATD may not be used for noncitizens transferred laterally from a sector that has not met the threshold criteria above. Additionally, approval for use of Parole + ATD is time limited and must be reassessed every week by the Commissioner or Deputy Commissioner. USBP is not authorized to process noncitizens via Parole + ATD when these criteria are not met, absent extraordinary circumstances as determined by the Commissioner of CBP.

*Individual Assessment*

Each noncitizen is individually processed consistent with 8 U.S.C. § 1225(a) after encounter. This inspection process includes, but is not limited to, an assessment of the individual's identification and immigration background, review of any national security or criminal concerns, and consideration of which immigration processing pathway is best applicable to the individual noncitizen. This memorandum applies only to those individuals who are expected to be placed in removal proceedings under INA § 240.

Once the Parole + ATD initial threshold is met, each individual noncitizen should be assessed on a case-by-case individualized basis to determine whether he or she is eligible for parole based on

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 4

an urgent humanitarian reason or whether there is a significant public benefit. In making this determination, agents shall consider individualized circumstances, such as an individual's current immigration status, criminal history, compliance history, community or family ties, role as a caregiver or provider, and other humanitarian or medical factors. Upon placing an individual in Parole + ATD, CBP will temporarily pause the completion of the removal paperwork under INA § 240, which will instead be completed at a later date.

Prior to a noncitizen's processing via Parole + ATD, CBP must conduct biometric identity verification and thoroughly evaluate any potential national security and public safety concerns. USBP must also collect and document a physical address for each noncitizen processed via Parole + ATD.

*Ineligible for Parole + ATD*

Parole + ATD may not be used for noncitizens who, based on an individualized assessment, pose a national security risk, unmitigable flight risk, public safety threat, or who claim to be, are suspected to be, or are determined to be unaccompanied children as defined by 6 U.S.C. § 279(g)(2) or appear likely to be subject to the mandatory detention requirements of INA § 236(c), 8 U.S.C. § 1226(c), if processed for removal proceedings pursuant to INA §240, 8 U.S.C. § 1229.

*Subsequent Processing*

CBP and ICE will work jointly to streamline and complete charging document issuance for individuals processed via Parole + ATD. Each agency is responsible for completing the processing for 50 percent of the total Parole + ATD caseload. The final processing and placement into removal proceedings pursuant to 8 U.S.C. § 1229 is expected to be the same, regardless of whether that paperwork occurs as a part of the Parole + ATD processing.

**Reporting and Oversight**

CBP must notify ICE in writing each time Parole + ATD is authorized in a sector to ensure that ICE has the appropriate staff and ATD capacity available in the applicable location(s). Such notification must occur before processing for Parole + ATD begins in the authorized border sector(s). In each case, ICE will determine the appropriate ATD enrollment conditions for the noncitizen, including but not limited to the type of technology used or frequency of required check-in appointments.

CBP will provide daily reporting to Department of Homeland Security Headquarters and ICE, detailing how many noncitizens were processed at the Southwest border with charging documents, voluntary return, and Parole + ATD, by sector. The daily reports will be used to identify any operational changes that are needed to modify the continued use of Parole + ATD at any given time.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

---

STATE OF FLORIDA,

*Plaintiff,*

v.

The UNITED STATES OF AMERICA, *et al.*,

*Defendants.*

Civil Action No. 3:21-cv-01066

---

**CERTIFICATION OF ADMINISTRTIVE RECORD**

I, Patrick J. Lechleitner, pursuant to 28 U.S.C. §1746, declare under penalty of perjury as follows:

1.      I am the Senior Official performing the duties of the Deputy Director for U.S. Immigration and Customs Enforcement ("ICE").  I have held this position since August 15, 2021.  In this capacity, I am the second highest ranking official within ICE and oversee all of its component groups, including the day-to-day operations of the agency, an annual budget of over $8 billion, and more than 20,000 employees.  Prior to this current position, I was the Acting Executive Associate Director for Homeland Security Investigations (HSI) from March 16, 2021 to July 30, 2021 and permanent Executive Associate Director for HSI from July 31 to present.  I have also held positions at ICE Headquarters as the Assistant Director for HSI International Operations Division from March 3, 2019 through my acting time as EAD, and Acting Assistant

Director for the National Security Investigations Divisions, and the Deputy Assistant Director overseeing HSI's Cyber Crimes Divisions. I was also the Special Agent in Charge for HSI Washington, D.C. from March 7, 2017 until March 3, 2019.  In total, I have over 20 years of federal law enforcement experience with the U.S. Customs Service, and HSI with almost 5 additional years as a local police officer in Virginia prior to federal service.

2.      The facts attested to herein are based upon my personal knowledge or upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3.      The documents listed in the accompanying Administrative Record Index and contained in the files annexed hereto, constitute to the best of my knowledge and belief, a true and complete copy of all non-privileged documents and materials considered by ICE in issuing the July 18, 2022 Memorandum, titled *Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations*.


I certify under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of July, 2022 in Washington, D.C.

PATRICK J
LECHLEITNER

Digitally signed by PATRICK J LECHLEITNER
Date: 2022.07.25 18:22:20 -04'00'

Patrick J. Lechleitner
Senior Official Performing the Duties of the
Deputy Director
U.S. Immigration and Customs Enforcement

FOR OFFICIAL USE ONLY

 **U.S. Immigration and Customs Enforcement**

 **U.S. Customs and Border Protection**

July 18, 2022

MEMORANDUM FOR:   Raul L. Ortiz
                  Chief
                  U.S. Border Patrol

                  Corey A. Price
                  Executive Associate Director
                  Enforcement and Removal Operations

FROM:             Chris Magnus
                  Commissioner
                  U.S. Customs and Border Protection

                  Tae D. Johnson
                  Acting Director
                  U.S. Immigration and Customs Enforcement

SUBJECT:          Policy on the Use of Parole Plus Alternatives to Detention
                  to Decompress Border Locations

**Purpose**

To require that certain processing be completed, and certain capacity criteria be met, before noncitizens may be released from custody along the Southwest border via Parole plus Alternatives to Detention (Parole + ATD). This memorandum rescinds and replaces all prior guidance regarding the use of Parole + ATD, including but not limited to the November 2, 2021, memorandum from USBP Chief Raul L. Ortiz, titled *Parole Plus Alternative to Detention*.

**Background**

Undocumented noncitizens who are not expelled pursuant to the court-ordered implementation of the Centers for Disease Control & Prevention's Title 42 public health Order are inspected by U.S. Customs and Border Protection (CBP), U.S. Border Patrol (USBP) upon encounter, consistent with 8 U.S.C. § 1225(a); this is often referred to as "processing." Processing includes, among other things, identification, review of immigration and criminal history, an assessment of national security concerns, and an evaluation of what pathway is most appropriate for the individual noncitizen, to include removal proceedings under section 240 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1229. expedited removal, permitting an individual to voluntarily return, and/or parole.

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 2

Pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A), the Secretary of Homeland Security has the authority to parole certain noncitizens into the United States "temporarily . . . on a case-by-case basis for urgent humanitarian reasons or significant public benefit." When, pursuant to an inspection of a noncitizen under 8 U.S.C. § 1225(a), CBP exercises its discretion to parole noncitizens on a case-by-case basis into the United States, including during the initiation of or to facilitate the initiation of removal proceedings under section 240 of the INA, those noncitizens may be eligible to be enrolled in the U.S. Immigration and Customs Enforcement (ICE) ATD program.

The goal of the ICE ATD program is, for a portion of the enrolled non-detained population, to increase compliance with release conditions, court appearances, and final orders of removal. ATD is an alternative to detention and allows ICE to exercise increased supervision over noncitizens who, on a case-by-case basis, are not detained, but are potentially subject to removal. The level of supervision and technology assigned to noncitizens enrolled in the ATD program is determined on a case-by-case basis based on each individual's current immigration status, criminal history, compliance history, community or family ties, role as a caregiver or provider, and other humanitarian or medical factors. ICE may adjust the level of supervision and technology required as the level of the noncitizen's compliance either increases or decreases.

Generally, CBP standards allow for short-term detention of fewer than 72 hours in CBP facilities, after which time CBP is expected to transfer the noncitizen to ICE if CBP believes continued custody is required. While this time period may sometimes be exceeded, CBP facilities are not structured or equipped for long-term detention. This yields numerous challenges, including the ability to provide appropriate medical care and to treat and control contagious illnesses. In sum, crowding in border facilities poses risks to both individuals in custody and those working there. Border encounters remain at historic highs. With a record number of displaced persons in the hemisphere, high encounter rates and the associated challenges are expected to continue. It is incumbent on CBP to transfer noncitizens to ICE or if discretion warrants, to release the noncitizen under appropriate conditions.

Parole + ATD provides a processing mechanism to address situations in which there is not appropriate detention space available, and there are operational concerns about the number of people present in, and potentially subject to a prolonged time-in-custody at, USBP facilities along the Southwest border. It is significantly more efficient—approximately 60 minutes faster—to process individuals, consistent with 8 U.S.C. § 1225(a), for Parole + ATD as opposed to issuing a Notice to Appear (NTA) or other charging document at the time of encounter. Use of Parole + ATD also allows ICE to exercise increased supervision over certain noncitizens who are released from CBP custody pending the initiation of removal proceedings. Those subject to Parole + ATD are not simply released into the community; they are subject to supervision and are subsequently issued an NTA under INA § 240.

That said, Parole + ATD is a tool that should be used sparingly—only when justified by an urgent humanitarian reason or because it yields a significant public benefit in the form of disease-mitigation, as a safety valve to address overcrowding.

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 3

## Policy

Over the last several months, CBP and ICE have made deliberate efforts to prioritize the health and safety of noncitizens and the workforce. The use of Parole + ATD provides one such tool— allowing for the more rapid decompression of facilities that otherwise may be overcrowded in ways that promote health and safety. That said, and as this guidance makes clear, the use of Parole + ATD is not meant to be a primary processing tool; its use is permitted only in those situations in which threshold criteria are met, and its use is subject to appropriate approvals and oversight — thus ensuring that its application is limited to those situations in which the relevant health and safety conditions justify its use.

*Threshold Criteria and Approval Process*

Parole + ATD may be authorized by the Commissioner of CBP only when the following criteria exist:

- There are more than 15,000 noncitizens in USBP custody across all Southwest border sectors OR a sector or centralized processing center's in-custody total exceeds 100% of its full capacity; AND
- CBP has encountered more than 6,000 noncitizens per day across the Southwest border over a 72-hour period.

When these scenarios exist, they create urgent crowding and excessive time-in-custody concerns that justify application of ICE's limited ATD resources to support CBP's use of parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

To use Parole + ATD in a specific border sector, the relevant USBP Sector Chief must request approval from the Commissioner of CBP, through the USBP Chief.

Approval for Parole + ATD may be granted only on a sector-by-sector basis and Parole + ATD may not be used for noncitizens transferred laterally from a sector that has not met the threshold criteria above. Additionally, approval for use of Parole + ATD is time limited and must be reassessed every week by the Commissioner or Deputy Commissioner. USBP is not authorized to process noncitizens via Parole + ATD when these criteria are not met, absent extraordinary circumstances as determined by the Commissioner of CBP.

*Individual Assessment*

Each noncitizen is individually processed consistent with 8 U.S.C. § 1225(a) after encounter. This inspection process includes, but is not limited to, an assessment of the individual's identification and immigration background, review of any national security or criminal concerns, and consideration of which immigration processing pathway is best applicable to the individual noncitizen. This memorandum applies only to those individuals who are expected to be placed in removal proceedings under INA § 240.

Once the Parole + ATD initial threshold is met, each individual noncitizen should be assessed on a case-by-case individualized basis to determine whether he or she is eligible for parole based on

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 4

an urgent humanitarian reason or whether there is a significant public benefit. In making this determination, agents shall consider individualized circumstances, such as an individual's current immigration status, criminal history, compliance history, community or family ties, role as a caregiver or provider, and other humanitarian or medical factors. Upon placing an individual in Parole + ATD, CBP will temporarily pause the completion of the removal paperwork under INA § 240, which will instead be completed at a later date.

Prior to a noncitizen's processing via Parole + ATD, CBP must conduct biometric identity verification and thoroughly evaluate any potential national security and public safety concerns. USBP must also collect and document a physical address for each noncitizen processed via Parole + ATD.

*Ineligible for Parole + ATD*

Parole + ATD may not be used for noncitizens who, based on an individualized assessment, pose a national security risk, unmitigable flight risk, public safety threat, or who claim to be, are suspected to be, or are determined to be unaccompanied children as defined by 6 U.S.C. § 279(g)(2) or appear likely to be subject to the mandatory detention requirements of INA § 236(c), 8 U.S.C. § 1226(c), if processed for removal proceedings pursuant to INA §240, 8 U.S.C. § 1229.

*Subsequent Processing*

CBP and ICE will work jointly to streamline and complete charging document issuance for individuals processed via Parole + ATD. Each agency is responsible for completing the processing for 50 percent of the total Parole + ATD caseload. The final processing and placement into removal proceedings pursuant to 8 U.S.C. § 1229 is expected to be the same, regardless of whether that paperwork occurs as a part of the Parole + ATD processing.

**Reporting and Oversight**

CBP must notify ICE in writing each time Parole + ATD is authorized in a sector to ensure that ICE has the appropriate staff and ATD capacity available in the applicable location(s). Such notification must occur before processing for Parole + ATD begins in the authorized border sector(s). In each case, ICE will determine the appropriate ATD enrollment conditions for the noncitizen, including but not limited to the type of technology used or frequency of required check-in appointments.

CBP will provide daily reporting to Department of Homeland Security Headquarters and ICE, detailing how many noncitizens were processed at the Southwest border with charging documents, voluntary return, and Parole + ATD, by sector. The daily reports will be used to identify any operational changes that are needed to modify the continued use of Parole + ATD at any given time.

Pennsylvania Avenue, NW
Washington, DC 20229



U.S. Customs and
Border Protection

NOV 0 2 2021

MEMORANDUM FOR:    All Chief Patrol Agents
                   All Deputy Chief Patrol Agents

FROM:              Raul L. Ortiz
                   Chief
                   U.S. Border Patrol

SUBJECT:           Parole Plus Alternative to Detention

This memorandum supersedes previous guidance relating to prosecutorial discretion and
issuance of Notices to Report (NTR), as issued in March 2021, and establishes conditions for the
implementation of parole plus Alternative to Detention (Parole + ATD), a processing pathway
that will replace the use of NTR unless that pathway is explicitly authorized by the U.S. Border
Patrol (USBP) Chief.

USBP takes very seriously its mission of creating a secure border while ensuring the health and
safety of migrants in its custody, as well as the health of the workforce. Earlier this year, when
encounters were consistently high, operational capacity strained, and COVID-19 acute, USBP
began issuing NTRs, a significantly faster mechanism for processing noncitizens, particularly
when used for family units (FMU). NTRs were used for certain noncitizens following initial
processing and collection of biometric and biographic information. The use of this processing
pathway enabled USBP to relieve overcrowding in congregate settings, thus better protecting
both the workforce and noncitizens in our custody. Importantly, use of an NTR decreased
processing times significantly compared with processing families for a Notice to Appear (NTA),
thus ensuring that families were more expeditiously moved out of U.S. Customs and Border
Protection (CBP) custody. The process of issuing NTAs is much more time consuming, given the
level of detail and interagency coordination required to establish A-files and finalize the charging
documents. Those released with NTRs, however, were directed to report to ICE for further
processing, including for an NTA, as appropriate.

Effective immediately, USBP is ceasing the use of NTRs. When noncitizens will be processed
for release from USBP facilities, USBP will prioritize resources to issue noncitizens NTAs
immediately. NTAs formally initiate immigration proceedings, and it is USBP's goal to
maximize NTA issuance from USBP facilities and eliminate the need for use of alternative
processing pathways in the future.

In circumstances where an alternate path is necessary to address urgent crowding and excessive
Time-In-Custody (TIC) in USBP facilities, Border Patrol has developed an alternative processing
pathway: the use of Parole + ATD. This pathway includes enrollment of FMUs in ICE ATD
programs to ensure individuals are accounted for after release from USBP facilities. Parole +
ATD is a rigorous enforcement process that is effective and includes accountability measures to

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

**A244**

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

Parole Plus Alternative to Detention
Page 2

require noncitizens to report to ICE for issuance of an NTA and continue through the formal immigration process.

To deal with situations in which capacity constraints or conditions in custody warrant the more expeditious processing, USBP may consider use of Parole + ATD on a case-by-case basis for FMUs when certain conditions, laid out below, exist. The use of Parole + ATD in these circumstances will ensure that the USBP can continue to meet its mission requirements, such as border security operations, by maximizing deployments of agents to the field. Use of Parole + ATD is consistent with 8 U.S.C. § 1182(d)(5), which provides that certain noncitizens may be paroled temporarily "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit"—namely, the urgent humanitarian need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities.

All individual members of a FMU who are processed for Parole + ATD, will, as a condition of their parole, be required to report to ICE within 15 days to be processed for an NTA. Effective immediately:

In the Del Rio (DRT) and Rio Grande Valley (RGV) Sectors, Chief Patrol Agents may authorize the processing of FMUs for Parole + ATD on a case-by-case basis when the temporary staffing support to the sector is maximized, the seven-day average of encounters is greater than the sector's Fiscal Year 2019 May daily average,[1] and when one or more of the following is true:

- The average TIC in the sector exceeds 72 hours AND the number of subjects who were taken into custody in the sector during the preceding 48 hours exceeds the number of individuals booked out in the same period.

- The sector exceeds 100% of the total non-COVID detention capacity AND the number of subjects who were taken into custody in the sector during the preceding 48 hours exceeds the number of individuals booked out in the same period.

Outside of the DRT and RGV Sectors, any sector seeking to utilize the Parole + ATD pathway must obtain approval from the USBP Chief and the CBP Commissioner prior to implementation. The USBP Chief and CBP Commissioner may authorize the use of this pathway in situations in which capacity constraints or conditions in custody show that there is an urgent humanitarian reason to release FMUs in a more expeditious fashion in order to avoid crowding in CBP facilities and the resulting COVID-19 health risks to the workforce and migrants in custody, taking into account the factors identified above.

The use of Parole + ATD pathway in DRT and RGV Sectors will be reassessed by USBP HQ on a daily basis in accordance with the conditions established above.

---

[1] The Fiscal Year 2019 May daily average in RGV was 1,607 and in DRT was 276. This month saw the highest encounter numbers that year.

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

Parole Plus Alternative to Detention
Page 3

Parole + ATD may not be used for noncitizens who pose a national security or public safety threat. Furthermore, Parole + ATD may only be issued when an individual is not covered by or is excepted from, on a case-by-case basis, the U.S. Centers for Disease Control and Prevention (CDC) Title 42 Order.

In sectors in which the use of the Parole + ATD pathway has been approved, if parole is appropriate based on a consideration of the above factors (as well as any other applicable urgent humanitarian reasons or significant public benefit considerations), USBP agents may exercise their discretion to process the noncitizen(s) with Parole + ATD, after initial enrollment processing is complete, rather than issuing an NTA.

Under no circumstances will a noncitizen who claims to be, is suspected to be, or is determined to be a noncitizen unaccompanied child as defined by 6 U.S.C. § 279(g)(2), be processed through this pathway.

As the processing landscape and the nature of the current COVID-19 pandemic remains fluid and may change over time, updated guidance will be disseminated to the field via email to reflect the latest changes. In particular, when COVID-19 conditions eventually improve, it is expected that there will no longer be a need for this alternate pathway.

Staff may direct their questions to the Immigration, Prosecutions, and Custody Operations Unit at Headquarters by emailing

<p style="text-align:center"><strong>Comms Plan: Mailing Initiative and NTAs<br>FINAL 11.8.21</strong></p>

## Overview:

- ICE Field Offices will mail out approximately 78,000 packets that include:
    - Cover letter with general resources
    - Notice to Appear, Form I-862
    - Interview Notice, Form G-56
    - Informational materials on change of address, legal assistance, and more
- During the ICE appointment, ICE will review the case with the noncitizen, take biometrics and photos, and establish any ongoing check-in requirements.
- More than 1,400 ICE staff are supporting the initiative at ERO and HSI field offices across the country.

## Statement attributable to ICE spokesperson:

"U.S. Immigration and Customs Enforcement is mailing charging documents to place noncitizens in removal proceedings who have been paroled or released under prosecutorial discretion by Customs and Border Protection (CBP).

"Noncitizens are being directed to their closest ICE Field Office and will be processed using the information collected by CBP as evidence of citizenship and removability.  During the ICE appointment, ICE will review the case with the noncitizen, take biometrics and photos, and establish any ongoing check-in requirements.

"Noncitizens must report to ICE and appear at their designation immigration court date as part of their immigration proceedings in order to comply with US law.  Action will be taken against those that do not appear consistent with the law and Department priorities.

"By mailing out these charging documents, ICE is initiating removal proceedings in a timely way."

## Additional Background (for reporters):

- ICE has communicated to noncitizens via mail for decades.
- Other appropriate charging documents will be issued in person, as appropriate, on a case-by-case basis.
- When an individual reports to the ICE Field Office, they will be asked additional information and provide fingerprints.
- The noncitizen will receive instructions about next steps and information on how to find legal help and other resources.

## RTQs

- **Why didn't noncitizens get this notice when they arrived in the US?**
  Earlier this year, when encounters were consistently high, operational capacity strained, and COVID-19 acute, CBP began issuing notices to report (NTR), a significantly faster mechanism for processing noncitizens, particularly when used for family units (FMU). NTRs were used for certain noncitizens following initial processing and collection of

<p style="text-align:center"><strong>A247</strong></p>

biometric and biographic information. The use of this processing pathway enabled CBP to relieve overcrowding in congregate settings, thus better protecting both the workforce and noncitizens in CBP custody. Those released with NTRs, however, were directed to report to ICE for further processing, including for an NTA, as appropriate.

CBP is no longer issuing NTRs.  Instead, in circumstances where an alternate path is necessary to address urgent crowding and excessive Time-In-Custody (TIC) in CBP facilities, Border Patrol has developed an alternative processing pathway: the use of Parole + ATD. This pathway includes enrollment of FMUs in ICE ATD programs to ensure individuals are accounted for after release from CBP facilities. Parole + ATD is a rigorous enforcement process that is effective and includes accountability measures to require noncitizens to report to ICE for issuance of an NTA and continue through the formal immigration process.

- **How do you know where people are?**
  ICE is using the address provided to CBP when noncitizens were initially processed, the address that the noncitizen has provided to ICE directly, or through enrollment in the ATD program.

- **Why is ICE embarking on this initiative?**
  We are applying an organized and methodical approach to place noncitizens in removal proceedings who have been paroled or released by CBP. By mailing out these charging documents, ICE is relieving scheduling pressures on its Field Offices and initiating removal proceedings in a timely way. ICE Field Offices will mail out a packet that includes an NTA, an ICE appointment date, and more. During the ICE appointment, ICE will review the case with the noncitizen, take biometrics and photos, and establish any ongoing check-in requirements. More than 1,400 ICE staff are supporting the initiative at ERO and HSI field offices across the country.

- **Why does a noncitizen have to report to ICE?**
  Noncitizens must report to the ICE Field Office and show up at their immigration court dates. This preserves the integrity of the immigration system and provides noncitizens with the opportunity to seek relief or protection from removal. If a noncitizen has any questions about reporting, they can call ICE at 833-383-1465 where operators can help in several languages.

- **What is Form I-862?**
  Form I-862 (Notice to Appear, also known as an NTA) is provided to noncitizens to initiate removal proceedings under section 240 of the Immigration and Nationality Act. It includes, among other things, the immigration charges against the noncitizen and the date, time, and address of the Executive Office for Immigration Review (EOIR) immigration court where they are required to appear. It also notifies the noncitizen of the requirement that he or she provide a written record of any change of address or telephone number.

- **What is the plan/process to handle inquiries coming in to verify legitimacy of the letters? Report fraudulent ones?**
  ICE can validate call-in letters, NTRs, and parole documents issued to noncitizens using person-specific identifiers that are exclusive to an individual. To validate a letter, noncitizens or their representatives can call the local ICE field office or contact the ICE VESL at 833-383-1465 where operators can help in several languages.

- **What is the plan for the longer lines at the check-in stations (i.e., Houston) when/if people do quickly decide they need to rush to report in Florida (though unlikely)?**
  The operation is designed to mail out NTAs to individuals issued an NTR or paroled and placed on ATD at the southwest border and create a more orderly process for reporting to ICE. Individuals will be required to report in person to receive limited documentation in person along with appropriate biometrics collection. However, the mailed NTA will reduce the amount of time needed with ICE officers.

- **Are these letters going out in the native language of the individual recipients?**
  Yes, brochures and advisals will be made available in English, Spanish, Portuguese, and Haitian Creole.

- **What's happening to the noncitizen that passed the 60-day report window? Are they receiving this packet?**
  Over a matter of months, ICE will issue noncitizens who have been released with a notice to report or on immigration parole an NTA and G-56 by mail.

- **If we don't receive viable addresses of those past the 60-report window, what happens to those noncitizens?**
  DHS plans to conduct follow-up inquiries to locate and take appropriate action with these individuals. Those who do not report, like anyone who is in our country without legal status, are subject to removal by ICE.

- **How many NTAs are being mailed?**
  Approximately 78,000 NTA packages are being mailed over the course of a matter of months.

- **What if the NTA gets lost in the mail? What should the noncitizen do?**
  A noncitizen or their legal representative should contact the ICE VESL (833-383-1465).

- **What will a noncitizen receive in the mail from ICE?**
  The mailing contains an NTA that, among other things, includes the charges against the noncitizen (violations of immigration law). The mailing will also include legal access resources and explanatory materials about how to provide a change of address. For those individuals released by CBP without being given an NTA, ICE field offices will process assigned cases using the information collected by CBP as evidence of citizenship and removability. A noncitizen will receive the following documents in the mail:
  - Cover letter with general resources
  - Notice to Appear, Form I-862

- o Interview Notice, Form G-56
- o Informational materials on change of address, legal assistance, and more

- **What happens when a noncitizen arrives for their appointment at a field office?**
  When a noncitizen reports to an ICE Field Office, they can bring an attorney or someone to help them at the appointment. Unless they have committed a serious crime, or the government thinks they may be a risk to the United States, a noncitizen will not be taken into custody at the appointment. When they report to the ICE Field Office, an officer will confirm contact information, take biometrics, and explain the court process. The noncitizen will receive instructions about next steps and receive more information on how to find legal help and other resources.

- **How does a noncitizen change their address with ICE?**
  To change an address with ICE, a noncitizen should contact the ICE Victims Engagement and Services Line at 1-833-383-1465 or ice.gov/vesl. For cases already filed with EOIR, noncitizens are also required to change their address with the court by submitting a Change of Address, Form EOIR-33, with the EOIR.

- **Does ICE expect a large number of in absentia removal orders as a result of noncitizens not receiving their mailed NTA?**
  It is critical that all noncitizens contact the ICE VESL line to update their contact information with ICE if it changes. Failure to appear at a scheduled immigration court hearing may result in a judge ordering the individual removed in absentia.

- **Will people be placed on the dedicated docket?**
  Yes, they will be placed on the dedicated docket if they are part of a family group who was apprehended between the ports of entry after May 28, 2021, eligible for the ATD program, and residing in one of the 11 dedicated docket jurisdictions.

**Communications deliverables from ICE OPA:**
- RTQ
- Updates to ice.gov/check-in: adding video and example of sample packet
  - o Video (style: animation) explaining mailer's intent; will launch with Spanish and then add versions in Portuguese and Creole.
  - o Updated information on changing address already made.
- Focused media effort, pitching placed stories to Telemundo/Univision and Spanish radio in the following markets: Miami, Houston, New Orleans, Atlanta, Newark, Chicago, Boston, Washington, Los Angeles, and San Francisco.

**Draft Tick Tock (subject to change):**
**Thursday, November 4**
5:30-6:15PM ET        ICE/OPE host stakeholder call, "What to Expect from the Mailout NTA and Processing"

**Friday, November 5**

Ongoing                    ICE/OPE CRO's to host calls in areas of responsibility for additional key
stakeholders

**Monday, November 8**
            First round of packets drops in the mail
            ICE/OPA begins pitching to targeted media (Telemundo/Univision)

**Tuesday, November 9**
            Add video (English, Spanish) to ice.gov/check-in; Portuguese and Creole
to come by week's end.

| Capacity Date | Capacity Location | AOR | Number of Appointments | Noncitizen Count | Capacity |
|---|---|---|---|---|---|
| 2022-05-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-04-01 | WICHITA ICE OFFICE | Chicago | 5 | 9 | 12.50 |
| 2023-01-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-09-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-12-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-06-01 | CHICAGO FIELD OFFICE | Chicago | 73 | 169 | 97.19 |
| 2024-01-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-05-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 34 | 73 | 93.65 |
| 2023-02-01 | CHICAGO FIELD OFFICE | Chicago | 34 | 102 | 88.89 |
| 2023-04-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-10-01 | CHICAGO FIELD OFFICE | Chicago | 36 | 99 | 83.82 |
| 2022-09-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 1 | 1 | 1.79 |
| 2022-09-01 | LOUISVILLE FIELD OFFICE | Chicago | 4 | 9 | 9.25 |
| 2022-09-01 | MILWAUKEE FIELD OFFICE | Chicago | 17 | 38 | 82.86 |
| 2023-01-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-03-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 25 | 69 | 58.33 |
| 2022-05-01 | LOUISVILLE FIELD OFFICE | Chicago | 33 | 94 | 42.39 |
| 2022-05-01 | MILWAUKEE FIELD OFFICE | Chicago | 17 | 40 | 85.07 |
| 2023-09-01 | MILWAUKEE FIELD OFFICE | Chicago | 13 | 34 | 43.40 |
| 2022-09-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |

| 2022-11-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 36 | 87 | 88.39 |
|---|---|---|---|---|---|
| 2023-05-01 | MILWAUKEE FIELD OFFICE | Chicago | 19 | 49 | 77.27 |
| 2022-07-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 33 | 70 | 85.83 |
| 2023-01-01 | MILWAUKEE FIELD OFFICE | Chicago | 17 | 40 | 78.08 |
| 2023-03-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-09-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-11-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-01-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 7 | 17 | 9.72 |
| 2023-04-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-12-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-12-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-04-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 24 | 59 | 88.43 |
| 2023-01-01 | CHICAGO FIELD OFFICE | Chicago | 35 | 99 | 98.21 |
| 2023-03-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-09-01 | CHICAGO FIELD OFFICE | Chicago | 38 | 110 | 92.50 |
| 2022-11-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2024-04-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 25 | 57 | 66.88 |
| 2022-05-01 | CHICAGO FIELD OFFICE | Chicago | 67 | 158 | 98.05 |

| Date | Office | Location | | | |
|---|---|---|---|---|---|
| 2022-12-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-02-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 29 | 75 | 86.67 |
| 2022-04-01 | LOUISVILLE FIELD OFFICE | Chicago | 39 | 87 | 50.00 |
| 2022-04-01 | MILWAUKEE FIELD OFFICE | Chicago | 12 | 29 | 58.62 |
| 2023-08-01 | MILWAUKEE FIELD OFFICE | Chicago | 14 | 41 | 55.56 |
| 2022-08-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-10-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 35 | 79 | 89.06 |
| 2023-04-01 | MILWAUKEE FIELD OFFICE | Chicago | 15 | 36 | 71.83 |
| 2022-06-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 48 | 113 | 93.60 |
| 2022-12-01 | MILWAUKEE FIELD OFFICE | Chicago | 13 | 35 | 69.23 |
| 2023-04-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | LOUISVILLE FIELD OFFICE | Chicago | 12 | 38 | 20.69 |
| 2022-08-01 | MILWAUKEE FIELD OFFICE | Chicago | 21 | 50 | 79.78 |
| 2022-10-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-04-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-12-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-06-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 8 | 24 | 18.18 |
| 2023-02-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-11-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |

| 2023-03-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-12-01 | CHICAGO FIELD OFFICE | Chicago | 35 | 101 | 83.82 |
| 2023-02-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | CHICAGO FIELD OFFICE | Chicago | 42 | 127 | 88.95 |
| 2022-10-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2024-03-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 22 | 68 | 60.87 |
| 2022-04-01 | CHICAGO FIELD OFFICE | Chicago | 55 | 136 | 98.82 |
| 2023-11-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-09-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 33 | 81 | 89.06 |
| 2022-04-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 1 | 1 | 33.33 |
| 2023-03-01 | MILWAUKEE FIELD OFFICE | Chicago | 20 | 48 | 80.95 |
| 2022-05-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 55 | 155 | 97.22 |
| 2022-11-01 | MILWAUKEE FIELD OFFICE | Chicago | 16 | 41 | 60.00 |
| 2023-03-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | LOUISVILLE FIELD OFFICE | Chicago | 31 | 83 | 49.38 |
| 2022-07-01 | MILWAUKEE FIELD OFFICE | Chicago | 16 | 38 | 79.41 |
| 2022-11-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-01-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 35 | 85 | 93.75 |
| 2023-07-01 | MILWAUKEE FIELD OFFICE | Chicago | 12 | 37 | 78.49 |

| 2023-03-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-11-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-05-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 8 | 20 | 15.00 |
| 2023-01-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-04-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-06-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-06-01 | WICHITA ICE OFFICE | Chicago | 1 | 1 | 1.19 |
| 2023-02-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 3 | 10 | 11.76 |
| 2022-10-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-01-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | CHICAGO FIELD OFFICE | Chicago | 31 | 97 | 97.06 |
| 2024-02-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-06-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 27 | 75 | 87.50 |
| 2023-10-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-03-01 | CHICAGO FIELD OFFICE | Chicago | 28 | 77 | 67.31 |
| 2022-11-01 | CHICAGO FIELD OFFICE | Chicago | 39 | 110 | 85.63 |
| 2022-04-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 43 | 127 | 96.69 |
| 2022-10-01 | MILWAUKEE FIELD OFFICE | Chicago | 17 | 41 | 82.86 |
| 2023-04-01 | CHICAGO FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-02-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |

**A256**

| 2022-06-01 | LOUISVILLE FIELD OFFICE | Chicago | 33 | 97 | 43.44 |
|---|---|---|---|---|---|
| 2022-06-01 | MILWAUKEE FIELD OFFICE | Chicago | 20 | 48 | 79.07 |
| 2022-10-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-12-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 32 | 82 | 89.06 |
| 2023-06-01 | MILWAUKEE FIELD OFFICE | Chicago | 13 | 39 | 72.22 |
| 2022-05-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 38 | 96 | 85.94 |
| 2023-02-01 | MILWAUKEE FIELD OFFICE | Chicago | 15 | 37 | 74.29 |
| 2023-04-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-10-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-04-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 9 | 25 | 73.08 |
| 2022-12-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-02-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-09-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-06-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-05-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2023-01-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-10-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2023-04-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2023-02-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-12-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-06-01 | MIDLAND ERO OFFICE | El Paso | 7 | 23 | 1.12 |

**A257**

| 2023-04-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-12-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-08-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-04-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2023-04-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-12-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-08-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2023-03-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2023-01-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-11-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-09-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-04-01 | ICE COLOCATION EL PASO | El Paso | 4 | 6 | 3.11 |
| 2022-05-01 | MIDLAND ERO OFFICE | El Paso | 10 | 28 | 3.18 |
| 2022-11-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-07-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2023-03-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2023-03-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-11-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-08-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-07-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2023-04-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2023-02-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-12-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |

| 2022-10-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-05-01 | ALBUQUERQUE OFFICE | El Paso | 1 | 1 | 1.75 |
| 2022-04-01 | MIDLAND ERO OFFICE | El Paso | 16 | 41 | 14.88 |
| 2022-08-01 | MIDLAND ERO OFFICE | El Paso | 3 | 8 | 2.16 |
| 2022-06-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2023-02-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-10-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-10-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-07-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-06-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2023-02-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-11-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-09-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-04-01 | ALBUQUERQUE OFFICE | El Paso | 5 | 7 | 63.64 |
| 2023-03-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2023-01-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-07-01 | MIDLAND ERO OFFICE | El Paso | 12 | 34 | 5.31 |
| 2023-01-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-09-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-05-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2023-01-01 | WICOMICO DETENTION FACILITY | Baltimore | 1 | 2 | 2.26 |
| 2022-10-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 171 | 433 | 57.92 |
| 2023-02-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 2 | 6 | 1.19 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-11-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2024-02-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-10-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-04-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 19 | 47 | 100.00 |
| 2022-05-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 21 | 58 | 100.00 |
| 2023-05-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-08-01 | WICOMICO DETENTION FACILITY | Baltimore | 14 | 35 | 100.00 |
| 2022-10-01 | WICOMICO DETENTION FACILITY | Baltimore | 2 | 6 | 8.05 |
| 2023-01-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 21 | 59 | 6.16 |
| 2022-09-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 238 | 539 | 77.87 |
| 2024-01-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-09-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-04-01 | WICOMICO DETENTION FACILITY | Baltimore | 10 | 27 | 100.00 |
| 2023-04-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-05-01 | WICOMICO DETENTION FACILITY | Baltimore | 13 | 33 | 100.00 |
| 2022-09-01 | WICOMICO DETENTION FACILITY | Baltimore | 8 | 14 | 17.65 |
| 2022-12-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 165 | 442 | 59.55 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-04-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 0 | 0 | 0.00 |
| 2022-08-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 296 | 734 | 97.79 |
| 2023-07-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-02-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-03-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2024-04-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-12-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-07-01 | WICOMICO DETENTION FACILITY | Baltimore | 12 | 32 | 100.00 |
| 2022-06-01 | WICOMICO DETENTION FACILITY | Baltimore | 14 | 35 | 100.00 |
| 2023-08-01 | WICOMICO DETENTION FACILITY | Baltimore | 1 | 3 | 3.38 |
| 2022-11-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 160 | 410 | 54.06 |
| 2023-03-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 2 | 6 | 0.96 |
| 2022-12-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2024-03-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-11-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-06-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-12-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-12-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 14 | 36 | 10.64 |
| 2022-08-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 4 | 14 | 8.11 |
| 2023-01-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | HELENA FIELD OFFICE | Salt Lake City | 1 | 4 | 5.00 |

| 2022-05-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-04-01 | PROVO OFFICE | Salt Lake City | 12 | 35 | 70.24 |
| 2023-01-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | PROVO OFFICE | Salt Lake City | 15 | 43 | 82.95 |
| 2022-05-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 120 | 209 | 36.33 |
| 2022-07-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | TWIN FALLS FIELD ERO | Salt Lake City | 1 | 1 | 2.88 |
| 2023-03-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 1 | 1 | 4.73 |
| 2022-11-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-04-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | BOISE FIELD OFFICE | Salt Lake City | 2 | 3 | 5.13 |
| 2022-08-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 34 | 84 | 95.16 |
| 2023-04-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | RENO OFFICE | Salt Lake City | 4 | 8 | 10.34 |
| 2022-12-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | PROVO OFFICE | Salt Lake City | 13 | 37 | 87.50 |
| 2023-03-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 15 | 47 | 9.94 |
| 2022-10-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |

**A264**

| 2022-04-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 242 | 416 | 88.09 |
|---|---|---|---|---|---|
| 2022-06-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 2 | 6 | 3.39 |
| 2023-03-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | PROVO OFFICE | Salt Lake City | 2 | 8 | 16.67 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-12-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | PROVO OFFICE | Salt Lake City | 15 | 40 | 79.55 |
| 2023-03-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 13 | 45 | 12.89 |
| 2022-09-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-06-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 2 | 5 | 3.32 |
| 2023-02-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | PROVO OFFICE | Salt Lake City | 16 | 37 | 86.25 |
| 2022-04-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 10 | 19 | 18.46 |
| 2023-02-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | PROVO OFFICE | Salt Lake City | 14 | 43 | 88.75 |
| 2023-02-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-06-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-01-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-09-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-11-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-09-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-05-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-02-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-07-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2023-02-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |

| 2022-05-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-10-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-10-01 | LATHAM OFFICE | Buffalo | 1 | 2 | 4.17 |
| 2022-12-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-08-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-10-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-08-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-01-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-04-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 16 | 26 | 6.05 |
| 2022-06-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2023-01-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-04-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-09-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-04-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-01-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-05-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-04-01 | LATHAM OFFICE | Buffalo | 1 | 1 | 2.42 |
| 2022-09-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2023-04-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-07-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-12-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-05-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2023-04-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-08-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-03-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-12-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |

| Date | Office | Location | | | |
|------|--------|----------|---|---|---|
| 2022-11-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-07-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-04-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-04-01 | SYRACUSE OFFICE | Buffalo | 15 | 22 | 100.00 |
| 2023-03-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-07-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-02-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-11-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-12-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-10-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-06-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-03-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-08-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2023-03-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-06-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-11-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-07-01 | DALLAS FIELD OFFICE | Dallas | 70 | 159 | 14.54 |
| 2023-03-01 | DALLAS FIELD OFFICE | Dallas | 1 | 1 | 0.07 |
| 2022-11-01 | DALLAS FIELD OFFICE | Dallas | 1 | 3 | 0.25 |
| 2023-04-01 | DALLAS FIELD OFFICE | Dallas | 0 | 0 | 0.00 |
| 2022-09-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-05-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2023-01-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2023-02-01 | DALLAS FIELD OFFICE | Dallas | 4 | 4 | 0.33 |
| 2022-10-01 | DALLAS FIELD OFFICE | Dallas | 4 | 8 | 0.67 |
| 2022-12-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-08-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2023-03-01 | OKLAHOMA CITY - ERO | Dallas | 1 | 1 | 0.64 |
| 2023-01-01 | DALLAS FIELD OFFICE | Dallas | 3 | 3 | 0.25 |
| 2022-09-01 | DALLAS FIELD OFFICE | Dallas | 5 | 10 | 0.69 |
| 2023-04-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-11-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-06-01 | DALLAS FIELD OFFICE | Dallas | 168 | 379 | 100.00 |
| 2022-07-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-04-01 | DALLAS FIELD OFFICE | Dallas | 143 | 357 | 100.00 |
| 2022-05-01 | DALLAS FIELD OFFICE | Dallas | 169 | 439 | 100.00 |
| 2022-04-01 | OKLAHOMA CITY - ERO | Dallas | 14 | 37 | 10.05 |
| 2022-08-01 | DALLAS FIELD OFFICE | Dallas | 5 | 8 | 0.58 |
| 2022-12-01 | DALLAS FIELD OFFICE | Dallas | 2 | 4 | 0.28 |
| 2022-10-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-06-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2023-02-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-11-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2022-05-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2023-03-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2023-02-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2022-10-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2022-09-01 | HARLINGEN FIELD OFFICE | Harlingen | 1 | 3 | 1.37 |
| 2023-01-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |

**A270**

| 2022-08-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-06-01 | HARLINGEN FIELD OFFICE | Harlingen | 1 | 1 | 0.46 |
| 2022-12-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2022-07-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2023-04-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2022-04-01 | HARLINGEN FIELD OFFICE | Harlingen | 8 | 18 | 3.95 |
| 2023-04-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-12-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-07-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2023-02-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-10-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-05-01 | PHOENIX FIELD OFFICE | Phoenix | 1 | 1 | 0.13 |
| 2023-03-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-11-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-06-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2023-01-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-08-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-04-01 | PHOENIX FIELD OFFICE | Phoenix | 9 | 19 | 0.70 |
| 2022-04-01 | TUCSON OFFICE | Phoenix | 2 | 4 | 6.67 |
| 2023-02-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-10-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-05-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-07-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2023-04-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-12-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-09-01 | PHOENIX FIELD OFFICE | Phoenix | 1 | 1 | 0.13 |
| 2022-09-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2023-01-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-08-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2023-03-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |

| 2022-11-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-06-01 | PHOENIX FIELD OFFICE | Phoenix | 1 | 2 | 0.18 |
| 2022-04-01 | WESTERVILLE CO-LO OFFICE | Detroit | 21 | 55 | 84.87 |
| 2022-08-01 | WESTERVILLE CO-LO OFFICE | Detroit | 24 | 72 | 48.78 |
| 2022-06-01 | BLUE ASH BUILDING | Detroit | 12 | 29 | 42.86 |
| 2022-06-01 | CLEVELAND OFFICE | Detroit | 1 | 3 | 3.57 |
| 2023-01-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-08-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-09-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-11-01 | WESTERVILLE CO-LO OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-02-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-10-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-01-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-04-01 | WESTERVILLE CO-LO OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-01-01 | WESTERVILLE CO-LO OFFICE | Detroit | 1 | 1 | 1.89 |
| 2022-07-01 | WESTERVILLE CO-LO OFFICE | Detroit | 26 | 64 | 74.44 |
| 2023-04-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-05-01 | CLEVELAND OFFICE | Detroit | 1 | 3 | 3.85 |
| 2022-11-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-06-01 | DETROIT FIELD OFFICE | Detroit | 7 | 23 | 0.29 |
| 2022-05-01 | BLUE ASH BUILDING | Detroit | 21 | 62 | 86.72 |
| 2023-01-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-04-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-09-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-12-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-03-01 | WESTERVILLE CO-LO OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-08-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-10-01 | WESTERVILLE CO-LO OFFICE | Detroit | 1 | 3 | 2.04 |
| 2022-06-01 | WESTERVILLE CO-LO OFFICE | Detroit | 28 | 86 | 52.94 |
| 2022-10-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-12-01 | BLUE ASH BUILDING | Detroit | 1 | 4 | 4.38 |
| 2022-05-01 | DETROIT FIELD OFFICE | Detroit | 25 | 68 | 3.24 |
| 2022-04-01 | BLUE ASH BUILDING | Detroit | 19 | 57 | 84.52 |
| 2023-03-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-04-01 | CLEVELAND OFFICE | Detroit | 5 | 8 | 15.85 |
| 2023-03-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-08-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-11-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-02-01 | WESTERVILLE CO-LO OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-07-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-04-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-12-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-05-01 | WESTERVILLE CO-LO OFFICE | Detroit | 26 | 67 | 68.60 |
| 2022-09-01 | WESTERVILLE CO-LO OFFICE | Detroit | 4 | 8 | 7.96 |
| 2022-07-01 | BLUE ASH BUILDING | Detroit | 1 | 1 | 3.33 |
| 2022-04-01 | DETROIT FIELD OFFICE | Detroit | 28 | 61 | 4.16 |

**A273**

| 2023-02-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-09-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-10-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-12-01 | WESTERVILLE CO-LO OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-03-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-11-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-02-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-07-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-03-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-04-01 | SANTA ANA OFFICE | Los Angeles | 6 | 15 | 2.39 |
| 2023-01-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-11-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-07-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-03-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-11-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-01-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-05-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 127 | 351 | 100.00 |
| 2022-09-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-05-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-07-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 1 | 3 | 0.22 |
| 2023-03-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-11-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-07-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-09-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-04-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-02-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-05-01 | SAN BERNARDINO OFFICE | Los Angeles | 1 | 3 | 0.24 |
| 2022-10-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-06-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-02-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-09-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-08-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-06-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 113 | 314 | 48.26 |
| 2023-04-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-12-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-02-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-10-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-12-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-06-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-08-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-04-01 | SAN BERNARDINO OFFICE | Los Angeles | 10 | 20 | 2.39 |
| 2022-09-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-03-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-01-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-04-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 2 | 5 | 3.03 |
| 2023-01-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-03-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-11-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-07-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-10-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 1 | 2 | 0.17 |
| 2022-09-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-11-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-05-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-07-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-01-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2023-04-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-05-01 | SANTA ANA OFFICE | Los Angeles | 1 | 3 | 0.34 |
| 2023-02-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-12-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-08-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-04-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-12-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-02-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-04-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 102 | 256 | 100.00 |
| 2022-10-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |

**A276**

| 2022-06-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-08-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 2 | 3 | 0.24 |
| 2022-04-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-06-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-04-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-12-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-08-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-10-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-04-01 | DOVER OFFICE | Philadelphia | 12 | 29 | 75.58 |
| 2022-11-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-07-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-12-01 | DOVER OFFICE | Philadelphia | 16 | 35 | 73.75 |
| 2022-08-01 | DOVER OFFICE | Philadelphia | 16 | 36 | 93.75 |
| 2023-03-01 | DOVER OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-03-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-09-01 | PHILIADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-06-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2022-11-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-09-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-07-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-05-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-02-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-03-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-10-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-04-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-01-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-04-01 | PITTSBURGH SUB OFFICE | Philadelphia | 5 | 11 | 20.00 |
| 2022-07-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 1 | 2 | 1.17 |
| 2022-10-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-06-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-11-01 | DOVER OFFICE | Philadelphia | 15 | 37 | 72.50 |
| 2022-07-01 | DOVER OFFICE | Philadelphia | 14 | 27 | 95.83 |
| 2023-02-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-05-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-01-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-04-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-12-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-09-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-03-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-12-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-02-01 | DOVER OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-08-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-05-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2022-10-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-08-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-04-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 1 | 2 | 0.60 |
| 2022-06-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 4 | 4 | 2.96 |
| 2022-04-01 | YORK ERO FIELD OFFICE | Philadelphia | 2 | 7 | 6.10 |
| 2022-10-01 | DOVER OFFICE | Philadelphia | 12 | 32 | 94.44 |
| 2022-06-01 | DOVER OFFICE | Philadelphia | 16 | 38 | 96.88 |
| 2023-01-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-09-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-05-01 | CHARLESTON FIELD OFFICE | Philadelphia | 2 | 6 | 1.18 |
| 2022-12-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-03-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-11-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-08-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-02-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-11-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-09-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-07-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-04-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-02-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 1 | 3 | 1.50 |
| 2022-05-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 2 | 7 | 3.33 |
| 2023-01-01 | PITTSBURGH SUB OFFICE | Philadelphia | 1 | 1 | 1.92 |
| 2022-05-01 | DOVER OFFICE | Philadelphia | 14 | 37 | 68.75 |
| 2022-12-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-08-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-01-01 | DOVER OFFICE | Philadelphia | 9 | 26 | 50.96 |
| 2022-04-01 | CHARLESTON FIELD OFFICE | Philadelphia | 1 | 2 | 0.49 |
| 2022-09-01 | DOVER OFFICE | Philadelphia | 14 | 34 | 92.86 |
| 2023-04-01 | DOVER OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-04-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-10-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-07-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2022-12-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-10-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-08-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-06-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |

| 2023-03-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2023-04-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-11-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-02-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-04-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 48 | 121 | 71.01 |
| 2022-06-01 | PITTSBURGH SUB OFFICE | Philadelphia | 1 | 2 | 2.68 |
| 2023-01-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 2 | 2 | 1.56 |
| 2022-11-01 | WASHINGTON FIELD OFFICE | Washington | 2 | 3 | 2.18 |
| 2022-04-01 | WASHINGTON FIELD OFFICE | Washington | 56 | 137 | 96.44 |
| 2023-04-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-12-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-03-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-11-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-07-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-01-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-05-01 | NORFOLK ASAC OFFICE | Washington | 1 | 1 | 0.98 |
| 2022-09-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-05-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-09-01 | WASHINGTON FIELD OFFICE | Washington | 1 | 2 | 1.42 |
| 2023-03-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-10-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-02-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-10-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-08-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-04-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-12-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-04-01 | NORFOLK ASAC OFFICE | Washington | 5 | 11 | 12.12 |
| 2022-06-01 | WASHINGTON FIELD OFFICE | Washington | 41 | 118 | 61.39 |
| 2022-08-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-02-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-09-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-01-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-03-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-11-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-07-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-05-01 | WASHINGTON FIELD OFFICE | Washington | 62 | 155 | 83.78 |
| 2023-01-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-07-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-04-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-12-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-08-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-02-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-06-01 | NORFOLK ASAC OFFICE | Washington | 1 | 2 | 1.47 |
| 2022-10-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |

**A282**

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 17 | 29 | 16.67 |
| 2022-06-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-07-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 1 | 3 | 1.48 |
| 2022-04-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 84 | 181 | 100.00 |
| 2023-04-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-12-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-06-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 2 | 3 | 1.41 |
| 2022-11-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2023-03-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-05-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 71 | 128 | 54.24 |
| 2023-02-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-10-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-09-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 2 | 5 | 2.33 |
| 2023-01-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-08-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-11-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-11-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |

**A283**

| | | | | | |
|---|---|---|---|---|---|
| 2022-07-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-06-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-04-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 3 | 5 | 0.20 |
| 2023-03-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-03-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-06-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-02-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-02-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-10-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-10-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-05-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-01-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-01-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-09-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-08-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-09-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 1 | 2 | 0.06 |
| 2022-12-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-12-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-08-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-07-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-05-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 3 | 7 | 0.19 |
| 2022-04-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-04-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-04-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-02-01 | SAINT PAUL ICE OFFICE | Saint Paul | 18 | 52 | 88.89 |
| 2022-08-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | SAINT PAUL ICE OFFICE | Saint Paul | 22 | 52 | 93.75 |
| 2022-07-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-06-01 | SAINT PAUL ICE OFFICE | Saint Paul | 37 | 109 | 95.21 |
| 2023-04-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | DES MOINES ICE OFFICE | Saint Paul | 1 | 3 | 5.56 |
| 2022-06-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-06-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 6 | 12 | 3.80 |
| 2023-03-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | OMAHA FIELD OFFICE | Saint Paul | 10 | 17 | 14.29 |
| 2022-11-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |

| 2023-01-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2023-04-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 4 | 33.33 |
| 2022-07-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | SAINT PAUL ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 2 | 0.59 |
| 2022-08-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 3 | 1.84 |
| 2022-09-01 | SAINT PAUL ICE OFFICE | Saint Paul | 22 | 56 | 96.15 |
| 2022-06-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | SAINT PAUL ICE OFFICE | Saint Paul | 36 | 99 | 93.04 |
| 2023-03-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | SIOUX CITY ERO BUILDING | Saint Paul | 2 | 7 | 8.57 |
| 2022-11-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | SAINT PAUL ICE OFFICE | Saint Paul | 22 | 55 | 95.19 |
| 2022-07-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | DES MOINES ICE OFFICE | Saint Paul | 6 | 12 | 50.00 |
| 2023-01-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |

| 2022-07-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | GRAND FORKS ERO OFFICE | Saint Paul | 3 | 7 | 40.63 |
| 2022-11-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-07-01 | NORTH PLATTE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | NORTH PLATTE OFFICE | Saint Paul | 2 | 5 | 3.03 |
| 2022-06-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 2 | 0.62 |
| 2022-07-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | NORTH PLATTE OFFICE | Saint Paul | 2 | 6 | 2.33 |
| 2023-02-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | SAINT PAUL ICE OFFICE | Saint Paul | 29 | 81 | 82.14 |
| 2023-02-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | SIOUX CITY ERO BUILDING | Saint Paul | 6 | 10 | 11.11 |
| 2022-10-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | SAINT PAUL ICE OFFICE | Saint Paul | 27 | 58 | 87.50 |
| 2022-06-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | SAINT PAUL ICE OFFICE | Saint Paul | 23 | 71 | 87.97 |
| 2022-05-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 1 | 1 | 25.00 |
| 2022-12-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | GRAND FORKS ERO OFFICE | Saint Paul | 3 | 6 | 50.00 |
| 2022-10-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-06-01 | NORTH PLATTE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-06-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | NORTH PLATTE OFFICE | Saint Paul | 7 | 11 | 6.67 |
| 2022-06-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |

**A288**

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | NORTH PLATTE OFFICE | Saint Paul | 9 | 32 | 20.00 |
| 2023-01-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-07-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 3 | 1.94 |
| 2023-03-01 | SAINT PAUL ICE OFFICE | Saint Paul | 26 | 56 | 90.00 |
| 2022-09-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | SAINT PAUL ICE OFFICE | Saint Paul | 25 | 55 | 93.75 |
| 2022-08-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-07-01 | SAINT PAUL ICE OFFICE | Saint Paul | 33 | 86 | 86.86 |
| 2022-04-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 1 | 1 | 8.33 |
| 2022-11-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-07-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-12-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-07-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 5 | 7 | 6.91 |
| 2023-04-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | OMAHA FIELD OFFICE | Saint Paul | 1 | 2 | 2.70 |
| 2022-12-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-06-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 2 | 0.62 |
| 2022-09-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | NORTH PLATTE OFFICE | Saint Paul | 3 | 7 | 4.00 |
| 2022-12-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 14 | 41 | 32.93 |
| 2022-10-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2023-03-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-06-01 | SAXON BUILDING | Boston | 4 | 14 | 11.30 |
| 2023-03-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2023-04-01 | HARTFORD SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-06-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-03-01 | BURLINGTON MA OFFICE | Boston | 3 | 8 | 0.79 |
| 2023-01-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-08-01 | BURLINGTON MA OFFICE | Boston | 1 | 2 | 0.22 |

| 2022-11-01 | BURLINGTON MA OFFICE | Boston | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-08-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-10-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-04-01 | BURLINGTON MA OFFICE | Boston | 69 | 181 | 20.23 |
| 2023-02-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-10-01 | HARTFORD SUB OFFICE | Boston | 9 | 22 | 6.84 |
| 2022-06-01 | HARTFORD SUB OFFICE | Boston | 5 | 11 | 6.87 |
| 2022-05-01 | SAXON BUILDING | Boston | 26 | 65 | 58.37 |
| 2023-02-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2023-03-01 | HARTFORD SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-05-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-09-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 19 | 60 | 87.30 |
| 2022-09-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2023-02-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-12-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-07-01 | BURLINGTON MA OFFICE | Boston | 2 | 6 | 0.67 |
| 2022-09-01 | BURLINGTON MA OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-07-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-09-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-01-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-04-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2023-02-01 | BURLINGTON MA OFFICE | Boston | 1 | 1 | 0.16 |
| 2022-05-01 | HARTFORD SUB OFFICE | Boston | 4 | 4 | 5.13 |
| 2023-01-01 | HARTFORD SUB OFFICE | Boston | 1 | 2 | 1.52 |
| 2022-09-01 | HARTFORD SUB OFFICE | Boston | 9 | 24 | 6.28 |
| 2022-08-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 23 | 60 | 100.00 |
| 2023-02-01 | HARTFORD SUB OFFICE | Boston | 0 | 0 | 0.00 |

**A291**

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-12-01 | SAXON BUILDING | Boston | 1 | 2 | 2.37 |
| 2022-08-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2023-01-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-04-01 | SAXON BUILDING | Boston | 27 | 60 | 97.24 |
| 2023-01-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2022-06-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-08-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-04-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-03-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2023-01-01 | BURLINGTON MA OFFICE | Boston | 1 | 5 | 0.50 |
| 2023-04-01 | BURLINGTON MA OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-11-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-12-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-06-01 | BURLINGTON MA OFFICE | Boston | 1 | 3 | 0.28 |
| 2022-12-01 | HARTFORD SUB OFFICE | Boston | 2 | 4 | 2.89 |
| 2022-10-01 | MANCHESTER ICE | Boston | 1 | 3 | 1.85 |
| 2022-05-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 21 | 68 | 100.00 |
| 2022-08-01 | HARTFORD SUB OFFICE | Boston | 25 | 74 | 27.57 |
| 2022-04-01 | HARTFORD SUB OFFICE | Boston | 32 | 72 | 55.22 |
| 2022-10-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 20 | 80 | 100.00 |
| 2023-04-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-07-01 | SAXON BUILDING | Boston | 1 | 2 | 2.09 |
| 2023-04-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2022-11-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2022-07-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-02-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-10-01 | BURLINGTON MA OFFICE | Boston | 1 | 1 | 0.17 |
| 2022-12-01 | BURLINGTON MA OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-09-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |

| 2022-11-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-05-01 | BURLINGTON MA OFFICE | Boston | 2 | 6 | 0.45 |
| 2022-05-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2023-03-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-11-01 | HARTFORD SUB OFFICE | Boston | 6 | 11 | 0.85 |
| 2022-04-01 | MANCHESTER ICE | Boston | 4 | 9 | 7.22 |
| 2022-07-01 | HARTFORD SUB OFFICE | Boston | 8 | 22 | 5.54 |
| 2022-04-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 17 | 61 | 100.00 |
| 2022-07-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 20 | 62 | 100.00 |
| 2022-06-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 21 | 72 | 100.00 |
| 2022-11-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 20 | 74 | 100.00 |
| 2023-03-01 | TAMPA SUB OFFICE | Miami | 45 | 81 | 91.30 |
| 2023-02-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-06-01 | TAMPA SUB OFFICE | Miami | 37 | 88 | 96.15 |
| 2022-11-01 | TAMPA SUB OFFICE | Miami | 36 | 76 | 92.59 |
| 2022-10-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-05-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 32 | 51 | 89.39 |
| 2022-07-01 | TAMPA SUB OFFICE | Miami | 35 | 76 | 90.28 |
| 2022-06-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-12-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2025-03-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |

| 2022-08-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2024-11-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2023-04-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2022-07-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-04-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2023-03-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2024-08-01 | JACKSONVILLE CO-LO OFFICE | Miami | 7 | 12 | 4.19 |
| 2022-11-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2023-05-01 | ORLANDO CO-LO OFFICE | Miami | 31 | 85 | 100.00 |
| 2023-10-01 | ORLANDO CO-LO OFFICE | Miami | 29 | 80 | 100.00 |
| 2024-04-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 65 | 100.00 |
| 2022-10-01 | MIRAMAR ERO OFFICE | Miami | 100 | 252 | 100.00 |
| 2023-04-01 | ORLANDO CO-LO OFFICE | Miami | 29 | 74 | 100.00 |
| 2023-09-01 | MIRAMAR ERO OFFICE | Miami | 100 | 251 | 100.00 |
| 2024-02-01 | ORLANDO CO-LO OFFICE | Miami | 31 | 52 | 100.00 |
| 2022-09-01 | MIRAMAR ERO OFFICE | Miami | 105 | 265 | 100.00 |
| 2022-12-01 | JACKSONVILLE CO-LO OFFICE | Miami | 25 | 67 | 100.00 |
| 2023-03-01 | ORLANDO CO-LO OFFICE | Miami | 35 | 82 | 100.00 |
| 2023-08-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 64 | 100.00 |

**A294**

| | | | | | |
|---|---|---|---|---|---|
| 2024-01-01 | MIRAMAR ERO OFFICE | Miami | 105 | 249 | 100.00 |
| 2022-11-01 | ORLANDO CO-LO OFFICE | Miami | 42 | 93 | 100.00 |
| 2023-02-01 | ORLANDO CO-LO OFFICE | Miami | 31 | 76 | 100.00 |
| 2023-06-01 | ORLANDO CO-LO OFFICE | Miami | 29 | 71 | 100.00 |
| 2023-12-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 67 | 100.00 |
| 2024-06-01 | JACKSONVILLE CO-LO OFFICE | Miami | 22 | 46 | 100.00 |
| 2022-06-01 | ORLANDO CO-LO OFFICE | Miami | 55 | 122 | 88.94 |
| 2022-05-01 | TAMPA SUB OFFICE | Miami | 43 | 98 | 97.73 |
| 2022-10-01 | TAMPA SUB OFFICE | Miami | 33 | 79 | 92.59 |
| 2022-09-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-04-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 18 | 36 | 77.14 |
| 2022-05-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2023-02-01 | TAMPA SUB OFFICE | Miami | 34 | 68 | 89.47 |
| 2023-01-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2025-02-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2022-07-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2024-10-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2023-03-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2022-11-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-02-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-10-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-04-01 | JACKSONVILLE CO-LO OFFICE | Miami | 21 | 52 | 100.00 |
| 2023-09-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 49 | 100.00 |
| 2024-02-01 | MIRAMAR ERO OFFICE | Miami | 100 | 231 | 100.00 |
| 2022-09-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 67 | 100.00 |
| 2023-03-01 | MIRAMAR ERO OFFICE | Miami | 115 | 268 | 100.00 |
| 2023-07-01 | ORLANDO CO-LO OFFICE | Miami | 26 | 64 | 100.00 |
| 2024-01-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 52 | 100.00 |
| 2022-06-01 | MIRAMAR ERO OFFICE | Miami | 109 | 306 | 100.00 |
| 2022-11-01 | MIRAMAR ERO OFFICE | Miami | 98 | 242 | 100.00 |
| 2023-02-01 | MIRAMAR ERO OFFICE | Miami | 95 | 226 | 100.00 |
| 2022-09-01 | ORLANDO CO-LO OFFICE | Miami | 45 | 99 | 86.19 |
| 2023-06-01 | MIRAMAR ERO OFFICE | Miami | 104 | 252 | 100.00 |
| 2023-11-01 | ORLANDO CO-LO OFFICE | Miami | 28 | 57 | 100.00 |
| 2024-05-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 57 | 100.00 |
| 2023-01-01 | ORLANDO CO-LO OFFICE | Miami | 44 | 95 | 100.00 |
| 2022-05-01 | ORLANDO CO-LO OFFICE | Miami | 48 | 106 | 86.11 |
| 2023-05-01 | MIRAMAR ERO OFFICE | Miami | 111 | 248 | 100.00 |
| 2023-10-01 | MIRAMAR ERO OFFICE | Miami | 105 | 233 | 100.00 |
| 2024-03-01 | ORLANDO CO-LO OFFICE | Miami | 27 | 48 | 100.00 |
| 2022-07-01 | MIRAMAR ERO OFFICE | Miami | 100 | 272 | 100.00 |

| 2022-10-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 58 | 100.00 |
|---|---|---|---|---|---|
| 2023-04-01 | MIRAMAR ERO OFFICE | Miami | 100 | 213 | 100.00 |
| 2022-04-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2023-04-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2023-01-01 | TAMPA SUB OFFICE | Miami | 42 | 75 | 93.52 |
| 2022-12-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-04-01 | TAMPA SUB OFFICE | Miami | 40 | 93 | 94.74 |
| 2022-09-01 | TAMPA SUB OFFICE | Miami | 38 | 80 | 91.23 |
| 2022-08-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2024-09-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2023-02-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2022-10-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2025-01-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2023-01-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-09-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-04-01 | MIRAMAR ERO OFFICE | Miami | 101 | 231 | 100.00 |
| 2022-06-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-05-01 | JACKSONVILLE CO-LO OFFICE | Miami | 33 | 90 | 100.00 |
| 2023-07-01 | MIRAMAR ERO OFFICE | Miami | 100 | 227 | 100.00 |
| 2023-12-01 | ORLANDO CO-LO OFFICE | Miami | 21 | 48 | 100.00 |

**A297**

| 2022-08-01 | MIRAMAR ERO OFFICE | Miami | 115 | 311 | 100.00 |
|---|---|---|---|---|---|
| 2022-11-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 60 | 100.00 |
| 2023-02-01 | JACKSONVILLE CO-LO OFFICE | Miami | 22 | 65 | 100.00 |
| 2022-08-01 | ORLANDO CO-LO OFFICE | Miami | 51 | 109 | 98.75 |
| 2023-06-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 50 | 100.00 |
| 2023-11-01 | MIRAMAR ERO OFFICE | Miami | 105 | 283 | 100.00 |
| 2024-04-01 | ORLANDO CO-LO OFFICE | Miami | 8 | 12 | 100.00 |
| 2023-01-01 | MIRAMAR ERO OFFICE | Miami | 100 | 231 | 100.00 |
| 2022-04-01 | ORLANDO CO-LO OFFICE | Miami | 40 | 95 | 97.04 |
| 2023-05-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 61 | 100.00 |
| 2023-10-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 66 | 100.00 |
| 2024-03-01 | MIRAMAR ERO OFFICE | Miami | 106 | 221 | 100.00 |
| 2022-07-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 69 | 100.00 |
| 2022-12-01 | ORLANDO CO-LO OFFICE | Miami | 46 | 94 | 100.00 |
| 2023-04-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 53 | 100.00 |
| 2023-08-01 | ORLANDO CO-LO OFFICE | Miami | 36 | 90 | 100.00 |
| 2024-02-01 | JACKSONVILLE CO-LO OFFICE | Miami | 22 | 49 | 100.00 |
| 2023-03-01 | JACKSONVILLE CO-LO OFFICE | Miami | 30 | 73 | 100.00 |
| 2023-04-01 | TAMPA SUB OFFICE | Miami | 7 | 15 | 83.33 |
| 2023-03-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-12-01 | TAMPA SUB OFFICE | Miami | 39 | 81 | 92.98 |
| 2022-11-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-06-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 8 | 15 | 25.56 |
| 2022-08-01 | TAMPA SUB OFFICE | Miami | 42 | 89 | 94.93 |
| 2022-07-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2023-01-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2025-04-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2022-09-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2024-12-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2022-08-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-05-01 | MIRAMAR ERO OFFICE | Miami | 115 | 310 | 100.00 |
| 2022-05-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2023-04-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-12-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-06-01 | JACKSONVILLE CO-LO OFFICE | Miami | 25 | 70 | 100.00 |
| 2023-11-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 48 | 100.00 |
| 2024-04-01 | MIRAMAR ERO OFFICE | Miami | 25 | 46 | 100.00 |
| 2022-10-01 | ORLANDO CO-LO OFFICE | Miami | 42 | 80 | 100.00 |
| 2023-01-01 | JACKSONVILLE CO-LO OFFICE | Miami | 22 | 55 | 100.00 |
| 2023-09-01 | ORLANDO CO-LO OFFICE | Miami | 31 | 77 | 100.00 |

| 2024-03-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 54 | 100.00 |
|---|---|---|---|---|---|
| 2022-12-01 | MIRAMAR ERO OFFICE | Miami | 109 | 259 | 100.00 |
| 2023-08-01 | MIRAMAR ERO OFFICE | Miami | 115 | 268 | 100.00 |
| 2024-01-01 | ORLANDO CO-LO OFFICE | Miami | 31 | 56 | 100.00 |
| 2023-07-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 67 | 100.00 |
| 2023-12-01 | MIRAMAR ERO OFFICE | Miami | 100 | 251 | 100.00 |
| 2024-07-01 | JACKSONVILLE CO-LO OFFICE | Miami | 28 | 50 | 100.00 |
| 2022-08-01 | JACKSONVILLE CO-LO OFFICE | Miami | 28 | 80 | 100.00 |
| 2022-07-01 | ORLANDO CO-LO OFFICE | Miami | 46 | 99 | 98.82 |
| 2023-04-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2022-10-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2022-10-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 0 | 0 | 0.00 |
| 2022-07-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 60 | 169 | 100.00 |
| 2023-03-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 1 | 1 | 0.19 |
| 2022-08-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 1 | 1 | 0.19 |
| 2022-06-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 63 | 168 | 100.00 |
| 2022-04-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 227 | 550 | 68.04 |
| 2022-09-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2022-09-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 0 | 0 | 0.00 |
| 2022-04-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 51 | 131 | 100.00 |
| 2023-02-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2022-07-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 2 | 5 | 0.70 |
| 2023-03-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 1 | 2 | 0.58 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-01-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 1 | 1 | 0.20 |
| 2022-05-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 63 | 173 | 100.00 |
| 2023-01-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 2 | 5 | 1.55 |
| 2022-12-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2023-04-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 0 | 0 | 0.00 |
| 2022-12-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 2 | 3 | 0.47 |
| 2022-06-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 21 | 46 | 6.14 |
| 2022-08-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 45 | 129 | 40.85 |
| 2022-11-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2023-02-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 0 | 0 | 0.00 |
| 2022-11-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 2 | 4 | 0.60 |
| 2022-05-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 223 | 663 | 76.64 |
| 2023-10-01 | HOUSTON FIELD OFFICE | Houston | 39 | 96 | 7.91 |
| 2023-06-01 | HOUSTON FIELD OFFICE | Houston | 37 | 102 | 7.68 |
| 2022-04-01 | HOUSTON FIELD OFFICE | Houston | 134 | 286 | 81.13 |
| 2022-06-01 | HOUSTON FIELD OFFICE | Houston | 85 | 244 | 100.00 |
| 2024-02-01 | HOUSTON FIELD OFFICE | Houston | 39 | 117 | 8.38 |
| 2023-01-01 | HOUSTON FIELD OFFICE | Houston | 80 | 183 | 100.00 |
| 2022-08-01 | HOUSTON FIELD OFFICE | Houston | 95 | 243 | 100.00 |
| 2024-04-01 | HOUSTON FIELD OFFICE | Houston | 0 | 0 | 0.00 |
| 2023-05-01 | HOUSTON FIELD OFFICE | Houston | 44 | 107 | 7.12 |
| 2024-01-01 | HOUSTON FIELD OFFICE | Houston | 43 | 123 | 7.60 |
| 2023-09-01 | HOUSTON FIELD OFFICE | Houston | 36 | 95 | 6.94 |

| 2022-12-01 | HOUSTON FIELD OFFICE | Houston | 80 | 183 | 100.00 |
|---|---|---|---|---|---|
| 2023-12-01 | HOUSTON FIELD OFFICE | Houston | 35 | 99 | 7.17 |
| 2023-08-01 | HOUSTON FIELD OFFICE | Houston | 45 | 114 | 6.20 |
| 2023-04-01 | HOUSTON FIELD OFFICE | Houston | 35 | 91 | 7.11 |
| 2022-10-01 | HOUSTON FIELD OFFICE | Houston | 81 | 190 | 100.00 |
| 2022-09-01 | HOUSTON FIELD OFFICE | Houston | 80 | 205 | 100.00 |
| 2023-11-01 | HOUSTON FIELD OFFICE | Houston | 39 | 95 | 7.88 |
| 2022-05-01 | HOUSTON FIELD OFFICE | Houston | 88 | 247 | 100.00 |
| 2023-07-01 | HOUSTON FIELD OFFICE | Houston | 32 | 94 | 5.26 |
| 2023-03-01 | HOUSTON FIELD OFFICE | Houston | 56 | 110 | 10.31 |
| 2024-03-01 | HOUSTON FIELD OFFICE | Houston | 2 | 5 | 0.43 |
| 2022-07-01 | HOUSTON FIELD OFFICE | Houston | 75 | 171 | 100.00 |
| 2022-11-01 | HOUSTON FIELD OFFICE | Houston | 85 | 195 | 100.00 |
| 2023-02-01 | HOUSTON FIELD OFFICE | Houston | 75 | 159 | 100.00 |
| 2022-10-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2023-07-01 | ATLANTA FEDERAL OFFICE | Atlanta | 18 | 50 | 90.91 |
| 2023-03-01 | ATLANTA FEDERAL OFFICE | Atlanta | 22 | 61 | 84.48 |
| 2024-03-01 | ATLANTA FEDERAL OFFICE | Atlanta | 12 | 33 | 75.00 |
| 2024-01-01 | CHARLOTTE ERO OFFICE | Atlanta | 1 | 2 | 0.99 |
| 2022-10-01 | ATLANTA FEDERAL OFFICE | Atlanta | 26 | 59 | 98.33 |
| 2022-09-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 1 | 3 | 1.79 |
| 2023-02-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-05-01 | ATLANTA FEDERAL OFFICE | Atlanta | 32 | 87 | 85.55 |

**A302**

| 2023-11-01 | ATLANTA FEDERAL OFFICE | Atlanta | 23 | 53 | 88.46 |
| 2022-05-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 51 | 140 | 96.67 |
| 2024-04-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-06-01 | ATLANTA FEDERAL OFFICE | Atlanta | 31 | 73 | 100.00 |
| 2023-11-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2023-10-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-11-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 58 | 100.00 |
| 2023-02-01 | CHARLOTTE ERO OFFICE | Atlanta | 24 | 67 | 100.00 |
| 2023-02-01 | ATLANTA FEDERAL OFFICE | Atlanta | 19 | 51 | 82.26 |
| 2024-02-01 | ATLANTA FEDERAL OFFICE | Atlanta | 15 | 38 | 81.71 |
| 2023-07-01 | CHARLOTTE ERO OFFICE | Atlanta | 17 | 37 | 33.02 |
| 2022-09-01 | ATLANTA FEDERAL OFFICE | Atlanta | 33 | 87 | 80.77 |
| 2022-08-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 56 | 144 | 91.88 |
| 2023-01-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-04-01 | ATLANTA FEDERAL OFFICE | Atlanta | 29 | 75 | 98.74 |
| 2023-10-01 | ATLANTA FEDERAL OFFICE | Atlanta | 23 | 52 | 86.92 |
| 2022-04-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 38 | 115 | 83.94 |
| 2023-06-01 | ATLANTA FEDERAL OFFICE | Atlanta | 25 | 64 | 98.11 |
| 2023-09-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2024-03-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-07-01 | CHARLOTTE ERO OFFICE | Atlanta | 24 | 64 | 100.00 |
| 2022-08-01 | CHARLOTTE ERO OFFICE | Atlanta | 28 | 74 | 100.00 |
| 2022-11-01 | ATLANTA FEDERAL OFFICE | Atlanta | 25 | 65 | 100.00 |

| 2023-01-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 73 | 100.00 |
| 2023-04-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-08-01 | ATLANTA FEDERAL OFFICE | Atlanta | 36 | 90 | 94.83 |
| 2022-07-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 56 | 133 | 97.32 |
| 2022-12-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2023-09-01 | ATLANTA FEDERAL OFFICE | Atlanta | 18 | 53 | 89.17 |
| 2023-05-01 | ATLANTA FEDERAL OFFICE | Atlanta | 23 | 65 | 91.38 |
| 2023-01-01 | ATLANTA FEDERAL OFFICE | Atlanta | 22 | 60 | 92.31 |
| 2024-01-01 | ATLANTA FEDERAL OFFICE | Atlanta | 20 | 44 | 93.10 |
| 2023-08-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2024-02-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-12-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 55 | 100.00 |
| 2024-04-01 | ATLANTA FEDERAL OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-11-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2023-08-01 | ATLANTA FEDERAL OFFICE | Atlanta | 26 | 73 | 97.33 |
| 2023-04-01 | ATLANTA FEDERAL OFFICE | Atlanta | 19 | 51 | 85.00 |
| 2022-12-01 | ATLANTA FEDERAL OFFICE | Atlanta | 23 | 59 | 90.77 |
| 2023-03-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-07-01 | ATLANTA FEDERAL OFFICE | Atlanta | 25 | 69 | 95.83 |
| 2023-12-01 | ATLANTA FEDERAL OFFICE | Atlanta | 18 | 43 | 84.03 |
| 2022-06-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 53 | 140 | 96.67 |
| 2022-06-01 | CHARLOTTE ERO OFFICE | Atlanta | 28 | 68 | 100.00 |
| 2023-12-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |

| 2022-04-01 | CHARLOTTE ERO OFFICE | Atlanta | 30 | 80 | 100.00 |
| 2022-05-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 64 | 100.00 |
| 2023-06-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 67 | 100.00 |
| 2023-05-01 | CHARLOTTE ERO OFFICE | Atlanta | 29 | 81 | 100.00 |
| 2022-10-01 | CHARLOTTE ERO OFFICE | Atlanta | 24 | 55 | 100.00 |
| 2023-04-01 | CHARLOTTE ERO OFFICE | Atlanta | 24 | 57 | 100.00 |
| 2022-09-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 68 | 100.00 |
| 2023-03-01 | CHARLOTTE ERO OFFICE | Atlanta | 28 | 55 | 100.00 |
| 2022-05-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |

| 2022-10-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-07-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | CRAIG OFFICE | Denver | 1 | 2 | 5.88 |
| 2022-12-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |

| Date | Office | Location | | | |
|------|--------|----------|---|---|---|
| 2022-08-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | FLORENCE OFFICE | Denver | 1 | 1 | 0.70 |
| 2022-06-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 1 | 1 | 0.53 |

**A307**

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | ERO - FREDERICK CO OFFICE | Denver | 1 | 2 | 7.14 |
| 2022-07-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-05-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 5 | 7 | 3.47 |
| 2023-02-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-08-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | BATON ROUGE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | BATON ROUGE RAC OFFICE | New Orleans | 1 | 4 | 20.00 |

**A310**

| | | | | | |
|---|---|---|---|---|---|
| 2022-06-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | BATON ROUGE RAC OFFICE | New Orleans | 17 | 33 | 54.35 |
| 2022-12-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | BOSSIER CITY | New Orleans | 4 | 13 | 3.13 |
| 2022-06-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | LAFAYETTE RAC OFFICE | New Orleans | 7 | 14 | 100.00 |
| 2022-04-01 | FORT SMITH RAC OFFICE | New Orleans | 2 | 4 | 13.16 |
| 2022-05-01 | MONTGOMERY ERO OFFICE | New Orleans | 1 | 3 | 50.00 |
| 2023-04-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | FAYETTEVILLE ERO OFFICE | New Orleans | 4 | 11 | 100.00 |
| 2022-05-01 | GULFPORT RAC OFFICE | New Orleans | 6 | 11 | 100.00 |
| 2023-03-01 | GULFPORT RAC OFFICE | New Orleans | 4 | 10 | 20.00 |
| 2022-07-01 | LAFAYETTE RAC OFFICE | New Orleans | 7 | 14 | 50.00 |
| 2022-12-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | GULFPORT RAC OFFICE | New Orleans | 1 | 1 | 3.03 |
| 2022-09-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 16 | 37 | 20.31 |
| 2022-08-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-10-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 37 | 106 | 49.06 |
| 2022-06-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 20 | 16.67 |
| 2022-08-01 | NEW ORLEANS OFFICE | New Orleans | 19 | 45 | 18.63 |
| 2022-11-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | GULFPORT RAC OFFICE | New Orleans | 4 | 6 | 100.00 |
| 2022-12-01 | NASHVILLE SAC OFFICE | New Orleans | 14 | 33 | 76.67 |
| 2024-04-01 | NASHVILLE SAC OFFICE | New Orleans | 2 | 8 | 83.33 |
| 2023-02-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | NASHVILLE SAC OFFICE | New Orleans | 17 | 36 | 67.95 |
| 2023-12-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 21 | 20.83 |
| 2022-10-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | NASHVILLE SAC OFFICE | New Orleans | 38 | 92 | 80.92 |
| 2023-08-01 | NASHVILLE SAC OFFICE | New Orleans | 10 | 26 | 33.33 |
| 2022-12-01 | NEW ORLEANS OFFICE | New Orleans | 22 | 44 | 23.56 |
| 2023-04-01 | GULFPORT RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-02-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | BATON ROUGE RAC OFFICE | New Orleans | 1 | 1 | 51.02 |
| 2023-04-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | BATON ROUGE RAC OFFICE | New Orleans | 22 | 42 | 80.00 |
| 2023-04-01 | BATON ROUGE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | BATON ROUGE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | FAYETTEVILLE ERO OFFICE | New Orleans | 2 | 4 | 100.00 |
| 2023-01-01 | GULFPORT RAC OFFICE | New Orleans | 2 | 2 | 5.88 |
| 2023-03-01 | KNOXVILLE RAC OFFICE | New Orleans | 1 | 2 | 1.42 |
| 2022-12-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 1 | 2 | 1.42 |
| 2022-11-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | GULFPORT RAC OFFICE | New Orleans | 1 | 3 | 10.00 |

| 2022-10-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 1 | 1 | 2.29 |
| 2022-08-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 22 | 50 | 20.00 |
| 2022-07-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | NEW ORLEANS OFFICE | New Orleans | 166 | 309 | 100.00 |
| 2022-06-01 | GULFPORT RAC OFFICE | New Orleans | 6 | 9 | 100.00 |
| 2022-04-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 31 | 73 | 44.07 |
| 2023-04-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | LAFAYETTE RAC OFFICE | New Orleans | 11 | 16 | 100.00 |
| 2022-04-01 | MONTGOMERY ERO OFFICE | New Orleans | 4 | 10 | 55.56 |
| 2022-10-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | NASHVILLE SAC OFFICE | New Orleans | 14 | 30 | 83.33 |
| 2024-03-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 21 | 20.83 |
| 2023-01-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | NASHVILLE SAC OFFICE | New Orleans | 13 | 33 | 91.67 |
| 2023-11-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 24 | 33.33 |
| 2023-04-01 | NEW ORLEANS OFFICE | New Orleans | 1 | 1 | 31.25 |
| 2022-09-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-07-01 | NASHVILLE SAC OFFICE | New Orleans | 7 | 21 | 22.22 |
| 2022-11-01 | NEW ORLEANS OFFICE | New Orleans | 17 | 36 | 20.70 |
| 2022-05-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |

**A314**

| | | | | | |
|---|---|---|---|---|---|
| 2023-02-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 24 | 30.00 |
| 2022-07-01 | NEW ORLEANS OFFICE | New Orleans | 20 | 50 | 23.30 |
| 2023-01-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | BATON ROUGE RAC OFFICE | New Orleans | 24 | 48 | 83.61 |
| 2022-08-01 | BOSSIER CITY | New Orleans | 6 | 15 | 3.45 |
| 2023-03-01 | BATON ROUGE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | BATON ROUGE RAC OFFICE | New Orleans | 2 | 5 | 22.58 |
| 2022-10-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |

**A315**

| | | | | | |
|---|---|---|---|---|---|
| 2022-12-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | GULFPORT RAC OFFICE | New Orleans | 4 | 8 | 60.00 |
| 2022-05-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 3 | 4 | 7.58 |
| 2022-06-01 | LITTLE ROCK ERO OFFICE | New Orleans | 1 | 1 | 1.85 |
| 2022-07-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 25 | 70 | 39.34 |
| 2022-06-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | JACKSON RAC OFFICE | New Orleans | 2 | 6 | 100.00 |
| 2023-03-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 1 | 3 | 7.41 |
| 2022-10-01 | LAFAYETTE RAC OFFICE | New Orleans | 1 | 2 | 27.27 |
| 2023-01-01 | MOBILE RAC OFFICE | New Orleans | 2 | 2 | 25.00 |
| 2023-02-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | GULFPORT RAC OFFICE | New Orleans | 2 | 2 | 5.88 |
| 2022-05-01 | KNOXVILLE RAC OFFICE | New Orleans | 3 | 8 | 6.75 |
| 2022-11-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 15 | 38 | 14.21 |
| 2022-12-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | LAFAYETTE RAC OFFICE | New Orleans | 10 | 20 | 100.00 |
| 2022-06-01 | NASHVILLE SAC OFFICE | New Orleans | 18 | 41 | 95.16 |
| 2023-10-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 27 | 40.00 |

| 2023-02-01 | NEW ORLEANS OFFICE | New Orleans | 6 | 9 | 5.08 |
|---|---|---|---|---|---|
| 2022-08-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-06-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 26 | 36.67 |
| 2022-10-01 | NEW ORLEANS OFFICE | New Orleans | 18 | 38 | 21.48 |
| 2023-01-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 22 | 25.00 |
| 2022-06-01 | NEW ORLEANS OFFICE | New Orleans | 136 | 274 | 97.29 |
| 2022-09-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | GULFPORT RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | NASHVILLE SAC OFFICE | New Orleans | 16 | 29 | 87.50 |
| 2024-02-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 24 | 30.00 |
| 2023-04-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | BATON ROUGE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | BATON ROUGE RAC OFFICE | New Orleans | 1 | 1 | 60.98 |
| 2022-04-01 | CHATTANOOGA RAC OFFICE | New Orleans | 5 | 11 | 91.67 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-07-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | BATON ROUGE RAC OFFICE | New Orleans | 3 | 6 | 36.00 |
| 2023-01-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | BOSSIER CITY | New Orleans | 1 | 3 | 5.77 |
| 2022-05-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | NEW ORLEANS OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | GULFPORT RAC OFFICE | New Orleans | 6 | 9 | 100.00 |
| 2022-04-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 3 | 9 | 28.57 |
| 2022-08-01 | LAFAYETTE RAC OFFICE | New Orleans | 7 | 17 | 62.50 |
| 2022-04-01 | MOBILE RAC OFFICE | New Orleans | 2 | 3 | 9.43 |
| 2023-01-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | GULFPORT RAC OFFICE | New Orleans | 5 | 11 | 22.22 |
| 2022-04-01 | KNOXVILLE RAC OFFICE | New Orleans | 12 | 29 | 19.46 |
| 2022-10-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 12 | 29 | 12.24 |
| 2022-09-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 10 | 26 | 35.48 |

**A318**

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | LITTLE ROCK ERO OFFICE | New Orleans | 11 | 26 | 36.11 |
| 2022-06-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 36 | 90 | 47.37 |
| 2022-07-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-05-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 28 | 43.33 |
| 2022-09-01 | NEW ORLEANS OFFICE | New Orleans | 23 | 45 | 24.44 |
| 2022-12-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 23 | 26.67 |
| 2022-04-01 | NEW ORLEANS OFFICE | New Orleans | 122 | 232 | 93.06 |
| 2023-04-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | NASHVILLE SAC OFFICE | New Orleans | 18 | 35 | 67.95 |
| 2024-01-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 21 | 20.00 |
| 2022-11-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | NASHVILLE SAC OFFICE | New Orleans | 45 | 112 | 86.26 |
| 2023-09-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 23 | 29.17 |
| 2023-01-01 | NEW ORLEANS OFFICE | New Orleans | 20 | 35 | 21.48 |
| 2023-03-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | SPOKANE OFFICE | Seattle | 1 | 4 | 10.71 |
| 2022-07-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |

**A319**

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | RICHLAND OFFICE | Seattle | 1 | 1 | 0.97 |
| 2022-08-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |

| 2022-04-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-11-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | EUGENE OFFICE | Seattle | 1 | 5 | 100.00 |
| 2022-07-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | PORTLAND OFFICE | Seattle | 2 | 6 | 0.58 |
| 2022-09-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-02-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | SEATTLE FIELD OFFICE | Seattle | 12 | 24 | 8.20 |
| 2023-04-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 1 | 1 | 7.14 |
| 2022-12-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |

**A322**

| 2022-09-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2023-01-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 60 | 150 | 86.35 |
| 2022-05-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 124 | 330 | 96.99 |
| 2023-02-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-10-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-01-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 49 | 148 | 86.00 |
| 2022-06-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-03-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |

| 2023-03-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2023-02-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-10-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-06-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | SACRAMENTO SUB OFFICE | San Francisco | 1 | 1 | 0.59 |
| 2023-03-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2023-02-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-09-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-04-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 78 | 198 | 96.71 |
| 2023-01-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 11 | 28 | 44.30 |
| 2022-09-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 51 | 154 | 90.29 |
| 2022-05-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 74 | 172 | 93.21 |
| 2023-02-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-01-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |

| 2022-10-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-10-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-09-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-06-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-06-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-02-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2023-02-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-10-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2023-01-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-06-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-05-01 | SACRAMENTO SUB OFFICE | San Francisco | 8 | 8 | 6.50 |
| 2023-03-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 61 | 170 | 94.68 |
| 2022-05-01 | STOCKTON OFFICE | San Francisco | 3 | 6 | 46.88 |
| 2022-08-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 58 | 164 | 95.31 |
| 2022-04-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 54 | 134 | 80.80 |
| 2023-04-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-09-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |

**A325**

| 2022-05-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-04-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-01-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2023-01-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-09-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-09-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-05-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-04-01 | SACRAMENTO SUB OFFICE | San Francisco | 19 | 27 | 13.41 |
| 2023-01-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-10-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 57 | 149 | 82.51 |
| 2022-06-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 75 | 175 | 90.61 |
| 2023-03-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-02-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 46 | 139 | 86.06 |
| 2022-04-01 | STOCKTON OFFICE | San Francisco | 5 | 8 | 77.78 |
| 2022-07-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-03-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |

| 2022-12-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-05-01 | BAKERSFIELD OFFICE | San Francisco | 1 | 2 | 0.56 |
| 2022-12-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-04-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-04-01 | FRESNO OFFICE ERO | San Francisco | 3 | 3 | 0.76 |
| 2022-06-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2023-03-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-10-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | NEW YORK FIELD OFFICE | New York City | 1 | 1 | 0.11 |
| 2022-04-01 | NEW YORK FIELD OFFICE | New York City | 421 | 1217 | 70.28 |
| 2022-08-01 | NEW YORK FIELD OFFICE | New York City | 217 | 595 | 36.13 |
| 2023-04-01 | NEW YORK FIELD OFFICE | New York City | 0 | 0 | 0.00 |
| 2022-11-01 | NEW YORK FIELD OFFICE | New York City | 6 | 18 | 0.24 |
| 2022-07-01 | NEW YORK FIELD OFFICE | New York City | 195 | 533 | 34.33 |
| 2023-02-01 | NEW YORK FIELD OFFICE | New York City | 0 | 0 | 0.00 |
| 2022-06-01 | NEW YORK FIELD OFFICE | New York City | 292 | 831 | 47.14 |

| 2023-03-01 | NEW YORK FIELD OFFICE | New York City | 1 | 1 | 0.11 |
| 2022-10-01 | NEW YORK FIELD OFFICE | New York City | 166 | 424 | 91.70 |
| 2023-01-01 | NEW YORK FIELD OFFICE | New York City | 1 | 1 | 0.13 |
| 2022-09-01 | NEW YORK FIELD OFFICE | New York City | 164 | 461 | 36.72 |
| 2022-05-01 | NEW YORK FIELD OFFICE | New York City | 435 | 1251 | 58.12 |

| Capacity (%) Key: |
|---|
| Greater Than 75% |
| Between 50% and 75% |
| Between 25% and 50% |
| Less Than 25% |

| AOR | (All) |
|---|---|

| Capacity (%) | Column Labels | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Row Labels | 04-2022 | 05-2022 | 06-2022 | 07-2022 | 08-2022 | 09-2022 | 10-2022 | 11-2022 | 12-2022 | 01-2023 | 02-2023 | 03-2023 | 04-2023 |
| WICOMICO DETENTION FACILITY | 100 | 100 | 100 | 100 | 100 | 17.65 | 8.05 | 0 | 0 | 2.26 | 0 | 0 | 0 |
| MOUNT LAUREL NJ ERO/HSI | 100 | 100 | 100 | 100 | 40.85 | 0 | 0 | 0 | 0 | 1.55 | 0 | 0.58 | 0 |
| LAFAYETTE RAC OFFICE | 100 | 100 | 100 | 50 | 62.5 | 0 | 27.27 | 0 | 0 | 0 | 0 | 0 | 0 |
| BALTIMORE DISTRICT OFFICE | 100 | 100 | | | 97.79 | 77.87 | 57.92 | 54.06 | 59.55 | 6.16 | 1.19 | 0.96 | 0 |
| SCARBOROUGH ERO SUB OFFICE | 100 | 100 | 100 | 100 | 100 | 87.3 | 100 | 100 | 32.93 | 0 | 0 | 0 | 0 |
| CHARLOTTE ERO OFFICE | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| JACKSONVILLE CO-LO OFFICE | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| DALLAS FIELD OFFICE | 100 | 100 | 100 | 14.54 | 0.58 | 0.69 | 0.67 | 0.25 | 0.28 | 0.25 | 0.33 | 0.07 | 0 |
| MIRAMAR ERO OFFICE | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| EUGENE OFFICE | 100 | | | | | | | | | | | | |
| SAN ANTONIO ERO RESIDENT OFFICE | 100 | 54.24 | 1.41 | 1.48 | 0 | 2.33 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| FAYETTEVILLE ERO OFFICE | 100 | 100 | | | | | | | | | | | |
| SYRACUSE OFFICE | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GULFPORT RAC OFFICE | 100 | 100 | 100 | 100 | 60 | 10 | 3.03 | 22.22 | 5.88 | 5.88 | 0 | 20 | 0 |
| JACKSON RAC OFFICE | 100 | | | | | | | | | | | | |
| LOS ANGELES FIELD OFFICE | 100 | 100 | 48.26 | 0.22 | 0.24 | 0 | 0.17 | 0 | 0 | 0 | 0 | 0 | 0 |
| CHICAGO FIELD OFFICE | 98.82 | 98.05 | 97.19 | 97.06 | 88.95 | 92.5 | 83.82 | 85.63 | 83.82 | 98.21 | 88.89 | 67.31 | 0 |
| ATLANTA FEDERAL OFFICE | 98.74 | 85.55 | 100 | 95.83 | 94.83 | 80.77 | 98.33 | 100 | 90.77 | 92.31 | 82.26 | 84.48 | 85 |
| SAXON BUILDING | 97.24 | 58.37 | 11.3 | 2.09 | 0 | 0 | 0 | 0 | 2.37 | 0 | 0 | 0 | 0 |
| ORLANDO CO-LO OFFICE | 97.04 | 86.11 | 88.94 | 98.82 | 98.75 | 86.19 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| SAN FRANCISCO FIELD OFFICE | 96.71 | 96.99 | 90.61 | 80.8 | 93.21 | 86.35 | 82.51 | 95.31 | 90.29 | 86 | 86.06 | 94.68 | 44.3 |
| ERO/HSI INDIANAPOLIS OFFICE | 96.69 | 97.22 | 93.6 | 85.83 | 85.94 | 89.06 | 89.06 | 88.39 | 89.06 | 93.75 | 86.67 | 58.33 | 0 |
| WASHINGTON FIELD OFFICE | 96.44 | 83.78 | 61.39 | 0 | 0 | 1.42 | 0 | 2.18 | 0 | 0 | 0 | 0 | 0 |
| LAS VEGAS HSI, ERO AND OPLA | 95.16 | 8.11 | 3.32 | 0 | 3.39 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TAMPA SUB OFFICE | 94.74 | 97.73 | 96.15 | 90.28 | 94.93 | 91.23 | 92.59 | 92.59 | 92.98 | 93.52 | 89.47 | 91.3 | 83.33 |
| NEW ORLEANS OFFICE | 93.06 | 100 | 97.29 | 23.3 | 18.63 | 24.44 | 21.48 | 20.7 | 23.56 | 21.48 | 5.08 | 0 | 31.25 |
| CHATTANOOGA RAC OFFICE | 91.67 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ERO - KANSAS CITY FIELD OFFICE | 88.43 | 93.65 | 87.5 | 60.87 | 66.88 | 1.79 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| WEST VALLEY CITY OFFICE | 88.09 | 36.33 | 10.64 | 12.89 | 9.94 | 0 | 0 | 0 | 4.73 | 0 | 0 | 0 | 0 |
| WESTERVILLE CO-LO OFFICE | 84.87 | 68.6 | 52.94 | 74.44 | 48.78 | 7.96 | 2.04 | 0 | 0 | 1.89 | 0 | 0 | 0 |
| BLUE ASH BUILDING | 84.52 | 86.72 | 42.86 | 3.33 | 0 | 0 | 0 | 0 | 4.38 | 0 | 0 | 0 | 0 |
| CHARLESTON ERO/HSI OFFICE | 83.94 | 96.67 | 96.67 | 97.32 | 91.88 | 1.79 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BATON ROUGE RAC OFFICE | 83.61 | 80 | 54.35 | 36 | 22.58 | 51.02 | 0 | 0 | 0 | 20 | 60.98 | 0 | 0 |
| SAINT PAUL ICE OFFICE | 82.14 | 93.04 | 95.21 | 86.86 | 87.97 | 96.15 | 93.75 | 93.75 | 87.5 | 95.19 | 88.89 | 90 | 0 |
| HOUSTON FIELD OFFICE | 81.13 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 10.31 | 7.11 |
| NASHVILLE SAC OFFICE | 80.92 | 86.26 | 95.16 | 91.67 | 67.95 | 67.95 | 87.5 | 83.33 | 76.67 | 26.67 | 25 | 30 | 16.67 |
| STOCKTON OFFICE | 77.78 | 46.88 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TALLAHASSEE OFFICE COMMMONWEALTH | 77.14 | 89.39 | 25.56 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DOVER OFFICE | 75.58 | 68.75 | 96.88 | 95.83 | 93.75 | 92.86 | 94.44 | 72.5 | 73.75 | 50.96 | 0 | 0 | 0 |
| SAINT LOUIS FILE CONTROL OFFICE | 73.08 | 15 | 18.18 | 9.72 | 11.76 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PHILADELPHIA OFFICE N 8TH ST. | 71.01 | 3.33 | 2.96 | 1.17 | 0 | 0 | 0 | 0 | 0 | 1.56 | 1.5 | 0 | 0 |
| NEW YORK FIELD OFFICE | 70.28 | 58.12 | 47.14 | 34.33 | 36.13 | 36.72 | 91.7 | 0.24 | 0.11 | 0.13 | 0 | 0.11 | 0 |
| PROVO OFFICE | 70.24 | 86.25 | 79.55 | 87.5 | 82.95 | 88.75 | 16.67 | 0 | 0 | 0 | 0 | 0 | 0 |
| PETER W. RODINO JR FEDERAL BLDG | 68.04 | 76.64 | 6.14 | 0.7 | 0.19 | 0 | 0 | 0.6 | 0.47 | 0.2 | 0 | 0.19 | 0 |
| ALBUQUERQUE OFFICE | 63.64 | 1.75 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MILWAUKEE FIELD OFFICE | 58.62 | 85.07 | 79.07 | 79.41 | 79.78 | 82.86 | 82.86 | 60 | 69.23 | 78.08 | 74.29 | 80.95 | 71.83 |
| MONTGOMERY ERO OFFICE | 55.56 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HARTFORD SUB OFFICE | 55.22 | 5.13 | 6.87 | 5.54 | 27.57 | 6.28 | 6.84 | 0.85 | 2.89 | 1.52 | 0 | 0 | 0 |
| LOUISVILLE FIELD OFFICE | 50 | 42.39 | 43.44 | 49.38 | 20.69 | 9.25 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GRAND FORKS ERO OFFICE | 50 | 40.63 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DES MOINES ICE OFFICE | 50 | 5.56 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MEMPHIS ERO OFFICE BUSINESS PARK | 44.07 | 49.06 | 47.37 | 39.34 | 20 | 20.31 | 12.24 | 14.21 | 1.42 | 0 | 0 | 0 | 0 |
| LITTLE ROCK ERO OFFICE | 36.11 | 0 | 1.85 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HOMEWOOD AL ERO/HSI OFFICE | 35.48 | 7.58 | 0 | 0 | 0 | 0 | 2.29 | 0 | 0 | 0 | 0 | 0 | 0 |
| HSI/ERO SPRINGFIELD MO OFFICE | 33.33 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ETOWAH ERO + 287G OFFICE | 28.57 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7.41 | 0 |
| BURLINGTON MA OFFICE | 20.23 | 0.45 | 0.28 | 0.67 | 0.22 | 0 | 0.17 | 0 | 0 | 0.5 | 0.16 | 0.79 | 0 |
| PITTSBURGH SUB OFFICE | 20 | 0 | 2.68 | 0 | 0 | 0 | 0 | 0 | 0 | 1.92 | 0 | 0 | 0 |
| NORTH PLATTE OFFICE | 20 | 2.33 | 0 | 0 | 1.84 | 4 | 6.67 | 0.62 | 0.59 | 0.62 | 1.94 | 3.03 | 33.33 |
| KNOXVILLE RAC OFFICE | 19.46 | 6.75 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1.42 | 0 |
| OGDEN QUICK RESPONSE TEAM | 18.46 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| RICHMOND VA, HQ COOP OFFICE | 16.67 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CLEVELAND OFFICE | 15.85 | 3.85 | 3.57 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MIDLAND ERO OFFICE | 14.88 | 3.18 | 1.12 | 5.31 | 2.16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| OMAHA FIELD OFFICE | 14.29 | 0 | 0 | 0 | 2.7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SACRAMENTO SUB OFFICE | 13.41 | 6.5 | 0 | 0 | 0 | 0 | 0 | 0 | 0.59 | 0 | 0 | 0 | 0 |
| FORT SMITH RAC OFFICE | 13.16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| WICHITA ICE OFFICE | 12.5 | 0 | 1.19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NORFOLK ASAC OFFICE | 12.12 | 0.98 | 1.47 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SIOUX CITY ERO BUILDING | 11.11 | 8.57 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SPOKANE OFFICE | 10.71 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| RENO OFFICE | 10.34 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| OKLAHOMA CITY - ERO | 10.05 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.64 | 0 |
| MOBILE RAC OFFICE | 9.43 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25 | 0 | 0 | 0 |
| CEDAR RAPIDS IA RAC OFFICE | 8.33 | 25 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SEATTLE FIELD OFFICE | 8.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MANCHESTER ICE | 7.22 | 0 | 0 | 0 | 0 | 0 | 1.85 | 0 | 0 | 0 | 0 | 0 | 0 |
| ERO - FREDERICK CO OFFICE | 7.14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| WENATCHEE INVESTIGATIONS OFFICE | 7.14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TUCSON OFFICE | 6.67 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| YORK ERO FIELD OFFICE | 6.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| Row Labels | 05-2023 | 06-2023 | 07-2023 | 08-2023 | 09-2023 | 10-2023 | 11-2023 | 12-2023 | 01-2024 | 02-2024 | 03-2024 | 04-2024 | 05-2024 | 06-2024 | 07-2024 | 08-2024 | 09-2024 | 10-2024 | 11-2024 | 12-2024 | 01-2025 | 02-2025 | 03-2025 | 04-2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WICOMICO DETENTION FACILITY | 0 | 0 | 0 | 3.38 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | | | | | |
| CHARLOTTE ERO OFFICE | 100 | 100 | 33.02 | 0 | 0 | 0 | 0 | 0 | 0.99 | 0 | 0 | 0 | | | | | | | | | | | | |
| JACKSONVILLE CO-LO OFFICE | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 4.19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MIRAMAR ERO OFFICE | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | | | | | | | | | | | | |
| ATLANTA FEDERAL OFFICE | 91.38 | 98.11 | 90.91 | 97.33 | 89.17 | 86.92 | 88.46 | 84.03 | 93.1 | 81.71 | 75 | 0 | | | | | | | | | | | | |
| ORLANDO CO-LO OFFICE | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | | | | | | | | | | | | |
| HOUSTON FIELD OFFICE | 7.12 | 7.68 | 5.26 | 6.2 | 6.94 | 7.91 | 7.88 | 7.17 | 7.6 | 8.38 | 0.43 | 0 | | | | | | | | | | | | |
| NASHVILLE SAC OFFICE | 43.33 | 36.67 | 22.22 | 33.33 | 29.17 | 40 | 33.33 | 20.83 | 20 | 30 | 20.83 | 83.33 | | | | | | | | | | | | |
| MILWAUKEE FIELD OFFICE | 77.27 | 72.22 | 78.49 | 55.56 | 43.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | | | | | |

(All other rows have no values in the 05-2023 to 04-2025 columns.)

| Office | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BUFFALO FIELD OFFICE CO-LO SITE | 6.05 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CRAIG OFFICE | 5.88 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BOISE FIELD OFFICE | 5.13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HELENA FIELD OFFICE | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DETROIT FIELD OFFICE | 4.16 | 3.24 | 0.29 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HARLINGEN FIELD OFFICE | 3.95 | 0 | 0.46 | 0 | 1.37 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GRAND ISLAND ERO/HSI OFFICE | 3.8 | 6.91 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DENVER FOD AND CHIEF COUNSEL OFFICE | 3.47 | 0.53 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BOSSIER CITY | 3.13 | 5.77 | 0 | 3.45 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ICE COLOCATION EL PASO | 3.11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CORTEZ CIRCLE OFFICE | 3.03 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TWIN FALLS FIELD ERO | 2.88 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LATHAM OFFICE | 2.42 | 0 | 0 | 0 | 4.17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SANTA ANA OFFICE | 2.39 | 0.94 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SAN BERNARDINO OFFICE | 2.39 | 0.24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| RICHLAND OFFICE | 0.97 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| FRESNO OFFICE ERO | 0.76 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PHOENIX FIELD OFFICE | 0.7 | 0.13 | 0.18 | 0 | 0.13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| FLORENCE OFFICE | 0.7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PIKE COUNTY PRISON DETENTION CENTER | 0.6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PORTLAND OFFICE | 0.58 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CHARLESTON FIELD OFFICE | 0.49 | 1.18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SAN DIEGO DISTRICT FIELD OFFICE | 0.2 | 0.19 | 0 | 0 | 0.06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ALAMOSA OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TAMUNING OFFICE GUAM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DURANGO OFFICE ERO | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ROSWELL, NM ERO | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IDAHO FALLS ICE OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ANCHORAGE OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BAKERSFIELD OFFICE | 0 | 0.56 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SIOUX FALLS ICE OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IMPERIAL OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MEDFORD OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CASPER SUB-OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ST. ALBANS OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| RAPID CITY ICE OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SAN PATRICIO OFFICE CENTER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ST. GEORGE OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DEPORTATION PROCESSING CENTER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GRAND JUNCTION RESIDENT AGENT IN CHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CHAMPLAIN ERO OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| YAKIMA OFFICE - ERO | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GLENWOOD SPRING QUICK RESPONSE TEAM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ERO PROCESSING CENTER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HONOLULU FIELD OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**A330**





**From:**
**To:** ███████████
**Cc:**
**Subject:** FW: Op Horizon OT update
**Date:** Monday, April 25, 2022 3:18:00 PM

See below for Op Horizon employee count and $ spent.

**From:** ████████████████ @ice.dhs.gov>
**Sent:** Friday, April 22, 2022 3:07 PM
**To:** ██████████████████████ @ice.dhs.gov>; ████████████
████████████ @ice.dhs.gov>
**Cc:** ██████████████████ @ice.dhs.gov>; ████████████████████ @ice.dhs.gov>;
████████████████████████████ @ice.dhs.gov>; ████████████████
████████████████ @ice.dhs.gov>; ████████████████████████ @ice.dhs.gov>; ████████████████
████████████ @ice.dhs.gov>; ████████████████████████ @ice.dhs.gov>; ████████████████
████████████ @ice.dhs.gov>; ████████████████████████ @ice.dhs.gov>
**Subject:** RE: Op Horizon OT update

████████████████ the total is $15,394,778 for YTD ATD OT expenses related to Operation Horizon.
██████████████████████████████████████████████████████████
████████

Based on the revised OT and NTA totals the cost per is listed in the table below.

| Operation Horizon | |
|---|---|
| | |
| OT Cost | $15,394,778.00 |
| NTAs issued | 72,132 |
| Cost per NTA | $213.43 |

**From:** ██████████████████████████ @ice.dhs.gov>
**Sent:** Friday, April 22, 2022 11:04 AM
**To:** ████████████████████ @ice.dhs.gov>
**Cc:** ██████████████████ @ice.dhs.gov>; ████████████████████████ @ice.dhs.gov>;
████████████████████ @ice.dhs.gov>; ████████████████████████ @ice.dhs.gov>;
████████████████████████ @ice.dhs.gov>; ████████████████████ @ice.dhs.gov>; ████████
████████████████ @ice.dhs.gov>; ████████████████████████ @ice.dhs.gov>
**Subject:** RE: Op Horizon OT update

Thanks!

**From:** ████████████████████ @ice.dhs.gov>

**Sent:** Friday, April 22, 2022 10:58 AM
**To:** ███████████████████████ @ice.dhs.gov>
**Cc:** ███████████████ @ice.dhs.gov>; █████████████████████ @ice.dhs.gov>;
███████████████ @ice.dhs.gov>; █████████████████ @ice.dhs.gov>;
███████████████████ @ice.dhs.gov>; ████████████████ @ice.dhs.gov>; Billings,
█████████████ @ice.dhs.gov>; ████████████████████ @ice.dhs.gov>
**Subject:** FW: Op Horizon OT update

████ ,

█████████████████████ The total number of NTAs was 72,132 NTAs, based on an
average of 2,500 ICE employees per Phase.

Let me know if you need anything else.

---

**From:** ███████████████████ @ice.dhs.gov>
**Date:** Friday, Apr 22, 2022, 8:00 AM
**To:** ██████████████ @ice.dhs.gov>, █████████████████ @ice.dhs.gov>
**Cc:** ███████████ @ice.dhs.gov>, ████████████████ @ice.dhs.gov>,
███████████████ @ice.dhs.gov>, ████████████████ @ice.dhs.gov>, ████████
███████████ @ice.dhs.gov>, ████████████████ @ice.dhs.gov>
**Subject:** RE: Op Horizon OT update

We had 2,520 ICE volunteers who participated OH1.  2,700 DHS employees: 2,663 ICE personnel
who participated in OH2.   The volunteers only worked on this effort via OT, which  is  $19,952,680
for FY22.

I'm adding ████ who can get us the number of charging docs/NTAs issued as part of OH total.

████████████████████████████████████

---

**From:** ████████████████ @ice.dhs.gov>
**Sent:** Friday, April 22, 2022 9:52 AM
**To:** ████████████████ @ice.dhs.gov>; ███████████
████████████ @ice.dhs.gov>
**Cc:** ████████████████ @ice.dhs.gov>; ████████████████ @ice.dhs.gov>;
███████████████ @ice.dhs.gov>; ████████████████ @ice.dhs.gov>; ████
████████████ @ice.dhs.gov>
**Subject:** RE: Op Horizon OT update

████████████████████████████████████
███████████████████████████████
████████████████████████████████████
███████████████████████

| FY14 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 663 | 67.4% |
| Failure Rate | 321 | 32.6% |
| Absconder Rate* | 308 | 31.3% |
| **Total Terminations** | **984** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY19 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 41,853 | 71.2% |
| Failure Rate | 16,926 | 28.8% |
| Absconder Rate* | 15,837 | 26.9% |
| **Total Terminations** | **58,779** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY15 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 2,641 | 69.6% |
| Failure Rate | 1,155 | 30.4% |
| Absconder Rate* | 973 | 25.6% |
| **Total Terminations** | **3,796** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY20 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 12,750 | 53.4% |
| Failure Rate | 11,144 | 46.6% |
| Absconder Rate* | 9,311 | 39.0% |
| **Total Terminations** | **23,894** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY16 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 5,620 | 65.9% |
| Failure Rate | 2,911 | 34.1% |
| Absconder Rate* | 2,636 | 30.9% |
| **Total Terminations** | **8,531** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY21 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 19,783 | 77.9% |
| Failure Rate | 5,604 | 22.1% |
| Absconder Rate* | 4,525 | 17.8% |
| **Total Terminations** | **25,387** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY17 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 14,857 | 73.3% |
| Failure Rate | 5,402 | 26.7% |
| Absconder Rate* | 4,651 | 23.0% |
| **Total Terminations** | **20,259** | **100.0%** |

| FY22 thru March FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 26,567 | 82.1% |
| Failure Rate | 5,796 | 17.9% |
| Absconder Rate* | 4,792 | 14.8% |
| **Total Terminations** | **32,363** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY18 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 21,319 | 70.1% |
| Failure Rate | 9,106 | 29.9% |
| Absconder Rate* | 8,316 | 27.3% |
| **Total Terminations** | **30,425** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY14-FY22 thru March FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 146,053 | 71.4% |
| Failure Rate | 58,365 | 28.6% |
| Absconder Rate* | 51,349 | 25.1% |
| **Total Terminations** | **204,418** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate



**From:** Houser, Jason P
**To:** ███████████████
**Cc:** ███████████████
**Subject:** RE: Parole/ATD releases
**Date:** Monday, May 2, 2022 4:00:38 PM

Got it.

Much appreciated

Jason P Houser
Chief of Staff
Immigration & Customs Enforcement (ICE)
███████████████████
████████████████████████
█████████████████
███████████████
██████████████████

Warning: This email and any attachments are UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this email should be furnished to the media, either in written or verbal form. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message from your system.

**From:** ████████████████████ @ice.dhs.gov>
**Sent:** Monday, May 2, 2022 3:59 PM
**To:** Houser, Jason P ████████████████
**Cc:** ██████████████████ @ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

19,158 NTRs are over the 60 day mark (non-compliant) of 93,964 NTRs issued.  That's 20%.

**From:** Houser, Jason P ████████████████████
**Sent:** Monday, May 2, 2022 3:48 PM
**To:** ████████████████ @ice.dhs.gov>
**Cc:** ████████████████ @ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

████████████████████████████

Jason P Houser
Chief of Staff
Immigration & Customs Enforcement (ICE)



Warning: This email and any attachments are UNCLASSIFIED//FOR OFFICIAL USE ONLY (U///FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this email should be furnished to the media, either in written or verbal form. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message from your system.

**From:** ██████████████████████████@ice.dhs.gov>
**Sent:** Monday, May 2, 2022 3:35 PM
**To:** Houser, Jason P ██████████████████
**Cc:** ████████████████@ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

Yeah, that's what it is looking like.

**From:** Houser, Jason P ████████████████
**Sent:** Monday, May 2, 2022 3:32 PM
**To:** ██████████████████@ice.dhs.gov>
**Cc:** ████████████████@ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

So still 12 percent?

██████████████████

Jason P Houser
Chief of Staff
Immigration & Customs Enforcement (ICE)
██████████████████
████████████████████
██████████████
██████████████
████████████

Warning: This email and any attachments are UNCLASSIFIED//FOR OFFICIAL USE ONLY (U///FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this email should be furnished to the media, either in written or verbal form. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message from your system.

**From:** █████████████████████ @ice.dhs.gov>
**Sent:** Monday, May 2, 2022 3:30 PM
**To:** Houser, Jason P ██████████████████
**Cc:** ███████████████ @ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

11, 008 P+ATD with no check-in over 60 Days.

---

**From:** Houser, Jason P ███████████████████
**Sent:** Monday, May 2, 2022 3:13 PM
**To:** ██████████████████ @ice.dhs.gov>
**Cc:** ██████████████ @ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

Any number on those non complaint?

If not, no worries.

Thanks ██████

Jason P Houser
Chief of Staff
Immigration & Customs Enforcement (ICE)



Warning: This email and any attachments are UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this email should be furnished to the media, either in written or verbal form. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message from your system.

---

**From:** ███████████████████ @ice.dhs.gov>
**Sent:** Monday, May 2, 2022 3:11 PM
**To:** Houser, Jason P ████████████████
**Cc:** ████████████ @ice.dhs.gov>
**Subject:** Parole/ATD releases

Per request:

For P+ATD releases,

**A341**

Check-ins are 91,311 (65%)
No check-ins are 49,576 (35%)

| | | | |
|---|---|---|---|
| Current Backlog: | | 110,708 | |
| Processing Rate: | | 109 | |
| Influx Rate: | | 1300 | |
| Daily NTA Per Officer: | | 2.6 | |
| Officers: | | 42 | |
| Loaded Rate | $ | 73.24 | |
| Officer Rate per Day: | $ | 585.92 | |
| Cost per Day: | $ | 24,563.57 | |

| | P+ATD Halted Immediately | 30 Additional Days P+ATD | 60 Additional Days P+ATD | 90 Additional Days P+ATD |
|---|---|---|---|---|
| Backlog | 110,708 | 146,438 | 182,168 | 217,898 |
| Days To Clear Backlog | 1016 | 1343 | 1671 | 1999 |
| Cost to Clear Backlog | $ 24,948,473.60 | $ 33,000,366.52 | $ 41,052,259.45 | $ 49,104,152.37 |
| Net Additional Cost (Compared to Baseline) | $ - | $ 8,051,892.92 | $ 16,103,785.85 | $ 24,155,678.77 |

███████████

| | |
|---|---|
| **From:** | ████████ |
| **Sent:** | Friday, May 6, 2022 8:15 AM |
| **To:** | ████████; Houser, Jason P; ████████; Price, Corey A; ████████ |
| **Subject:** | FW: Projecting ICE workload |
| **Attachments:** | Cost if P+ATD Halted 30-60-90-days_v2.xlsx |

████████████████████████████

Stop P+ATD now: 2.8 years to clear and $25M
Stop P+ATD in 30 days: 3.7 years to clear and $33M
Stop P+ATD in 60 days: 4.6 years to clear and $41M
Stop P+ATD in 90 days: 5.5 years to clear and $49M

████████

ICE Unified Coordination Group Representative
DHS Southwest Border Coordination Center (SBCC)
████████

**From:** ████████ @ice.dhs.gov>
**Sent:** Thursday, May 5, 2022 10:03 AM
**To:** ████████ @ice.dhs.gov>; ████████ @ice.dhs.gov>;
████████ @ice.dhs.gov>; ████████ @ice.dhs.gov>
**Subject:** FW: Projecting ICE workload

Please see the and below snapshot of SOA's cost and time to process projections based on current processing rates.

████████████████████████████ Basically every 30 days P+ATD
continues this costs us about a year and $8 million dollars.

████████████████████

Stop P+ATD now: 2.8 years to clear and $25M
Stop P+ATD in 30 days: 3.7 years to clear and $33M
Stop P+ATD in 60 days: 4.6 years to clear and $41M
Stop P+ATD in 90 days: 5.5 years to clear and $49M

| | P+ATD Halted Immediately | 30 Additional Days P+ATD | 60 Additional Days P+ATD | 90 Additional P+ATD |
|---|---|---|---|---|
| Backlog | 110,708 | 146,438 | 182,168 | |
| Days To Clear Backlog | 1016 | 1343 | 1671 | |
| Cost to Clear Backlog | $ 24,948,473.60 | $ 33,000,366.52 | $ 41,052,259.45 | $ 49,104 |
| Net Additional Cost (Compared to Baseline) | $ - | $ 8,051,892.92 | $ 16,103,785.85 | $ 24,155 |

| | | |
|---|---|---|
| Current Backlog: | | 110,708 |
| Processing Rate: | | 109 |
| Influx Rate: | | 1300 |
| Daily NTA Per Officer: | | 2.6 |
| Officers: | | 42 |
| Loaded Rate | $ | 73.24 |
| Officer Rate per Day: | $ | 585.92 |
| Cost per Day: | $ | 24,563.57 |



U.S. Immigration and Customs Enforcement
Office of Enforcement & Removal Operations

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message.



**From:** ▮▮▮▮▮▮▮▮▮▮▮▮@ice.dhs.gov>
**Sent:** Wednesday, May 4, 2022 6:46 PM
**To:** ▮▮▮▮▮@ice.dhs.gov>; ▮▮▮▮▮@ice.dhs.gov>; ▮▮▮▮
▮▮▮▮@ice.dhs.gov>; ▮▮▮▮@ice.dhs.gov>; ▮▮▮
▮▮▮@ice.dhs.gov>; ▮▮▮▮@ice.dhs.gov>
**Cc:** ▮▮▮▮▮@ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

Good evening ▮▮▮▮,

Attached and below is the first iteration of estimates for the dedicated cost and time to clear the backlog of P+ATD non-citizens that require NTA issuance assuming current CBP P+ATD rates and no additional resources to work the backlog:

Stop P+ATD now: 2.8 years to clear and $25M
Stop P+ATD in 30 days: 3.7 years to clear and $33M
Stop P+ATD in 60 days: 4.6 years to clear and $41M
Stop P+ATD in 90 days: 5.5 years to clear and $49M

| | P+ATD Halted Immediately | 30 Additional Days P+ATD | 60 Additional Days P+ATD | 90 Additional P+ATD |
|---|---|---|---|---|
| Backlog | 110,708 | 146,438 | 182,168 | |
| Days To Clear Backlog | 1016 | 1343 | 1671 | |
| Cost to Clear Backlog | $ 24,948,473.60 | $ 33,000,366.52 | $ 41,052,259.45 | $ 49,104 |
| Net Additional Cost (Compared to Baseline) | $ - | $ 8,051,892.92 | $ 16,103,785.85 | $ 24,155 |

Please let us know if you have questions or need more information.

Thank you

v/r



Enforcement Removal Operations
U.S. Immigration and Customs Enforcement



**Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.**

From: ▮▮▮▮▮▮▮▮
Sent: Monday, May 2, 2022 6:13 PM
To: ▮▮▮▮ @ice.dhs.gov> ▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮
▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮
▮▮▮▮ @ice.dhs.gov>; ▮▮▮▮ @ice.dhs.gov>
Subject: RE: Projecting ICE workload

Good evening ▮▮▮▮,

Attached is the analysis for the time required to clear the backlog of P+ATD NTAs required by ERO.

Under current conditions (processing rate of 109 CDIs per day and influx rate of 1,226 P+ATD cases per day), the number of cases would never be cleared.

If the P+ATD program was halted today, it would take 33.4 months to clear the current backlog.

███████████████████████████████████████████████████████████████████████

Please let me know if you have questions or need more information.

Thank you

██

**v/r**



Enforcement Removal Operations
U.S. Immigration and Customs Enforcement
█████████████████████████████

**Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.**



**From:** ████████████
**Sent:** Wednesday, April 27, 2022 3:15 PM
**To:** ████████ @ice.dhs.gov>; ████████ @ice.dhs.gov>; ████
████ @ice.dhs.gov>; ████████ @ice.dhs.gov>; ████
████ @ice.dhs.gov>; ████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

Good evening ████,

Total PD release cases since 3/21/2021 (NTR, NTR+, now Parole + ATD began 8/6/21) : 226,297

Released yesterday on Parole + ATD (4/26/22) : 1,542

CBP Avg releases/day on Parole + ATD (based on last 30 days): 1,226

Total ERO has processed (CDIs Issued): 115,589
-        Processed through Operation Horizon: 64,165

Total outstanding for processing (CDIs Not Issued): 110,708
-        Inside Reporting Window: 44,220
-        Outside Reporting Window: 66,488

Please let us know if you have questions or need more information.

Thank you

**v/r**

Enforcement Removal Operations
U.S. Immigration and Customs Enforcement

**Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.**

**From:** ██████████ @ice.dhs.gov>
**Sent:** Tuesday, April 26, 2022 3:33 PM
**To:** ██████████ @ice.dhs.gov>; ██████████ @ice.dhs.gov>; ██
██████████ @ice.dhs.gov>; ██████████ @ice.dhs.gov>;

@ice.dhs.gov>;                                              @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

████  ,

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████████████

Thanks,

████

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:**                                         @ice.dhs.gov>
**Date:** Tuesday, Apr 26, 2022, 4:16 PM
**To:**                              @ice.dhs.gov>,                       @ice.dhs.gov>,
              @ice.dhs.gov>,                       @ice.dhs.gov>,                @ice.dhs.gov>,  ██
              @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

Ma'am

████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████

████

**v/r**

████████████████████████████
████████████████
████████████████████████

**Enforcement Removal Operations**

U.S. Immigration and Customs Enforcement



**Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.**

**From:** ████████████████ @ice.dhs.gov>
**Date:** Tuesday, Apr 26, 2022, 3:46 PM
**To:** ███████ @ice.dhs.gov>, ████████ @ice.dhs.gov>, ██████████
████ @ice.dhs.gov>, ████████ @ice.dhs.gov>, ██████
████ @ice.dhs.gov>, ████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

Adding ███████████.

████████████████
████████████

Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
███████████

**From:** ████████████ @ice.dhs.gov>
**Sent:** Tuesday, April 26, 2022 3:34 PM
**To:** ████████ @ice.dhs.gov>; ████████ @ice.dhs.gov>; ███████
████ @ice.dhs.gov>; ████████ @ice.dhs.gov>; ███████
████ @ice.dhs.gov>
**Subject:** FW: Projecting ICE workload

████ et al.

████████████████████████

Total PD release cases since 3/21/2021 (NTR, NTR+, now Parole + ATD began 8/6/21): **239,058**
Released yesterday on Parole + ATD: **1452**

CBP Avg releases/day on Parole + ATD: ==833==

Total ERO has processed: ██████████ ███████████████████████████████████████████████

Total outstanding for processing: ██████████
          Inside and outside of reporting window

Estimated man hours to process: █████████████████████████████████████████

██████████████████████████████ . █████████████████████████████████████
████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████

███████████████████████████████████████

Happy to chat if it's easier.

Thanks,

██████

██████████████████

U.S. Immigration and Customs Enforcement
Office of Enforcement & Removal Operations

███████████████

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message.

---

**From:** ███████████████ @ice.dhs.gov>
**Sent:** Tuesday, April 26, 2022 1:02 PM
**To:** ████████████████████ @ice.dhs.gov>; █████████████████ @ice.dhs.gov>
**Cc:** ████████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

Sent with BlackBerry Work
(www.blackberry.com)

**From:** ██████████ @ice.dhs.gov>
**Date:** Tuesday, Apr 26, 2022, 12:43 PM
**To:** ██████████ @ice.dhs.gov>, ██████████ @ice.dhs.gov>
**Cc:** ██████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

████████████████████████████████████████████████████████

██████████ total PD release cases since 3/21/2021 (NTR, NTR+, now Parole + ATD began 8/6/21):  **239,058**
Released yesterday on Parole + ATD: **1452**
CBP Avg releases/day on Parole + ATD: **833**
Total ERO has processed: █
Total outstanding for processing: █
Estimated man hours to process: █████████████

████████████████████████████████████████████████████████

████████████ .

████████████████████

DHS Southwest Border Coordination Center
Washington, DC
██████████

---

**From:** ██████████ @ice.dhs.gov>
**Sent:** Tuesday, April 26, 2022 11:49 AM
**To:** ██████████ @ice.dhs.gov>; ██████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

10-4, I can get that worked in and an overall number as well.

---

**From:** ██████████ @ice.dhs.gov>
**Sent:** Tuesday, April 26, 2022 11:48 AM
**To:** ██████████ @ice.dhs.gov>; ██████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

████████████████████████████████████████████████████████

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** ██████████ @ice.dhs.gov>
**Date:** Tuesday, Apr 26, 2022, 11:46 AM
**To:** ██████████ @ice.dhs.gov>, ██████████ @ice.dhs.gov>
**Subject:** Projecting ICE workload



**Southwest Border Coordination Center**
**Enforcement and Removal Operations**
**Immigration and Customs Enforcement**

| FY14 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 17,779 | 89.5% |
| Failure Rate | 2,081 | 10.5% |
| Absconder Rate* | 1,394 | 7.0% |
| Total Terminations | 19,860 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY19 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 20,962 | 85.8% |
| Failure Rate | 3,482 | 14.2% |
| Absconder Rate* | 3,006 | 12.3% |
| Total Terminations | 24,444 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY15 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 11,019 | 88.4% |
| Failure Rate | 1,439 | 11.6% |
| Absconder Rate* | 1,105 | 8.9% |
| Total Terminations | 12,458 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY20 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 8,402 | 72.7% |
| Failure Rate | 3,154 | 27.3% |
| Absconder Rate* | 2,427 | 21.0% |
| Total Terminations | 11,556 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY16 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 11,013 | 85.7% |
| Failure Rate | 1,834 | 14.3% |
| Absconder Rate* | 1,571 | 12.2% |
| Total Terminations | 12,847 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY21 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 12,608 | 82.5% |
| Failure Rate | 2,667 | 17.5% |
| Absconder Rate* | 2,070 | 13.6% |
| Total Terminations | 15,275 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY17 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 13,043 | 81.9% |
| Failure Rate | 2,879 | 18.1% |
| Absconder Rate* | 2,418 | 15.2% |
| Total Terminations | 15,922 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

| FY22 thru April Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 55,438 | 93.2% |
| Failure Rate | 4,061 | 6.8% |
| Absconder Rate* | 3,358 | 5.6% |
| Total Terminations | 59,499 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

**A354**

*Absconder rate is a subset of failure rate

| FY18 Non-FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 16,037 | 80.9% |
| Failure Rate | 3,778 | 19.1% |
| Absconder Rate* | 3,177 | 16.0% |
| **Total Terminations** | **19,815** | **100.0%** |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

*Absconder rate is a subset of failure rate

| FY14-FY22 thru April Non-FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 166,301 | 86.8% |
| Failure Rate | 25,375 | 13.2% |
| Absconder Rate* | 20,526 | 10.7% |
| **Total Terminations** | **191,676** | **100.0%** |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate



**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**STATE OF FLORIDA**,

    **Plaintiff**,

**v.**                             **Case No. 3:21cv1066-TKW-EMT**

**UNITED STATES OF AMERICA**,
et al.,

    **Defendants**.
_____/

**ORDER DENYING MOTION TO
SUPPLEMENT ADMINISTRATIVE RECORD**

This case is before the Court based on Florida's motion to supplement the administrative record for the parole + ATD policy (Doc. 47).  No hearing is necessary to rule on the motion, and upon due consideration of the motion and its attachments and Defendants' response in opposition (Doc. 54), the Court finds that the motion is due to be denied.

In this case, Florida challenges two of Defendants' immigration policies—the so-called "non-detention policy" and the parole + ATD policy—under the Administrative Procedure Act (APA) and the Constitution.  The administrative record prepared by Defendants for the parole + ATD policy consists of only 31 pages.  Florida believes that the administrative record is incomplete and that it should be allowed to conduct extra-record discovery to supplement the record.  Defendants

respond that Florida has not made the showing required to supplement the administrative record or to permit extra-record discovery.

Judicial review of agency action under the APA is typically limited to the record before the agency when it took the challenged action. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996). However, the reviewing court may look beyond (and accordingly permit discovery to supplement) the administrative record provided by the agency in some circumstances—including "when 'an agency's failure to explain its action effectively frustrates judicial review' or when 'there is a strong showing of agency bad faith or improper behavior.'" *Morales v. Comm'r of Soc. Sec.*, 799 F. App'x 672, 676 (11th Cir. 2020) (quoting *Pres. Endangered Areas of Cobb's History*, 87 F.3d at 1246 n.1); *see also Marllantas, Inc. v. Rodriguez*, 806 F. App'x 864, 867 (11th Cir. 2020) (finding no error in the district court's decision not to allow discovery to supplement the administrative record produced by the agency because the plaintiff did not make "a strong showing of bad faith or improper behavior"); *Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1262 (11th Cir. 2007) (similar); *SOSS2, Inc. v. U.S. Army Corps of Eng'rs*, 403 F. Supp. 3d 1233, 1239 (M.D. Fla. 2019) (finding that the lack of evidence concerning red tide in the

administrative record did not frustrate judicial review of whether the omission of an analysis of red tide constituted an arbitrary and capricious decision).

Here, it is hard to believe that Defendants adopted an entirely new program pursuant to which thousands of aliens have been released into the country without considering more than 31 pages of evidence,[1] but a government official has certified that to be the case. That certification, which was made under penalty of perjury, is entitled to a presumption of regularity, *see Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019), and, at this point, Florida has not shown that the certification was made in bad faith or is otherwise improper. Thus, the administrative record for the ATD + policy is what it is.

The possibility that the administrative record will not provide an adequate justification for the parole + ATD policy is not a sufficient reason to authorize Florida to supplement the record. Indeed, an inadequate or incomplete administrative record will presumably work in Florida's favor because if the parole + ATD policy is not sufficiently supported by the record, it will be invalidated. Thus,

---

[1] The paltry size of the administrative record certainly raises the proverbial judicial eyebrow, *see In re United States*, 875 F.3d 1200, 1206 (9th Cir. 2017), and is a factor to be considered in deciding whether to allow extra-record discovery, *see NVE, Inc. v. HHS*, 436 F.3d 182, 196 (3d Cir. 2006), but the Court agrees with Defendants that "the standard for completeness of [an administrative record] is not the number of pages, but the contents of those pages." Doc. 54 at 19; *see also Nat'l Min. Ass'n v. Jackson*, 2011 WL 9977235, at *4 (D.D.C. Sept. 14, 2011) ("[T]he size of the administrative record is unimportant. … [T]he amount of material in the record is insignificant so long as that material enables the Court to review the agencies' actions and determine the issues in dispute.").

if as Florida argues in its motion, the administrative record omits material information that was necessary to support the parole + ATD policy, then the policy will not withstand judicial review.    Likewise, Florida's argument that the continuance of the parole + ATD policy cannot be logically squared with the federal government's contemporaneous efforts to repeal the "Title 42 Order" goes more to the merits of Florida's claims than the adequacy of the administrative record.  *See Altamaha Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 2007 WL 1830864, at *3 (S.D. Ga. June 21, 2007) (rejecting plaintiffs' attempt to supplement the administrative record because their arguments in favor of doing so did not evince bad faith, but rather merely "disputed the ... decision-making process" and "repackage[d]" plaintiffs' APA claims).

The fact that the Court's review of the parole + ATD policy under the APA is limited to the 31-page administrative record does not mean that Florida is precluded from seeking discovery altogether because, separate and apart from the APA claims, Florida has alleged that the challenged policies violate the Constitution.    *See Almaklani v. Trump*, 444 F. Supp. 3d 425, 432-33 (E.D.N.Y. 2020) (collecting cases acknowledging a lack of consensus among district courts as to whether additional discovery is appropriate when a constitutional claim is included along with APA claims, and ultimately declining to permit extra-record discovery); *California v. U.S. Dep't of Homeland Sec.*, 2020 WL 1557424, at *12-16 (N.D. Cal. Apr. 1, 2020)

(collecting cases and concluding that the APA and constitutional claims constituted different factual allegations, therefore opening up additional discovery). Additionally, because Defendants deny the existence of the non-detention policy,[2] Florida cannot be constrained by an administrative record as to that alleged policy. *See Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affs.*, 842 F. Supp. 2d 127, 131 (D.D.C. 2012) ("[A]bsent an administrative record constituting the materials upon which the agenc[y] arrived at some decision … plaintiffs would likely be entitled to some discovery to enable meaningful judicial review.").

Accordingly, for the reasons stated above, it is **ORDERED** that Florida's motion to supplement the administrative record for the parole + ATD policy (Doc. 47) is **DENIED**.

**DONE and ORDERED** this 6th day of June, 2022.

*T. Kent Wetherell, II*

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

---

[2] Defendants go so far as to describe the non-detention policy as "imaginary," Doc. 54 at 1 n.1, but that derogatory rhetoric is hard to square with the reality that hundreds of thousands of aliens have not been detained pending immigration proceedings but rather have been released into the country on "parole" or otherwise since January 2021. It is also hard to square Defendants' claim that there is no overriding non-detention policy with the fact that parole decisions are supposed to be made on a case-by-case assessment of the <u>alien's</u> individual circumstances (not just Defendants' capacity constraints and enforcement priorities) and it would likely be statistically impossible for hundreds of thousands of "individualized" decisions to come out exactly the same (i.e., release on parole) by mere happenstance. *See* Doc. 45 at 24. However, the question of whether the non-detention policy is real or imaginary goes to the merits of this case, which is not yet before the Court.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

v.                            Case No. 3:21-cv-1066-TKW-ZCB

The UNITED STATES OF AMERICA;
*et al.*,

    *Defendants*.

_____/

## **FLORIDA'S PROPOSED FINAL ORDER**

In *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the Supreme Court held that 8 U.S.C. § 1225(b) "mandate[s] detention of applicants for admission" through the completion of removal proceedings. *See Jennings*, 138 S. Ct. at 842. According to Florida, within days of President Bident taking office, his Department of Homeland Security (DHS)[1] issued an unwritten policy of releasing applicants for admission into the interior unless DHS determines that they are a public safety or flight risk. Florida calls this policy the Non-Detention Policy and argues that it violates § 1225(b).

---

[1] Defendants in this case include DHS, its components Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and Citizenship and Immigration Services (USCIS), the heads of each of these entities in their official capacity, and the United States of America. The Court refers to Defendants collectively as DHS. *See* 5 U.S.C. § 702 (explaining that "[t]he United States may be named as a defendant" in an Administrative Procedure Act (APA) case but that the judgment must specify the officers "personally responsible for compliance").

This Court held a bench trial to determine whether that policy exists. The Court heard testimony from senior DHS officials, including the Chief of Border Patrol, and reviewed videoed congressional testimony from DHS Secretary Alejandro Mayorkas. The Court also admitted more than 100 exhibits, which include DHS policies, data, and email communications.

Border Patrol Chief Raul Ortiz testified that, under the prior administration, DHS only allowed the release of applicants for admission at the Southwest Border under "very exigent circumstances." [FOF ¶ 17.] Secretary Mayorkas stated to Congress that DHS's current policy at the Southwest Border is as follows: "We are increasing our use of alternatives to detention, and we are using detention when it is a public safety imperative or an imperative to ensure the continued appearance of individuals in immigration enforcement proceedings." [FOF ¶ 24.] Florida contends that this change in policy is the Non-Detention Policy, and the State seeks vacatur of that policy under the Administrative Procedure Act (APA).

Based on the evidence at trial, the Court agrees with Florida that DHS made this change in policy and that it is reviewable under the APA. DHS cannot reasonably dispute that the agency changed its detention policy, and its implicit argument that it "depart[ed] from [its] prior policy *sub silentio*" does not persuade the Court that the policy change is unreviewable. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (Scalia, J.) (explaining that such a change

2

would violate the APA per se); *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.").

In addition to the Non-Detention Policy, Florida challenges DHS's Parole Plus Alternatives to Detention Policy (Parole + ATD Policy), the latest iteration of which is reflected in a July 18, 2022 memorandum. The Parole + ATD Policy takes the narrow parole authority in 8 U.S.C. § 1182(d)(5)—which is only available "on a case-by-case basis for urgent humanitarian reasons or significant public benefit"— and substitutes it for the inspection requirements in § 1225 as a means to mass release applicants for admission into the interior without initiating removal proceedings. Since issuing that policy, DHS has not used it "sparingly" as the memo suggests but has leveraged Parole + ATD to make *en masse* parole without the initiation of removal proceedings the primary processing mechanism for migrants at the Southwest Border.

Many of the questions presented in this case were before the Supreme Court in *Biden v. Texas*, 142 S. Ct. 2528 (2022), although the Supreme Court did not reach them. In dissent, Justice Alito expressed concern that DHS was releasing "more than 27,000" aliens a month. *Id.* at 2554 (Alito, J., dissenting). As the Court will explain, the numbers in this case exceed that number by a considerable margin, and the more

3

developed evidence before this Court regarding DHS's implementation of these releases demonstrates that they are unlawful.

For the reasons explained in this Order, both challenged policies are reviewable under the APA and must be vacated.

## EXECUTIVE SUMMARY

While the Court's findings of fact will address many issues, the Court recognizes that the principal dispute in this case is the existence of the Non-Detention Policy. Recognizing the importance of this issue to the parties, as well as to any reviewing court, the Court begins with a short summary of the facts that lead to the conclusion that the Non-Detention Policy exists:

- In President Trump's last full month in office, Border Patrol released 17 aliens at the Southwest Border. [FOF ¶ 6.] At that time, DHS only authorized Border Patrol to release applicants for admission at the border under "very exigent circumstances." [FOF ¶¶ 17–18.]

- In President Biden's first full month in office, Border Patrol released 8,798 aliens at the Southwest Border. [FOF ¶¶ 6, 19.] As explained below, what caused this significant increase was a change in policy away from the "very exigent circumstances" policy.

- As a candidate, President Biden promised to change this policy within 100 days of taking office. [FOF ¶ 11.]

- On President Biden's first day in office, his Acting Secretary of DHS formally rescinded guidance designed to end so-called catch-and-release, which is a euphemism for the release of applicants for admission subject to detention under 8 U.S.C. § 1225(b). [FOF ¶ 13.]

- Senior officials at ICE warned that this policy change would result in a substantial reduction in the number of aliens in ICE detention, and senior officials at CBP warned that this policy change would result in a substantial increase in the number of aliens being released at the Southwest Border. [FOF ¶¶ 14–15.]

- Within days of President Biden taking office, senior officials at DHS informed Border Patrol Chief Raul Ortiz—then the Deputy Chief—that Border Patrol was now authorized to release aliens who were not deemed a public safety or flight risk. [FOF ¶¶ 17–18.] Chief Ortiz viewed this as a change in policy because the previous policy only allowed release under "very exigent circumstances." [FOF ¶¶ 17–18.] These communications occurred by telephone. [FOF ¶ 17.]

- Releases increased exponentially at the Southwest Border during President Biden's first month in office, even as the total amount of border traffic did not exceed similar months where releases were low under President Trump. [FOF ¶¶ 19–20.]

- Secretary Mayorkas told Congress on two occasions that DHS made the precise policy change that Florida calls the Non-Detention Policy. [FOF ¶ 24.]

- Secretary Mayorkas also told Congress that DHS had substantial excess detention capacity at the time these releases began, which corroborates Florida's contention that the increased releases were the result of a policy change rather than increased border traffic. [FOF ¶ 55.]

- DHS began reducing its detention capacity around that time and even left certain detention facilities completely unoccupied. [FOF ¶¶ 58–59.]

- DHS is now releasing more than 100,000 aliens per month at the Southwest Border. [FOF ¶ 47.]

- These increased releases began due to a policy change, even if DHS has since completely lost control of the border. It is notable, however, that DHS continues telling Congress the following regarding its reductions in detention capacity: "[A] reduction in detention capacity level will not impede ICE's ability to apprehend, detain, and remove noncitizens that present a threat to national security, border security, and public safety." [FOF ¶ 59.]

5

## BACKGROUND AND PROCEDURAL HISTORY

Florida filed this action on September 28, 2021. [Doc. 1.] In its initial Complaint, the State challenged two policies: (1) DHS's Non-Detention Policy, issued in January or February of 2021, which authorizes DHS to release aliens at the Southwest Border unless they are a public safety or flight risk, and (2) DHS's Prosecutorial Discretion Policy, which was reflected in a March 19, 2021 memorandum signed by then-Border Patrol Chief Rodney Scott (the March Memo).[2] [Doc. 1 ¶¶ 30, 54–55; Pl. Ex. 20.]

Under the March Memo, DHS asserted "discretionary authority" to mass release aliens at the Southwest Border "without placing them in removal proceedings." [Pl. Ex. 20 at 1.] Instead of issuing a Notice to Appear, the agency invented a new document called a "Notice to Report," which asked released aliens to turn themselves in at an ICE field office at a later date. [Doc. 87-1 at SAR 93.]

---

[2] Florida originally challenged the Prosecutorial Discretion Policy on information and belief, and the State appeared to assume that no formal memorandum existed. [*See* Doc. 1 ¶ 7 (discussing "guidance sent to border patrol").] Similarly, DHS did not include the March Memo in the administrative record in this case, did not produce it in discovery, and strongly implied that no formal memorandum existed in its Answers. [*See* Doc. 53 ¶ 11 (discussing "guidance to individual Border Patrol Agents"); Doc. 79 ¶ 11 (same).] After the close of discovery, Florida obtained a copy of the March Memo, which DHS produced to a third party in response to a FOIA request. At a telephonic hearing scheduled soon thereafter, the Department of Justice (DOJ) represented that, during the first 14 months of this litigation, neither the attorneys who appeared in this case nor their contacts at DHS were aware that the March Memo existed. For ease of discussion, the Court treats Florida's original challenge as a challenge to the March Memo, which is moot in any event.

Florida called this practice "immigration enforcement by the honor system." [Doc. 1 ¶ 31.]

In what became a pattern in this case, DHS reacted to Florida's Complaint by rescinding the March Memo. [*See* Doc. 6-1 at 18 (moving to dismiss Florida's complaint as moot).] Specifically, on November 2, 2021, Border Patrol Chief Raul Ortiz issued the first written Parole + ATD Policy (the November Memo). According to the November Memo, Notices to Report were used as a "significantly faster mechanism for processing noncitizens." [Doc. 87-1 at SAR 93.] In other words, they allowed Border Patrol to release aliens more quickly than if the agency initiated removal proceedings prior to release.

The November Memo sought to continue the practice of rapid release without initiating removal proceedings, but it grounded the policy in the parole authority in 8 U.S.C. § 1182(d)(5). [Doc. 87-1 at SAR 94]; *see* 8 U.S.C. § 1182(d)(5) (allowing temporary parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit"). As a basis to invoke the parole standard, the November Memo relied on the need to prevent "the spread of COVID-19." [Doc. 87-1 at SAR 94.]

The November Memo applied Parole + ATD only to family units, required that these family units be placed on an alternative to detention (such as an ankle

monitor or ICE issued cell phone), and requested that these family units "report to ICE within 15 days to be processed for" a Notice to Appear. [Doc. 87-1 at SAR 94.]

On February 1, 2022, Florida filed its First Amended Complaint. [Doc. 16.] The State continued to challenge the Non-Detention Policy, but the State replaced its challenge to the March Memo with a challenge to the November Memo. On March 7, 2022, DHS moved to dismiss the First Amended Complaint. [Doc. 23.] On May 4, 2022, this Court denied that motion. [Doc. 45.] On May 24, 2022, DHS filed its Answer. [Doc. 53.]

In its Answer, DHS took the position that "the alleged 'nondetention policy' does not exist." [Doc. 53 ¶ 20.] The parties thus began discovery, which was principally aimed at resolving that factual dispute.

On July 13, 2022, Florida discovered during a deposition that Border Patrol had expanded the Parole + ATD Policy without informing Florida or this Court and without altering the November Memo. [Doc. 70 at 2.] Specifically, Border Patrol expanded Parole + ATD to apply to single adults—rather than just family units—and for reasons unrelated to COVID-19. [Doc. 70 at 2.] Five days after Florida made that discovery, DHS replaced the November Memo with the July 18, 2022 Parole + ATD Policy (the July Memo), which is the policy now before this Court. [Doc. 87-1 at SAR 1–4.]

Unlike the March Memo and November Memo, the July Memo is not signed by the Chief of Border Patrol. Instead, it is cosigned by Acting ICE Director Tae Johnson and then-CBP Commissioner Chris Magnus. [Doc. 87-1 at SAR 1.] The July Memo no longer limits Parole + ATD to family units, and it replaces the COVID rationale with a more general concern regarding DHS's need to "treat and control contagious illnesses." [Doc. 87-1 at SAR 2.]

On August 12, 2022, Florida filed its Second Amended Complaint to replace its challenge to the November Memo with a challenge to the July Memo. [Doc. 74.] On October 3, 2022, DHS moved for summary judgment. [Doc. 88.] Florida did not move for summary judgment on the merits, but the State did move for partial summary judgment on standing. [Doc. 86.] On November 11, 2022, the Court denied both motions. [Doc. 117.]

A four-day bench trial began on January 9, 2023. The parties presented documentary evidence, live testimony, video deposition testimony, and written deposition testimony. The documentary evidence consisted mostly of DHS documents, including formal policies, public statements, and internal communications.

Witnesses from DHS included Raul Ortiz, Chief of Border Patrol at CBP, Corey Price, Executive Associate Director of Enforcement and Removal Operations (ERO) at ICE, Tony Barker, (former) Chief of the Law Enforcement Operations

A369

Directorate at Border Patrol, Robert Guadian, Deputy Assistant Director of ERO, and Matthew Davies, Executive Director of the Office of Field Operations (OFO) at CBP. These witnesses provided testimony on DHS's policies and practices, including changes in DHS policy on or after January 20, 2021.

Witnesses from Florida included Jacob Oliva, Senior Chancellor for the Florida Department of Education, Lavitta Stanford, Budget Director for the Florida Department of Corrections, Patricia Grogan, Director of Economic Self-Sufficiency Policy and Programs for the Florida Department of Children and Families, James Heckman, Bureau Chief of Workforce Statistics and Economic Research at the Florida Department of Economic Opportunity, and Jesse Bottcher, Administrator in the Bureau of Medicaid Policy at the Florida Agency for Health Care Administration. These witnesses provided testimony regarding Florida's standing.

With the benefit of post-trial briefing and several hours of oral argument, the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### General Background on Immigration Enforcement

1. The Department of Homeland Security (DHS) is the agency responsible for immigration enforcement. The Executive Office of Immigration Review (EOIR) within the Department of Justice runs the immigration courts. [Doc. 122 ¶ 2; Pl. Designation of Robert Guadian at 125:16–125:22.]

10

2. The two DHS components principally at issue here are Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP).

3. ICE, through its subcomponent Enforcement and Removal Operations (ERO), is responsible for immigration enforcement in the interior and for running DHS's immigration detention. [Doc. 122 ¶¶ 11–12.]

4. CBP is responsible for border enforcement. The Office of Field Operations (OFO) enforces immigration law at ports of entry, and Border Patrol enforces immigration law between ports of entry. [Doc. 122 ¶¶ 9–10.]

5. OFO and Border Patrol maintain temporary holding facilities where they generally aim to detain aliens for no more than 72 hours. After 72 hours, continued detention requires a transfer to ICE custody. [Doc. 122 ¶¶ 13–15.]

<u>Immigration Detention Prior to the Biden Administration</u>

6. Before January 20, 2021, DHS rarely released aliens apprehended at the Southwest Border. For example, in the entire month of December 2020, Border Patrol released only 17 aliens. [Pl. Ex. 2 at 2–3.]

7. DHS's policy of rarely releasing aliens at the Southwest Border was informed by the statutory language in 8 U.S.C. § 1225(b), which states that applicants for admission "shall be detained." *See Jennings*, 138 S. Ct. at 842.

8. DHS's policy was also informed by Executive Order 13767, Border Security and Immigration Enforcement Improvements, 82 Fed. Reg. 8,793 (Jan. 25, 2017), which

instructed DHS to "take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings." *Id.* at 8,795. That language related specifically to aliens apprehended while committing "[i]llegal [e]ntry." *Id.* [Pl. Ex. 54.]

9. DHS's policy was not a byproduct of COVID-19 or of low overall border traffic. For example, in February 2020, Border Patrol apprehended over 30,000 aliens at the Southwest Border but released only 91. [Pl. Ex. 1 at 4.]

10. As Border Patrol Chief Raul Ortiz testified, the policy was reflected in instructions from DHS leadership. Those instructions were to only release aliens at the Southwest Border under "very exigent circumstances." Those instructions applied both to releases under the parole authority in 8 U.S.C. § 1182(d)(5) and releases under 8 U.S.C. § 1226(a). [Pl. Designation of Raul Ortiz at 173:13–174:7; Tr. Day 2 at 146:4–146:7.] Releases under § 1226(a) are referred to as Order of Recognizance releases or NTA/OR releases. [Doc. 122 ¶ 19.]

<u>Changes in Detention Policy Under the Biden Administration</u>

11. In 2020, then candidate-for-president Joseph R. Biden promised that, within 100 days of being inaugurated, his administration would "[e]nd prolonged detention" of migrants, which he viewed as improperly "punitive," and transition them to so-called "alternatives to detention." [Pl. Ex. 45 at 5.]

12

12. Immediately after he became President on January 20, 2021, DHS began implementing this policy change. [Tr. Day 2 at 148:13–148:21.]

13. On January 20, 2021, then Acting Secretary of DHS David Pekoske signed a memorandum entitled Review of and Interim Revisions to Civil Immigration Enforcement and Removal Policies and Priorities (the Pekoske Memo). The Pekoske Memo substantially narrowed DHS's immigration priorities. Most relevant here, the Pekoske Memo rescinded DHS's guidance implementing Executive Order 13767—which instructed DHS to detain aliens apprehended at the Southwest Border—even though President Biden had not yet formally rescinded Executive Order 13767. [Pl. Ex. 16 at 5.]

14. On January 27, 2021, senior officials at ICE determined that the Pekoske Memo would result in 50% fewer aliens entering into DHS detention as compared to historical numbers. [Pl. Designation of Corey Price at 43:18–45:10.]

15. On January 28, 2021, senior officials at Border Patrol informed senior officials at CBP that these policy changes, as well as other policy changes like the termination of the Migrant Protection Protocols, would result in the mass release of aliens into the interior of the United States. [Pl. Ex. 98 at 5; Tr. Day 2 at 133:5–133:10, 158:15–158:18.]

16. On February 2, 2021, President Biden issued Executive Order 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To

Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 Fed. Reg. 8,267 (Feb. 2, 2021). That Executive Order formally rescinded Executive Order 13767, *id.* at 8,270, which the Pekoske Memo had already functionally abrogated. [Pl. Ex. 53.]

17. Consistent with these policy changes, DHS leadership communicated to Border Patrol officials that the Trump-era limitations on alien releases—specifically, limiting releases to "very exigent circumstances"—were no longer in effect. Many of those communications occurred by telephone. [Pl. Designation of Raul Ortiz at 173:13–174:2, 175:5–177:8.]

18. On its face, the Pekoske Memo indicates that border security, including the removal of aliens illegally entering the United States, is a priority for DHS components. But Border Patrol Chief Ortiz (who was then Deputy Chief) testified that his understanding of DHS policy was that detention of illegal border crossers who were not deemed a public safety threat was not a priority. [Tr. Day 2 154:23– 155:4, 155:24–156:3.] As such, Chief Ortiz understood that Border Patrol was now authorized to release all other aliens into the interior, even if those aliens qualified as applicants for admission under 8 U.S.C. § 1225(a). [Pl. Designation of Raul Ortiz at 163:1–163:17.] Notably, both iterations of the Parole + ATD Policy are consistent

with this understanding, as both policies carve out public safety risks but not border security risks. [Doc. 87-1 at SAR 4, 95.]

19. Around that same time, and consistent with Chief Ortiz's understanding, Border Patrol began exponentially increasing the number of aliens it was releasing at the Southwest Border. In February 2021, Border Patrol released 8,798 aliens at the Southwest Border, compared to only 17 in December 2020. [Pl. Ex. 2 at 2.]

20. These express changes in detention policy described in ¶¶ 17–18 caused these increased releases, not increases in apprehension or detention capacity constraints. For example, Border Patrol released only 91 aliens at the Southwest Border in February 2020, when apprehensions were 20% higher than in February 2021. [*Compare* Pl. Ex. 1 at 4, *with* Pl. Ex. 2 at 2–3.]

21. These Border Patrol releases principally invoked 8 U.S.C. § 1226(a) as authority, even though the aliens at issue qualify as applicants for admission under 8 U.S.C. § 1225(a), [Pl. Ex. 2 at 2; Doc. 122 ¶ 19; Doc. 87-1 at SAR 1–2; Tr. Day 2 at 59:11–60:11], and were arrested without an administrative warrant as contemplated by 8 U.S.C. § 1226(a), [Pl. Ex. 48 at 5–6; Pl. Ex. 63 at 6–8; Pl. July 13 Designation of Tony Barker at 61:2–62:3; Tr. Day 1 at 118:13–119:8].

22. Some, though certainly not all, of these releases were of family units. [Doc. 87-1 at SAR 93.] Family units, as DHS uses that term, include aliens traveling as a

15

family and must include a parent and a minor child. [Tr. Day 2 at 68:7–68:17, 118:15–119:5.]

23. In February 2021, DHS categorically abolished the detention of migrant families. DHS converted some family detention centers to single adult detention centers. DHS closed other facilities altogether. In the case of the Berks facility, for example, DHS left that facility vacant from February 2021 through June of 2021 until DHS could terminate its contract. [Pl. Ex. 19 at 5; Pl. Ex. 60 at 10, 16; Pl. Designation of Robert Guadian at 144:6–146:1; Tr. Day 2 at 75:6–76:8; Tr. Day 3 at 48:22–49:24.]

24. Secretary Mayorkas has been candid about this change in policy. He testified to Congress on two occasions—May 26, 2021 and May 4, 2022—where he affirmed that DHS changed its detention policy under President Biden. On May 26, 2021, he testified as follows: "Congressman, one of the things that I have observed is the detention of individuals that do not pose a threat to public safety or do not pose a risk of flight . . . . I am concerned about the overuse of detention where alternatives to detention, ATD, would suffice in ensuring the integrity of the immigration system." [Pl. Ex. 62.] On May 4, 2022, he testified that, in his view, "detention has been misused in the immigration system for many years," and he described DHS's current detention policy as follows: "We are increasing our use of alternatives to detention, and we are using detention when it is a public safety imperative or an

16

imperative to ensure the continued appearance of individuals in immigration enforcement proceedings." [Pl. Ex. 61.] Secretary Mayorkas made these statements specifically with respect to DHS's practices at the Southwest Border.

25. The decision to eliminate family detention was an application of this policy. In the rare circumstances where a member of a family unit qualifies for detention under DHS policy, DHS separates the family and detains the parent as a single adult. Thus, DHS no longer has any use for family detention. [Tr. Day 2 at 75:13–76:8, 121:7–121:12.]

26. According to Border Patrol Chief Raul Ortiz, the effect of this change in detention policy was a substantial increase in border traffic. This is because immigration enforcement, including detention when required by the immigration laws, serves as a deterrent. [Tr. Day 2 at 150:3–151:12.] From February 2021 to March 2021, the number of apprehensions at the Southwest Border more than doubled. [Pl. Ex. 2 at 2–3.]

27. Even as border traffic skyrocketed, DHS's "daily detention population levels" remained "near historic lows." [Pl. Ex. 23 at 63.] In other words, DHS had excess detention capacity as a result of its change in detention policy, and DHS did not react to the resulting increase in border traffic by revisiting that change in detention policy.

The March 19, 2021 Prosecutorial Discretion Policy

28. By the middle of March 2021, Border Patrol's facilities were becoming increasingly overcrowded. This overcrowding was caused by increases in border traffic, the time it takes for Border Patrol to effectuate a release under 8 U.S.C. § 1226(a), and Border Patrol's failure to transfer aliens to ICE custody for continued detention—often because ICE refused to accept custody. [Pl. Ex. 20; Tr. Day 2 at 61:3–61:17, 125:15–125:24, 164:16–164:18; Doc. 87-1 at SAR 93.]

29. On March 19, 2021, Border Patrol issued its Prosecutorial Discretion Policy. Border Patrol issued that policy in response to that overcrowding, and two factors played a critical role. First, it takes Border Patrol two hours or longer to complete the paperwork necessary for a release under 8 U.S.C. § 1226(a), which includes a Notice to Appear to initiate removal proceedings. [Doc. 87-1 at SAR 5, 93; Pl. Ex. 20.] Second, Border Patrol understood that the policy changes discussed in ¶¶ 12–18 authorized Border Patrol to create such a policy. [Tr. Day 2 154:23–155:4, 155:24–156:3, 160:11–161:9.]

30. The Prosecutorial Discretion Policy authorized Border Patrol agents to release aliens at the border with minimal processing and without initiating removal proceedings, which can occur much more quickly than releases under 8 U.S.C. § 1226(a). [Pl. Ex. 20; Doc. 87-1 at SAR 5, 93.] As one ICE official put it, Border Patrol was releasing aliens at the border with nothing more than "a piece of paper

18

that said 'go find somebody at ICE.'" [Pl. Ex. 38 at 1:35–1:46.] This "piece of paper" was called a "Notice to Report," and it instructed the alien to turn himself in to the ICE field office at his final destination. [Tr. Day 2 at 161:10–161:19.]

31. In March 2021, Border Patrol's monthly releases at the Southwest Border reached 26,037. [Pl. Ex. 2 at 2.]

32. Border Patrol continued the Prosecutorial Discretion Policy for several months. During that time, Border Patrol continued to release aliens under that policy, but Border Patrol also continued releasing aliens at the Southwest Border under 8 U.S.C. § 1226(a). [Pl. Ex. 2 at 2; Pl. Ex. 23 at 11.]

33. These releases continued to cause an increase in migration flows, which caused releases to increase even more. [Tr. Day 2 at 150:3–151:6; Pl. Designation of Raul Ortiz at 171:13–173:12; Pl. Ex. 2 at 2–3; Pl. Ex. 23 at 16–17; Pl. Ex. 30.] In July 2021, Border Patrol released over 60,000 aliens at the Southwest Border. [Pl. Ex. 2 at 2–3.]

34. That same month, DHS began seeking to shore up the lawfulness of Prosecutorial Discretion. DHS also began making greater efforts to track aliens released at the Southwest Border. DHS did so due to concerns with the lawfulness of Prosecutorial Discretion and because only "approximately 30%" of released aliens reported to ICE as instructed. [Pl. Ex. 34 at 3.]

35. These efforts had two features. First, Border Patrol began phasing out the Notice to Report and replacing it with a formal grant of parole under 8 U.S.C. § 1182(d)(5). Second, ICE began placing aliens on Alternatives to Detention (ATD) at the time of release from Border Patrol. This occurred by embedding ICE officers in Border Patrol facilities. ICE gave some aliens ankle monitors. ICE gave other aliens cell phones. [Pl. Ex. 23 at 23, 33; Pl. Ex. 34 at 3; Tr. Day 2 at 113:17–114:9.]

<u>The November 2, 2021 Parole + ATD Policy</u>

36. On September 28, 2021, Florida filed this suit. As part of this suit, Florida challenged the Prosecutorial Discretion Policy. Florida did so on information and belief because DHS had not made that policy public. *See supra* n.2.

37. On November 2, 2021, Border Patrol issued its first written Parole + ATD Policy (the November Memo). The Parole + ATD policy formally authorized Border Patrol to release aliens *en masse* using the limited case-by-case parole authority in 8 U.S.C § 1182(d)(5). Although presented as a new policy, the November Memo essentially formalized what Border Patrol was already doing and provided an explanation for purposes of judicial review. The November Memo also formally rescinded the March 2021 Prosecutorial Discretion Policy, which Border Patrol was already phasing out. [Doc. 87-1 at SAR 93–95; Pl. Ex. 34 at 3; Pl. Ex. 23 at 23, 33; Pl. July 13 Designation of Tony Barker & Def. July 13 Designation of Tony Barker at 145:6–149:1.]

A380

38. The November Memo, on its face, limited Parole + ATD to family units. The November Memo states that the Parole + ATD Policy's purpose is to quickly move family unit aliens out of Border Patrol facilities by foregoing the initiation of removal proceedings prior to releasing them into the interior. According to the November Memo, this helps avoid overcrowding in Border Patrol processing centers, which can lead to the spread of COVID-19. [Doc. 87-1 at SAR 93–95.]

39. The November Memo was, in part, a solution to a problem DHS created when it ended family detention. Specifically, that decision caused family unit encounters to increase by 1,000% in the first six months of the Biden Administration, from 7,296 in January to 82,966 in July. [Pl. Ex. 23 at 16.] And overcrowding in Border Patrol facilities was further exacerbated by the fact that ICE was not accepting transfers of custody for family units. [Tr. Day 2 at 164:16–164:18; Pl. Designation of Raul Ortiz at 157:4–158:21, 168:19–169:2; Pl. Ex. 18.]

40. As with Prosecutorial Discretion, aliens released under Parole + ATD were instructed to report to ICE for processing so that DHS could initiate removal proceedings. [Pl. Ex. 23 at 23, 33; Doc. 87-1 at SAR 93–94.]

41. Also in November 2021, DHS initiated Operation Horizon. Operation Horizon involves DHS officials, mainly from ICE, seeking to locate aliens released under Prosecutorial Discretion or Parole + ATD in order to serve them with a Notice to Appear. Internal ICE documents from that month note that "CBP has released over

A381

130,000 noncitizens with [a Notice to Report] or parole." These documents also note that "only a fraction of these noncitizens (approximately 30%) have reported to ICE for processing." Operation Horizon continues to this day. [Pl. Ex. 34 at 3; Pl. Ex. 35 at 3; Pl. Designation of Corey Price at 128:4–128:10.]

42. In early 2022, Border Patrol expanded Parole + ATD. While this decision is not reflected in any memorandum of which the Court is aware, the evidence shows that Border Patrol began applying the policy to single adults in addition to family units. Border Patrol also began using Parole + ATD for purposes unrelated to COVID-19 mitigation. [Def. July 13 Designation of Tony Barker at 88:4–88:25; Pl. July 13 Designation of Tony Barker at 109:14–110:5.]

<u>The July 18, 2022 Parole + ATD Policy</u>

43. On July 13, 2022, Florida took a deposition of Tony Barker, Acting Chief for the Law Enforcement Directorate of CBP. At that deposition, Chief Barker disclosed DHS's decision expanding Parole + ATD beyond the scope contemplated by the November Memo. [Def. July 13 Designation of Tony Barker at 88:4–88:25; Pl. July 13 Designation of Tony Barker at 109:14–110:5.]

44. Five days later, CBP and ICE jointly issued the second formal Parole + ATD Policy (the July Memo). [Doc. 87-1 at SAR 1–4.]

45. The July Memo maintains the same basic structure as the November Memo, except that it expands Parole + ATD to single adults in addition to family units.

22

46. The July Memo also abandons the COVID-19 rationale in the November Memo. Instead, the July Memo states that avoiding overcrowding in Border Patrol facilities is necessary for general "disease-mitigation." [Doc. 87-1 at SAR 2.]

47. In the first few months following the November Memo, Border Patrol continued to use 8 U.S.C. § 1226(a) as its principal release mechanism. For example, Border Patrol released 34,705 aliens under § 1226(a) in November 2021 as compared to 5,683 under Parole + ATD. [Pl. Ex. 3 at 3.] Beginning in April 2022, however, Parole + ATD became Border Patrol's primary release mechanism. In that month, Border Patrol released 39,918 aliens under Parole + ATD and 22,523 aliens under § 1226(a). [Pl. Ex. 3 at 3.] Today, the numbers are even more stark. For example, of the 141,140 aliens Border Patrol apprehended in November 2022, it released 88,851 aliens under Parole + ATD and 16,501 aliens under § 1226(a). [Pl. Ex. 4 at 3.]

<u>Whether the Non-Detention Policy Exists</u>

48. Florida contends that DHS created a Non-Detention Policy shortly after President Biden took office. DHS denies that it created such a policy, and its witnesses testified that they received no blanket instruction not to detain aliens at the border.

49. The Court finds that much of this disagreement is caused by Florida's use of the term "Non-Detention Policy," which is a label the State chose for ease of discussion. When Florida refers to the Non-Detention Policy, it refers to the change in policy

that occurred in late January or early February of 2021 whereby DHS no longer detains aliens at the border unless DHS determines that they are a public safety risk or flight risk. Border Patrol Chief Ortiz testified that he understood his directives to change shortly after President Biden took office. [Tr. Day 2 at 133:5–133:10, 148:13–148:21, 154:23–155:4, 155:24–156:3, 158:15–158:18; Pl. Designation of Raul Ortiz at 173:13–174:2, 175:5–177:8.] And Secretary Mayorkas affirmed that fact in testimony to Congress on two occasions. [Pl. Exs. 61, 62.]

50. DHS's witnesses, by contrast, testified that DHS does not "have a policy of not detaining noncitizens." [Tr. Day 2 at 140:7–140:9.]

51. But Florida does not contend that DHS has a categorical non-detention policy, and DHS witnesses did not deny that DHS made the policy change Florida describes as the Non-Detention Policy.

52. DHS witnesses also testified that DHS does not have "a preference for parole over detention." [Tr. Day 2 at 73:18–73:3, 139:17–140:2.] But again, Florida does not contend that DHS has a categorical *preference* for release as opposed to detention, but that DHS changed *which aliens* are eligible for detention as opposed to release.

53. Moreover, to the extent the DHS witnesses at trial intended to communicate that DHS has no policy preference for releasing aliens from detention if they are not a public safety or flight risk, the Court finds that testimony not credible and against

the great weight of the trial evidence. As discussed, Secretary Mayorkas stated to Congress on two separate occasions, in unambiguous language, that DHS has such a policy preference. And, as discussed above, DHS has a clear pattern since January 20, 2021 of releasing rather than detaining aliens at the Southwest Border whom the agency determines are not a public safety or flight risk.

54. The Court therefore finds that in late January or early February of 2021, DHS leadership told Border Patrol that strict limits on the release of aliens at the border were no longer in place and that aliens should only be detained if they are a public safety risk or flight risk. That policy remains in effect to this day, and when the Court refers to the Non-Detention Policy it intends to refer to that change in policy.

<u>DHS's Detention Capacity Defense</u>[3]

55. Throughout this case, DHS has insisted that it lacks the resources to comply with the mandatory detention requirements in 8 U.S.C. § 1225(b). Out the gate, the Court reiterates its finding that DHS made a change in detention policy *before* the number of migrants traveling to the border reached unprecedented levels. In fact, DHS had substantial excess detention capacity in the first few months of 2021 when Border Patrol's releases reached unprecedented levels: "When the budget was being formulated during Spring 2021, ICE's adult daily detention population levels were

---

[3] The Court refers to DHS's detention capacity arguments as a "defense" because 8 U.S.C. § 1225(b) requires detention. The Court, however, does not mean that this is an affirmative defense or that DHS has the burden of persuasion.

near historic lows." [Pl. Ex. 23 at 63.] Having said that, the Court makes the following additional findings.

56. During the last immigration surge in 2019, DHS maintained sufficient capacity to detain an average daily population (ADP) of as high as 55,000. [Pl. Ex. 12 at 3; Pl. Ex. 13 at 37.]

57. In 2020, DHS anticipated that border traffic would increase again when the COVID-19 pandemic ended. [Pl. Ex. 12 at 9.] It therefore requested an increase to 60,000 ADP in its fiscal year 2021 budget request. [Pl. Ex. 13 at 11, 40.]

58. Shortly after President Biden took office, DHS requested a reduction to 32,500 ADP for fiscal year 2022. [Pl. Ex. 25 at 7; Pl. Ex. 26 at 43, 147.] For fiscal year 2023, DHS requested a further reduction to 25,000 ADP. [Pl. Ex. 27 at 10, 47; Pl. Ex. 28 at 48.]

59. In both fiscal year 2022 and fiscal year 2023, DHS made the following representation to Congress on behalf of ICE, which manages DHS's detention capacity: "[A] reduction in detention capacity level will not impede ICE's ability to apprehend, detain, and remove noncitizens that present a threat to national security, border security, and public safety." [Pl. Ex. 26 at 44; Pl. Ex. 28 at 48.]

60. This Court finds that DHS's detention capacity arguments are not made in good faith given the agency's representations to Congress. *Cf. Texas v. United States*, 40

F.4th 205, 217 n.5 (5th Cir. 2022) (affirming district court's finding that similar resource-based arguments were "not in good faith").

<div align="center">Effect of the Challenged Policies in Florida</div>

61. Since President Biden took office, Border Patrol has released more than one million aliens at the Southwest Border. [Pl. Ex. 2 at 2; Pl. Ex. 3 at 3; Pl. Ex. 4 at 3.] This does not include OFO or ICE releases, which are also substantial, [Tr. Day 4 at 63:25–64:9; Pl. Ex. 8 at 5–6], because OFO does not publicly report its releases, and ICE does not distinguish in its public data between interior enforcement and border enforcement. [*E.g.*, Pl. Ex. 2 at 1; Pl. Ex. 8 at 5–6.]

62. In this case, DHS provided data from January 2021 to July 2022. That data indicates that DHS currently believes that 160,000 of these aliens are currently in either Florida, Puerto Rico, or the Virgin Islands, which is the territorial responsibility of the Miami ERO office. [Pl. Ex. 10.] These numbers do not account for aliens released after July 2022, which is particularly notable because DHS's monthly releases have increased since then. [Pl. Ex. 3 at 3; Pl. Ex. 4 at 4.]

63. Based on the above, and the testimony in this case, the Court finds that well over 100,000 aliens released under the challenged policies are currently in Florida.

64. While DHS says it is screening people to determine if they are a public safety threat, DHS cannot reliably make that determination. According to DHS witnesses, the agency has no way to determine if an alien has a criminal history in his home

<div align="center">27</div>

country unless that country reports the information to the U.S. government or the alien self-reports. [Tr. Day 2 at 95:1–95:25.] Therefore, DHS is mainly only screening aliens at the border to determine if they have previously committed a crime *in the United States*. Because many of these aliens are coming to the United States for the first time, DHS does not know their criminal history.

65. Florida is required to include inadmissible aliens in the State's free public education. *Plyler v. Doe*, 457 U.S. 202, 230 (1982). Florida law requires that all children ages six to sixteen attend school. § 1003.21(1)(a), Fla. Stat. [Tr. Day 1 at 31:22–32:1.]

66. Florida's Department of Education tracks the number of "immigrant children and youth" enrolled in Florida's schools. *See* 20 U.S.C. § 7011(5). "Immigrant children and youth" include students born abroad who did not attend school in the United States in the last three academic school years. [Doc. 122 ¶¶ 33, 36; Tr. Day 1 at 32:4–32:13.]

67. In the 2020–2021 school year, 95,084 "immigrant children and youth" were enrolled in Florida's schools. In the 2021–2022 school year, 112,375 were enrolled in Florida's schools. [Pl. Ex. 95; Tr. Day 1 at 41:2–41:15.]

68. Since January 2021, approximately 17,000 more "immigrant children and youth" enrolled in Florida's schools. [Pl. Ex. 95; Tr. Day 1 at 41:2–41:15.]

69. Florida spends roughly $8,000 per student per year on primary and secondary education. [Doc. 122 ¶¶ 37–39; Tr. Day 1 at 30:17–31:1.]

70. Jacob Oliva, Senior Chancellor at the Department of Education, testified about his experiences visiting schools and meeting families and students who had recently enrolled in Florida schools. When probed by defense counsel, Mr. Oliva testified that he was aware of students and families who had recently come to Florida from another country and enrolled in public schools. The Court finds his testimony credible. [Tr. Day 1 at 24:20–21, 48:21–48:25, 52:2–53:1.]

71. When coupled with the data presented in this case, as well as common sense, the Court finds that at least some of the aliens released under the challenged policies have enrolled their children in Florida's public schools and caused the State financial injury.

72. Florida's Department of Corrections tracks expenditures on "undocumented criminal alien[s]" under 8 U.S.C. § 1231(i) in order to participate in the State Criminal Alien Assistance Program, a grant program run by the U.S. Department of Justice. [Doc. 122 ¶¶ 29–31.]

73. Undocumented criminal aliens include persons released under 8 U.S.C. § 1182(d)(5) or 8 U.S.C. § 1226(a) who have been convicted of at least one felony or two misdemeanors. [Pl. Ex. 96 at 7 (explaining that "undocumented" aliens

includes aliens who entered unlawfully and aliens who have pending removal proceedings).]

74. In each of the last four reporting cycles (2015–2019), Florida received partial reimbursement for approximately 7,000 eligible undocumented criminal aliens. Of the more than $119 million in expenditures incurred by the State each year incarcerating these aliens, the federal government reimbursed less than $9 million per year. [Doc. 122 ¶ 32.]

75. Based on these past expenditures and the large number of aliens released under the challenged policies that are present in the State, the Court finds it likely that at least one such alien will commit a crime and impose costs on the State. On this point, the Court finds credible Director Price's testimony that based on his past experiences some number of aliens released on parole would commit crimes. [Pl. Designation of Corey Price at 130:11–131:11.]

76. Florida's Agency for Health Care Administration administers Medicaid throughout the State. [Doc. 122 ¶ 41.]

77. Under 42 U.S.C. § 1395dd, participating medical facilities must provide emergency medical services to immigrants regardless of their legal status, and the State covers a portion of the costs of these services for aliens who meet eligibility requirements. [Doc. 122 ¶ 43.]

30

78. From January 2020 to April 2022, the State paid over $111 million to provide emergency services to over 150,000 noncitizens. [Doc 122 ¶ 44.]

79. Florida's Department of Economic Opportunity provides reemployment assistance benefits to state residents. [Doc. 122 ¶ 48.]

80. If an alien is authorized to work in the United States and meets other eligibility criteria, the alien is eligible to receive these benefits. [Doc. 122 ¶ 51.] Aliens released under 8 U.S.C. § 1182(d)(5) are eligible to apply for work authorization. [Doc. 122 ¶ 52.] Aliens released under other mechanisms, such as 8 U.S.C. § 1226(a), are eligible to apply for work authorization 150 days after submitting an application for asylum. [Doc. 122 ¶ 53.]

81. From January 2020 to May 2022, the State paid over $425 million in reemployment assistance benefits to noncitizens. [Doc. 122 ¶ 54.]

82. Florida's Department of Children and Families provides a variety of public services. For some of these services, aliens are expressly eligible. For others, the State provides services regardless of immigration status. [Doc. 122 ¶ 56.]

83. Through its administration of a federally funded program for refugees, the Department of Children and Families tracks information regarding Cubans and Haitians receiving federal refugee benefits. [Tr. Day 4 at 51:20–55:22.] Roughly 150,000 Cubans and Haitians who entered the United States between October 1, 2021, and September 30, 2022, received federal refugee benefits in Florida. [Tr. Day

31

4 at 53:17–55:22.] These aliens more likely than not received other similar benefits, especially given the significant proportion of aliens released under the challenged policies who are from Cuba or Haiti. [Tr. Day 4 at 18:7–18:12, 54:5–55:22, 58:8–58:25; Doc. 87-1 at SAR 5; Pl. Designation of Raul Ortiz at 63:6–64:13.]

84. Given the large number of aliens released under the challenged policies who are in Florida, and the breadth of benefits available to them, the Court finds that at least some aliens released under the challenged policies have caused the State to incur additional expenses and that these expenses will increase absent relief in this case. [Pl. Designation of Corey Price at 131:4–131:22; 132:16–134:8.]

<div align="center">The <em>Flores</em> Consent Decree</div>

85. In 1997, the INS (now part of DHS) voluntarily entered a consent decree in *Flores v. Garland*, No. cv-85-4544 (C.D. Cal.), as part of litigation regarding detention of minors. [*See* Pl. Exs. 19, 33.]

86. As interpreted, the *Flores* consent decree limits the length of detention of minors and creates a presumption against detention longer than 20 days. [*See* Pl. Ex. 19 at 1 (interim report regarding number of class members in custody over 20 days).]

87. The *Flores* 20-day presumption is intended to allow DHS time to complete the expedited removal process under 8 U.S.C. § 1225(b)(1). [Pl. Ex. 64 at 1–2; 8 C.F.R. § 1003.42(e); Tr. Day 4 at 62:14–63:20.]

88. At a minimum, where *Flores* causes DHS to release a family unit, 20 days is ample time for DHS to initiate removal proceedings with respect to members of that family unit.

89. The initiation of removal proceedings against released aliens would mitigate Florida's injuries given the significant backlog the challenged policies have caused in the initiation of removal proceedings against applicants for admission, as well as the approximately five years it takes to remove an alien once removal proceedings begin. [Doc. 87-1 at SAR 261–66; Tr. Day 3 at 67:14–68:6.]

## CONCLUSIONS OF LAW[4]

The Court's conclusions of law proceed in the following order: (1) Florida's Article III standing; (2) Florida's prudential standing, sometimes referred to as statutory standing or the zone of interests test; (3) the Non-Detention Policy; (4) the Parole + ATD Policy; and (5) the remedy. For the Parole + ATD Policy, the Court relies on the administrative record. *See Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs* (*PEACH*), 87 F.3d 1242, 1246 (11th Cir. 1996). For the remaining issues, the Court relies on the trial record.[5]

---

[4] To the extent the Court discusses facts not expressly listed in the findings of fact, the Court intends them as findings of fact.

[5] DHS does not contend that the Court should review the Non-Detention Policy based on an administrative record because DHS has not provided one.

A393

<u>Article III Standing</u>

To establish Article III standing, Florida must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Moreover, "the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced at trial.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

At trial, Florida presented evidence of various state expenditures applicable to aliens in the State. Specifically, Florida presented evidence from five state agencies: the Florida Department of Education; the Florida Department of Children and Families; the Florida Department of Economic Opportunity; the Florida Department of Corrections; and the Florida Agency for Health Care Administration. The Court discusses each in turn, but the Court discusses Florida's Department of Education evidence in more detail because it finds that evidence most persuasive.

## *Special Solicitude*

"States are not normal litigants for purposes of invoking federal jurisdiction." *West Virginia v. Dep't of Treasury*, No. 22-10168, 2023 WL 334914, at *4 (11th Cir. Jan. 20, 2023). Rather, States are entitled to "special solicitude" in establishing standing. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). To invoke that special

A394

solicitude, a State must show (1) a procedural right and (2) a quasi-sovereign interest. *Id.* at 519–20. Once a State does so, the requirements of traceability and redressability are relaxed. *Texas v. United States (DAPA)*, 787 F.3d 733, 753 (5th Cir. 2015), *aff'd by an equally divided court*, *United States v. Texas*, 579 U.S. 547 (2016).

Florida's procedural right in this case is provided by the APA. *See DAPA*, 809 F.3d at 752; *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1032 (M.D. Fla. 2021). The only question is whether Florida can show a quasi-sovereign interest. When Florida joined the Union, it ceded certain sovereign prerogatives to the federal government concerning immigration enforcement. *See Massachusetts*, 549 U.S. at 519 ("When a State enters the Union, it surrenders certain sovereign prerogatives."); *Arizona v. United States*, 567 U.S. 387, 436 (2012) (Scalia, J., concurring in part and dissenting in part) (observing that States "jealously guarded" their sovereignty with regards to immigration enforcement during the Constitutional Convention of 1787). Accordingly, the Court concludes that Florida has a quasi-sovereign interest in its territory, in the presence of unauthorized aliens within that territory, and in the effect those aliens have on the public fisc. *See DAPA*, 809 F.3d at 752.

And surely that must be correct—if special solicitude is to have any meaning, it must apply in the immigration context. Having surrendered many of their sovereign prerogatives, the States are left at the mercy of the federal government. As

A395

the Supreme Court recognized in *Arizona*, the federal government's failures have led to an "epidemic of crime, safety risks, serious property damage, and environmental problems." *Arizona*, 567 U.S. at 398.

Before applying this standard to Florida's evidence, the Court briefly reviews how the Supreme Court applied special solicitude in *Massachusetts v. EPA*. In that case, the States alleged that global warming would cause a "rise in sea levels," lead to "severe and irreversible changes to natural ecosystems," "increase . . . the spread of disease," and "contribute to the ferocity of hurricanes." *Massachusetts*, 549 U.S. at 521–22. The Court recognized that the States' traceability and redressability arguments were in many ways speculative—for example, "China and India" were likely to "offset any marginal domestic decrease" in greenhouse gas emissions. *Id.* at 523–24. Nonetheless, the Court applied the relaxed special solicitude standard and found that the States established standing because the risk of harm "would be reduced to some extent." *Id.* at 526. As the Court will explain, Florida's standing evidence is far stronger than the States' evidence in *Massachusetts v. EPA*.

## Florida Department of Education

Like all States, Florida is required to include inadmissible aliens in the State's free public education. *Plyler v. Doe*, 457 U.S. 202, 230 (1982). And Florida law requires that all children ages six to sixteen attend school. *See* § 1003.21(1)(a), Fla. Stat. At trial, Florida presented testimony from Senior Chancellor Jacob Oliva from

A396

the Florida Department of Education. Mr. Oliva testified that Florida spends roughly $8,000 per student per year on primary and secondary education. [FOF ¶ 69.] To demonstrate that Florida spends these funds on aliens released under the challenged policies, Florida relies on two categories of evidence.

First, as this Court found, there are more than 100,000 aliens currently in Florida who were released under the challenged policies. [FOF ¶ 63.] Moreover, many of these aliens are family units. [FOF ¶ 22.] Based on that evidence, Florida asks the Court to infer that some of these aliens will enroll their children in public schools.

Second, Florida seeks to corroborate that inference with testimony from Mr. Oliva. Specifically, Mr. Oliva testified that Florida tracks the number of "immigrant children and youth" enrolled in its schools each year. [FOF ¶ 66.] Immigrant children and youth include children who (a) were born outside the United States and (b) were not educated in the United States in the last three years. *See* 20 U.S.C. § 7011(5). In the 2021–2022 school year, Florida enrolled over 112,000 such children in its public schools, an increase of approximately 17,000 students since January 2021. [FOF ¶ 67–68.] In addition to the data, Mr. Oliva provided anecdotal testimony regarding aliens who recently entered the country enrolling in Florida's schools. [FOF ¶ 70.]

While "immigrant children and youth" certainly would include aliens other than those released under the challenged policies, the increase of 17,000, along with the other evidence in this case, supports a finding that at least some aliens released under the challenged policies are enrolling their children in Florida's schools and will continue to do so. [FOF ¶ 71.] This evidence is legally sufficient to demonstrate standing.

As to injury in fact, "[e]conomic detriment . . . is the epitome of an injury in fact." *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989); *see also Plyler*, 457 U.S. at 228 n.23 (noting that "unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service"). Florida's expenditures plainly qualify as economic detriment.

As to traceability, these costs are traceable to the challenged policies. In December 2020—before the challenged policies went into effect—Border Patrol released only 17 aliens at the Southwest Border. [FOF ¶ 19.] In November 2022, the challenged policies caused Border Patrol to release over 100,000 aliens at the Southwest Border. [FOF ¶ 47.] Moreover, the Parole + ATD Policy and its predecessor policies have caused Border Patrol to release these aliens without initiating removal proceedings. [FOF ¶¶ 40–41.] Even as compared to other released aliens, aliens without pending removal proceedings will remain in Florida for additional time, costing the State additional funds. [FOF ¶ 89.]

A398

DHS contends that the intervening decisions of aliens to unlawfully enter the country and travel to Florida negate traceability. But intervening actions of third parties—even unlawful actions—do not negate a finding of traceability where the third parties have "react[ed] in predictable ways" to government actions. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). In this case, the Court has found that (a) the challenged policies have resulted in the release of aliens who would not otherwise have been released, [FOF ¶ 61], (b) some of those aliens have traveled to Florida and enrolled their children in public schools, [FOF ¶¶ 62–63, 68–71], and (c) the challenged policies have caused an increase in border traffic, which has compounded these issues, [FOF ¶ 26]. The third-party reactions Florida asserts are therefore not only predictable but were confirmed as matter of fact at trial.

Finally, as to redressability, "redressability and traceability overlap" in this case "as two sides of a causation coin." *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997). Florida seeks declaratory relief, vacatur under the APA, and, consistent with the limits on injunctive relief in 8 U.S.C. § 1252(f), permanent injunctive relief limited to DHS's violations of 8 U.S.C. § 1182(d)(5). Each form of relief would provide Florida at least partial redress. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (explaining that a plaintiff need not show that its injuries will be completely redressed).

39

Courts have "long presumed that officials of the Executive Branch will adhere to the law as declared by the court." *Comm. on Judiciary of U.S. House of Reps. v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008). Similarly, vacatur under the APA would "deprive" the challenged policies "of force," *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (quoting 91 C.J.S. *Vacate* (1955)), preventing DHS from continuing to apply them at the Southwest Border. Finally, injunctive relief would prevent DHS from paroling aliens *en masse* as a mechanism to avoid initiating removal proceedings. *Cf. Chiles*, 865 F.2d at 1209–10 (finding that an injunction against the United States would remedy the injury to a local government caused by persons escaping from a federal detention center).

Were all that not enough, because Florida invokes procedural rights under the APA, Florida need only show that "there is some possibility that the requested relief will prompt the injury-causing party to reconsider" its unlawful decisions. *Massachusetts*, 549 U.S. at 518; *see also Nelson*, 576 F. Supp. 3d at 1032 (explaining that APA review is a procedural right for purposes of *Massachusetts v. EPA*).

DHS contests redressability on the ground that released aliens who enroll their children in school are typically family units, and DHS's ability to detain family units is limited by the consent decree in *Flores v. Garland*, No. cv-85-4544 (C.D. Cal.). According to DHS, the *Flores* consent decree generally limits detention of family units to 20 days. [FOF ¶ 86.] Thus, DHS argues, even absent the challenged policies,

40

applicants for admission subject to mandatory detention under 8 U.S.C. § 1225(b) will be released after 20 days.

DHS's redressability argument is wrong for three reasons. First, Florida is not required to prove with certainty the "practical impact of any decision." *Chafin v. Chafin*, 568 U.S. 165, 175 (2013). Rather, Florida satisfies redressability if the *relief* Florida seeks will redress its harm. For example, courts "decide cases against foreign nations" even though their "choices to respect final rulings are not guaranteed." *Id.* at 176. Similarly, "the fact that a defendant is insolvent does not moot a claim for damages." *Id.* at 175–76. As the Court already explained, the three forms of relief Florida seeks will redress the State's injuries.

Second, if Florida prevails in its argument that 8 U.S.C. § 1225(b) mandates detention for aliens apprehended at the Southwest Border—and if DHS insists that *Flores* is causing the agency to violate that statute—one would expect DHS to bring that to the attention of the *Flores* court. *But see Flores v. Lynch*, 828 F.3d 898, 908–09 (9th Cir. 2016) (holding that *Flores* does not "grant release rights to parents"); *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022) (clarifying that district courts may not enjoin the operation of 8 U.S.C. § 1225(b) on a class-wide basis). To

41

instead insist that DHS may consent to violate the law and that doing so *eliminates Article III jurisdiction* is plainly wrong.[6]

Third, the evidence at trial showed that *Flores* does not categorically prevent DHS from detaining family units in a way that would negate redressability. The purpose of the *Flores* 20-day presumption is to allow DHS to apply expedited removal to family units under 8 U.S.C. § 1225(b)(1), which can be completed in that short window. [FOF ¶ 87.] And even if DHS fails to complete removal in 20 days, the agency has ample time to at least *initiate* removal proceedings prior to release. [FOF ¶ 88.] As this Court has found, releasing aliens without initiating removal proceedings extends the total time the aliens are enrolled in Florida's schools, and a favorable judgment for Florida would redress that harm. [FOF ¶ 89.]

Accordingly, the Court finds that Florida has established Article III standing based on the funds it spends providing public education.

### Florida's Remaining Standing Evidence

Florida's remaining standing evidence, which is from four other state agencies, is less powerful than its Department of Education evidence. Florida offers evidence of historical expenditures on unauthorized aliens—specifically, the cost of incarcerating criminal aliens and the cost of public benefits like emergency

---

[6] At the beginning of the trial, DHS objected to all evidence regarding the *Flores* consent decree on relevance grounds. That the agency now argues that *Flores* defeats jurisdiction in this case is a noteworthy shift.

A402

Medicaid, unemployment, and public assistance. [FOF ¶¶ 72–83.] On the basis of these historical expenditures, Florida asks the Court to infer that the State will spend some of these resources on aliens released under the challenged policies.

For costs of incarceration, Florida principally relies on the testimony of the head of ERO at ICE and on common sense. According to Florida, at least one of the over 100,000 aliens in the State who were released under the challenged policies will commit a crime serious enough to end up in state prison. Executive Associate Director Price of ERO agreed this was likely. [FOF ¶ 75.] For Emergency Medicaid, Florida relies on a similar common sense argument and the fact that the State is required to pay for emergency services to unauthorized aliens as a condition of participation. *See* 42 U.S.C. § 1395dd; [FOF ¶ 77]. Finally, for public benefits, Florida relies on the fact that 153,000 Cuban and Haitian nationals who entered between October 1, 2021, and September 30, 2022, have sought federally funded refugee benefits. [FOF ¶ 83.] And Florida contends that these same aliens are likely to be eligible for other benefits that are partially state funded, especially given the substantial portion of aliens released under the challenged policies who are from Cuba or Haiti. [FOF ¶ 83.]

While the Court finds this evidence to be less persuasive than the State's education evidence, the Court concludes that this evidence—which is at least as persuasive as the evidence in *Massachusetts v. EPA*—is sufficient to establish

A403

standing given that "States are not normal litigants for purposes of invoking federal jurisdiction." *West Virginia*, 2023 WL 334914, at *4.

As to injury, Florida need only show a "substantial risk" that the State will suffer injury from the challenged policies in the future. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 407 (2013). Florida's evidence of over 100,000 aliens in the State, along with its historical expenditures on unauthorized aliens, meets this standard. [FOF ¶¶ 63, 72–83.]

As to traceability, while Florida has not identified specific released aliens who have cost the State money on these programs, the Eleventh Circuit does not require such specific evidence even *without* special solicitude. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280–81 (11th Cir. 2015) (agreeing that a plaintiff's injury need not "be traced to specific molecules of pollution emitted by the alleged polluter," only "that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged" (quotations omitted)). Florida certainly need not make this showing *with* the benefit of special solicitude. *See Texas v. United States* (*DACA II*), 50 F.4th 498, 517–18 (5th Cir. 2022) (applying the special solicitude standard and finding standing even though "[t]he record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients").

Finally, Florida has shown redressability for the same reasons it has shown redressability as to the Department of Education evidence. In fact, Florida's redressability arguments are even stronger because these other expenditures are not disproportionately caused by family units.

<u>Zone of Interests</u>

To challenge either the Non-Detention Policy or the Parole + ATD Policy under the APA, Florida must fall within the "zone of interests" of the INA. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). The zone of interests test is "not meant to be especially demanding," *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and "the benefit of any doubt goes to the plaintiff," *Patchak*, 567 U.S. at 225.

Florida satisfies that test here. "It's clear that the INA aimed, at least in part, to protect States from" harms to their fisc. *Texas v. Biden*, 20 F.4th 928, 975 (5th Cir. 2021), *rev'd on other grounds Biden v. Texas*, 142 S. Ct. 2528 (2022); *accord Cook Cnty., Ill. v. Wolf*, 962 F.3d 208, 220 (7th Cir. 2020) (holding that a county was within the zone of interests of the INA); *see also Demore v. Kim*, 538 U.S. 510, 517–21 (2003) (explaining that the 1996 amendments to the INA were motivated in part by the costs caused by the government's failure to remove deportable aliens).

In fact, several provisions of the INA specifically seek to protect the States from the injuries the federal government causes when it fails to fulfill its duties. For

A405

example, one provision of the INA grants the States partial reimbursement for the costs of incarcerating criminal aliens. *See* 8 U.S.C. § 1231(i). Another provision seeks to ensure that "Federal, State, or local government entit[ies]" can share "information regarding the citizenship or immigration status" of "any individual." *See* 8 U.S.C. § 1373(a). Still another allows state officers to supplement the efforts of federal officials by "perform[ing] a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g).

For these reasons, Florida satisfies the zone of interests test.

<u>The Non-Detention Policy</u>

In late January or early February of 2021, DHS made a discrete change in detention policy. Before that time, DHS limited the release of aliens at the Southwest Border to very exigent circumstances. Under the new policy, the Non-Detention Policy, DHS began instructing agents to release aliens at the Southwest Border unless an alien is a public safety or flight risk.

As this Court explained in its Executive Summary, the change in policy away from the "very exigent circumstances" standard to the "not a public safety or flight risk" standard is the Non-Detention Policy Florida seeks to challenge.

Florida contends that the Non-Detention Policy is (1) contrary to law and in excess of statutory authority, 5 U.S.C. § 706(2)(A), (C); (2) arbitrary and capricious,

46

5 U.S.C. § 706(2)(A); and (3) promulgated without notice and comment as required by 5 U.S.C § 553. The Court considers each argument in turn, but the Court first addresses DHS's contention that the Non-Detention Policy is not subject to judicial review.

*APA Reviewability*

"The APA establishes a basic presumption of judicial review." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quotations omitted); *accord Dep't of Com.*, 139 S. Ct. at 2567 ("The Administrative Procedure Act embodies a basic presumption of judicial review." (quotations omitted)). To overcome that presumption, DHS argues that the Non-Detention Policy is unreviewable because it is not "final agency action," 5 U.S.C. § 704, and because it is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2).

As to final agency action, DHS presents two arguments: First, DHS argues that the Non-Detention Policy is not agency action at all. Second, DHS argues that, even if agency action, the Non-Detention Policy is not final under the APA.

The APA defines agency action as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *See* 5 U.S.C. § 701(b)(2) (explaining that the APA incorporates the definition of "agency action" in 5 U.S.C § 551); 5 U.S.C § 551(13) (defining "agency action" to include a "rule"); 5 U.S.C § 551(4) (defining

47

"rule"). As the Supreme Court made clear in *Biden v. Texas*, a reviewing court's role is to review an "agency statement of general or particular applicability . . . designed to implement" the relevant decision. 142 S. Ct. at 2545 (quoting 5 U.S.C. § 551(4)). A court errs if it instead attempts to review "an abstract decision apart from specific agency action." *Id.*

Here, Florida challenges the policy change that replaced the "very exigent circumstances" standard with the "not a public safety or flight risk" standard. The fact that Florida identifies no specific written document does not foreclose APA review. Courts have routinely recognized that a policy need not be reduced to writing to be subject to APA review. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting authorities); *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018) (same); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 339–42 (D.D.C. 2018) (finding the existence of a policy where statistics of parole application denials were "irrefutable"). And DHS has identified no contrary authority. *Cf. Regents*, 140 S. Ct. at 1905 ("The APA establishes a basic presumption of judicial review.")

Moreover, "depart[ure] from a prior policy *sub silentio*" would violate the APA per se. *See Fox Television*, 556 U.S. at 515 (Scalia, J.); *accord id.* ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."). The Court

A408

thus views the absence of a written decisional document as more of a problem for DHS than a problem for Florida. *See Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored" (quotations omitted)).

For these reasons, Florida has demonstrated that the Non-Detention Policy is "agency action." This agency action is also "final." 5 U.S.C. § 704. Agency action is "final" if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted).

The Non-Detention Policy clearly marks the consummation of DHS's decisionmaking process and determines legal rights and obligations. *See id.* The policy established "new marching orders" directing immigration officials to only detain individuals if they are a public safety risk or a flight risk. *City of Dania Beach v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007). For aliens, release results in free movement in the United States rather than detention pending removal. *See Zadvydas v. Davis*, 533 U.S. 678, 690–96 (2001) (describing the liberty interest in detention of aliens). If that were not enough, aliens paroled under 8 U.S.C. § 1182(d)(5) or

those with pending asylum claims are eligible to apply for work authorization.[7] And as explained above, the release of applicants for admission at the border determines Florida's obligations—including its constitutional obligation to provide education and its statutory obligations under Medicaid. [FOF ¶¶ 65, 77.]

Finally, the Non-Detention Policy is not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). That exception is read "quite narrowly" and applies only where the relevant statute leaves "no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quotations omitted); *accord Dep't of Com.*, 139 S. Ct. at 2568 (explaining that the agency's discretion must be "unbounded" for § 701(a)(2) to apply). For reasons the Court will address when determining whether the Non-Detention Policy is contrary to law, the relevant statutes do not confer unbounded discretion to DHS, and § 701(a)(2) does not apply.

\* \* \*

The Non-Detention Policy is subject to judicial review under the APA. Before turning to that review, the Court briefly notes DHS's argument that the Non-Detention Policy is the result of a change in Administration and that political considerations are a perfectly valid basis for a change in policy. DHS's argument

---

[7] 8 C.F.R. § 274a.12(c)(8), (11) (recognizing that aliens with pending asylum claims and paroled aliens are eligible to apply for work authorization).

goes to the standard the Court should apply in reviewing the Non-Detention Policy rather than whether it is reviewable in the first instance.

"[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Com.*, 139 S. Ct. at 2573; *see also Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 979 (9th Cir. 2015) (Smith, J., dissenting) (noting that "[e]lections have legal consequences" and "policies of the new president will occasionally clash with, and supplant, those of the previous president, often leading to changes in rules promulgated pursuant to the" APA).

Similarly, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for any executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, C.J., concurring in part and dissenting in part).

But just as the APA does not require a heightened standard under these circumstances, neither do these circumstances create a more favorable standard. *See Fox Television*, 556 U.S. at 514. And, importantly, a new administration certainly "may not choose not to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its regulatory functions." *State Farm*, 463 U.S. at 59 n.* (Rehnquist, C.J., concurring in part and dissenting in part).

51

*Contrary to Law*

Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Florida contends that the Non-Detention Policy is contrary to law because 8 U.S.C. § 1225(b) requires DHS to detain aliens apprehended crossing the Southwest Border, but the Non-Detention Policy instructs DHS's officials to release these aliens except under narrow circumstances. DHS presents two arguments in response. First, DHS argues that detention under 8 U.S.C. § 1225(b) is discretionary. Second, DHS argues that, even if § 1225(b) is mandatory, DHS has discretion to release the aliens under either 8 U.S.C. § 1226(a) or 8 U.S.C. § 1182(d)(5).

Under the INA, certain aliens are "deemed . . . applicant[s] for admission." 8 U.S.C. § 1225(a)(1). Specifically, applicants for admission include aliens "who arrive[] in the United States . . . whether or not at a designated port of arrival" and aliens "present in the United States who ha[ve] not been admitted." 8 U.S.C. § 1225(a)(1). Section 1225 imposes certain duties on immigration officers to "[i]nspect" applicants for admission, regardless whether the aliens are "arriving in the United States" or whether they are present without having "been admitted or paroled." 8 U.S.C. § 1225(b); *see id.* § 1225(a)(3) (explaining that "[a]ll aliens . . . who are applicants for admission . . . shall be inspected").

52

**A412**

This broad definition of applicants for admission is a relatively recent addition to the INA. Before 1996, the INA only contemplated inspection of aliens arriving at ports of entry. *See* 8 U.S.C. § 1225(a) (1995) (discussing "aliens arriving at ports of the United States"); *id.* § 1225(b) (1995) (discussing "the examining immigration officer at the port of arrival"). Other aliens, such as those who entered illegally, were not subject to § 1225(b). *See* 8 U.S.C. § 1251(a)(1)(B) (1995) (explaining that an alien "who entered the United States without inspection . . . is deportable" rather than being subject to inspection and exclusion).

In 1996, however, Congress expanded § 1225 by adding the broad definition of "applicant for admission" discussed above. Pub. L. No. 104-208 § 302, 110 Stat. 3009-579 (1996). In doing so, Congress subjected a broader category of aliens to the inspection regime that applied to aliens who showed up at a port of entry seeking admission. *See Jennings*, 138 S. Ct. at 836–37 ("Applicants for admission must be 'inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law." (quoting 8 U.S.C. § 1225(a)(3)); 8 U.S.C. § 1225(a)(3) ("All aliens . . . who are applicants for admission . . . shall be inspected by immigration officers.").

All parties agree, and the Court has found, that the aliens at issue meet the statutory definition for applicants for admission and are subject to inspection under § 1225. [*See* FOF ¶ 21; Doc. 87-1 at SAR 1 (explaining that what DHS refers to as

"processing" of illegal border crossers is an "inspect[ion] . . . consistent with 8 U.S.C. § 1225(a)").] The Court therefore turns to the three points of contention relevant to the lawfulness of the Non-Detention Policy: (1) whether detention of applicants for admission under 8 U.S.C. § 1225(b) is mandatory; (2) whether and when DHS may release applicants for admission at the Southwest Border under 8 U.S.C. § 1226(a); and (3) whether and when DHS may release these aliens under 8 U.S.C. § 1182(d)(5).

Section 1225(b) lays out a complex decision tree governing the inspection process for applicants for admission. Certain aliens are subject to a process called expedited removal, 8 U.S.C. § 1225(b)(1), with exceptions for those seeking asylum who make an affirmative showing that they fear persecution in their home country, 8 U.S.C. § 1225(b)(1)(B)(ii). Section 1225(b)(2) then contains a catch all governing applicants for admission not subject to (b)(1) whom DHS instead places in standard removal proceedings. *See* 8 U.S.C. § 1225(b)(2)(A) (explaining that "other aliens . . . shall be detained for a proceeding under" 8 U.S.C. § 1229a). The Court will not dedicate detailed discussion to each step in the decision tree because, regardless of the specific path an alien takes, the alien "shall be detained" pending immigration proceedings, and that mandate continues until the proceedings are complete. *See* 8 U.S.C. § 1225(b)(1)(B)(ii) ("shall be detained"); *id.* § 1225(b)(1)(B)(iii)(IV) (same); *id.* § 1225(b)(2)(A) (same); *see also* 8 U.S.C.

A414

§ 1225(b)(1)(A)(i) ("the officer shall order the alien removed from the United States without further hearing or review"); *id.* § 1225(b)(1)(B)(iii)(I) (same). As the Supreme Court explained in *Jennings*, "§§ 1225(b)(1) and (b)(2) . . . mandate detention of applicants for admission until certain proceedings have concluded." *Jennings*, 138 S. Ct. at 842.

Notwithstanding the plain text of § 1225(b) and the Supreme Court's holding in *Jennings*, DHS argues that detention of applicants for admission is discretionary. In DHS's view, § 1225(b)'s mandatory language flows in only one direction—the statute prevents aliens from obtaining release, but it does not create obligations for DHS. In other words, DHS interprets the "shall" language in § 1225(b) to limit the rights of aliens but not to limit the agency's own discretion.

The Court rejects DHS's argument and concludes that § 1225(b)'s "shall be detained" requirements are mandatory. As the Supreme Court recognized in *Jennings*, "the word 'shall' usually connotes a requirement." *Jennings*, 138 S. Ct. at 844 (quotations omitted). This is because "[t]he word 'shall' does not convey discretion." *United States v. Quirante*, 486 F.3d 1273, 1275 (11th Cir. 2007). Rather, "where Congress uses the word 'shall' to describe a party's obligation, Congress intends to command rather than suggest." *Id.* That conclusion is confirmed by the heading for § 1225(b)(1)(B)(iii)(IV), which describes that provision as creating "[m]andatory detention." *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,

A415

554 U.S. 33, 47 (2008) (explaining that "statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute" (quotations omitted)). And the other detention provisions of § 1225(b) use the identical phrase "shall be detained." *Compare* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), *with id.* § 1225(b)(1)(B)(ii), *and id.* § 1225(b)(2)(A).

Moreover, Congress's use of the discretionary "may" in other similar provisions of the INA bolsters the Court's conclusion that § 1225(b)'s detention requirements are mandatory. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (quotations omitted)). For example, § 1226(a) states that certain other aliens "*may* be arrested and detained." *See* 8 U.S.C. § 1226(a) (emphasis added). And in other provisions of § 1225 Congress recognized the difference between a discretionary option and a mandatory command. *E.g.*, 8 U.S.C. § 1225(b)(2)(C) ("[T]he Attorney General *may* return the alien to [a contiguous territory] pending" removal. (emphasis added)); *Biden v. Texas*, 142 S. Ct. at 2541 (concluding that § 1225(b)(2)(C) "clearly connotes" discretion).

In arguing otherwise, DHS relies on *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), *Heckler v. Chaney*, 470 U.S. 821 (1985), and the "deep-rooted

nature of law-enforcement discretion," *Castle Rock*, 545 U.S. at 761.[8] But these cases do not "set agencies free to disregard legislative direction," and they make clear that Congress is free to cabin enforcement discretion by providing "guidelines for the agency to follow in exercising its enforcement powers." *Heckler*, 470 U.S. at 832–33; *accord Castle Rock*, 545 U.S. at 761 (explaining that, to find a mandatory duty, the Court "would require some stronger indication from the Colorado Legislature" than the phrase "shall use every reasonable means"). As explained above, Congress cabined DHS's discretion in § 1225(b) when it commanded the agency, in clear and unambiguous language, to detain applicants for admission pending removal proceedings.

Having concluded that § 1225(b) is mandatory rather than discretionary, the Court turns to whether either of the release mechanisms DHS invokes are permissible in light of the mandatory language in § 1225(b). As explained in the Court's findings of fact, DHS applies the Non-Detention Policy in some instances by releasing aliens under § 1226(a) and in other instances by releasing aliens under § 1182(d)(5). [FOF ¶ 47.]

---

[8] DHS also argues that it has enforcement discretion to forego any immigration enforcement against a particular alien and can thereby avoid § 1225(b)'s detention requirements. The evidence at trial, however, shows that DHS is initiating removal proceedings against the population of aliens at issue. As such, DHS's argument is beside the point.

A417

The Court begins with § 1226(a). While § 1225(b) governs the detention of applicants for admission, § 1226(a) states that, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed." *See* 8 U.S.C. § 1226(a). It then states that, following such arrest, the Attorney General "may continue to detain the arrested alien" or "may release the alien" either "on bond" or on "conditional parole." *See* 8 U.S.C. § 1226(a).

DHS contends that § 1226(a) applies to aliens at the Southwest Border so long as the alien reaches U.S. soil. And because § 1225(a)'s definition of applicants for admission also includes these aliens, *see* 8 U.S.C. § 1225(a), DHS contends that Congress gave the agency a choice—if DHS wants to detain an alien at the Southwest Border, it can apply § 1225(b), but if DHS wants to release the alien, it can apply § 1226(a).

The Court rejects DHS's argument for two reasons. First, § 1226(a) does not apply to applicants for admission apprehended by DHS at the Southwest Border. Second, even if it could apply under some circumstances, the evidence at trial showed that DHS is initially processing applicants for admission at the Southwest Border under § 1225, and, at a minimum, DHS may not switch back and forth between § 1225 and § 1226 when processing aliens at the border.

A418

Starting with the first point, § 1225(a) treats a specific class of aliens as "applicants for admission," and § 1225(b) mandates detention of these aliens throughout their removal proceedings. Section 1226(a), by contrast, states in general terms that detention of aliens pending removal is discretionary unless the alien is a criminal alien. *See* 8 U.S.C. § 1226(c).

As the Supreme Court stated in *Jennings*, § 1226 applies to "certain aliens *already in the country*." 138 S. Ct. at 838 (emphasis added). And even if an alien crossing the Southwest Border fell within § 1226(a)'s general language, § 1225(b)'s specific mandatory language would trump § 1226(a)'s general permissive language. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). This canon applies to §§ 1225 and 1226, as it is "most frequently applied to statutes in which a general permission . . . is contradicted by a specific prohibition," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Moreover, DHS's position would render mandatory detention under § 1225(b) meaningless. As explained above, Congress expanded § 1225(b) in 1996 to apply to a broader category of aliens, including illegal border crossers. Pub. L. No. 104-208 § 302, 110 Stat. 3009-579 (1996). That change would make little sense if DHS retained discretion to apply § 1226(a) and release illegal border crossers whenever the agency saw fit. *Cf. Demore*, 538 U.S. at 518 (explaining that "wholesale

failure[s]" by the federal government motivated the 1996 amendments to the INA).

In fact, as the U.S. Attorney General recently explained, "section [1225] (under

which detention is mandatory) and section [1226(a)] (under which detention is

permissive) can be reconciled only if they apply to different classes of aliens."

*Matter of M-S-*, 27 I&N Dec. 509, 516 (2019).[9]

That brings the Court to the second point. Even if DHS were correct that

§ 1225(b) and § 1226(a) overlap, and even if DHS were correct that the agency has

discretion to decide which provision to apply, what DHS certainly may not do is

initiate an inspection under § 1225 and then, at some later time, attempt to shift the

alien's detention to § 1226(a). As explained below, *Jennings* expressly rejects that

approach.

DHS's initial apprehension and processing of applicants for admission at the

Southwest Border is an "inspection" under 8 U.S.C. § 1225. [FOF ¶ 21; Doc. 87-1

at SAR 1.] During that inspection, if DHS decides to release an alien under

§ 1226(a), it initiates a removal proceeding against the alien under 8 U.S.C. § 1229a

by serving a Notice to Appear and then relies on those pending removal proceedings

as a basis to shift the alien's detention from § 1225(b) to § 1226(a). At closing

argument, counsel for DHS described the agency's position that the decision to place

---

[9] The Attorney General's opinion cites sections 235 and 236 of the INA, which are 8 U.S.C. § 1225 and 8 U.S.C. § 1226 respectively.

A420

an applicant for admission in standard removal proceedings under 8 U.S.C. § 1229a, instead of expedited removal proceedings under § 1225(b)(1), causes § 1226(a) to govern the alien's detention. The Court concludes that these applications of § 1226(a) are unlawful because § 1225(b)(2), not § 1226(a), governs the detention of applicants for admission whom DHS places in standard removal proceedings following in inspection under § 1225.

As explained above, § 1225(b)(1) discusses expedited removal for applicants for admission, and § 1225(b)(2) discusses standard removal for applicants for admission. Section 1225(b)(2) expressly states that aliens not subject to expedited removal under (b)(1) "shall be detained for a proceeding under section 1229a," which is the provision of the INA governing standard removal proceedings. In *Jennings*, the plaintiffs made the basic argument DHS advances here—arguing that "for a proceeding" in § 1225(b)(2) means "only until the *start* of applicable proceedings," and that § 1226(a) governs detention once those proceedings begin. *Jennings*, 138 S. Ct. at 844. The Supreme Court, however, rejected the plaintiffs' position that § 1226(a) governs the detention of applicants for admission once removal proceedings begin, holding that "(b)(2) mandate[s] detention of aliens *throughout the completion of applicable proceedings* and not just until the moment those proceedings begin." *Id.* at 845 (emphasis added).

A421

Making matters worse for DHS, the evidence at trial showed that DHS is not obtaining warrants for aliens arrested at the Southwest Border. Because a warrant is a precondition for detention under § 1226(a), it is also a precondition for a release under § 1226(a). Section 1226(a) "authorizes detention only '[o]n a warrant issued' by the Attorney General." *Jennings*, 138 S. Ct. at 845 (quoting 8 U.S.C. § 1226(a)). And DHS does not obtain a warrant under § 1226(a) at the time the agency apprehends an alien at the Southwest Border but rather relies on the warrantless arrest provision in 8 U.S.C. § 1357(a)(2). *See* 8 U.S.C. § 1357(a)(2) (allowing a warrantless arrest when an alien "is entering or attempting to enter the United States in violation of law" in the "presence or view" of an immigration officer); [FOF ¶ 21]

In DHS's Rule 30(b)(6) deposition, the agency's representative testified that DHS does not obtain an arrest warrant at any time before releasing an applicant for admission at the Southwest Border under § 1226(a). [Pl. July 13 Designation of Tony Barker at 61:2–62:3.] At trial, however, DHS insisted that it obtains such a warrant at the time of *release* (not at the time of *arrest*) and places the warrant in the alien's case file. [Tr. Day 2 at 124:10–125:14.] The Court does not find DHS's evidence credible given what the agency's corporate representative said in his deposition. But the Court also finds the dispute immaterial because what DHS claims to be doing is equally unlawful. [FOF ¶ 21.]

Warrants under § 1226(a) are *arrest* warrants. But what DHS claims to be doing is using warrants as a basis for *release* of an alien that the agency has already arrested under different authority—namely, § 1225's inspection provisions and § 1357(a)(2)'s warrantless arrest provision. These warrants—to the extent DHS is obtaining them at all—are at best a form of administrative hand-waving designed to invoke a release mechanism that plainly does not apply. The Supreme Court described this approach aptly in *Jennings*:

> If respondents' interpretation of § 1225(b) were correct, then the Government could detain an alien without a warrant at the border, but once removal proceedings began, the Attorney General would have to issue an arrest warrant in order to continue detaining the alien. To put it lightly, that makes little sense.

*Jennings*, 138 S. Ct. at 845.

Having concluded that § 1225(b) requires detention of applicants for admission at the Southwest Border and that DHS may not release these aliens under § 1226(a), the Court must address whether DHS's releases under § 1182(d)(5) are lawful. Because Florida separately challenges the Parole + ATD Policy, and because that policy explains how DHS is using § 1182(d)(5) at the Southwest Border, the Court will address that question when it discusses the Parole + ATD Policy.

### *Arbitrary and Capricious*

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). This standard "requires that

63

agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Indeed, meaningful judicial review requires an agency to "disclose the basis of its action." *See Dep't of Com.*, 139 S. Ct. at 2573 (quotations omitted).

Florida contends that DHS's refusal to acknowledge its change in policy renders the Non-Detention Policy arbitrary and capricious. The Court agrees. As Justice Scalia explained in *Fox Television*, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." 556 U.S at 515. And an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* DHS's issuance of the Non-Detention Policy was a distinct change in detention policy, and DHS's failure to acknowledge that change, or to provide a decisional document or administrative record for this Court to review, is fatal because the Court has no way to assess whether the agency's actions are reasonable and reasonably explained.

Accordingly, the Court concludes that the Non-Detention Policy is arbitrary and capricious.

*Notice and Comment*

The parties' contentions regarding notice and comment center largely on their factual disagreements. Florida argues that a significant change in detention policy is

subject to notice and comment, while DHS argues that Florida merely challenges an amalgam of individual enforcement decisions. The Court has already found that the Non-Detention Policy is a distinct and reviewable policy. That leaves the Court with only minimal arguments from DHS regarding why that policy is not subject to notice and comment.

The APA "specifies that an agency shall afford interested persons general notice of proposed rulemaking and an opportunity to comment before a substantive rule is promulgated." *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979) (discussing 5 U.S.C § 553). The APA distinguishes between interpretive rules, which are not subject to notice and comment, and substantive rules, which are. *Id.* at 301–03. A rule is substantive and thus subject to notice and comment if it "affect[s] individual rights and obligations." *Id.* at 302 (quotations omitted).

For similar reasons that the Non-Detention Policy is final agency action, it is a substantive rule. It gives new marching orders to immigration officials, determines whether aliens are detained or free to move in the United States, and implicates Florida's obligations to provide services and benefits to released aliens. Because the Non-Detention Policy is a "rule of general applicability" regarding the detention or

non-detention of aliens, it is subject to rulemaking. *Jean v. Nelson* (*Jean I*), 711 F.2d 1455, 1476–77 (11th Cir. 1983).[10]

DHS principally invokes the "agency management" exception to notice and comment in 5 U.S.C. § 553(a)(2). But that exception is a "narrow[]" one that does not apply when the policy is not "primarily for the internal benefit" of agency employees. *Tunik v. Merit Sys. Prot. Bd.*, 407 F.3d 1326, 1344 (Fed. Cir. 2005). A policy governing when aliens may be detained or released goes far beyond the internal management of DHS.

Because the Non-Detention Policy affects the rights and obligations of both aliens and Florida, it is a substantive rule subject to notice and comment.

<u>The Parole + ATD Policy</u>

In addition to the Non-Detention Policy, Florida challenges DHS's Parole + ATD Policy. As discussed, the July Memo reflects the latest iteration of that policy. Florida contends that the Parole + ATD Policy is contrary to law, arbitrary and capricious, and subject to notice and comment. DHS contends that the Parole + ATD Policy is not subject to judicial review.

---

[10] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean v. Nelson* (*Jean II*), 727 F.2d 957, 962 (11th Cir. 1984) (en banc). The en banc court did not address the notice and comment argument because the federal government conducted notice and comment in response to the panel opinion. *Id.* at 984.

A426

The Court reviews these questions based on the administrative record provided by DHS, *see Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985), subject to two exceptions. First, the Court will look beyond the administrative record to determine "if an agency considered all the relevant factors." *See Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1202 (11th Cir. 2022).

Second, the Court will supplement the record to include DHS's publicly available data regarding the number of times the agency is using Parole + ATD per month. A Court may look beyond the record where the absence of evidence "effectively frustrates judicial review" by failing to present a clear picture of the agency's actions. *PEACH*, 87 F.3d at 1246 n.1. The July Memo states that "Parole + ATD is a tool that should be used sparingly" and is "not meant to be a primary processing tool." In reality, however, DHS has made Parole + ATD its primary processing pathway and is releasing as many as 88,000 applicants for admission per month. [FOF ¶ 47.] This extra-record evidence blatantly contradicts statements in the decisional document, and the Court must consider it to fairly determine whether the July Memo complies with the case-by-case requirement in § 1182(d)(5). *See Biden v. Texas*, 142 S. Ct. 2528, 2554 (2022) (Alito, J., dissenting) (looking to the number of parole grants per month to evaluate compliance with the case-by-case requirement).

67

Before delving into these issues, the Court briefly summarizes the July Memo. The memo outlines a Border Patrol policy for releasing applicants for admission under § 1182(d)(5). Section 1182(d)(5) authorizes DHS to "parole . . . any alien applying for admission to the United States" but "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A). [Doc. 87-1 at SAR 1–4.] The policy seeks to bypass the inspection procedures in § 1225, including the initiation of removal proceedings, so that Border Patrol can move aliens out of its holding capacity and mitigate overcrowding. As the July Memo states, "Parole + ATD provides a processing mechanism to address situations in which there is not appropriate detention space available, and there are operational concerns about the number of people present in, and potentially subject to a prolonged time-in-custody at, USBP facilities along the Southwest border." [Doc. 87-1 at SAR 2.] The July Memo also describes itself as "a safety valve to address overcrowding." [Doc. 87-1 at SAR 2.]

The July Memo provides threshold criteria for when Border Patrol may authorize Parole + ATD in a sector. [Doc. 87-1 at SAR 3.] While the memo instructs agents to make an individualized assessment of "whether [an alien] is eligible for parole based on an urgent humanitarian reason or whether there is a significant public benefit," it predetermines that "disease-mitigation" through the use of a

68

**A428**

"safety valve to address overcrowding" satisfies § 1182(d)(5).  [Doc. 87-1 at SAR 2, 3–4.]

Importantly, the July Memo, unlike the November Memo, does not expressly limit Parole + ATD to family units. [*Compare* Doc. 87-1 at SAR 94.] The July Memo only disqualifies noncitizens who "pose a national security risk, unmitigable flight risk, [or] public safety threat," are unaccompanied children, or are subject to mandatory detention under 8 U.S.C § 1226(c). [Doc. 87-1 at SAR 4.] Finally, the memo instructs CBP and ICE to collaborate to locate released aliens for processing in the interior of the United States at a later date. [Doc. 87-1 at SAR 4.]

The administrative record contains various reports about processing times and detention capacity at the Southwest Border, talking points regarding the Parole + ATD Policy, the earlier November Memo and the administrative record associated with that policy, and internal discussions regarding the administrative backlog Parole + ATD has and will continue to cause. [Doc. 87-1 at SAR 5, 93–95, 165–69, 261–70.]

### *APA Reviewability*

The Court again begins with the APA's "basic presumption of judicial review." *Regents*, 140 S. Ct. at 1905 (quotations omitted). DHS argues that the Parole + ATD Policy is unreviewable because it is not "final agency action,"

69

5 U.S.C. § 704, and because it is "committed to agency discretion by law," 5 U.S.C.

§ 701(a)(2).

As explained above, an agency action is final if it "mark[s] the consummation

of the agency's decisionmaking process" and is "one by which rights or obligations

have been determined, or from which legal consequences will flow." *Bennett*, 520

U.S. at 177–78 (quotations omitted). The July Memo is a formal, signed memo by

the heads of ICE and CBP that instructs agents how to exercise their authority. [Doc.

87-1 at SAR 1–4.] It also sets criteria by which aliens are eligible or ineligible for

parole and release from DHS custody. [*E.g.*, Doc. 87-1 at SAR 4.] Moreover,

granting parole has legal and financial consequences for the State of Florida because

it determines eligibility for a variety of state programs. [FOF ¶ 80; *see also* FOF

¶ 65–84.]

DHS argues that the July Memo is not final because officers retain discretion

to detain or parole individuals. But the fact that agency officials may retain a

modicum of discretion does not negate the finality of the overarching policy

directing their actions. *See Scenic Am., Inc. v. U.S. Dep't of Trans.*, 836 F.3d 42, 56

(D.C. Cir. 2016); *Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*,

335 F.3d 607, 614–15 (7th Cir. 2003).

Likewise, the decisions reflected in the July Memo are not "committed to

agency discretion by law." 5 U.S.C. § 701(a)(2). For reasons the Court will soon

A430

explain, the parole authority in § 1182(d)(5) is not unbounded and provides a meaningful standard by which to review the agency's actions. *See Dep't of Com.*, 139 S. Ct. at 2568; *accord Weyerhaeuser*, 139 S. Ct. at 370 (explaining that § 701(a)(2) applies when these is "no meaningful standard against which to judge the agency's exercise of discretion" (quotations omitted)).

Finally, the Supreme Court has indicated—albeit in dicta—that DHS's use of the parole authority in 8 U.S.C. § 1182(d)(5) is at a minimum not categorically exempt from judicial review. As the Court explained in *Biden v. Texas*, "under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." 142 S. Ct. at 2543; *see Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (explaining that "there is dicta and then there is dicta, and then there is Supreme Court dicta").

For these reasons, the July Memo is subject to APA review.

### Contrary to Law

Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Florida argues that the July Memo is contrary to law because it ignores the plain language of § 1182(d)(5). That statute authorizes parole only on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5). It further

requires that a paroled alien be "forthwith . . . returned to the custody from which he was paroled" once "the purposes of such parole . . . have been served." 8 U.S.C. § 1182(d)(5).

The Court concludes that the July Memo is contrary to law in three ways: (1) it does not contemplate a return to custody once the purposes of parole have been served; (2) it does not comply with the case-by-case requirement; and (3) it does not limit parole to urgent humanitarian reasons or significant public benefit.

The July Memo does not even acknowledge the requirement that an alien be returned to DHS custody when "the purposes of such parole shall . . . have been served." 8 U.S.C. § 1182(d)(5)(A). As counsel for DHS acknowledged during oral argument, the "purpose" of parole contemplated by the July Memo is moving aliens out of Border Patrol facilities faster than would occur if the alien were processed consistent with § 1225. [Tr. Day 4 at 208, 210; Doc. 87-1 at SAR 112.] In doing so, the July Memo seeks to shift the inspection contemplated by § 1225 to an ICE field office in the interior.

If that is the case, the purpose of parole is served when the alien has his first encounter with ICE. But nothing in the memo or administrative record contemplates a return to custody at that time or any time thereafter. In fact, the administrative record indicates that DHS promises aliens released under the July Memo that they "will not be taken into custody" when they report to ICE. [Doc. 87-1 at SAR 168.]

72

As to the "case-by-case" requirement, the phrase "case-by-case" indicates that DHS must conduct an individualized assessment of each alien to determine whether to grant parole. 8 U.S.C. § 1182(d)(5). Section 1182(d)(5) clarifies that "case" refers to the specific circumstances of the alien. *See* 8 U.S.C. § 1182(d)(5)(A) (explaining that when an alien is returned to custody after the purposes of parole have been served "his *case* shall continue to be dealt with in the same manner as that of any other applicant for admission" (emphasis added)).

As the Fifth Circuit recently explained, Congress amended § 1182(d)(5) in 1996 to add the "case-by-case" requirement and prevent *en masse* use of § 1182(d)(5). *See Texas v. Biden*, 20 F.4th at 997. Congress made these changes in response to the federal government "us[ing] the parole power to bring in large groups of immigrants." *Id.* at 947; *see also Biden v. Texas*, 142 S. Ct. at 2555 (Alito, J., dissenting) (reiterating the Fifth Circuit's explanation). Congress labeled that portion of its legislation "Limitation On Use of Parole." *See* Pub. L. No. 104-208 § 602(a), 110 Stat. 3009-689 (1996). And, in the same amendment, Congress also added a requirement that DHS report detailed statistics about the number of parolees, their length of parole, and if they had been returned to custody. Pub. L. 104-208 No. § 602(b), 110 Stat. 3009-689 to -690 (1996) (referred to as "8 USCA § 1182 Note").

The process set forth in the July Memo violates the case-by-case requirement. While the memo pays lip service to assessments of individual aliens, the July Memo

73

is largely focused on *DHS's operational circumstances* rather than an individual alien's circumstances. [Doc. 87-1 at SAR 3 (discussing overcrowding).] Any case-by-case consideration of the alien's circumstances—to the extent it occurs at all—focuses on whether the alien is a public safety risk or flight risk, [Doc. 87-1 at SAR 4], not on whether the alien meets the exceedingly high parole standard. *See* 8 U.S.C. § 1182(d)(5) (discussing "urgent humanitarian reasons or significant public benefit"). And the memo turns the parole standard on its head by providing *ineligibility* criteria rather than *eligibility* criteria. [Doc. 87-1 at SAR 3–4.] In other words, the July Memo establishes a presumption of parole when the relevant "triggers" are met.

Time estimates in the administrative record confirm that Border Patrol is not conducting meaningful case-by-case consideration. The record indicates that the "processing time" for issuing a Notice to Appear is between two and two and a half hours. Parole + ATD, by contrast, takes only 15–30 minutes total. [Doc. 87-1 at SAR 5.] And this 15–30 minutes also includes placing the alien on ATD, collecting information including a physical address, and running the alien's biometric information through various databases to determine whether the alien is a public safety risk. [Doc. 87-1 at SAR 3–4.] In fact, if DHS were taking the "case-by-case" requirement seriously, the Court doubts that § 1182(d)(5) would form the basis for a new policy whose express purpose is *speeding up* the processing of migrants.

A434

On this point, the Court finds persuasive Justice Alito's discussion of the case-by-case requirement in *Biden v. Texas*, 142 S. Ct. 2528, 2555 (2022) (Alito, J., dissenting). There, Justice Alito explains that "simply . . . going through a brief checklist for each alien" is "inconsistent with the ordinary meaning of 'case-by-case' review." *Id.* Further, Justice Alito notes that the number of aliens paroled each month "gives rise to a strong inference that the [g]overnment is not really making these decisions on a case-by-case basis." *Id.* at 2554. Notably, the data before Justice Alito showed 27,000 paroles in April 2022, whereas the data before this Court shows more than 88,000 in November 2022. [FOF ¶ 47.]

Finally, the Court concludes that the July Memo violates § 1182(d)(5)'s requirement that parole only be granted "for urgent humanitarian reasons or significant public benefit." "Urgent humanitarian reasons" and "significant public benefit" reserves the parole authority for extraordinary circumstances. Before 1996, § 1182(d)(5)(A) permitted parole "for emergent reasons or reasons strictly in the public interest." 8 U.S.C. § 1182(d)(5)(A) (1995). The addition of "urgent" and "significant" added a higher level of exigency. *In re BFW Liquidation, LLC*, 899 F.3d 1178, 1191 (11th Cir. 2018) ("[C]hanges in statutory language generally indicate an intent to change the meaning of the statute.").

Fundamentally, the July Memo takes issue with the time it takes to conduct the mandated inspection under § 1225 and finds that speeding up processing yields

A435

a significant public benefit. [*E.g.*, Doc. 87-1 at SAR 2 ("It is significantly more efficient—approximately 60 minutes faster—to process individuals, consistent with 8 U.S.C. § 1225(a), for Parole + ATD as opposed to issuing a Notice to Appear (NTA) or other charging document at the time of encounter.").]

Even assuming there may be circumstances where an individual alien might be eligible for parole based on overcrowding and safety concerns, creating an entirely new processing pathway to avoid the process mandated by § 1225 is not consistent with the narrow language in § 1182(d)(5). And it is clear that Parole + ATD has become the *primary* processing pathway for aliens at the Southwest Border. In November 2022, for example, Border Patrol apprehended 141,000 aliens at the border and released 88,000 of them on Parole + ATD. [FOF ¶ 47.]

DHS has suggested that the Court should read this standard broadly and defer to DHS's implementing regulations to define "urgent humanitarian reasons" and "significant public benefit." DHS defines these terms to include several medical conditions, custody of minors, witnesses in proceedings or investigations, and "[a]liens whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b). Thus, DHS contends, it may parole an alien who does not present a security risk or risk of absconding because that alien's "continued detention is not in the public interest." *Id.*

76

While Florida does not challenge this regulation, the State urges that 8 C.F.R. § 212.5(b) does not entitle DHS to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and that, in any event, the regulation does not support DHS's argument that Parole + ATD satisfies the "urgent humanitarian reasons or significant public benefit" standard. The Court agrees with Florida.

While *Chevron* deference would require DHS to show that § 1182(d)(5) is ambiguous, the Court need not address that question because DHS's interpretation is not reasonable. *See Chevron*, 467 U.S. at 843. Specifically, 8 C.F.R. § 212.5(b)(5) asks whether "detention" is "in the public interest." But that inquiry flips the INA on its head, as § 1225(b) requires detention *unless* an alien meets the exceedingly high parole standard. Thus, DHS cannot reasonably take the position that, absent an affirmative finding that detention is in the public interest, an alien is entitled to release.

Moreover, 8 C.F.R. § 212.5(b)(5)'s "public interest" language was not an attempt by the agency to interpret the phrase "urgent humanitarian reasons or significant public benefit," which is a prerequisite for *Chevron* deference. *See Jaen v. Sessions*, 899 F.3d 182, 187 n.4 (2d Cir. 2018) (denying *Chevron* deference for a document that did not "purport to interpret the statute"). The phrase "whose continued detention is not in the public interest," 8 C.F.R. § 212.5(b), tracks closely the pre-1996 text of § 1182(d)(5). *See* 8 U.S.C. § 1182(d)(5)(A) (1995) (permitting

77

parole "for emergent reasons or *reasons strictly in the public interest*" (emphasis added)). And the federal government promulgated that regulation under the pre-1996 statutory text. *See* 47 Fed. Reg. 30,044. Thus, the phrase "public interest" was parroting language, which receives no deference under *Chevron*. *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).

The only question, then, is whether DHS's failure to update the regulation after the 1996 amendment—to reflect the change from "public interest" to "significant public benefit"—is subject to *Chevron* deference. The Court is skeptical that DHS's failure to update its regulations to track an amended statute was an attempt to interpret the amended statute. But if it were, such a decision would be so plainly unreasonable as to foreclose *Chevron* deference.

Finally, even if DHS were entitled to *Chevron* deference, 8 C.F.R. § 212.5(b) would not support the lawfulness of the Parole + ATD Policy. The mere fact that DHS may parole an alien whose "continued detention is not in the public interest" does not allow the agency to create an unprecedented new processing pathway, use that pathway in place of the mandated inspections under § 1225, and convert that pathway into the primary mechanism for processing aliens at the Southwest Border.

For these reasons, the Court concludes that the July Memo is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

A438

*Arbitrary and Capricious*

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). As explained, this standard "requires that agency action be reasonable and reasonably explained." *Prometheus*, 141 S. Ct. at 1158. Under the oft-repeated standard, a reviewing court must look to see if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. "To determine if an agency considered all the relevant factors and important aspects of the problem, a court may look to the language of the relevant statutes, regulations, the administrative record, and even beyond the administrative record." *Bidi Vapor*, 47 F.4th at 1202 (quotations and citations omitted).

Florida presents five bases for why the July Memo is arbitrary and capricious: (1) DHS failed to adequately consider the ever-worsening backlog caused by earlier iterations of the Parole + ATD Policy; (2) DHS failed to acknowledge the extraordinary expansion of the agency's use of parole under § 1182(d)(5) as compared to the agency's historical practice; (3) DHS ignored the evidence when it concluded that Parole + ATD will only be "used sparingly" and that it is "not meant

79

to be a primary processing tool"; (4) DHS failed to consider whether the Parole + ATD policy would increase migration flows; and (5) DHS failed to acknowledge its decision to expand Parole + ATD to include single adults rather than only family units, much less explain why it did so.

As to the backlog, the administrative record contains estimates regarding the number of individuals released on Parole + ATD against whom DHS must still initiate removal proceedings. [Doc. 87-1 at SAR 261–66.] These projections show that for every 90 days Parole + ATD continues, the policy creates a backlog that takes 5.5 years and $49 million to clear. [Doc. 87-1 at SAR 261–62.] And this backlog only accounts for the time needed to *begin* removal proceedings—not the additional time to complete those proceedings and remove aliens. [FOF ¶ 89.] By these estimates, the backlog created by Parole + ATD will take *decades* to overcome.

The July Memo does not expressly consider this backlog, much less consider alternatives or explain why the backlog is not a reason to change course. But, DHS argues, the presence of this information in the administrative record demonstrates that DHS considered it. And, they say, the July Memo at least acknowledges the backlog insofar as it directs ICE and CBP to share the burden of clearing that backlog. [Doc. 87-1 at SAR 4.]

Given the gravity of the problem, the Court concludes that DHS did not adequately consider it. In *Regents*, for example, the reliance interests of DACA

A440

recipients were sufficiently significant that the Court expected "the rescission memorandum" *itself* to discuss the issue. *See Regents*, 140 S. Ct. at 1913. And whatever the passing references to the backlog in the July Memo and the administrative record show, they do not provide the Court with a basis to evaluate DHS's *reasoning* as to that problem. *See Prometheus*, 141 S. Ct. at 1158 (explaining that the APA requires that "agency action be reasonable and reasonably explained"). Nor is the Court permitted to "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

As to whether DHS adequately explained its substantial expansion of the parole authority, the Court again agrees with Florida. At trial, DHS did not provide a single document pre-dating the events in this case that gave guidance to Border Patrol regarding the parole authority. DHS did, however, offer OFO and ICE documents. Those documents indicate that "[l]ack of detention space . . . [is] not [an] appropriate reason[] to parole an inadmissible alien," [Def. Ex. F], and that DHS previously paroled aliens under 8 C.F.R. § 212.5(b)'s "public interest" language only *after* the alien demonstrated a credible fear of persecution in his home country, [Def. Ex. C]. The Parole + ATD Policy is therefore an unprecedented expansion— now being used tens of thousands of times per month on aliens who have shown no

entitlement to remain in the United States—that DHS utterly failed to acknowledge or address.[11]

Relatedly, the July Memo says that the Parole + ATD Policy will only be "used sparingly" and that it is "not meant to be a primary processing tool." [Doc. 87-1 at SAR 2, 3.] Those statements—which turned out to be untrue—were contrary to "the evidence before the agency" when DHS issued the July Memo. *See State Farm*, 463 U.S. at 43. In the last full month applying the November Memo (June 2022)— the previous iteration of Parole + ATD—Border Patrol released over 40,000 applicants for admission under that policy, which was more than 40% of total apprehensions at the Southwest Border that month. [Pl. Ex. 3 at 3.] The July Memo *expanded* Parole + ATD to include single adults rather than just family units. It was therefore contrary to all available evidence to expect that the July Memo would be used sparingly and not become the primary processing pathway.

As to migration flows, the Court heard evidence at trial—including testimony from the Chief of Border Patrol—that changes in detention policy like the Parole + ATD Policy can substantially increase border traffic, and they have done so. [FOF ¶ 26.] Neither the July Memo nor the administrative record discuss effects on migration flows at all, which is surprising given DHS's consistent position that

---

[11] The Court acknowledges that the November Memo was the first expansion of the parole authority, but the November Memo similarly does not acknowledge this expansion.

increased border traffic, rather than a change in policy, is to blame for all of its failures. In any event, DHS's failure to even consider that effect is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Finally, Florida contends that DHS failed to explain why it expanded Parole + ATD to single adults. The November Memo, which formally established the Parole + ATD processing pathway, limited its application to family units. [Doc. 87-1 at SAR 94.] The July Memo does not limit parole to family units, and thus marks a change in the agency's policy. [Doc. 87-1 at SAR 1–4.] "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox Television*, 556 U.S. at 515. Failure to acknowledge this shift in agency policy is arbitrary and capricious per se.

Accordingly, the Court concludes that the July Memo is arbitrary and capricious.

### Notice and Comment

As stated above, the APA requires an agency to give notice and opportunity for comment for rules that affect rights and obligations. *See* 5 U.S.C. § 553; *Chrysler Corp.*, 441 U.S. at 302. Excluded from that obligation are "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).

A443

Florida claims that the July Memo is an agency rule affecting rights and obligations that was subject to notice and comment. DHS disagrees, arguing that the July Memo falls into the exceptions for notice and comment under 5 U.S.C. § 553(b)(A).

For the same reasons the July Memo is final agency action, it is a substantive rule. The July Memo instructs agents how to exercise their discretionary authority under § 1182(d)(5), sets criteria for determining grants of parole, and affects Florida's obligations to paroled aliens. Further, the July Memo sets a generally applicable policy to determine whether aliens are detained or paroled, which is subject to notice and comment. *Jean I*, 711 F.2d at 1476–77.

The Court concludes that none of the exceptions in 5 U.S.C. § 553(b)(A) apply to the July Memo. First, the July Memo is not an interpretive rule. An interpretive rule is a "statement[] as to what the administrative officer thinks the statute or regulation means." *Brown Exp., Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) (quoting *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952)).[12] The July Memo does not "purport to interpret a statute or regulation," *id.*, or try to explain the meaning of § 1182(d)(5), so it cannot be an interpretive rule.

---

[12] Fifth Circuit decisions issued before close of business on September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Similarly, the July Memo is not a general statement of policy. "A general statement of policy . . . is merely an announcement to the public of the policy which the agency hopes to implement" and "presages an upcoming rulemaking." *Id.* at 701 (quotations omitted). The July Memo does none of these things. It establishes a substantive change in policy effective immediately and cannot be a general statement of policy.

Finally, the July Memo is not a rule of agency organization. That exception applies where a rule is "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (quotations omitted). Here, the July memo "alter[s] the standards imposed" on aliens and the criteria by which parole may be granted to affected parties. *Id.* at 1024. Thus, the July Memo is not a "rule[] of agency organization, procedure, or practice," 5 U.S.C § 553(b)(A), and it is not exempt from notice and comment.

Accordingly, the July Memo is subject to notice and comment.

<u>Florida's Remaining Claims</u>

The Court does not reach Florida's constitutional claim or its claim that DHS's violation of the mandatory detention provisions in § 1225(b) is agency action unlawfully withheld under 5 U.S.C. § 706(1). As to the former, "[a] fundamental and longstanding principle of judicial restraint requires that courts avoid reaching

A445

constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445–46 (1988); *accord Texas. v. United States*, No. 6:21-cv-16, 2022 WL 2109204, at *44 (S.D. Tex. June 10, 2022) (taking this approach with a similar claim in a similar case). As to the latter, because the Court grants vacatur of both challenged policies based on § 1225(b)'s requirements, it need not grant any further relief to compel compliance with § 1225(b). *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).

<u>The Remedy</u>

As explained above, the Non-Detention Policy and the Parole + ATD Policy violate the APA on several grounds. Florida asks this Court to vacate both policies, enjoin the Parole + ATD Policy, and issue declaratory relief. DHS argues that 8 U.S.C § 1252(f) bars both injunctive relief and APA vacatur and alternatively that this Court should limit relief to aliens released into Florida.

Under the APA, a court must "hold unlawful and set aside agency action" that violates the APA. 5 U.S.C. § 706. In the Eleventh Circuit, "[v]acatur . . . is the ordinary APA remedy." *Black Warrior Riverkeeper*, 781 F.3d at 1290 (quotation omitted). Vacatur typically operates to set aside a rule generally, not as a partial remedy for the plaintiffs. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (explaining that "the ordinary result" of a

successful APA claim is that "the rules are vacated" and not that "their application

to the individual petitioners is proscribed" (quotation omitted)).

Even if the party-specific vacatur DHS seeks were a proper remedy under the

APA, complete vacatur is "necessary to grant complete relief to" Florida here.

*Health Freedom Def. Fund v. Biden*, 599 F. Supp. 3d 1144, 1177 (M.D. Fla. 2022).

Once released at the Southwest Border, aliens are free to travel throughout the

United States. If the Court were to follow DHS's request—which would essentially

involve DHS asking aliens where they are going and applying the challenged

policies to aliens who don't respond with "Florida"—released aliens would be free

to travel to Florida. *See id.* at 1178 (denying a request for partial vacatur where there

were "no adequate assurances that the government can provide that its

agents . . . will not violate this Court's order and deprive Plaintiffs of their relief").

Moreover, if DHS's policy were to detain applicants for admission who say they are

traveling to Florida and release other aliens, the Court expects that it would not take

long for immigration law violators to discover how to ensure their own release.

DHS also argues that 8 U.S.C. § 1252(f) bars this Court from vacating either

policy because vacatur "enjoin[s] or restrain[s] the operation of" certain provisions

of the INA. *See* 8 U.S.C. § 1252(f). The Supreme Court addressed that provision in

two decisions last term. *See Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065

(2022); *Biden v. Texas*, 142 S. Ct. at 2538–39. And in *United States v. Texas*, 143

87

S. Ct. 51 (July 21, 2022), argued this term, the Supreme Court granted certiorari on the question whether § 1252(f) bars APA vacatur.

For its part, this Court finds the Fifth Circuit's approach in the decision under review in that case persuasive. Observing that the Supreme Court "indicated that § 1252(f) is to be interpreted relatively narrowly," the Fifth Circuit concluded that "vacatur neither compels nor restrains further agency decision-making" and thus that § 1252(f) does not bar vacatur. *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022), *cert granted* 143 S. Ct. 51 (July 21, 2022). The Court agrees that vacatur is a distinct remedy not implicated by § 1252(f) and is appropriate in this case.

Florida also requests an order enjoining DHS from enforcing the Parole + ATD policy. The operation of parole under 8 U.S.C. 1182(d)(5)(A) is not implicated by § 1252(f) because it is not in the part of the INA to which § 1252(f) applies. *See* 8 U.S.C. § 1252(f) (applying to "provisions of part IV of this subchapter"); 8 U.S.C. § 1182(d)(5) (found in part II of the same subchapter). Thus, the Court has authority to enter an injunction with respect to Parole + ATD.

The Court, however, declines to issue an injunction because vacatur—"a less drastic remedy"—is "sufficient to redress" Florida's injury. *See Monsanto*, 561 U.S. at 165–66. Thus, the Court finds vacatur and declaratory relief the appropriate remedies at this time. If Florida discovers that this Court's Order has not provided

88

complete relief, the State may file a Rule 60(b) motion, which the Court will consider on an expedited basis.

## CONCLUSION

The Court finds that both the Non-Detention Policy and the Parole + ATD Policy violate the APA and that vacatur of both policies is the appropriate remedy. On its own motion, the Court stays its order for seven days to allow DHS to seek appellate relief. The Court denies any further stay of its order. Accordingly, it is **ORDERED** that:

1. The Court **DECLARES UNLAWFUL** and **VACATES** the Non-Detention Policy and Parole + ATD Policy, remanding them to the agency for further proceedings consistent with this opinion.

2. The Clerk is directed to **ENTER** final judgment in favor of the Plaintiff as to Counts 1–6 and in favor of the Defendants as to Counts 7–8 in accordance with this order and **CLOSE** this case.

3. The Court **STAYS** the effect of this order and the final judgment for seven days from the date of this order.

**DONE and ORDERED** this ___ day of ____, 2023.

A449

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Joseph E. Hart (FBN 124720)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Anita Patel (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF SERVICE

I certify that on February 16, 2023, a true and correct copy of the foregoing

was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ James H. Percival*
Deputy Attorney General

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

|  |  |  |
|---|---|---|
| STATE OF FLORIDA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-01066 |
| | ) | |
| The UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND POST-TRIAL BRIEF

## <u>TABLE OF CONTENTS</u>

INTRODUCTION............................................................................1

LEGAL FRAMEWORK ...............................................................7

PROPOSED FINDINGS OF FACT .............................................16

PROPOSED CONCLUSIONS OF LAW.....................................42

POST-TRIAL BRIEF IN SUPPORT OF DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ...........................67

I.   Plaintiff Does Not Have Standing to Bring This Case ...........................67

    A.   Plaintiff's standing claim is legally insufficient.............................67

    B.   The majority of Plaintiff's standing evidence is "useless"..............75

    C.   Plaintiff has not shown the injuries alleged by the Florida Department of Education are traceable to the challenged policies . 78

    D.   Plaintiff has not shown its claims are redressable........................82

II.   Plaintiff's Claims Are Not Reviewable Under the APA.........................84

    A.   Committed to agency discretion by law.......................................84

    B.   No final agency action................................................88

    C.   Statutes preclude jurisdiction and zone of interests .....................91

III.   The Parole+ATD Policy is Not Contrary to Law .................................94

    A.   Factual background...................................................95

    B.   The Parole+ATD program does not violate the law ....................100

    C.   The Parole+ATD program is not arbitrary or capricious............114

**D.** **The Parole+ATD program was not subject to notice and comment** ................................................................. **122**

**IV.** **There is No Non-Detention Policy**................................ **126**

**A.** **Plaintiff has not identified a specific agency statement that is reviewable under the APA** ......................................... **126**

**B.** **Plaintiff has not proven that Defendants have a non-detention policy** ................................................................ **137**

**i.** **The detention and parole statistics Plaintiff relied on do not establish a non-detention policy**............................................ **137**

**ii.** **Funding requests are not evidence of a non-detention policy** **140**

**iii.** **ICE's closure of its family residential centers increased, rather than decreased, detention capacity defeating Plaintiff's claim that the conversion is evidence of a non-detention policy**...... **146**

**iv.** **Border Patrol's use of Parole+ATD is not evidence of a non-detention policy** .................................................. **148**

**v.** **Border Patrol's temporary use of Notices to Report is not evidence of a non-detention policy** ...................................... **149**

**vi.** **The termination of MPP is not evidence of a non-detention policy** .................................................................. **151**

**C.** **The alleged non-detention policy is not arbitrary or capricious**... **152**

**D.** **The alleged non-detention policy is not contrary to law**.............. **154**

**E.** **The alleged non-detention policy was not subject to notice and comment** ................................................................. **163**

**V.** **The Take Care Clause Does Not Provide a Private Cause of Action for Plaintiff to Sue the Executive Branch** ................................ **164**

**VI.** **There are Limited Remedies Available to Plaintiff**............................ **173**

iii

A.    Injunctive relief is inappropriate ................................................ 174

    i.    Injunctive relief is barred by 8 U.S.C. § 1252(f)(1) ............... 174

    ii.    Plaintiff has not shown it is entitled to injunctive relief ........ 178

B.    Declaratory relief is inappropriate unless properly crafted ......... 182

C.    At most, the Court may remand to the agency without vacating the policies ......................................................................................... 186

    i.    The APA bars universal vacatur of the challenged policies ... 186

    ii.    Universal vacatur is also barred by 8 U.S.C § 1252(f)(1) ...... 189

    iii.    At most, the only proper remedy is to remand to the agency without vacatur ................................................................. 190

D.    Any remedy provided must be limited to the injuries actually proved by Plaintiff ..................................................................... 194

CONCLUSION ........................................................................................ 199

# **INTRODUCTION**

Plaintiff, the State of Florida, has opinions regarding the federal government's current management of immigration enforcement at the Southwest border. Determining immigration policy, however, is not the role of the States in our federal system. The "federal power to determine immigration policy is well settled." *Arizona v. United States*, 567 U.S. 387, 395 (2012). Indeed, a "principal feature" of federal power is the "broad discretion exercised by immigration officials." *Id.* at 395-96. The system reflects the reality that immigration officials must determine how to deploy finite resources when enforcing the Nation's immigration laws.

Congress has made the Secretary of Homeland Security responsible for "establishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and "administering rules . . . governing . . . parole," 6 U.S.C. § 202(4). U.S. Customs and Border Protection ("CBP"), the component of the Department of Homeland Security ("DHS") responsible for enforcing immigration laws at ports of entry and between ports of entry, authorized its immigration officers to take certain enforcement actions in specific circumstances to relieve overcrowding, protect its workforce and noncitizens in CBP custody, and maximize its limited resources. Similarly, U.S. Immigration and Customs Enforcement ("ICE"), the DHS component responsible for, among other things, detaining noncitizens in removal proceedings or awaiting removal, has, within the boundaries of what Congress has

authorized, adjusted its detention capacity and improved compliance rates of non-detained noncitizens reporting to ICE.

Plaintiff asks this Court to undermine those decisions, curtail DHS's discretion to determine which noncitizens arriving at the border should be charged and detained, and supervise the Executive Branch's oversight of immigration more broadly. Plaintiff challenges Defendants' Parole Plus Alternatives to Detention ("Parole+ATD") policy, which informs discretionary parole authority under 8 U.S.C. § 1182(d)(5) in limited circumstances. Plaintiff also challenges a purported non-detention policy, which it asserts violates the Immigration and Nationality Act ("INA") and the Constitution under the Separation of Powers Doctrine and Take Care Clause. Plaintiff's claims are not supported by law, evidence, or the administrative record. Accordingly, Plaintiff cannot prevail.

First, the Court lacks authority to review Plaintiff's claims. As a threshold matter, Plaintiff lacks standing. After months of discovery and a four-day trial, Plaintiff failed to establish that it has suffered an actual or imminent injury caused by the challenged policies that is redressable by the Court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiff presented statistics purportedly showing it sustained costs from the presence of "noncitizens" and "immigrants" in the State. The statistics covered a period beginning in 2020, before the challenged practices were allegedly implemented. Plaintiff failed to establish that these costs were

attributable to applicants for admission who were paroled or otherwise released at the Southwest border since January 2021, or a result of either challenged policy. Plaintiff also failed to show any causation between Florida Department of Education ("DOE") expenditures and the commencement of DHS's Parole+ATD and alleged non-detention policies. As such, Plaintiff failed to establish standing to challenge either policy.

Additionally, Plaintiff's claims are not reviewable under the Administrative Procedure Act ("APA"). Plaintiff challenges discretionary resource allocation and conditional-release decisions that are committed to agency discretion by law, do not constitute challengeable final agency actions, and are shielded from judicial review by 8 U.S.C. §§ 1252(a)(2)(B)(ii) and 1226(e). Further, Plaintiff does not fall within the zone of interests to challenge the Immigration and National Act's ("INA)" detention and release provisions under the APA.[1]

Second, Plaintiff's challenge to the purported non-detention policy is non-justiciable because Plaintiff has not identified a specific agency "rule" that it challenges. 5 U.S.C. § 551(4). Plaintiff asks the Court to assume the existence of a

---

[1] These arguments were briefed previously at summary judgment and rejected by the Court in a short order without explanation (*see* ECF No. 117). The Supreme Court is set to hear argument in April regarding whether legal issues briefed and rejected at summary judgment are preserved for appeal absent repetition in a post-trial motion or brief. *See Dupree v. Younger*, 22-210. There is a circuit split on this issue, and the Eleventh Circuit has never taken a position. *Id.*, Petition for a Writ of Certiorari. Accordingly, in an abundance of caution, to ensure preservation for appeal, and because the Court's view might have changed following development of the record at trial, Defendants are raising these legal arguments again here.

A458

non-detention policy by amalgamating numerous discrete agency decisions and actions by individual immigration officers, in contravention of Supreme Court precedent. *Biden v. Texas*, 142 S.Ct. 2528, 2545 (2022) (holding that federal courts may not "postulat[e] the existence of an agency decision wholly apart from any agency statement . . . designed to implement that decision.").

Third, Plaintiff did not establish that the purported non-detention policy exists. Plaintiff asks the Court to infer its existence from the false premise that the prior administration's policies and priorities are the standard against which all others should be evaluated. But the determinative statute, 8 U.S.C. § 1182(d)(5), provides that DHS may parole any applicant for admission into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Plaintiff failed to show that Defendants paroled any noncitizens in violation of the statute. Plaintiff also argues that ICE's closure of three family residential centers, and Border Patrol's ("BP")[2] temporary use of Notices to Report ("NTRs") and subsequent use of Parole+ATD are evidence of a non-detention policy. The evidence established, however, that DHS had reasoned and independent bases for these decisions in the service of efficiency and the prioritization of resources.

---

[2] Border Patrol is the operational component of CBP that enforces immigration law between ports of entry. Tr. Day 2, 42:13-17, 43:25-44:8.

4

Fourth, none of DHS's decisions were arbitrary or capricious. They were rational responses to the nation's current immigration circumstances, where there is a lack of detention capacity sufficient to detain all noncitizens in removal proceedings. Given that reality, DHS prioritized detention for noncitizens who pose national security, public safety, or flight risks, and used parole for low-risk individuals. Parole+ATD rationally addresses the lengthy time required for full processing of border arrivals, the health and safety risks posed by overcrowding in BP processing facilities, and the need to supervise noncitizens to ensure their compliance with their immigration proceedings.

Fifth, the government's actions were lawful. Plaintiff's non-detention theory—either under its as-pled broad and vague definition of the alleged policy as the release of applicants for admission subject to mandatory detention, or Plaintiff's impermissible post-hoc theory that Defendants are detaining only noncitizens who fall into "public safety categories," Tr. Day 4, 71:22-72:7—is not supported by the evidence. Defendants detain tens-of-thousands of noncitizens monthly, including many who do not present a public safety threat. Plaintiff's preferred approach would render rational enforcement of the immigration laws functionally impossible and has not been followed by any administration. And Plaintiff's legal theory, at its core, presents a fundamental misunderstanding of the INA. The use of the term "shall" in section 8 U.S.C. § 1225(b) does not create a detention mandate for all applicants for

admission and does not override either Defendants' inherent law-enforcement resource prioritization discretion or the INA's interlocking provisions providing for release of applicants for admission on parole under section 1182(d)(5)(A). Further, the INA also grants DHS the discretion to process applicants for admission who enter the country illegally under section 1226(a) and to grant them conditional parole pending the outcome of their removal proceedings. Finally, even if the non-detention policy existed (which it does not), it would not be a rule subject to notice and comment. *See Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009).

Sixth, the Supplemental Administrative Record ("SAR") establishes that DHS's July 18, 2022 memorandum providing guidance for the Parole+ATD program is a lawful use of the parole authority under section 1182(d)(5)(A). The SAR also shows that the Parole+ATD policy is not arbitrary and capricious. Finally, the July 18, 2022 memorandum explains the agency's view of its authority under section 1182 as a statement of policy, and not as the creation of rights or duties subject to notice and comment. 5 U.S.C. 553(b)(A).

Finally, any redress here is limited by 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) bars this Court from issuing an injunction directing how the INA's detention and release provisions should be implemented. Section 1252(f)(1) also bars vacatur of the Parole+ATD policy or any purported non-detention policy, or declaratory relief that functions like an injunction. 8 U.S.C. § 1252(f)(1); *see*

*Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Because any remedy must be narrowly tailored to the established injury, the only appropriate remedy here would be a remand to DHS without vacatur. Any additional relief would impermissibly force this Court to oversee discretionary policy within the exclusive domain of the Executive Branch.

At bottom, the evidence presented by Plaintiff at trial established nothing more than that there was a change in approach to immigration between one administration and the next. But the fact that priorities may change when there is a change in administration is unsurprising. That is what democracy is meant to accomplish. As the Court noted, "that's just how the process works." Tr. Day 4, 78:25-79:1. "Congress intended whether the [Executive Branch] is adequately guarding the borders of the United States to be 'committed to agency discretion by law' and, thus, unreviewable," and challenges asserting such claims invoke fundamentally "political questions." *Chiles v. United States*, 69 F.3d 1094, 1096, 1097 (11th Cir. 1995). Plaintiff's policy dispute is simply a political question better suited to the voting booth than the courtroom.

## LEGAL FRAMEWORK

The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see, e.g.*, 6 U.S.C. § 202(5); 8 U.S.C.

7

§ 1103(a)(3). Noncitizens who lack valid entry documentation or enter the country without inspection are inadmissible and potentially removable. 8 U.S.C. §§ 1182(a)(6)-(7). However, DHS has "broad discretion" to decide "whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. If removal is initiated, the Executive nevertheless maintains the discretion to halt removal proceedings at any stage "for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999). The government may detain noncitizens it does decide to remove on the basis of their civil immigration offenses "for the limited period necessary for their removal proceedings." *Demore v. Kim*, 538 U.S. 510, 526 (2003). However, the government may not indefinitely detain noncitizens it cannot realistically remove. *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

Plaintiff's challenge to Defendants' alleged policy of releasing inadmissible noncitizens who enter at the Southwest border implicates two overlapping INA provisions governing detention and release of noncitizens: 8 U.S.C. §§ 1225 and 1226.

1. Inspection of applicants for admission. Section 1225 applies to "applicants for admission"—noncitizens who are present in the United States without being admitted or "who arrive[] in the United States" "whether or not at a designated port of arrival." *See* 8 U.S.C. § 1225(a)(1). Those who apply for admission or attempt to

apply to the United States via a port-of-entry are termed "arriving aliens." 8 C.F.R. §§ 1.2, 1001.1(q). Section 1225(b) provides for "inspection of applicants for admission." 8 U.S.C. § 1225(b). Following inspection, applicants for admission are processed through one of two main pathways. "Arriving aliens," and certain other noncitizens such as those who have entered the United States without having been admitted or paroled and are apprehended within 100 miles of the border and 14 days of entry, may, in the discretion of DHS, be placed in expedited removal procedures under section 1225(b)(1). 8 U.S.C. § 1225(b)(1)(A); 69 Fed. Reg. 48,877 (Aug. 11, 2004).[3] Arriving aliens, and other applicants for admission not placed in expedited removal proceedings, but who "are not clearly and beyond a doubt entitled to admission," may alternatively be placed in full removal proceedings under section 1229a. *See, e.g.,* 8 U.S.C. § 1225(b)(2)(A).[4] DHS has authority to place applicants for admission in full removal proceedings even if they may also be subject to expedited removal. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (BIA 2011).

---

[3] Under "expedited removal" procedures, certain noncitizens who lack valid entry documentation or make material misrepresentations shall be "order[ed] . . . removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1964-67 (2020) (discussing expedited removal).

[4] Section 1229a removal proceedings provide more extensive procedures than expedited removal, *compare* 8 U.S.C. § 1229a *with id.* § 1225(b)(1), including a right to appeal to the Board of Immigration Appeals (BIA) and a federal court of appeals. *Id.* § 1252(a)(1).

Further, neither section 1225(b)(1) nor section 1225(b)(2) mandates commencement of proceedings against amenable applicants for admission. *Matter of J-A-B- & I-J-V-A-*, 27 I. & N. Dec. 168, 172 (BIA 2017) (section 1225(b)(1)); *E-R-M-*, 25 I. & N. Dec. at 523 (section 1225(b)(2)(A)).[5] The decision whether to place any particular noncitizen in removal proceedings is a matter of DHS's core prosecutorial discretion. DHS is "invested with the sole discretion to commence [such] removal proceedings." *Matter of Avetisyan*, 25 I. & N. Dec. 688, 690-91 (BIA 2012), *overruled on other grounds by Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018), *reinstated by Matter of Cruz-Valdez*, 28 I. & N. Dec. 326 (A.G. 2021). Section 1225 thus "does not limit the authority of DHS to determine whether to pursue the removal of the immigrant" in the first place. *Crane v. Johnson*, 783 F.3d 244, 249 (5th Cir. 2015).

   2. <u>Detention and release of applicants for admission</u>. If a noncitizen subject to expedited removal expresses a fear of persecution, torture, or return to their country

---

[5] This discretion recognized by the BIA is fully consistent with *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019), which addressed the authority to detain noncitizens "originally placed in expedited [removal]" but then referred for "further consideration of the[ir] application for asylum" in full removal proceedings, 8 U.S.C. § 1225(b)(2)(B)(ii), and whether those noncitizens qualified for a bond hearing before an immigration judge. *Id.* at 511-12. *M-S-* rejected the availability of bond because their continued detention was governed by section 1225(b) rather than section 1226(a). *Id.* at 516. Bond hearings before immigration judges are not a release mechanism at issue in the case. *M-S-* does not address DHS's recognized discretion to select between expedited and full removal proceedings for applicants for admission at the outset. *See E-R-M-*, 25 I. & N. Dec. at 523. Additionally, *M-S-* recognized section 1226(a) "provides an independent ground for detention that does not limit DHS's separate authority to detain aliens originally placed in expedited removal." 27 I. & N. Dec. at 516.

10

of origin or indicates an intent to apply for asylum, and is then found to have a credible fear of persecution by an asylum officer, or an immigration judge upon review, that noncitizen is placed into proceedings "for further consideration of the application for asylum." 8 U.S.C. §§ 1225(b)(1)(A)(i), (b)(2)(B)(ii), (b)(2)(B)(iii)(I); 8 C.F.R. § 235.3(b)(4). Regardless of whether applicants for admission receive final executable expedited removal orders, demonstrate a credible fear and pursue relief or protection from removal, or are placed into full removal proceedings under section 1225(b)(2)(A), section 1225(b) provides that they "shall be detained" for those procedures. 8 U.S.C. §§ 1225(b)(2)(B)(ii), (b)(2)(B)(iii)(IV), (b)(2)(A). But these detention provisions are implicated only if DHS exercises its prosecutorial discretion in the first instance to charge a particular noncitizen with inadmissibility and seek their removal. *See Arizona v. Biden*, 40 F.4th 375, 391 (6th Cir. 2022). DHS has discretion whether to seek removal at all. *Arizona*, 567 U.S. at 396. Thus, DHS lacks "an obligation to take a noncitizen into custody, or keep them in custody, if they decide at that point or later on not to bring an enforcement action." *Arizona*, 40 F.4th at 391. Further, because "common sense" dictates that law enforcement officers retain "discretion, even in the presence of seemingly mandatory legislative commands," interpreting a provision using the term "shall," to be "a true mandate [to charge and detain all applicants for admission] … would require some stronger indication" in the legislation. *Town of Castle Rock v.*

11

*Gonzales*, 545 U.S. 748, 761 (2005). Section 1225(b) provides no "stronger indication" that this use of "shall" creates a judicially enforceable detention mandate. *See Arizona*, 40 F.4th at 391 ("[T]he use of "shall" does not automatically create a judicially enforceable mandate, especially when criminal or civil law enforcement is at issue.").

Even apart from DHS's inherent prosecutorial discretion, the interlocking provisions of the INA dealing with applicants for admission—sections 1225(b)(1) and (b)(2)—afford DHS discretion to grant parole to applicants for admission "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Under a regulation applying this authority (which has not been challenged here), parole is generally permissible for arriving aliens and other applicants for admission subject to expedited removal "whose continued detention is not in the public interest" as determined by DHS officials, provided they do not present a national security, public safety or flight risk. 8 C.F.R. §§ 212.5(b)(5), 235.2(c), 235.3(b)(2)(iii), 235.3(b)(4)(ii). The Parole+ATD program is a use of the parole authority under section 1182(d)(5)(A). SAR0002.[6]

Applicants for admission who enter the country unlawfully between ports of entry may be be detained or paroled under sections 1225(b) and 1182(d), as already described, or may be detained or released under section 1226(a) as noncitizens

---

[6] The Supplemental Administrative Record is contained in trial Exhibits 40 and 41.

present in the United States, as discussed immediately below. *See Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1116, 1118 (9th Cir. 2007).

3. Noncitizens who enter without inspection. Applicants for admission who do not seek entry at a port of entry or other place designated by DHS, but who are apprehended inside the United States after crossing the border illegally, that is, those who "enter without inspection," may be subject to detention or released on conditional parole under 8 U.S.C. § 1226. *Ortega-Cervantes*, 501 F.3d at 1116, 1118; *see, e.g.*, DHS Memorandum, *Re: Section 212(a)(6) of the Immigration and Nationality Act, Illegal Entrants and Immigration Violators*, 2009 WL 888664, at *5 (Mar. 3, 2009) ("Alien D arrives in the United States by crossing the border undetected 25 miles east of the port of entry at Sweet Grass, Montana. Sometime after his or her arrival, a CBP officer takes custody of Alien D and places him/her in removal proceedings. DHS determines that Alien D may be released from custody on posting a bond pursuant to section 236 of the Act (conditional parole).").

Section 1226(a) provides that, "[o]n a warrant issued by the [Secretary of DHS],[7] [a noncitizen] may be arrested and detained pending a decision on whether the alien is to be removed from the United States" or may be released on bond or "conditional parole." 8 U.S.C. § 1226(a); *see Matter of Castillo-Padilla*, 25 I. & N.

---

[7] Following the Homeland Security Act of 2002, statutory references to the Attorney General in immigration statutes are generally construed as referencing the appropriate Department of Homeland Security official. 6 U.S.C. §§ 251, 552(d); *see Thuraissigiam*, 140 S. Ct. at 1965 n.3.

A468

Dec. 257 (BIA 2010) (distinguishing "conditional parole" under section 1226(a)(2)(B) from parole under section 1182(d)(5)), *aff'd*, *Castillo-Padilla v. U.S. Att'y Gen.*, 417 F. App'x 888 (11th Cir. 2011). Outside of noncitizens with a qualifying criminal history or those subject to terrorism-related grounds of removability covered by section 1226(c), noncitizens covered by section 1226(a) are eligible for release on bond or conditional parole at DHS's discretion. 8 U.S.C. § 1226(a)(2). Indeed, an applicant for admission, who has been apprehended by BP or ICE after entering the United States between ports of entry, and then is released, is presumed to have been released on "conditional parole" pursuant to section 1226(a). *Ortega-Cervantes*, 501 F.3d at 1116. Alternatively, DHS may consider that noncitizen under section 1225(b) and parole her under section 1182(d)(5)(A). *Id.* But in that case, because section 1226(a) and not section 1225(b) is the default provision governing noncitizens who enter unlawfully between ports of entry, DHS must "make[] its intention" to use section 1182(d)(5) parole and not section 1226(a) conditional parole "clear, for example, by expressly referencing § 1182(d)(5)(A) and by issuing an I–94 card." *Id.* The release of a noncitizen on his own recognizance accompanied by service with a "Notices to Appear" in removal proceedings, such as used by both BP and ICE, constitutes a "conditional parole" under section 1226(a). Tr. Day 2, 112:6-113:1; Tr. Day 3, 22:14-23.

4. <u>Administrative warrant requirement</u>. Unlike section 1225, section 1226 provides for enforcement action "[o]n a warrant issued by" DHS, that is, an administrative warrant. 8 U.S.C. § 1226(a); *see Abel v. United States*, 362 U.S. 217, 232 (1960) (differentiating between administrative warrant for civil immigration offenses and judicial warrants for criminal offenses). Regulations prescribe the supervisory immigration officers, including "[s]upervisory border patrol agents," authorized to issue administrative arrest warrants. 8 C.F.R. § 287.5(e)(2).

However, a warrant, as referenced in section 1226, is not required to arrest a noncitizen who is "entering or attempting to enter" the United States or is "in the United States" in violation of immigration law or regulation, if the noncitizen "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see Aguirre v. Immigr. & Naturalization Serv.*, 553 F.2d 501, 502 (5th Cir. 1977) (holding warrantless arrest of unlawfully present noncitizen under 8 U.S.C. § 1357(a)(2) was lawful because officer believed noncitizen might abscond before a warrant could be obtained). In such cases, the noncitizen "shall be taken without unnecessary delay" before an examining officer. 8 C.F.R. § 287.3(a), (b) (recognizing the availability of warrantless arrest for noncitizens entering or present in the country unlawfully and amenable to arrest under section 1226); *see Aguirre*, 553 F.2d at 502 (holding warrantless arrest of unlawfully present noncitizen under 8 U.S.C. § 1357(a)(2) was lawful because officer believed noncitizen might abscond

15

before a warrant could be obtained). With such warrantless arrests, "a determination will be made within 48 hours of the arrest" whether the noncitizen will continue in custody or be released on bond or recognizance, and "whether a notice to appear and warrant of arrest … will be issued" if the decision has been made to charge the noncitizen with removal and to continue his detention 8 C.F.R. § 287.3(d). The immigration officers authorized to use the warrantless arrest authority under 8 U.S.C. § 1357(a)(2) are identified by regulation, and include "Border patrol agents," "Deportation officers," "CBP officers," "Immigration enforcement officers," and their respective supervisors. 8 C.F.R. § 287.5(c)(1).[8]

## <u>PROPOSED FINDINGS OF FACT</u>[9,10]

1.   No administration since the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") has been appropriated the

---

[8] These categories of line immigration officers are also authorized to exercise the authority specified in 8 U.S.C. § 1357(a) to serve administrative arrest warrants for immigration violations. 8 C.F.R. § 287.5(e)(3).

[9] It is not appropriate for the Court to make findings of fact on the Parole+ATD claims. "When a party challenges agency action under the APA, the district court does not perform its normal role but instead sits as an appellate tribunal." *United States v. Schwarzbaum*, 24 F.4th 1355, 1364 (11th Cir. 2022) (internal quotation omitted). Under APA review, "the material facts are those facts present in the agency's administrative record" and the Court's function "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sea Turtle Conservancy v. Locke*, No. 1:09-CV-259-SPM-GRJ, 2011 WL 13227945, at *2 (N.D. Fla. July 5, 2011). The facts as found by the agency in the administrative record are delineated *infra*.

[10] To the extent the Court determines that a statement listed as a Finding of Fact is more appropriately viewed as a Conclusion of Law, or vice versa, the Court should treat that statement as whichever it deems most appropriate.

resources that would be necessary to apprehend or detain every noncitizen[11] apprehended at or near the border. Tr. Day 3, 38:18-39:14.

2. Because there is not enough funding to detain every applicant for admission in removal proceedings, administrations have to make "tough decisions" about whom to detain and whom to release. Tr. Day 3, 41:2-7; Ex. C[12] at 2-3; Ex. I at 3-5; Ex. K at 10 n.8.

3. Releasing low-risk noncitizens frees up limited detention capacity for other, higher-priority noncitizens like criminals. Tr. Day 3, 41:2-7; Ex. C at 2-3; Ex. I at 3-5; Ex. K at 10 n.8.

4. Multiple presidential administrations have construed section 1182(d)(5) as permitting parole of noncitizens detained pursuant to 8 C.F.R. § 235.3(b) or (c) who "present neither a security risk or a risk of absconding" and "whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b)(5).

5. In 2005, ICE issued guidance indicating that noncitizens subject to mandatory detention or a high priority for detention should be released at the time of processing only "when national bed space population is at capacity." Memorandum from Victor X. Cerda, Acting Dir., Det. and Removal Operations, ICE, *ICE Transportation, Detention and Processing*

---

[11] In this memorandum, Defendants use the term "noncitizens" in lieu of the statutory term "aliens," except where quoting statutes or decisions using the latter term.
[12] All references to exhibits are to trial exhibits, except where specifically noted.

A472

*Requirements* (Jan. 11, 2005), available at https://www.ice.gov/doclib/foia /dro_policy_memos/icetransportationdetentionandprocessingrequirements.p df, at 2. [13]

6.  In 1992, the former Immigration and Naturalization Service ("INS"), expanding upon a pilot project conducted in May 1990 to October 1991, issued guidelines on releasing, through parole, asylum seekers from INS detention. In the memorandum, INS explained that it "has limited detention space" and that by adopting the parole project it would "be able to detain those persons most likely to abscond or to pose a threat to public safety rather than to base the detention decision solely or primarily on the availability of detention space." *See* Memorandum from Gene McNary, INS Comm'r, *Parole Project for Asylum Seekers at Ports of Entry and INS Detention* (Apr. 20, 1992), 9 Immigration Law Service 2d PSD Selected DHS Document 4110, at 1.

7.  In February 2017, then-Secretary John Kelly issued a policy memorandum stating that "[a]s the Department works to expand detention capabilities,

---

[13] A court may take judicial notice, "whether requested or not" of a fact "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), 201(c). And a court may do so at any stage of proceedings. *Id*. 201(f). Defendants submit that the Court can take judicial notice of existence of the fact that this guidance, and those noted in the following paragraphs, were issued. To be clear, Defendants are not asking the Court to assume the truth of any facts set forth therein— just the fact that guidance was issued.

detention of all [individuals described in section 1225] may not be immediately possible, and detention resources should be prioritized based upon potential danger and risk of flight if an individual [noncitizen] is not detained, and parole determinations will be made in accordance with current regulations and guidance. *See* 8 C.F.R. §§ 212.5, 235.3." Memorandum from John Kelly, Sec'y of Homeland Security, *Implementing the President's Border Security and Immigration Enforcement Improvement Policies* (Feb. 20, 2017), available at https://www.dhs.gov/sites/default/files /publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf, at 3.

8.   In 2017, ICE similarly issued policy guidance stating that "[p]arole or other release, with all available safeguards, may also be warranted where detention capacity limits the agency's ability to detain the [noncitizen] consistent with legal requirements, including court orders and settlement agreements." Memorandum from Matthew T. Albence, Exec. Assoc. Dir., ICE, *Implementing the President's Border Security and Interior Immigration Enforcement Policies* (Feb. 21, 2017), available at https://www.ice.gov/doclib/foia/eoRecords/eoRecordsEnforcement_01-20-2017_03-14-2017.pdf, at 3.

9.  In July 2019, following legal decisions addressing whether certain noncitizens were entitled to bond hearings before an immigration judge, *see Padilla v. ICE*, 387 F. Supp. 3d 1219 (W.D. Wash. 2019); *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019), ICE issued interim guidance to its workforce specifically noting that it lacked the detention capacity to detain all noncitizens to whom the immigration law detention provisions could be applied, that the agency accordingly needed to appropriately prioritize the use of this limited detention capacity, and that the public interest favored maintaining custody of noncitizens posing the greater potential danger to public safety or risk of flight. *See* ICE, *Interim Guidance for Implementation of* Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture* (July 2019).

10. In 1996, when Congress amended the parole statute and replaced the phrases "emergent reasons" and "reasons deemed strictly in the public interest" with "urgent humanitarian reasons" and "significant public benefit," it explicitly removed language from the original bill that would have limited these circumstances to a defined set of rare situations. H. R. 2202, "Immigration in the National Interest Act of 1995," August 4, 1995, https://www.congress.gov/bill/104th-congress/house-bill/2202/text/ih  (*e.g.*,

20

**A475**

"the alien is needed in the United States in order to donate an organ or other tissue for transplant into a close family member," or "only if the alien has assisted the United States Government in a matter, such as a law enforcement activity, and either the alien's presence in the United States is required by the Government or the alien's life would be threatened if the alien were not permitted to come to the United States).

Standing

11.  The State of Florida does not track noncitizen related expenditures in a manner that allows it to identify expenditures on specific noncitizens released under the challenged policies. Joint Pretrial Stipulation, ECF 122, at ¶ 27.

12.  Florida's Agency for Health Care Administration ("AHCA") does not determine the eligibility for the programs it administers; eligibility is determined by Florida's Department of Children and Families ("DCF"). Bottcher Dep.,[14] 23:9-24:25, 44:12-46:11.

13.  AHCA does not keep the information necessary to determine whether noncitizens using its services were released under the challenged policies, and thus cannot determine whether any funds were spent on noncitizens released under the challenged policies. Bottcher Dep., 25:1-16, 36:5-38:1, 41:4-10.

---

[14] All citations to depositions refer to the deposition designation excerpts the Parties provided to the Court during trial.

14. Florida's Department of Economic Opportunity ("DEO") does not collect information necessary to determine whether noncitizens using its services were released under the challenged policies, and thus cannot determine whether any funds were spent on noncitizens released under the challenged policies. Heckman Dep., 32:11-33:13, 135:4-17, 139:15-140:5.

15. Florida's Department of Corrections ("DOC") does not collect information necessary to determine whether noncitizens using its services were released under the challenged policies, and thus cannot determine whether any funds were spent on noncitizens released under the challenged policies. Tr. Day 3, 77:12-21, 78:23-79:13, 81:10-82:1.

16. DCF does not collect information necessary to determine whether noncitizens using its services were released under the challenged policies, and thus cannot determine whether any funds were spent on noncitizens released under the challenged policies. Tr. Day 4, 21:13-25, 32:17-33:5, 34:16-20, 35:1-10, 36:8-11, 37:21-38:12, 42:12-18, 43:10-12, 45:17-22, 46:16-47:1, 50:23-51:3.

17. DCF's Medicaid, Supplemental Nutrition Assistance Program ("SNAP"), and Temporary Assistance for Needy Families ("TANF") services have a five-year waiting period before the majority of noncitizens released on parole are eligible to use those services, and thus many of the noncitizens released under

the challenged policies would not be eligible to use those services until 2026 at the earliest. Tr. Day 4, 14:9-15:3, 25:15-20, 33:25-34:15, 35:24-36:2.

18. Paroled Cubans, Haitians, Ukrainians, and Afghans are the only populations of paroled noncitizens immediately eligible for the majority of services overseen by DCF. Tr. Day 4, 14:9:22, 16:23-17:2, 25:15-25.

19. However, DCF does not track the place of entry, mode of entry, or date of entry for Cubans, Haitians, Ukrainians, and Afghans, and therefore cannot say if they were released at the Southwest border under the challenged policies. Tr. Day 4, 18:13-19, 32:8-10, 48:21-49:6, 18:21-25, 19:1-4, 48:21-49:6.

20. While DCF does track, and therefore does have data to support the number of Cuban and Haitian noncitizens who entered the country between October 2021 and September 31, 2022, and who have used services provided by the refugee assistance program in Florida, Tr. Day 4, 53:13-20, those refugee services were fully funded by the federal government, Tr. Day 4, 37:11-13. And DCF still cannot say where these Cuban and Haitian noncitizens entered the country, or whether any of them received services funded by the State of Florida. Tr. Day 4, 53:13-20, 54:10-55:11.

21. All refugee programs in the State of Florida are 100 percent federally funded. Tr. Day 4, 30:17-31:20, 37:6-13.

22. The Department of Education ("DOE") does not track the citizenship of its students, where they entered the country, how they entered the country, the date they entered the country, or the mechanism by which they were released from federal immigration custody. Tr. Day 1, 31:8-18.

23. DOE does not collect information necessary to determine whether noncitizens using its services were released under the challenged policies, and thus cannot determine whether any funds were spent on noncitizens released under the challenged policies. Tr. Day 1, 31:8-18, 47:17-48:7, 48:13-15, 49:1-4, 51:23-52:1, 53:2-7.

24. Plaintiff defines "immigrant" children as those "who are not born in the United States and were not educated in the United States in the last three years." Tr. Day 1, 12:22-24.

25. DOE can provide the total number of "immigrant" students (the term it uses, and the population for which it has data) enrolled in public schools but is unable to identify whether any of these immigrant students are applicants for admission released at the Southwest border since January 2021. Tr. Day 1, 46:21-47:8. DOE therefore cannot determine how many noncitizens enrolled in public schools were released under the challenged policies, or if it has incurred expenditures for children released under the challenged policies.

26. DOE has not shown that students requiring English as a Second Language services are noncitizens, let alone that any were released under the challenged policies; citizen students may also not speak English. Tr. Day 1, 49:16-24.

27. Plaintiff has provided English as a Second Language services for decades. Tr. Day 1, 50:19-21.

28. Plaintiff receives federal funding for English Speakers of Other Language services. Tr. Day 1, 49:25-50:11.

29. DOE's total yearly cost per student was approximately $8,000 in the 2020-2021 school year, $7,800 in the 2021-2022 school year, and $8,200 in the 2022-2023 school year. Tr. Day 1, 28:10-15, 30:21-31:1.

30. DOE was able to spend more money per student in the 2022-2023 school year than the prior year because the State's economy was "thriving" during the Pandemic, as a result of remaining open. Tr. Day 1, 28:10-15, 30:21-31:1, 53:22-54:6.

31. The State of Florida was "open" during the pandemic, "attracting a lot of people from places that weren't open." Tr. Day 1, 53:22-54:6.

32. Plaintiff has not presented evidence that the increase in "immigrant" children is related to the challenged policies or other factors, including Florida's COVID policies. Tr. Day 1, 53:22-54:6.

33. Plaintiff cannot say whether the costs Plaintiff allegedly spent on noncitizens released under the challenged policies is greater or lesser than any revenue the State has derived from the same population. Tr. Day 4, 49:7-50:21.

Alleged Non-Detention Policy

34. Plaintiff has not identified any direct evidence that Defendants have a non-detention policy.

35. In his current position as the Executive Director for Admissibility and Passenger Programs at the Office of Field Operations ("OFO")[15], Matthew Davies would know about any policy instituted regarding the processing of migrants at ports of entry along the Southwest land border. Tr. Day 2, 73:14-17.

36. Executive Director Davies is not aware of any policy implemented since January 2021 suggesting a preference for any particular processing pathway over another. Tr. Day 2, 73:18-20.

37. Executive Director Davies is not aware of any policy suggesting a preference for parole over detention. Tr. Day 2, 73:21-23.

38. Executive Director Davies is not aware of any policy communicating an abdication of case-by-case review for parole. Tr. Day 2, 73:24-74:1.

---

[15] The Office of Field Operations ("OFO") is the operational component of CBP that enforces immigration law at ports of entry.

39. Executive Director Davies is not aware of any policy discouraging the transfer of noncitizens to ICE for detention. Tr. Day 2, 74:2-4.

40. In his current position as Chief of Border Patrol and in his prior position as Deputy Chief of Border Patrol, Raul Ortiz would know about any policy instituted regarding the processing of noncitizens at the Southwest land border. Tr. Day 2, 139:12-16.

41. Chief Ortiz is not aware of any policy implemented since January of 2021 that suggests a preference for parole over detention. Tr. Day 2, 129:17-19.

42. Chief Ortiz is not aware of any policy communicating an abdication of case-by-case review for parole. Tr. Day 2, 139:20-23.

43. Chief Ortiz is not aware of any policy discouraging the transfer of noncitizens to ICE for detention. Tr. Day 2, 139:24-140:2.

44. No one from the Biden Administration or DHS has instructed Chief Ortiz that the BP should not detain noncitizens. Tr. Day 2, 140:3-6.

45. In his capacity as ICE's Deputy Assistant Director for Field Operations East, Robert Guadian would know about any new ICE detention policy. Tr. Day 3, 31:18-32:2.

46. Deputy Assistant Director Guadian is not aware of any new ICE policy since January 2021 dealing with the release of noncitizens transferred from CBP. Tr. Day 3, 32:3-6.

27

47. Deputy Assistant Director Guadian is not aware of any new ICE policy since January 2021 directing ICE Enforcement and Removal Operations ("ERO") to release noncitizens transferred from CBP to ICE rather than detaining them. Tr. Day 3, 63:6-12.

48. The fact that there are statistics showing an increase in the use of parole and conditional parole under the Biden administration, as compared to the end of the Trump administration, is not evidence of a non-detention policy.

49. In 2019, there was a surge of families crossing the Rio Grande Valley. Tr. Day 2, 130:1-8.

50. In 2014, there was a surge of unaccompanied children. Tr. Day 2, 130:13-21.

51. Over the past three decades, there have been numerous periodic surges in migration. Tr. Day 2, 131:7-15.

52. At the end of the previous administration, the country was at the height of an ongoing global pandemic, and there were travel restrictions in place at that time, which severely depressed the number of noncitizens who were coming to the United States both lawfully and unlawfully. Tr. Day 2, 93:10-17; Ex. 1 at 4; Ex. 2 at 3-4.

53. In April 2020, there was a precipitous drop in illegal migration to the United States over the Southwest border, which slowly increased thereafter, month-by-month. Ex. 98, pg. 3; Ex. 1, at 4; Ex. 2 at 3.

54. After President Biden took office, CBP saw an increase in border crossings by Cubans, Nicaraguans, and Venezuelans. Ortiz Dep., 93:4-14; Barker July 13, 2022 Dep., 198:14-199:7.

55. Repatriation of Cubans, Nicaraguans, and Venezuelans is often not possible. Ortiz Dep., 93:4-14; Barker July 13, 2022 Dep., 94:10-13, 109:20-25.

56. If repatriation of a noncitizen is not possible, the likelihood that a noncitizen will be released increases because they cannot be detained indefinitely. Barker July 13, 2022 Dep., 94:4-95:5.

57. In March 2020, in response to the COVID-19 pandemic, the U.S. Department of Health and Human Services ("HHS") and Centers for Disease Control and Prevention ("CDC") issued an interim final rule to establish a procedure for CDC to temporarily suspend the introduction of certain noncitizens into the United States under Section 265. 85 Fed. Reg. 16,559 (Mar. 24, 2020). CDC invoked that procedure to issue an order suspending the introduction of certain noncitizens. 85 Fed. Reg. 17,060 (Mar. 26, 2020). HHS and CDC later finalized the rule and issued additional suspension orders. *See* 85 Fed. Reg. 56,424 (Sept. 11, 2020) (finalizing 42 C.F.R. 71.40); 85 Fed. Reg. 65,806 (Oct. 16, 2020). The currently operative order was issued in August 2021. 86 Fed. Reg. 42,828 (Aug. 5, 2021) ("Title 42").

58. The Title 42 orders apply to certain noncitizens arriving from Canada or Mexico who would otherwise be held in a "congregate setting" at a port of entry or U.S. BP station at or near the U.S. land and adjacent coastal borders, thereby risking the spread of COVID-19. 86 Fed. Reg. at 42,841. Under the orders, "covered noncitizens apprehended at or near U.S. borders" are "expelled" to Mexico, Canada, or their country of origin. *Id.* at 42,836.

59. The government's ability to expel noncitizens under Title 42 is constrained by "a range of factors, including, most notably, restrictions imposed by foreign governments." 86 Fed. Reg. at 42,836. Noncitizens cannot be expelled to Mexico or to their home countries unless those countries consent, and different countries have withheld or limited their consent in various ways. *Id.* Those realities, and the case-by-case exceptions in the Title 42 orders themselves, mean that many noncitizens have been processed under Title 8 even while the Title 42 orders have been in effect. *See* U.S. CBP, Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions Fiscal Year 2022, www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42- statistics-fy22.

60. While the number of applicants for admission released by BP increased as total apprehensions increased, so too did the use of expedited removal and detention. Ex. 2 at 3-4.

61. The fact that President Biden requested less funding for custody operations than President Trump is not evidence of a non-detention policy.

62. In his Fiscal Year 2021 budget request, President Trump requested $4,137,380,000 for custody operations. Ex. NN, at 10.

63. Congress appropriated $2,836,128,000 for custody operations for FY2021, 32% less than what President Trump requested. Ex. OO at 5.

64. In his FY2022 budget request, President Biden requested $2,775,100,000 for custody operations, 2.5% less than what Congress funded in 2021. Ex. OO, at 5.

65. Congress appropriated $2,874,481,000 for custody operations in FY2022, 1% more than President Biden requested and more than it appropriated for FY2021 during the Trump Administration. https://www.congress.gov/117/crec/2022/12/20/168/198/CREC-2022-12-20-pt2-PgS8553-2.pdf, pg. 8608.

66. It currently costs $125 a day to detain a single adult. Tr. Day 3, 37:7-10.

67. It previously cost $235 a day to detain each member of a family unit. Tr. Day 3, 37:11-14.

68. Alternatives to Detention ("ATD") is a flight mitigation tool used by ICE to promote accountability for noncitizens in removal proceedings. Tr. Day 3, 43:44:3.

69. There are three primary types of ATD: (i) ankle monitors, which can track in real time the location of noncitizens released on ATD; (ii) a smartphone app that uses facial identification software and allows deportation officers to, *inter alia*, verify noncitizen's identity at required remote check-ins, and (iii) voice recognition system that allows deportation officers to verify noncitizens' identities when they call in to check in via a landline. Tr. Day 3, 43:18-44:3.

70. It currently costs less than $8 day to enroll a noncitizen in ATD. Tr. Day 3, 46:10-12. Therefore, DHS can supervise and monitor 15 times as many noncitizens via ATD than traditional detention dollar for dollar.

71. President Biden requested more funding for alternatives to detention than President Trump. *Compare* Ex. NN at 10 with Ex. OO at 5.

72. Congress has consistently appropriated more funding for alternatives to detention year-after-year since 2018. Ex. LL at ICE-O&S 92; Ex. MM at 10; Ex. NN at 10; Ex. OO at 5; https://www.govinfo.gov/content/pkg/CPRT-117HPRT47047/pdf/CPRT-117HPRT47047.pdf, at 1228.

73. Congressional appropriations for alternatives to detention more than doubled from 2018 to 2022. Ex. LL at ICE-O&S 92; https://www.govinfo.gov /content/pkg/CPRT-117HPRT47047/pdf/CPRT-117HPRT47047.pdf,       at 1228.

74. In every year from 2018 through 2022, Congress has appropriated more funding for alternatives to detention than the President requested. Ex. LL at ICE-O&S 92; Ex. MM at 10; Ex. NN at 10; Ex. OO at 5; https://www.govinfo.gov/content/pkg/CPRT-117HPRT47047/pdf/CPRT-117HPRT47047.pdf, at 1228.

75. DHS statistics for FY2022 through April 2022, indicate that the compliance rate of single adults and family units in the ATD program was 93.2% and 82.1%, respectively, with absconder rates of only 5.6% and 14.8%, respectively. SAR0255, 0272.

76. Approximately 4.7 million noncitizens are currently in removal proceedings. Tr. Day 3, 38:14-17.

77. For the last year for which there is public data available, 2018, there were about 11.4 million removable noncitizens residing in the United States.[16]

78. Approximately 50% of those 4.7 million noncitizens may have been apprehended at the Southwest border. Tr. Day 3, 38:18-21.

79. To detain just the noncitizen adults apprehended at the Southwest border who are currently in removal proceedings, it would cost at least, roughly estimated, $45,625,000,000 a year, Tr. Day 3, 38:22-39:9—which is more than five times

---

[16]https://www.dhs.gov/sites/default/files/publications/immigration-statistics/Pop_Estimate/UnauthImmigrant/unauthorized_immigrant_population_estimates_2015_-_2018.pdf.

ICE's entire operating budget for FY2022. Ex. DD at 136 STAT 317. ICE's entire operating budget covers more than just detention and removal of noncitizens. It also includes, among other programs, Homeland Security Investigations. *See* Ex. DD.

80. In 2020, ICE had funding for 45,000 detention beds. Tr. Day 3, 38:3-13.

81. For 2021, President Trump requested funding sufficient to fund 60,000 beds. Ex. 13 at 3.

82. Congress appropriated only sufficient funding for ICE to fund 31,500 beds in FY2021. Tr. Day 3, 37:24-25.

83. In the 2022 budget, President Biden requested funding for 32,500 beds. Ex. 25, at 3.

84. Congress appropriated enough funding for 34,000 beds in 2022, which was more than Congress appropriated for FY2021. Tr. Day 3, 37:18-23.

85. Administrations prior to that of President Trump requested funding amounts for detention comparable to the current Administration. *See, e.g.*, DHS Budget in Brief for FY 2014, at 130 (describing presidential funding request for 31,800 beds), https://www.dhs.gov/sites/default/files/publications/FY%202014%20BIB%20-%20FINAL%20-508%20Formatted%20%284%29.pdf.[17]

---

[17] Publicly available DHS budget documents from 2003 to present can be accessed at https://www.dhs.gov/dhs-budget.

34

86.  The fact that ICE repurposed two family detention centers to single adult housing and closed a third is not evidence of a non-detention policy.

87.  ICE previously operated three family residential centers ("FRCs"), which DHS used to house children with their parents. The FRCs were known as Berks County FRC, Karnes County FRC, and Dilley South Texas Family FRC. Tr. Day 3, 49:2-6.

88.  Dilley and Karnes are located in Texas, and Berks was located in Pennsylvania. Tr. Day 3, 49:1-6.

89.  Tae Johnson, the then-Acting ICE Director, made the decision to close the Berks FRC and repurpose the Karnes and Dilley FRCs to house single adults. Tr. Day 3, 49:25-50:3.

90.  Mr. Johnson's decision to close and repurpose the three FRCs was a business decision. Tr. Day 3, 50:20-22; Guadian Dep., 145:4-7, 145:23-146:1.

91.  Pursuant to a 1997 consent decree in *Reno v. Flores*, 507 U.S. 292, 296 (1993)[18], FRCs must provide, among other things, schooling with bilingual instructors, as well as specialized medical care including access to pediatricians. Tr. Day 3, 47:5-48:7.

92.  When FRCs are used, there are limitations on mixed gender family detention—such that, for example, a dual head-of-household mother and

---

[18] *See also Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016).

father with a six-year-old daughter cannot be housed in the same dorm as a father with a thirteen-year-old son. Price Dep., 145:5-146:1; Ex. OO at 123 ("The true capacity of the FRCs is much lower than the total number of beds due to restrictions on the types of family compositions that can room together.").

93.   Dilley and Karnes were repurposed to house single adults. Tr. Day 3, 49:15-21; Price Dep., 62:6-9.

94.   Dilley and Karnes could be reconfigured back to FRCs. Price Dep. 52:15-21; Tr. Day 3, 51:9-13.

95.   Converting Dilley and Karnes from FRCs to detention for single adults allowed ICE to increase the number of people it could hold in custody. Price Dep., 57:14-22; Tr. Day 3, 37:18-23.

96.   Pursuant to an order issued in the *Flores* litigation in 2015, families generally can be detained no more than twenty days. Tr. Day 3, 48:8-16; Price Dep., 146:7-19; Guadian Dep., 147:5-7; *See Flores v. Barr*, 2020 WL 3488040, *3 (C.D. Cal. June 26, 2020).

97.   Therefore, ICE is often unable to detain families long enough to see their immigration proceedings to completion. Tr. Day 3, 48:20-21; 50:13-51:8; 53:22-25; Price Dep., 119:11-13.

A491

98. If one adult member of a family poses a national security or public safety risk, the family can be separated so the adult who poses the risk may be detained and the rest of the family granted parole. Tr. Day 2, 121:7-12; Tr. Day 3, 53:7-15.

99. Neither the temporary Notice to Report ("NTR") program nor the Parole+ATD program are evidence of a non-detention policy.

100. In March 2021, CBP, utilizing its prosecutorial discretion authority, began a practice of issuing NTRs, under which it released certain noncitizens with orders to report to the appropriate ICE field office to receive their NTAs. Tr. Day 2, 61:3-16.

101. Due to the strain of an influx of migrants on processing resources, CBP released noncitizens with NTRs to report to ICE within a specified timeframe to receive their charging documents. SAR0162.

102. CBP processing facilities are not structured or equipped for detention longer than 72 hours; extending detention of noncitizens poses challenges to CBP's ability to provide safe holding conditions and appropriate medical care, and to treat and control the spread of contagious diseases. SAR0002.

103. Without other intervention, high rates of border encounters may lead to overcrowding in CBP facilities which poses health and safety risks to both individuals in custody and CBP employees working there. SAR0002.

A492

104. NTRs provided a significantly faster mechanism for processing noncitizens apprehended at the border as compared to the time-consuming process required to issue NTAs prior to release. Preparing NTA requires labor intensive information gathering, interagency coordination and scheduling, and the creation of an A-file (the comprehensive file that document all of a noncitizen's interactions with DHS and immigration courts throughout their lives). These steps are necessary for the noncitizen to be provided a legally sufficient NTA that includes the charge of removability and the date and location of their immigration court hearing. SAR0162.

105. The use of NTRs was officially and fully rescinded on November 2, 2021 and replaced with Parole+ATD. Ex. 40 at 96.

106. The Parole+ATD program is a BP policy, designed to decompress Border Patrol Stations operating at over one-hundred percent capacity. Tr. Day 2, 60:12-25, 113:17-114:6; Ortiz Dep., 117:15-118:3; Barker July 13, 2022 Dep., 150:22-151:24; Barker Aug. 25, 2022 Dep., 12:14-13:7, 15:14-16:25, 28:16-29:23.

107. Parole+ATD maintained the benefits of the NTR practice—reducing processing time by comparison to full NTA issuance and thereby decompressing overcrowding in CBP facilities—while addressing the limitation of the NTR practice in creating accountability that noncitizens

check in with ICE and complete their removal proceedings, by enrolling parolees in ICE's ATD program. SAR0002, SAR0162-0163.

108. The ICE ATD program employs various types of monitoring technology and supervision to increase noncitizens' compliance with release conditions, court appearances, and removal orders. SAR0002.

109. DHS statistics for the most recent period available (FY2022 through April 2022) indicate that the compliance rate of single adults and family units in the ATD program was 93.2% and 82.1%, respectively, with absconder rates of only 5.6% and 14.8%, respectively. SAR0255, 0272.

110. The spread of COVID-19 in CBP facilities led to the hospitalizations and deaths of many noncitizens and employees. SAR0101, 0114, 0116.

111. Regardless of whether from COVID-19 or other health conditions, continuing high border encounter rates mean that facility over-crowding and associated health and safety challenges are expected to continue. SAR0002.

112. Decompression of facilities and reduction of processing time provides the further significant public benefit of ensuring that BP has sufficient resources focused on border security operations and other critical aspects of its mission through maximizing deployment of agents (who would otherwise be tasked with processing) to the field. SAR0163.

113. To address the case-processing backlog, the Parole+ATD program now requires that CBP and ICE find ways to streamline processing and that each will be responsible for 50% of the subsequent processing of the parolees' NTAs to place them into removal proceedings. SAR0004.

114. ICE has also undertaken an initiative to further relieve backlogs at its regional offices and expedite the service of NTAs on the NTR and Parole+ATD population by serving thousands of NTAs via mail. SAR0165-69.

115. In addition to section 1225, DHS also releases noncitizens apprehended after crossing the border on conditional parole under section 1226(a) via BP's release on Notice to Appear/Own Recognizance ("NTA/OR") or ICE's release of noncitizens transferred from CBP on Order of Release on Recognizance ("OREC"). Tr. Day 2 112:6-113:1; Tr. Day 3 22:14-23.

116. Orders of release under section 1226(a) constitute hundreds of thousands of the releases of border arrivals falling under the alleged non-detention policy. Ex. R at 3; Ex. S at 2-3; Tr. Day 2 59:11-60:11.

117. BP routinely arrests noncitizens unlawfully present inside the United States in circumstances where agents have no advance notice of the noncitizens' unlawful entry and thus no opportunity to obtain a warrant in advance of arresting them in the field. Tr. Day 2 124:17-125:2.

A495

118. To ensure a warrant is already available in case a noncitizen released under section 1226(a) fails to appear for their subsequent removal proceedings, BP practice is to issue an I-200 Warrant of Arrest to the noncitizens processed under NTA/OR. Tr. Day 2 124:10-125:14.

119. DHS is detaining multiple tens of thousands of applicants for admission subject to section 1225(b) each month. Ex. R at 1-3; Ex. S at 1, 3.

120. OFO, CBP, and ICE officers and agents are subject to policies and guidance directing them how to apply the section 1182(d)(5)(A) standard in their parole decisions. Tr. Day 2, 63:25-64:5, 65:18-67:7, 89:7-12, 114:10-115:8; Tr. Day 3, 27:15-28:1; Ex. B at § 8.2; Ex. C at ¶ 5.3; Ex. 40 at 5.

121. Every administration operating under section 1225(b) has had to make "tough decisions" about how to use limited detention space and thus has recognized that the use of parole frees up limited detention capacity for other, higher-priority noncitizens like criminals. Tr. Day 3, 41:2-7; Ex. C at 2-3; Ex. I at 3-5; Ex. K at 10 n.8.

122. In this case, were the Court to enjoin the use of the Parole+ATD program, there would be disastrous consequences for the border. The number of people in BP stations would immediately increase, Tr. Day 3, 56:6-20, and because the Parole+ATD program is being used only when BP custody is already at full capacity (of 15,000 noncitizens), SAR0003, border patrol stations would

41

become substantially over-crowded. Ex 3, at 3 (showing that in September 2022, 95,191 noncitizens were released on Parole+ATD). If this happens, agents would need to be pulled from the field to process these noncitizens, which, in turn, would open the border for cartels and criminal organizations to exploit. Tr. Day 2, 115:16-116:24. Such overcrowding would also pose a threat to agents and migrants who would be forced to be in close contact with a border operation and medical system that is strained. Tr. Day 2, 125:18-126:11.

## PROPOSED CONCLUSIONS OF LAW

Standing

1. Plaintiff has the burden of establishing Article III standing. *Lujan*, 504 U.S. at 561. Standing requires showing three elements: an (1) "injury in fact…which is concrete and particularized and actual or imminent, not conjectural or hypothetical," that is (2) "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party…," and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal citations omitted).

2. Plaintiff has failed to meet its burden to establish standing because it has not shown a direct injury it suffered because of the challenged policies. *Florida v. Mellon*, 273 U.S. 12, 18 (1927).

42

3.  Indirect financial harm to the State's economy is insufficient to establish standing. *Id.*; *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (no standing "where the claim was that actions taken by [federal] agencies had injured a State's economy and thereby caused a decline in general tax revenues").

4.  A State "has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015).

5.  Plaintiff "lacks a judicially cognizable interest in the prosecution or non-prosecution of another," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), and therefore cannot allege harm based on the government declining to detain or initiate removal proceedings against individuals. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (third parties "have no judicially cognizable interest in procuring enforcement of the immigration laws").

6.  Plaintiff is not entitled to special solicitude in assessing its standing in this context. Special solicitude is available to "a litigant to whom Congress has accorded a procedural right to protect his concrete interests." Such a litigant "can assert that right without meeting all the normal standards for redressability and immediacy." *Massachusetts v. EPA*, 549 U.S. 497, 517-518

43

(2007). Plaintiff has not identified any procedural right Congress provided States to sue to enforce the provisions of 8 U.S.C. §§ 1225 and 1226. Thus, Plaintiff is not entitled to a relaxed burden to establish its standing. *See Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 713 (2021) (a "claim of procedural injury does not relieve Plaintiff . . . of [its] burden—even if relaxed—to demonstrate causation and redressability."); *Arizona*, 40 F.4th at 385 ("[*Massachusetts*] does not remove Article III's imperative of a cognizable case or controversy or the requirements of injury, causation, and redressability.").

7.  Plausible assumptions are not sufficient to establish standing at the merits stage. *Lujan*, 504 U.S. at 561. A state must put forth "concrete evidence" that state "costs had increased or will increase as a result" of the particular challenged action, otherwise traceability is "purely speculative." *Id.*; *see also Texas v. California*, 141 S. Ct. 2104, 2119 (2021) (holding that "theory of standing" that "rests on a highly attenuated chain of possibilities" is insufficient—"would require far stronger evidence than the States have offered here to support their counterintuitive theory of standing").

8.  Plaintiff has failed to meet its burden to prove a concrete injury in fact.

9. The evidence from AHCA does not show a direct, concrete injury traceable to the challenged policies, and thus is not sufficient to find standing. *See Mellon*, 273 U.S. at 18; *Lujan*, 504 U.S. at 562; *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

10. The evidence from DEO does not show a direct, concrete injury traceable to the challenged policies, and thus is not sufficient to find standing. *See Mellon*, 273 U.S. at 18; *Lujan*, 504 U.S. at 562; *TransUnion LLC*, 141 S. Ct. at 2203.

11. The evidence from DOC does not show a direct, concrete injury traceable to the challenged policies, and thus is not sufficient to find standing. *See Mellon*, 273 U.S. at 18; *Lujan*, 504 U.S. at 562; *TransUnion LLC*, 141 S. Ct. at 2203.

12. The evidence from DCF does not show a direct, concrete injury traceable to the challenged policies, and thus is not sufficient to find standing. *See Mellon*, 273 U.S. at 18; *Lujan*, 504 U.S. at 562; *TransUnion LLC*, 141 S. Ct. at 2203.

13. The evidence from DOE does not show a direct, concrete injury traceable to the challenged policies, and thus is not sufficient to find standing. *See Mellon*, 273 U.S. at 18; *Lujan*, 504 U.S. at 562; *TransUnion LLC*, 141 S. Ct. at 2203.

14. Showing an increase in "immigrant" children—those not born in the United States or educated in the United States for the past three years (Tr. Day 1, 12:22-24)—is not specific enough to show traceability to the challenged policies.

15. Plaintiff has not proven that the increase in "immigrant" children is a result of the challenged policies, and not a result of "unfettered choices made by independent actors" deciding to move to Florida during the pandemic. *Lujan*, 504 U.S. at 562. There is no traceability if the "record reveals only speculation about the complex decisions made by non-citizens…." *Arpaio*, 797 F.3d at 20 (D.C. Cir. 2015). The Supreme Court has "rejected theories that rest on speculation about the decisions of independent actors," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013), and standing based on speculative future unlawful conduct, *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

16. Plaintiff has failed to show that its alleged injury is redressable by a favorable decision.

17. None of the Florida State agencies track or retrain data sufficient to trace their alleged injuries to the challenged policies. Thus, Plaintiff cannot say whether a change in policy would impact its alleged injuries. If the Court were to assume that a policy change would address Plaintiff's injuries, that would be speculative and not sufficient to show redressability. *See Arpaio*, 797 F.3d at 22; *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974); *Clapper*, 568 U.S. at 414; *Lyons*, 461 U.S. at 105.

A501

APA Reviewability

18. The practices Plaintiff challenges, the alleged non-detention policy and Parole+ATD, both involve the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," and are therefore committed to agency discretion by law. 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

19. Budgetary practices, and resource allocation and prioritization considerations, are core discretionary decisions. *See Heckler*, 470 U.S. at 831.

20. Defendants' decisions about how to process applicants for admission, including both whether to initiate a removal proceeding against them in the first place, and whether to detain them pending any such proceeding or removal, are inherently discretionary decisions committed to the agency's discretion. *See Heckler*, 470 U.S. at 831.

21. Such charging and detention decisions require balancing "whether agency resources are best spent on [enforcing] this violation [of the immigration laws] or another, whether the agency is likely to succeed" in actually obtaining this noncitizen's removal if it commits detention resources to ensuring their presence in removal proceedings, and whether detention or release for this person "best fits the agency's overall policies," considerations which are committed to agency discretion. *See Heckler*, 470 U.S. at 831.

22. "Congress has delegated remarkably broad discretion to executive officials under the [INA]" and its grants of authority "are nowhere more sweeping than in the context of parole." *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985); *see Jean v. Nelson*, 727 F.2d 957, 966 & n.8 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985) (*Jean II*). Further underscoring the unreviewable discretion inherent in parole, courts lack jurisdiction to review parole and bond decisions under 8 U.S.C. §§ 1226(e), 1252(a)(2)(B)(ii). *See*, *e.g.*, *Alonso-Escobar v. USCIS Field Off. Dir. Miami, Fla.*, 462 F. App'x 933, 935 (11th Cir. 2012) (unpublished); *Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1382 (S.D. Fla. 2002), *aff'd*, 321 F.3d 1336 (11th Cir. 2003).

23. "Congress intended whether the [Secretary] is adequately guarding the borders of the United States to be committed to agency discretion by law and, thus, unreviewable." *Chiles*, 69 F.3d at 1096.

24. Plaintiff additionally cannot obtain APA review because it does not challenge a "final agency action," 5 U.S.C. § 704, either with regard to the alleged non-detention policy or Parole+ATD.

25. Agency action is final if it determines legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

26. Agency action that "does not itself adversely affect" a party but instead "only affects his rights adversely on the contingency of future administrative action"

A503

is "nonfinal." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003).

27. There is no identifiable, concrete agency action underlying Plaintiff's alleged non-detention policy claims at all, let alone a final one. Courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision." *Texas*, 142 S. Ct. at 2545 (quoting 5 U.S.C. § 551(4)).

28. Plaintiff cannot challenge an "amalgam of release decisions" or "some generalized and amorphous conception of Defendants' detention and parole policies" under the APA because these do not provide the requisite "agency action." *Brnovich v. Biden*, No. CV-23-01568-PHX-MTL, 2022 WL 4448322 at *10, 12 (D. Ariz. Sept. 23, 2022).

29. The Parole+ATD program does not require CBP or ICE officers to take any specific action; it neither imposes an obligation on them to detain or release in any particular case, nor does it grant a noncitizen the right to release in any particular case. *See Bennett*, 520 U.S. at 178.

30. Because agency officials are "free to exercise discretion" to grant or deny parole in particular cases, or apply different types of ATD, the July 18, 2022 memorandum does not constitute final agency action. *See Jean v. Nelson*, 711

F.2d 1455, 1481 (11th Cir. 1983), *aff'd*, 472 U.S. 846 (1985) (Jean I); *Florida*

*v. United States*, 540 F. Supp. 3d 1144, 1157 (M.D. Fla. 2021), *vacated on*

*other grounds*, 2021 WL 5910702 (11th Cir. Dec. 14, 2021).

31. Additionally, Plaintiff cannot obtain APA review because statutes in the INA,

specifically 8 U.S.C. §§ 1252(a)(2)(B)(ii) and 1226(e), preclude the Court's

review of essential parts of the alleged non-detention policy and Parole+ATD,

5 U.S.C. § 701(a), and Plaintiff does not fall within the zone of interests of the

statutes it is suing to enforce.

32. Plaintiff's challenges to Defendants' decisions to release noncitizens on

parole are barred by section 1252(a)(2)(B)(ii)—which bars review of

"decision or action[s] … the authority for which is specified under this

subchapter to be in the discretion of … the Secretary of Homeland Security"—

because the INA specifically provides that the decision whether to grant

parole is "in [the] discretion" of the Secretary. 8 U.S.C. § 1182(d)(5)(A); *see*

*Jeanty*, 204 F. Supp. 2d at 1382.

33. There is also no judicial review of release decisions under section 1226.

DHS's "discretionary judgment regarding the application of [section 1226]

shall not be subject to review. No court may set aside any action or decision

… under this section regarding the detention or release of any alien or the

grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e); *see United States v. Velasquez-Velasquez*, 524 F.3d 1248, 1252 & n.3 (11th Cir. 2008).

34. Because the Court lacks jurisdiction to review any individual determination by DHS that release under either section 1182(d) or 1226 is warranted, it follows that the Court also lacks jurisdiction to review any challenge to an amalgamation of these individual decisions, or policy or procedure guiding these decisions. *See Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) (both DHS's "discretionary judgment regarding the application of parole" and "the manner in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints" are not subject to review).

35. Plaintiff also cannot obtain APA review because Plaintiff does not fall within the zone of interests of sections 1182(d)(5), 1226(a), or 1225(b).

36. The zone-of-interests inquiry asks whether Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). If a plaintiff is not the object of a challenged regulatory action—which the State of Florida is not, for either the alleged non-detention policy or Parole+ATD, whose objects would be the noncitizens detained or released—the plaintiff has no right of review as its

51

"interests are so marginally related to or inconsistent with the purposes implicit in the statute[.]" *Clarke*, 479 U.S. at 399.

37.  Nothing in the text, structure, or purpose of sections 1182(d)(5), 1225(b), or 1226(a) suggests that Congress intended to permit a State to invoke attenuated financial impacts of immigration enforcement policies to contest those policies. *See Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996).

38.  The statutory scheme indicates third parties like States, who are at most indirectly affected by discretionary parole decisions, do not fall within the zone of interest of the INA's detention and parole provisions. *See, e.g.*, 8 U.S.C. §§ 1226(e); 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (e), (g); *see also id.* §§ 1226a(b)(1), 1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g); *United States v. Fausto*, 484 U.S. 439, 448 (1988); *see also Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (concluding that plaintiffs who are not specific individuals who can pursue their claims through immigration proceedings lack a cause of action under the INA).

Parole+ATD

39.  The Court's consideration of Parole+ATD is confined to the administrative record Defendants produced. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). "[T]he task of the reviewing court is to apply the appropriate . . .

52

standard of review . . . to the agency decision based on the record the agency presents to the reviewing court." *Pres. Endangered Areas of Cobb's Hist.*, 87 F.3d at 1246.

40. The July 18, 2022 memorandum, and not the rescinded and replaced Parole+ATD guidance from November 2, 2021, is the operative agency action at issue in Plaintiff's challenge to Parole+ATD. *See Texas*, 142 S. Ct. at 2545; *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020), *cert. denied*, 142 S. Ct. 81 (2021).

41. The Court cannot second-guess the agency's thought process "as long as its conclusions are rational." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). The "court is not to substitute its judgment for that of the agency" and should still "uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

42. The July 18, 2022 memorandum is not contrary to law because it provides guidance for the Parole+ATD program requiring case-by-case parole decisions only for an urgent humanitarian reason or significant public benefit and otherwise in accord with the requirements of 8 U.S.C. § 1182(d)(5)(A).

43. Defendants' conclusions about the advisability of providing the Parole+ATD pathway as defined under the July 18, 2022 memorandum are more than

"rational," *Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1264, and its path to those conclusions "may reasonably be discerned," *Bowman Transp., Inc.*, 419 U.S. at 286.

44.    The July 18, 2022 memorandum is fully consistent with section 1182(d)(5)(A) because it requires, even when the triggering overcapacity criteria are met, that each noncitizen be "assessed on a case-by-case individualized basis to determine whether he or she is eligible for parole based on an urgent humanitarian reason or whether there is a significant public benefit" in order to release him or her on Parole+ATD. SAR0003-04; 8 U.S.C. § 1182(d)(5)(A).

45.    Under the APA, BP agents are entitled to a presumption of regularity that they properly discharge their duties under the July 2022 guidance, and the record offers no basis suggesting they are not performing the analyses required by the July 18, 2022 memorandum. *See Latif*, 666 F.3d at 748.

46.    The record establishes that individualized inquiries are being conducted for each noncitizen, and those ineligible for parole are not being released on Parole+ATD. A significant number of noncitizens are still in BP custody: there were on average 11,500 noncitizens in BP custody each day in FY2022 through July 22, 2022, with an average of 14,400 in custody each day in May 2022. SAR0005.

54

47. After a case-by-case review, releasing noncitizens on Parole+ATD serves a "significant public benefit" and "urgent humanitarian need" in that it responds to important health and safety risk concerns through decompression of overcrowded BP processing facilities. *See* 8 U.S.C. § 1182(d)(5)(A); *Grand River Enters. Six Nations*, 425 F.3d at 169.

48. The Parole+ATD program represents a more than "rational" response to address overcrowding at BP processing facilities. *See Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1264.

49. Further, the July 18, 2022 memorandum and accompanying administrative record indicate that Defendants considered all appropriate factors, including detention capacity, the processing backlog created by the program, and migratory flows, to the extent relevant and legally permissible. *See Bowman Transp., Inc.*, 419 U.S. at 286.

50. The July 18, 2022 memorandum did not have to undergo notice and comment rulemaking. It merely interprets and provides guidance for applying DHS's statutory parole authority under 8 U.S.C. § 1182(d)(5)(A) and constitutes, at most, an "interpretative rule," "general statement of policy," or rule of "agency organization, procedure, or practice," which are exempt from the notice and comment requirement. 5 U.S.C. § 553(b)(A).

51. The notice-and-comment rulemaking requirement does not apply to "interpretative rules" or "general statements of policy." 5 U.S.C. § 553(b)(A); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

52. Unlike legislative rules, interpretive rules "simply state[] what the administrative agency thinks the statute means"; they do not create rights or duties but merely "remind[] affected parties of existing duties." *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009).

53. "Generally, whether a particular agency proceeding announces a rule or a general policy statement depends upon whether the agency action establishes a binding norm. The key inquiry, therefore, is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case, or on the other hand, whether the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion. As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency in question has not established a binding norm." *Ryder Truck Lines, Inc. v. United States,* 716 F.2d 1369, 1377 (11th Cir. 1983) (quotation marks and internal citations omitted).

54. Whether an agency pronouncement is a legislative rule versus a general policy statement "depends upon whether the agency action establishes a binding

56

norm." *Nat'l Min. Ass'n v. Sec'y of Lab.*, 589 F.3d 1368, 1371 (11th Cir. 2009) (quotation omitted). "As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency in question has not established a binding norm." *Id.*

55. The July 18, 2022 memorandum is an interpretive rule rather than a substantive rule because it does not create any rights or duties for DHS or noncitizens, and the guidance does not expand the use of parole beyond the confines permitted under the statute. It merely states DHS's understanding of one possible use of its 8 U.S.C. §1182(d)(5)(A) authority. *See Warshauer*, 577 F.3d at 1337.

56. Further, the July 18, 2022 memorandum represents a general statement of policy because it does not establish a binding norm, as the agency remains free to consider facts in individual cases that arise, both in the particular release decisions of individual noncitizens, and in the week-by-week, sector-specific assessments as to whether to continue to authorize Parole+ATD for that sector based on its current capacity conditions. *See Nat'l Min. Ass'n*, 589 F.3d at 1371.

57. "Procedural rules," the general label for rules falling under the 5 U.S.C. § 553(b)(A) exception for "rules of agency organization, procedure, or practice," are "primarily directed toward improving the efficient and effective

operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza*, 754 F.3d at 1023 (quotation omitted).

58. Parole+ATD represents a procedural rule because it is aimed at improving the internal operations of BP by speeding up border processing when necessary and decompressing holding facilities. *See id.*

Conclusions Relevant to Both Non-Detention Policy and Parole+ATD

59. The INA does not define "urgent humanitarian reasons" or "significant public benefit."

60. In fact, in 1996, when Congress drafted the parole statute and created these terms, it explicitly removed language from the original bill that would have limited these circumstances to a defined set of rare situations. H. R. 2202, "Immigration in the National Interest Act of 1995," August 4, 1995, https://www.congress.gov/bill/104th-congress/house-bill/2202/text/ih.

61. Congress delegated to the agency the role of adjudicating these terms. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *see also New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1175 n.5 (D.N.M. 2020) (Section 1182(d)(5)(A)'s "vague standard conceivably encompasses a wide range of public benefits").

62. Defendants' implementation of "significant public benefit" to include preventing health and safety risks resulting from overcrowded detention

58

facilities, SAR0002-03, and prioritizing limited detention resources for more-dangerous noncitizens is reasonable. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-425 (1999) ("we have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context").

63. A DHS regulation and numerous authorities recognize the significant public benefit in fighting the spread of disease and protecting public health generally. *See, e.g.,* 8 C.F.R. § 212.5(b)(1) (providing parole for noncitizens detained pursuant to 8 C.F.R. § 235.3(b) or (c) with "serious medical conditions in which continued detention would not be appropriate"); *see also Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (noting "it doubtlessly advances the public interest to stem the spread of COVID-19"); *Grand River Enters. Six Nations*, 425 F.3d at 169 (identifying the promotion of "public health" as a "significant public interest[]").

Alleged Non-Detention Policy

64. To challenge a rule under the APA, a plaintiff must point to a specific statement of agency policy that it is challenging. *Biden*, 142 S. Ct. at 2545 (2022); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

65. The Court cannot rely upon circumstantial evidence to "postulat[e] the existence of an agency decision wholly apart from any 'agency statement. . . designed to implement' that decision." *Texas*, 142 S. Ct. at 2545. *See Brnovich*

59

*v. Biden*, --- F.Supp.3d ----2022 WL 4448322, at *10 (D. Ariz., Sept. 23, 2022) (addressing the identical alleged non-detention policy as challenged here).

66. The Court cannot aggregate separate agency decisions or decisions by individual immigration officers into a policy. *Lujan*, 497 U.S. at 891 (prohibiting broad programmatic attacks on day-to-day agency operations); *Whitewater Draw*, 5 F.4th at 1012, cert. denied, 142 S. Ct. 713 (2021) (Plaintiffs cannot obtain APA review of a collection of individual actions pertaining to a single subject simply by labeling those individual actions a policy); *Arizona v. Mayorkas*, 584 F. Supp. 3d 783, 791 (D. Ariz. 2022), *appeal dismissed*, No. 22-15519, 2022 WL 6105386 (9th Cir. Sept. 12, 2022) (State may not challenge under the APA a "collection of actions" as a "*de facto* program."); 33 Charles Alan Wright et al., Fed. Prac. and Proc. Judicial Review § 8322 (2d ed., Apr. 2021 update) (APA "does not authorize plaintiffs to pile together a mish-mash of discrete actions into a 'program.'"); *see also Lightfoot v. D.C.*, 273 F.R.D. 314, 326 (D.D.C. 2011) ("The question is not whether a constellation of disparate but equally suspect practices may be distilled from the varying experiences. . . but rather, Plaintiffs must first identify the 'policy or custom'" they contend violates the law).

67. The Budget and Accounting Act requires the President to submit a budget, *see* 31 U.S.C. § 1101, et seq., but Congress is free to enact appropriations that are

less than, more than, or consistent with the President's budget request. Constitution, Article I, Section 9, Clause 7.

68. Individual decisions by CBP agents to release applicants for admission, who have been apprehended at or after crossing the Southwest border, are not contrary to law. Those decisions represent: (a) valid exercises of Defendants' authority to release, on a case-by-case basis for an urgent humanitarian reason or significant public benefit, 8 U.S.C. § 1182(d)(5)(A), noncitizens subject to 8 U.S.C. § 1225(b), just as every administration has done, *Texas*, 142 S. Ct. at 2543, and (b) valid conditional releases of noncitizens who are present in the country and have been placed in removal proceedings, under 8 U.S.C. § 1226(a), *see Ortega-Cervantes*, 501 F.3d at 1116, 1118.

69. The INA provides for warrantless arrests where the noncitizen has entered the country illegally and is likely to escape before a warrant could be obtained. 8 U.S.C. § 1357(a)(2).

70. Sections 1225(b)(1)(b)(ii) and 1225(b)(2)(A) not only fail to provide any "stronger indication" that their use of the term "shall" creates a judicially enforceable detention mandate, *see Town of Castle Rock*, 545 U.S. at 761, but the interlocking provisions of the INA in fact indicate the opposite, as section 1182(d)(5)(A) provides for release on parole of applicants for admission subject to section 1225, *see Texas*, 142 S. Ct. at 2543.

61

71. Plaintiff has not identified an agency "rule" at issue in its alleged non-detention policy and therefore the APA's notice and comment requirements, which only govern "rulemaking," are categorically not implicated in this case. *See* 5 U.S.C. §§ 533, 551(4)-(5).

72. Even were there a "rule" at issue in the purported "non-detention policy," it would not be subject to notice and comment rulemaking because it would merely guide the agency in the application of its detention and release authorities under 8 U.S.C. §§ 1182(d), 1225(b), and 1226(a) and constitute, at most, an "interpretative rule," "general statement of policy," or procedural rule, 5 U.S.C. § 553(b)(A), for the same reasons as with Parole+ATD.

Take Care Clause

73. Both the Constitution and the INA vest the Executive with authority over decisions regarding detention and removal of noncitizens. *See*, *e.g.*, *U.S. ex rel. Knauff*, 338 U.S. at 543; *Velasquez*, 524 F.3d at 1253.

74. Federal courts should avoid creating new constitutional causes of action or even extend the application of previously implied causes of action. *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 695 (2004).

75. The Take Care Clause of the Constitution does not create a private right of action to challenge agency action. *Las Americas Immigrant Advocacy Center*

*v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021) (collecting cases); *see, e.g., Brnovich*, 2022 WL 4448322, *14; *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 800 (D. Md. 2020); *Robbins v. Reagan*, 616 F. Supp. 1259, 1269 (D.D.C.), *aff'd*, 780 F.2d 37 (D.C. Cir. 1985).

76. Even if the Take Care Clause can be pursued as a stand-alone cause of action, relief is possible "only where the duty to be performed is ministerial and the obligation to act peremptory, and plainly defined." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 602 (D.C. Cir. 1974); *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 800 (D. Md. 2020).

77. The Executive's duties under § 1225(b)(1) and (b)(2), and § 1182(d)(5) are not purely ministerial, *Florida v. United States*, No. 3:21CV1066-TKW-EMT, 2022 WL 2431414, at *14 (N.D. Fla. May 4, 2022), and therefore, Plaintiff cannot prevail on its Take Care Clause claim as a matter of law. *Nixon*, 492 F.2d at 602; *Columbus*, 453 F. Supp. 3d at 800.

<u>Remedy</u>

78. Any injunctive relief that "enjoins or restrains" DHS's use of 8 U.S.C. § 1225 or § 1226—including any court order that directs DHS as to how it should implement the covered provisions or which noncitizens it should or should not detain, release, or parole, or in what numbers—is barred by 8 U.S.C. § 1252(f)(1). 8 U.S.C. § 1252(f)(1); *see also Garland v. Aleman Gonzalez*, 142

S. Ct. 2057, 2064 (2022); *Texas*, 142 S. Ct. at 2538. Here, the Court cannot issue any of the relief Plaintiff seeks, whether injunctive relief or relief setting aside or vacating the challenged agency actions—because such an order would impermissibly enjoin or restrain DHS's implementation of multiple covered provisions, including sections 1225, 1226, 1229a, and 1231. Nor can the Court issue any injunctive or set/aside vacatur relief as to section 1182(d)(5), because although section 1182 is not covered by section 1252(f)(1), any injunction of section 1182 would directly impact DHS's use of section 1225(b), which *is* a covered provision in section 1252(f)(1).

79.   Were the Court to nonetheless conclude that some form of injunctive relief is appropriate despite the limitations of 8 U.S.C. § 1252(f)(1), that relief must be limited only to Florida. *See Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."). Granting Plaintiff relief that would extend to circumstances "apart from any concrete application that threatens imminent harm to [its] interests" would "fly in the face of Article III's injury-in-fact requirement." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

80. Any declaratory relief that is the functional equivalent of an injunction is also barred by section 1252(f)(1). 8 U.S.C. § 1252(f)(1).

81. Were the Court to issue declaratory relief that substitutes its judgement for that of the Executive Brach in determining which noncitizens should be detained or released, how many to detain or release, or how to best fund and deploy enforcement resources, that would be an inappropriate violation of the separation of powers. *See Chiles*, 69 F.3d 1094, 1096-1097 (11th Cir. 1995).

82. The APA does not affirmatively authorize a universal vacatur or nationwide relief. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J. concurring) ("No statute expressly grants district courts the power to issue universal injunctions."); *Virginia Society for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001) ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power.").

83. Vacatur is not appropriate given the disruptive consequences of vacating the challenged policies, which must be considered by the Court when deciding whether vacatur is appropriate. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *see also Am. Great Lakes Ports Ass'n v. Schultz,* 962 F.3d 510, 518 (D.C. Cir. 2020).

84. Given the disruptive consequences of any order vacating a policy impacting thousands of individuals monthly, the only appropriate remedy is to remand to the agency for further consideration or explanation without vacatur. *See, e.g.*, *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 105 (D.D.C. 2018); *Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*, 220 F.3d 683, 692 (5th Cir. 2000). For the same reason, even if an injunction were available in this context, the court should decline to award injunctive relief as a matter of equity. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008).

## POST-TRIAL BRIEF IN SUPPORT OF DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.**   **Plaintiff Does Not Have Standing to Bring This Case**

The threshold question is whether Plaintiff has standing to bring the present action. As explained below, the answer is no.

### A. Plaintiff's standing claim is legally insufficient.

A case or controversy exists only if a plaintiff has standing—that is, only if the plaintiff has suffered an injury-in-fact that is traceable to the challenged action and would likely be redressed by judicial relief. *TransUnion LLC*, 141 S. Ct. at 2203. An Article III injury requires the invasion of a "legally and judicially cognizable" interest, which means the dispute must be of the sort "traditionally thought to be capable of resolution through the judicial process." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). A "plaintiff must demonstrate standing for each claim he seeks to press" and "each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

A State may sue the federal government when the State is an object of the challenged action— for example, where the United States requires the State to act or to refrain from acting, determines how much federal funding it receives, or deprives it of a legal right. *See*, *e.g.*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (standing based on potential loss of federal funding awarded on basis of state population); *Printz v. United States*, 521 U.S. 898, 904 (1997) (federal

67

statute directed local law enforcement officers to participate in federal gun-regulation program). But a State may not sue the federal government simply because a federal policy has incidental effects on the State, like Plaintiff's argument here of possible downstream financial consequences and incidental effects of federal immigrant policy. To have standing it must have suffered a "*direct* injury" at the hands of the federal government. *Mellon*, 273 U.S. at 18 (emphasis added).[19] Indirect financial harm to the State's coffers or economy is insufficient. *Id.*; *cf. Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (no standing "where the claim was that actions taken by [federal] agencies had injured a State's economy and thereby caused a decline in general tax revenues").

A State "has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources." *Arpaio*, 27 F. Supp. 3d at 202 (D.D.C. 2014). To hold otherwise would inject the federal courts into all manner of policy controversies at the behest of States seeking to secure by court order what they could not obtain through the political process. The Supreme Court has distinguished between suits against private defendants to vindicate proprietary interests and suits against the United States to vindicate

---

[19] The Supreme Court is currently considering the circumstances in which a State may have standing to challenge federal immigration policy that has only an indirect effect on that State. *See United States v. Texas*, No. 22-58.

governmental interests. *See Alfred L. Snapp & Son, Inc., v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601-602 (1982). Thus, when a State sues the United States, additional principles come into play. *See, e.g.*, *Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923) (holding that States may not bring *parens patriae* suits against the United States). Hence the requirement that a State may only sue the United States if it has suffered a direct injury at the hands of the federal government. *Florida*, 273 U.S. at 18.

Plaintiff alleges that the Parole+ATD policy and the purported non-detention policy have increased its noncitizen population and, as a result, Plaintiff will expend more resources on noncitizens. Second Amended Complaint ("SAC"), ECF 74, ¶¶ 69-76. Any such correlation would not give rise to standing, however, because any "injury" would be indirect. Plaintiff cannot show a direct injury because the challenged policies do not instruct Plaintiff what to do, operate on Plaintiff directly, or deprive Plaintiff of any legal rights. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009). Such an injury is a non-cognizable generalized grievance. *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013); *Arizona*, 40 F.4th at 383 ("Contingent injuries, especially those arising from the impact of regulations on third parties not before the Court, rarely create cognizable cases or controversies."). Nor would the challenged policies directly deprive Florida of any federal funding. *Dep't of Commerce*, 139 S. Ct. at 2565.

Federal policies regulating people within a State will often have derivative effects on the State itself—but that has never been thought sufficient to vest a State with standing to challenge such policies. In our federal system, the United States and the States share sovereignty over the same territory and people. The Constitution empowers the United States to act on those people directly rather than through the States. *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). But dual sovereignty does not authorize a State to assert a judicially cognizable interest in avoiding incidental effects of federal policies. *Printz*, 521 U.S. at 920, especially where, as here, those effects derive from the independent actions of individuals in the State. *Lujan*, 504 U.S. at 560. The Supreme Court has repeatedly held that actions taken by the United States that indirectly injure the State's economy is not a direct injury sufficient to show standing. *See, e.g.*, *Florida,* 273 U.S. at 18 (holding that a federal inheritance tax that prompted a "withdrawal of property" and thus diminishing the State's tax base was not a "direct injury"); *Wyoming*, 502 U.S. at 448 ("Courts of Appeals have denied standing to States where the claim was that actions taken by the United States government agencies had injured a State's economy and thereby caused a decline in general tax revenues.").

Were the Court to find that any federal action that increases the number of noncitizens in a State establishes standing because it indirectly increases the State's expenditures, then other States could use similar logic to claim injury from any

70

federal action *reducing* their noncitizen populations who would otherwise pay state taxes. If such incidental financial effects satisfied Article III, every immigration policy dispute between the federal government and the States could end up in federal court. Indeed, such indirect injuries would not be limited to immigration policy disputes. Virtually any federal action can have an incidental effect on State finances because almost every federal policy will affect people within a State. Granting standing to a State for every such instance would remove all limitations to standing and "would permit nearly all state officials to challenge a host of Federal laws simply because they disagree with how many—or how few—Federal resources are brought to bear on local interests." *Arpaio*, 27 F. Supp. 3d at 202. States could then treat the federal courts as "an open forum for the resolution of political or ideological disputes," *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring), and "open the Judiciary to an arguable charge of providing government by injunction." *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 222 (1974). Federal judges would become "virtually continuing monitors of the wisdom and soundness of Executive action." *Laird v. Tatum*, 408 U.S. 1, 15 (1972).

Plaintiff also lacks standing because a litigant "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S.*, 410 U.S. at 619. Plaintiff's claims are premised on its opinion that the government is not sufficiently initiating removal proceedings or detaining noncitizens. Such claims are

foreclosed. *See Sure-Tan, Inc.*, 467 U.S. at 897 (third parties "have no judicially cognizable interest in procuring enforcement of the immigration laws"). [20]

Finally, Plaintiff is not entitled to special solicitude in this case. In *Massachusetts v. EPA*, Massachusetts sued the Environmental Protection Agency (EPA) for denying its rulemaking petition asking the agency to regulate greenhouse gases. 549 U.S. at 505. In concluding that Massachusetts had standing, the Supreme Court explained that "a litigant to whom Congress has accorded a procedural right to protect his concrete interests … can assert that right without meeting all the normal standards for redressability and immediacy." *Id.* at 517-18 (internal citations omitted). The Court observed that Congress had specifically granted States a special solicitude to challenge the EPA's denial of its petition for rulemaking. *Id.* at 519-20. ("Given that procedural right and Massachusetts' stake in protecting its quasi-sovereign interests, the Commonwealth [wa]s entitled to special solicitude in [the] standing analysis.").

"Special solicitude" lowers a litigant's burden as to standing where there is an allegation of deprivation of a procedural protection, as was true in *Massachusetts. Id.* at 518 (citation omitted); *see Lujan*, 504 U.S. at 572 n.7. Congress did not provide the States with a procedural right to the administration of immigration law in general,

---

[20] This argument is also currently pending at the Supreme Court. *See United States v. Texas*, No. 22-58.

A527

or parole in particular. And the Supreme Court did not create a new doctrine in *Massachusetts* that States are always favored litigants for purposes of Article III and can circumvent all the traditional requirements of standing—in particular, causation and redressability. *See Whitewater Draw Nat. Res. Conservation Dist.*, 5 F.4th at 1015 (a "claim of procedural injury does not relieve Plaintiff . . . of [its] burden—even if relaxed—to demonstrate causation and redressability."); *Arizona*, 40 F.4th at 385 ("[*Massachusetts*] does not remove Article III's imperative of a cognizable case or controversy or the requirements of injury, causation, and redressability."); *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1005 (D. Ariz. 2022), *reconsideration denied*, No. CV-21-00617-PHX-DWL, 2022 WL 2304527 (D. Ariz. June 27, 2022) ("Whatever its contours, the special solicitude doctrine cannot be some sort of magic wand that a state can wave over an otherwise inadequate record to automatically cure standing defects that would be fatal to a private litigant.") (internal citations omitted).

Moreover, even if States were entitled to favored treatment in some circumstances, Plaintiff would not be entitled to such treatment here. *Massachusetts* attached "critical importance" to the state's "procedural right" under the Clean Air Act ("CAA") to challenge the denial of a petition for rulemaking on emissions standards. 549 U.S. at 516, 518. *Massachusetts* also involved the threatened loss of territory owned by and subject to the sovereignty of the State—a harm that this Court

has long treated as distinctive and legally cognizable. *See* State Standing, 81 Va. L. Rev. at 415-416 (discussing 19th-century cases). This case, by contrast, involves "indirect fiscal burdens allegedly flowing" from a federal policy—a harm that not only is not "uniquely sovereign," but is entirely "humdrum." *Arizona*, 40 F.4th at 386. This case also involves immigration, for which the National Government, and not the States is the "key sovereign with authority and 'solicitude.'" *Id.* And, unlike the CAA, the INA creates no procedural right for any third party such as a State to challenge immigration enforcement and detention practices. *See, e.g.*, *Chiles*, 69 F.3d at 1096 ("Congress intended whether the [Secretary] is adequately guarding the borders of the United States to be committed to agency discretion by law and, thus, unreviewable.").

Indeed, outside the limited context discussed in *Massachusetts*, the Supreme Court has not afforded a State "special solicitude" in any other setting. To the contrary, since *Massachusetts*, the Court has consistently analyzed State standing without granting States favorable treatment simply because they are States. *See, e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2116-2120 (2021); *Dep't of Commerce*, 139 S. Ct. at 2565; *Arizona*, 40 F.4th at 385.[21] In the cases where States were found to have

---

[21] As the Court discussed during oral arguments, the Fifth Circuit has also addressed the issue of special solicitude for States challenging immigration policies and found standing based on the doctrine. Tr. Day 4, 198:4-12; *see also Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015), *as revised* (Nov. 25, 2015). *Texas*, however, dealt with States' challenge to an articulable, concrete policy–the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).

standing, the States demonstrated a direct financial injury (*Dep't of Commerce*, 139 S. Ct. at 2565), or a loss of State-owned real property (*Massachusetts*, 549 U.S. at 517-20). Here, Plaintiff is alleging indirect, downstream financial harms identical to those alleged in *Arizona*, 40 F.4th at 386. The Court did not find the alleged harms were sufficient for special solicitude there, and neither should the Court here.[22]

Plaintiff lacks standing to bring this case as a matter of law. Because Plaintiff failed to show at trial any direct, redressable harm that is traceable to the challenged policies, Plaintiff also lacks standing as a matter of fact.

### B. The majority of Plaintiff's standing evidence is "useless."

As this Court noted at the end of the trial, the majority of Plaintiff's standing evidence was "useless" and not "particularly helpful." Tr. Day 4, 119:16-120:7. Plaintiff claimed that five of its agencies incurred costs from the challenged policies, thereby establishing standing. Those agencies are the Department of Education ("DOE"), Department of Corrections ("DOC"), Department of Children and Families ("DCF"), Department of Economic Opportunity ("DEO"), and Agency for

---

*Id.* at 146. This case, however, is more comparable to *Arizona*, as both cases deal with a challenge to an amalgamation of policies and decisions. *See Arizona*, 40 F.4th at 380. Thus, the Court should follow the of the Sixth Circuit's interpretation of *Massachusetts* here.

[22] Even were Plaintiff entitled to special solicitude, such designation still "does not remove Article III's imperative of a cognizable case or controversy or the requirements of injury, causation, and redressability." *Arizona*, 40 F.4th at 385-86.

A530

Health Care Administration ("AHCA").[23] *See* Pretrial Stipulation, ECF 122, ¶¶ 27-63. However, the only witness Plaintiff presented to testify regarding standing at trial—indeed the only witness Plaintiff presented at all—was a representative from the Department of Education. Plaintiff otherwise relied only upon the Parties' December 9, 2022 pretrial stipulation to establish standing. This Court determined the evidence from the DOC, AHCA, DEO, and DCF was insufficient to show standing. Tr. Day 4, 119:16-120:7. Indeed, Plaintiff has admitted it does not track expenditures or data in a manner that allows it to identify expenditures made on specific noncitizens released under the challenged policies.[24] Therefore, Plaintiff cannot determine whether stopping or changing the challenged policies would impact its alleged costs. Even assuming Plaintiff's theory of indirect injury is cognizable, therefore, the evidence it presented fails to carry its burden of demonstrating Article III standing.

Notably, many of the stipulations include expenditures that *predate* the policies challenged in this case. Tr. Day 4, 36:8-18; 120:8-17; Pretrial Stipulation, ECF 122, ¶¶ 32, 34, 37, 44, 54, 55, 57, 58, 59. For example, paragraph 59 of the

---

[23] Plaintiff also previously alleged injuries from the Department of Highway Safety and Motor Vehicles, however, those alleged injuries and attendant pretrial stipulations (¶¶ 64-70) were withdrawn prior to the start of trial. *See* Transcript from Jan. 5, 2023 conference, at 20:2-21:9.

[24] Pretrial Stipulation, ECF 122, ¶ 27; Bottcher Dep., 25:1-16, 36:5-38:1, 41:4-10; Heckman Dep., 32:11-33:13, 135:4-17, 139:15-140:5; Tr. Day 1, 31:8-18, 47:17-48:7, 51:23-52:1, 53:2-7; Tr. Day 3, 77:12-21, 78:23-79:13, 81:10-82:1; Tr. Day 4, 21:13-25, 32:17-33:5, 34:16-20, 35:1-10, 36:8-11, 37:21-38:12, 42:12-18, 43:10-12, 45:17-22, 46:16-47:1.

Pretrial Stipulation provides that from January 2020 through January 2022, DCF spent $12,236 providing Relative Caregiver Financial Assistance from State funds to qualifying noncitizens. Pretrial Stipulation, ECF 122, ¶ 59. But a good portion, if not all, of this $12,236 may be attributable to noncitizens who entered the country before January 20, 2021, the date the challenged practices allegedly began. Tr. Day 4, 36:12-16, 36:17-18. Many of the other stipulations on which Plaintiff relies to establish standing suffer the same infirmity. *Id.* at ¶¶ 44, 54, 55, 57, 58, 59. The Court, therefore, cannot determine what, if any, portion of the stipulated costs incurred by the various agencies could be attributable to the practices challenged here after January 2021. Tr. Day 4, 120:8-17, 36:3-18.

Defendants adduced witness testimony to show the insufficiency of Plaintiff's standing claims. For example, Defendants showed that many of the services DCF oversees and administers (including SNAP, TANF, and Medicaid) have a five-year waiting period before many noncitizen applicants for admission would be eligible to receive their benefits, such that Florida could not incur resulting expenses until 2026 at the earliest. Tr. Day 4, 14:9-15:3, 25:15-20, 33:25-34:15, 35:24-36:2. The only exceptions to that waiting period are Cubans, Haitians, Ukrainians, and Afghans. Tr. Day 4, 14:9:22, 16:23-17:2, 25:15-25. The DCF witness, Patricia Grogan, was unable to testify whether any of the Cubans, Haitians, Ukrainians, or Afghans receiving DCF services were released at the Southwest border under the challenged

A532

policies, however. Tr. Day 4, 18:13-19, 32:8-10, 48:21-49:6, 18:21-25, 19:1-4, 48:21-49:6. She admitted that many Cubans and Haitians arrive to the United States via boat. Tr. Day 4, 32:11-16. Thus, Plaintiff cannot reasonably argue that Cubans or Haitians using DCF services have any nexus to the challenged policies. Tr. Day 4, 120:25-121:7. While DCF tracks data of Cuban and Haitian noncitizens who entered the country between October 2021 and September 31, 2022, and who have consumed services provided by the refugee assistance program in Florida, Tr. Day 4, 53:13-20, those refugee services were fully funded by the federal government, Tr. Day 4, 37:11-13. And DCF still cannot show where these Cuban and Haitian noncitizens entered the country, or whether any of them received services funded by the State of Florida. Tr. Day 4, 53:13-20, 54:10-55:11. Therefore, Plaintiff is unable to establish that it suffered any injury providing DCF services to these populations, let alone other applicants for admission released at the Southwest border after January 2021.

In sum, the injuries alleged by AHCA, DOC, DEO, and DCF are too attenuated to establish standing. Tr. Day 4, 194:14-24.

## C. Plaintiff has not shown the injuries alleged by the Florida Department of Education are traceable to the challenged policies.

Similarly, Plaintiff's allegation of indirect injury to the Florida Department of Education ("DOE") is not sufficiently traceable to the challenged policies and cannot establish standing.

A533

As an initial matter, it is undisputed that DOE "does not track alien expenditures in a manner that allows it to identify expenditures on specific aliens released under the challenged policies." Pretrial Stipulation, ECF 122, at ¶ 27. Plaintiff has conceded it cannot show traceability based on DOE's evidence. If Plaintiff cannot quantify its harm, it cannot establish standing, which requires the evidence of harm to be "concrete and particularized" and have a "causal connection…to the conduct complained of…" *Lujan*, 504 U.S. at 560-61. Thus, to find standing for Plaintiff, this Court would have to engage in chain of speculation involving several impermissible inferences and assumptions. Tr. Day 4, 122:17-19.

Plaintiff put forward evidence that there were 17,000 more "immigrant" students in Florida's public schools in the 2021-2022 school year compared to the 2020-2021 school year. Tr. Day 1, 41:16-19. Notably, the definition of an "immigrant" student—the only metric Plaintiff has to track this increase—is broader than just noncitizens and is certainly broader than applicants for admission paroled at the Southwest border since January 2021. Tr. Day 1, 46:21-47:8. It can include lawful permanent residents or even U.S. citizens. *Id.* Just showing an increase in "immigrant" students is not enough to show traceability to the challenged policies. These "immigrant" children may not be noncitizens at all, and if they are, there is no basis for determining whether they were released subject to the challenged policies, or if they are present in Florida under other immigration statutes. DOE does not track

their students' citizenship status, and if they are noncitizens, how they arrived in the country, where they arrived in the country, or their release mechanism, if any. Tr. Day 1, 31:8-18. So, Plaintiff cannot show that the increase of "immigrant" students in the most recent school year was caused by the challenged policies.

Exhibit 95 shows there were 95,084 "immigrant" students enrolled in Florida's public schools, on average, during the 2020-2021 school year. Ex. 95. During the 2021-2022 school year, there were, on average, 112,375. *Id.* The DOE witness, Jacob Oliva, explained that Surveys 2 and 3 were taken at specific times during the school year, but Survey 5 was done at the end of the year and is a culmination of enrollment throughout the school year. Tr. Day 1, 42:2-43:5. Thus, Plaintiff cannot show when, during the school year, the increase started, which is important because the 2020-2021 school year spanned two different administrations.

Plaintiff also did not offer any evidence of the number of "immigrant" students enrolled in Florida public schools in school years prior to 2020-2021. For example, the Court does not know how many "immigrant" students were enrolled in Florida public schools in the 2017-2018, 2018-2019, or 2019-2020 year. For all the Court knows, the number of "immigrant" students enrolled in Florida public schools in 2021-2022 may well be lower than the historic or pre-pandemic average, despite being greater than the number in 2020-2021. Indeed, according to Plaintiff's own witness, because the State of Florida was open during the pandemic, its economy

was "thriving," and the State was "attracting a lot of people from places that weren't open," Tr. Day 1, 53:22-54:6—perhaps even "immigrant" students from other States who already have permanent residence or were paroled into the country many years ago.[25] Simply put, the Court cannot conclude that the increase in immigrant children from the 2020-2021 school year to the 2021-2022 school year is a result of the challenged policies.

Nevertheless, based on the increase of "immigrant" students in the 2021-2022 school year, Plaintiff presented two theories of injury: that the increase of "immigrant" students requires Plaintiff to spend more money on English Speakers of Other Language ("ESOL") services; and that the increase means Plaintiff has less money to spend per student. However, both these theories are flawed and not supported by the evidence.

First, Plaintiff alleges that it uses more resources on students that require ESOL services than those who do not because it must invest in certified teachers, translators, and provide additional instruction for those students. Tr. Day 1, 44:19-45:14. However, just because a student does not speak English does not mean they are an "immigrant" student, let alone an applicant for admission paroled at the Southwest border. Even U.S. citizen students may not speak English. Tr. Day 1,

---

[25] Plaintiff cannot base its standing on the "unfettered choices made by independent actors." *Lujan*, 504 U.S. at 562. "Where predictions are so uncertain, [the Court] is prohibited from finding standing." *Arpaio*, 797 F.3d at 22; *see Arizona*, 40 F.4th at 387.

49:16-24. In any event, Plaintiff did not provide the number of students that require ESOL services, so there is no evidence before the Court as to what injury, if any, might have resulted from the presence of those students.[26]

Plaintiff's second theory of injury is that having more students means it has less money to spend on each student. Tr. Day 1, 28:19-30:10. That allegation is refuted by the evidence. First, Florida has allocated more money per student in the 2022-2023 school year, than it did in the prior two years. Tr. Day 1, 28:10-15, 30:21-31:1. Mr. Oliva testified that Florida is able to spend more per student in the 2022-2023 school year because the State was open during the pandemic, the State legislature benefited from increased revenue over the prior year, and that increase in revenue allowed it to allocate more dollars per student, despite an increase in enrollment. Tr. Day 1, 53:22-54:11. So rather than showing an injury, Plaintiff showed the opposite—it was able to spend more per student even as enrollment increased.

### D. Plaintiff has not shown its claims are redressable.

Plaintiff also failed to prove that its alleged injuries were redressable. A plaintiff has the burden of supporting each element of standing according to the degree of proof required at that particular stage of the litigation. *Bischoff v. Osceola*

---

[26] Plaintiff also receives federal funding for ESOL services, reducing any alleged injury it claims to suffer. Tr. Day 1, 49:25-50:11.

A537

*Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000). Not only did Plaintiff fail to show redressability by a preponderance of the evidence, *see Lujan*, 504 U.S. at 561,[27] it offered no evidence how detaining additional noncitizens would impact the Florida school system. Tr. Day 1, 53:18-21.

Additionally, should this Court find Plaintiff has only shown standing because additional "immigrant" children have come to Florida and enrolled in public schools, and that those "immigrant" children were released by the federal government at the southwest border and were subject to the challenged policies, any remedy must be related to the release of those "immigrant" children. Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."). Thus, if Plaintiff can show only an indirect fiscal injury as a result of more children coming to Florida, then any remedy must be limited to that direct injury. Potential remedies requested by Plaintiff are discussed further at Point VI, *infra*.

---

[27] "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

Crafting such a remedy, however, would be difficult because family units can generally be detained for only 20 days, Tr. Day 3, 48:8-13, 48:17-21, and unaccompanied children are placed in the care of the Department of Health and Human Services, which is not a party to this case. Even if the Court were to direct the federal government to detain more family units, or to cease releasing families on Parole+ATD, Plaintiff has not shown that a 20-day delay in those families arriving in Florida would have any impact on the annual cost of educating their children. Tr. Day 4, 196:8-17.

## II.     Plaintiff's Claims Are Not Reviewable Under the APA

This Court should also deny Plaintiff's APA claims because they are not subject to judicial review. The challenged decisions are committed to agency discretion by law, Plaintiff does not challenge final agency action, and statutes preclude the Court's review. Although this Court declined to grant summary judgment for these reasons, the evidence adduced at trial demonstrates that the threshold requirements for APA review were not satisfied.

### A. Committed to agency discretion by law.

The practices Plaintiff challenges are committed to agency discretion by law. 5 U.S.C. § 701(a)(2).

First, the aggregated detention and budgeting decisions Plaintiff challenges as part of an alleged non-detention policy involve the same "complicated balancing of

a number of factors which are peculiarly within [the agency's] expertise" and are therefore committed to agency discretion. *Heckler*, 470 U.S. at 831. Resource availability, allocation, and prioritization considerations are core agency discretionary decisions. *Id*. Congress has specifically tasked DHS with developing and implementing Congress's "policies and priorities" for resource allocation among other enforcement duties. 6 U.S.C. § 202(5).

Plaintiff's claims against the other part of the alleged non-detention-policy theory, and its claims against Parole+ATD, challenge Defendants' decisions about how and to process applicants for admission, including whether to detain them pending removal. *Infra* Point IV. Those matters are likewise committed to agency discretion by law and therefore not subject to judicial review under the APA. Both the decision whether and when to issue charging documents for removal proceedings, and the decision to detain or release pending those proceedings, in addition to implicating resource allocation considerations, also require balancing "whether agency resources are best spent on [enforcing] this violation [of the immigration laws] or another." *Heckler*, 470 U.S. at 831. These considerations are exactly the kind Congress has committed to agency discretion. *Id.* Indeed, the determination to detain or release on parole encompasses, *inter alia*, discretionary considerations relying on agency expertise and resource prioritization, difficult for a court to review, such as "the possibility that [a noncitizen] may abscond to avoid

being returned to his or her home country," "priorities for the use of limited detention space," and of course, the statutory requirements that parole be for "urgent humanitarian reasons or significant public benefit." *See Jeanty*, 204 F. Supp. 2d at 1382; 8 U.S.C. § 1182(d)(5)(A). The evidence established that these are in fact the considerations DHS officers and agents currently take into consideration in deciding whether to detain or parole, and Plaintiff offered no evidence establishing the contrary. Tr. Day 2, 65:18-67:7, 89:7-12, 114:10-115:8; Tr. Day 3, 27:15-29:10; Ex. B at § 8.2 & pp. 13-14 (checklist); Ex. C at ¶¶ 5.3, 6.2, 8.3; Ex. 40 at 5-7. Plaintiff's post hoc reformulation of its claim to challenge Defendants' alleged focus of detention resources for public-safety risks only underscores the discretionary prioritization that must occur even under its (unsupported) reading of the evidence.

Plaintiff maintains that section 1225(b) requires DHS to detain all amenable applicants for admission. Leaving aside that some may alternatively be subject to 1226(a), *infra* Point IV(D), section 1225(b) imposes no such unconditional duty. Although section 1225 uses the word "shall," the Supreme Court has instructed that the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory legislative commands." *Town of Castle Rock*, 545 U.S. at 761. In any event, nothing in the statute evinces a "strong[] indication" of intent to impose a "true [detention] mandate" on the Executive. *Id.*; *accord, Arizona*, 40 F.4th at 391. If anything, the opposite is true, because of the INA's provision of

release on parole under section 1182(d)(5)(A) for section 1225(b) detainees. *See MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, 950 F.3d 764, 776 (11th Cir. 2020) (court looks at statutory text in "relation to other provisions in the Act" to determine its meaning).

And parole is inherently discretionary, *see* 8 U.S.C. § 1182(d)(5)(A), further indicating that the structure of the INA commits the release decisions Plaintiff challenges to agency discretion. "Congress has delegated remarkably broad discretion to executive officials under the [INA]" and its grants of authority "are nowhere more sweeping than in the context of parole." *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985); *see Jean II*, 727 F.2d at 966 & n.8. Further underscoring the unreviewable discretion inherent in parole, courts lack jurisdiction to review parole and bond decisions under 8 U.S.C. §§ 1226(e), 1252(a)(2)(B)(ii). *See, e.g.*, *Alonso-Escobar v. USCIS Field Off. Dir. Miami, Fla.*, 462 F. App'x 933, 935 (11th Cir. 2012) (unpublished); *Jeanty*, 204 F. Supp. 2d at 1382.

In sum, Plaintiff challenges Defendants' discretionary decisions regarding how to prioritize detention resources and process noncitizens arriving at the country's border. However, "Congress intended whether the [Secretary] is adequately guarding the borders of the United States to be committed to agency discretion by law and, thus, unreviewable." *Chiles*, 69 F.3d at 1096. The evidence conclusively establishes that some prioritization of detention resources will always

be necessary. Defendants could not detain all noncitizens in removal proceedings, not even the subsidiary but substantial portion of whom are applicants for admission at the Southwest border, without Congress providing appropriated funding on a scale never-before-contemplated that is practically incalculable. *Infra* Point IV(B), (D). And neither the evidence at trial nor Plaintiff's arguments offered any meaningful standard to guide this Court to manage prioritization. *See Heckler*, 470 U.S. at 831–32 ("The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."). Thus, as a matter of law, evidentiary fact, and from a practical application perspective, the detention-resource-prioritization decisions challenged in this case, under both the non-detention policy and Parole+ATD, are committed to agency discretion by law and Plaintiff's claims cannot be reviewed under the APA.

## B. No final agency action.

Plaintiff additionally cannot obtain APA review because it does not challenge "final agency action," 5 U.S.C. § 704, either with regard to the non-detention policy or Parole+ATD. Agency action is final if it determines legal "rights or obligations." *Bennett*, 520 U.S. at 178. Agency action that "does not itself adversely affect" a party but instead "only affects his rights adversely on the contingency of future administrative action" is "nonfinal." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003). Neither the alleged non-detention policy nor

A543

Parole+ATD finally determine rights or obligations and are not final agency actions for APA purposes.

First, the evidence has not established the existence of any concrete "non-detention policy." *Infra*, Point IV. Instead, Plaintiff has merely pointed to an amalgam of distinct agency operations and individual release determinations—not any regulation, rule, or policy statement. *Id.* These assorted (and conjectured but not demonstrated) decisions do not represent an "agency action" cognizable under the APA, much less a "final" one. *Lujan*, 497 U.S. at 891. Courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision." *Texas*, 142 S. Ct. at 2545 (quoting 5 U.S.C. § 551(4)). Applying these precedents, a court recently rejected an identical challenge to Defendants' alleged "mass-parole and non-detention policies," holding that a state could not challenge an "amalgam of release decisions" or "some generalized and amorphous conception of Defendants' detention and parole policies" under the APA because they did not provide the requisite "agency action." *Brnovich*, 2022 WL 4448322 at *10, 12. Even if there were a concrete action at the heart of the alleged "non-detention policy," Plaintiff still failed to offer any evidence that it establishes rights or obligations. Even under Plaintiff's post hoc reformulation of its "non-detention" to focus on alleged prioritization of detention for public safety risks, DHS officers must still apply the

"public safety risk" rule to individual noncitizens' processing decisions before any such alleged "policy" could become final. *See Norton*, 324 F.3d at 1237.

As for Parole+ATD, while the July 18, 2022 memorandum provides a concrete agency action, it is also not final agency action because it neither creates legal rights or obligations nor is self-executing. *See id.* at 1236; SAR0002-04. The Parole+ATD program does not require CBP agents or ICE officers to take any specific action; it neither imposes an obligation to detain or release a noncitizen, nor does it grant a noncitizen the right to release. SAR0002-04; *see Bennett*, 520 U.S. at 178. The agents and officers retain discretion to detain or parole noncitizens on a "case-by-case basis," and nothing in the guidance mandates a specific result in any circumstance. SAR0003-04. Likewise, there is no requirement that ICE apply any particular type of ATD, as it is determined in each individual case. *Id.* Parole+ATD does not become final and challengeable until after a decision to detain or release, and what type of ATD to apply, if any, are made in an individual's case. *See Norton*, 324 F.3d at 1237. Because agency officials are "free to exercise discretion" to grant or deny parole in particular cases, or apply different types of ATD, the July 18, 2022 memorandum does not constitute final agency action. *See* Jean I, 711 F.2d at 1481; *Florida v. United States*, 540 F. Supp. 3d 1144, 1157 (M.D. Fla. 2021), *vacated on other grounds*.

### C. Statutes preclude jurisdiction and zone of interests.

Additionally, Plaintiff cannot obtain APA review because provisions in the INA, specifically 8 U.S.C. §§ 1252(a)(2)(B)(ii) and 1226(e), preclude the Court's review of essential parts of the alleged non-detention policy and Parole+ATD. 5 U.S.C. § 701(a). Further, Plaintiff does not fall within the zone of interests of the statutory provisions it is suing to enforce.

Two statutes limit the Court's ability to review Defendants' decisions to release noncitizens on parole under section 1182(d)(5)(A) or conditional parole under section 1226(a), which form the core of Plaintiff's challenges. First, regarding parole under section 1182(d)(5)(A), Plaintiff's challenges are precluded by section 1252(a)(2)(B)(ii)—which bars review of "decision or action[s] … the authority for which is specified under this subchapter to be in the discretion of … the Secretary of Homeland Security"—because the INA specifically provides that any decision whether to grant parole is "in [the] discretion" of the Secretary. 8 U.S.C. § 1182(d)(5)(A). In addition to the text, traditional considerations concerning law enforcement discretion further confirm the conferral of parole decisions to DHS's discretion. *Supra,* Point II(A).

Review of decisions to release noncitizens subject to section 1226, as many of the releases challenged here, *infra,* Point IV(D), are limited by the statute's jurisdiction-stripping provision. The statute provides that DHS's "discretionary

judgment regarding the application of [section 1226] shall not be subject to review. No court may set aside any action or decision … under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e).

Thus, these statutory provisions preclude jurisdiction, and therefore APA review, of individual decisions to release under sections 1182(d) and 1226(a). 5 U.S.C. § 701(a). Further, because the court lacks jurisdiction to review any individual parole determination by DHS, it follows that the court also lacks jurisdiction to review any challenge to an amalgamation of individual decisions as a purported "non-detention policy." Indeed, the Court cannot review an actual parole policy or procedure. *See Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) (both DHS's "discretionary judgment regarding the application of parole" and "the manner in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints" are not subject to review).

To the extent Plaintiff also challenges decisions to release noncitizens subject to the expedited removal or credible fear process under section 1225(b)(1), review is available, if at all, only in the U.S. District Court for the District of Columbia, and is otherwise forcefully barred by section 1252. *See* 8 U.S.C. § 1252(a)(2)(A)(i), (iv), (e)(3).

Plaintiff's claims also do not fall within the zone of interests of section 1225(b), the allegedly mandatory detention provision it claims is being violated, or sections 1182(d)(5) or 1226(a) for that matter. The zone-of-interests inquiry asks whether Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). If a plaintiff is not the object of a challenged regulatory action—which Florida is not, for either the purported non-detention policy or Parole+ATD—the plaintiff has no right of review as its "interests are so marginally related to or inconsistent with the purposes implicit in the statute[.]" *Clarke*, 479 U.S. at 399.

Nothing in the text, structure, or purpose of the INA generally, or sections 1182(d)(5), 1225(b), or 1226(a) specifically, suggests that Congress intended to permit a State to invoke attenuated financial impacts of immigration enforcement policies to contest those policies. *See FAIR, Inc.*, 93 F.3d at 902. *FAIR* rejected a similar challenge that the federal government's "scheme for parole" of inadmissible noncitizens violated statutory limits on parole authority, holding the plaintiff was not within the zone of interests as there was nothing in the "language of the statutes on which it relies" nor the "legislative history that even hints at a concern about regional impact" of immigration. *Id.* at 900-01. This rationale applies with equal force here: nothing in sections 1225(b) or 1226(a) indicates these statutes were designed to control migration to individual states.

Congress has enacted several provisions specifically aimed at protecting the Executive's discretion from the courts, *AADC*, 525 U.S. at 486-87, making clear that only noncitizens may challenge enforcement of certain types of decisions, and only through their removal proceedings. *See, e.g.*, 8 U.S.C. §§ 1226(e); 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (g); *see also id.* §§ 1226a(b)(1), 1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g); *United States v. Fausto*, 484 U.S. 439, 448 (1988) (a detailed review scheme that allows challenges by particular parties is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review"); *Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993). The statutory scheme thus indicates that only the individual noncitizens directly affected by detention or release decisions, and not third parties like states, who might be indirectly affected by these decisions, fall within the zone of interest of the INA's detention and parole provisions.

## III.    The Parole+ATD Policy is Not Contrary to Law

Plaintiff claims that the Parole+ATD program violates substantive and procedural requirements of the APA as (1) being contrary to law, SAC, ECF 74, ¶¶ 83-86; (2) arbitrary and capricious, *id.* at ¶¶ 95-100; and (3) having been adopted

without notice and comment, *id.* at ¶¶ 104-106. For the reasons explained below, none of these claims establishes an APA violation.

## A. Factual background.[28]

Beginning in March 2021, due to the strain of an influx of migrants on processing resources, BP released certain low-risk noncitizens with NTRs that contained instructions to report to ICE within a specified timeframe to receive their charging documents. SAR0162. CBP processing facilities are not structured or equipped for the detention of individuals for longer than 72 hours; extending detention of noncitizens challenges CBP's ability to provide safe housing conditions and appropriate medical care. SAR0002. Without other intervention, high rates of border encounters lead to overcrowding in CBP facilities, which poses health and safety risks to both the individuals in custody and CBP employees. *Id.*

NTRs provided a significantly faster mechanism for processing noncitizens apprehended at the border in comparison to the time-consuming process required to issue an NTA. SAR0162. NTAs require a higher degree of detail gathering, interagency coordination and scheduling, the creation of "A-files" (comprehensive files that document a noncitizen's interactions with DHS and immigration courts), and a means to notify the noncitizen of the charge of removability and the date and

---

[28] This factual background reflects the facts identified by the agency in creating the Parole+ATD memorandum and accompanying record. *Sea Turtle Conservancy*, 2011 WL 13227945, at *2.

location of their immigration court hearing. SAR0162; *see Pereira v. Sessions*, 138 S. Ct. 2105, 2110-11, 2115 (2018) (detailing the information that must be contained in an NTA). Because NTRs reduced processing time and the concomitant holding time, NTRs reduced the time CBP had to hold noncitizens, resulting in less crowding in its facilities and better protection of its employees and the detained noncitizens. SAR0162.

In November 2021 guidance, DHS replaced the use of NTRs with the Parole+ATD policy. SAR0162. Parole+ATD maintained the benefits of the NTR practice—reducing processing time and crowding in CBP facilities as compared to the use of NTAs—while addressing the limitation of the NTR program, by providing accountability and helping to ensure that noncitizens check in with ICE and complete their removal proceedings. SAR0002, SAR0162-63. The November 2021 Parole+ATD guidance formally memorialized the practical combination of two pre-existing authorities long used by DHS: the release of noncitizens on parole in appropriate circumstances pursuant to 8 U.S.C. § 1182(d)(5)(A), with enrollment in one of ICE's ATD programs. SAR0162-63. Despite the longstanding availability of these resources, the November 2021 guidance restricted Parole+ATD's use to times and sectors when and where necessary to address urgent crowding conditions. SAR0162. DHS recognized that the goal was to prioritize resources in the short term

96

and eventually issue NTAs to all noncitizens when the use of Parole+ATD was no longer necessary. *Id.*

ICE's ATD program employs various types of monitoring technology and supervision to increase noncitizens' compliance with release conditions, court appearances and removal orders. SAR0002. The level of technology and supervision assigned to a noncitizen under ICE's ATD program is determined by a case-by-case assessment of the noncitizen's immigration status, criminal history (if any), compliance history, community or family ties, role as a caregiver or provider, and any other relevant humanitarian or medical factors. *Id.* ICE may adjust the level of technology and supervision under ATD as the noncitizen's level of compliance increases or decreases. *Id.* DHS statistics for the most recent period available at the time (FY2022, through April 2022) indicate that the compliance rate of single adults and family units in the ATD program was 93.2% and 82.1%, respectively, with absconder rates of only 5.6% and 14.8%, respectively. SAR0255, 0272.

On July 18, 2022, DHS rescinded the November 2021 guidance memorandum, and provided new guidance to further specify and limit Parole+ATD's use, including requiring as a prerequisite that certain processing (explained *infra*) be completed and overcapacity circumstances exist. SAR0001. Under the current guidance, Parole+ATD is available only for individual BP sectors

97

following a weekly determination by CBP leadership that threshold overcapacity exists, using the following criteria:

- There are more than 15,000 noncitizens in BP custody across all Southwest border sectors, *or*, a sector or central processing center's in-custody total exceeds 100% of its full capacity; *and*
- CBP has encountered more than 6,000 noncitizens per day across the Southwest border over a 72-hour period.

SAR0003.

The July 2022 memorandum explains that when both circumstances exist, they create urgent crowding and excessive time-in-custody concerns that justify application of ICE's limited ATD resources to support CBP's use of parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit. SAR0003. The use of Parole+ATD is reassessed for an individual sector every week: a BP sector cannot utilize Parole+ATD unless the CBP Commissioner authorizes it on a week-by-week basis. *Id.* Further, regarding the processing requirement, BP must conduct biometric identity verification and thoroughly evaluate any potential public safety or national security concerns, as well as collect and document a physical destination address for each noncitizen prior to releasing that noncitizen on Parole+ATD. SAR0004.

Even when the threshold criteria are met and the CBP Commissioner has authorized a sector to use Parole+ATD, BP agents still must assess "each individual noncitizen … on a case-by-case individualized basis to determine whether he or she

is eligible for parole based on an urgent humanitarian reason or whether there is a significant public benefit." SAR0003-04; *see also* 8 U.S.C. § 1182(d)(5)(A). In doing so, the agents must consider individualized circumstances, including a noncitizen's current immigration status, criminal history, compliance history, community or family ties, role as a caregiver or provider, and any other humanitarian or medical factors. SAR0004. Parole+ATD may not be used for individuals who pose a national security risk, unmitigable flight risk, or public safety threat, or who are unaccompanied children or who are criminal noncitizens subject to the mandatory detention requirements of 8 U.S.C. § 1226(c). *Id.*

Parole+ATD provides the significant public benefits of mitigating the spread of disease and preventing overcrowding in facilities that jeopardizes the health and safety of the noncitizens and workforce. SAR0002-03. As a point of reference, the spread of COVID-19 in BP facilities led to the hospitalizations and deaths of many noncitizens and employees. SAR0101, 0114, 0116. Regardless of whether from COVID-19 or other health conditions, continuing high border encounter rates mean that facility overcrowding, and associated health and safety challenges are expected to continue. SAR0002. Decompression of facilities (i.e., reducing overcapacity) and reduction of processing time provide the further significant public benefit of ensuring that BP has sufficient resources focused on border security operations and

other critical aspects of its mission by maximizing the deployment of agents who would otherwise be tasked with processing. SAR0163.

The July 2022 guidance memorandum evinces a recognition of, and response to, the processing backlog that developed due to the use of NTRs and Parole+ATD. SAR0261-71. The memorandum provides that CBP and ICE must streamline processing and that each agency will be responsible for 50% of the subsequent processing of the parolees' NTAs to place them into removal proceedings. SAR0004. In addition to serving NTAs on parolees when they check into regional DHS offices, ICE and CBP have also undertaken an initiative to further relieve backlogs at these regional offices and expedite the service of NTAs via mail to further relieve backlogs. SAR0165-69.

## B. The Parole+ATD program does not violate the law.

Plaintiff argues that the current Parole+ATD policy is unlawful because the July 18, 2022 memorandum[29] describing that policy violates section 1182(d)(5)(A)

---

[29] To the extent Plaintiff challenges the November 2, 2021 memorandum, Defendants' official rescission of that memorandum and replacement with a new and different Parole+ATD memorandum on July 18, 2022 moots Plaintiff's challenge to the November 2021 iteration of the program. *See Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020), *cert. denied*, 142 S. Ct. 81 (2021). Only the July 2022 memorandum is a live agency action subject to review here, as that memorandum expressly "rescinds and replaces all prior guidance regarding the use of Parole+ATD, including but not limited to the November 2, 2021, memorandum[.]" SAR0001. The July 2022 memorandum represents a new, distinct agency action because it looked at the issue afresh and provided "several new reasons" for the policy, as well as altered parts of the practice and added additional aspects, ECF 87-1, SAR0003-0004, "absent from the [earlier] memorandum." *See Texas*, 142 S. Ct. at 2544.

in three ways: (1) it "completely fails to respect in any way the requirement that the individual be taken back into custody when the purpose of parole has been served," Tr. Day 4, 99:1-3; (2) Parole+ATD does not involve "a meaningful case-by-case adjudication" in determining whom to release, *id.* at 107:15-16; and (3) the program violates the "urgent humanitarian interest or significant public benefit" requirement because humanitarian interests or public benefits must be unique to an individual and cannot be shared, *id.* at 110:9-15. *See also* SAC, ECF 74, ¶¶ 83-86. Those arguments are without merit.

Parole+ATD's statutory authority, section 1182(d)(5)(A), provides that the Secretary of Homeland Security may

> in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A).

The July 18, 2022 memorandum is consistent with section 1182(5)(A). The memorandum provides that to release a noncitizen on Parole+ATD, each noncitizen must be "assessed on a case-by-case individualized basis to determine whether he or

101

she is eligible for parole based on an urgent humanitarian reason or whether there is a significant public benefit," even when the triggering overcapacity criteria are met. SAR0003-04; 8 U.S.C. § 1182(d)(5)(A). Under the APA, BP agents are entitled to a presumption of regularity that they properly discharge their duties under the governing agency policy. *See Latif*, 666 F.3d at 748. The record offers no basis to suggest the BP agents are not performing the analyses required by the July 18, 2022 memorandum. On the contrary, the record establishes that BP agents are conducting individualized inquiries and are not releasing noncitizens who are not eligible for parole on Parole+ATD. SAR0005. The record shows that significant numbers of noncitizens are still detained for processing: there were on average 11,500 noncitizens in BP custody each day in FY2022 through July 22, 2022, with an average of 14,400 in custody each day in May 2022. *Id*. And even if Plaintiff did object to the parole decisions made by individual officers, it has not identified those decisions as the relevant agency actions in this lawsuit. This lawsuit would accordingly be an improper vehicle for challenging specific parole decisions by individual officers.

First, Plaintiff argues that Parole+ATD violates the requirement that, "when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." 8 U.S.C. § 1182(d)(5)(A). The record does not support this argument.

While the health and safety risk management through decompression of overcrowded BP processing facilities is at least one of the significant public benefits served by releasing noncitizens on Parole+ATD, that motivation does not exhaust all the "purposes" of that parole.[30] The purposes of releasing a noncitizen on Parole+ATD include the need "to facilitate the initiation of removal proceedings" and "ensure their compliance with," among other things, "court appearances" and "final orders of removal."[31] SAR0002. Thus, the July 18, 2022 memorandum indicates that the purposes of release on Parole+ATD have not fully been served until a noncitizen appears in and completes their removal proceedings and complies with any subsequent removal orders. *See id.* As with CBP, ICE also has limits on its detention capacity so, absent the ability by ICE to re-detain a substantial portion of the Parole+ATD population, monitored and supervised parole under Parole+ATD is the best available tool for ensuring their compliance with the removal process. *See* SAR0255, 0272. Release on Parole+ATD is not open-ended but rather terminates upon the completion of immigration proceedings or removal (if so ordered), or at

---

[30] These causes for Parole+ATD have not resolved, as indicated by the fact that the CBP Commissioner continues each week to authorize some sectors to utilize Parole+ATD, which he may only do when specified overcapacity conditions exist. SAR0003. Whatever the cause for the high border encounter rates leading to those overcapacity conditions, Parole+ATD continues to be necessary for significant public benefit of providing "a safety valve to address overcrowding" and the numerous health and safety issues that can cause. SAR0002.

[31] The statute's use of the plural term "purposes," as opposed to merely "purpose," evinces Congressional recognition that release on parole may simultaneously serve multiple purposes and ends, and the value of the parole is not deemed exhausted until *all* of them have been achieved. *See* 8 U.S.C. § 1182(d)(5)(A).

any earlier point in ICE's discretion. *See id.* The DHS officer(s) supervising the noncitizen's proceedings are positioned to know when these endpoints have been reached. The portion of the record highlighted by Plaintiff at trial confirms that CBP and ICE share authority over the noncitizens' ongoing parole. If upon checking in, ICE determines that the noncitizen has committed a serious crime or disagrees with CBP's initial assessment regarding their national security or public safety risk, an ICE officer can revoke the parole and take the individual into custody pending removal proceedings. SAR0168; *see* Tr. Day 4, 99:24-100:23.

Were the Court to adopt the more limited view that the purposes of release on Parole+ATD are deemed fully served as soon as the noncitizen checks in with ICE or otherwise receives their NTA, even under this view Parole+ATD still comports with the statute. The custody "from" and "to" which the noncitizen is paroled is one and that same, that of the same overarching agency, DHS. That the border component (currently CBP) handles the initial parole and the interior enforcement component (currently ICE) takes over upon check-in and initiation of removal proceedings is immaterial for purposes of the statute, which was passed and last updated when all immigration functions were performed by the legacy Immigration and Naturalization Service. *See Delgado-Sobalvarro v. Att'y Gen.*, 625 F.3d 782, 786 (3d Cir. 2010) (describing history of parole statute). This principle is illustrated in *Ahrens v. Rojas*, 292 F.2d 406 (5th Cir. 1961), which dealt with the parole of a

Cuban national under section 1182(d)(5). *Id.* at 412. In 1959, Rojas fled Cuba to the United States and applied for admission at the port of entry at Key West, Florida, where he was paroled into the United States. *Id.* at 407. He underwent exclusion (the precursor to removal) proceedings and received a final deportation order. The defendant, the INS District Director, ordered him to return to his custody for removal, but eventually decided to let him remain on parole in Miami due to his physical condition. *Id.* However, Rojas was planning an armed assault on Cuba, and the Secretary of State intervened to request that the INS revoke his parole, which it did, and detained him in a border patrol detention facility; the Fifth Circuit upheld that revocation. *Id.* at 407-408. *Ahrens* indicates that a parole granted at a port of entry (by the precursor to OFO) could be both revoked and regranted by the INS District Director (the precursor to ICE), and that a parolee could upon the second revocation be held by yet a third immigration component, border patrol (although the Fifth Circuit still deemed that border-patrol detention "returning the plaintiff to the custody of the defendant," that is, the INS Miami district director, *id.* at 412), all as a valid operation of the parole authority under section 1182(d)(5). In other words, *Ahrens* indicates that "the custody from which he was paroled" in 8 U.S.C. § 1182(d)(5)(A) refers to *federal immigration custody*, not a particular component or office of INS/DHS.

A560

Section 1182(d)(5)(A) also provides that, upon that return to custody, the noncitizen's "case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). Although Plaintiff might prefer to read "case" in this clause to refer narrowly to the noncitizen's removal proceedings, such that the availability of parole must be tied to ongoing removal proceedings, precedent demonstrates that "case" need not be read so narrowly, but rather sweeps in other noncitizen activities, procedures, and statuses. As *Ahrens* demonstrates, even once a final deportation order has been issued, parole may be reauthorized to accommodate a noncitizen's physical condition, which would have been impermissible if "case" were limited to specific exclusion (removal) proceedings. *See id.* at 407. In interpreting section 1182(d)(5)(A), the Supreme Court has also indicated that "case" cannot be limited to removal proceedings because noncitizens with final removal orders who are still present in the United States (who are no longer in removal proceedings) are eligible for parole under section 1182(d)(5)(A). *Clark v. Martinez*, 543 U.S. 371, 386 (2005) (explaining that in such circumstances, "[t]he manner in which the case of any other applicant would be 'dealt with'" as provided in section 1182(d)(5)(A) would be the procedures in 8 U.S.C. § 1231(a) for noncitizens who are no longer in removal proceedings but rather are awaiting execution of removal orders). Thus, while the record makes clear that the purpose of Parole+ATD is to facilitate the initiation,

106

conduction of, and completion of removal proceedings against the parolees, SAR0002, even were removal proceedings not the purpose, parole would still be viable under section 1182(d)(5)(A) to address other aspects of their immigration "case[s]."

Plaintiff also argues that Parole+ATD does not involve "a meaningful case-by-case adjudication" in determining whom to release because BP processing takes approximately 15 to 30 minutes per individual, during which agents are undertaking multiple inquiries and leaving little to no time to determine if the parole standard is met. Tr. Day 4, 107:15-108:4.

The record contradicts Plaintiff's assumption that the entirety of the process for interviewing a noncitizen and determining whether he or she is eligible for Parole+ATD takes 15 to 30 minutes; instead, the record provides only that the ministerial *processing* necessary to release the individual on Parole+ATD is what takes 15 to 30 minutes. SAR0005. As the July 18, 2022 memorandum indicates, starting the processing for Parole+ATD presupposes that a decision has already been made *to* process that individual for Parole+ATD, and not through other available Title 8 pathways like expedited removal. *Id.* The July 18, 2022 memorandum requires that officers consider a noncitizen's individual circumstances and verify they are not a national security risk, unmitigable flight risk, public safety threat, unaccompanied child, or are likely subject to mandatory detention for criminal

noncitizens before deciding to place them on Parole+ATD—not to mention the officer must first determine whether the noncitizen satisfies the section 1182(d)(5)(A) standard. SAR0003-04. Further, the July 18, 2022 memorandum explicitly requires that the biometric identity verification and national security and public safety screening be performed "*[p]rior* to a noncitizen's processing via Parole+ATD." SAR0004 (emphasis added). Hence, the individualized consideration of a noncitizen's security and flight risks, urgent humanitarian reason or significant public benefit for parole, and biometric verification have already occurred before BP agents begin the 15-to-30-minute processing phase (which also excludes the time frame in which ICE contractors are assessing the individual for risk in order determine the appropriate level of ATD, SAR0002).

Further, Plaintiff's processing-time argument based on an out-of-context detail from the administrative record does not and cannot articulate any flaw in the July 18, 2022 decisional memorandum itself, which does not impose any time limit on determining whether a noncitizen is eligible for Parole+ATD. *See* SAR0001-04. Rather, the memorandum requires that an individual determination be conducted in all cases, and the noncitizen may be released only if a case-by-case assessment establishes an urgent humanitarian reason or significant public benefit. SAR0003-04. As explained, BP agents are entitled to a presumption of regularity that they are properly conducting this determination. *See Latif*, 666 F.3d at 748.

Third, Plaintiff also maintains the July 18, 2022 memorandum violates the "urgent humanitarian reasons or significant public benefit" requirement in section 1182(d)(5)(A) because it argues, humanitarian reasons or public benefits cannot be the same for more than one individual. Tr. Day 4, 110:9-15.

The INA does not define "urgent humanitarian reasons" or "significant public benefit." In fact, in 1996, when Congress drafted the parole statute and created these terms, it explicitly removed language from the original bill that would have limited these circumstances to a defined set of rare situations. H.R. 2202, Immigration in the National Interest Act of 1995, § 523 (Aug. 4, 1995).[32] Congress eliminated these restrictions from the bill after concerns were raised about the importance of giving the Secretary "flexibility to deal with compelling immigration situations."[33] That Congress rejected the House's proposal of these limits in favor of the un-limited version the Senate eventually adopted weighs heavily against an overly restrictive interpretation of section 1182(d)(5). *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved

---

[32] https://www.congress.gov/bill/104th-congress/house-bill/2202/text/ih.

[33] https://www.govinfo.gov/content/pkg/CRPT-104hrpt469/pdf/CRPT-104hrpt469-pt1.pdf, at P. 538. At the time, there were competing versions of what the parole standard should include. The IIRIRA House Report proposed constraints on parole authority, which would have tightly limited the substantive grounds for release. *See* H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, at 77-78 (1996) (cited in *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011)). However, Congress did not enact the House's proposed constraints, instead adopting the Senate's amendment to section 1182(d)(5)(A), which proposed, in material respects, the current standard, which more broadly authorizes release on parole to advance an (undefined) significant public benefit. *See* H.R. Rep. No. 828, 104th Cong., 2d Sess. 245 (1996).

the result the Government urges here weighs heavily against the Government's interpretation.") (citing *Doe v. Chao*, 540 U.S. 614, 621-623 (2004)).

The resulting absence of any statutory provision defining or limiting "urgent humanitarian reasons or significant public benefit" means that Congress delegated to the agency the role of adjudicating these terms. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *see also New Mexico*, 450 F. Supp. 3d at 1175 n.5 (Section 1182(d)(5)(A)'s "vague standard conceivably encompasses a wide range of public benefits"). Defendants' implementation of "significant public benefit" to include preventing health and safety risks resulting from overcrowded detention facilities, SAR0002-03, is reasonable. *See INS v. Aguirre-Aguirre,* 526 U.S. 415, 424-425 (1999) (further noting "judicial deference to the Executive Branch is especially appropriate in the immigration context"). Regulations and numerous authorities recognize the significant public benefit in fighting the spread of disease, and ensuring public health generally.[34] *See, e.g.,* 8 C.F.R. § 212.5(b)(1) (providing parole for noncitizens with "serious medical conditions in which continued detention would not be appropriate"); *Swain*, 961 F.3d at 1293 (noting "it doubtlessly advances the public interest to stem the spread

---

[34] To the extent detention capacity plays any role in this disease and death mitigation rationale, regulation, precedent, and accepted agency practice have recognized the need to prioritize limited detention space as a valid basis for parole. *See* Point III(A), *supra*.

of COVID-19"); *Grand River Enterprises Six Nations, Ltd.*, 425 F.3d at 169 (identifying the promotion of "public health" as a "significant public interest[]").

Plaintiff's argument that the urgent humanitarian reasons or significant public benefit must be unique to each individual noncitizen and cannot be shared with other similarly situated noncitizens or DHS personnel interacting with them, lacks any support and indeed is contradicted by the plain text of section 1182(d)(5)(A) and a regulation implementing its authority, 8 C.F.R. § 212.5(b), which Plaintiff does not challenge.[35] The former provides for parole based on "significant *public* benefit" and the latter provides, in relevant part, for parole of noncitizens "whose continued detention is not in the *public* interest." 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(b)(5) (emphasis added). These authorities thus expressly contemplate parole based on "public" considerations, that is, based on a larger group or community than simply the one noncitizen at issue. *See* "Public," https://www.merriam-webster.com/dictionary/public ("of, relating to, or affecting all the people or the whole area of a nation or state"). Moreover, in the adjacent subsection, which limits

---

[35] Any challenge to this regulation, promulgated in 1996, would be time-barred regardless. *See* 28 U.S.C. § 2401(a); *Ctr. For Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006); *see also* 47 FR 30044-01 (1982). While 8 C.F.R. § 212.5(b) applies only to arriving aliens and noncitizens in the expedited removal process, it interprets the same authority, section 1182(d)(5)(A), providing the authority for Parole+ATD. And this regulation establishes DHS's reasonable and unchallenged interpretation of section 1182(d)(5)(A) that urgent humanitarian interests and significant public benefits need not be unique and can be realized if an individual falls within a group sharing common characteristics such as being a minor in DHS custody, 8 C.F.R. § 212.5(b)(3), or in another group whose detention is not in the public interest, *id.* § 212.5(b)(5).

the Secretary's authority to parole noncitizens who are determined to be refugees, Congress expressly employed the phrase "compelling reasons in the public interest *with respect to that particular alien*." 8 U.S.C. § 1182(d)(5)(B) (emphasis added). *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Had Congress intended to include that limiting phrase in section 1182(d)(5)(A), it could have readily done so. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2414 (2018) ("Had Congress instead intended in [this section of the INA] to constrain the President's power to determine who may enter the country, it could easily have chosen language directed to that end."). And it is well settled that the Secretary is empowered to establish general policies in relation to his exercise of discretionary parole authority under section 1182(d)(5). *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230, 244 (2001); *Reno v. Flores*, 507 U.S. 292, 313-14 (1993); *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991); *Heckler v. Campbell*, 461 U.S. 458, 467 (1983); *Yang v. INS*, 79 F.3d 932, 936 (9th Cir. 1996); *Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970); *see also Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 163 (2003) ("In each of these instances, we draw a conclusion on grounds of plausibility: if Congress had meant to set a counterintuitive limit on authority to act, it would have said more than it did . . . .").

112

In fact, just a few years ago, when issuing the National Defense Authorization Act for Fiscal Year 2020, Congress explicitly recognized the "importance" of, in part, the Secretary's authority to make class-based parole eligibility rules. https://www.congress.gov/116/plaws/publ92/PLAW-116publ92.pdf, Section 1758, at pg. 133 STAT. 1861 (regarding parole in place eligibility for members of the armed forces). Congress has also funded several nationality-based parole programs for certain populations including, for example, Ukrainians. *See* 47 Fed. Reg. 30044-01 (1982). The fact that Congress has provided funding for group-specific parole programs indicates that Congress sanctions basing parole eligibility upon broad parole factors. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986). Plaintiff's critique is, in effect, a request for greater arbitrariness in making parole determinations. But nothing in the statute requires DHS to eschew general principles in making parole determinations, so long as those principles allow officers to take into account an individual's unique factual circumstances.

Next, Plaintiff argues that Parole+ATD "flips the presumption" in section 1182(d)(5)(A) and "make[s] a categorical judgment that under certain circumstances everybody gets paroled" unless they fall into "carve-outs" for "disqualifying crimes, or things like that." Tr. Day 4, 109:23-110:5. The June 2022 memorandum does not support this argument. The memorandum indicates that the presence of the triggering conditions that permit the CBP Commissioner to authorize Parole+ATD only creates

one more processing tool that officers *may* use. *See* SAR0002-05. The memorandum does not provide that Parole+ATD becomes the presumptive processing tool for all applicants for admission that BP encounters, and certainly not that all individuals eligible for Parole+ATD will presumptively be released without any case-by-case assessment to determine whether referral for detention or release is more appropriate. *See* SAR0002-05. Indeed, the record refutes the notion that BP is applying a blanket presumption of release, because it shows BP is still detaining significant numbers of noncitizens pending their processing. To trigger the (continually reevaluated) availability of Parole+ATD at all, there have to be over 15,000 noncitizens in custody across the Southwest border and/or the particular sector's facility is over 100% maximum detention capacity. SAR0003. And even after Parole+ATD had been authorized for some sectors, BP was still detaining on average 11,500 noncitizens per day throughout FY2022. SAR0005.

The administrative record establishes that the Parole+ATD program is not contrary to law.

### C. The Parole+ATD program is not arbitrary or capricious.

Plaintiff contends that Parole+ATD is arbitrary and capricious because the July 18, 2022 memorandum: (1) does not "tell immigration officers how to apply the parole requirement, that once the reasons for parole have been served, the person be taken back into custody;" Tr. Day 4, 105:8-10; (2) does not address the backlog or

"explain how to deal with it," *id.* at 112:4-9; (3) does not acknowledge "inconsistent agency positions" based on extra-record evidence that ICE has its own parole policy, *id.* at 114:2-18; (4) does not discuss "the effect the Parole Plus ATD policy might have on migration flows," *id.* at 117:3-4; and because (5) "the first Parole Plus ATD policy was limited to family units" but the "second Parole Plus ATD expanded it to single adults" which "is a significant change between policies that" was not discussed in the memorandum, *id.* at 117:13-20; *see also* SAC, ECF 74, ¶¶ 95-100.

As noted, the standard for showing a decision to be arbitrary and capricious is extremely deferential to agency decision-making. *See Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996). The courts cannot second guess an agency's thought process "as long as its conclusions are rational." *Miccosukee*, 566 F.3d at 1264. The "court is not to substitute its judgment for that of the agency" and should still "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp.*, 419 U.S. at 286.

The agency's conclusions in the July 18, 2022 memorandum about the advisability of providing the Parole+ATD pathway are more than "rational," and its path to those conclusions "may reasonably be discerned." High border encounter rates cause overcrowding at BP facilities, which causes health and safety risks. SAR0001-04. The goal of Parole+ATD is to serve significant public interests by

maximizing the resources used for both processing noncitizens for removal and making BP agents available to protect the border, while minimizing the hazards caused by overcrowding. SAR0001-02. The Parole+ATD program is a rational means that accomplishes this goal. Parole+ATD reduces the time BP must hold noncitizens, decompressing its holding facilities and mitigating the overcrowding risk, while the component of enrollment in ATD highly increases the likelihood that noncitizens so enrolled will comply with and undergo removal proceedings. This reasoned approach more than suffices under the deferential APA review standard. *See Miccosukee Tribe*, 566 F.3d at 1264.

Plaintiff's arguments that the July 18, 2022 memorandum is arbitrary and capricious do not alter this conclusion. First, there is no need for the July 18, 2022 memorandum to address how and when DHS officers are to end a grant of parole. As noted, parole under section 1182(d)(5)(A) is a longstanding INA authority that BP agents have employed for years. The parameters and procedures for termination of parole are provided in regulations. *See* 8 C.F.R. § 212.5(e). Further, the July 18, 2022 memorandum addresses the conditions under which BP agents may release a noncitizen under Parole+ATD to initiate removal proceedings, and that supervision and any continued parole will be handled by ICE. SAR0002-04.

Second, the record demonstrates that DHS considered and took efforts to address the backlog via changes to the Parole+ATD program in the July 18, 2022

memorandum. Prior to reauthorizing the program on July 18, 2022, the agency considered the size of the processing backlog resulting from the use of NTRs and Parole+ATD, but also considered the time and expenses that would be required to clear the backlog should Parole+ATD be fully ended at various points in time. SAR0261-71. Responding to and attempting to counteract the growth of this processing backlog, the July 18, 2022 memorandum directed CBP and ICE to find ways to streamline processing and designated each to be responsible for 50% of the subsequent processing of NTAs. SAR0004. Further, the record demonstrates that ICE has also undertaken an initiative to further relieve backlogs at regional offices and expedite the service of thousands of NTAs by mail. SAR0165-69. More is not required, as the agency "need not write an exegesis" on an issue so long as its decision indicates that it "considered and reasoned through" the evidence. *Farah v. U.S. Att'y Gen.*, 12 F.4th 1312, 1329 (11th Cir. 2021). Evidence of the backlog data in the record and the July 18, 2022 memorandum demonstrate that DHS "considered and reasoned through" the backlog created by Parole+ATD, alternatives such as ceasing it or changing the program to improve processing capacity (a path which the agency decided to pursue), and ultimately determined that the benefits of Parole+ATD still outweighed the backlog's associated costs.

Plaintiff relies on *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1912 (2020), in support of its argument that the

Parole+ATD memorandum itself, as opposed to the memorandum in combination with its supporting record, failed to consider an important aspect of the problem in the form of the backlog. In *Regents*, the Supreme Court held that the Secretary's reasoning only touched on the illegality of providing affirmative benefits under DACA and failed to consider or provide a basis for rejecting another part of the program, forbearance. *Id.* The issue in *Regents* was whether the agency considered continuing the forbearance piece *at all*, not, as Plaintiff focuses on here, a matter of how much of the consideration of the issue was presented in the decisional memorandum versus the administrative record. *Id.* Here, the agency unmistakably recognized the issue of the backlog and called for measures to address it. *Regents* does not indicate that Defendants' decision regarding authorizing Parole+ATD was deficient.

Third, Plaintiff improperly relies on extrinsic evidence to support its argument that the July 18, 2022 memorandum does not acknowledge "inconsistent agency positions," pointing to extra-record evidence that ICE has its own parole policy, ICE Parole Directive 11002.1 (Dec. 9, 2008), Ex. C, in contrast to Parole+ATD. Extra-record arguments are not a basis for challenging an agency action under the APA, where "the task of the reviewing court is to apply the appropriate … standard of review … to the agency decision based on the record the agency presents to the reviewing court." *Pres. Endangered Areas of Cobb's Hist.*, 87 F.3d at 1246. "[T]he

focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). Plaintiff has not demonstrated that the Parole+ATD record requires supplementation, and the Court has agreed that review of Parole+ATD must be limited to the administrative record, *see* ECF 55, and therefore an argument based on extrinsic evidence about how another component of DHS addresses parole is irrelevant to the substantive validity of the July 18, 2022 memorandum.

However, even if the Court considers ICE Parole Directive 11002.1, it does not demonstrate that Parole+ATD is arbitrary and capricious. The ICE Directive provides guidance to ICE for paroling certain noncitizens, "arriving aliens," who come to it through the expedited removal process after demonstrating a credible fear. *Id.* The July 18, 2022 memorandum, by contrast, provides parole guidance to BP officers, not ICE (whose only roles in Parole+ATD are to determine the appropriate type of ATD for noncitizens BP has already decided to release, SAR0003, and then to decide whether to re-detain the noncitizen at later stages of the removal process). The July 2022 memorandum does not apply to "arriving aliens" coming through the expedited removal process, but limits its focus to those who will be processed with NTAs and placed directly into removal proceedings under section 1229a. *Id.* Even so, both the July 18, 2022 memorandum and the ICE Directive apply the section

1182(d)(5)(A) standard, requiring that any releases be justified by an urgent humanitarian interest or significant public benefit; require a case-by-case adjudication; and prohibit release of noncitizens who are national security, public-safety or unmitigable-flight risks. *Compare* SAR0002-03 *with* Ex. C at ¶¶ 4.2, 4.3, 5.3, 6.2 (both providing for parole only based on an individualized inquiry under section 1182(d)(5)(A) standard where the person is not a flight nor security risk).

Fourth, without support, Plaintiff argues Parole+ATD encourages migration. The July 18, 2022 memorandum reflects DHS's consideration of migratory flows by only permitting a sector to utilize release under this mechanism for the specified period when high encounter rates have the sector (or border generally) at overcapacity. SAR0003. Plaintiff suggests that Parole+ATD is encouraging migration, but this inverts cause and effect. The record establishes that Parole+ATD was developed to respond to a record number of border encounters, and not that border encounters increased after the use of Parole+ATD. SAR0001-04, 0162-63. By contrast, nothing in the record indicates that noncitizens were drawn to the Southwest border principally by the prospect of Parole+ATD, or even that Parole+ATD specifically was a factor at all in the migrants' decision-making. *See Whitewater Draw*, 5 F.4th at 1015 ("myriad economic, social, and political realities [] might influence an alien's decision to risk life and limb to come to the United States.") (cleaned up). Even were it possible to undertake some empirical study of

the effect of Parole+ATD on migration patterns, "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies" before reaching decisions. *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021). Further, the premise of Plaintiff's argument, that the government could or should use its parole authority to deter migration, has been called into question by courts. *See Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 157 (D.D.C. 2018) (directing the government in that case to provide a new parole decision "without considering immigration deterrence" as a factor).

Fifth, Plaintiff incorrectly argues the expansion of Parole+ATD from just family units to include single adults constitutes a change of position and requires additional explanation under the APA. *If* an agency "*is* changing position," and particularly if that new position "rests upon factual findings that contradict those which underlay its prior policy," *then* the APA may require some explanation regarding the change. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). That is not the case here. While the November 2021 memorandum contemplated that Parole+ATD would be used, at that time, *primarily* for family units, it did not preclude the use of the policy for single adults. SAR0163. There is nothing inherent in the policy as originally described in November 2021 that is limited only to family units. *See id.* Further, both the November 2021 and July 2022 memoranda reflect that in-custody figures will trigger the use of Parole+ATD,

without any distinction between family units or individuals. SAR0003, 0163. BP agents must undertake the same individual-specific inquiry under section 1182(d)(5)(A) when deciding whether to grant parole. SAR0164. Thus, since the agency never adopted a prohibition on using it for single adults, and the apparatus for applying Parole+ATD was the same for both adults and families, the application of the program to single adults did not represent an inconsistent position by comparison to past practice and required no further explanation. *See Fox Television Stations*, 556 U.S. at 515.

Accordingly, the July 18, 2022 memorandum is not arbitrary and capricious.[36]

## D. The Parole+ATD program was not subject to notice and comment.

Plaintiff incorrectly claims that the July 18, 2022 memorandum was required to undergo notice-and-comment rulemaking. Tr. Day 4, 117:21-25; *see* SAC, ECF 74, ¶¶ 104-106. However, the Parole+ATD guidance is not the type of rights-creating document that requires notice and comment rulemaking, as it only provides guidance for the implementation of the Parole+ATD policy consistent with section 1182(d)(5)(A).

The notice-and-comment rulemaking requirement does not apply to "interpretative rules" or "general statements of policy." 5 U.S.C. § 553(b)(A); *Perez*

---

[36] Plaintiff's arguments on the arbitrary and capricious claim from summary judgment that were not discussed at trial, to the extent not waived, lack merit for the reasons previously briefed by Defendants. ECF 88-1 at 42-46; ECF 107 at 14-15.

*v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Unlike legislative rules, interpretive rules "simply state[] what the administrative agency thinks the statute means." *Warshauer*, 577 F.3d at 1337. Such guidance does not create rights or duties but merely "remind[] affected parties of existing duties." *Id*. The difference "likely turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute." *Id*. Similarly, whether an agency pronouncement is a rule versus a general policy statement "depends upon whether the agency action establishes a binding norm." *Nat'l Min. Ass'n v. Sec'y of Labor*, 589 F.3d 1368, 1371 (11th Cir. 2009) (quotation omitted). The memorandum does not produce a binding rule because it permits agents to continue considering the individual circumstances of each case. *See id*. ("As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency in question has not established a binding norm."); *see also Texas v. United States*, 50 F.4th 498, 522 (5th Cir. 2022) (whether agency action is a general statement of policy turns on "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion"). Rules of "agency organization, procedure, or practice" are also exempt from the notice and comment requirement. 5 U.S.C. § 553(b)(A); *see Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014).

The July 18, 2022 memorandum is, at most, an interpretive rule or general statement of policy because it offers guidance that directly tracks the language of

section 1182(d)(5)(A): release on Parole+ATD may only be granted "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." SAR0003. The July 18, 2022 memorandum does not create any rights or duties for DHS or noncitizens, and the guidance does not expand the use of parole beyond the confines permitted under the statute. *See Warshauer*, 577 F.3d at 1337. Rather, the July 18, 2022 memorandum provides that DHS's determination of an "urgent humanitarian reason" or "significant public benefit" can include considerations of health and safety where overcrowding conditions are present. Thus, the July 18, 2022 memorandum is at most an interpretive rule. Additionally, it may be viewed as a general policy statement, as the July 18, 2022 memorandum does not establish a binding norm, because the agency remains free to consider facts in individual cases and in the week-by-week, sector-specific assessments as to whether to continue to authorize Parole+ATD. SAR0002-04; *see Nat'l Min. Ass'n*, 589 F.3d at 1371. Indeed, mirroring the parole statute, the procedures outlined in the July 18, 2022 memorandum are applied "on a case-by-case basis," and provide no assurance that parole will be granted in any specific case. SAR0002-04. Rather, the July 18, 2022 memorandum falls comfortably within the longstanding rule that agency policies or procedures that inform the public of the agency's current policy regarding enforcement and use of discretionary authorities (here, the parole authority) are general statements of policy. *See, e.g.*, *Innovation Law Lab v. McAleenan*, 924 F.3d

124

503, 509 (9th Cir. 2019) (explaining that the agency policy which directed immigration officers to consider whether they "may return" a noncitizen to Mexico pending removal proceedings was a statement of policy "because immigration officers designate applicants for return on a discretionary case-by-case basis"), *stay granted*, 140 S. Ct. 1564 (2020); *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 597 (5th Cir. 1995) (similar, in context of FDA guidance concerning enforcement actions). In short, the July 2022 memorandum merely "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citation omitted).

Alternatively, the July 2022 memorandum qualifies as a rule of "agency organization, procedure, or practice." 5 U.S.C. § 553(b). "Procedural rules," the general label for rules falling under this exemption, are "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza*, 754 F.3d at 1023 (quotation omitted). Parole+ATD is aimed at improving the internal operations of BP by speeding up border processing and addressing overcrowding and detention facilities. SAR0001-04. The July 18, 2022 memorandum improves the DHS subcomponents' use of parole authority without changing the substantive rights of the affected noncitizens or third parties. *See Mendoza,* 754 F.3d at 1023. By contrast, processing via Parole+ATD does not alter the "the substantive criteria by which"

DHS will "approve or deny" a parole request or an ultimate claim for relief. *James v. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000).

Under any scenario, the July 18, 2022 memorandum does not promulgate a substantive, rights-altering rule and consequently was not required to undergo notice and comment.

## IV.   <u>There is No Non-Detention Policy</u>

Plaintiff alleges that in 2021, Defendants instituted an unwritten non-detention policy at the Southwest border. Plaintiff challenges this unwritten policy under the APA as contrary to law, arbitrary and capricious, and as procedurally improper based on Defendant's failure to engage in notice and comment rulemaking. SAC, ECF 74, at ¶¶ 77-82, 87-94, 101-103. This claim raises five questions for the Court: (1) has Plaintiff identified a specific agency statement of non-detention that can be challenged as a policy under the APA; (2) has Plaintiff proven the alleged policy exists; (3) is the policy arbitrary and capricious; (4) is the policy contrary to law; and (5) did the policy have to undergo notice and comment? For the reasons discussed below, the answer to each of these questions is no.

### A.   Plaintiff has not identified a specific agency statement that is reviewable under the APA.

Plaintiff claims that Defendants' non-detention policy is unwritten. But whether written or unwritten, a challenged policy must be tied to a specific agency statement to be reviewable under the APA. *See Texas*, 142 S. Ct. at 2545 (Courts

may not "postulat[e] the existence of an agency decision wholly apart from any agency statement . . . designed to implement that decision."). *Texas* concerned the Secretary of Homeland Security's termination of the Migrant Protection Protocols ("MPP") via a June 1, 2021 memorandum, and later in an October 29, 2021 memorandum. On December 13, 2021, the Fifth Circuit affirmed the district court's decision requiring the government to re-implement MPP. *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021). As relevant here, the court of appeals held that the October 29 memorandum terminating MPP did not constitute final agency action because it (like the June memorandum) was merely evidence of the Secretary's separate, freestanding, policy decision to terminate MPP, and that only the Secretary's freestanding decision had legal effect. 20 F.4th at 951, 950-58. The Supreme Court reversed. It held the Fifth Circuit committed reversible error because Courts are not free to "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision." *Id.* at 2545. The Supreme Court explained, "[t]o the extent that the Court of Appeals understood itself to be reviewing an abstract decision apart from specific agency action, as defined in the APA, that was error." *Id.* "It was not the case that the [June and October memoranda] simply *explained* DHS's decision [to terminate MPP]…To the contrary, the [memoranda] were themselves the operative agency actions, each of them an agency statement…designed to implement,

127

interpret, or prescribe law or policy." *Id.* Thus, assuming Plaintiff can challenge an unwritten policy under the APA, *Texas* makes clear that Plaintiff must identify a specific "agency statement" that it is challenging. Plaintiff has not done so here—as a matter of pleading or as a matter of proof.

In the SAC, Plaintiff broadly—and vaguely—defined the alleged non-detention policy as "the government's policy of releasing aliens subject to mandatory detention." ECF 74, ¶ 20. At summary judgment, Plaintiff similarly described it as the government's "*general* policy of releasing aliens subject to mandatory detention." ECF 86 at 2 (emphasis added). Plaintiff abandoned that articulation of the policy during closing arguments after the Court observed that "[the policy cannot be] we're not going to detain anybody because they are detaining people." Tr. Day 4, 72:1-2. Plaintiff narrowed its description and claimed, for the first time, that the policy is that Defendants "are not [] detain[ing] individuals unless they fall into. . . narrow public safety categories." Tr. Day 4, 71:22-72:7.

The Court should not consider Plaintiff's post-trial articulation of the alleged non-detention policy. A plaintiff may not change its claims after trial merely because the evidence failed to support the claims alleged in its complaint. *See, e.g., Washington A. & G. R. Co. v. Bradleys*, 77 U.S. 299, 303 (1869) ("It is hardly necessary to repeat the axioms in the equity law of procedure, that the allegations and proofs must agree, that the court can consider only what is put in issue by the

pleadings, that averments without proofs and proofs without averments are alike unavailing."). While Federal Rule of Civil Procedure 15(b) "allows parties to add unpled issues to a case if those issues have been tried with the express or implied consent of the parties," *Doe #6 v. Miami-Dade Cnty.*, 974 F.3d 1333, 1335 (11th Cir. 2020), Defendants neither expressly nor impliedly consented to Plaintiff changing its definition of the non-detention policy during closing arguments. Implied consent requires actual notice of the new claim or theory. *Id.* at 1339; *Cioffe v. Morris*, 676 F.2d 539, 541–42 (11th Cir. 1982). Actual notice is required because a party moving under Rule 15(b) "must comply with the notice demands of procedural due process." *Doe #6*, 974 F.3d at 1335.

Here, Defendants did not have actual notice of Plaintiff's new explanation of the alleged non-detention policy until after the conclusion of the evidentiary portion of the trial. That delay prejudiced Defendants, because Defendants, who have consistently denied there is any non-detention policy, were struggling to understand what the non-detention policy supposedly was. Indeed, the Court seemingly had the same struggle: "I've been trying to struggle to put my arms around this and understand what it was, and [Plaintiff's counsel's explanation during oral argument] was the first time it really kind of made sense to me." Tr. Day 4, 165:22-25. It is no small thing that, in a trial whose primary purpose was to determine whether

Defendants have a non-dentition policy, Plaintiff changed its articulation of what it claims the policy is after the submission of all the evidence.

The Court should not entertain Plaintiff's post-trial articulation of the alleged non-detention policy. *See Doe #6*, 974 F.3d at 1335 (Holding the district court did not abuse its discretion when, on that last day of a five-day bench trial, it declined to permit plaintiff to change its case theory from a facial constitutional challenge to an as-applied challenge, because fair notice was not given to the defendant and due process was therefore not satisfied); *Vital Pharms., Inc. v. Monster Energy Co.*, 553 F. Supp. 3d 1180, 1236 (S.D. Fla. 2021) (declining to permit plaintiff, after trial, to change its pre-trial definition of its unregistered trade dress); *c.f. Theni Guru Krishna Textile Mills, Ltd v. World's Glob. Source, LLC*, 844 F. App'x 279, 280 (11th Cir. 2021) (Defendant was not prejudiced by a new issue introduced during trial, where the district court recessed the bench trial for four-and-a-half weeks so that defendant could prepare to address the new claim when the case continued).

Regardless, Plaintiff failed to establish the existence of the non-detention policy under any theory. *See* 5 U.S.C. § 551(4) ("rule" for purposes of the APA "means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency…"); *Texas*, 142 S.Ct. at 2545 (federal courts may not "postulat[e] the

existence of an agency decision wholly apart from any agency statement . . . designed to implement that decision."). The Court received testimony about the Defendants' detention policies and operations from five witnesses, three who testified in court and two by deposition. Given their roles since January 2021, each of the three live witnesses would know if a non-detention policy existed. Tr. Day 2, 73:14-17, 139:12-16; Tr. Day 3, 31:18-32:2. Critically, none of these witnesses testified to the existence of a non-detention policy. Indeed, the three witnesses who testified in court—whom the Court found credible (Tr. Day 4, 164:6-11)—testified to the contrary: Matthew Davies, Executive Director of Admissibility and Passenger Programs for OFO, testified that he is not aware of any generalized preference for parole over detention, any policy discouraging detention, or any abdication of case-by-case review for determining the appropriate processing disposition for any noncitizen. Tr. Day 2, 73:14-74:4. Robert Guadian, ICE's Deputy Assistant Director for Field Operations East testified he is not aware of any policy directing ICE to release noncitizens transferred to ICE from CBP rather than detaining them. Tr. Day 3, 63:3-12. Raul Ortiz, Chief of the Border Patrol, testified that he is not aware of any directive suggesting a preference for release over detention, any policy communicating an abdication of case-by-case review, or any policy discouraging the transfer of noncitizens to ICE for detention. Tr. Day 2, 129:17-140:6.

Plaintiff relies on the Interim Civil Enforcement Priorities adopted immediately after the beginning of the current administration (a.k.a. the Pekoske Memo, Ex. 16) to argue that DHS has followed a broad non-detention policy. That argument is meritless. The Pekoske Memo is legally irrelevant here, and in any event, Plaintiff mischaracterizes its significance. Whereas Chief Ortiz testified that the Pekoske Memo "drove part of [the] decision-making" as to who should be detained "on a mandatory basis," Tr. Day 2, 155:17-156:3, he did not testify that he understood the Pekoske Memo to say that Border Patrol could *only* detain those categories of noncitizens listed in the Memo. On the contrary, he testified that BP continues to assess parole on a case-by-case basis, based on the same factors used prior to January 2021, which have always included flight risk and danger to the community. Tr. Day 2, 114:21-115:8, 175:10-14. Any in any event, the Pekoske Memo has long been superseded and bears no relevance to the issues in this case. The Court received the Pekoske Memo into evidence "for th[e] limited purpose of understanding what . . . the Notice to Report policy once was for prosecutorial discretion, . . . but no other." Tr. Day 2, 24:24-25:3.[37]

---

[37] Further, the reviewability and legality of the final enforcement priorities—as set forth in a later, superseding, iteration of the Pekoske Memo—is already pending before the Supreme Court. *See United States v. Texas*, No. **Error! Main Document Only.**22-58. Florida also filed a lawsuit challenging the enforcement priorities in Orlando and lost that challenge. *See Florida v. United States*, No. 8:21-cv-541-CEH-SPF, 2021 U.S. Dist. LEXIS 94083, at *28-29 (M.D. Fla. May 18, 2021) (Prioritization guidelines "are not statutes and do not have the status of law as they constitute a prioritization and not a prohibition of enforcement"). Undeterred, Florida then joined the States

In short, there was no direct evidence presented at trial—testimonial or documentary—that Defendants have a non-detention policy. By contrast, when district courts that have permitted APA review of unwritten policies, there was at least some direct evidence of a specific agency statement subject to review. *See, e.g.*, *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 146 (D.D.C. 2018) ("public statements by high level government officials . . . indicating the existence of a deterrence policy" even under less-rigorous preliminary-injunction standard); *id.* at 147 (noting government actually "admitted to a deterrence policy" in *R.I.L.-R v. Johnson*, 80 F.Supp.3d at 177); *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 929–30 (D.C. Cir. 2008) (Commission failed to deny or refute that it had a "policy of disclosing confidential information without notice.").

Instead of direct evidence of a non-detention policy, Plaintiff presented the Court with evidence of assorted decisions made by Defendants, which it alleges, taken together, are evidence of a non-detention policy.[38] But the Court may not

---

of Alabama and Georgia to challenge the enforcement priorities in the Northern District of Alabama. *See Alabama v. Biden*, 22-CV-418, which is currently stayed pending the Supreme Court's decision in *United States v. Texas*. *Id*. ECF No. 17.

[38] Among the discrete decisions challenged by Plaintiff are Defendants' decision to (i) close and/or repurpose three FRCs, (ii) seek more funding for alternatives to detention and less funding for detention operations than the prior administration, (iii) prioritize the detention of noncitizens who pose a national security risk over the detention of individuals who do not pose such a threat, (iv) use Parole+ATD to decompress Border Patrol stations, and (v) use, for a limited period of time, NTRs to decompress Border Patrol stations (a decision that is now rescinded and moot), and (vi) terminate MPP. The substance of each of these as they relate to the non-detention policy of these is discussed below in turn.

"postulat[e] the existence of an agency decision wholly apart from any 'agency statement'" implementing that decision, *Texas*, 142 S. Ct. at 2545; *accord Brnovich*, 2022 WL 4448322, at *10, nor aggregate individual decisions or policies into a super-policy, *Whitewater Draw*, 5 F.4th at 1012 (citing *Lujan*, 497 U.S. at 891).

In *Brnovich*, a case almost identical to this one, a district court in Arizona found that the Supreme Court's decision in *Texas* precluded it from considering the plaintiffs' challenge to Defendants' alleged non-detention policy under the APA.

> To the extent Plaintiffs contend their claims are directed at Defendants' "mass-parole and non-detention" policies in general, however, rather than any specific agency decision or document, they misunderstand the scope of judicial review under the APA. Courts should not, and indeed cannot, review broad, generalized agency policies in the abstract. Nor can they separate an agency's decision from the statement intended to implement that decision. *See Texas*, --- U.S. ---, 142 S. Ct. at 2545 (courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision" (quoting 5 U.S.C. § 551(4))). That is because an agency's statement is in fact the "action" that the APA permits courts to review…. The Supreme Court's language applies with equal force in this case… Accordingly, Plaintiffs' APA claims related to the NTR policy are reviewable, but to the extent Plaintiffs attempt to challenge amorphous parole policies, those APA claims must be dismissed.

*Id.,* 2022 WL 4448322, *10.

Not only is Plaintiff prohibited from postulating the existence of an agency policy from a collection of data and separate decisions, *Texas*, 142 S. Ct. at 2545, it

also cannot aggregate separate agency decisions into a policy. Rather, the APA requires Plaintiff to "direct its attack against some *particular* 'agency action.'" *Lujan*, 497 U.S. at 891 (emphasis added).

In *Lujan*, environmentalists challenged what they termed the Bureau of Land Management's "land withdrawal review program." 497 U.S. at 890. They alleged that the program violated the law in numerous respects. *Id* at 891. But instead of attacking each alleged failing as final agency action individually subject to review under the APA, the *Lujan* plaintiffs sought to have the entire program declared illegal. The Supreme Court did not allow that. It held that a "challenge [to] the entirety of petitioners' so-called 'land withdrawal review program' . . . [was] not an 'agency action' . . . , much less 'final agency action,'" because the challenged program was "simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the [Bureau of Land Management] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans." *Id.* at 890. The Court concluded that this type of broad, programmatic attack is not actionable under the APA and instead should be addressed in "the halls of Congress, where programmatic improvements are normally made." *Id.*

Similarly, here, Plaintiff broadly attacks what it calls the non-detention policy—which, absent a specific policy statement, can be characterized, at best, as

an amalgam of separate decisions made by the Secretary of Homeland Security, BP, OFO, and ICE with respect to detention and parole priorities. Pursuant to *Lujan*, judicial review of such aggregated decisions is not permitted under the APA. *See Whitewater Draw*, 5 F.4th at 1012, *cert. denied*, 142 S. Ct. 713 (2021) (no APA review of a collection of individual actions pertaining to a single subject simply by labeling those individual actions a policy); *Arizona v. Mayorkas*, 584 F. Supp. 3d 783, 791 (D. Ariz. 2022), *appeal dismissed*, No. 22-15519, 2022 WL 6105386 (9th Cir. Sept. 12, 2022) (holding that State's challenge to a "collection of actions" as a "*de facto* program" that has encouraged migration and population growth is not actionable under the APA); *see also Lightfoot v. D.C.*, 273 F.R.D. 314, 326 (D.D.C. 2011) ("The question is not whether a constellation of disparate but equally suspect practices may be distilled from the varying experiences. . . but rather, Plaintiffs must first identify the 'policy or custom'" they contend violates the law). "The APA authorizes challenges to specific actions—such as a particular rule or order. It does not authorize plaintiffs to pile together a mish-mash of discrete actions into a 'program' and then sue an agency to force broad policy changes to this 'program.'" 33 Charles Alan Wright et al., Fed. Prac. & Proc. Judicial Review § 8322 (2d ed., Apr. 2021 update). Indeed, what Plaintiff seeks to do in this lawsuit is challenge the current administration's "change in approach" to immigration. Tr. Day 4, 78:20. But, as the Court noted, changes in approach between administrations are not

"particularly surprising because you have a new administration, you have new priorities, and that's just how the  process works." *Id*. at 78:24-79:1.[39] In short, Plaintiff has neither identified nor established a specific agency statement which is challengeable under the APA.

### B. Plaintiff has not proven that Defendants have a non-detention policy.

Even if Plaintiff could challenge a policy untethered to a specific agency statement or a policy built by aggregating other policies into a super-policy—neither of which it can do as set forth above—the evidence that Plaintiff offered in support of the existence of such a policy does not survive scrutiny.

i.  <u>The detention and parole statistics Plaintiff relied on do not establish a non-detention policy.</u>

Plaintiff presented the Court with statistics showing that since January 2021, more noncitizens who have entered the country at the Southwest border have been released than during the previous administration. *See, e.g.*, Ex. 1, at 4, Ex. 2 at 2-3. Plaintiff argues that this trend provides evidence of a non-detention policy. Tr. Day 1, 9:16-21, 11:16-22; Tr., Day 4 77:5-25, 79:7-8. Not so: the evidence demonstrates other factors account for these differences.

First, at the end of the previous administration, the country was at the height of an ongoing global pandemic, and "there were travel restrictions . . . which severely

---

[39] For the same reason, Plaintiff cannot aggregate individual immigration officer decisions granting parole or release under sections 1225 and 1226 into a policy.

depressed the number of travelers who were coming to the United States both lawfully and unlawfully." Tr. Day 2, 93:10-17. For example, in January and February 2020, BP was apprehending about 30,000 migrants a month at the Southwest border. Ex. 1 at 4. In March 2020, as the pandemic was intensifying, that number fell to about 23,000. *Id.* By April that number fell to under 1,200 and remained low for months. *Id.*

Second, beginning near the end of the previous administration, and continuing into the current administration, there was a trending increase in monthly irregular migration to the United States over the Southwest border. Ex. 98 at 3. For example, in the last three months of the previous administration there were 6,041, 7,881, and 10,546 apprehensions by BP respectively. Ex. 2 at 3. In the first three months of the current administration that trend continued with apprehensions of 12,787, 25,325, and 61,972 respectively. *Id.* By July 2021, that number surpassed 100,000. *Id.*[40] And, while releases increased as a result of the influx of migration, so too did the use of expedited removal and detention. *See, e.g.*, Ex. 2 at 3-4. For example, in December 2020, only 1,643 noncitizens were processed through expedited removal. Ex. 2 at 3. But that number increased almost month-by-month, and by July 2021, that number

---

[40] Data shows that many of these apprehensions were repeat border-crossers. By June 2022, "51 percent of Title 42 expulsions were followed by re-encounters of the same individuals." https://www.dhs.gov/sites /default/files/2022- 12/2022_1114_plcy_enforcement_actions_fy2021.pdf. This suggests that apprehension numbers may be elevated because migrants are repeatedly trying to enter the country after prior Title 42 expulsions.

stood at almost 13,000. *Id.* Similarly, in December 2020, only 4,183 noncitizens were transferred to ICE by BP for detention; by July 2021, that number was over 28,000. *Id.* Voluntary returns also increased month by month over this same period. *Id.*

Third, at the same time that BP was seeing increases in migration, there was a change in the demographics of those migrants crossing the border between points of entry. Most notably, there was increase in migration by noncitizens from Cuba, Nicaragua, and Venezuela. Ortiz Dep., 93:4-14; Barker July 13, 2022 Dep., 198:14-199:7. Because repatriation was generally not possible for those populations, *id.*, and Defendants may not indefinitely detain populations subject to final orders of removal for whom removal is unlikely, *Zadvydas*, 533 U.S. at 699 (noting such detention would be unconstitutional), noncitizens from these countries often had to be released. Barker July 13, 2022 Dep., 198:14-199:7.

Fourth, Mexico passed a law which precluded Mexican officials from detaining children who are not Mexican nationals, even if they were with their families. Because Mexico would not accept such children, especially those from Cuba, Nicaragua, and Venezuela, this new law, which sent into effect on January 11, 2021,[41] adversely affected the Border Patrol's ability to expel family units under Title 42. *Id.* That necessarily meant that more individuals had to be either detained,

---

[41] https://imumi.org/wp-content/uploads/2021/03/Asylum-migrant-children-march-2021.pdf

or—as was the case, since detention capacity was over-stretched and pandemic conditions created a risk of disease transmission—paroled using Parole+ATD. which resulted in more paroles.

As set forth above, the evidence at trial established that a variety of factors contributed to the increase in the number of applicants for admission released at the Southwest border. And critically, the evidence failed to show that any increase in the number of noncitizens released was due to an alleged non-detention policy.

ii.    Funding requests are not evidence of a non-detention policy.

It is undisputed that the current administration requested less funding for detention operations than the previous Administration. *See* Ex. NN, at 10; Ex. OO, at 5. But this is irrelevant. The Budget and Accounting Act requires the President to submit a budget proposal to Congress, *see* 31 U.S.C. §1101, *et seq.*, but Congress is free to enact appropriations that are less than, more than, or consistent with the President's budget request. *See* U.S. Const., art. I, §9, cl. 7. Indeed, in his FY2021 budget request, President Trump requested $4,137,380,000 for ICE custody operations.[42] Ex. NN, at 10 (all figures are noted in thousands). But Congress largely

---

[42] DHS receives its appropriations for the costs of detention and ATD through ICE's appropriations. *See, e.g.,* Ex. AA at 18. ICE receives an annual appropriation for Operations and Support, which contains a set aside amount for Enforcement, Detention, and Removal Operations. *Id*. Congress, in the Joint Explanatory Statement that accompanies the appropriation further divides the funding provided into Programs, Projects, and Activities, or PPAs. *See, e.g.,* Ex. OO at 3, 5. ICE receives an annual PPA for "custody operations," which is where it funds the costs of detention. *Id; see also* Exhibit NN at ICE-O&S-125. ICE also receives an annual PPA for

rejected that administration's request. Indeed, Congress appropriated only $2,836,128,000 for custody operations for 2021—*thirty-two percent* less than what was requested. Ex. OO, at 5. President Biden, in his 2022 budget request, then requested $2,775,100,000 for custody operations, Ex. OO, at 5, about 2.5% less than what Congress appropriated in 2021.[43] Detaining just the noncitizen single adults apprehended at the Southwest border who are currently in removal proceedings would cost at least a roughly-estimated $45,625,000,000 a year, Tr. Day 3, 38:22-39:9—which is more than five times ICE's entire operating budget for 2022, Ex. DD, at 136 STAT 317. Viewed in that light, the roughly 2.5% difference between the funding requested for custody operations for FY2022, and what Congress appropriated under the previous administration for FY2021, is miniscule and

---

"alternatives to detention," which funds that program. *Id.* at ICE-O&S-165. With respect to detention beds, ICE does not receive funding tied to a certain amount of bed space. Tr. Day 3, 36:18-37:4. ICE receives funding for custody operations, which includes the costs of detention, and it tries to estimate how many beds a certain amount might cover under current market conditions. Exhibit NN at ICE-O&S-125. When Congress provides funding for custody operations, however, it does not limit ICE to a certain number of beds. *See, e.g.*, Ex. OO at 3, 5, NN at ICE-O&S-125. ICE may purchase however much detention space it can afford, based on the amount of funding provided. Tr. Day 3, 36:18-37:4. President Trump's request for $4,137,380,000 for custody operations in 2021 (which is not limited to beds, but includes funding for related costs, such as guards, healthcare, and other services for custody operations, Ex. NN at ICE-O&S-130), was anticipated to cover the cost of 60,000 beds. Ex. 13 at 3.

[43] Congress appropriated $2,800,481,000 for custody operations in 2022, very close to what the administration requested, https://www.congress.gov/117/crec/2022/12/20/168/198/CREC-2022-12-20-pt2-PgS8553-2.pdf, pg. 8608, and actually slightly more than was appropriated to the prior administration.

141

insignificant.[44]

Furthermore, while President Biden requested less funding for custody operations than President Trump, he requested more funding for alternatives to detention. *Compare* Ex. NN at 10 *with* Ex. OO at 5. That decision was rational: whereas it costs at least $125 a day to detain a single adult noncitizen, Tr. Day 3, 37:7-10, it costs less than $8 day to place a noncitizen on alternatives to detention, Tr. Day 3, 46:10-12. Thus, dollar-for-dollar, far more people can be supervised while undergoing removal proceedings with alternatives to detention than via detention— fifteen times more.

Congress appears to have agreed that increasing funding for alternatives to detention makes sense. Congress has consistently appropriated more funding for

---

[44] The difference can also be considered in terms of number of beds that the funding requests and appropriations can purchase. In 2020, ICE had 45,000 detention beds. Tr. Day 3, 38:3-13. For 2021, President Trump requested funding for 60,000 beds. Ex. 13 at 3. Congress appropriated sufficient funding for ICE to fund 31,500 beds in 2021. Tr. Day 3, 37:24-25. In the 2022 budget, President Biden requested funding for 32,500 beds. Ex. 25, at 35. Congress appropriated enough funding for 34,000 beds. Tr. Day 3, 37:18-23. Administrations prior to that of President Trump requested funding amounts for detention comparable to the current Administration. *See, e.g.*, DHS Budget in Brief for FY 2014, at 130 (cited at ¶ 85 of the Findings of Fact.) Critically, ICE would need 4.7 million beds to detain all the noncitizens currently in removal proceedings, Tr. Day 3, 38:14-17, which is more detention beds than exist in the country, Tr. Day 3, 39:24-40:9. So again, the difference in the number of beds requested by President Biden compared to both the number of beds sought by President Trump and appropriated by Congress is contextually insignificant. Also, Congress actually appropriated *more* funding to President Biden for 2022 than it did to President Trump for 2021.

alternatives to detention year-after-year since 2018.[45] In fact, the Congressional appropriation more than doubled from 2018 to 2022. *Id*. Not only has Congress appropriated more funding year-after-year for alternatives to detention relative to the prior year, in every year from 2018 through 2022, Congress has appropriated more funding for alternatives to detention than the President requested. *Id*. These legislative acts demonstrate that Congress recognizes and approves the use of alternatives to detention. *See Schor*, 478 U.S. at 846 ("Where, as here, 'Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation,' we cannot but deem that construction virtually conclusive.") (internal citations omitted); *Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983).

Moreover, as the Court noted, this administration's decision to request less funding for custody operations and more funding for alternatives to detention than the prior administration is "a policy choice that this administration . . . [has] every

---

[45]

| Fiscal Year | Requested | Funded |
|---|---|---|
| 2018 | $177,700,000 (Ex. LL at ICE-O&S 92) | $187,205,000 (Ex. MM at 10) |
| 2019 | $184,446,000 (Ex. MM at 10) | $274,621,000 (Ex. NN at 10) |
| 2020 | $209,913,000 (Ex. MM at 10) | $319,213,000 (Ex. NN at 10) |
| 2021 | $353,941,000 (Ex. NN at 10) | $440,122,000 (Ex. OO at 5) |
| 2022 | $440,476,000 (Ex. OO at 5) | $442,662,000 (https://www.govinfo.gov/content/pkg/CPRT-117HPRT47047/pdf/CPRT-117HPRT47047.pdf, at 1228) |

right to make, because they won and they got elected." Tr. Day 4, 178:8-179:3. Indeed, under separation of powers principles, the Court can neither direct the President to seek more funding for detention nor demand Congress appropriate more funding for detention—precisely indicating that the dispute before this Court is largely a political one. Tr. Day 4, 236:1-19; *see Castanon v. United States*, 444 F. Supp. 3d 118, 130 (D.D.C. 2020) ("We are troubled by the import of Plaintiffs' central premise: that it is both feasible and proper for this Court to order (or otherwise seek to compel) Congress to enact particular legislation. The concerns raised by such a premise include Article I's Speech or Debate Clause, general separation-of-powers principles, and Article III standing.") (cleaned up). Simply put, there was no evidence introduced at trial that the current administration's budget request for custody operations was made pursuant to, or is evidence of, a non-detention policy.

In rebuttal, however, Plaintiff's counsel pointed out an apparent inconsistency in Defendants' explanation for why it requested less funding for detention—an inconsistency that Plaintiff claims is evidence of a non-detention policy. Specifically, Plaintiff noted that in Exhibit 23, according to the Secretary, DHS's justification for requesting less funding for detention operations was that "[w]hen the budget was being formulated during Spring 2021, ICE's adult daily detention population levels were near historic lows." Tr. Day 4, 254:13-255:13, referring to

Ex. 23, at 117. But Plaintiff's counsel argued that, at trial, Defendants' witnesses testified that ICE needed to release noncitizens because of a *lack* of detention capacity. Plaintiff claims this inconsistency is evidence of a non-detention policy. Tr. Day 4, 254:13-255:13. Not so. Plaintiff's argument ignores relevant testimony about the pandemic's influence upon detention capacity. DAD Guadian explained that during the pandemic, various court orders limited DHS's ability to use all its beds. Tr. Day 3, 33:25-36:13.[46] Indeed, as both he and Chief Ortiz explained, both BP and ICE were generally required to keep 75% of their available detention space empty so as to maintain six-foot distancing and minimize the risk of disease transmission. *Id.*; Tr. Day 2, 134:6-17. Chief Ortiz explained that if an ICE facility was operating at 18% of its total physical capacity, that would still be considered "full" capacity during the pandemic. Tr. Day 2, 177:2-12. So, contrary to Plaintiff's argument, single adult detention may have been "historically low" and yet still at 100% capacity. Therefore, there is no inconsistency between the Secretary's statement and witness testimony at trial—and this illusory inconsistency is not evidence of a non-detention policy. Rather, Plaintiff simply wants the Court to conclude that because the President requested less funding for custody operations,

---

[46] Court orders and settlement agreements limiting detention capacity include, *inter alia*: *Zepeda Rivas v. Jennings*, 465 F.Supp.3d 1028 (N.D. Cal. 2020); *Fraihat v. ICE,* 445 F.Supp.3d 709 (C.D. Cal 2020); *Hernandez Roman v. Wolf*, No. 20-00768 (C.D. Cal. filed Apr. 4, 2020), *appeal docketed*, No. 20-55436 (9th Cir. filed June 29, 2020); *Gayle v. Meade*, No. 20-21553 (S.D. Fla. filed Apr. 13, 2020); *Santos Garcia v. Mayorkas,* No. 20-821 (E.D. Va. filed July 23, 2020).

*ipso facto*, there must be a non-detention policy. The proof does not bear that out.

### iii. ICE's closure of its family residential centers increased, rather than decreased, detention capacity defeating Plaintiff's claim that the conversion is evidence of a non-detention policy.

Plaintiff has argued that the closure of one family residential center (Berks), and the conversion of two others to single adult housing (Dilley and Karnes), is evidence of a non-detention policy. *See* Tr. Day 1, 8:23-9:6. The evidence established no such connection, however. On the contrary, the evidence established that ICE then-Acting Director Tae Johnson's decision to close Berks and repurpose Dilley and Karnes was a "business decision," Tr. Day 3, 49:25-50:3, 50:20-22, driven in large part by costs, that actually resulted in *increased* detention capacity of higher-priority individuals. Tr. Day 3, 37:18-23; Price Dep., 57:14-22. Indeed, the evidence demonstrates that repurposing these facilities increased detention capacity and was a rational "business decision." The uncontested rationality of the decision undermines Plaintiff's argument that the closures were made in furtherance of a non-detention policy.

The evidence demonstrates that Defendants' decision to close or repurpose these facilities was rational, and not part of some broad, unwritten non-detention policy. First, Defendants faced a substantial need for more single adult detention space close to the Southwest border, Tr. Day 3, 50:13-16; Guadian Dep., 141:7-11,

and Dilley and Karnes are in southern Texas, Tr. Day 3, 49:1-6.[47] Second, detaining a family is substantially more expensive than detaining a single adult because of limitations imposed in a 1997 consent decree in *Flores v. Rosen*, No. 85-CV-4544 (C.D. Cal.). Tr. Day 3, 47:5-48:7. For example, family residential centers must provide schooling with bilingual instructors, as well as specialized medical care and access to pediatricians. *Id.* As such, it cost $235 a day to house each member of a family unit in a family residential center, Tr. Day 3, 37:11-14, whereas it costs only $125 a day to house a single adult, Tr. Day 3, 37:7-10. Third, family demographics limit how many and which families can be housed in a dorm together. Ex. OO at 123, Ex. 98 at 4. For example, a dual head-of-household mother and father with a six-year-old daughter cannot be housed in the same dorm as a father with a thirteen-year-old son. Price Dep., 145:5-146:1. Accordingly, transitioning Dilley and Karnes from family detention to single adult housing, which is not limited in the same way, increased the number of individuals who could be detained. Tr. Day 3, 37:18-23;

---

[47] In closing argument, Plaintiff's counsel said that "you heard some testimony during this case from one of defendants' witnesses that there was a real need to re-purpose facilities to deal with single adults and that single adults were driving the surge," Tr. Day 4, 254:7-10, but argued that this alleged testimony is belied by Exhibit 23, which shows that in the first seven months of 2021, the number of family units coming to the Southwest border increased eleven-fold, whereas single adult traffic increased only two-fold. Tr. Day 4, 253:22-254:11, referencing Exhibit 23 at 70-71. Plaintiff's counsel's argument is flawed. No witness testified that single adults were solely driving the surge and the need to convert the FRCs to single adult detention. Rather DAD Guadian testified only that there was "a large number of adults crossing the Southwest border," and as a result, ICE "needed additional adult beds." Guadian Dep., 141:9-11; *see also* Tr. Day 3, 50:13-16. Exhibit 23 confirms this. While percentage-wise there was a larger increase in family traffic than single adult traffic, the total number of single adults crossing the border remained significantly higher than individuals in family units. Exhibit 23 at 70-71.

Price Dep., 57:14-22. Stated differently, had ICE not converted Dilley and Karnes to single adult detention, Defendants would have had to release *more* individuals, not fewer.

Fourth, pursuant to an order issued in the *Flores* litigation in 2015, families generally can be detained no more than twenty days, after which they must be released. Tr. Day 3, 48:8-16; Price Dep., 146:7-19; Guadian Dep., 147:5-7; *See Flores v. Barr*, 2020 WL 3488040, *3 (C.D. Cal. June 26, 2020). As a result, ICE is often unable to detain families long enough for their immigration proceedings to conclude, Tr. Day 3, 48:20-21, 50:13-51:8, 53:22-25; Price Dep., 119:11-13, whereas single adults can be detained through the completion of their immigration proceedings. Tr. Day 3, 51:2-8. These combined realities supported the "business decision" to convert Dilley and Karnes to single adult housing, and to close Berks, located in Pennsylvania—far from the Southwest border. Tr. Day 3, 49:1-6.

In short, while Plaintiff has suggested that the conversion of Dilley and Karnes to single adult housing and the closure of Berks were part of a purported non-detention policy, there is no evidence to support that conclusion. Rather, the evidence shows it was a sensible decision necessitated by the large number of single adults CBP encountered, who are generally a higher detention priority than families.

iv.   Border Patrol's use of Parole+ATD is not evidence of a non-detention policy.

Plaintiff also asks the Court to consider the Parole+ATD program not only as

148

a stand-alone policy, which it is separately challenging under the APA, but also as evidence of a larger general non-detention policy. As set forth *supra* at Point IV(A), the Court cannot amalgamate individual, discrete policies to create an overall policy as Plaintiff asks it to do. Even if it could, the evidence established that the Parole+ATD program was not part of a general non-detention policy, but rather was a discrete BP policy, designed to decompress BP stations operating at over 100% capacity. Tr. Day 2, 60:12-25, 113:17-114:6; Ortiz Dep., 117:15-118:3; Barker July 13, 2022 Dep., 150:22-151:24; Barker Aug. 25, 2022 Dep., 12:14-13:7, 15:14-16:25, 28:16-29:23. The policy just addresses short-term CBP holding for processing, and leaves it to ICE to decide whether to take a noncitizen released on Parole+ATD into detention following check-in. SAR0168. Further, validity of Parole+ATD must be determined on the basis of the administrative record, *supra*, Point III.

     v.    <u>Border Patrol's temporary use of Notices to Report is not evidence of a non-detention policy.</u>

Plaintiff has also argued that BP's temporary use of NTRs shows that Defendants were implementing a general non-detention policy. That argument is meritless. In the first place, the use of NTRs is legally irrelevant to this case, because that practice was eliminated more than a year ago, when BP ceased their use and switched to Parole+ATD. Any in any event, the evidence established that NTRs were used by BP to respond to an emergency situation of overcrowding in BP facilities that threatened to spread disease. *See* Tr. Day 2, 61:3-17, 161:13-19; Tr. Day 2,

125:15-127:1; Price Dep., 61:6-9. Chief Ortiz and former-Chief Scott created the program at the height of the pandemic and during a period of high encounters. Tr. Day 2, 125:15-127:1. Chief Ortiz explained that 17 BP officers had died from Covid, more than 3,000 officers were in quarantine, noncitizens were arriving from countries with different states of disease, and the medical infrastructure along the border was strained. Tr. Day 2, 125:15-127:1. It was under these conditions that Chief Ortiz and former-Chief Scott came up with the NTR program to decompress overcrowded BP stations. Tr. Day 2, 125:15-127:1; Ex. 20. Pursuant to that policy, and relying upon prosecutorial discretion, BP agents released noncitizens who did not pose a security or flight risk, with instructions to report to ICE within a specified period of time to receive their Notices to Appear. Ex. 20; Tr. Day 2, 61:10-15, 160:11-22, 161:13-23, 162:25-163:17. To be clear, the Court cannot determine whether the issuance of NTRs was lawful, as the program is no longer in existence, Plaintiff no longer challenges it, and even if it did, any challenge would be moot. The only relevance of the NTR program is whether it is evidence of a non-detention policy. ECF 130 at 3-4. Thus, as with Parole+ATD, the evidence does not establish that NTRs were evidence of a non-detention policy by the current administration, as the program was created solely by officers at BP to address its own emergent issues and provided only short-term release for NTA processing. It was not designed to address detention by ICE.

vi.   <u>The termination of MPP is not evidence of a non-detention policy.</u>

Plaintiff's counsel argued in his opening remarks that the termination of MPP is evidence of a non-detention policy because in terminating it, DHS narrowed the pathways designed to alleviate resource constraints. Tr. Day 1, 9:4-6. But Plaintiff adduced no evidence that the Secretary's decision to terminate MPP was based upon an unwritten, general non-detention policy, rather than the reasons stated in the October 29 memoranda terminating the MPP program and the administrative record supporting that decision.[48] Furthermore, if Plaintiff thought the reasons given in either the June 1 or October 29 memos terminating MPP were pretextual, it could have sued to challenge the termination—as other States did. But it did not do so, and it cannot collaterally attack the termination of MPP here.[49] Simply put, Plaintiff has not offered any evidence that MPP was terminated in furtherance of an unwritten

---

[48] An agency's designation of the administrative record is entitled to a strong presumption of regularity, *Oceana v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019).

[49] During closing arguments, the Court queried whether Defendants can argue that parole is necessary due to a lack of detention capacity, when the Secretary chose to terminate MPP, which Plaintiff claims helped alleviate the problem of lack of detention capacity. Tr. Day 4, 167:23-169:3. The answer is yes. In *Biden v. Texas*, the Supreme Court held that 8 U.S.C. § 1225(b)(2)(C)—the statute authorizing MPP—is not a "safety valve" for dealing with noncitizens who are "not detained under section 1225(b)(2)(A)." 142 S. Ct. at 2542. Rather, "the contiguous-territory return authority in section 1225(b)(2)(C) is discretionary—and remains discretionary notwithstanding any [putative] violation of section 1225(b)(2)(A)." *Id*. at 2544. (In *Biden v. Texas*, the Court assumed without deciding that detention under section 1225(b) is mandatory. 142 S.Ct. at 2542.) Regardless of what the Secretary does with his discretion under 1225(b)(2)(C), the use of parole remains lawful if each instance was assessed on a case-by-case basis for humanitarian need or significant public benefit, *id*. at 2543 ("the INA expressly authorizes DHS to process applicants for admission under a third option: parole")—which they were, as discussed further *infra* at Point IV(D).

non-detention policy.

## C. The alleged non-detention policy is not arbitrary or capricious.

To the extent the Court finds that Plaintiff established a reviewable non-detention policy—which again, it did not—the claim nonetheless fails as no part of it is arbitrary or capricious. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To survive scrutiny, an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). Here, if any non-detention policy exists, it satisfies this standard.

Plaintiff—realizing at the eleventh hour that its pleaded claim has no merit—now argues DHS is detaining only those noncitizens who pose a national security risk or flight risk. Tr. Day 4, 71:22-72:7. Plaintiff previously alleged that the non-detention policy is the "policy of releasing aliens subject to mandatory detention." SAC, ECF No. 74, at ¶ 20. Plaintiff cannot succeed on showing either iteration of the policy is arbitrary or capricious. Even if Defendants had a policy of releasing applicants for admission subject to alleged mandatory detention under section 1225(b), that policy would not be arbitrary or capricious because this administration,

like every other administration, has not had enough funding from Congress to detain everyone potentially subject to 1225(b) detention. Therefore, the release of some applicants for admission subject to detention under section 1225(b) is rationally related to this funding shortfall. And as explained above, Section 1225(b) does not mandate detention.

Plaintiff's post-trial definition of the alleged non-detention policy fairs no better. As this Court noted, "if [] there is such a policy and it says, in effect, only detain bad criminals and people that are a danger to the national security, the rationale for that that I heard throughout this trial was we have to make choices because we don't have enough space for everybody. And prioritizing those people over women and children and families, I'm not sure how that would be arbitrary." Tr. Day 4, 96:22-97:4. Given capacity constraints, prioritizing detention space for noncitizens who pose a danger to society over those who do not is more than rational. *See State Farm*, 463 U.S. at 43.

The current administration, like every administration before it, has had to make difficult choices about whom to detain and whom to release given grossly insufficient resources. Those choices would become no less difficult if Defendants had slightly more detention capacity because there still would not be even close to enough. Tr. Day 3, 41:2-7 ("even with 10,000 additional beds, we'll still be making tough decisions as we were in 2020 when, you know, we're still making at-large

arrests and we still have to make tough decisions about who to place in those beds"). Thus, any non-detention policy of the sort alleged by Plaintiff is plainly not arbitrary or capricious. *See State Farm*, 463 U.S. at 43; *see also Dep't of Commerce*, 139 S. Ct. at 2569 ("We may not substitute our judgment for that of the Secretary, but instead must confine ourselves to ensuring that he remained within the bounds of reasoned decisionmaking." (citations and quotation marks omitted)).[50]

### D. The alleged non-detention policy is not contrary to law.

Even were the Court to find that Defendants have a non-detention policy as alleged by Plaintiff (both as defined in their complaint and through this litigation, and as amended by Plaintiff post-trial), such a policy is not contrary to law under the APA. Releasing some applicants for admission who are subject to detention under section 1225(b) is unavoidable and is lawful because the word "shall" as used in that statute is subject to prosecutorial discretion and the parole authority in section 1182. And, prioritizing the detention of noncitizens who pose a national security, public safety, or flight risk over those who do not, is lawful. Paroling noncitizens on a case-by-case basis for urgent humanitarian concerns or significant public benefit is also

---

[50] Because Plaintiff challenges the non-detention policy as its own distinct policy, whether the alleged policy is arbitrary and capricious must be assessed at that level. Stated differently, this Court should not separately consider whether each of the alleged sub-parts of the alleged non-detention policy are arbitrary or capricious—for example, if converting the FRCs to single adult housing was arbitrary and capricious, if using NTRs was arbitrary and capricious, if using Parole+ATD was arbitrary and capricious, if requesting more funding for alternatives to detention vis-a-vis detention was arbitrary and capricious, etc. But, even if the Court did so, as set forth in Point IV(B), each of these decisions was rational.

lawful. And finally, releasing noncitizens on conditional parole, colloquially referred to as NTA-OR, under section 1226(a) is also lawful.

First, holding Plaintiff to its definition of the non-detention policy as pleaded in the complaint—i.e. that Defendants are releasing applicants for admission subject to detention under section 1225(b)—those releases are not unlawful. *See* Point IV(A). Nor would it be unlawful for Defendants to "only" detain those noncitizens apprehended at or near the border who pose a national security, public safety, or flight risk (or even to prioritize their detention).

Section 1225(b) does not require that Defendants detain every noncitizen encountered at or near the border. First, nothing in sections 1225(b)(1) and (b)(2) overcomes the "deep-rooted nature of law-enforcement discretion," *Town of Castle Rock*, 545 U.S. at 760-61. Section 1225(b)(1)—which authorizes the expedited removal of certain noncitizens—does not mandate expedited removal. Immigration officers must first make a discretionary determination whether a noncitizen should be processed under section 1225(b)(1) at all. *See E-R-M- & L-R-M-*, 25 I. & N. Dec. at 523 ("DHS has discretion to put aliens in [§ 1229a] removal proceedings even though they may also be subject to expedited removal"); *cf., e.g.*, *Villa-Anguiano v. Holder*, 727 F.3d 873, 878-79 (9th Cir. 2013) (recognizing DHS discretion whether to place a noncitizen in section 1229a removal proceedings or to proceed with reinstatement of removal under section 1231(a)(5)); *Cazun v. U.S. Att'y Gen.*, 856

155

F.3d 249, 261 (3d Cir. 2017) (same); *Graham v. Mukasey*, 519 F.3d 546, 551-52 (6th Cir. 2008) (same – administrative removal under section 1228(b)). Nothing in section 1225(b)(2)(A) mandates the commencement of removal proceedings under section 1229a against all applicants for admission at the border or physically present in the country. *See, e.g., Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. at 523 (noting "broad discretion given to … charging decisions by the Executive Branch, that is, the DHS, in the immigration context"). Rather, section 1225(b)(2)(A) "authorizes the government to detain certain aliens" seeking admission to the United States if it decides to remove them through section 1229a removal proceedings. *Jennings v. Rodriguez*, 138 S. Ct. 830, 838 (2018). The antecedent decision whether to pursue removal at all is a separate, discretionary decision of the Secretary that is not subject to judicial review—just as prosecutors' decisions whether to bring criminal charges against suspected offenders are not subject to judicial review. *See Arizona*, 567 U.S. at 396; *AADC*, 525 U.S. at 483, 485-86, 485 n.9. Accordingly, even if Section 1225(b)(2)(A) "directs [immigration officers] to detain an alien for the purpose of placing that alien in removal proceedings"—a proposition the government disputes—the provision "does not limit the authority of DHS to determine whether to pursue the removal of the immigrant" in the first place. *Crane*, 783 F.3d at 249; *Cortez-Felipe v. INS*, 245 F.3d 1054, 1057 (9th Cir. 2001).

Finally, nothing in the statute requires DHS to detain all eligible noncitizens even once removal proceedings are commenced. Instead, the INA authorizes DHS to release detained noncitizens in particular circumstances, subject to statutory and regulatory limitations, including through parole, 8 U.S.C. § 1182(d)(5)(A), or "bond" and "conditional parole," 8 U.S.C. § 1226(a)(2)(A)-(B). And the decision whether to release is a complex decision that takes into account many factors. Noncitizens detained under Section 1225(b), and indeed all applicants for admission, regardless of whether they are in removal proceedings or not, are eligible for release on parole in DHS's discretion "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Testimony from all the CBP and ICE witnesses—as well as the documentary evidence–establish that their officers and agents are directed to apply this statutory standard in their parole decisions. Tr. Day 2, 63:25-64:5, 65:18-67:7, 89:7-12, 114:10-115:8; Tr. Day 3, 27:15-28:1; Ex. B at § 8.2; Ex. C at ¶ 5.3; Ex. 40 at 5.[51,52] Plaintiff has not identified even a single parole decision since January 20, 2021, that does not conform to components' parole policies. *See Latif v. Obama*, 666 F.3d 746, 748 (D.C. Cir. 2011).

---

[51] Evidence concerning parole practices for non-immigrant noncitizens, that is, noncitizens entering the United States for some limited reason without the intent to seek asylum or the ability to remain in the United States permanently, is irrelevant as the release of nonimmigrant visitors is not being challenged here. Tr. Day 2, 92:7-93:1; *see* Ex. F at 1; Ex. G at 1.

[52] However, the lawfulness of releases under section 1182(d) on Parole+ATD is addressed based on record review *infra* in Point III.

Furthermore, and critically, Plaintiff's claim with respect to the alleged non-detention policy, as originally defined in the complaint, challenges Defendants' release of applicants for admission subject to "mandatory detention" under section 1225(b). But the supposedly "mandatory" detention aspect of section 1225(b) does not apply to releases under section 1226(a), which cover some or many of the noncitizen border dispositions Plaintiff challenges. Section 1226(a) does not mandate the detention of applicants for admission apprehended inside the United States. *See* 8 U.S.C. § 1226(a)(2); *Ortega-Cervantes*, 501 F.3d at 1116.

Other than noncitizens with a qualifying criminal history addressed in section 1226(c), section 1226(a) noncitizens are eligible for release on bond or conditional parole in DHS's unreviewable discretion. 8 U.S.C. § 1226(a)(2), (e). Even if they recently crossed the border, noncitizens apprehended inside the United States, may be subject to section 1226(a) and may be released under its unconditioned authority even if they are also applicants for admission who could alternatively be paroled under section 1182(d)(5)(A). *Ortega-Cervantes*, 501 F.3d at 1116. That is, contrary to Plaintiff's understanding, applicants for admission apprehended inside the United States may be subject to *either* section 1225/1182 or section 1226, in DHS's discretion, *ab initio*. *See id.* They are not initially subject to section 1225 and then at some later point processed under section 1226. *See* Tr. Day 4, 89:3-8. The evidence establishes that DHS routinely releases noncitizens apprehended after crossing the

border on conditional parole under section 1226(a), that is, under BP's release on NTA/OR or ICE's release of noncitizens transferred from CBP on OREC (order of release on recognizance). Tr. Day 2, 112:6-113:1; Tr. Day 3, 22:14-23. Orders of release on recognizance under section 1226(a) constitute hundreds of thousands of the releases of border arrivals that Plaintiff challenges here—but which do not fall within the definition of the policy as set forth in the complaint. *See, e.g.*, Ex. R at 3 (detailing BP releases on NTA/OR for FY2022); Ex. S at 2-3 (same for first month in FY2023); Tr. Day 2, 59:11-60:11 (describing NTA/OR as release under section 1226(a) and saying BP "predominantly use[s]" NTA/OR by comparison NTA/parole under section 1182(d)).[53]

Section 1226(a) calls for an administrative warrant to be issued to detain noncitizens taken into custody under that authority. However, the INA provides for warrantless arrests where the noncitizen has entered the country illegally and is likely to escape before a warrant could be obtained. 8 U.S.C. § 1357(a)(2); *see Aguirre*, 553 F.2d at 502. This is the circumstance, where agents have no advance notice of the noncitizens' unlawful entry and thus no opportunity to obtain a warrant in advance of BP arresting them in the field. Tr. Day 2, 124:17-125:2. In these circumstances, regulation provides that a determination must "be made within 48

---

[53] These statistics also demonstrate the BP is issuing several thousands of NTAs each month to noncitizens referred to ICE for detention under section 1226, under the category "Warrant of Arrest/Notice to Appear – Detained." Ex R at 3; Ex S at 2-3.

hours of the arrest" as to whether a "warrant of arrest … will be issued" *if* that determination is to charge the noncitizen with removal and continue their detention. 8 C.F.R. § 287.3(d). Thus, governing statutory and regulatory law requires only that a warrant be issued for section 1226 noncitizens arrested without a warrant pursuant to section 1357(a)(2) *if* DHS decides to continue them in custody for removal proceedings, but not if it is going to release them on recognizance or not pursue removal proceedings. Even so, out of an abundance of caution that a warrant is already available in case the noncitizen fails to appear for their subsequent removal proceedings, Chief Ortiz's testimony established that BP practice is to issue a Form I-200 Warrant of Arrest to the A-files of noncitizens released on NTA/OR.[54] Tr. Day 2, 124:10-125:14.

Plaintiff's argument about impermissible releases from allegedly mandatory detention has bearing on that portion of the applicant for admission population processed under section 1225(b). However, the evidence shows Defendants are

---

[54] Former BP Deputy Chief Tony Barker's July 2022 deposition testimony that he did not believe that BP always obtains warrants for noncitizens arrested between ports of entry does not contradict Chief Ortiz's testimony on this point. Tr. Day 1, 118:13-119:2. Deputy Chief Barker was not asked about *administrative* warrants as relevant to noncitizens released on NTA/OR; he was asked only whether general warrants are obtained when noncitizens who have entered the country between ports of entry are arrested. *See id.* 116:7-119:2. His answers, which addressed the NTA/Warrant of Arrest pathway for criminal noncitizens as well as noncitizens who would be prosecuted criminally (requiring a judicial criminal warrant) made clear that he did not understand the question or his response to be limited solely to whether BP obtains administrative warrants for persons released on NTA/OR. *Id.* 118:20-119:24. There are several circumstances in which BP might process individuals arrested between ports of entry for which the INA does not call for a warrant at any point, such as those noncitizens being processed for expedited removal or removal proceedings under section 1225(b).

detaining multiple tens of thousands of this population each month. *See, e.g.*, Ex. R at 1-2 (showing FY 2022 statistics for OFO's monthly transfers of noncitizens processed for expedited removal and claiming fear to ICE/ERO for detention); *id.* at 3 (showing FY2022 statistics for BP's monthly transfers of noncitizens to ICE and other federal agencies for detention); Ex. S at 1, 3 (statistics for OFO and BP transfers for first month in FY2023). The evidence further establishes that, regarding the remaining portion of this population who Defendants are releasing, these releases are not contrary to the law.

While parole decisions sometimes take into consideration lack of detention and holding capacity, this is neither the dispositive factor, Tr. Day 2, 71:5-7, nor is it an unlawful consideration. Longstanding regulations applicable to noncitizens detained under 8 C.F.R. § 235.3(b) or (c) make clear that where "continued detention is not in the public interest," such as where space limitations require prioritization for detaining those most presenting a public danger, prioritizing detention capacity can constitute an urgent humanitarian reason or significant public benefit permitting parole on a case-by-case basis, provided there is no security or flight risk. 8 C.F.R. § 212.5(b)(5). Consistent with this authority to prioritize detention capacity, no administration since section 1225 was enacted has requested or received the capacity to detain every noncitizen applicant for admission who is potentially amenable to detention. Tr. Day 3, 38:18-39:14; *see Texas*, 142 S. Ct. at 2535 ("DHS has never

161

had sufficient detention capacity to maintain in custody every single person described in section 1225"). Every administration has to make "tough decisions" about how to use limited detention space and thus has recognized that the use of parole frees up limited detention capacity for other, higher-priority noncitizens like criminals. Tr. Day 3, 41:2-7; *see, e.g.*, Ex. C (ICE Parole directive 11002.1) at 2-3; Ex. I (ICE Transportation, Detention and Processing Requirements (Jan. 11, 2005)) at 3-5; Ex. K (DHS Memo – "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017) at 10 n.8 (maintaining operation of Ex. C). Courts have recognized that DHS's consideration of detention resources is appropriate in the exercise of the parole authority. *See Padilla v. ICE,* 953 F.3d 1134, 1145 (9th Cir. 2020), *vacated on other grounds*, 141 S. Ct. 1041 (2021); *Jeanty,* 204 F. Supp. 2d at 1377. Congress has amended the INA since the current version of section 1225(b) was enacted in 1996, for example with the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, but not once has it sought to disturb this longstanding agency practice of releasing low priority section 1225(b) noncitizens to prioritize space for those whose detention serves the public interest. Indeed, Congress has even provided Administrations *less* detention funding than they requested to cover even a small fraction of this population. *See* Ex. OO at 5; *supra*, Point IV(B)(ii). These actions and inactions constitute Congressional acquiescence to DHS's consideration of capacity and prioritization of detention

space. *See Schor*, 478 U.S. at 846; *Bob Jones Univ.*, 461 U.S. at 599 (Congress's clear awareness of, but failure to address, widely known agency action "when enacting other and related legislation make out an unusually strong case of legislative acquiescence").

To the extent the disparate actions Plaintiff challenges represent a policy at all, they do not violate the INA.

### E. The alleged non-detention policy was not subject to notice and comment.

Even if the evidence demonstrated that there was a non-detention policy, which it does not, Plaintiff's argument that any such policy must be subject to notice and comment rulemaking, SAC, ECF 74, ¶¶ 101-103, lacks a basis in law or fact. *See* Point III(D), *supra*. The APA requires notice-and-comment only for certain types of legislative rules. 5 U.S.C. § 553. As set forth above in Section II(D), a "rule" requires "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). "Rule making" means "an agency process for formulating, amending, or repealing a rule." *Id.* § 551(5). Further, absent a "legislative rule," which "creates new law, rights, or duties," notice-and-comment is not required. *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009).

The evidence at trial has not identified any "agency statement of general or particular applicability and future effect" or "process for formulating" such a statement related to Plaintiff's constantly changing conception of the non-detention policy, much less any document that "creates new law, rights, or duties." Even if plaintiff had identified such a statement, it would at most qualify as a general statement of policy, which is exempt from notice-and-comment requirements. Accordingly, notice and comment was not required with respect to the alleged non-detention policy. *See* Point III(D).

## V.   The Take Care Clause Does Not Provide a Private Cause of Action for Plaintiff to Sue the Executive Branch[55]

Plaintiff claims that "[t]he federal government cannot ignore federal statutes, and the Constitution—including the separation of powers doctrine and the Take Care Clause[56]—provides a separate cause of action to challenge the conduct described in Counts 1 and 2" (referring to the Parole+ATD policy and the alleged non-detention policy). SAC, ECF 74, ¶ 111. Plaintiff's Constitutional claim fails as a matter of law and evidentiary proof.

First, separation of powers principles, to the extent they are implicated at all,

---

[55] While Defendants acknowledge the Court's comments and position regarding Plaintiff's Take Care Clause claim, Tr. Day 4, 118:3-22, 257:19-258:3, Plaintiff did not withdraw its claim prior to the filing of the post-trial briefs. Therefore, Defendants include a fulsome argument on this claim out of an abundance of caution.

[56] The Take Care Clause (the "Clause") authorizes the President to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3.

defeat Plaintiff's legal theory. Both the Constitution and the INA vest the Executive with authority over decisions regarding detention and removal of noncitizens. *See, e.g.*, *Knauff*, 338 U.S. at 543; *United States v. Velasquez*, 524 F.3d 1248, 1253 (11th Cir. 2008) (holding that the Executive, not the judiciary, has the authority to decide to detain noncitizens). This Court previously rejected this argument at the motion to dismiss stage, noting that "the judiciary does have the authority to say what the law is and to invalidate action of the Executive Branch that contravenes the law and/or the Constitution." *Florida v. United States*, No. 3:21CV1066-TKW-EMT, 2022 WL 2431414, at *13 (N.D. Fla. May 4, 2022). Respectfully, this explanation combines two separate issues—whether Plaintiff can maintain a cause of action challenging alleged statutory violations under the Constitution's separation of powers principle, versus whether the Court could issue injunctive or declaratory relief with respect to alleged statutory violations without contravening separation of powers principals. The answer to the latter question (which the Court addressed in its decision on the motion to dismiss) is yes, but the answer to the former question, at least as concerns the statutes in question here—§§ 1225(b) and 1182(d)(5)—is no. *See Dalton v. Specter*, 511 U.S. 462, 474 (1994) (holding that claims that Executive Branch actions are inconsistent with carrying out their "statutory authority are not 'constitutional' claims" but rather statutory claims, and that the "distinction between claims that an official exceeded his statutory authority, on one hand, and claims that he acted in

violation of the Constitution, on the other, is too well established to permit this sort of evisceration"). Indeed, in a virtually identical case to this one, a district court in Arizona dismissed the plaintiff's Constitutional claims, which the plaintiffs based, in part, on separation of powers principles. *See Brnovich*, 2022 WL 4448322 at *14 ("Plaintiffs fail to explain how Defendants could violate separation of powers principles when the Constitution and the INA vest the Executive with authority to carry out the immigration laws.").

Second, with respect to Plaintiff's Constitutional Take Care Clause claim, no court has ever found that the Take Care Clause provides a private right of action. *Las Americas Immigrant Advocacy Center v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021) (collecting cases); *see, e.g.*, *Brnovich*, 2022 WL 4448322, *14 ("the justiciability of a Take Care Clause claim is an open question, and neither the United States Supreme Court nor any circuit court has definitively found a private right of action stemming from the Clause"); *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 800 (D. Md. 2020) ("No court in this circuit, or any other circuit, has definitively found that the 'Take Care Clause' provides a private cause of action which a Plaintiff may bring against the President of the United States or his administration."); *Robbins v. Reagan*, 616 F. Supp. 1259, 1269 (D.D.C.), *aff'd*, 780 F.2d 37 (D.C. Cir. 1985) (similar). Accordingly, the "viability of the 'Take Care Clause' as a stand-alone cause of action is, to put it lightly, uncertain." *City of*

*Columbus*, 453 F. Supp. 3d at 800.[57]   And that uncertainty and lack of precedent should foreclose finding a private cause of action under the Clause given the Supreme Court's repeated caution that courts should avoid creating new constitutional causes of action or even extend the application of previously implied causes of action. *See, e.g.*, *Egbert v. Boule,* 142 S. Ct. 1793, 1800 (2022) ("our cases have made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts. . ."); *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020); *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1856 (2017); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 695 (2004). Thus, if this Court held that the Clause creates a private right of action, it would be reaching a novel conclusion that neither the Supreme Court nor any other court has reached and, in doing so, would disregard 40 years of Supreme Court precedent disfavoring the creation of new constitutional causes of action. This case does not present an occasion for such a drastic break from precedent.

 *Columbus* is instructive. In *Columbus*, plaintiffs sued the President and his

---

[57] At summary judgment, Plaintiff relied upon *Smith v. Meese*, 821 F.2d 1484 (11th Cir. 1987) to refute the proposition that no court has found that the Take Care Clause creates a private right of action. *See* ECF 98 at 35. Plaintiff misconstrued *Meese*. The Court in *Meese* did not find that the Take Care Clause creates a private right of action. In fact, they had no occasion to do so; the Plaintiff had not even pleaded the claim. *See Meese* Complaint, annexed hereto as Exhibit A (not available electronically). Rather, the Eleventh Circuit discussed the Take Care Clause in the context of its holding that separation of powers principles did not bar federal court review of prosecutorial decisions, which allegedly deprived black voters of their constitutional right to vote, as the district court had found.

delegates alleging they violated the Clause through several executive actions and a final rule, which, taken together, created a de facto repeal of the Affordable Care Act passed by Congress. *City of Columbus*, 453 F. Supp. 3d at 800-803. The Court held that the Clause does not create a private right of action, and even if it did, it would not extend far enough to encompass Plaintiff's claim, which hinged upon a challenge to the discretionary actions of the Executive rather than his failure to implement a non-discretionary ministerial function. *Id.* The distinction between discretionary actions and ministerial functions as relevant to the Take Care Clause, derives from *Marbury v. Madison*, 5 U.S. 137, 154 (1803) and *Mississippi v. Johnson*, 71 U.S. 475 (1866) and their discussion of the related cause of action of mandamus.[58] Where a plaintiff has a cause of action under mandamus, a court can grant relief "only where the duty to be performed is ministerial and the obligation to act peremptory, and plainly defined." *Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 602 (D.C. Cir. 1974).

At the motion to dismiss stage, this Court found that the Take Care Clause

---

[58] In each of those cases, the plaintiffs sought mandamus to compel the President to perform a single, specific act legislated by Congress that required no discretion to implement. These cases distinguished "executive and political" duties, also referred to as "discretionary" duties, from a "ministerial duty," which is "a simple, definite duty" that is "imposed by law" where "nothing is left to discretion." *Johnson*, 71 U.S. at 498. In contrast, "a duty is discretionary if it involves judgment, planning, or policy decisions." *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988) (citation omitted). Pursuant to *Johnson*, "[t]he former could be enforced, by mandamus, on Executive Branch officials—and perhaps, though not clearly so, even on the President—while the latter were beyond the purview of the courts." *Columbus*, 453 F. Supp. 3d at 800.

could survive because "the statutory duties in this case fall somewhere in between [discretionary and ministerial] because although § 1182(d)(5)(A) clearly affords Defendants some discretion to parole aliens notwithstanding the explicit detention mandates in § 1225(b)(1) and (b)(2), that discretion is not absolute because the grounds and duration of parole authority are specifically limited by statute." *Florida*, 2022 WL 2431414, at *14. While that may be true, whether this Court could provide relief under the Clause presents a narrower question—is the duty that the Plaintiff claims the Executive Branch abdicated purely and unequivocally, ministerial. *Nixon*, 492 F.2d at 602 ("The law must not only authorize the demanded action but require it; the duty must be clear and indisputable.") (cleaned up). In *Nixon*, the Court found that the Federal Pay Comparability Act created a plainly defined, clear and undisputable, ministerial obligation on the part of the President, and that issuing a declaratory judgment would "not require any court supervision over the performance of duty by the Executive Branch." *Id.* at 605. This case and *Columbus* are distinguishable. Here, the Court acknowledged in its decision on the motion to dismiss that the Executive's duty under §§ 1225(b)(1) and (b)(2) and 1182(d)(5) is not *purely and unequivocally* ministerial. *Florida*, 2022 WL 2431414, at *14; *Nixon*, 492 F.2d at 602. As explained, there is a large aspect of discretion in granting parole under section 1182(d)(5)(A) and conditional parole under section 1226(a), and inherently always at least some in prioritizing detention resources and exercising

inherent law enforcement discretion under section 1225(b).

Considering *Nixon*, its analysis of *Marbury* and *Johnson*, and after canvassing for other relevant cases regarding whether the Clause creates a private right of action, the *Columbus* Court held that there is no precedential authority for finding the Clause creates a private right of action against the Executive Branch. *Columbus*, 453 F. Supp. 3d at 803. The *Columbus* Court further held: "Assuming, *arguendo*, that a valid Take Care Clause cause of action exists in some form, and that a district court may, as it did in *Nixon*, issue a declaratory judgment against the President—neither of which appears firmly grounded in precedent or sound constitutional principles—Plaintiff has nonetheless failed to state a claim." *Id*. The Court explained that none of the Executive's actions about which plaintiff complained were ministerial in the sense developed in *Johnson* and *Nixon*. "That is, there is no peremptory, and plainly defined, course of action the President could take to rectify the flaws that Plaintiffs perceive in his execution of the [statute]" and "[a]ny judgment to the contrary by this court would require court supervision over the performance of duty by the Executive Branch." *Id*. (cleaned up). So too here.

Courts have thus viewed attempts to supervise Executive discretion as infringing on the authority provided by the Clause to the Executive and thus protected from judicial interference. *See Lujan*, 504 U.S. at 577 (holding that it would be improper for the courts to take over the President's duty to "take Care that

the Laws be faithfully executed"); *Johnson*, 71 U.S. at 499 (The president's duty "to see that the laws are faithfully executed," falls under "the general principles which forbid judicial interference," and a claim to restrain executive action through this clause is not only "without a precedent," but there is "much weight against it."); *Citizens for Responsibility and Ethics in Washington v. Trump*, 302 F. Supp. 3d 127 (D.D.C. 2018) ("The Supreme Court has advised that how the President chooses to exercise the discretion Congress has granted him is not a matter for [the courts'] review") (quoting *Dalton v. Specter*, 511 U.S. 462, 476 (1994)); *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1139 (S.D. Cal. 2018) ("[G]iven that the challenged steps taken by the Secretary are ones that are plausibly called for by an act of Congress, a Take Care challenge in this case would essentially open the doors to an undisciplined and unguided review process for all decisions made by the Executive Department.").

At the motion to dismiss stage, this Court rejected this argument:

> [T]he Court sees no reason why such a claim could not be pursued at least in circumstances where (as alleged here) the Executive Branch has completely abdicated its responsibility to enforce the law as written . . . . This conclusion is supported by the Supreme Court's observation that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity" and the "long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

*Florida*, 2022 WL 2431414, at *13.

Respectfully, however, *Armstrong*—which rejected an attempt to craft a "right of action" for "private enforcement" under the Supremacy Clause—does not stand for the proposition that the Court could craft some novel cause of action or equitable relief here.[59] More to the point, Defendants indisputably "are detaining people," Tr. Day 4, 72:1-2, and therefore, Plaintiff cannot sustain a Take Care Clause claim based on the complete abdication of the Executive's duties. ECF No. 119, Transcript from November 18, 2022 conference, at 28:19-29:5. Stated differently, even if this Court were to hold that the Take Care Clause creates a private right of action, for which the Court could craft declaratory relief, Defendants have not violated that Clause, because Defendants are detaining noncitizens under § 1225(b)(1) and are lawfully releasing noncitizens on parole, on a case-by-case basis, under § 1182(d)(5). Point IV(D), *supra*.

In short, Plaintiff has not identified in the INA a plainly defined, clear and undisputable ministerial obligation that Defendants have abdicated, for which the

---

[59] The Supreme Court noted, "[t]he power … to enjoin unlawful executive action is subject to express and implied statutory limitations" and, based on the limited right of action in the statute at issue in that case, rejected an attempt to pursue a claim or seek relief different from what Congress set out in the statute. *Id*. at 327-28. Similarly, here, the INA provides for a particular, but limited, cause of action to enforce the statute, and the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id*. The Clause's lack of any manageable legal standard to apply also counsels against finding it provides a stand-alone cause of action. Where a provision is of a "judicially unadministrable nature" it "preclude[s] the availability of equitable relief." *Id*. Additionally, the facts elicited at trial did not bear out that "the Executive Branch has completely abdicated its responsibility to enforce the law."

Court could order declaratory relief. *See Brnovich*, 2022 WL 4448322, *14 (holding, with similar claims, the "Court agrees that separation of powers principles and the Take Care Clause do not provide Plaintiffs with causes of action."). Indeed, crafting relief would require Court supervision over the performance of how the Executive Branch carries out broad statutory provisions, further defining the statutory obligations in ways the statutes themselves do not. No court has read the Clause to create such a cause of action or read it so broadly as to open the courtroom doors to challenges to *how* the Executive executes Congress's laws. Neither should this one in the circumstances presented here.

## VI.   There are Limited Remedies Available to Plaintiff

Plaintiff seeks declaratory relief, and vacatur, Tr. Day 4, 244:14-15, as well as an injunction "as it goes to the parole authority." *Id.* 249:21-23. Specifically, in its pleadings, Plaintiff asks this Court for "permanent injunctive relief enjoining Defendants from enforcing [the Parole+ATD and non-detention] policies," *see* SAC, ECF 74, at 30; "declaratory relief declaring the policies unlawful," *id.*; and "to vacate: (1) the government's policy of releasing aliens subject to mandatory detention (the non-detention policy), whether based on an untenable assertion of enforcement discretion to ignore § 1225 or an abuse of the parole authority under § 1182, and (2) the Parole+ATD policy, which also misuses the parole authority under § 1182." *Id.* at ¶ 20.

However, as discussed below, injunctive relief and vacatur would be inappropriate in this case, and any declaratory relief would have to be very narrowly crafted. If this Court determines that Plaintiff should prevail on any of its claims, given the disruptive consequences of any broad order, the Court should, at most, remand to the agency to address the issue identified by the Court without vacating the policy. Any additional relief would be broader than necessary to address the alleged injuries and would impermissibly place the Court in the position of overseeing discretionary policy choices that must be left to the discretion and expertise of the Executive Branch.

**A. Injunctive relief is inappropriate.**

First, Plaintiff seeks the stunning remedy of a nationwide injunction on the government's "parole authority." Tr. Day 4, 244:14-15, 249:21-23; *see also* SAC, ECF 74, at 30. Such an overbroad remedy would not only be unheard of, but also not permitted under the law.

    i.   Injunctive relief is barred by 8 U.S.C. § 1252(f)(1).

First, injunctive relief of the government's detention and parole authority in the circumstances presented in this case is barred by 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) provides that, except in a case brought by an "an individual [noncitizen]" in removal proceedings, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of

the provisions of part IV of this subchapter [of the INA]." 8 U.S.C. § 1252(f)(1); *see Aleman Gonzalez*, 142 S. Ct. at 2064; *Texas*, 142 S. Ct. at 2538. That restriction applies in this case by its plain terms: Plaintiff is not an individual noncitizen in removal proceedings, and this case seeks to enjoin or restrain the operation of sections 1225 and 1226. *Texas*, 142 S. Ct. at 2538. Therefore, as Plaintiff's request for injunctive relief is directly aimed at the government's enforcement, implementation, or carrying out of covered provisions of the INA, it falls squarely within the Supreme Court's decision in *Aleman Gonzalez*, 142 S. Ct. at 2064.

The term "enjoin" carries not only a negative meaning, but also a positive one: it means "[t]o require; command; positively direct." Black's Law Dictionary 529 (6th ed. 1990). An "[i]njunction" is "[a] court order prohibiting someone from doing some specified act *or* commanding someone to undo some wrong or injury." *Id.* at 784 (emphasis added). Thus, by depriving lower courts of authority to "enjoin," section 1252(f)(1) bars not only injunctions that block the operation of the covered INA provisions on Constitutional or other grounds, but also injunctions that direct the Executive Branch to adhere to the court's reading of those provisions instead of the Executive's own interpretation and implementation of them. Thus, the Court cannot enjoin Defendants to, for example, strictly comply with a "mandatory" reading of section 1225(b). *See Aleman Gonzalez*, 142 S. Ct. at 2065 ("Those orders 'enjoin or restrain the operation' of § 1231(a)(6) because they require officials to

175

take actions that (in the Government's view) are not required by § 1231(a)(6) and to refrain from actions that (again in the Government's view) are allowed by § 1231(a)(6). Those injunctions thus interfere with the Government's efforts to operate § 1231(a)(6), and the injunctions do not fall within the exception for individualized relief because the injunctions were entered on behalf of entire classes of aliens.").

Plaintiff is also seeking an injunction as to the federal government's parole authority under section 1182. *See* SAC, ECF 74, at ¶ 20. Although facially addressed to section 1182, this request implicates section 1225, because section 1182(d)(5)(A) is how Defendants implement their detention authority under section 1225. The parole statute explicitly states that parole is available only for applicants for admission, and thus parole under section 1182(d)(5) is the mechanism for releasing noncitizens detained pursuant to section 1225, which also governs "applicants for admission." 8 U.S.C. §§ 1182(d)(5)(A); 1225(a), (b). Should the Court place limitations on the government's use of section 1182, or mandate that it be used in a certain way, that would necessarily "restrain the operation of" section 1225. For example, in this case Plaintiff alleges that section 1182(d)(5) does not permit releases on parole based on detention capacity or based on health and safety considerations. *See, e.g.*, Tr. Day 4, 108:18-109:19. Were the court to grant Plaintiff an injunction on either of those grounds because it views section 1182(d)(5) as not

authorizing release on those bases, that order would necessarily impact section 1225, as that order would prohibits DHS from releasing individuals subject to section 1225 on that basis. Although the Supreme Court explained in *Aleman Gonzalez* that section 1252(f) may not apply to an order enjoining the "unlawful operation of a provision that is not specified in § 1252(f)(1)" where "that injunction has some *collateral* effect on the operation of a covered provision," *Aleman Gonzalez*, 142 S. Ct. at 2067 n.4, an injunction here would be anything but collateral. *See, e.g.*, "Collateral," https://www.merriam-webster.com/dictionary/collateral ("accompanying as secondary or subordinate"); "Collateral," https://www.dictionary.com/browse/collateral ("accompanying; auxiliary," "aside from the main subject, course, etc."). Indeed, it would directly implicate the government's interpretation and operation of section 1225(b) by ordering the government: "to refrain from actions that ([] in the Government's view) are allowed by" section 1225(b). *Aleman Gonzalez*, 142 S. Ct. at 2065. Accordingly, for purposes of the claims in this case then, such an order concerning section 1182(d)(5) is inextricably intertwined with section 1225, and thus barred by section 1252(f).[60]

---

[60] Any restraint of the parole authority would also impact regulations that are not at issue in this case. For example, 8 C.F.R. § 212.5 and § 235.3 implement DHS's detention authority, including parole decisions. 8 C.F.R. § 212.5, § 235.3. Yet Plaintiff does not challenge these regulations, nor could it—any challenge to these regulations, implemented in 1982 and amended in relevant part in 1997, are long time-barred, so no order of this Court can set aside either provision. *See* 28 U.S.C. § 2401(a); *Ctr. For Biological*, 453 F.3d at 1334 (applying six-year statute of limitations for suits against the United States); *see also* 47 FR 30044-01 (1982).

Section 1252(f)(1) prohibits orders that restrain "the operation of " the covered provisions. 8 U.S.C. § 1252(f)(1). The term "operation," in this context, means execution, enforcement, or implementation. *See, e.g.*, "Operation," https://www.merriam-webster.com/dictionary/operation ("method or manner of functioning"). Section 1252(f)(1) therefore prohibits injunctions that restrain the Executive Branch's implementation of the immigration laws, whether the basis for the suit is that the agency has misinterpreted the relevant provisions or violated the APA or the Constitution. *See Aleman Gonzalez*, 142 S. Ct. at 2065; *Hamama v. Adducci*, 912 F.3d 869, 879–80 (6th Cir. 2018), *cert. denied*, 141 S. Ct. 188 (2020) ("The district court . . . created out of thin air a requirement . . . that does not exist in the statute; and adopted standards that the government must meet. … If these limitations on what the government can and cannot do under the . . . provision are not 'restraints,' it is not at all clear what would qualify as a restraint" under section 1252(f). Thus, any limitation on section 1182(d)(5)(A) authority necessarily implicates and constrains the government's operation and implementation of section 1225(b), which is not permitted under section 1252(f)(1).

ii.   <u>Plaintiff has not shown it is entitled to injunctive relief.</u>

Assuming the Court finds Plaintiff succeeded on the merits of any of their claims, and that the limitations of § 1252(f)(1) do not apply here, that still does not entitle Plaintiff to an injunction. Plaintiff must demonstrate: "(1) that it has suffered

<div align="center">178</div>

an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (internal citations omitted). Thus, to be entitled to an injunction, Plaintiff must show that the "balance of equities tip in [its] favor," outweigh the harm to the Defendants, and that "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). These latter two factors "merge" where, as here, the government is the Defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiff has demonstrated, at most, an increase in "immigrant" children enrolled in Florida public schools over the last two years. *See* Point I, *supra*. However, none of the alleged costs Plaintiff put forward were traceable to the challenged policies, and Plaintiff has not (and cannot) quantify the magnitude of any such expenditures, either in the past or going into the future. *Id.* By contrast, enjoining the government's entire "parole authority" as Plaintiff requests in the Second Amended Complaint, or the Parole+ATD policy, would cause grave harm to the Executive.[61] Such an injunction would represent "an improper intrusion by a

---

[61] Such a widespread, universal injunction would also be improper, as any relief should be narrowly tailored to the policies at issue in the case and the injuries actually proven by Plaintiff. Discussed further at Point VI(D), *infra*.

federal court into the workings of a coordinate branch of the Government," *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers), and would "invade" the Executive's prosecutorial discretion, a "special province" that Article II commits to the President, *AADC*, 525 U.S. at 489. It would also "undermine[] the separation of powers," *Texas v. United States*, 14 F.4th 332, 340 (5th Cir.), *vacated*, 24 F.4th 407 (5th Cir. 2021) (en banc), and impair the government's "weighty" "interest in efficient administration of the immigration laws," *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

This injury is not merely theoretical. Were the Court to enjoin the use of the Parole+ATD program, or parole in general, there would be severe disruption in DHS's management of the border and "disastrous consequences" for the border. Tr. Day 4, 227:19-25. As an initial matter, the number of people in BP facilities would immediately increase. *See* Tr. Day 3, 56:6-20. The Parole+ATD program can be authorized in certain sectors when there are "more than 15,000 noncitizens in USBP custody across all Southwest border sectors…" Ex. 40 at SAR0003. Should Parole+ATD stop being an available pathway, then the noncitizens BP might have processed under that pathway would likely have to remain in custody. In September 2022, that number was 95,191. Ex 3 at 3. If having 15,000 noncitizens in custody is considered full capacity for BP, then the operational issues BP would face with an additional 95,000 noncitizens in their custody would be severe and debilitating.

If BP facilities were suddenly at seven times their capacity, that would necessitate agents be pulled from the field to help with processing, which poses a risk to the border. *See* Tr. Day 4, 148:7-17; Tr. Day 2, 115:16-116:24. If agents taken out of the field to process the influx of noncitizens, the border will be open for cartels and criminal organizations to exploit. Tr. Day 2, 115:16-116:24. The Parole+ATD policy takes those concerns into consideration, increasing the disruption that would occur if the program were to suddenly be enjoined. Ex 41 at SAR0163 ("The use of Parole+ATD in these circumstances will ensure that the USBP can continue to meet its mission requirements, such as border security operations, by maximizing deployments of agents to the field."). Ending the Parole+ATD policy would also impact the safety of the noncitizens and the officers and could lead to unsafe conditions for everyone. Tr. Day 2, 56:21-57:2. Chief Ortiz explained, in detail, the significant risks of such overcrowding to agents and migrants who were forced to be in close contact with a border operation and medical system that is strained. Tr. Day 2, 125:18-126:11. These harms dwarf any incidental effect on Plaintiff.

Regardless, because nothing in the APA or the Court's equitable authority displaces Article III limitations or traditional principles of equity, *see* 8 U.S.C. § 702, any injunction must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), which are especially salient in the context of immigration

decisions impacting foreign affairs. *Knauff*, 338 U.S. at 543 ("[T]he power of exclusion of aliens is also inherent in the executive department of the sovereign."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power."); *Hawaii*, 138 S. Ct. at 2418-19 ("Because decisions in these matters may implicate relations with foreign powers, … such judgments are frequently of a character more appropriate to … the Executive.").

Any injunction, but particularly the broad injunction Plaintiff seeks requiring greater detention of, and/or less frequent parole of, noncitizens, that dictates that the Executive must alter its discretion in processing noncitizens, is a significant breach of separation of powers and should be rejected for that reason as well.

## B. Declaratory relief is inappropriate unless properly crafted.

Section 1252(f)(1) generally does not preclude declaratory relief that adheres to the proper scope for such relief and does not circumvent section 1252(f)(1)'s limitations by functioning as an injunctive order: a declaratory judgment "declare[s] the rights and other legal relations" of the parties, 28 U.S.C. § 2201(a), but does not coerce compliance or "interdict[ ] the operation" of the challenged statute or administrative action. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 155 (1963).

Therefore, if any declaratory relief issued by this Court acts like an injunction, it would be barred by section 1252(f)(1).

The same logic applies should the Court disagree with Defendants' explanation of the application of sections 1225 and 1226 to noncitizens encountered "after having illegally crossed the border between ports of entry who are both applicants for admission and noncitizens encountered inside the United States…." Tr. Day 4, 152:10-155:12. The Court may not issue an order restraining Defendants' application of section 1226 to applicants for admission, nor can the Court make section 1225 mandatory to every noncitizen. Were the Court to issue an order directing Defendants how to interpret or apply sections 1225 or 1226, such as providing that they require Defendants to detain a certain type or quantity of individuals, or seek funding to permit greater detention[62], that would have the same effect as an injunction and would be unavailable under section 1252(f)(1), as well as violate the discretion of the Executive Branch.

Similarly, the Court is unable to issue declaratory relief concerning the "correct" number of releases or detentions of individual noncitizens without violating separation of powers principles. That is because the issues in this case are

---

[62] Further, any remedy from this Court that involves direction regarding funding requirements would also violate 8 U.S.C. § 1231(g)(1), which directs the Attorney General to "arrange" for detention of noncitizens. *See* 8 U.S.C. § 1231(g)(1). Any relief that directs DHS to detain certain groups, or at certain levels, would require more funding and would also implicate § 1231(g)(1).

nonjusticiable political questions; Plaintiff's claims boil down to its disagreement with how Defendants utilize various INA release mechanisms, and space and funding for prioritizing detention space. Plaintiff seeks to "require[] the Secretary to enforce the immigration laws" and to "change his priorities for" detention of noncitizens. *Texas v. United States*, 809 F.3d 134, 169 (5th Cir. 2015). Likewise, Plaintiff asks this Court to "substitute [its] judgment" for that of the federal political branches in determining which noncitizens should be detained and which released, and how best to fund and deploy enforcement resources, and Plaintiff would "have the judiciary formulate or rewrite immigration policy" to that end. *Id.* (quoting *Mathews v. Diaz*, 426 U.S. 67, 84 (1976)). As the Eleventh Circuit has explained, "Congress intended whether the [Executive Branch] is adequately guarding the borders of the United States to be 'committed to agency discretion by law' and, thus, unreviewable," and challenges asserting such claims invoke fundamentally "political questions." *Chiles*, 69 F.3d at 1096-97.

Defendants also retain prosecutorial discretion at every step of the removal process concerning whether to remove any specific noncitizen. *AADC*, 525 U.S. at 483-84. So, any declaratory relief that requires an expansion of DHS's resources beyond those currently budgeted and allocated by Congress is unreasonable, unduly burdensome, if not entirely impossible. Further, Plaintiff is not challenging "agency action[s]" but rather, at best, operational decisions, which are not addressable under

the APA. *See Lujan*, 497 U.S. at 891; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004) (APA does not permit general challenges regarding "compliance with broad statutory mandates").

Such agency decisions are also committed to agency discretion by law. *See* Point II, *supra*. The Parole+ATD policy and the alleged non-detention policy both involve a "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise" which, by definition, are discretionary decisions. *Heckler*, 470 U.S. at 831. Here, there are no judicially discoverable or manageable standards for determining how much or what type of detention (which is funded by Congress) is enough to safeguard the country and facilitate immigration processing, how many and which applicants for admission ought to be paroled or otherwise released, and how much money should be sought or provided for immigration enforcement and for what operations in particular. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 217 (1962); *Chiles*, 69 F.3d at 1096-1097.

As this Court discussed during closing arguments, the Court has no power to order the President to request more funding for detention space, nor can this Court direct Congress to provide more funding. Tr. Day 4, 235:23-236:13. "There comes a point at which any remedy [this Court] can provide would almost prove the point of a dispute being a political question." *Id.* at 236:13-15. Any declaratory relief this Court could issue would highlight those concerns. For example, if this Court were

185

to find a non-detention policy that is actionable under the APA, and find that such policy is illegal, the natural implication from such a declaration would be that additional noncitizens must be detained for the government to comply with the Court's ruling. However, as the Court heard, the federal government would need a staggering amount of funding to detain every noncitizen it encounters. *See* Tr. Day 3, 38:14-39:9. And even if the federal government were to detain significantly more noncitizens than it is currently detaining, albeit less than all, the federal government would still require more funding for custody operations to do so, and that would require this Court to violate the separation of powers and instruct Congress to provide more funding consistent with such a dictate.

**C. At most, the Court may remand to the agency without vacating the policies.**

   i.   The APA bars universal vacatur of the challenged policies.

      Plaintiff also seeks vacatur of the Parole+ATD policy. The APA, however, does not affirmatively authorize a universal vacatur or nationwide relief. *See Trump*, 138 S. Ct. at 2425 (Thomas, J. concurring) ("No statute expressly grants district courts the power to issue universal injunctions."). The APA provides only that a court may, at most, "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). That provision does not address remedies at all, which are governed by 5 U.S.C. § 703. But even assuming it did, nothing in § 706(2)'s text specifies whether a rule, if found invalid, should be set aside on its *face* or *as applied* to the challenger, let alone

that injunctive relief should extend beyond application to the plaintiff in a particular case. When used in the context of judicial review, "set aside" can refer to vacating an order—one might say, for example, that an appellate court "sets aside" a lower-court judgment. *See* John Harrison, *Section 706 of the Administrative Procedure act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. on Red. Bull. 37, 42 (2020) (Harrison). But "[t]hose words can also refer to a court's decision to regard a purportedly valid juridical act as ineffective." *Id.* at 43; see *Webster's* 2291 (defining "set aside" as a: "To put to one side; discard; dismiss" and b: "To reject from consideration; overrule") (emphasis omitted).

Statutes and judicial opinions often use the phrase in the latter sense when they refer to courts' "setting aside" unconstitutional legislation. *See*, *e.g.*, Act of Aug. 24, 1937, ch. 754, § 3, 50 Stat. 752-753; *Mallinckrodt Chem. Works v. Missouri ex rel. Jones*, 238 U.S. 41, 54 (1915); see also Harrison 43-45 (discussing other examples). The phrasing in that context means that courts disregard unconstitutional statutes when deciding the cases before them, not that they vacate the statutes. Courts "have no power *per se* to review and annul acts of Congress on the ground that they are unconstitutional." *Massachusetts v. Mellon*, 262 U.S. at 488. Instead, judicial review "amounts to little more than the negative power to disregard an unconstitutional enactment." *Id.*

Treating Section 706(2) as an instruction to disregard unlawful agency action thus aligns ordinary judicial review of agency action with judicial review of legislation. And it is also the only interpretation consistent with the statutory context. Section 706(2) requires a court to "hold unlawful and set aside agency action, findings, and conclusions." It would not make sense for a court to vacate an agency's "findings" and "conclusions." But it is entirely sensible for a court to disregard unfounded agency findings and conclusions in resolving the case before it.

Interpreting Section 706 to require universal vacatur would bring about the kind of remedial innovation that Congress disclaimed. Remedies "ordinarily 'operate with respect to specific parties,'" rather than "'on legal rules in the abstract,'" *California*, 141 S. Ct. at 2115 (citation omitted), but vacatur does the opposite. Universal relief "upset[s] the bedrock practice of case-by-case judgments with respect to the parties in each case," *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring). And reading Section 706(2) to authorize hundreds of district judges around the Nation to grant universal relief in every APA case would perpetuate all of the now-familiar problems with nationwide injunctions. See, *e.g.*, *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay); *Trump*, 138 S. Ct. at 2425-2433 (2019) (Thomas, J., concurring). Thus, the Court should adopt the narrower reading of the "set aside" language and not issue a nationwide vacatur. *See Virginia Society for Human Life*,

263 F.3d at 393 ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power.").

ii.   Universal vacatur is also barred by 8 U.S.C § 1252(f)(1).

Vacatur is also barred under 8 U.S.C. § 1252(f)(1). Like an injunction, vacatur "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on the agency action under review. Vacatur is a "less drastic remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), than an injunction prohibiting the agency from re-adopting the challenged policy in the future. But a vacatur is practically equivalent to an injunction compelling the agency to rescind or stop implementing the challenged action. Vacatur thus possesses the hallmark of the relief barred by section 1252(f)(1).

As discussed *supra*, section 1252(f)(1) prohibits lower courts from "order[ing] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 142 S. Ct. at 2064. A vacatur as to the Parole+ATD policy renders that policy void; as to the government's "parole authority" and alleged non-detention policy, a vacatur would "enjoin or restrain" the "operation" of sections 1225 and 1226, which is specifically prohibited. 8 U.S.C. § 1252(f)(1). A vacatur of either of these policies would mean that DHS would be conditioned or limited in its authority to detain or release noncitizens under these statutes, nationwide, which is an

injunction in all but name. Consistent with that view, courts routinely treat vacatur as functionally equivalent to an injunction. Indeed, the Court recognized the same during oral arguments, noting that "a vacatur is effectively an injunction." Tr. Day 4, 248:7-8. Thus, the arguments discussed in Point VI(A), *supra*, as to why injunctive relief is inappropriate also preclude this Court from vacating the policies challenged in this case.

### iii. At most, the only proper remedy is to remand to the agency without vacatur.

If the Court rules in Plaintiff's favor on any of Plaintiff's claims challenging agency actions, the only proper remedy is to remand to the agency for further consideration or explanation without vacatur of the policy. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

Where a challenge to agency action alleges that the agency failed to engage in reasoned decision-making or adequately explain its decision, as Plaintiff does here, the agency should be given the opportunity to correct any procedural defects on remand, which it can readily do. Remand without vacatur is within the Court's power, and appropriate in this case. *Black Warrior Riverkeeper, Inc.*, 781 F.3d at

190

1289 ("Whether a court may remand a matter to an agency without vacating the agency's action is a question of first impression in our circuit. We agree, as have most other courts, that the remedy of remand without vacatur is within a reviewing court's equity powers under the APA.") (internal citations omitted). Only in "rare circumstances" is remand for agency reconsideration not the appropriate solution. *Fla. Power & Light*, 470 U.S. at 744. "Remand is generally appropriate when 'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so, and when vacating would be 'disruptive.'" *Radio-Television News Directors Ass'n v. F.C.C.*, 184 F.3d 872, 888 (D.C. Cir. 1999), citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

Remanding without vacating is particularly appropriate where vacatur would cause disruption or chaos, which halting the Parole+ATD program, or the government's use of parole in other contexts, would do. *See, e.g.*, *Radio-Television News Directors Ass'n*, 184 F.3d at 888; *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002) (remand without vacatur appropriate where vacating decision would have "disruptive consequences" and be "an invitation to chaos"); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (similar).

The Eleventh Circuit's test for deciding whether an agency's action should be remanded without vacatur is to balance the equities at issue. *Black Warrior*

*Riverkeeper, Inc.*, 781 F.3d at 1290. The test considers "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Id.* (citing *Allied–Signal, Inc.,* 988 F.2d at 150–51); *see also Am. Great Lakes Ports Ass'n v. Schultz,* 962 F.3d 510, 518 (D.C. Cir. 2020) (same). Among the equities to be balanced are both the "disruptive consequences" should the policy be vacated, as well as "the potential … damage that might continue unabated while [the agency] revisits its determinations." *Black Warrior Riverkeeper*, 781 F.3d at 1290.

Here, should the Court vacate the Parole+ATD policy or the alleged non-detention policy, or issue injunctive relief on either, there would be severe disruption in DHS's management of the border and "disastrous consequences" for the border. Tr. Day 4, 227:19-25. As discussed *supra*, there would be extensive crowding and backlogs in facilities, more agents taken out of the field for processing resulting in less patrols between ports of entry. Tr. Day 3, 56:5-20; Tr. Day 4, 148:7-17; Tr. Day 2, 115:16-116:24, 56:21-57:2. This would result in significant risks to agents, migrants, and the local populations near the border. Tr. Day 2, 125:18-126:11. In addition, ICE detention capacity would quickly be full of noncitizens who do not pose a danger to the community or national security and higher risk individuals will be released. Such an outcome would be highly disruptive and unsafe for the country.

A647

Given these clear consequences stemming from any vacatur, precedent requires the Court to avoid disruption and, at most, remand without vacatur or other injunctive relief because the agency can remedy any APA defect by providing further explanation. *See, e.g.*, *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 105 (D.D.C. 2018), *aff'd*, 962 F.3d 510 (D.C. Cir. 2020) (remanding without vacating after weighing the *Allied–Signal* factors and determining that "the disruptive consequences [of vacatur] would be considerable"); *Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1, 14 (D.D.C. 2019), *rev'd on other grounds*, 967 F.3d 818 (D.C. Cir. 2020), *rev'd*, 142 S. Ct. 1896 (2022) (remanding without vacatur, noting that "the uncertainty surrounding this issue all but guarantees its resolution would be highly disruptive, should the Court vacate the [rules]"); *Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*, 220 F.3d 683, 692 (5th Cir. 2000) ("remand, without vacatur" is appropriate where "it would be disruptive to vacate a rule that applies to other" groups beyond the plaintiffs and where the agency "may well be able to justify its decision" with further explanation). Similarly, should the Court find the government has an unwritten non-detention policy and vacate the government's ability to use parole or bond/conditional parole, the impact on border operations would be immediate and debilitating. There would be extensive crowding and backlogs in facilities, more agents taken out of the field for processing resulting in less patrols between ports of entry. Tr. Day 3, 56:5-20; Tr. Day 4, 148:7-17; Tr. Day 2, 115:16-

116:24, 56:21-57:2. This would result in significant risks to agents, migrants, and the local populations near the border. Tr. Day 2, 125:18-126:11. In addition, ICE detention capacity would quickly be full of noncitizens who do not pose a danger to the community or national security. ICE only has so many beds—detention space is a finite resource—so if ICE is not permitted to release lower threat individuals, then higher risk individuals may not be detained. Such an outcome would be highly disruptive and unsafe for the country, and thus strongly weighs against vacatur of the government's parole authority.

### D. Any remedy provided must be limited to the injuries actually proved by Plaintiff.

Were the Court to nonetheless conclude that some form of injunctive relief is appropriate despite the limitations of section 1252(f), that relief must be limited to the actual parties in this case. Thus, any injunction must be limited only to Florida.[63] Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining

---

[63] A further limitation to any potential remedy available to this Court is statutory limitations on what is judicially reviewable, and where such claims must be heard. *See* 8 U.S.C. § 1252(a)(2)(A); § 1252(a)(2)(B)(ii) (prohibiting judicial review of "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title."); § 1226(e).

A649

party, even though the court's judgment may benefit others collaterally."). Granting Plaintiff relief that would extend to circumstances "apart from any concrete application that threatens imminent harm to [its] interests" would "fly in the face of Article III's injury-in-fact requirement." *Summers*, 555 U.S. at 494.

Longstanding practice confirms that injunctions are limited to what is necessary to remedy a plaintiff's injury. The scope of a court's statutory authority to enter injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999). But the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Hawaii*, 138 S. Ct. at 2427-28 (Thomas, J., concurring); *DHS*, 140 S. Ct. at 600 (Gorsuch, J., concurring) (same). As a result, "a plaintiff could not sue to vindicate the private rights of someone else." *Id*. at 2428; *see, e.g.*, *Scott v. Schedler*, 826 F.3d 207, 214 (5th Cir. 2016) ("injunction may not encompass more conduct than was requested or exceed the legal basis of the lawsuit"); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification.") (alteration in original; quotation marks omitted)); *Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379, 393 (4th Cir. 2001)

A650

("[p]reventing the [agency] from enforcing [the regulation] against other parties in other circuits does not provide any additional relief to [the plaintiff]").

Similarly, if the Court does not remand without vacatur—in direct contradiction to the APA—relief still should be limited to remedying the injuries of the parties before the Court. Relief should be, at most, vacatur of the portions of the policies found insufficient as applied to Plaintiff, with remand for further consideration or explanation, and not include injunctive relief for Plaintiff or nationwide. The common remedy in an APA case where a rule or policy is found arbitrary or capricious, is to vacate the part of the rule or policy that is unlawful. *See, e.g., Util. Solid Waste Activities Grp. v. Env't Prot. Agency*, 901 F.3d 414, 449 (D.C. Cir. 2018) (vacating and remanding portions of an agency rule for further consideration). Injunctive relief is inappropriate in such circumstances. Indeed, the Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction and would commit reversible error in doing so unless an injunction would "have [a] meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (reversing injunction in APA case where vacatur provided sufficient relief). This Court would invite error because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course," or where "a less drastic

remedy such as partial or complete vacatur … [is] sufficient to redress" the Plaintiff's injury. *Id.*

Here, vacatur as to Plaintiff based on the specific claims the Court finds have merit, and remand to the agency to consider those issues anew, would more than redress any injury Plaintiff may establish without the need for more coercive relief. *See, e.g.*, *N. Air Cargo v. United States Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("It was quite anomalous [for the district court] to issue an injunction. When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal."). For example, were the Court to find that Plaintiff succeeded in meeting its burden in showing the Parole+ATD policy was contrary to law, and the Court did not find that remand without vacatur was appropriate, then a potential narrowly tailored remedy that would be appropriate would be to vacate the Parole+ATD policy for any noncitizens who have an intended destination of Florida. BP collects a physical address for each noncitizen processed through the Parole+ATD pathway, SAR0004, so a potential remedy would be to prohibit the use of that pathway for noncitizens who report a Florida address.

Likewise, any potential remedy must be limited to address the specific injuries Plaintiff actually proved were traceable to the challenged policies. Defendants

197

maintain Plaintiff has not established a cognizable injury, as discussed in Point I, *supra¸* but if the Court finds that Plaintiff established a sufficient injury based on an increase in "immigrant" children enrolling in Florida public schools, and thus has standing only on that basis, then any relief issued by the Court has to be limited to that group as to all claims. *See DaimlerChrysler Corp.*, 547 U.S. at 352. (A "plaintiff must demonstrate standing for each claim he seeks to press" and "each form of relief sought."). Put plainly, if the Court finds that Florida has standing because more children are enrolling in Florida public schools, then the Court's remedy can only address children going to Florida. As children are processed either as unaccompanied minors or as part of a family unit, Tr. Day 2, 68:7-12, and unaccompanied minors are in the care of the Health and Human Services Department and outside the scope of this case, the processing of family units destined for Florida is all the Court would be empowered to redress. Any order from this Court dealing with the government's entire parole authority would be overbroad and inappropriate given that Plaintiff was able to prove only one discrete, traceable type of injury. *See* Point I, *supra*.

In conclusion, Plaintiff is not entitled to any relief. But if the Court finds Plaintiff has succeeded on the merits of any of its claims, the Court should remand to the agency for further consideration without vacating the challenged policy or limit its vacatur to portions of the challenged policy that apply to injuries Plaintiff

actually proved. Should the Court enter any judgment in Plaintiff's favor, Defendants respectfully request that the Court stay its order from taking effect for sufficient time to allow for potential new rulemaking, *see Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 50 F.4th 164, 172 (D.C. Cir. 2022), or to permit Defendants to decide whether to appeal and seek a stay pending appeal, given the national significance of the issues presented in this case. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

## CONCLUSION

For the foregoing, judgment should be entered in favor of Defendants, dismissing all of Plaintiff's claims with prejudice.

Date: February 16, 2023                    Respectfully submitted,

JASON R. COODY                             BRIAN M. BOYNTON
*United States Attorney*                   *Principal Deputy Assistant Attorney General*

MARIE A. MOYLE                             WILLIAM C. PEACHEY
*Assistant United States Attorney*         *Director*
Northern District of Florida               Office of Immigration Litigation
                                           District Court Section

                                           EREZ REUVENI
                                           *Assistant Director*

                                           /s/ *Joseph A. Darrow*
                                           JOSEPH A. DARROW
                                           ERIN T. RYAN
                                           ELISSA P. FUDIM
                                           *Trial Attorneys*
                                           U.S. Department of Justice
                                           Civil Division

199

A654

Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2023 I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the Northern District of Florida by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Joseph A. Darrow*
JOSEPH A. DARROW
Trial Attorney
United States Department of Justice
Civil Division

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

STATE OF FLORIDA,

     *Plaintiff*,

     v.                                  Case No. 3:23-cv-9962-TKW-ZCB

ALEJANDRO MAYORKAS, et al.,

     *Defendants*.

_____/

## EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

     Courts have "long presumed that officials of the Executive Branch will adhere to the law as declared by the court." *Comm. on Judiciary of U.S. House of Reps. v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008). This case puts that presumption to the test.

     On March 8, 2023, the Court vacated DHS's Parole + Alternatives to Detention Policy (the Parole + ATD Policy). *See* Op. & Order, Doc. 157, *Florida v. United States*, No. 3:21-cv-1066-TKW-ZCB (N.D. Fla. Mar. 8, 2023).[1] The Court did so, among other reasons, because DHS's use of *en masse* parole for operational convenience is plainly contrary to 8 U.S.C. § 1182(d)(5). *See* Op. & Order at 91.

---

[1] All further citations to "Op. & Order" refer to this Court's March 8 Opinion and Order unless otherwise noted.

The Court also concluded that parole policies like Parole + ATD are subject to notice and comment. Op. & Order at 99–102.

If DHS believed that Parole + ATD was operationally important—and if DHS believed the policy could plausibly be defended on appeal—one would have expected the agency to seek an emergency stay, especially given this Court's generous grant of a seven-day stay to facilitate just that. Alternatively, DHS could have taken this Court's remand seriously and developed an alternative policy consistent with this Court's order. *See* Op. & Order at 108 (remanding "for further proceedings consistent with this Opinion and Order").

DHS did neither. Instead, it waited until the day before the Title 42 order expires and then apparently began drafting a new memo authorizing Border Patrol to release aliens *en masse*. A "DHS Spokesperson" went on record with NBC News and described the new policy as follows:

> As Republican and Democratic administrations alike have done in the past to protect the safety and security of Border Patrol agents and migrants in the event of severe overcrowding conditions, U.S. Border Patrol sectors may consider releasing certain migrants who have undergone strict national security and public safety vetting to continue their immigration processes.
>
> This may include processing migrants for parole to reduce the amount of time they spend in custody. Each parole will be considered on an individualized case-by-case basis, and individuals who are released will be required to check in with Immigration and Customs Enforcement and undergo removal proceedings in immigration court. Individuals may be placed into an Alternatives to Detention program to ensure compliance, if deemed appropriate. The targeted use of parole will

allow Border Patrol to focus its resources most effectively to quickly process and remove individuals who do not have a legal basis to remain in the country.[2]

That policy is materially identical to Parole + ATD, which is likely why an anonymous source described it as an attempted "workaround" of this Court's March 8 order.[3]

At this time, Florida does not possess a copy of the policy in question, though the State has asked DHS for it several times. Ex. 1. Meanwhile, Title 42 expires at 11:59 p.m. Eastern daylight time tonight,[4] and DHS is expected to release aliens by the thousands.

Florida seeks a temporary restraining order to preserve the status quo until the parties can brief motions for a preliminary injunction or to postpone the effective date of the new policy. The Biden Administration's behavior, if left unchecked, makes a mockery of our system of justice and our Constitution. Florida asks the

---

[2] Julia Ainsley, *Biden admin to allow for the release of some migrants into the U.S. with no way to track them*, NBC News (May 10, 2023), https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-track-rcna83704.

[3] Jennie Taer, *Biden Admin To Release Illegal Immigrants 'En Masse' Without Tracking Technology, Court Dates*, Daily Caller (May 10, 2023), https://dailycaller.com/2023/05/10/biden-admin-to-release-illegal-immigrants-en-masse-without-tracking-technology-court-dates/.

[4] OMB, *Statement of Administration Policy: H.R. 382 and H.J. Res. 7* (Jan. 30, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf (announcing White House plan to let public health emergency expire on May 11).

Court to order a response by 4 p.m. Eastern daylight time and to rule on this motion by 11:59 p.m. Eastern daylight time, when the Title 42 order expires.

## LEGAL STANDARD

A plaintiff seeking a temporary restraining order must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (explaining that the same standard applies to temporary restraining orders).[5]

## ARGUMENT

### I.   FLORIDA HAS STANDING AND IS IRREPARABLY HARMED BY THE NEW PAROLE POLICY.

As a result of DHS's mismanagement of the border, over a million illegal aliens have been released into the interior of the United States. Op. & Order at 11.[6]

---

[5] Florida emailed counsel for DHS a copy of the complaint in this action. Upon filing of this motion, Florida will immediately provide a copy to counsel for DHS via email. *See* Fed. R. Civ. P. 65(b) (permitting a temporary restraining order upon notice to an adverse party or its attorney).

[6] Florida relies on the Court's Order and Opinion as factual evidence in support of its request for two reasons. First, the facts as the Court found them have preclusive consequences despite the government's appeal of that judgment. *Jaffree v. Wallace*, 837 F.2d 1461, 1467 (11th Cir. 1988) ("The established rule in the federal courts is that a final judgment retains all of its res judicata consequences pending decision of the appeal." (quotations omitted)); *United States v. Stauffer Chem. Co.*, 464 U.S. 165 (1984) (holding that mutual collateral estoppel is applicable against the federal government); *Nixon v. Richey*, 513 F.2d 430, 438 n.75 (D.C. Cir. 1975) (noting that "[t]he federal rule is that pendency of an appeal does not suspend the operation of a final judgment for purposes of collateral estoppel" and collecting authorities). Second, the Rules of Evidence are

Well over 100,000 of those illegal aliens ended up in Florida, and the State has paid millions of dollars to provide public benefits to these aliens. Op. & Order at 42–43.

Under the new parole policy announced by DHS, tens of thousands more will be released and will likely make their way to Florida. Florida will continue to expend funds on illegal aliens present in the State in the form of public education, incarceration costs for aliens who commit crimes, unemployment benefits, and emergency Medicaid. Op. & Order at 44–47. Those costs will increase as a result of the new parole policy.

These losses constitute irreparable harm to the State because they "cannot be undone through monetary remedies," *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (quotations omitted), as the United States has sovereign immunity from damages claims, *see Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

## II.   INJUNCTIVE RELIEF IS NOT FORECLOSED BY 8 U.S.C. § 1252(F).

Under 8 U.S.C. § 1252(f), a district court may not "enjoin or restrain the operation of the provisions of part IV of this subchapter." *See also Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). But DHS relies on the parole

---

relaxed at this procedural stage, and the Court's findings approximate the type of evidence Florida plans to present should this case proceed to trial. *See Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceedings." (quotations omitted)).

authority in 8 U.S.C. § 1182(d)(5), which is in part II of that subchapter not part IV. Thus, preliminary injunctive relief is not precluded by § 1252(f). *See* Op. & Order at 106–07.

### III.   FLORIDA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

#### a.  *The new parole policy is subject to judicial review.*

##### i.  **The new parole policy is final agency action.**

The APA only permits challenges to "final agency action[s]." 5 U.S.C. § 704. An agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted).

The new parole policy meets this test because it "instructs agents how to exercise their discretionary authority under the parole statute and sets criteria by which aliens are eligible or ineligible for parole." Op. & Order at 67. Further, it establishes new marching orders for agents and determines Florida's obligations to provide benefits to certain aliens, particularly its obligations to provide public education, Medicaid, and unemployment benefits. Op. & Order at 67.

##### ii.  **The new parole policy is not committed to agency discretion.**

The APA exempts from judicial review actions that are "committed to agency discretion," 5 U.S.C. § 701(a)(2)—in other words, where the statute leaves "no

meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quotations omitted). The parole authority in § 1182(d)(5) is not unbounded and has meaningful standards. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019). Further, the Supreme Court has indicated that use of the parole authority is subject to APA review. *See* Op. & Order at 68 (citing *Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022)).

### b. The new parole policy is contrary to law.

Section 1182(d)(5) permits DHS to parole aliens into the United States "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" and requires that aliens be returned to custody "when the purposes of such parole . . . have been served." The new parole policy is contrary to law for at least three reasons.

First, the new parole policy apparently does not provide a mechanism to return aliens to custody once the parole purpose has been served. According to reports, the new parole policy involves the mass release of aliens in some cases *without any ability to track them*. Ainsley, *supra* note 2. If DHS cannot even track the whereabouts of released aliens, it clearly has no plan to evaluate whether the purposes of parole have been served or return them to custody. *See* Op. & Order at 89–90.

Second, the planned *en masse* parole of over 11,000 aliens at one time suggests that the government is not making parole determinations on a case-by-case basis. Op. & Order at 92–93; Ainsley, *supra* note 2.

Finally, the new parole policy violates § 1182(d)(5)'s requirement that parole only be granted "for urgent humanitarian reasons or significant public benefit." The apparent purpose of this new policy is to create a new processing pathway to decompress foreseeably crowded facilities. That purpose is not consistent with the standards in § 1182(d)(5). Op. & Order at 93–94.

For these reasons, Florida is likely to show that the new parole policy is contrary to law.

### c. DHS failed to conduct notice and comment.

The new parole policy is an agency rule affecting legal rights and obligations and thus subject to notice and comment under the APA. Op. & Order at 99–100. The new policy instructs agents how to exercise their discretionary authority, sets criteria for granting parole, and affects Florida's obligations to provide public benefits to certain aliens. Op. & Order at 100.

Further, DHS cannot avoid the notice and comment requirements of 5 U.S.C. § 553 by invoking the "good cause" exception. *See Florida v. Becerra*, 544 F. Supp. 3d 1241, 1295–99 (M.D. Fla. 2021) (discussing the high bar necessary to invoke "good cause" and collecting authorities). This Court vacated the Parole + ATD

policy on March 8, 2023. DHS—knowing it had limited release mechanisms and expecting a surge of traffic at the border—did nothing until the day before the Title 42 order was set to expire. "Good cause cannot arise as a result of the agency's own delay," *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 114 (2d Cir. 2018), and DHS's delay cannot excuse its failure to conduct notice and comment here.

For these reasons, Florida is likely to succeed on its notice and comment claim.

### d. The new parole policy is arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). The new parole policy is arbitrary and capricious because it is a pretextual attempt to circumvent this Court's prior ruling. Instead of approaching the problem in good faith, such as by seeking a stay of this Court's ruling, DHS slapped a new label on the same Parole + ATD Policy that this Court vacated and went about its business. This is the very definition of "capricious." *See Franklin Sav. Ass'n v. Office of Thrift Supervision*, 35 F.3d 1466, 1472 (10th Cir. 1994) ("The [APA] protects from agency action that is arbitrary and capricious or in bad faith.").

### IV.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY RELIEF.

The equities and public-interest factors merge for federal government action. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both favor an injunction here. "[T]he public interest in enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981); *accord Nken*, 556 U.S. at 436 (finding public interest in "prompt execution of removal orders"). And "[f]orcing federal agencies to comply with the law is undoubtedly in the public interest." *Cent. United Life., Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015).

The public interest favors Florida all the more here because DHS is plainly acting in bad faith and seeking to avoid this Court's previous rulings.

### V.   PRECLUSION PRINCIPLES MAY PREVENT DHS FROM MAKING CERTAIN CONTENTIONS.

Mutual collateral estoppel is available against the federal government and would prevent DHS from litigating factual or legal questions actually litigated in the previous cause. *Baez-Sanchez*, 947 F.3d 1033, 1036 (7th Cir. 2020); *see also supra* note 6. While Florida is confident it can support all legal and factual contentions necessary for final judgment, the limited nature of remaining facts and legal issues weighs heavily in favor of temporary relief.

## VI.   NO BOND IS REQUIRED UNDER RULE 65(C).

"[T]he amount of security . . . is a matter within the discretion of the trial court." *BellSouth Telecomm. v. MCIMetro Access Transmission Servs.*, 425 F.3d 964, 971 (11th Cir. 2005) (quotations omitted); *see Texas v. United States*, 524 F. Supp. 3d 598, 668 (S.D. Tex. 2021) (holding that no security was required for a preliminary injunction barring DHS's 100-day pause on removals).

## CONCLUSION

For the foregoing reasons, the Court should enter a temporary restraining order preventing DHS from implementing the new parole policy or otherwise using § 1182(d)(5) as a tool of operational convenience, to relieve overcrowding, or to facilitate faster processing at the Southwest border. The Court should also set a briefing schedule for preliminary relief and order DHS to provide weekly status reports regarding Border Patrol's use of the parole authority in § 1182(d)(5).

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
COUNSELOR TO THE ATTORNEY GENERAL

Joseph E. Hart (FBN 124720)
COUNSELOR TO THE ATTORNEY GENERAL

Anita Patel (FBN 70214)
ASSISTANT BUREAU CHIEF

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Local Rule 7.1(F) because it contains 2,570 words.

*/s/ James H. Percival*
Chief of Staff

## CERTIFICATE OF SERVICE

I certify that on May 11, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system and furnished by US Mail to:

Alejandro Mayorkas
Secretary of Homeland Security
U.S. Department of Homeland Security
Office of the General Counsel
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0485

United States of America
c/o United States Attorney's Office
Northern District of Florida
Civil Process Clerk - Pensacola
Division
21 East Garden Street, Suite 400
Pensacola, FL 32502

Raul Ortiz
Chief, United States Border Patrol
U.S. Customs and Border Protection
Office of Chief Counsel
1300 Pennsylvania Avenue NW, Suite
4.4-B
Washington, D.C. 20229

U.S. Department of Justice
Justice Management Division
950 Pennsylvania Ave., N.W.
Room 1111
Washington, DC 20530


_/s/ James H. Percival_____
Chief of Staff

**James Percival**

| | |
|---|---|
| **From:** | James Percival |
| **Sent:** | Wednesday, May 10, 2023 9:13 PM |
| **To:** | Darrow, Joseph A. (CIV); Fudim, Elissa P. (CIV); Ryan, Erin T. (CIV) |
| **Cc:** | Joseph Hart; Anita Patel; John Guard; Natalie Christmas |
| **Subject:** | RE: FL v. U.S. - 3:21-cv-1066 (N.D. Fla.) |
| **Attachments:** | Complaint as Filed.pdf |

Hi Joe,

We have been seeking answers on DHS's plans since Tuesday morning, ever since these disturbing plans began to emerge. Those plans appear to us to be both plainly unlawful and possibly in violation of the Court's order. We have received almost no information from you, even though DHS is freely sharing detailed plans with an NBC reporter via a "DHS spokesperson."

Please see the attached Complaint filed in a new action against DHS officials. While we seek to effect formal service of process of the summons and Complaint, please let me know if you will accept email service of other filings.

Jimmy

---

**From:** Darrow, Joseph A. (CIV) <Joseph.A.Darrow@usdoj.gov>
**Sent:** Wednesday, May 10, 2023 7:57 PM
**To:** James Percival <James.Percival@myfloridalegal.com>; Ryan, Erin T. (CIV) <Erin.T.Ryan@usdoj.gov>; Fudim, Elissa P. (CIV) <Elissa.P.Fudim@usdoj.gov>
**Cc:** Joseph Hart <Joseph.Hart@myfloridalegal.com>; Anita Patel <Anita.Patel@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Natalie Christmas <Natalie.Christmas@myfloridalegal.com>
**Subject:** RE: FL v. U.S. - 3:21-cv-1066 (N.D. Fla.)

Hi Jimmy,

We are looking into this and will get back to you on it as soon as we can.

Best,

Joe

---

**From:** James Percival <James.Percival@myfloridalegal.com>
**Sent:** Wednesday, May 10, 2023 5:29 PM
**To:** Darrow, Joseph A. (CIV) <Joseph.A.Darrow@usdoj.gov>; Ryan, Erin T. (CIV) <Erin.T.Ryan@usdoj.gov>; Fudim, Elissa P. (CIV) <Elissa.P.Fudim@usdoj.gov>
**Cc:** Joseph Hart <Joseph.Hart@myfloridalegal.com>; Anita Patel <Anita.Patel@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Natalie Christmas <Natalie.Christmas@myfloridalegal.com>
**Subject:** [EXTERNAL] RE: FL v. U.S. - 3:21-cv-1066 (N.D. Fla.)

Joe,

Please see the statements from a DHS spokesperson in the below article. We request a copy of this new policy ASAP.

Jimmy

---

**From:** James Percival <James.Percival@myfloridalegal.com>
**Sent:** Tuesday, May 9, 2023 8:17 PM
**To:** Darrow, Joseph A. (CIV) <Joseph.A.Darrow@usdoj.gov>; Ryan, Erin T. (CIV) <Erin.T.Ryan@usdoj.gov>; Fudim, Elissa P. (CIV) <Elissa.P.Fudim@usdoj.gov>
**Cc:** Joseph Hart <Joseph.Hart@myfloridalegal.com>; Anita Patel <Anita.Patel@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Natalie Christmas <Natalie.Christmas@myfloridalegal.com>
**Subject:** Re: FL v. U.S. - 3:21-cv-1066 (N.D. Fla.)

Joe,

That memo is not a processing mechanism. It is guidance regarding how to exercise existing mechanisms.

Is DHS's position that this is an application of the parole authority, or does DHS view this as prosecutorial discretion?

Jimmy

---

**From:** Darrow, Joseph A. (CIV) <Joseph.A.Darrow@usdoj.gov>
**Sent:** Tuesday, May 9, 2023 7:32:10 PM
**To:** James Percival <James.Percival@myfloridalegal.com>; Ryan, Erin T. (CIV) <Erin.T.Ryan@usdoj.gov>; Fudim, Elissa P. (CIV) <Elissa.P.Fudim@usdoj.gov>
**Cc:** Joseph Hart <Joseph.Hart@myfloridalegal.com>; Anita Patel <Anita.Patel@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Natalie Christmas <Natalie.Christmas@myfloridalegal.com>
**Subject:** RE: FL v. U.S. - 3:21-cv-1066 (N.D. Fla.)

Hi Jimmy,

We hope you all have been well too.

We looked into this, and DHS has informed us that the activity referenced in those media reports is occurring pursuant to the policy described in the May 19, 2022 memorandum from Chief Raul Ortiz, "Noncitizen Releases from U.S. Border Patrol Custody," which we produced in discovery and which your colleague questioned Ortiz about in his deposition (Exhibit 3).

Best,

Joe

**Joseph A. Darrow**
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Liberty Square Building
450 5th Street, NW
Washington, DC 20530-0001
Mobile: ████████
joseph.a.darrow@usdoj.gov

**From:** James Percival <James.Percival@myfloridalegal.com>
**Sent:** Tuesday, May 9, 2023 11:51 AM
**To:** Darrow, Joseph A. (CIV) <Joseph.A.Darrow@usdoj.gov>; Ryan, Erin T. (CIV) <Erin.T.Ryan@usdoj.gov>; Fudim, Elissa P. (CIV) <Elissa.P.Fudim@usdoj.gov>
**Cc:** Joseph Hart <Joseph.Hart@myfloridalegal.com>; Anita Patel <Anita.Patel@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Natalie Christmas <Natalie.Christmas@myfloridalegal.com>
**Subject:** [EXTERNAL] FL v. U.S. - 3:21-cv-1066 (N.D. Fla.)

Hi all,

I hope you are well and have enjoyed some rest since our trial.

As you know, the Court vacated DHS's Parole + ATD policy and remanded to the agency for "further proceedings consistent with this Opinion and Order." *See* Doc. 157 at 108. That Order found the Parole + ATD policy contrary to law, arbitrary and capricious, and subject to notice and comment.

The reason I am writing is to seek an update on those "further proceedings." We are not aware of any new release policy published in the Federal Register for notice and comment since the Court ruled. As such, we do not believe that DHS could have promulgated any new release policy applicable to Border Patrol that is "consistent with" the Court's order. Based on DHS's representations at trial, that would leave Orders of Recognizance under Section 1226(a) as the only release mechanism available to Border Patrol to deal with periods of high border traffic.

According to media reports, Border Patrol decided last night that it will begin something called "'safe' street releases of migrants to communities across [the] border." https://twitter.com/BillFOXLA/status/1655918436835368962. Can you please confirm that all such releases by Border Patrol will be under Section 1226(a) following the initiation of removal proceedings?

If you cannot provide that confirmation, please provide a copy of the policy Border Patrol plans to rely on for these releases.

Please get back to us by Thursday COB.

Thank you,

Jimmy



James H. Percival
Chief of Staff
Office of the Attorney General
PL-01 The Capitol │ Tallahassee, FL 32399-1050
Tel.: (850) 414-3300
E-mail: james.percival@myfloridalegal.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

STATE OF FLORIDA,

     Plaintiff,

v.                                                              Case No 3:23-cv-9962

Alejandro Mayorkas;
et. al,

     Defendants.

_____


## OPPOSITION TO EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

1

## INTRODUCTION

Florida asks this Court to enter a temporary restraining order preventing DHS from using its parole authority under 8 U.S.C. § 1182(d)(5) to address an emerging challenge at the southwest border, including a new parole policy specifically developed for that purpose. The Court should deny this request to limit the Executive's authority to carry out a core Executive function, managing the border, particularly on an emergency basis without the benefit of full briefing on the eve of an expected dramatic increase in arrivals at the border.

On May 10, 2023, U.S. Customs and Border Protection issued a Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document. *See* ECF No. 5-1. The Parole with Conditions policy was issued on an emergency basis in anticipation of a significant increase in arrivals at the southwest border following the end of the Title 42 health order that is anticipated to overwhelm border facilities. Florida argues that this policy is merely an "attempted workaround" of this Court's ruling that the Parole + Alternatives to Detention Policy improperly used parole for "operational convenience" in violation of the parole statute, 8 U.S.C. § 1182(d)(5), and should have been issued only following an opportunity for public notice and comment. Mot. at 1-3. However, there are important distinctions between the Parole + ATD policy and the policy CBP has now promulgated. The Parole with Conditions policy is substantively different from the prior policies in important

ways, including that the grant of parole is time limited and the policy focuses to an even greater degree on ensuring the health and safety of individuals. And the policy was adopted in markedly different circumstances that make clear that going through notice and comment rulemaking would not have been possible.

Far from using parole merely for "operational convenience," Parole with Conditions was adopted for use as necessary to address an imminent and dramatic increase arrivals at the southwest border in the coming days and the elimination of Title 42 expulsion authority. As this Court acknowledged, arrivals are expected to skyrocket "when the Title 42 Order is no longer in place." *Florida v. United States*, 2023 WL 2399883, at *3 (N.D. Fla. Mar. 8, 2023).

In the past months, DHS has taken various steps to prepare in advance for this coming crisis and developed a comprehensive plan to manage the border. For example, DHS has established processes to allow nationals of certain countries— countries to which it is very difficult to return their nationals—to seek advanced case-by-case consideration of their applications from abroad, coupled with advanced vetting, and negotiated for prompt return to Mexico of migrants from those countries who do not enter through this process. *See, e.g.*, 88 Fed. Reg. 1279. This has resulted in a dramatic reduction in irregular migration from those countries.   DHS has also expanded use of the CBP One mobile app, which allows noncitizens to schedule a time to arrive at ports of entry along the southwest border for orderly processing.

DHS has also finalized a rule that makes noncitizens who do not enter through lawful pathways or seek protection in third countries, and instead enter the United States at the southwest border without prior authorization, presumptively ineligible for a discretionary grant of asylum. *See* 88 Fed. Reg. 11,704. And the Secretary of Homeland Security has announced other measures to respond to the anticipated surge in arrivals, including moving personnel, increasing processing efficiency to mitigate potential overcrowding, and administering consequences for unlawful entry, including removal, detention, and prosecution. *See* https://www.dhs.gov/news/2023/05/01/fact-sheet-update-dhs-planning-southwest-border-security-measures-title-42-public.

Nonetheless, a significant risk remains that the increase in arrivals will be great enough that these measures are insufficient to mitigate the risk of overcrowding at border facilities that could overwhelm the border and raise serious health and safety risks to noncitizens and immigration officials. Parole with Conditions is designed not for operational convenience, but rather precisely for such an emergency situation at the border. Thus, it can only be used in certain exigent circumstances, such as where U.S. Border Patrol has apprehended over 7,000 noncitizens per day across the southwest border over a 72-hour period, or where the average time in custody has exceeded 60 hours. *Id*. at 4 And it can be used only when "specifically

requested by a sector and authorized by the CBP commissioner." ECF No. 5-1 at 3.
.

DHS is exercising all available authority to address the anticipated surge in migrants, but its available staffing and facilities to safely process and issue charging documents to record numbers of new arrivals are limited. In the face of an imminent crisis, DHS must make use of all available statutory authority Congress has granted it to process migrants, including parole. Given the limitations on other available options, once those options are exhausted, parole may be a necessary alternative. An order restricting DHS's parole authority on the eve of this crisis has the serious potential to cause chaos and undermine the security of the border and the safety of border officials. The resulting harm to the public from such an injunction far outweighs the more remote financial harms raised by Florida.

Accordingly, the Court should deny the motion for a temporary restraining order. Given the stakes of enjoining a policy necessary to managing the border in the coming days, at a minimum the Court should allow time for a hearing before issuing any injunctive relief. If, however, the Court elects to issue injunctive relief without first allowing for a hearing, Defendants respectfully request that the Court enter a temporary administrative stay of any order for a reasonable amount of time to allow Defendants to evaluate whether to pursue emergency appellate review.

## LEGAL AND PROCEDURAL BACKGROUND

<u>Legal Background.</u> The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see, e.g.*, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3). Noncitizens who lack valid entry documentation or enter the country without inspection are inadmissible and potentially removable. 8 U.S.C. §§ 1182(a)(6)-(7). However, DHS has "broad discretion" to decide "whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. If removal is initiated, the Executive nevertheless maintains the discretion to halt removal proceedings at any stage "for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999). The government may detain noncitizens it does decide to remove on the basis of their civil immigration offenses "for the limited period necessary for their removal proceedings." *Demore v. Kim*, 538 U.S. 510, 526 (2003).

"Applicants for admission" are noncitizens who are present in the United States without being admitted or "who arrive[] in the United States" "whether or not at a designated port of arrival." *See* 8 U.S.C. § 1225(a)(1). Those who apply for admission or attempt to apply to the United States via a port-of-entry are termed "arriving aliens." 8 C.F.R. §§ 1.2, 1001.1(q). "Arriving aliens," and certain other noncitizens such as those who have entered the United States without having been admitted or paroled and are apprehended within 100 miles of the border and 14 days

of entry, may, in the discretion of DHS, be placed in expedited removal procedures under section 1225(b)(1). 8 U.S.C. § 1225(b)(1)(A); 69 Fed. Reg. 48,877 (Aug. 11, 2004).[1] Arriving aliens, and other applicants for admission not placed in expedited removal proceedings, but who "are not clearly and beyond a doubt entitled to admission," may alternatively be placed in full removal proceedings under section 1229a. *See* 8 U.S.C. § 1225(b)(2)(A).[2] While these categories of applicants for admission *may* be placed into these proceedings, they need not be. Section 1225 "does not limit the authority of DHS to determine whether to pursue the removal of the immigrant" in the first place. *Crane v. Johnson*, 783 F.3d 244, 249 (5th Cir. 2015); see *Reno v. AADC*, 525 U.S. 471, 483 (1999) (noting that the Executive Branch has the "discretion to abandon" the process "[a]t each stage").

Regardless of whether applicants for admission receive final executable expedited removal orders, demonstrate a credible fear and pursue relief or protection from removal, or are placed into full removal proceedings under section 1225(b)(2)(A), section 1225(b) provides that they "shall be detained" for those

---

[1] Under "expedited removal" procedures, certain noncitizens who lack valid entry documentation or make material misrepresentations shall be "order[ed] . . . removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1964-67 (2020) (discussing expedited removal).

[2] Section 1229a removal proceedings provide more extensive procedures than expedited removal, *compare* 8 U.S.C. § 1229a *with id.* § 1225(b)(1), including a right to appeal to the Board of Immigration Appeals (BIA) and a federal court of appeals. *Id.* § 1252(a)(1).

7

procedures. 8 U.S.C. §§ 1225(b)(2)(B)(ii), (b)(2)(B)(iii)(IV), (b)(2)(A). But these detention provisions are implicated only if and when DHS exercises its prosecutorial discretion in the first instance to charge a particular noncitizen with inadmissibility and seek their removal. *See Arizona v. Biden*, 40 F.4th 375, 391 (6th Cir. 2022). DHS lacks "an[y] obligation to take a noncitizen into custody, or keep them in custody, if they decide at that point or later on not to bring an enforcement action." *Id*. Further, because "common sense" dictates that law enforcement officers retain "discretion, even in the presence of seemingly mandatory legislative commands," interpreting a provision using the term "shall," to be "a true mandate [to charge and detain all applicants for admission] … would require some stronger indication" in the legislation. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005). Section 1225(b) provides no "stronger indication" that this use of "shall" creates a judicially enforceable detention mandate. *See Arizona*, 40 F.4th at 391 ("[T]he use of "shall" does not automatically create a judicially enforceable mandate, especially when criminal or civil law enforcement is at issue.").

Even apart from DHS's inherent prosecutorial discretion, the interlocking provisions of the INA dealing with applicants for admission—sections 1225(b)(1) and (b)(2)—afford DHS discretion to grant parole to applicants for admission "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Courts have recognized that promoting public health and

8

preventing the spread of serious diseases, especially in detention settings, constitutes a significant public benefit. *See, e.g.*, *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (identifying the promotion of "public health" as a "significant public interest[]"); *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (noting "it doubtlessly advances the public interest to stem the spread of COVID-19"); *Jones v. Wolf*, 467 F. Supp. 3d 74, 94 (W.D.N.Y. 2020) (noting "the public interest in ensuring public health is also best served by the petitioners' being confined in conditions that do not pose a substantial risk of their contracting" serious illness). Parole is generally permissible for arriving aliens and other applicants for admission subject to expedited removal "whose continued detention is not in the public interest" as determined by DHS officials, provided they do not present a national security, public safety or flight risk. 8 C.F.R. §§ 212.5(b)(5), 235.2(c), 235.3(b)(2)(iii), 235.3(b)(4)(ii).

Parole has been offered on a programmatic basis, to various groups united by a common urgent humanitarian interest or significant public benefit (so long as parolees individually still meet the section 1182(d)(5)(A) standard) for decades: Orderly Departure Program, 1980-1999 (Vietnamese nationals); Moscow Lautenberg Parole Program, 2000-2011 (religious minorities from the former Soviet Union, Estonia, Latvia, or Lithuania); Iraqi Kurds program, 1996-97; Visa Waiver Program, April–October 2000; Haitian Orphan Parole Program, January–April

9

2001; Cuban Family Reunification Program, 2007–present; Cuban Medical Professional Program, 2006–2013; Cuban Attached Family Members of Refugees program, 2007–2014; CNMI and Guam Parole Programs, 2009 – present; and Central American Minors Program, 2014-18, 2021 – present. *See, e.g.*, Written Testimony of Joseph Langois to Senate Subcomm., U.S. Dep't of Homeland Sec., Apr. 23, 2015, https://www.dhs.gov/news/2015/04/23/written-testimony-uscis-senate-judiciary-subcommittee-immigration-and-national; Shalini Bhargava Ray, *The Emerging Lessons of* Trump v. Hawaii, 29 Wm. & Mary Bill Rts. J. 775, 795 (2021) (discussing cases challenging programmatic humanitarian parole rescissions "on a mass scale") (citing Alison Kamhi et al., *Parole In Immigration Law* § 1.1 (1st ed. 2016)).

Factual and Procedural Background. On May 10, 2023, based on a statement reported in media that Defendants were going to employ a "targeted use of parole [to] allow Border Patrol to focus its resources most effectively [on] quickly process[ing] and remov[ing] individuals who do not have a legal basis to remain in the country," ECF No. 1 ¶ 27 (alterations in original), Plaintiff filed the instant suit, alleging this "targeted use of parole" initiative violated the APA. ECF No. 1. Florida alleged three claims: Defendants' action was contrary to law (Count 1), arbitrary and capricious (Count 2), and was required to but failed to undergo notice and comment rulemaking.

On May 10, 2023, Border Patrol Chief Raul Ortiz signed a memorandum titled "Policy on Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions)." (Parole With Conditions Policy, Ex. A.) The May 10, 2023 memorandum outlines exigent border-overcapacity circumstances when Border Patrol may utilize DHS's longstanding parole authority under section 1182(d)(5)(A) to temporarily parole noncitizens, who have been inspected, vetted, and checked for national security concerns, on a case-by-case basis for urgent humanitarian reasons or for significant public benefit, prior to the issuance of a charging document where that parole is conditioned on a noncitizen, within 60 days, scheduling an appointment to appear at an U.S. Immigration and Customs Enforcement (ICE) facility at a date in the future for the initiation of appropriate removal proceedings or requesting service, via a designated online location, of a Notice to Appear (NTA) by mail. Ex. A. When the limited exigent circumstances concerning overcapacity outlined in the memorandum exist, use of Parole With Conditions permits CBP to maintain adequate enforcement resources (which would otherwise be focused on processing and issuing NTAs to applicants for admission) along the border to deter the efforts of criminal organizations and traffickers and intercept persons seeking to enter the United States unlawfully, and to prioritize the health and safety of individual noncitizens in its custody through reducing overcrowding. *Id.* It also allows Border Patrol to maintain safe and humane holding

conditions, compliant with all applicable court orders and other legal obligations, for each noncitizen in its custody. *Id.* Parole With Conditions may only be used on a temporary, sector-specific basis where Border Patrol agents determine, on "a case-by-case individualized basis, examining all of the facts and circumstances at the time of the noncitizen's inspection," that "there are urgent humanitarian reasons that warrant parole of [that] particular person, given the health and safety of individuals in custody, or that there is significant public benefit in paroling the particular person in order to allow for [Border Patrol] to continue to process those it has in its custody or utilize its limited personnel to process and maintain border security." *Id.* The grant of Parole with Conditions is for a specific period, generally 60 days, and the parole automatically terminates upon the expiration of that period. *Id.*

The May 10, 2023 memorandum carefully outlines the considerations and scope of the case-by-case evaluations of prospective parolees under this program:

> Prior to a noncitizen's processing via Parole with Conditions, CBP must conduct biometric identity verification. The BPA making determinations regarding Parole with Conditions must evaluate any potential national security and public safety concerns. Any assessment must consider all of the facts and circumstances known to the BPA at the time, including but not limited to, the noncitizen's immigration history, criminal history, community or family ties, medical concerns, role as a caregiver or provider, and other factors known to the BPA. The assessment may begin as early as the initial encounter in the field, and there is no limitation on the time period in which this individual evaluation must occur. BPAs must make determinations about national security and public safety based on the facts and circumstances known at the time of processing.

A685

In addition, the BPA must consider whether, given the time the individual has been in custody, and the availability of ICE detention space, there is an urgent humanitarian reason or significant public benefit to parole the individual from custody, such as where a noncitizen has medical, mental health, or other care needs that cannot reasonably be provided in USBP custody given the prolonged time in custody due to encounter numbers. Additionally, because BP personnel and resources are finite, BP must consider whether processing personnel and resources are necessary to process other noncitizens in BP custody or accomplish enforcement actions that are immediately critical to border security for the greater public benefit. If so, the individual may be considered for Parole with Conditions

Ex. A.

Parole With Conditions comes in response to a moment of crisis at the border. DHS has taken many far-reaching actions to decrease processing times during periods of high encounters at the border, including detailing more personnel to the border, standing up additional processing facilities, leveraging technology to reduce processing time and digitize A-files, and called in the assistant of other DHS components and employees, and even Department of Defense troops. Declaration of Matthew J. Hudak at ¶¶ 6-7 (Exhibit B). Nevertheless, encounters remain at a historic high. *Id*. ¶ 8. As of May 9, 2023, Border Patrol is holding more than 27,000 noncitizens in custody, which is over capacity in eight of nine Southwest border sectors. *Id.* Border Patrol is on pace to surpass the 2.1 million encounters recorded in Fiscal Year (FY) 2022. During FY23 to date, Border Patrol has encountered approximately 1.4 million noncitizens. *Id.*

The lifting of the Centers for Disease Control and Prevention's Title 42 Public Health Order (Title 42) is expected to lead to a further surge in migrants, with number of encounters predicted at an average of 12,000-14,000 noncitizen per day. *Id.*

At the current operational pace, and without any additional measures such as Parole with Conditions, USBP would have over 45,000 individuals in custody by the end of the month. *Id.* ¶ 9.  Further, the DHS Chief Medical Officer has concluded that "current conditions pose an increased risk of adverse health outcomes." *Id.* ¶ 13. Overcrowding and increased movement of noncitizens between facilities has the potential to result in adverse health outcomes, including the spread of communicable diseases (e.g., Measles, Varicella, etc.) among noncitizens held in these facilities. *Id.*

Based on these conditions, "a court order determining that CBP cannot release individuals from BP custody would" "exacerbate already very seriously concerning holding conditions, likely force operational conditions that causes CBP to violate [other] court orders ..., and have extremely dire and catastrophic consequences." Ex. B at 18.

Florida moved for a temporary restraining order on May 11, 2023. ECF No. 2. Florida requests equitable relief "preventing DHS from implementing the new parole policy or otherwise using § 1182(d)(5) as a tool of operational convenience, to relieve overcrowding, or to facilitate faster processing at the Southwest border."

*Id.* at 11. Florida also requests the Court to "set a briefing schedule for preliminary relief and order DHS to provide weekly status reports regarding Border Patrol's use of the parole authority in § 1182(d)(5)." *Id.*

## ARGUMENT

To obtain preliminary equitable relief, Florida must affirmatively demonstrate: "(1) substantial likelihood of success on the merits; (2) [that] irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [him] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). In the Eleventh Circuit, "a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000). A TRO or PI should be denied because Florida cannot make this showing: its claims lack merit and its injury does not outweigh the damage its requested relief would impose on the United States.[3]

## I. Florida Cannot Obtain APA Review of Its Claims.

---

[3] The balance of equities and public interest factors merge when the Government is the defendant. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

A688

*A. Committed to agency discretion by law.*

The use of parole under Parole With Conditions is committed to agency discretion by law and thus unreviewable under the APA. 5 U.S.C. § 701(a)(2).

The choice whether and when to charge a noncitizen for removal, and whether to detain them while that determination is being made, are the type of enforcement decisions "generally committed to an agency's absolute discretion." *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Such decisions "often involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another … and, indeed, whether the agency has enough resources to undertake the action." *Id.* Both the decision whether and when to issue charging documents for removal proceedings, and the decision to detain or release pending those proceedings, in addition to implicating resource allocation considerations, also require balancing "whether agency resources are best spent on [enforcing] this violation [of the immigration laws] or another." *Heckler*, 470 U.S. at 831. These considerations are exactly the kind Congress has committed to agency discretion. *Id.* Indeed, the determination to detain or release on parole encompasses, *inter alia*, discretionary considerations relying on agency expertise and resource prioritization, difficult for a court to review, such as "the possibility that [a noncitizen] may abscond to avoid being returned to his or her home country," "priorities for the use

A689

of limited detention space," and of course, the statutory requirements that parole be for "urgent humanitarian reasons or significant public benefit." *See Jeanty v. Bulgar*, 204 F. Supp. 2d 1366, 1382 (S.D. Fla. 2002); 8 U.S.C. § 1182(d)(5)(A).

Nor does section 1225(b) require DHS to detain all amenable applicants for admission. Although section 1225 uses the word "shall," the Supreme Court has instructed that the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory legislative commands." *Town of Castle Rock*, 545 U.S. at 761. In any event, nothing in the statute evinces a "strong[] indication" of intent to impose a "true [detention] mandate" on the Executive. *Id.*; *accord, Arizona*, 40 F.4th at 391. If anything, the opposite is true, because of the INA's provision of release on parole under section 1182(d)(5)(A) for section 1225(b) detainees. *See MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, 950 F.3d 764, 776 (11th Cir. 2020) (court looks at statutory text in "relation to other provisions in the Act" to determine its meaning).

And parole is inherently discretionary, *see* 8 U.S.C. § 1182(d)(5)(A), further indicating that the structure of the INA commits the release decisions Plaintiff challenges to agency discretion. "Congress has delegated remarkably broad discretion to executive officials under the [INA]" and its grants of authority "are nowhere more sweeping than in the context of parole." *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985); *see Jean II*, 727 F.2d at 966 & n.8. Further

17

underscoring the unreviewable discretion inherent in parole, courts lack jurisdiction to review parole and bond decisions under 8 U.S.C. §§ 1226(e), 1252(a)(2)(B)(ii). *See, e.g.*, *Alonso-Escobar v. USCIS Field Off. Dir. Miami, Fla.*, 462 F. App'x 933, 935 (11th Cir. 2012) (unpublished); *Jeanty*, 204 F. Supp. 2d at 1382.

     *B. No final agency action.*

     Florida additionally cannot obtain APA review because it does not challenge "final agency action," 5 U.S.C. § 704. Agency action is final if it determines legal "rights or obligations." *Bennett*, 520 U.S. at 178. Agency action that "does not itself adversely affect" a party but instead "only affects his rights adversely on the contingency of future administrative action" is "nonfinal." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003).

     The Parole With Conditions is not final agency action because it does not finally determine anyone's rights or obligations. The program does not require CBP agents to take any specific action; it neither imposes an obligation to detain or release a noncitizen, nor does it grant a noncitizen the right to release. Ex. A. The agents and officers retain discretion to detain or parole noncitizens on a "case-by-case basis," and nothing in the guidance mandates a specific result in any circumstance. *Id.* Parole With Conditions does not become final and challengeable until after a decision to detain or release is made in an individual's case. *See Norton*, 324 F.3d at 1237. Because agency officials are "free to exercise discretion" to grant or deny

A691

parole in particular cases, the May 10, 2023 memorandum does not constitute final agency action. *See Jean I*, 711 F.2d at 1481; *Florida v. United States*, 540 F. Supp. 3d 1144, 1157 (M.D. Fla. 2021), *vacated on other grounds*.

## II. Florida Cannot Succeed on the Merits

*A. Count I (Contrary to Law)*

Parole With Conditions represents a valid use of DHS's parole authority under section 1182.  Section 1182(d)(5)(A) provides that the Secretary of Homeland Security may

> in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A).

The May 10, 2023 memorandum is consistent with this provision. The memorandum provides that Parole With Conditions may only be granted on a case-by-case basis to individual noncitizens for urgent humanitarian reasons or significant public benefit. Ex. A. The memorandum provides that the individualized inquiry must consider both the individual's identity, public-safety and flight-risk factors as

well as whether there is an urgent humanitarian interest or significant public benefit relevant *to that individual*. Ex. A.

In enacting section 1182(d), Congress did not define the terms "urgent humanitarian reasons or significant public benefit," thus delegating to the agency the role of adjudicating these terms. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *see also New Mexico*, 450 F. Supp. 3d at 1175 n.5 (Section 1182(d)(5)(A)'s "vague standard conceivably encompasses a wide range of public benefits"). The May 10, 2023 memo provides that possible urgent humanitarian interests or significant public benefits that Border Patrol agents may find, on an individual basis, to just release on parole include "such as where a noncitizen has medical, mental health, or other care needs that cannot reasonably be provided in USBP custody given the prolonged time in custody due to encounter numbers," or where "processing personnel and resources are necessary to process other noncitizens in BP custody" of higher priority than that individual "or accomplish enforcement actions that are immediately critical to border security for the greater public benefit." Ex. A. These applications of the section 1182(d)(5) standard are reasonable and entitled to deference. *See INS v. Aguirre-Aguirre,* 526 U.S. 415, 424-425 (1999) (further noting "judicial deference to the Executive Branch is especially appropriate in the immigration context"). The need to prevent disease and other health and safety concerns created by overcrowding in congregate settings

is roundly recognized as a significant public benefit, *see, e.g.*, 8 C.F.R. § 212.5(b)(1) (providing parole for noncitizens with "serious medical conditions in which continued detention would not be appropriate"); *Grand River Enterprises Six Nations, Ltd.*, 425 F.3d at 169; *Swain*, 961 F.3d at 1293, and regulations applying the parole authority in a parallel context have long recognized that paroling noncitizens whose detention is not in the public interest due to the need to prioritize agency enforcement reasons is a significant public benefit, *see* 8 C.F.R. § 212.5(b)(5). Indeed, where Border Patrol agents must be detailed to processing rather than policing the border, they will be less able to promote public safety by apprehending noncitizens seeking to enter illegally, including, for example "those linked with terrorist organizations, those with criminal records, smugglers," and "those actively trafficking other members of the same group (which could include children)." Ex. B, ¶ 15.

Because the May 10, 2023 memorandum requires that Border Patrol agents comply with the requirements of section 1182(d)(5)(A) by conducting a sufficient case-by-case inquiry, ensuring there is an urgent humanitarian interest or significant public benefit justifying this particular application of the parole authority, and ensuring that any grant of parole terminates on a definitive date when its purposes will have been served, Parole With Conditions is fully consistent with section 1182(d)(5)(A) and not contrary to law.

Florida argues that this policy flouts the Court's ruling on Parole+ATD and otherwise is contrary to law for the reasons articulated by the Court in vacating that program on March 8, 2023. *See Florida v. United States*, No. 3:21-cv-1066-TKW-ZCB, ECF No. 157 (N.D. Fla. Mar. 8, 2023). However, that order did not preclude DHS from using its parole authority in other ways, and Parole With Conditions different from Parole+ATD in critical ways relevant to the Court's determinations that the latter was not consistent with section 1182(d)(5)(A).

*First*, unlike Parole+ATD, which did not specify an endpoint to the grant of parole once its purposes had been served, Parole With Conditions provides that the grant of parole must be specified to terminate at a time certain, generally to be 60 days. Ex. A. Thus, the parole will terminate when DHS has determined that "the purposes of such parole … shall have been served," 8 U.S.C. § 1182(d)(5)(A), namely that the particular urgent humanitarian interest or significant public benefit deemed to justify that individual's release—be it to respond to medical concerns and avoid health issues due to overcapacity in Border Patrol holding facilities, or the need to prioritize Border Patrol personnel resources from fully processing for an NTA this individual to be able to police the border against particular criminal and

A695

security threats—will have been served by their parole from Border Patrol custody

for subsequent completion of their NTA processing.[4]

*Second,* Parole Plus Conditions is much clearer than the Parole+ATD

memorandum in its requirement for a thorough individualized consideration prior to

releasing the individual on parole. Unlike with Parole+ATD, the May 10, 2023

memorandum makes clear that there "is no limitation on the time period in which

this individual evaluation must occur." Ex. A at 5. Border Patrol agents must take as

long as necessary, beginning potentially "as early as the initial encounter in the

field," to "conduct biometric identity verification" and "evaluate any potential

national security and public safety concerns," considering "all of the facts and

circumstances known to the [agent] at the time, including but not limited to, the

noncitizen's immigration history, criminal history, community or family ties,

medical concerns, role as a caregiver or provider," and other relevant factors. *Id.*

Further, as explained further immediately *infra*, the individualized inquiry

does not solely "focus[] on whether the alien is a public safety risk or flight risk,"

---

[4] Florida criticizes the Parole With Conditions memorandum on the assumption that it does not specify that noncitizens will automatically be taken back into custody when that specific period of parole terminates. However, the memorandum provides that U.S. Immigration and Customs Enforcement (ICE) "will make a separate, independent determination, after processing the individual for appropriate removal proceedings, whether to release the individual on parole during the pendency of such proceedings." Ex. A at 6. However, ICE lacks the capacity to detain all of the millions of noncitizens in removal proceedings, as the Court recognized in *Florida*. ECF No. 157 at 38 ("The evidence establishes that Defendants do not have sufficient detention capacity to detain all arriving aliens[.]"). Moreover, Defendants can only return individuals to Mexico under 8 U.S.C. § 1225(b)(2)(C) to the extent Mexico permits it.

but also requires that the Border Patrol agent determine that substantive component of section 1182(d)(5) is met with respect to that individual. *See Florida*, ECF No 157 at 92. That is, the agent must determine there is an urgent humanitarian interest or significant public benefit present due to a specific humanitarian interest or public benefit pertaining to that individual and relevant to that specific point in time.

*Third,* Florida is incorrect in its assumption that release on Parole With Conditions will violate the requirement of having an urgent humanitarian interest or significant public benefit by blanketly creating "a new processing pathway." Unlike with the Parole+ATD memorandum, the May 10, 2023 memorandum specifies a number of potential urgent humanitarian interests or significant public benefits that may justify parole for individual noncitizens, depending on their particular circumstances, such as, for example, "where a noncitizen has medical, mental health, or other care needs that cannot reasonably be provided in USBP custody given the prolonged time in custody due to encounter numbers." Ex. A at 5. The same urgent humanitarian interest or significant public benefit will not apply in a blanket fashion to every noncitizen being paroled under the policy, nor permit release of every noncitizen encountered in a sector at a given time on a mass scale "merely for sake of administrative expediency." *Florida*, ECF No. 157 at 95. Rather, each parole decision under this policy must be justified by humanitarian or public-interest factors

relevant to that individual and the specific circumstances of their detention by Border Patrol under the conditions existing at that time.

Further indicating that Parole With Conditions is not an open-ended new processing pathway as Florida claims, the May 10, 2023 memorandum makes clear that once capacity in a sector experiencing the exigent overcrowding that triggers the availability of consideration for Parole With Conditions falls back below 95%, Parole With Conditions should not be utilized and "concerns regarding health and safety of noncitizens in short-term custody" in particular are less likely to be present. Ex. A at 4. The May 10 memorandum "emphasizes that even where a Sector has been approved to utilize the Parole with Conditions pathway that it must use it sparingly and only after a case-by-case determination for each individual alien. Such approval in no way permits blanket paroles from a Sector." Ex. B ¶ 11.

Contrary to Florida's assumption about this use of parole, Parole With Conditions utilizes section 1182(d)(5)(A) neither "as a tool of operational convenience" or merely "to facilitate faster processing at the Southwest border," and permits release stemming from overcrowding only to the extent that the overcrowding is accompanied or contributes to specific urgent humanitarian interests or significant public benefits applicable on an individual basis. The May 10, 2023 memorandum is thus consistent with the language of the statute and the Court's explanation of that language in the context of Parole+ATD in *Florida*.

A698

### B. Count II (Arbitrary and Capricious)

The May 10, 2023 memorandum is not arbitrary and capricious. The standard for showing a decision to be arbitrary and capricious is extremely deferential to agency decision-making. *See Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996). The courts cannot second guess an agency's thought process "as long as its conclusions are rational." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). The "court is not to substitute its judgment for that of the agency" and should still "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

Parole With Conditions is not arbitrary and capricious because it represents a clearly rational response using the agency's available legal tools to respond to dire concerns presented by historic overcapacity at the Southern border: namely, the urgent health and other concerns that can be caused by overcrowding in border holding facilities and the significant threats to public safety that can arise when Border Patrol is unable to devote sufficient resources to policing the border and preventing the unlawful entry of criminal entities due to the need to have its agents completing NTA processing for oftentimes low-threat applicants for admission. Further, the May 10, 2023 memorandum reflects DHS's attempts, to the extent

materially possible, to respond to and adapt its operations in response to the court's criticism of prior parole uses.

Florida's only argument that the May 10, 2023 memorandum is arbitrary and capricious is that it is merely Parole+ATD relabeled.  But, in fact, the policy is a different use of DHS's statutory parole authority, for the reasons explained above. Parole With Conditions, further, is meaningfully different from Parole+ATD on the three bases in which the Court held the latter program violated section 1182(d)(5)(A). First, the May 10, 2023 memorandum requires that grants of parole have definite termination points to ensure the parole terminates once the particular urgent humanitarian interest or significant public benefit attendant to that noncitizen's condition and circumstances surrounding their encounter at the border are no longer present. Second, the memorandum makes clear that there is no time limit on the individualized inquiry, and that the case-by-case inquiry must address not just identity, public safety and flight risk factors, but whether the substantive "urgent humanitarian interest or significant public benefit" standard of section 1182(d)(5)(A) is met with respect to that individual and the circumstances at the time of their inspection. Third, the memorandum does not authorize mass release based on a blanket interest in "administrative expediency" that applies sector- or border-wide, *Florida*, ECF No. 157 at 95, but rather specifies a range of particular, long recognized bases for finding an urgent humanitarian interest or significant public

benefit, and requires that Border Patrol agents determine that there is an applicable urgent humanitarian interest or significant public benefit justifying that individual's release from custody. Ex. A at 5.  The May 10, 2023 memorandum thus indicates that DHS considered all relevant factors, including the Court's identification of issues with Parole+ATD, in attempting to craft a response to exigent overcapacity circumstances at the border, and does not represent arbitrary and capricious decisionmaking.

### C. Count III  (Notice and Comment)

Plaintiff incorrectly claims that the May 10 memorandum was required to undergo notice-and-comment rulemaking. TRO at 8-9. However, the Parole Plus Conditions guidance is not the type of rights-creating document that requires notice and comment rulemaking.  Instead, it is an interpretive rule or a general statement of policy.  In any event, good cause excuses notice and comment in the emergency circumstances presented here.

**(a) Notice and comment rule making does not apply because Parole Plus Conditions is an interpretative rule or statement of general policy.**

The notice-and-comment rulemaking requirement does not apply to "interpretative rules" or "general statements of policy." 5 U.S.C. § 553(b)(A); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Unlike legislative rules, interpretive rules "simply state[] what the administrative agency thinks the statute

A701

means." *Warshauer*, 577 F.3d at 1337. Such guidance does not create rights or duties but merely "remind[] affected parties of existing duties." *Id*. The difference "likely turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute." *Id*.

Whether an agency pronouncement is a general statement of policy "depends upon whether the agency action establishes a binding norm." *Nat'l Min. Ass'n v. Sec'y of Labor*, 589 F.3d 1368, 1371 (11th Cir. 2009) (quotation omitted).  The Eleventh Circuit has explained that "[a]s long as the agency remains free to consider the individual facts in the various cases that arise, then the agency in question has not established a binding norm." *Id*.

Rules of "agency organization, procedure, or practice" are also exempt from the notice and comment requirement. 5 U.S.C. § 553(b)(A); *see Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014).

The May 10 memorandum is an interpretive rule or a general statement of policy because it offers guidance that directly tracks the language of the parole statute, section 1182(d)(5)(A): release on Parole With Conditions may only be granted "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Exhibit A. The May 10 memorandum does not create any rights or duties for DHS or noncitizens, and the guidance does not expand the use of parole beyond the confines permitted under the statute. *See Warshauer*, 577 F.3d at 1337.

Rather, the May 10 memorandum provides that DHS's determination of an "urgent humanitarian reason" or "significant public benefit" can include considerations of health and safety where overcrowding conditions are present and "USBP's continued ability to carry out its critical border security and enforcement mission." Ex. A at 2, 5. Thus, the May 10 memorandum is at most an interpretive rule. Additionally, it may be viewed as a general policy statement, as it does not establish a binding norm, because the agency remains free to consider facts in individual cases and requires sector-specific assessments as to whether to continue to authorize Parole Plus Conditions. Ex. A at 3-5; *see Nat'l Min. Ass'n*, 589 F.3d at 1371.

Indeed, mirroring the parole statute, the procedures outlined in the May 10 memorandum are applied "on a case-by-case basis" depend on whether "there is an urgent humanitarian reason or significant public benefit to parole" and provide no assurance that parole will be granted in any specific case. *Id*. at 5 & 6. Rather, the May 10 memorandum falls within the longstanding rule that agency policies or procedures that inform the public of the agency's current policy regarding enforcement and use of discretionary authorities (here, the parole authority) are general statements of policy. *See, e.g.*, *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019) (explaining that the agency policy which directed immigration officers to consider whether they "may return" a noncitizen to Mexico pending removal proceedings was a statement of policy "because immigration

A703

officers designate applicants for return on a discretionary case-by-case basis"), *stay granted*, 140 S. Ct. 1564 (2020); *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 597 (5th Cir. 1995) (similar, in context of FDA guidance concerning enforcement actions). In short, the May 10 memorandum merely "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citation omitted).

Alternatively, the May 10 memorandum qualifies as a rule of "agency organization, procedure, or practice." 5 U.S.C. § 553(b). "Procedural rules," the general label for rules falling under this exemption, are "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza*, 754 F.3d at 1023 (quotation omitted); *see also Texas v. United States*, 50 F.4th 498, 522 (5th Cir. 2022) (looking at "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion"). Parole Plus Conditions is aimed at allowing BP to fulfil its mission and addressing current and anticipated increases in overcrowding and detention facilities. Ex. __ at 3-4; Ex. B. The May 10 memorandum identifies circumstances for the consideration of parole authority without changing the substantive rights of the affected noncitizens or third parties. *See Mendoza,* 754 F.3d at 1023. Further, the utilization of Parole Plus Conditions does not alter the "the substantive criteria by which" DHS

**A704**

will "approve or deny" a parole request or an ultimate claim for relief. *James v. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000).

Under any scenario, the May 10 memorandum does not promulgate a substantive, rights-altering rule and consequently was not required to undergo notice and comment.

### (b) Good Cause Excuses Compliance With Notice and Comment.

For the reasons stated above 5 U.S.C. § 553 does not apply to the Parole Plus Conditions laid out in the May 10 memorandum. But even if it did, BP was within its authority to forego notice and comment here for good cause. Section 553 permits an agency to forego notice and comment "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." § 553(b)(3)(B).  "Emergencies, though not the only situations constituting good cause, are the most common" reason for forgoing notice and comment. *U.S. v. Dean*, 604 F.3d 1275, 1281 (11th Cir. 2010). An "emergency situation" includes those where notice and comment would pose "a possible imminent hazard to [] persons, and property within the United States," *Jifry v. FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004). In short, although the good cause exception must be used sparingly, it is "an important safety valve to be used where delay would do real harm." *Dean,* 604 F.3d at 1279.

Here, compliance with notice and comment rule making would prevent BP from effecting its central mission—patrolling the nation's borders and apprehending those who cross the border between ports of entry. BP explained in the May 10 memorandum that "situations in certain sectors are quickly evolving into exigent circumstances, constituting good cause for bypassing notice and comment rulemaking, as contrary to the public interest." Ex. A at 7. The details of this exigency and the exigent situation facing BP—given their physical capacity limitations, staffing limitations, and budgetary limitations—are set forth in the accompanying declaration of Matthew J. Hudak.

As this Court is aware, Title 42—the Centers for Disease and Control's health measure, which previously permitted BP to expel migrants without an ability to seek asylum—expires tonight. Knowing Title 42 was set to expire, DHS took a number of measures to address the anticipated migrant surge at the border. *See* Hudak Decl. at ¶ 6. Those measures included (i) digitizing A-files to permit faster review and processing times, *id*. at ¶ 6a, (ii) improving mobile intake capabilities through CBP Mobile devices that replace the paper field intake forms used by USBP to document biographical data from the non-citizens encountered, *id*. at ¶ 6b, (iii) moving employees to the border to assist with non-law enforcement support activities, *id*. at ¶ 6c, (iv) engaging with virtual and mobile processing technologies such as laptops, *id*. at ¶ 6d, (v) engaging Border Patrol Processing Coordinators (BPPC), who are not

immigration officers but are employed by Border Patrol, to perform administrative tasks to speed up processing times, *id*. at ¶ 6e, (vi) streamlined the processing of Notices to Appear/ Order of Own Recognizance, *id*. at ¶ 6 f, (vii) redistributing Office of Field Operations ("OFO") officers to assist BP, *id*. at ¶ 6g (viii) building soft sided holding capacity to permit the processing of more noncitizens. *Id*. at ¶ 8. In addition to these steps, DHS has also implemented other policies to seek to minimize the flow of traffic at the southwest border. In addition, DHS had had conversations with the Government of Mexico, and Mexico currently is not accepting any returns under the Migrant Protection Protocols (MPP).

Notwithstanding these efforts, there are an unprecedented number of migrants at the border who will seek entry to the United States upon the expiration of Title 42. Meanwhile, BP stations are already at capacity. As of May 9, 2023, USBP is holding more than 27,000 noncitizens in custody.  *See* Hudak Decl. at ¶ 10. This is overcapacity in eight of nine SWB sectors. Currently, the USBP is on pace to surpass the 2.1 million encounters recorded in Fiscal Year (FY) 2022. During FY23 to date, USBP has encountered approximately 1.4 million noncitizens. The lifting of the Centers for Disease Control and Prevention's Title 42 Public Health Order (Title 42) is expected to lead to a further surge in migrants, with number of encounters predicted at an average of 12,000-14,000 noncitizen per day. *Id.* For the past 7 days, BP has averaged over 8,750 encounters per day, double the average daily encounters

in May of 2019, the highest month of the 2019 surge. Ex. A at 7. When Title 42 is lifted, the migrants along the border who cross into the United States will have the lawful ability to claim asylum, and the government, by statute, will have to consider those claims. 8 U.S.C. § 1225. BP does not have the staff available, or the space available, to issue Notices to Appear—the charging document in immigration cases—to each of the individuals expected to arrive at the border in the coming days and weeks, while simultaneously continuing to patrol the border. At the current operational pace, and without any additional measures such as Parole with Conditions, USBP would have over 45,000 individuals in custody by the end of the month. *See* Hudak Decl. Border Patrol is not resourced to manage the level of encounters currently occurring across the Southwest Border, and the U.S. Congress provided less than half of the $4.9 billion that DHS requested to prepare for the lifting of Title 42. *Id.*   To be clear, while DHS continues to explore options for dealing with the surge at the Southwest border, at the present time, if conditions remain as they are, and had DHS not issued the Parole Plus Conditions and instead engaged in notice and comment, BP would have had no choice but to decline to apprehend noncitizens crossing the border or initiate removal proceedings against them in sectors with insufficient capacity to comply with the court's order. *See* Hudak Decl. at ¶¶ 17, 21. In the absence of other options, and facing the imminent

termination of Title 42, BP must do something, and Parole Plus Conditions provides a short term solution to the emergent conditions faced at the Southwest border.

An agency has good cause to waive notice and comment where "an imminent, externally imposed deadline or the existence of an emergency" created urgency to promulgate the rule, *Paucar v. Att'y Gen. of U.S.*, 545 F. App'x 121, 125 (3d Cir. 2013), as is the case here. As set forth above, an agency also has good cause to forgo notice and comment when doing so is necessary to "carry out its mission," as is the case here, Ex. A at 7. *Riverbend*, 958 F.2d at 1484. In short, the emergency posed by the termination of Title 42 and the surge in migration justify an exception to notice and comment here. *See Wall v. Centers for Disease Control & Prevention*, No. 6:21-CV-975-PGB-DCI, 2022 WL 1619516, at *10 (M.D. Fla. Apr. 29, 2022) (Covid 19 emergency justified foregoing notice and comment of mask mandate and travel testing rules).

Consistent with these principles, BP recognized that pre-promulgation notice and comment was impossible because "certain sectors are quickly evolving into exigent circumstances," Ex. A at 7, and with migration at historic levels for the past seven-days and the imminent end to Title 42, the "situation requires urgent action." *Id.*

## II.  The Balance of Equities Opposes Injunctive Relief.

A TRO would irreparably harm the United States and the public by frustrating

measures DHS has adopted that are necessary to address an expected significant increase in noncitizens arriving in the coming days. DHS has identified an imminent crisis at the southwest border—record numbers of noncitizens seeking to enter our country, overwhelming the immigration system—and has planned to use all authority at its disposal to address this crisis. But that authority is limited. Outside of narrow exceptions, DHS cannot return noncitizens arriving from other countries to Mexico, and certainly cannot do so in numbers that would alleviate the pressure on the border. Nor does DHS have the resources to either detain this record number of arrivals, or the staffing and facilities to safely process and issue charging documents to all these new arrivals in the normal course. With detention or return of these noncitizens being impossible, and normal processing impossible in a safe or orderly manner that would not lead to dangerous overcrowding and attendant risks to health, safety, and security of both migrants and immigration officials, the relief Florida seeks—barring DHS from using its statutory parole authority under § 1182(d)(5), Mot. at 11—would leave the agency with no options.

Put simply, "a court may not require an agency to render performance that is impossible." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167-68 (D.C. Cir. 2017); *see also Ala. Power Co. v. Castle*, 636 F.2d 323, 359 (D.C. Cir. 1979); *NRDC v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974). Indeed, "[i]t has long been settled that a federal court has no authority ... to declare principles or rules of law which cannot affect the

matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted). In "contemplating the equities," a Court cannot "order a party to jump higher, run faster, or lift more than she is physically capable." *Am. Hosp. Ass'n*, 867 F.3d at 167-68.

Florida requests that the Court "enter a temporary restraining order preventing DHS from implementing the new parole policy or otherwise using § 1182(d)(5) as a tool of operational convenience, to relieve overcrowding, or to facilitate faster processing at the Southwest border." Mot. at 11. But Florida offers no explanation for how this is possible in the context of the imminent influx in arrivals. Simply removing statutory authority Congress provided DHS to use parole would, in these circumstances, risk the safety of border officials and migrants, and risk overwhelming border facilities and the security of the border itself.

As for its own harm, Florida raises financial costs related to noncitizens Florida anticipates may over time travel to Florida and use State services or benefits. Mot. at 5. Whatever weight the Court may give those allegations of future harm, they cannot be avoided by granting relief that would be extremely challenging for DHS to comply with, nor can they outweigh the significant and far more imminent harms to safety and border security a TRO would cause. As the Supreme Court has emphasized, challenges to immigration enforcement discretion "invade a special province of the Executive." *Reno v. Am.-Arab Anti-Discrimination Comm.*

("AADC"), 525 U.S. 471, 489 (1999). And here, Plaintiffs challenge the Executive's ability to exercise that discretion not in normal times, but rather its exercise of that discretion to respond to a crisis at the southwest border.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo,* 456 U.S., 102 S. Ct. 1798, 1803 (1982). By removing one of the few tools DHS has to address this crisis, an injunction would undermine a core Executive function related to managing an international border and cause direct, irreparable injury to the interests of the government and the public, which "merge" in suits against the federal government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## CONCLUSION

For the forgoing reasons, the Court should deny the motion for a temporary restraining order, and at a minimum, allow time for a hearing before issuing any injunctive relief. And if the Court issues injunctive relief, Defendants respectfully request that the Court enter a temporary administrative stay of any order for a reasonable amount of time to allow Defendants to evaluate whether to pursue emergency appellate review.

A712

Date:  May 5, 2023

JASON R. COODY
*United States Attorney*

MARIE A. MOYLE
*Assistant United States Attorney*
Northern District of Florida

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
ERIN T. RYAN
ELISSA FUDIM
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

*Counsel for Defendants*

1

# **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 11, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which provided an electronic notice and electronic link of the same to all attorneys of record.

By: */s/ Joseph A. Darrow*
JOSEPH A. DARROW
Trial Attorney
United States Department of Justice
Civil Division

2

USCA11 Case: 23-11644      Document: 3-3      Date Filed: 05/19/2023      Page: 718 of 763

Parole Project for Asylum Seekers at Ports of Entry and..., 9 Immigration Law...

**9 Immigration Law Service 2d PSD Selected DHS Document 4110**

**Immigration Law Service, Second Edition**  November 2021 Update

**SELECTED DHS DOCUMENTS**

**Parole**

# Parole Project for Asylum Seekers at Ports of Entry and INS Detention (Apr. 20, 1992)

A715

Parole Project for Asylum Seekers at Ports of Entry and..., 9 Immigration Law...



89 INTERPRETER RELEASES    326    April 27, 1992

Appendix I, continued

15272    Federal Register / Vol. 57, No. 81 / Monday, April 27, 1992 / Proposed Rules

Appendix II

Memorandum

Subject:
Parole Project for Asylum
Seekers at Ports of Entry
and in INS Detention

Date:
APR 2 0 1992

To:
All Regional Administrators
All Regional Counsels
All District Directors
All Chief Patrol Agents
All Officers in Charge
All District Counsels

From:
Office of the Commissioner

The Service conducted a Pilot Parole Project beginning in May, 1990 and concluding in October, 1991. After evaluating the preliminary results of this project, the Service has decided to reimplement it and to expand it to all Service detention facilities, as well as to contract detention facilities and major ports of entry where Service personnel are available to conduct pre-screening interviews.

The Service has limited detention space. By adopting the Parole Project, the Service will be able to detain those persons most likely to abscond or to pose a threat to public safety rather than to base the detention decision solely or primarily on the availability of detention space. This memorandum sets forth the criteria under which a person who appears to be excludable from the United States, but who has made a claim for asylum, may be paroled pending adjudication of his or her claim.

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    2

Parole Project for Asylum Seekers at Ports of Entry and..., 9 Immigration Law...

69 INTERPRETER RELEASES                  527                    April 27, 1992

Appendix II, continued

## PRE-SCREENING INTERVIEWS

Pre-screening interviews will be conducted at two types of
locations.

First, the Service will endeavor to place asylum pre-
screening officers (APSOs) at certain major airports and other
ports of entry. The APSOs may be (1) members of the Asylum Corps
or (2) inspectors or other Service officers who have been
specially trained in asylum law and in asylum interviewing
techniques. The Director of Asylum and the General Counsel have
been directed to develop a course of training in asylum law and
interviewing standards for APSOs, and a team consisting of
representatives of the Inspections and Asylum Branches is working
to develop operating procedures for APSOs at ports of entry.

Second, the Service will conduct pre-screening interviews at
all Service detention facilities, as well as at contract
detention facilities where Service personnel are available to
conduct interviews. The interviews at detention facilities will
be conducted, wherever possible, by APSOs. Pending the
widespread availability of trained APSOs, these interviews will
be conducted by Service attorneys.

## RELEASE CRITERIA

In making the determination whether to recommend parole for
a person seeking asylum, the interviewer will determine if the
following criteria have been met:

1.  The person's true identity has been determined with a
reasonable degree of certainty.

2. The allegations in the person's asylum application
---- or, in the case of a person who has requested asylum
upon arrival at a port of entry, the statements made by the
person in support of his or her request for asylum together
with any other evidence available to the APSO --- appear to
be credible and to provide substantial support for the
application or request.

3.  The person does not appear to fall within any of the
following categories:

a.) Any person who ordered, incited, assisted, or
otherwise participated in the persecution of any person
on account of race, religion, nationality, membership
in a particular social group, or political opinion. 8
U.S.C. § 1101(a)(42);

b.) Any person who has been convicted of an aggravated
felony. 8 U.S.C. § 1158(d);

c.) Any person who has been convicted by a final court
judgment of a particularly serious crime in the United
States constituting a danger to the community. 8 C.F.R.
§ 208.14(c)(1);

Parole Project for Asylum Seekers at Ports of Entry and..., 9 Immigration Law...

69 INTERPRETER RELEASES          528          April 27, 1992

Appendix II, continued

d.) Any person who has been firmly resettled within the meaning of § 208.15. 8 C.F.R. § 208.14(c)(2); or

e.) Any person who may be regarded as a danger to the security of the United States. 8 C.F.R. § 208.14(c)(3).

4.   The person has legal representation as defined under 8 C.F.R. § 292.1, and/or a place to live and employment or other means of support.

5.   The person agrees to the following:

a.) to contact the appropriate local INS office each month and to indicate any change in the person's address, employment, or representative; and

b.) to appear for all hearings before the EOIR and/or all interviews with the Service; and

c.) to appear for deportation, if the person is ultimately ordered excluded; and

d.) to report for detention if the person fails to comply with the above requirements, or if the alien is convicted of any felony or three misdemeanors.

If the interviewer has found that the person has met the above criteria, and in the absence of other factors suggesting an unusually strong risk that the person will not appear for further proceedings, the interviewer shall recommend to the district director that the person be paroled.  In cases where the person meets some but not all of the above tests, or where other factors suggest a strong risk that the person will not appear as required, the district director may require the person to post a bond.  Upon review, the district director may determine that exclusion/deportation proceedings should be terminated and the district director may refer the person's case to the asylum office for processing.

The district directors may also continue to grant parole for the reasons set forth in 8 C.F.R. § 212.5.

Gene McNary
Commissioner

Westlaw. © 2021 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

A718

U.S. Department of Homeland Security
Washington, DC 20528



February 20, 2017

MEMORANDUM FOR:    Kevin McAleenan
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Thomas D. Homan
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Lori Scialabba
                   Acting Director
                   U.S. Citizenship and Immigration Services

                   Joseph B. Maher
                   Acting General Counsel

                   Dimple Shah
                   Acting Assistant Secretary for International Affairs

                   Chip Fulghum
                   Acting Undersecretary for Management

FROM:              John Kelly
                   Secretary

SUBJECT:           **Implementing the President's Border Security and
                   Immigration Enforcement Improvements Policies**

This memorandum implements the Executive Order entitled "Border Security and
Immigration Enforcement Improvements," issued by the President on January 25, 2017, which
establishes the President's policy regarding effective border security and immigration
enforcement through faithful execution of the laws of the United States. It implements new
policies designed to stem illegal immigration and facilitate the detection, apprehension, detention,
and removal of aliens who have no lawful basis to enter or remain in the United States. It
constitutes guidance to all Department personnel, and supersedes all existing conflicting policy,
directives, memoranda, and other guidance regarding this subject matter—to the extent of the
conflict—except as otherwise expressly stated in this memorandum.

**A719**

## A. Policies Regarding the Apprehension and Detention of Aliens Described in Section 235 of the Immigration and Nationality Act.

The President has determined that the lawful detention of aliens arriving in the United States and deemed inadmissible or otherwise described in section 235(b) of the Immigration and Nationality Act (INA) pending a final determination of whether to order them removed, including determining eligibility for immigration relief, is the most efficient means by which to enforce the immigration laws at our borders. Detention also prevents such aliens from committing crimes while at large in the United States, ensures that aliens will appear for their removal proceedings, and substantially increases the likelihood that aliens lawfully ordered removed will be removed.

These policies are consistent with INA provisions that mandate detention of such aliens and allow me or my designee to exercise discretionary parole authority pursuant to section 212(d)(5) of the INA only on a case-by-case basis, and only for urgent humanitarian reasons or significant public benefit. Policies that facilitate the release of removable aliens apprehended at and between the ports of entry, which allow them to abscond and fail to appear at their removal hearings, undermine the border security mission. Such policies, collectively referred to as "catch-and-release," shall end.

Accordingly, effective upon my determination of (1) the establishment and deployment of a joint plan with the Department of Justice to surge the deployment of immigration judges and asylum officers to interview and adjudicate claims asserted by recent border entrants; and, (2) the establishment of appropriate processing and detention facilities, U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) personnel should only release from detention an alien detained pursuant to section 235(b) of the INA, who was apprehended or encountered after illegally entering or attempting to illegally enter the United States, in the following situations on a case-by-case basis, to the extent consistent with applicable statutes and regulations:

1.    When removing the alien from the United States pursuant to statute or regulation;

2.    When the alien obtains an order granting relief or protection from removal or the Department of Homeland Security (DHS) determines that the individual is a U.S. citizen, national of the United States, or an alien who is a lawful permanent resident, refugee, asylee, holds temporary protected status, or holds a valid immigration status in the United States;

3.    When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director consents to the alien's withdrawal of an application for admission, and the alien contemporaneously departs from the United States;

4.    When required to do so by statute, or to comply with a binding settlement agreement or order issued by a competent judicial or administrative authority;

2

**A720**

5.      When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director authorizes the alien's parole pursuant to section 212(d)(5) of the INA with the written concurrence of the Deputy Director of ICE or the Deputy Commissioner of CBP, except in exigent circumstances such as medical emergencies where seeking prior approval is not practicable. In those exceptional instances, any such parole will be reported to the Deputy Director or Deputy Commissioner as expeditiously as possible; or

6.      When an arriving alien processed under the expedited removal provisions of section 235(b) has been found to have established a "credible fear" of persecution or torture by an asylum officer or an immigration judge, provided that such an alien affirmatively establishes to the satisfaction of an ICE immigration officer his or her identity, that he or she presents neither a security risk nor a risk of absconding, and provided that he or she agrees to comply with any additional conditions of release imposed by ICE to ensure public safety and appearance at any removal hearings.

To the extent current regulations are inconsistent with this guidance, components will develop or revise regulations as appropriate. Until such regulations are revised or removed, Department officials shall continue to operate according to regulations currently in place.

As the Department works to expand detention capabilities, detention of all such individuals may not be immediately possible, and detention resources should be prioritized based upon potential danger and risk of flight if an individual alien is not detained, and parole determinations will be made in accordance with current regulations and guidance. *See* 8 C.F.R. §§ 212.5, 235.3. This guidance does not prohibit the return of an alien who is arriving on land to the foreign territory contiguous to the United States from which the alien is arriving pending a removal proceeding under section 240 of the INA consistent with the direction of an ICE Field Office Director, ICE Special Agent-in-Charge, CBP Chief Patrol Agent, or CBP Director of Field Operations.

**B. Hiring More CBP Agents/Officers**

CBP has insufficient agents/officers to effectively detect, track, and apprehend all aliens illegally entering the United States. The United States needs additional agents and officers to ensure complete operational control of the border. Accordingly, the Commissioner of CBP shall—while ensuring consistency in training and standards—immediately begin the process of hiring 5,000 additional Border Patrol agents, as well as 500 Air & Marine Agents/Officers, subject to the availability of resources, and take all actions necessary to ensure that such agents/officers enter on duty and are assigned to appropriate duty stations, including providing for the attendant resources and additional personnel necessary to support such agents, as soon as practicable.

Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for

Management, Chief Financial Officer, and Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### C. Identifying and Quantifying Sources of Aid to Mexico

The President has directed the heads of all executive departments to identify and quantify all sources of direct and indirect Federal aid or assistance to the Government of Mexico. Accordingly, the Under Secretary for Management shall identify all sources of direct or indirect aid and assistance, excluding intelligence activities, from every departmental component to the Government of Mexico on an annual basis, for the last five fiscal years, and quantify such aid or assistance. The Under Secretary for Management shall submit a report to me reflecting historic levels of such aid or assistance provided annually within 30 days of the date of this memorandum.

### D. Expansion of the 287(g) Program in the Border Region

Section 287(g) of the INA authorizes me to enter into a written agreement with a state or political subdivision thereof, for the purpose of authorizing qualified officers or employees of the state or subdivision to perform the functions of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States. This grant of authority, known as the 287(g) Program, has been a highly successful force multiplier that authorizes state or local law enforcement personnel to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, transport and conduct searches of an alien for the purposes of enforcing the immigration laws. From January 2006 through September 2015, the 287(g) Program led to the identification of more than 402,000 removable aliens, primarily through encounters at local jails.

Empowering state and local law enforcement agencies to assist in the enforcement of federal immigration law is critical to an effective enforcement strategy. Aliens who engage in criminal conduct are priorities for arrest and removal and will often be encountered by state and local law enforcement officers during the course of their routine duties. It is in the interest of the Department to partner with those state and local jurisdictions through 287(g) agreements to assist in the arrest and removal of criminal aliens.

To maximize participation by state and local jurisdictions in the enforcement of federal immigration law near the southern border, I am directing the Director of ICE and the Commissioner of CBP to engage immediately with all willing and qualified law enforcement jurisdictions that meet all program requirements for the purpose of entering into agreements under 287(g) of the INA.

The Commissioner of CBP and the Director of ICE should consider the operational functions and capabilities of the jurisdictions willing to enter into 287(g) agreements and structure such agreements in a manner that employs the most effective enforcement model for that jurisdiction, including the jail enforcement model, task force officer model, or joint jail enforcement-task force officer model. In furtherance of my direction herein, the Commissioner of

4

CBP is authorized, in addition to the Director of ICE, to accept state services and take other actions as appropriate to carry out immigration enforcement pursuant to 287(g).

### E.  Commissioning a Comprehensive Study of Border Security

The Under Secretary for Management, in consultation with the Commissioner of CBP, Joint Task Force (Border), and Commandant of the Coast Guard, is directed to commission an immediate, comprehensive study of the security of the southern border (air, land and maritime) to identify vulnerabilities and provide recommendations to enhance border security. The study should include all aspects of the current border security environment, including the availability of federal and state resources to develop and implement an effective border security strategy that will achieve complete operational control of the border.

### F.  Border Wall Construction and Funding

A wall along the southern border is necessary to deter and prevent the illegal entry of aliens and is a critical component of the President's overall border security strategy. Congress has authorized the construction of physical barriers and roads at the border to prevent illegal immigration in several statutory provisions, including section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, 8 U.S.C. § 1103 note.

Consistent with the President's Executive Order, the will of Congress and the need to secure the border in the national interest, CBP, in consultation with the appropriate executive departments and agencies, and nongovernmental entities having relevant expertise—and using materials originating in the United States to the maximum extent permitted by law—shall immediately begin planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, along the land border with Mexico in accordance with existing law, in the most appropriate locations and utilizing appropriate materials and technology to most effectively achieve operational control of the border.

The Under Secretary for Management, in consultation with the Commissioner of CBP shall immediately identify and allocate all sources of available funding for the planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, and develop requirements for total ownership cost of this project, including preparing Congressional budget requests for the current fiscal year (e.g., supplemental budget requests) and subsequent fiscal years.

### G.  Expanding Expedited Removal Pursuant to Section 235(b)(1)(A)(iii)(I) of the INA

It is in the national interest to detain and expeditiously remove from the United States aliens apprehended at the border, who have been ordered removed after consideration and denial of their claims for relief or protection. Pursuant to section 235(b)(1)(A)(i) of the INA, if an immigration officer determines that an arriving alien is inadmissible to the United States under

5

section 212(a)(6)(C) or section 212(a)(7) of the INA, the officer shall, consistent with all applicable laws, order the alien removed from the United States without further hearing or review, unless the alien is an unaccompanied alien child as defined in 6 U.S.C. § 279(g)(2), indicates an intention to apply for asylum or a fear of persecution or torture or a fear of return to his or her country, or claims to have a valid immigration status within the United States or to be a citizen or national of the United States.

Pursuant to section 235(b)(1)(A)(iii)(I) of the INA and other provisions of law, I have been granted the authority to apply, by designation in my sole and unreviewable discretion, the expedited removal provisions in section 235(b)(1)(A)(i) and (ii) of the INA to aliens who have not been admitted or paroled into the United States, who are inadmissible to the United States under section 212(a)(6)(C) or section 212(a)(7) of the INA, and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been continuously physically present in the United States for the two-year period immediately prior to the determination of their inadmissibility. To date, this authority has only been exercised to designate for application of expedited removal, aliens encountered within 100 air miles of the border and 14 days of entry, and aliens who arrived in the United States by sea other than at a port of entry.[1]

The surge of illegal immigration at the southern border has overwhelmed federal agencies and resources and has created a significant national security vulnerability to the United States. Thousands of aliens apprehended at the border, placed in removal proceedings, and released from custody have absconded and failed to appear at their removal hearings. Immigration courts are experiencing a historic backlog of removal cases, primarily proceedings under section 240 of the INA for individuals who are not currently detained.

During October 2016 and November 2016, there were 46,184 and 47,215 apprehensions, respectively, between ports of entry on our southern border. In comparison, during October 2015 and November 2015 there were 32,724 and 32,838 apprehensions, respectively, between ports of entry on our southern border. This increase of 10,000–15,000 apprehensions per month has significantly strained DHS resources.

Furthermore, according to EOIR information provided to DHS, there are more than 534,000 cases currently pending on immigration court dockets nationwide—a record high. By contrast, according to some reports, there were nearly 168,000 cases pending at the end of fiscal year (FY) 2004 when section 235(b)(1)(A)(i) was last expanded.[2] This represents an increase of more than 200% in the number of cases pending completion. The average removal case for an alien who is not detained has been pending for more than two years before an immigration judge.[3] In some immigration courts, aliens who are not detained will not have their cases heard by an

---

[1] Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)a(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002); Designating Aliens For Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004); Eliminating Exception to Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4902 (Jan. 17, 2017).

[2] Syracuse University, *Transactional Records Access Clearinghouse (TRAC) Data Research*; available at http://trac.syr.edu/phptools/immigration/court_backlog/.

[3] *Id.*

6

immigration judge for as long as five years. This unacceptable delay affords removable aliens with no plausible claim for relief to remain unlawfully in the United States for many years.

To ensure the prompt removal of aliens apprehended soon after crossing the border illegally, the Department will publish in the *Federal Register* a new Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act, which may, to the extent I determine is appropriate, depart from the limitations set forth in the designation currently in force. I direct the Commissioner of CBP and the Director of ICE to conform the use of expedited removal procedures to the designations made in this notice upon its publication.

## H. Implementing the Provisions of Section 235(b)(2)(C) of the INA to Return Aliens to Contiguous Countries

Section 235(b)(2)(C) of the INA authorizes the Department to return aliens arriving on land from a foreign territory contiguous to the United States, to the territory from which they arrived, pending a formal removal proceeding under section 240 of the INA. When aliens so apprehended do not pose a risk of a subsequent illegal entry or attempted illegal entry, returning them to the foreign contiguous territory from which they arrived, pending the outcome of removal proceedings saves the Department's detention and adjudication resources for other priority aliens.

Accordingly, subject to the requirements of section 1232, Title 8, United States Code, related to unaccompanied alien children and to the extent otherwise consistent with the law and U.S. international treaty obligations, CBP and ICE personnel shall, to the extent appropriate and reasonably practicable, return aliens described in section 235(b)(2)(A) of the INA, who are placed in removal proceedings under section 240 of the INA—and who, consistent with the guidance of an ICE Field Office Director, CBP Chief Patrol Agent, or CBP Director of Field Operations, pose no risk of recidivism—to the territory of the foreign contiguous country from which they arrived pending such removal proceedings.

To facilitate the completion of removal proceedings for aliens so returned to the contiguous country, ICE Field Office Directors, ICE Special Agents-in-Charge, CBP Chief Patrol Agent, and CBP Directors of Field Operations shall make available facilities for such aliens to appear via video teleconference. The Director of ICE and the Commissioner of CBP shall consult with the Director of EOIR to establish a functional, interoperable video teleconference system to ensure maximum capability to conduct video teleconference removal hearings for those aliens so returned to the contiguous country.

## I. Enhancing Asylum Referrals and Credible Fear Determinations Pursuant to Section 235(b)(1) of the INA

With certain exceptions, any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum. For those aliens who are subject

7

to expedited removal under section 235(b) of the INA, aliens who claim a fear of return must be referred to an asylum officer to determine whether they have established a credible fear of persecution or torture.[4] To establish a credible fear of persecution, an alien must demonstrate that there is a "significant possibility" that the alien could establish eligibility for asylum, taking into account the credibility of the statements made by the alien in support of the claim and such other facts as are known to the officer.[5]

The Director of USCIS shall ensure that asylum officers conduct credible fear interviews in a manner that allows the interviewing officer to elicit all relevant information from the alien as is necessary to make a legally sufficient determination. In determining whether the alien has demonstrated a significant possibility that the alien could establish eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, the asylum officer shall consider the statements of the alien and determine the credibility of the alien's statements made in support of his or her claim and shall consider other facts known to the officer, as required by statute.[6]

The asylum officer shall make a positive credible fear finding only after the officer has considered all relevant evidence and determined, based on credible evidence, that the alien has a significant possibility of establishing eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, based on established legal authority.[7]

The Director of USCIS shall also increase the operational capacity of the Fraud Detection and National Security (FDNS) Directorate and continue to strengthen the integration of its operations to support the Field Operations, Refugee, Asylum, and International Operations, and Service Center Operations Directorate, to detect and prevent fraud in the asylum and benefits adjudication processes, and in consultation with the USCIS Office of Policy and Strategy as operationally appropriate.

The Director of USCIS, the Commissioner of CBP, and the Director of ICE shall review fraud detection, deterrence, and prevention measures throughout their respective agencies and provide me with a consolidated report within 90 days of the date of this memorandum regarding fraud vulnerabilities in the asylum and benefits adjudication processes, and propose measures to enhance fraud detection, deterrence, and prevention in these processes.

## J.  Allocation of Resources and Personnel to the Southern Border for Detention of Aliens and Adjudication of Claims

The detention of aliens apprehended at the border is critical to the effective enforcement of the immigration laws. Aliens who are released from custody pending a determination of their removability are highly likely to abscond and fail to attend their removal hearings. Moreover, the screening of credible fear claims by USCIS and adjudication of asylum claims by EOIR at

---

[4] *See* INA § 235(b)(1)(A)-(B); 8 C.F.R. §§ 235.3, 208.30.
[5] *See* INA § 235(b)(1)(B)(v).
[6] *See id.*
[7] *Id.*

8

detention facilities located at or near the point of apprehension will facilitate an expedited resolution of those claims and result in lower detention and transportation costs.

Accordingly, the Director of ICE and the Commissioner of CBP should take all necessary action and allocate all available resources to expand their detention capabilities and capacities at or near the border with Mexico to the greatest extent practicable. CBP shall focus these actions on expansion of "short-term detention" (defined as 72 hours or less under 6 U.S.C. § 211(m)) capability, and ICE will focus these actions on expansion of all other detention capabilities. CBP and ICE should also explore options for joint temporary structures that meet appropriate standards for detention given the length of stay in those facilities.

In addition, to the greatest extent practicable, the Director of USCIS is directed to increase the number of asylum officers and FDNS officers assigned to detention facilities located at or near the border with Mexico to properly and efficiently adjudicate credible fear and reasonable fear claims and to counter asylum-related fraud.

### K.  Proper Use of Parole Authority Pursuant to Section 212(d)(5) of the INA

The authority to parole aliens into the United States is set forth in section 212(d)(5) of the INA, which provides that the Secretary may, in his discretion and on a case-by-case basis, temporarily parole into the United States any alien who is an applicant for admission for urgent humanitarian reasons or significant public benefit. The statutory language authorizes parole in individual cases only where, after careful consideration of the circumstances, it is necessary because of demonstrated urgent humanitarian reasons or significant public benefit. In my judgment, such authority should be exercised sparingly.

The practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration.

Therefore, the Director of USCIS, the Commissioner of CBP, and the Director of ICE shall ensure that, pending the issuance of final regulations clarifying the appropriate use of the parole power, appropriate written policy guidance and training is provided to employees within those agencies exercising parole authority, including advance parole, so that such employees are familiar with the proper exercise of parole under section 212(d)(5) of the INA and exercise such parole authority only on a case-by-case basis, consistent with the law and written policy guidance.

Notwithstanding any other provision of this memorandum, pending my further review and evaluation of the impact of operational changes to implement the Executive Order, and additional guidance on the issue by the Director of ICE, the ICE policy directive establishing standards and procedures for the parole of certain arriving aliens found to have a credible fear of persecution or

torture shall remain in full force and effect.[8] The ICE policy directive shall be implemented in a manner consistent with its plain language. In every case, the burden to establish that his or her release would neither pose a danger to the community, nor a risk of flight remains on the individual alien, and ICE retains ultimate discretion whether it grants parole in a particular case.

## L. Proper Processing and Treatment of Unaccompanied Alien Minors Encountered at the Border

In accordance with section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (codified in part at 8 U.S.C. § 1232) and section 462 of the Homeland Security Act of 2002 (6 U.S.C. § 279), unaccompanied alien children are provided special protections to ensure that they are properly processed and receive the appropriate care and placement when they are encountered by an immigration officer. An unaccompanied alien child, as defined in section 279(g)(2), Title 6, United States Code, is an alien who has no lawful immigration status in the United States, has not attained 18 years of age; and with respect to whom, (1) there is no parent or legal guardian in the United States, or (2) no parent of legal guardian in the United States is available to provide care and physical custody.

Approximately 155,000 unaccompanied alien children have been apprehended at the southern border in the last three years. Most of these minors are from El Salvador, Honduras, and Guatemala, many of whom travel overland to the southern border with the assistance of a smuggler who is paid several thousand dollars by one or both parents, who reside illegally in the United States.

With limited exceptions, upon apprehension, CBP or ICE must promptly determine if a child meets the definition of an "unaccompanied alien child" and, if so, the child must be transferred to the custody of the Office of Refugee Resettlement within the Department of Health and Human Services (HHS) within 72 hours, absent exceptional circumstances.[9] The determination that the child is an "unaccompanied alien child" entitles the child to special protections, including placement in a suitable care facility, access to social services, removal proceedings before an immigration judge under section 240 of the INA, rather than expedited removal proceedings under section 235(b) of the INA, and initial adjudication of any asylum claim by USCIS.[10]

Approximately 60% of minors initially determined to be "unaccompanied alien children" are placed in the care of one or more parents illegally residing in the United States. However, by Department policy and practice, such minors maintained their status as "unaccompanied alien children," notwithstanding that they may no longer meet the statutory definition once they have been placed by HHS in the custody of a parent in the United States who can care for the minor. Exploitation of that policy led to abuses by many of the parents and legal guardians of those minors and has contributed to significant administrative delays in adjudications by immigration

---

[8] ICE Policy No. 11002.1: Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009).

[9] *See* 8 U.S.C. § 1232(b)(3).

[10] *See generally* 8 U.S.C. § 1232; INA § 208(b)(3)(C).

10

courts and USCIS.

To ensure identification of abuses and the processing of unaccompanied alien children consistent with the statutory framework and any applicable court order, the Director of USCIS, the Commissioner of CBP, and the Director of ICE are directed to develop uniform written guidance and training for all employees and contractors of those agencies regarding the proper processing of unaccompanied alien children, the timely and fair adjudication of their claims for relief from removal, and, if appropriate, their safe repatriation at the conclusion of removal proceedings. In developing such guidance and training, they shall establish standardized review procedures to confirm that alien children who are initially determined to be "unaccompanied alien child[ren]," as defined in section 279(g)(2), Title 6, United States Code, continue to fall within the statutory definition when being considered for the legal protections afforded to such children as they go through the removal process.

### M. Accountability Measures to Protect Alien Children from Exploitation and Prevent Abuses of Our Immigration Laws

Although the Department's personnel must process unaccompanied alien children pursuant to the requirements described above, we have an obligation to ensure that those who conspire to violate our immigration laws do not do so with impunity—particularly in light of the unique vulnerabilities of alien children who are smuggled or trafficked into the United States.

The parents and family members of these children, who are often illegally present in the United States, often pay smugglers several thousand dollars to bring their children into this country. Tragically, many of these children fall victim to robbery, extortion, kidnapping, sexual assault, and other crimes of violence by the smugglers and other criminal elements along the dangerous journey through Mexico to the United States. Regardless of the desires for family reunification, or conditions in other countries, the smuggling or trafficking of alien children is intolerable.

Accordingly, the Director of ICE and the Commissioner of CBP shall ensure the proper enforcement of our immigration laws against any individual who—directly or indirectly—facilitates the illegal smuggling or trafficking of an alien child into the United States. In appropriate cases, taking into account the risk of harm to the child from the specific smuggling or trafficking activity that the individual facilitated and other factors relevant to the individual's culpability and the child's welfare, proper enforcement includes (but is not limited to) placing any such individual who is a removable alien into removal proceedings, or referring the individual for criminal prosecution.

### N. Prioritizing Criminal Prosecutions for Immigration Offenses Committed at the Border

The surge of illegal immigration at the southern border has produced a significant increase in organized criminal activity in the border region. Mexican drug cartels, Central American gangs, and other violent transnational criminal organizations have established sophisticated criminal

11

enterprises on both sides of the border. The large-scale movement of Central Americans, Mexicans, and other foreign nationals into the border area has significantly strained federal agencies and resources dedicated to border security. These criminal organizations have monopolized the human trafficking, human smuggling, and drug trafficking trades in the border region.

It is in the national interest of the United States to prevent criminals and criminal organizations from destabilizing border security through the proliferation of illicit transactions and violence perpetrated by criminal organizations.

To counter this substantial and ongoing threat to the security of the southern border— including threats to our maritime border and the approaches—the Directors of the Joint Task Forces-West, -East, and -Investigations, as well as the ICE-led Border Enforcement Security Task Forces (BESTs), are directed to plan and implement enhanced counternetwork operations directed at disrupting transnational criminal organizations, focused on those involved in human smuggling. The Department will support this work through the Office of Intelligence and Analysis, CBP's National Targeting Center, and the DHS Human Smuggling Cell.

In addition, the task forces should include participants from other federal, state, and local agencies, and should target individuals and organizations whose criminal conduct undermines border security or the integrity of the immigration system, including offenses related to alien smuggling or trafficking, drug trafficking, illegal entry and reentry, visa fraud, identity theft, unlawful possession or use of official documents, and acts of violence committed against persons or property at or near the border.

In order to support the efforts of the BESTs and counter network operations of the Joint Task Forces, the Director of ICE shall increase of the number of special agents and analysts in the Northern Triangle ICE Attaché Offices and increase the number of vetted Transnational Criminal Investigative Unit international partners. This expansion of ICE's international footprint will focus both domestic and international efforts to dismantle transnational criminal organizations that are facilitating and profiting from the smuggling routes to the United States.

**O. Public Reporting of Border Apprehensions Data**

The Department has an obligation to perform its mission in a transparent and forthright manner. The public is entitled to know, with a reasonable degree of detail, information pertaining to the aliens unlawfully entering at our borders.

Therefore, consistent with law, in an effort to promote transparency and renew confidence in the Department's border security mission, the Commissioner of CBP and the Director of ICE shall develop a standardized method for public reporting of statistical data regarding aliens apprehended at or near the border for violating the immigration law. The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public in a medium that can be readily accessed.

At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following information must be included: the number of convicted criminals and the nature of their offenses; the prevalence of gang members and prior immigration violators; the custody status of aliens and, if released, the reason for release and location of that release; and the number of aliens ordered removed and those aliens physically removed.

**P.  No Private Right of Action**

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing this guidance, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

13

Office of Enforcement and Removal Operations

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

February 21, 2017

MEMORANDUM FOR:    All ERO Employees

FROM:    Matthew T. Albence
Executive Associate Director

SUBJECT:    Implementing the President's Border Security and Interior
Immigration Enforcement Policies

On February 21, 2017, Secretary Kelly issued the attached memoranda, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies," and "Enforcement of the Immigration Laws to Serve the National Interest." These new polices outline the role of the Department of Homeland Security (DHS) in the implementation of Executive Order (E.O.) 13767, "Border Security and Immigration Enforcement Improvements," 82 Fed. Reg. 8793 (Jan. 25, 2017), and E.O. 13768, "Enhancing Public Safety in the Interior of the United States," 82 Fed. Reg. 8799 (Jan. 25, 2017). Effective immediately, Enforcement and Removal Operations (ERO) will implement this direction from the Secretary, with particular guidance as set forth below.

Additionally, U.S. Immigration and Customs Enforcement (ICE) is reviewing all existing policies and guidance documents and will revise or rescind relevant policies in order to ensure consistency with the E.O.[1]

### A. Enforcement Policy

Effective immediately, ERO officers will take enforcement action against all removable aliens encountered in the course of their duties. As always, ERO officers must make an individualized custody determination in every case, prioritizing detention resources on aliens subject to expedited removal and aliens removable on any criminal ground, security or related ground, or for grounds related to fraud or material misrepresentation. Under the terms of the E.O., DHS will no longer exempt classes or categories of removable aliens from potential enforcement.

Additionally, regardless of the basis of removability, ERO officers should prioritize efforts to remove aliens who:

---

[1] With the exception of the June 15, 2012 memo, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," and the November 20, 2014 memo, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents."

FOR OFFICIAL USE ONLY

Subject: Implementing the President's Border Security and Interior Immigration
       Enforcement Policies

(1) Have been convicted of any criminal offense;
(2) Have been charged with any criminal offense that has not been resolved;
(3) Have committed acts which constitute a chargeable criminal offense;
(4) Have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency;
(5) Have abused any program related to receipt of public benefits;
(6) Are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or
(7) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

Aliens listed above do not necessarily have to be placed in removal proceedings based on a criminal ground of inadmissibility or removability. Instead, ERO officers should prioritize individuals within the above priorities for removal proceedings based on any lawfully available removal grounds.

## B. Detention Policy

The agency is currently expanding detention space to support the E.O.'s termination of "catch-and-release" policies.[2] ERO will work to detain aliens pending a final determination of whether they will be removed from the United States, including a determination regarding eligibility for immigration relief and protection. ERO officers should only release from detention an alien detained pursuant to section 235(b) of the Immigration and Nationality Act (INA) on a case-by-case basis, in accordance with applicable statues and regulations, in the following situations:

(1) When removing the alien from the United States pursuant to statute or regulation;
(2) When the alien obtains an order granting relief or protection from removal or DHS determines that the individual is a U.S. citizen, national of the United States, or an alien who is a lawful permanent resident, refugee, asylee, holds temporary protected status, or holds a valid immigration status in the United States;
(3) A Field Office Director consents to the alien's withdrawal of an application for admission, and the alien contemporaneously departs from the United States;
(4) When required to do so by statute, or to comply with a binding settlement agreement or order issued by a competent judicial or administrative authority;
(5) A Field Office Director authorizes the alien's parole pursuant to section 212(d)(5) of the INA with the written concurrence of the Deputy Director of ICE, except in exigent circumstances such as medical emergencies where seeking prior approval is not practicable. In those exceptional instances, any such parole will be reported to the Deputy Director as expeditiously as possible; or
(6) When an arriving alien processed under the expedited removal provisions of section

---

[2] The implementation of this provision may be dependent upon the deployment of a surge of immigration judges and asylum officers and the acquisition of additional detention space, as determined by the Secretary.

FOR OFFICIAL USE ONLY
**A733**

Subject: Implementing the President's Border Security and Interior Immigration
Enforcement Policies

235(b) has been found to have established a "credible fear" of persecution or torture by
an asylum officer or an immigration judge, provided that such an alien affirmatively
establishes to the satisfaction of an immigration officer his or her identity, that he or she
presents neither a security risk nor a risk of absconding, and provided that he or she
agrees to comply with any additional conditions of release imposed to ensure public
safety and appearance at any removal hearings.

As the agency works to expand its detention capacity, detention of all such individuals may not
be possible. Detention resources should be prioritized based upon potential danger and risk of
flight if an individual alien is not detained.

### C. Release and Parole Policy

ERO officers should process requests for parole or other release sparingly, and only in individual
cases where, after careful consideration of the circumstances, the officer believes that the release
would serve the best interests of the United States because of demonstrated urgent humanitarian
reasons or significant public benefit. Parole or other release, with all available safeguards, may
also be warranted in instances where detention capacity limits the agency's ability to detain the
alien consistent with legal requirements, including court orders and settlement agreements.

Agency policy establishing standards and procedures for the parole of certain arriving aliens
found to have a credible fear of persecution or torture will remain in full force and effect until
further evaluation is completed and additional guidance is issued.[3] ERO officers are reminded,
however, to apply ICE policy consistent with its plain language, and to ensure that the alien is
held to his or her burden of establishing identity and that his or her release will not pose a danger
or risk of flight. There is no presumption that an individual alien's release would not pose a
danger or risk of flight.

### D. Processing and Treatment of Unaccompanied Alien Minors

ERO officers will continue to comply with the requirements of the William Wilberforce
Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) and the *Flores* Settlement
Agreement, including all implementing policies and procedures, to ensure that all children,
including unaccompanied alien children, are provided special protections to ensure that they are
properly processed and receive appropriate care and placement when they are encountered by
DHS officers and agents. Mexican and Canadian unaccompanied alien children may be
permitted to withdraw their application for admission and return to Mexico or Canada after
proper coordination with the Mexican or Canadian Consulate has been completed.

---

[3] Current agency policy is set forth in ICE Policy No. 11002.1: Parole of Arriving Aliens Found to Have a Credible
Fear of Persecution or Torture, dated December 8, 2009, which is available here. The policy is implicated by
pending litigation before the U.S. Supreme Court in *Jennings v. Rodriguez*, No. 15-1204, and as noted in the
Secretary's February 17, 2017 memorandum, "Implementing the President's Border Security and Immigration
Enforcement Improvements Policies," is subject to further review and evaluation pending ongoing implementation
of Executive Order 13767.

FOR OFFICIAL USE ONLY

Subject: Implementing the President's Border Security and Interior Immigration
Enforcement Policies

Unaccompanied alien children who are permitted to withdraw may be repatriated at the nearest
port of entry to Mexican or Canadian Consulate officials at a time designated by the consulate
official.

### E. No Private Right of Action

This document provides only internal ICE policy guidance, which may be modified, rescinded,
or superseded at any time without notice. This guidance is not intended to, does not, and may
not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by
any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by
this guidance on the otherwise lawful enforcement or litigation prerogatives of ICE.

In implementing these policies, I direct all ERO employees to consult with legal counsel through
proper chain of command, to ensure compliance with all applicable laws, including the
Administrative Procedure Act.

FOR OFFICIAL USE ONLY

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture**

| | |
|---|---|
| **DISTRIBUTION:** | **ICE** |
| **DIRECTIVE NO.:** | **11002.1** |
| **ISSUE DATE:** | **December 8, 2009** |
| **EFFECTIVE DATE:** | **January 4, 2010** |
| **SUPERSEDES:** | **See section 3.** |
| **FEA NUMBER:** | **601-05** |

1.    **PURPOSE.** The purpose of this ICE policy directive is to ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States. This directive provides guidance to Detention and Removal Operations (DRO) Field Office personnel for exercising their discretion to consider the parole of arriving aliens processed under the expedited removal provisions of section 235 of the Immigration and Nationality Act (INA) who have been found to have a "credible fear" of persecution or torture by U.S. Citizenship and Immigration Services (USCIS) or an immigration judge of the Executive Office for Immigration Review. This directive establishes a quality assurance process that includes record-keeping requirements to ensure accountability and compliance with the procedures set forth herein.

1.1.    This directive does not apply to aliens in DRO custody under INA § 236. This directive applies only to arriving aliens who have been found by USCIS or an immigration judge to have a credible fear of persecution or torture.

2.    **AUTHORITIES/REFERENCES.**

2.1.    INA §§ 208, 212(d)(5), 235(b), and 241(b)(3); 8 U.S.C. §§ 1158, 1182(d)(5), 1225(b), and 1231(b)(3); 8 C.F.R. §§ 1.1(q), 208.30(e)-(f), 212.5 and 235.3.

2.2.    Department of Homeland Security Delegation Number 7030.2, "Delegation of Authority to the Assistant Secretary for the Bureau of Immigration and Custom Enforcement" (Nov. 13, 2004).

2.3.    ICE Delegations of Authority to the Directors, Detention and Removal and Investigations and to Field Office Directors, Special Agents in Charge and Certain Other Officers of the Bureau of Immigration and Customs Enforcement, No. 0001 (June 6, 2003).

3.    **SUPERSEDED POLICIES AND GUIDANCE.** The following ICE directive is hereby superseded:

3.1.    ICE Policy Directive No. 7-1.0, "Parole of Arriving Aliens Found to Have a 'Credible Fear' of Persecution or Torture" (Nov. 6, 2007).

4.     **BACKGROUND.**

4.1.     Arriving aliens processed under the expedited removal provisions of INA §235(b) may pursue asylum and related forms of protection from removal if they successfully demonstrate to USCIS or an immigration judge a credible fear of persecution or torture.

4.2.     Arriving aliens who establish a credible fear of persecution or torture are to be detained for further consideration of the application for asylum.  INA § 235(b)(1)(B)(ii).  Such aliens, however, may be paroled on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding.  8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c) (providing that aliens referred for INA § 240 removal proceedings, including those who have a credible fear of persecution or torture, may be paroled under § 212.5(b) standards).

4.3.     The applicable regulations describe five categories of aliens who may meet the parole standards based on a case-by-case determination, provided they do not present a flight risk or security risk:  (1) aliens who have serious medical conditions, where continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; and (5) aliens whose continued detention is not in the public interest.  *See* 8 C.F.R. § 212.5(b).  *But compare* 8 C.F.R. § 235.3(b)(4)(ii) (stating that arriving aliens who have not been determined to have a credible fear will not be paroled unless parole is necessary in light of a "medical emergency or is necessary for a legitimate law enforcement objective").

4.4.     While the first four of these categories are largely self-explanatory, the term "public interest" is open to considerable interpretation.  This directive explains how the term is to be interpreted by DRO when it decides whether to parole arriving aliens determined to have a credible fear.  The directive also mandates uniform record-keeping and review requirements for such decisions.  Parole remains an inherently discretionary determination entrusted to the agency; this directive serves to guide the exercise of that discretion.

5.     **DEFINITIONS:**

5.1.     **Arriving Alien.**  For purposes of this directive, "arriving alien" has the same definition as provided for in 8 C.F.R. § 1.1(q) and 1001.1(q).

5.2.     **Credible Fear.**  For purposes of this directive, with respect to an alien processed under the INA § 235(b) "expedited removal" provisions, "credible fear" means a finding by USCIS or an immigration judge that, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts

2

as are known to the interviewing USCIS officer or immigration judge, there is a significant possibility that alien could establish eligibility for asylum under INA § 208, withholding of removal under INA § 241(b)(3), or protection from removal under the Convention Against Torture.

5.3.    **Parole.** For purposes of this directive, "parole" is an administrative measure used by ICE to temporarily authorize the release from immigration detention of an inadmissible arriving alien found to have a credible fear of persecution or torture, without lawfully admitting the alien. Parole does not constitute a lawful admission or a determination of admissibility, *see* INA §§ 212(d)(5)(A), 101(a)(13)(B), and reasonable conditions may be imposed on the parole, *see* 8 C.F.R. § 212.5(d). By statute, parole may be used, in the discretion of ICE and under such conditions as ICE may prescribe, only for urgent humanitarian reasons or for significant public benefit. As interpreted by regulation, "urgent humanitarian reasons" and "significant public benefit" include the five categories set forth in 8 C.F.R. § 212.5(b) and listed in paragraph 4.3 of this directive, including the general category of "aliens whose continued detention is not in the public interest."

## 6.    POLICY.

6.1.    As soon as practicable following a credible fear determination by USCIS for an arriving alien detained by DRO, DRO shall provide the alien with the attached *Parole Advisal and Scheduling Notification*. This form informs the alien that he or she will be interviewed for potential parole from DRO custody and notifies the alien of the date of the scheduled interview and the deadline for submitting any documentary material supporting his or her eligibility for parole. The contents of the notification shall be explained to such aliens in a language they understand. In determining whether detained arriving aliens found to have a credible fear should be paroled from custody, DRO shall proceed in accordance with the terms of this directive.

6.2.    Each alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case. However, when an arriving alien found to have a credible fear establishes to the satisfaction of DRO his or her identity and that he or she presents neither a flight risk nor danger to the community, DRO should, absent additional factors (as described in paragraph 8.3 of this directive), parole the alien on the basis that his or her continued detention is not in the public interest. DRO Field Offices shall uniformly document their parole decision-making processes using the attached *Record of Determination/Parole Determination Worksheet*.

6.3.    Consistent with the terms of this directive, DRO shall maintain national and local statistics on parole determinations and have a quality assurance process in place to monitor parole decision-making, as provided for in sections 7 and 8 of this directive.

3

Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture

6.4.   In conducting parole determinations for arriving aliens in custody after they are found to have a credible fear of persecution or torture, DRO shall follow the procedures set forth in section 8 of this directive.

6.5.   DRO shall provide every alien subject to this directive with written notification of the parole decision, including a brief explanation of the reasons for any decision to deny parole. When DRO denies parole under this directive, it should also advise the alien that he or she may request redetermination of this decision based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding. DRO shall ensure reasonable access to translation or interpreter services if notification is provided to the alien in a language other than his or her native language and the alien cannot communicate effectively in that language.

6.6.   Written notifications of parole decisions shall be provided to aliens subject to this directive and, if represented, their representative within seven days of the date an alien is initially interviewed for parole or the date the alien requests a parole redetermination, absent reasonable justification for delay in providing such notification.

6.7.   A decision to grant or deny parole shall be prepared by a DRO officer assigned such duties within his or her respective DRO Field Office. The decision shall pass through at least one level of supervisory review, and concurrence must be finally approved by the Field Office Director (FOD), Deputy FOD (DFOD), or Assistant FOD (AFOD), where authorized by the FOD.

7.   **RESPONSIBILITIES.**

7.1.   The **DRO Director** is responsible for the overall management of the parole decision-making process for arriving aliens in DRO custody following determinations that they have a credible fear of persecution or torture.

7.2.   The **DRO Assistant Director for Operations** is responsible for:

1)  Ensuring considered, consistent DRO parole decision-making and recordkeeping nationwide in cases of arriving aliens found to have a credible fear;

2)  Overseeing monthly tracking of parole statistics by all DRO Field Offices for such cases; and

3)  Overseeing an effective national quality assurance program that monitors the Field Offices to ensure compliance with this directive.

7.3.   **DRO Field Office Directors** are responsible for:

1)  Implementing this policy and quality assurance processes;

4

2) Maintaining a log of parole adjudications for credible fear cases within their respective geographic areas of responsibility, including copies of the *Record of Determination/Parole Determination Worksheet*;

3) Providing monthly statistical reports on parole decisions for arriving aliens found to have a credible fear;

4) Making the final decision to grant or deny parole for arriving aliens found to have a credible fear within their respective areas of responsibility or, alternatively, delegating such responsibility to their DFODs or AFODs (in which case, FODs nevertheless retain overall responsibility for their office's compliance with this directive regardless of delegating signatory responsibility to DFODs or AFODs); and

5) Ensuring that DRO field personnel within their respective areas of responsibility who will be assigned to make parole determinations are familiar with this directive and corresponding legal authorities.

7.4.    **DRO Deputy Field Office Directors** are responsible for reviewing, and forwarding for their respective FODs' approval, parole decisions prepared by their subordinates in the cases of arriving aliens found to have a credible fear of persecution or torture. Alternatively, DFODs delegated responsibility under paragraph 7.3 of this directive are responsible for discharging final decision-making authority over parole determinations in such cases within their respective areas of responsibility.

7.5.    **Assistant Field Office Directors** are responsible for reviewing, and forwarding for their respective DFODs' or FODs' approval, parole decisions prepared by their subordinates in the cases of arriving aliens found to have a credible fear of persecution or torture. Alternatively, AFODs delegated responsibility under paragraph 7.3 of this directive are responsible for discharging final decision-making authority over parole determinations in such cases within their respective areas of responsibility.

7.6.    As applicable, **DRO field personnel** so assigned by their local chains-of-command are responsible for providing detained arriving aliens found to have a credible fear with the attached *Parole Advisal and Scheduling Notification* and for fully and accurately completing the attached *Record of Determination/Parole Determination Worksheet* in accordance with this directive and corresponding legal authorities.

8.    **PROCEDURES.**

8.1.    As soon as practicable following a finding that an arriving alien has a credible fear, the DRO Field Office with custody of the alien shall provide the attached *Parole Advisal and Scheduling Notification* to the alien and explain the contents of the notification to the alien in a language he or she understands, through an interpreter if

5

necessary. The Field Office will complete the relevant portions of the notification, indicating the time when the alien will receive an initial interview on his or her eligibility for parole and the date by which any documentary evidence the alien wishes considered should be provided, as well as instructions for how any such information should be provided.

8.2     Unless an additional reasonable period of time is necessary (e.g., due to operational exigencies or an alien's illness or request for additional time to obtain documentation), no later than seven days following a finding that an arriving alien has a credible fear, a DRO officer familiar with the requirements of this directive and corresponding legal authorities must conduct an interview with the alien to assess his or her eligibility for parole. Within that same period, the officer must complete the *Record of Determination/Parole Determination Worksheet* and submit it for supervisory review. If the officer concludes that parole should be denied, the officer should draft a letter to this effect for the FOD's, DFOD's, or AFOD's signature to be provided to the alien or the alien's representative and forward this letter for supervisory review along with the completed *Record of Determination/Parole Determination Worksheet*. The letter must include a brief explanation of the reasons for denying parole and notify the alien that he or she may request redetermination of parole based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding.

8.3.    An alien should be paroled under this directive if DRO determines, in accordance with paragraphs (1) through (4) below, that the alien's identity is sufficiently established, the alien poses neither a flight risk nor a danger to the community, and no additional factors weigh against release of the alien.

   1) Identity.

      a) Although many individuals who arrive in the United States fleeing persecution or torture may understandably lack valid identity documentation, asylum-related fraud is of genuine concern to ICE, and DRO must be satisfied that an alien is who he or she claims to be before releasing the alien from custody.

      b) When considering parole requests by an arriving alien found to have a credible fear, Field Office personnel must review all relevant documentation offered by the alien, as well as any other information available about the alien, to determine whether the alien can reasonably establish his or her identity.

      c) If an alien lacks valid government-issued documents that support his or her assertion of identity, Field Office personnel should ask whether the alien can obtain government-issued documentation of identity.

6

d) If the alien cannot reasonably provide valid government-issued evidence of identity (including because the alien reasonably does not wish to alert that government to his or her whereabouts), the alien can provide for consideration sworn affidavits from third parties. However, third-party affiants must include copies of valid, government issued photo-identification documents and fully establish their own identities and addresses.

e) If government-issued documentation of identity or third-party affidavits from reliable affiants are either not available or insufficient to establish the alien's identity on their own, Field Office personnel should explore whether the alien is otherwise able to establish his or her identity through credible statements such that there are no substantial reasons to doubt the alien's identity.

2) Flight Risk.

a) In order to be considered for release, an alien determined to have a credible fear of persecution or torture must present sufficient evidence demonstrating his or her likelihood of appearing when required.

b) Factors appropriate for consideration in determining whether an alien has made the required showing include, but are not limited to, community and family ties, employment history, manner of entry and length of residence in the United States, stability of residence in the United States, record of appearance for prior court hearings and compliance with past reporting requirements, prior immigration and criminal history, ability to post bond, property ownership, and possible relief or protection from removal available to the alien.

c) Field Office personnel shall consider whether setting a reasonable bond and/or entering the alien in an alternative-to-detention program would provide reasonable assurances that the alien will appear at all hearings and depart from the United States when required to do so.

d) Officers should exercise their discretion to determine what reasonable assurances, individually or in combination, are warranted on a case-by-case basis to mitigate flight risk. In any event, the alien must be able to provide an address where he or she will be residing and must timely advise DRO of any change of address.

7

3) Danger to the Community.

    a) In order for an alien to be considered for parole, Field Office personnel must make a determination whether an alien found to have a credible fear poses a danger to the community or to U.S. national security.

    b) Information germane to the determination includes, but is not limited to, evidence of past criminal activity in the United States or abroad, of activity contrary to U.S. national security interests, of other activity giving rise to concerns of public safety or danger to the community (including due to serious mental illness), disciplinary infractions or incident reports, and any criminal or detention history that shows that the alien has harmed or would likely harm himself or herself or others.

    c) Any evidence of rehabilitation also should be weighed.

4) Additional Factors.

    a) Because parole remains an inherently discretionary decision, in some cases there may be exceptional, overriding factors that should be considered in addition to the three factors discussed above. Such factors may include, but are not limited to, serious adverse foreign policy consequences that may result if the alien is released or overriding law enforcement interests.

    b) Field Office personnel may consider such additional factors during the parole decision-making process.

8.4.    Assigned DRO officers should, where appropriate, request that parole applicants provide any supplementary information that would aid the officers in reaching a decision. The *Record of Determination/Parole Determination Worksheet* should be annotated to document the request for supplementary information and any response from the detainee.

8.5.    After preparing and signing the *Record of Determination/Parole Determination Worksheet*, and in the case of a denial of parole, drafting a written response to the alien, the assigned DRO officer shall forward these materials and the parole request documentation to his or her first-line supervisor for review and concurrence.

8.6.    Upon his or her concurrence, the first-line supervisor shall sign the *Record of Determination/Parole Determination Worksheet* where indicated and forward it, along with any related documentation, to the FOD (or, where applicable, the DFOD or AFOD) for final approval.

8.7.    The FOD (or, where applicable, the DFOD or AFOD) shall review the parole documentation, consult with the preparing officer and supervisor as necessary, and

8

either grant or deny parole by signing the *Record of Determination/Parole Determination Worksheet* where indicated and, in the case of a denial, signing the written response to the alien.

8.8.   Following a final decision by the FOD to deny parole (or, where applicable, the DFOD or AFOD), the Field Office shall provide the written response to the alien or, if represented, to the alien's legal representative, indicating that parole was denied. If parole is granted, the Field Office shall provide the alien with a date-stamped I-94 Form bearing the following notation: **"Paroled under 8 C.F.R. § 212.5(b). Employment authorization not to be provided on this basis."**

8.9.   If an alien makes a written request for redetermination of an earlier decision denying parole, the Field Office may, in its discretion, reinterview the alien or consider the request based solely on documentary material already provided or otherwise of record.

8.10.   The supporting documents and a copy of the parole decision sent to the alien (if applicable), the completed *Record of Determination/Parole Determination Worksheet*, and any other documents related to the parole adjudication should be placed in the alien's A-file in a record of proceeding format. In addition, a copy of the *Record of Determination/Parole Determination Worksheet* shall be stored and maintained under the authority of the FOD for use in preparing monthly reports.

8.11.   On a monthly basis, FODs shall submit reports to the Assistant Director for Operations, or his or her designee, detailing the number of parole adjudications conducted under this directive within their respective areas of responsibility, the results of those adjudications, and the underlying basis of each Field Office decision whether to grant or deny parole. The Assistant Director for Operations, or his or her designee, in conjunction with appropriate DRO Headquarters components, will analyze this reporting and collect individual case information to review in more detail, as warranted. In particular, this analysis will rely on random sampling of all reported cases for in-depth review and will include particular emphasis on cases where parole was not granted because of the presence of additional factors, per paragraph 8.3(4) of this directive. Any significant or recurring deficiencies identified during this monthly analysis should be explained to the affected Field Office, which will take appropriate corrective action.

8.12.   At least once every six months, the Assistant Director for Operations, or his or her designee, shall prepare a thorough and objective quality assurance report, examining the rate at which paroled aliens abscond and the Field Offices' parole decision-making, including any noteworthy trends or corrective measures undertaken based upon the monthly quality assurance analysis required by paragraph 8.11 of this directive.

9

9.    **ATTACHMENTS.**

- *Parole Advisal and Scheduling Notification.*
- *Record of Determination/Parole Determination Worksheet.*

10.   **NO PRIVATE RIGHTS CREATED.** This directive is an internal policy statement of ICE. It is not intended to, shall not be construed to, may not be relied upon to, and does not create, any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

**Approved:**    _____

John Morton
Assistant Secretary
U.S. Immigration and Customs Enforcement

Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture

**A745**



U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536



U.S. Immigration
and Customs
Enforcement

**JAN 1 1 2005**

MEMORANDUM FOR:     ALL SPECIAL AGENTS IN CHARGE
                    ALL FIELD OFFICE DIRECTORS

FROM                Marcy M. Forman
                    Director
                    Office of Investigations

                    Victor X. Cerda
                    Acting Director
                    Detention and Removal Operations

SUBJECT:            ICE Transportation, Detention and Processing Requirements

The attached memorandum dated October 18, 2004, from Border and Transportation Under
Secretary Asa Hutchinson entitled *"Detention Prioritization and Notice to Appear
Documentary Requirements"* is re-circulated with this guidance. This memorandum applies to
all components within US Immigration and Customs Enforcement (ICE).

To assist the field locations in implementation of the aforementioned memorandum, the Office
of Investigations (OI) and the Office of Detention and Removal Operations (DRO) are
providing this joint guidance to the Special Agents in Charge (SAC) and Field Office Directors
(FOD).

The following guidance will assist the SACs and FODs while conducting immigration
enforcement operations:

- The arresting office is responsible to ensure all aliens in ICE custody are served with
  appropriate processing papers that will facilitate the most expedient removal process
  (i.e. stipulated removal, reinstatement, administrative, expedited, notice to appear) as
  soon as possible after being taken into custody, but no longer than forty-eight (48)
  hours in the absence of exceptional circumstances.

- OI and DRO personnel will notify their respective management when a detained alien
  has not been processed/served within 48 hours of being in Immigration and Customs
  Enforcement (ICE) custody. The SAC/FOD or designee will ensure that the aliens are
  processed and served immediately. **All aliens will be served in an expeditious
  manner.**

FOR OFFICIAL USE ONLY
LAW E xxxxxxxxxxxxxxx NSITIVE

www.ice.gov

 



- DRO will continue to provide the transportation support to OI of aliens prior to processing, from jails, roadside smuggling loads, drop houses and other significant enforcement operations as conducted in past local procedures. SACs and FODs should ensure proper communication and understanding of the local level of transportation support.

- DRO does not have the legal authority to transport United States Citizens (USCs) or Lawfully Admitted Permanent Residents (LAPRs) for criminal proceedings. However, DRO will transport LAPRs and/or illegal aliens that may be presented as material witnesses, after they have been processed for a Notice To Appear (NTA). DRO will not detain an alien solely on the basis of a material witness warrant. If such is occurring, both the SAC and FOD should address this issue with the local U.S. Attorney's Office.

- Should the FOD or designee determine that an alien, categorized as a Mandatory Detention or High Priority #1-6 detention, as described on page 2 of the attached memorandum *"Detention Prioritization and Notice to Appear Documentary Requirements"*, be released at the time of processing, the DRO office will provide a written denial to the SAC for inclusion in the alien's A-File. This should only occur when the national bed space population is at capacity and such situation should be reported by the FOD to HQDRO prior to such release.



- The A-file should be completed and accompany the aliens when they are turned over to DRO or with the least possible delay. If the A-file is not available or the A-file needs to be retained for prosecution purposes, the processing agent will create a temporary file (T-file), which will include the original NTA and copies of all other required documentation for DRO use and tracking. T-Files should be used in extremely limited circumstances.

- In the event that the Judgment & Conviction (J&C) documents are necessary for an alien's removal hearing and are unavailable when the A-file is transferred to DRO, the processing agent must ensure that the J&C documents have been requested by annotating the request in the A-file. The processing agent is responsible for ensuring that the J&Cs are forwarded to DRO for inclusion in the A-File in a timely manner.

OI & DRO Headquarters staffs are working together to ensure uniformity and that a spirit of cooperation exists during this transition period. It should be emphasized however that local communication and coordination between SAC and FOD offices should occur to ensure proper implementation and monitoring of these requirements.

Attachment

FOR [xxxxxxxxxxxxx] ONLY
LAW EN[                ]NSITIVE


**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPS (DDP) 50/10-C

*Office of the Executive Associate Commissioner*     *425 I Street NW*
*Washington, DC 20536*

OCT - 7 1998

MEMORANDUM FOR REGIONAL DIRECTORS

FROM:        Michael A. Pearson
             Executive Associate Commissioner
             Office of Field Operations

SUBJECT:     Detention Guidelines Effective October 9, 1998

As you know, the Immigration and Naturalization Service (INS) supported a legislative proposal for extension of the Transition Period Custody Rules (TPCR). This extension will allow us to continue the exercise of discretion in custody determinations. However, we expect that it will be some time before this discretion is granted with the result that as of October 9, 1998, TPCR discretionary authority will no longer be in effect. Attached with this memorandum are the detention guidelines which will be in effect as of October 9.

I recognize that 100 percent compliance with these guidelines will be virtually impossible to achieve immediately. Furthermore, 100 percent adherence to the guidelines would have major impacts on other program operations which are critical to the overall INS mission. We have met with Congressional staff to advise them of the impacts on our operations resulting from the expiration of TPCR. We have been advised that we may get future Congressional support for some type of discretionary relief from mandatory detention, but only if we can document and demonstrate that a maximum effort to comply with the detention mandates has been made. Shortly, we will provide you with guidance concerning additional data that we will need to collect and provide to Congress.

At this time, I am directing that, to the extent possible, you adhere to the detention scheme outlined in the attached and work toward utilizing 80 percent of your bedspace for mandatory detention cases. In the event that a District Director, Chief Patrol Agent, or Officer In Charge makes a custody determination which is not in keeping with the guidelines (e.g., a Category 1 case is released to make detention space for a Category 2 or 3), the reasons for the decision must be clearly documented in writing and placed in the alien's file. At any time the mandatory detention occupancy falls below 80 percent of available bedspace, the responsible field manager must notify the Regional Director.

In the event that your District Directors have released someone prior to October 9, who is now subject to detention, nothing in this memorandum should be construed as requiring their rearrest/detention. However, if conditions have changed or circumstances warrant, nothing should preclude you from exercising your authority to rearrest and detain.

CA11 Case: 22-11841 Subject: Detention and Deportation Effective October 9, 1998 Document: 5-6    Date Filed: 05/19/2023    Page: 752 of 7

Additionally, each Regional Director is directed to prepare a written monthly summary of custody determinations made by field offices within your respective jurisdictions which are inconsistent with the attached detention guidelines. The monthly summaries will be used to justify our need for continued discretion in detention decisions in our ongoing discussions with the Department of Justice, the Administration, and the Congress. The first monthly summary will be for the month ending October 31. Regions should forward the summaries to this office not later than 1 week after the end of the month.

Attachment



U.S. Department of Justice
Immigration and Naturalization Service

HQOPS 50/10

*425 I Street NW*
*Washington, DC 20536*

OCT - 7 1998

INS DETENTION USE POLICY
October 9, 1998

I.    INTRODUCTION

This policy governs the detention of aliens and supercedes, the Detention Use Policy issued July 14, 1997. The purpose of this policy is to revise the detention priorities of the Immigration and Naturalization Service (INS) in light of the expiration of the Transition Period Custody Rules (TPCR). Section 236(c) of the Immigration and Nationality Act (INA) is now in full force and effect. With the expiration of the TPCR, certain portions of 8 C.F.R. § 3.19 and § 236.1, as noted in those sections, no longer apply.

Under this policy, the four categories of alien detention are: (1) required (with limited exceptions), (2) high priority, (3) medium priority, and (4) lower priority. Aliens in category 1--required detention--must be detained, with a few exceptions. Aliens in categories 2, 3, and 4 may be detained depending on the availability of detention space and the facts of each case. Aliens in category 2 should be detained before aliens in categories 3 or 4, and aliens in category 3 should be detained before aliens in category 4. The District Director or Sector Chief retains the discretion, however, to do otherwise if the facts of a given case require.

These instructions do not apply to the detention and release of juveniles, which is covered in other INS policies.

## II. DEFINITIONS

* *Required detention:* Detention of certain classes of aliens required by the INA or applicable regulations. With few exceptions, aliens subject to required detention must be detained and are not eligible for release.

* *Discretionary detention:* Detention of aliens authorized but not required by the INA or applicable regulations. All aliens in proceedings are subject to discretionary detention unless they fit into one of the categories covered by required detention. Aliens subject to discretionary detention are eligible to be considered individually for release.

* *Final order of removal:* Final removal order issued by an immigration officer, an immigration judge (IJ), the Board of Immigration Appeals, or a Federal judge to an alien placed in proceedings on or after April 1, 1997. INS officers should consult District counsel on issues regarding the finality of removal orders.

* *Final order of deportation or exclusion:* Final deportation or exclusion order issued by an immigration officer, an immigration judge, the Board of Immigration Appeals, or a Federal judge to an alien placed in proceedings before April 1, 1997. INS officers should consult District counsel on issues regarding the finality of deportation or exclusion orders.

## III. DETENTION CATEGORIES

A. Arriving Aliens: Expedited Removal under INA § 235.

**Category 1: Required detention (with exceptions)**

* *Aliens in Expedited Removal.* Arriving aliens at Ports-of-Entry who are inadmissible under INA § 212(a)(6)(C) or 212(a)(7) are subject to expedited removal proceedings pursuant to INA § 235(b)(1). Any alien placed into expedited removal must be detained until

removed from the United States and may not be released
from detention unless (1) parole is required to meet a
medical emergency or legitimate law enforcement
objective, or (2) the alien is referred for a full
removal proceeding under § 240 (for example, upon a
finding of "credible fear of persecution"). Although
parole is discretionary in all cases where it is
available, it is INS policy to favor release of aliens
found to have a credible fear of persecution, provided
that they do not pose a risk of flight or danger to the
community. See INA §§ 235(b)(1), 8 C.F.R. § 235.3.

Aliens who are ordered removed under expedited removal
and who make an unverified claim to United States
citizenship, or to lawful permanent resident, refugee,
or asylee status, are referred to an IJ for a status
review under 8 C.F.R. § 235.3(b)(5)(iv). Such aliens
must be detained pending this review, unless parole is
required to meet a medical emergency or legitimate law
enforcement objective.

If there is insufficient detention space to detain an
alien in expedited removal who arrived at a land border
Port-of-Entry and claims a fear of persecution unrelated
to Canada or Mexico, that alien may be required to wait
in Canada or Mexico pending a final determination of his
or her asylum claim. If an alien expresses a fear of
persecution related to Canada or Mexico, the alien must
be detained for proceedings and may not be required to
wait in that country for a determination of the claim.

Aliens subject to expedited removal who arrive at a land
border Port-of-Entry, but do not claim lawful status in
the United States or a fear of persecution, should be
processed immediately and detained until removed. These
aliens should not be required to wait in Mexico or
Canada pending the issuance of an expedited removal
order.

The INS may permit an alien in expedited removal to
withdraw his or her application for admission.

Note that the INS maintains approximately 1,100 User Fee beds, which are funded by the User Fee Account. The INS can only use these beds for aliens arrested in support of airport operations.

B.    Aliens in Proceedings: INA § 240 (Removal), § 238 (Expedited Removal of Criminal Aliens), Former INA § 236 (Exclusion), and Former INA § 242 (Deportation).

     1.    Category 1: Required detention (with exceptions)

•    *Aliens subject to required detention in removal and deportation proceedings.* Pursuant to INA § 236(c), the INS must take into custody all aliens who are chargeable as terrorists, and virtually all aliens who are chargeable as criminals, upon their release from criminal incarceration or custody. § 236(c) does <u>not</u> apply to the following groups of aliens who are removable as criminals: (a) aliens who are removable under § 237 for a single crime involving moral turpitude, if they were sentenced to less than a year; (b) aliens who are removable under § 237 for a conviction for high-speed flight from an immigration checkpoint (18 U.S.C. § 758); and (c) aliens who are removable under § 237 for crimes relating to domestic violence, stalking, and the abuse or neglect of children.

§ 236(c) applies to aliens in both removal proceedings under § 240 and deportation proceedings under former § 242. Therefore, under § 236(c) the INS must continue to detain aliens who are described in that section (by their § 237 equivalents) if (a) they were previously taken into custody while in deportation proceedings (i.e., charged under § 241 in proceedings commenced prior to April 1, 1997) and (b) they are still in custody upon the expiration of the TPCR. Note that current § 236(c) does <u>not</u> apply to aliens in exclusion proceedingA752er former § 236.

Once in INS custody, the alien may be released during
proceedings only if the Attorney General determines
that it is necessary to protect a witness, a person
cooperating with an investigation, or a family member
of such a person.  To be considered for release in the
exercise of discretion, the alien must also
demonstrate that release would not pose a danger to
persons or property and that the alien does not pose a
flight risk.  See the requirements set forth at INA
§ 236(c)(2).

- *Aliens with aggravated felony convictions in exclusion
  proceedings.*  The INS must detain any alien in
  exclusion proceedings under former § 236 (i.e.,
  charged under § 212 in proceedings commenced prior to
  April 1, 1997) who has been convicted of an aggravated
  felony, as currently defined under INA § 101(a)(43).
  The INS may not parole such an alien during exclusion
  proceedings.  Note that the expiration of the TPCR has
  no effect on these aliens since the TPCR did not apply
  to them.

2.  **Category 2: High Priority**

- Aliens removable on security and related grounds, if
  not subject to required detention.

- Other criminal aliens not subject to required
  detention.

- Aliens who are a danger to the community or a flight
  risk, if not subject to required detention.

- Aliens whose detention is essential for border
  enforcement but are not subject to required detention.

- Aliens engaged in alien smuggling, if not subject to
  required detention.

**A753**

3.  Category 3: Medium Priority

*   Inadmissible, non-criminal arriving aliens who are not in expedited removal proceedings and are not subject to required detention.

*   Aliens who have committed fraud before the INS, if not subject to required detention.

*   Aliens apprehended at the worksite who have committed fraud in obtaining employment, if not subject to required detention.

4.  Category 4: Low Priority

*   Other removable aliens, if not subject to required detention.

*   Aliens originally placed in expedited removal who have been referred for a full removal proceeding under § 240 upon a finding of a "credible fear of persecution." See the discussion at section A.1 above regarding the INS policy favoring release.

C.  Aliens with Final Orders of Removal, Deportation, or Exclusion.

1.  Category 1: Required detention (with exceptions)

*   *All aliens who have final orders of removal and all aliens who have final orders of deportation and are subject to required detention.* This category includes all aliens ordered removed under revised § 240, whether or not they are terrorists or criminals, and all criminal aliens ordered removed under revised § 238. It also includes all terrorist and criminal aliens ordered deported under former § 242 if subject to required detention under § 236(c).

    Revised INA § 241(a) requires the INS to remove within 90 days any of the aliens in this category. The alien

A754

may not be released during this 90-day period.   See
INA § 241(a)(2).

Aliens whom INS is unable to remove within 90 days
should be released under an order of supervision.   See
INA § 241(a)(3).   However, the INS may continue to
detain certain aliens, including, among others, those
who are inadmissible on any ground; deportable or
removable on criminal or security grounds; dangerous;
or flight risks.   See INA § 241(a)(6).

- *Aliens with final orders under expedited removal.*   The
  INS must detain aliens who have been issued final
  orders under expedited removal (revised § 235(b)(1))
  on grounds of being inadmissible under INA §
  212(a)(6)(C) or § 212(a)(7).   Pending immediate
  removal, the INS must detain such an alien.   However,
  the INS may stay the removal of such an alien if
  removal is not practicable or proper, or if the alien
  is needed to testify in a criminal prosecution.   See
  INA § 241(c)(2).

- Aliens convicted of aggravated felonies with final
  orders of exclusion.   The INS must continue to detain
  until removal any alien with a final order of
  exclusion (i.e., charged under section 212 in
  proceedings commenced prior to April 1, 1997) who has
  been convicted of an aggravated felony, as <u>currently</u>
  defined under INA § 101(a)(43).   The INS may not
  parole such an alien unless the alien is determined to
  be unremovable pursuant to old INA § 236(e)(2) and the
  alien meets the criteria for release under that
  provision.   See former INA § 236(e) (as designated
  prior to April 1, 1997) and the Mariel Cuban parole
  regulations at 8 C.F.R. §§ 212.12 and 212.13.

2.   **Category 2: High Priority**

- *Aliens with final orders of deportation (if not
  terrorists or criminals subject to required detention
  under § 236(c) and § 241(a)) or exclusion (if not
  aggravated felons).*   Aliens placed into proceedings

prior to April 1, 1997, who were or are ordered
deported or excluded, are only subject to required

- detention if terrorists or convicted of certain
  crimes.  See part C.1 above.  Otherwise, they are
  subject to discretionary detention and, once they have
  a final order of deportation or exclusion, their
  detention should ordinarily be a high priority.

  Please note that the 6-month rule of former INA
  § 242(c) and (d), which regards detention and release,
  continues to apply to these non-terrorist and non-
  criminal aliens with final orders of deportation.
  Non-aggravated felon aliens with final orders of
  exclusion may be paroled from custody in the
  discretion of the INS.

## IV.   GENERAL DIRECTIONS

### A.   Category 1

- Aliens subject to required detention shall have first
  priority for all available[1] INS detention space.

- With the exceptions noted above, category 1 aliens
  shall be detained.

- Each Region should ensure that it maintains sufficient
  non-criminal detention space to provide basic support
  for its full spectrum of law enforcement objectives.
  However, with the exception of this basic level of
  non-criminal detention space, each Region, District,

---

[1] Available detention space means space that is both available and
suitable for the detention of the alien in question.  For example, an
alien terrorist subject to required detention would have first
priority for all INS beds suitable for the detention of terrorists.
No alien should be detained in an INS bed unsuitable for that alien's
detention (regardless of the detention category).

- and Sector must seek to comply with the detention
  priorities outlined above.

  If a category 1 alien comes into INS custody but no
  detention space is available locally, the responsible
  office should pursue the following options in rank
  order:

  1)  acquire additional detention space locally,
      securing funds from the Region if necessary;

  2)  transfer the alien to another INS District or
      Region where space or funding is available;

  3)  release an alien in local INS custody who is not
      subject to required detention (i.e., an alien in
      category 2, 3, or 4) to make space for the
      category 1 alien; or

  4)  release an alien in INS custody in another
      District who is not subject to required detention
      (i.e., an alien in category 2, 3, or 4) to make
      space for the category 1 alien.

- If a category 1 alien comes into INS custody when all
  INS criminal beds nationwide (i.e., beds not reserved
  for juveniles, User Fee operations, or non-criminal
  detention) are occupied by other category 1 aliens and
  there are no additional detention funds available, the
  responsible office should contact its Regional
  Director to arrange for the release of a lower-
  priority category 1 alien in order to permit the
  detention of a higher-priority category 1 alien.

- INA § 236(c) does not require the INS to arrest any
  alien who is described in that section but was
  released from criminal incarceration or custody
  previously.  However, if the INS later encounters such
  an alien in a non-custodial setting and elects to
  initiate immigration proceedings, the alien is subject
  to required detention. **A757**

• INA § 236(c) does not require the INS to re-arrest any alien who is described in that section but was released from INS custody under the TPCR.

However, the INS may re-arrest such an alien under INA § 236(b) if conditions have changed or if circumstances otherwise warrant.

B. **Categories 2, 3, and 4**

• Aliens in categories 2, 3, or 4 should generally be detained according to rank, higher priorities before lower priorities. Exceptions to this general rule may be made as follows:

1) The District Director or Sector Chief may make an exception in individual cases if local circumstances require.

2) The Regional Director, with the concurrence of the Executive Associate Commissioner for Field Operations, may make an exception to accommodate special regional enforcement initiatives.

3) The Executive Associate Commissioner for Field Operations may make an exception to accommodate special national enforcement initiatives or to address an emergency.

C. **Juvenile Aliens**

• This Detention Use Policy does not apply to juvenile aliens or juvenile detention space. Please refer to the instructions for the detention and release of juvenile aliens issued previously.

A758

Date: May 19, 2023

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
    *General*
WILLIAM C. PEACHEY
  *Director*

/s/ *Erez Reuveni*
EREZ REUVENI
  *Assistant Director*
  U.S. Dep't of Justice, Civil Division
  Office of Immigration Litigation,
  District Court Section
  P.O. Box 868, Ben Franklin Station
  Washington, DC 20044

SARAH S. WILSON
  *Assistant Director*
JOSEPH A. DARROW
  *Trial Attorney*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2023, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Eleventh

Circuit by using the appellate CM/ECF system. Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.

*/s/ Erez Reuveni*
EREZ REUVENI
Assistant Director
United States Department of Justice