**Nos. 23-11528, 23-11644**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

———————————

STATE OF FLORIDA,

Plaintiff-Appellee,

v.

ALEJANDRO MAYORKAS, Secretary
of Homeland Security, in his official
capacity; et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of Florida

———————————

### APPELLANTS' PRINCIPAL BRIEF

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
  *Director*
EREZ REUVENI
  *Assistant Director*
JOSEPH A. DARROW
ELISSA P. FUDIM
ERIN T. RYAN
  *Trial Attorneys*
  U.S. Dep't of Justice, Civil Division
  Office of Immigration Litigation,
  District Court Section
  P.O. Box 868, Ben Franklin Station
  Washington, DC 20044

*State of Florida v. Alejandro Mayorkas, et al.*, Nos. 23-11528, 23-11644

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendants-Appellants

certify that the following have an interest in the outcome of this appeal:

<u>Natural Persons</u>

Bell, Daniel W.

Boynton, Brian M.

Brodeen, Karen A.

Butler, Steven

Christmas, Natalie

Coody, Jason R.

Crapo, Matt A.

Darrow, Joseph A.

DeSantis, Ronald

Fabian, Sarah B.

Faruqui, Bilal A.

Fudim, Elissa P.

Garland, Merrick

Guard, John M.

Hart, Joseph E.

*State of Florida v. Alejandro Mayorkas, et al.*, Nos. 23-11528, 23-11644

Hudak, Matthew

Jaddou, Ur M.

Johnson, Tae D.

Mayorkas, Alejandro

Miller, Troy

Monson, Darrick

Moody, Ashley

Moyle, Marie A.

Ortiz, Raul

Patel, Anita J.

Peachey, William C.

Percival, James H.

Reuveni, Erez

Ryan, Erin T.

Ward, Brian C.

Wetherell, T. Kent

Whitaker, Henry C.

<u>Entities</u>

Immigration Reform Law Institute

State of Florida

*State of Florida v. Alejandro Mayorkas, et al.*, Nos. 23-11528, 23-11644

Florida Office of the Attorney General

United States of America

U.S. Attorney's Office, Northern District of Florida

U.S. Citizenship and Immigration Services

U.S. Customs and Border Protection

U.S. Department of Homeland Security

U.S. Immigration and Customs Enforcement

U.S. Department of Justice, Civil Division


Dated:  June 12, 2023            */s/ Joseph A. Darrow*
                                 JOSEPH A. DARROW

*State of Florida v. Alejandro Mayorkas, et al.*, Nos. 23-11528, 23-11644

## STATEMENT REGARDING ORAL ARGUMENT

Appellants ("the federal government") believe that oral argument would assist the Court in resolving this matter.

## TABLE OF CONTENTS

**Page**

INTRODUCTION..................................................................................................1

STATEMENT OF THE ISSUES.........................................................................2

STATEMENT OF THE CASE...........................................................................3

STANDARD OF REVIEW ...............................................................................12

SUMMARY OF THE ARGUMENT ................................................................13

ARGUMENT ......................................................................................................17

I.    The District Court Erroneously Held Florida Has Standing to Challenge Parole+ATD and PWC ..............................................................17

II.   The District Court Erroneously Held the APA Permitted Review of Florida's Challenges to Parole+ATD and PWC ..........................................23

    A.    Parole+ATD and PWC are committed to agency discretion and a statute precludes review ...................................................................23

    B.    Parole+ATD and PWC are not reviewable final agency actions......27

    C.    Florida is not in the statutory zone of interests .................................29

III.  The District Court Erroneously Held that Parole+ATD and PWC Are Contrary to Law ..............................................................................................29

    A.    The memoranda are consistent with Section 1182(d)(5) .................29

    B.    The memoranda satisfy the "return to custody" and "case" clauses ..............................................................................................33

    C.    The memoranda meet the case-by-case requirement .......................37

**D.    Parole + ATD and PWC do not violate the "urgent humanitarian reasons or significant public benefit" requirement** ...........................**40**

**IV.    The District Court Erroneously Held the Parole+ATD Memorandum is Arbitrary and Capricious**.................................................................**42**

**V.    The District Court Erroneously Held That Parole+ATD and PWC Require Notice-and-Comment Rulemaking** ...................................**44**

**VI.    Equitable Factors Did Not Support the District Court's Injunction of  PWC** ........................................................**48**

**VII.    The District Court's Orders are Impermissibly Overbroad**....................**53**

**CONCLUSION**..........................................................................................**56**

**CERTIFICATE OF COMPLIANCE** ..........................................**57**

**CERTIFICATE OF SERVICE** ..........................................................**57**

**RULE 28(F) STATUTORY ADDENDUM**...........................................**58**

# TABLE OF AUTHORITIES

## CASE LAW

*Adams v. Vance*,
   570 F.2d 950 (D.C. Cir. 1978)...............................................................50

*Ahrens v. Rojas*,
   292 F.2d 406 (5th Cir. 1961) ................................................................36

*Alonso-Escobar v. USCIS Field Off. Dir. Miami, Fla.*,
   462 F. App'x 933 (11th Cir. 2012)........................................................26

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987) ............................................................................50

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022)............................................. 17, 20, 21, 25

*Arpaio v. Obama*,
   27 F. Supp. 3d 185 (D.D.C. 2014)................................................ 18, 55

*Bennett v. Spear*,
   520 U.S. 154 (1997) ..................................................................... 27, 28

*Biden v. Texas*,
   142 S. Ct. 2528 (2022) ................................................................... 7, 24

*Block v. Community Nutrition Inst.*,
   467 U.S. 340 (1984) ............................................................................29

*Bob Jones Univ. v. United States*,
   461 U.S. 574 (1983) ..................................................................... 37, 41

*California v. Texas*,
   141 S. Ct. 2104 (2021) ........................................................................17

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ................................................................ 30-31, 40

*Chiles v. United States*,
    69 F.3d 1096 (1995) ....................................................................... 25

*Clark v. Martinez*,
    543 U.S. 371 (2005) ....................................................................... 36

*Clarke v. Securities Indus. Ass'n*,
    479 U.S. 388 (1987) ....................................................................... 29

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ........................................................... 4

*Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*,
    304 F.3d 1167 (11th Cir. 2002) ....................................................... 13

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 352 (2006) ....................................................................... 54

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) .............................................................. 17, 44

*Dep't of the Navy v. Egan*,
    484 U.S. 518 (1988) ....................................................................... 48

*Duncan v. Walker*,
    533 U.S. 167 (2001) ....................................................................... 35

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................. 16, 44

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ....................................................................... 41

*Florida v. Mayorkas*,
    No. 3:23-cv-9962, 2023 WL 3398099  (N.D. Fla. May 11, 2023) ....................... 1

*Florida v. Mellon*,
    273 U.S. 12 (1927) ................................................................... 13, 18

*Florida v. United States*,
    540 F. Supp. 3d 1144 (M.D. Fla. 2021) ...............................................28

*Florida v. United States*,
    No. 3:21-cv-1066, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) ..........................1

*Garcia-Mir v. Smith*,
    766 F.2d 1478 (11th Cir. 1985) ...........................................................25

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022) ...........................................................53

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ............................................................... 17, 53

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005) ...........................................................31

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ....................................................... 14, 23, 24, 27

*Innovation Law Lab v. McAleenan*,
    924 F.3d 503 (9th Cir. 2019) ..................................................... 45, 50

*INS v. Aguirre-Aguirre*,
    526 U.S. 415 (1999) ............................................................... 15, 31

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) ...........................................................28

*Jean v. Nelson*,
    727 F.2d 957 (11th Cir. 1984) ...........................................................25

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004) ...........................................................46

*Jysk Bed'N Linen v. Dutta-Roy*,
    810 F.3d 767 (11th Cir. 2015) ...........................................................13

*Kucana v. Holder*,
    558 U.S. 233 (2010) ............................................................................26

*Latif v. Obama*,
    666 F.3d 746 (D.C. Cir. 2011)............................................................38

*Leng May Ma v. Barber*,
    357 U.S. 185 (1958) ............................................................................15

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ............................................................................18

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ....................................................... 17, 19, 21, 22

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ............................................................................53

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) .............................................................. 14, 19, 20

*Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*,
    226 F.3d 1226 (11th Cir. 2000).................................................... 22, 23

*MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*,
    950 F.3d 764 (11th Cir. 2020)............................................................25

*Nat'l Min. Ass'n v. Sec'y of Labor*,
    589 F.3d 1368 (11th Cir. 2009)...................................... 16, 45, 46

*Nat'l Parks Conservation Ass'n v. Norton*,
    324 F.3d 1229 (11th Cir. 2003).................................................... 14, 27

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
    896 F.2d 1283 (11th Cir. 1990).................................................... 51, 52

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................48

*Patel v. Garland*,
   142 S. Ct. 1614 (2022) ................................................................. 26, 27

*Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*,
   87 F.3d 1242 (11th Cir. 1996)...............................................................42

*Prof'ls & Patients for Customized Care v. Shalala*,
   56 F.3d 592 (5th Cir. 1995) ................................................................46

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ..............................................................................17

*Sure-Tan, Inc. v. NLRB*,
   467 U.S. 883 (1984) ..............................................................................18

*Swain v. Junior*,
   961 F.3d 1276 (11th Cir. 2020) ..........................................................31

*Town of Castle Rock v. Gonzales*,
   545 U.S. 748 (2005) .................................................................. 24-25, 35

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) .........................................................................53

*United States v. Dean*,
   604 F.3d 1275 (11th Cir. 2010) .................................................. 16, 46

*United States v. Cortez*,
   449 U.S. 411 (1981) ..............................................................................48

*United States v. Schwarzbaum*,
   24 F.4th 1355 (11th Cir. 2022)............................................................12

*West Virginia v. U.S. Dep't of Treasury*,
   59 F.4th 1124 (11th Cir. 2023)............................................... 17, 19, 20

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................... 16, 50, 51

*Wyoming v. Oklahoma,*
  502 U.S. 437 (1992) ........................................................................18

## FEDERAL STATUTES

5 U.S.C. § 553(b)(B) ........................................................................46

5 U.S.C. § 701(a) ...........................................................................14

5 U.S.C. § 701(a)(1) .................................................................. 23, 26

5 U.S.C. § 701(a)(2) .........................................................................23

5 U.S.C. § 703 ...............................................................................12

5 U.S.C. § 704 ...............................................................................27

5 U.S.C. § 706(2) ...........................................................................53

5 U.S.C. § 706(2)(A) .................................................................. 3, 12

5 U.S.C. § 706(2)(D) .........................................................................3

6 U.S.C. § 202(4) ...........................................................................31

8 U.S.C. § 703 ...............................................................................18

8 U.S.C. § 1103(a)(1) .......................................................................31

8 U.S.C. § 1182(d)(5) .......................................................................44

8 U.S.C. § 1182(d)(5)(A) ........................................................... *passim*

8 U.S.C. § 1225(a)(1) .........................................................................3

8 U.S.C. § 1226(a) ...........................................................................36

8 U.S.C. § 1226(c) ..................................................................... 7, 34

28 U.S.C. § 1491 .............................................................................51

## PUBLIC LAW

Pub. L. No. 104-208 ..................................................................37

Pub. L. No. 109-13 ....................................................................37

Pub. L. No. 117-43 ....................................................................37

Pub. L. No. 117-128 ..................................................................37

## FEDERAL REGULATIONS

8 C.F.R. § 212.5(b) ....................................................................41

8 C.F.R. § 212.5(b)(1) ......................................................... 31, 34

8 C.F.R. § 212.5(b)(2) ...............................................................34

8 C.F.R. § 212.5(b)(3) ...............................................................34

8 C.F.R. § 212.5(b)(4) ...............................................................34

8 C.F.R. § 212.5(b)(5) ................................................... 34, 40, 41

8 C.F.R. § 212.5(e)(2)(i) ...................................................... 15, 32

8 C.F.R. § 212.5(e)(2)(ii) ..................................................... 15, 32

## FEDERAL REGISTRY

86 Fed. Reg. 42,828 (Aug. 5, 2021) ...........................................4

87 Fed. Reg. 18,078 (2022) ......................................................31

## MISCELLANEOUS

Oxford English Dictionary, *Public*,
   https://www.oed.com................................................................39

Shalini Bhargava Ray, *The Emerging Lessons of Trump v. Hawaii,* 29 Wm. & Mary Bill Rts. J. 775, 795 (2021) .......................................................................36

U.S. Dep't of Homeland Sec., *Written Testimony of Joseph Langois to Senate Subcomm*., Apr. 23, 2015, https://www.dhs.gov/news/2015/04/23/written-testimony-uscis-senate-judiciary-subcommittee-immigration-and-national ...........................................................36

## STATEMENT OF JURISDICTION

This matter involves the consolidated appeals from the district court's final judgment in *Florida v. United States*, No. 3:21-cv-1066 (N.D. Fla. Mar. 8, 2023), and the preliminary injunction order in *Florida v. Mayorkas*, No. 3:23-cv-9962 (N.D. Fla. May 16, 2023). The federal government filed notices of appeal on May 5, 2023 and May 17, 2023 respectively. *See* Fed. R. App. P. 4(a)(1)(B). The Court has jurisdiction over the appeal from the final judgment in No. 3:21-cv-1066, 28 U.S.C. § 1291, and over the appeal from the preliminary injunction in No. 3:23-cv-9962, 28 U.S.C. § 1292(a)(1).

## INTRODUCTION

In response to historically high rates of noncitizens arriving at that border, the Department of Homeland Security (DHS) developed two related but distinct guidance implementing its discretionary parole authority under 8 U.S.C. § 1182(d)(5)(A). The guidance allowed DHS to process individual noncitizens more quickly during exigent circumstances, to avoid overwhelming limited detention capacity, and to ensure the safety and welfare of U.S. Border Patrol (USBP) agents and noncitizens in government custody. Florida challenges the memoranda implementing this guidance, but its suit is not justiciable on multiple grounds and, in any event, fails on the merits.

This Court should reverse the district court's orders in *Florida v. United States*, No. 3:21-cv-01066, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) (Appendix ("A") 323-431), vacating the "Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations" (Parole+ATD) memorandum (A1-4), and in *Florida v. Mayorkas*, 23-cv-9962, 2023 WL 3398099 (N.D. Fla. May 11, 2023) (A460-476), enjoining the "Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document" (PWC) memorandum. These orders are legally erroneous, unsupported by the record, and disruptive to DHS's mission to ensure safety and security at the border.

The Parole+ATD and PWC memoranda are consistent with the United States' discretionary parole authority under 8 U.S.C. § 1182(d)(5)(A) and comply with the procedural and substantive requirements. They also conform to DHS's longstanding understanding of this parole authority, reflected in regulatory interpretations and its use of parole over several decades. The district court's orders conflict with the plain terms of the laws at issue, background principles informing the government's law enforcement discretion, and years of agency practice ratified by Congressional acquiescence.

The orders also frustrate the most effective measures available to DHS to secure the border while protecting the health and welfare of USBP agents and noncitizens during periods of significantly increased border encounters that require immediate action to avoid overwhelming DHS capacity. The orders leave DHS limited options for addressing sudden increases in border encounters and the orders intrude into core executive authority over the border and DHS's discretionary parole authority.

For these reasons, and those that follow, the Court should reverse the district court's orders vacating Parole+ATD and enjoining PWC.

## STATEMENT OF THE ISSUES

1. Whether Florida has standing to challenge the Parole+ATD and PWC memoranda.

2. Whether the memoranda are reviewable under the APA.

3. Whether the memoranda are contrary to law, 5 U.S.C. §706(2)(A), because they violate the "case-by-case," "urgent humanitarian interest or significant public benefit," and return-to-custody clauses of 8 U.S.C. § 1182(d)(5)(A).

4. Whether the memoranda are arbitrary and capricious under 5 U.S.C. § 706(2)(A).

5. Whether the memoranda must undergo notice-and-comment rulemaking under 5 U.S.C. § 706(2)(D).

6. Whether Florida would suffer irreparable injury absent a preliminary injunction blocking the PWC memoranda, and whether the balance of the equities supports that injunction.

7. Whether the district court erred in entering nationwide vacatur of Parole+ATD and a nationwide preliminary injunction of PWC.

## STATEMENT OF THE CASE

Legal Background. Congress delegated to the Executive Branch the authority and discretion to inspect and process "applicants for admission"—noncitizens who are present without being admitted or "who arrive[] in the United States." 8 U.S.C. § 1225(a)(1). Congress authorized several options for processing these noncitizens. *See*, *e.g.*, *id.* § 1225(b)(1) (expedited removal for certain applicants for admission identified at or near the border); *id.* § 1225(b)(2)(A) (removal proceedings for

applicants who are "seeking admission" not "clearly and beyond a doubt entitled to be admitted"); *id.* § 1229a (removal proceedings for noncitizens present in the United States); *id.* § 1225(b)(2)(C) (return to contiguous territory pending removal proceedings for applicants described in section 1225(b)(2)(A)). Further, section 1225 "does not limit the authority of DHS to determine whether to pursue the removal of the [noncitizen]" in the first place. *Crane v. Johnson*, 783 F.3d 244, 249 (5th Cir. 2015). DHS also has the discretion to release applicants for admission on parole temporarily following a case-by-case assessment "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

Factual and Procedural Background. From March 20, 2020, through May 11, 2023, a series of public health orders entered by the Centers for Disease Control and Prevention (CDC) under its Title 42 authority to combat the COVID-19 pandemic suspended the introduction of "persons traveling from Canada or Mexico … who would otherwise be introduced into a congregate setting in a [land port of entry] or [USBP] station at or near the U.S. land and adjacent coastal borders." Public Health Reassessment and Order, 86 Fed. Reg. 42,828 (Aug. 5, 2021). Covered noncitizens were expelled to Mexico or their home countries without processing under our immigration laws.

Notwithstanding Title 42, DHS has encountered historically high numbers of noncitizens in recent years. Because the issuance of Notices to Appeal (NTAs) is

4

time consuming, when Customs and Border Protection (CBP) encounters very high numbers of noncitizens, the U.S. Border Patrol (USBP) has encountered overcapacity issues at USBP stations while processing noncitizens. A2, A8. To address strain at border facilities, DHS has tried several approaches. In March 2021, USBP began releasing border arrivals through Notices to Report (NTRs). A432-33. Following individualized vetting, noncitizens encountered between ports of entry were, where appropriate, released from custody prior to receiving an NTA. *Id.* They instead received an NTR, which instructed them to check in at an U.S. Immigration and Customs Enforcement (ICE) office to be processed for removal proceedings at a later date. *Id.* Shifting time-consuming NTA processing to the interior helped decompress USBP facilities (where noncitizens would otherwise be held until processing was complete) and allowed limited personnel resources to focus on border enforcement.

DHS subsequently determined that guidance with stronger safeguards was preferred. A1-4. Accordingly, USBP formally rescinded the NTR guidance in favor of Parole+ATD in November 2021. A434-36. Under the Parole+ATD guidance, USBP provided temporary authority in individual border sectors experiencing defined overcapacity conditions to temporarily parole new arrivals, consistent with section 1185(d)(5)(A)'s requirements, before fully processing them for NTAs. A1-4. The noncitizens temporarily released on parole were enrolled in ICE's

5

Alternatives to Detention (ATD) program and instructed to check in with ICE in the interior for NTA processing within a specified timeframe. *Id.* ICE monitored and supervised the paroled noncitizens' appearances via electronic ankle monitors and other supervision technology. *Id.*

On July 18, 2022, DHS rescinded the November 2021 memorandum, and provided new guidance to further limit Parole+ATD's use. A1. Under that operative guidance, Parole+ATD was available only for individual USBP sectors following a weekly determination by CBP leadership that threshold overcapacity existed, based on specified in-custody and encounter limits. A3. It outlined USBP's practice to conduct biometric identity verification and thoroughly evaluate any potential public safety or national security concerns, as well as collect and document a physical destination address for each noncitizen prior to releasing that noncitizen on Parole+ATD. A3-4. Even when the threshold criteria were met and the CBP Commissioner had authorized a sector to use Parole+ATD, USBP agents still had to assess "each individual noncitizen … on a case-by-case individualized basis to determine whether he or she is eligible for parole based on an urgent humanitarian reason or whether there is a significant public benefit." *Id.* In doing so, the agents had to consider individualized circumstances, including a noncitizen's current immigration status, criminal history, compliance history, community or family ties, role as a caregiver or provider, and any other humanitarian or medical factors. A4.

Parole+ATD could not be used for individuals who pose a national security risk, unmitigable flight risk, or public safety threat, or who were unaccompanied children or criminal noncitizens subject to the mandatory detention requirements of 8 U.S.C. § 1226(c). *Id.*

On September 28, 2021, Florida sued DHS in the Northern District of Florida, challenging several of DHS's practices at the Southwest border under the APA and Take Care Clause of the U.S. Constitution. Florida twice amended its complaint, ultimately challenging Parole+ATD and Defendants' purported "non-detention" policy. A22-44, A45-80, A86-118. In the Second Amended Complaint, Florida broadly described the alleged non-detention policy as "the government's policy of releasing aliens subject to mandatory detention." A93. At the close of trial, Florida narrowed this to the government's alleged refusal to detain individuals who were "not a public safety or flight risk." A387. Following trial and APA record review, on March 8, 2023, the district court entered final judgment on Florida's claims. The court found Florida's non-detention claim was nonjusticiable, *see Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022), and vacated and remanded the Parole+ATD memorandum. A387-89, A430-31.

Following the vacatur of Parole+ATD, on May 11, 2023, the public health emergency underlying the CDC order expired. This, in turn, caused the Title 42 order to expire. Defendants anticipated that absent change to its guidance, that expiration

would be followed by an unprecedented increase of migrants seeking to illegally cross the Southwest border. A439-40.

DHS undertook multiple initiatives to prepare for Title 42's end, *id.*, but as that date approached, USBP began to face exigent circumstances. On May 10, 2023, facing unprecedented migration flows and anticipating greater numbers following the termination of Title 42 the following day, DHS issued its PWC guidance. A5-11. PWC permitted the CBP Commissioner to temporarily authorize individual border sectors to permit their agents to temporarily parole noncitizens who had been inspected, vetted, and checked for national security and public safety concerns for only 60 days, and to permit the noncitizens to schedule an appointment with ICE to complete their NTA processing or request an NTA by mail. A9-10. PWC was limited to specific sectors and periods of potentially unsafe overcrowding, defined in terms of border encounter and capacity rates, and parole under the guidance was permitted only after an "individualized case-by-case" assessment of the "urgent humanitarian reasons" or "significant public benefit" requirement. A8-10. This exigent measure was designed to safeguard the health and safety of individual noncitizens in DHS's custody and employees by expediting processing and thereby reducing overcrowding and the harms caused by overcrowding. A6, A9. Moreover, absent use of this guidance, USBP officials might devote a disproportionate amount of their limited resources to NTA processing, at the expense of other critical national

security and public safety functions, including deterring criminal organizations and traffickers and intercepting unlawful entrants. *Id.*

Florida filed an APA challenge to the PWC memorandum in the Northern District of Florida on May 10, 2023. A450-459. On May 11, 2023, the district court entered a temporary restraining order prohibiting DHS from continuing to implement PWC, and, based on the parties' agreement, converted the TRO into a preliminary injunction on May 16, 2023. A460-76, A493-502.

District court opinions. In the district court's view, the two parole memoranda were unlawful for substantially identical reasons. A467, A497-98.

In its March 8, 2023 order, the district court held that Florida had standing to challenge Parole+ATD based on its provision of state-funded public education to more noncitizen children coming to Florida as a result of being released on Parole+ATD. A370-81. The court then held it could review Florida's challenge under the APA because states fell into the zone of interests of the parole statute and other relevant provisions of the Immigration and Nationality ACT (INA), A381-82; the case did not present a non-justiciable political question, A383-86; the Parole+ATD memoranda constituted final agency action, A389-90; Parole+ATD

was not committed to agency discretion by law, A390; and review was not precluded by jurisdiction-stripping provisions of the INA, A391.[1]

Turning to the merits, the district court held that Parole+ATD violated the parole statute, 8 U.S.C. § 1182(d)(5)(A), by failing to comport with its return-to-custody, case-by-case, and "urgent humanitarian reasons or significant public benefit" requirements for releasing a noncitizen on parole. A409-16. The court held that (1) the memorandum did not contemplate noncitizens released on Parole+ATD being detained at some later date, (2) the individualized inquiry was not long and comprehensive enough to meet the "case-by-case" standard, and (3) the humanitarian and public-interest justifications for Parole+ATD improperly focused more on "administrative expediency" than the noncitizen's individual circumstances and thus impermissibly used parole to "create an entirely new processing pathway." *Id.*

The court next held that Parole+ATD was arbitrary and capricious for failing to address (1) the backlog of noncitizens awaiting NTAs created by earlier iterations of the guidance and explaining why this backlog did not outweigh the benefits of continuing Parole+ATD, (2) evidence that many noncitizens were being released on Parole+ATD contradicting the memorandum's admonitions that it was to be "used

---

[1] The district court separately found that it lacked the ability to review Florida's challenge to the "non-detention policy" because that "policy" offered no final agency action to review. A387-89.

sparingly" and was not meant to be a primary processing tool," and (3) the "expansion" of the Parole+ATD guidance in the July 18, 2022 memorandum to include single adults and not just family units. A419-21.

The court also held that Parole+ATD required notice-and-comment rulemaking, as "it establishes a generally applicable policy to determine whether aliens are detained or paroled, it instructs agents how to exercise their discretionary authority under § 1182(d)(5), it sets criteria for granting parole, and it affects Florida's obligations to paroled aliens." A421-24.

Finally, like the court found no impediments in the INA to its issuance of relief. A425-30. The court determined that nationwide relief was appropriate because partial relief—in particular, an injunction relating only to noncitizens claiming they were going to Florida—would not prevent noncitizens from actually going to Florida. *Id.*; *see also* A474, A483-84, A500.

In temporarily restraining, and later permanently enjoining, PWC, the district court held that Florida likely had standing, could obtain APA review, and was likely to succeed on is contrary-to-law and notice-and-comment claims because PWC was "materially indistinguishable" from Parole+ATD, and thus the court's conclusions in its March 8, 2023 order applied equally to PWC. A467-68, A497. The court also separately rejected DHS's argument that PWC was exempt from notice-and-comment procedure under the APA's good-cause exception. A467 at n.5.

11

Regarding the injunctive factors relevant only to the PWC order, the court held that Florida would suffer an irreparable injury absent relief because the potential "improper[]" parole of noncitizens who might settle in Florida would irreversibly harm its fisc and sovereignty. A471-72, A498. Further, the court held that the balance of equities tipped in favor of injunctive relief because PWC followed a course the court in the Parole+ATD case had already told DHS it could not take, the crisis at the border was "largely of [DHS's] own making," and the Court was not persuaded that conditions at the border were in fact dire. A472-73, A498-99.

The government sought a stay of both orders pending appeal before this Court. The Court denied that motion by a split decision on June 5, 2023, on the ground that DHS failed to show irreparable harm.

## STANDARD OF REVIEW

In a challenge to agency action under the APA, the Court "review[s] the district court's decision de novo and the underlying agency action under the standards set out in the APA." *United States v. Schwarzbaum*, 24 F.4th 1355, 1363 (11th Cir. 2022). The Court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *see* 5 U.S.C. § 703 (prescribing remedies).

12

The district court's grant of a preliminary injunction is reviewed for abuse of discretion, although any component legal determinations are reviewed de novo and errors of law warrant "plenary review" of the entire order. *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171-72 (11th Cir. 2002). To warrant preliminary injunctive relief, a party must show: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 774 (11th Cir. 2015).

## SUMMARY OF THE ARGUMENT

The Court should reverse the district court's orders enjoining PWC and vacating Parole+ATD. First, the district court erred in concluding that Florida had Article III standing. Florida cannot establish standing because it is not directly affected by the two memoranda, and it challenges only the incidental effects of federal regulation of third parties, who may or may not enter Florida and use public services. *See Florida v. Mellon*, 273 U.S. 12, 18 (1927). The district court's conclusion that Florida had an injury traceable to the memoranda—increased use of state-funded services—impermissibly relied on speculation because the generalized evidence covered a broad variety of noncitizens, failed to connect Parole+ATD to

any new costs, and predated PWC. Florida is not entitled to special solicitude as a state because it is bringing general APA suits and has no distinct procedural right arising from immigration enforcement. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

Second, the APA claims are not reviewable. Florida challenges guidance concerning decisions under the parole statute, 8 U.S.C. § 1182(d)(5)(A). But how DHS implements parole is committed to its discretion. Such discretionary decisions are shielded from judicial review, 8 U.S.C. § 1252(a)(2)(B)(ii), and are likewise subject to principles of enforcement discretion, *see Heckler v. Chaney*, 470 U.S. 821, 831 (1985), which also precludes APA review. *See* 5 U.S.C. § 701(a). Finally, neither Parole+ATD nor PWC is reviewable "final" agency action—they neither directly regulate Florida nor dictate the outcome of any individual parole decision, leaving those decisions in the discretion of USBP agents. *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003).

Third, the district court erred in holding Parole+ATD and PWC violate section 1182(d)(5)(A). That statute provides the Secretary of Homeland Security may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). The noncitizen shall return to the "custody from which he

14

was paroled" "when the purposes of such parole shall, in the opinion of the [Secretary], have been served," and "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id*. The memoranda are consistent with the statute. The memoranda and their interaction with the regulatory framework meet the "return to custody" requirement by guaranteeing their parole is terminate and they are eligible to be detained, if appropriate, when they are placed in removal proceedings, if not sooner. 8 C.F.R. § 212.5(e)(2)(i), (ii). The memoranda satisfy the "case-by-case" requirement because they explicitly require that each parolee be vetted in an individual, comprehensive inquiry and individually qualify under the section 1182(d)(5)(A) standard. Although noncitizens may be similarly released for overcrowding, DHS is still releasing individuals only after finding an "urgent humanitarian reason or significant public benefit." Congress placed no numerical limit on paroles. 8 U.S.C. § 1182(d)(5)(A). DHS's interpretation of these statutorily undefined terms to include the humanitarian and public-interest scenarios that arise when border sectors are dangerously overcrowded is longstanding, reasonable, and entitled to deference. *See INS v. Aguirre-Aguirre,* 526 U.S. 415, 424-25 (1999); *see also Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (endorsing INS policy of paroling noncitizens from custody as "reflect[ing] the humane qualities of an enlightened civilization").

15

Fourth, the district court erred in holding that Parole+ATD was arbitrary and capricious. The July 18, 2022 memorandum and accompanying record indicated that the agency considered the backlog created by the guidance. The memorandum's "use[] sparingly" admonition was merely precatory and did not establish any particular requirements that Parole+ATD's use violated. And the application of Parole+ATD to single adults did not represent a reversal of position requiring explanation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Fifth, the district court erred in holding that Parole+ATD and PWC required notice and comment.  As "general statements of policy" that did not establish binding norms and left USBP agents free to grant or deny parole in any given case, they did not require notice and comment. *See Nat'l Min. Ass'n v. Sec'y of Labor*, 589 F.3d 1368, 1371 (11th Cir. 2009). Further, DHS had "good cause" to forgo notice-and-comment rulemaking for PWC, which was adopted in light of emergent, dangerous overcrowding at the Southwest border as Title 42 neared termination. *See U.S. v. Dean*, 604 F.3d 1275, 1281 (11th Cir. 2010).

Sixth, the district court erred in finding Florida had an irreparable injury to its sovereignty or public fisc based on unsupported speculation about the potential use of PWC and the independent actions of third-party noncitizens. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The court compounded this error by holding this conjectural injury outweighed the harm of depriving the federal

16

government of a limited use border-management tool for ensuring both safe conditions in detention facilities and border security.

Finally, the district court erred in the relief granted. The nationwide scope of both orders violates the traditional limitations on equitable relief requiring that a remedy redress only the injury of the plaintiff before the court, *see Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018), and exceeds the court's authority under the APA. 8 U.S.C. § 703.

## ARGUMENT

### I.  The District Court Erroneously Held Florida Has Standing to Challenge Parole+ATD and PWC.

To have standing, Florida must show that it has suffered an "injury in fact" "caused" by the two memoranda that a favorable decision would "redress." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992). Parole+ATD and PWC do not regulate Florida or any other state, so Florida does not allege direct injury or deprivation of legal rights. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019); *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1132 (11th Cir. 2023). Instead, Florida asserts indirect injuries premised on the speculative actions of third parties—migrants. A375-76. Florida's claims fail for that reason alone. *See California v. Texas*, 141 S. Ct. 2104, 2117 (2021); *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022) (citing *Lujan*, 504 U.S. at 562-63 ("Contingent injuries, especially those

17

arising from the impact of regulations on third parties not before the Court, rarely create cognizable cases or controversies.")). A state "has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015). Federal policies regulating people within a state will often have derivative effects on the state itself—but that is not sufficient to vest a state with standing. The Supreme Court has repeatedly held that actions by the United States that indirectly injure the state's economy do not inflict a direct injury sufficient to show standing. *See, e.g.*, *Florida v. Mellon,* 273 U.S. 12, 18 (1927); *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992).

In addition, a party—sovereign or otherwise—generally "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). The same principle applies to enforcement of the immigration laws. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). Here, Florida asserts that DHS is improperly declining to enforce aspects of the immigration laws against noncitizens whom Florida would prefer to see immediately issued an NTA and detained. But Florida has no judicially cognizable interest in procuring "enforcement of the immigration laws" against third parties.

18

*Id.*[2]

The district court nevertheless found Florida had standing to challenge Parole+ATD and PWC because the court believed that more "immigrant children and youth" had enrolled in Florida schools since January 2021, and Florida was entitled to special solicitude. A371-72, A497, A467-71. Those conclusions are erroneous, and neither overcomes the legal obstacles to Florida's theory identified above.

First, special solicitude did not excuse Florida from articulating a cognizable injury traceable to the challenged memoranda and redressable by an order invalidating those memoranda. A state may enjoy "[s]pecial solicitude" in establishing standing when it has been deprived of a procedural protection. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *see Lujan*, 504 U.S. at 572 n.7. But Congress did not provide state sovereigns with a procedural right to challenge the administration of immigration law in general or parole in particular.

The district court nevertheless held that Florida was entitled to special solicitude based, in part, on this Court's recent decision in *West Virginia v. U.S. Dep't of Treasury*, 59 F.4th 1124 (11th Cir. 2023). A372 at n.24. *West Virginia*, however, did not address special solicitude, much less conclude that the state

---

[2] These arguments are currently pending before the Supreme Court. *See United States v. Texas*, No. 22-58.

Plaintiffs in that case were entitled to special solicitude. Rather, it concerned garden-variety traceability. *West Virginia*, 59 F.4th at 1136-37. Moreover, *West Virginia* involved *direct* effects on state tax revenue arising out of a quasi-contractual relationship between the states and the federal government. *See* 59 F.4th at 1133-34. The court held that those direct "intangible" injuries to the states were sufficient to support standing, and the effect on state sovereignty was "heighten[ed]," because the challenged guidance "restricts the way in which states may reduce tax receipts or change tax rates …." *Id*. at 1136. Likewise, *Massachusetts v. EPA* addressed the threatened loss of territory owned by and subject to the sovereignty of the state. *Id.*

In contrast, the present case involves "indirect fiscal burdens allegedly flowing" from federal immigration enforcement decisions. *Arizona*, 40 F.4th at 386. Although the district court briefly suggested that the challenged memoranda implicate Florida's territorial interests due to the "presence of unauthorized aliens within that territory," A372, that reasoning dramatically overreads *Massachusetts*, which dealt with the literal *loss* of territory, *see* 549 U.S. at 522-23. The mere fact that a challenged policy may have effects *within* a state's territory is insufficient. Outside the limited context discussed in *Massachusetts*, the Supreme Court has not afforded a state "special solicitude," and never in a case challenging immigration policy. Accordingly, as the Sixth Circuit recently concluded, such harms do not warrant special solicitude and do not relieve a state from "Article III's imperative of

a cognizable case or controversy or the requirements of injury, causation, and redressability." *Arizona*, 40 F.4th at 385-86.

Second, the district court wrongly concluded that Florida suffered injury traceable to Parole+ATD and PWC. The standing inquiry requires the evidence of harm to be "concrete and particularized" and have a "causal connection … to the conduct complained of." *Lujan*, 504 U.S. at 560-61. The court found standing in the Parole+ATD case based on evidence that more than 100,000 noncitizens released at the Southwest border since January 2021 went to Florida, during which time the number of "immigrant children and youth" enrolled in Florida schools had increased by more than 17,000 students. A375-80. The court found standing for the PWC guidance based on this same evidence. A467-68.

The district court's conclusion was improper. Florida showed only that there were 17,000 more "immigrant" students in Florida's public schools in the 2021-2022 school year compared to the 2020-2021 school year. A375-76. Florida defined "immigrant" students as those not born in the United States or educated in the United States for the past three years. A161, A195. That definition includes asylees, legal permanent residents, those on various visas, and even United States citizens who may have been born and raised abroad. A195-196. Critically, the number was not limited to noncitizens paroled under Parole+ATD. A376. Thus, broadly showing an increase in "immigrant" students fails to show traceability to Parole+ATD.

21

Further, the 100,000 noncitizens believed to have entered Florida since January 2021 included noncitizens released: on parole other than pursuant to the Parole+ATD guidance, on conditional release not at issue here, but which Florida challenged as part of its "non-detention policy" claims, and potentially even those released pursuant to court orders. A364-65. Indeed, Florida conceded it does not track data in a manner that allows it to identify expenditures made on behalf of noncitizens released under the challenged memoranda. A137, A195-197. As a result, the court based standing on speculation without adequate footing in the record. The quantum of proof that must be brought forward to establish standing depends on the stage of the proceedings at which it is reviewed. Even at the motion to dismiss stage, injury cannot be conjectural. *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229 (11th Cir. 2000). This case went to trial, where controverted facts, including those on standing, "must be 'supported adequately by the evidence adduced at trial.'" *Lujan*, 504 U.S. at 561. The district court's determination that Florida had standing was not supported by the record.

The district court's PWC ruling further compounded this error. The court had no new evidence corresponding to the PWC memoranda, which was in effect May 10-11, 2023, such as data regarding Florida school enrollments or the number of noncitizens released pursuant to the PWC memorandum who provided Florida addresses. Further, any inferences regarding Parole+ATD cannot be imputed to

22

PWC: it is unknown how PWC, designed for exigent circumstances, would have been employed by DHS. Conjecture insufficient to support standing for Parole+ATD is similarly insufficient to carry Florida's burden to establish standing to challenge PWC without *any* evidence. *See Miccosukee Tribe of Indians*, 226 F.3d at 1229.

## II.     The District Court Erroneously Held the APA Permitted Review of Florida's Challenges to Parole+ATD and PWC.

The district court erred by reviewing Parole+ATD and PWC under the APA because the processes are committed to agency discretion by law and do not represent final agency action, Florida does not fall within the statutory zone of interests, and certain jurisdictional statutes preclude the court's review of the memoranda.

### A.  Parole+ATD and PWC are committed to agency discretion and a statute precludes review.

The manner of DHS's implementation of its parole authority through Parole+ATD and PWC is committed to agency discretion by law and, therefore Florida's arbitrary-and-capricious and notice-and-comment challenges are unreviewable. 5 U.S.C. § 701(a)(2). Further, 8 U.S.C. § 1252(a)(2)(B)(ii) precludes review of the Parole+ATD and PWC memoranda. 5 U.S.C. § 701(a)(1).

Decisionmaking involved in Parole+ATD and PWC, including if and when to charge and detain noncitizens, requires a "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Heckler v. Chaney*,

470 U.S. 821, 831 (1985). The resource allocation considerations partially informing the Parole+ATD and PWC processes (in addition to the health and safety concerns arising from overcrowding in holding facilities) also require balancing "whether agency resources are best spent on [enforcing] this violation [of the immigration laws] or another." *Id.* Resource availability, allocation, and prioritization considerations are core agency discretionary decisions. *Id.*

The district court nevertheless held the memoranda do not reflect agency discretion because an agency must "reasonably explain" its use of its parole discretion. A390 (quoting *Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022)). The court was mistaken. The court cited dicta in *Texas* that generally addresses an agency's burden to explain its decisionmaking in its implementing memoranda; the Supreme Court was not addressing whether particular uses of parole authority (which was not at issue in that case) were committed to agency discretion. *See* 142 S. Ct. at 2543.

"[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler*, 470 U.S. at 831. Applicants for admission eligible for parole are generally subject to section 1225, but that provision does not require DHS to detain, decline to parole, or issue charging documents to any specific individual. Although section 1225 uses the word "shall," the Supreme Court has instructed that the "deep-rooted nature of law-enforcement discretion" persists "even in the

presence of seemingly mandatory legislative commands." *Town of Castle Rock*, 545 U.S. 748, 761 (2005). Nothing in section 1225 evinces a "strong[] indication" of intent to impose a "true [detention] mandate" on the Executive. *Id.*; *accord Arizona*, 40 F.4th at 391. If anything, the opposite is true, as shown by the INA's provision of release on parole under section 1182(d)(5)(A) for section 1225(b) detainees. *See MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, 950 F.3d 764, 776 (11th Cir. 2020) (holding a court looks at statutory text in "relation to other provisions in the Act" to determine its meaning). Indeed, "[t]here are many moving parts in immigration law, and we doubt these laws completely eliminate [DHS's] discretion to decide whom to charge, whom to remove, and when to do so." *Arizona*, 40 F.4th 391; *see also Chiles*, 69 F.3d at 1096 ("Congress intended whether the [Secretary] is adequately guarding the borders of the United States to be committed to agency discretion by law and, thus, unreviewable.").

Even setting aside DHS's traditional enforcement discretion, the statute authorizing Parole+ATD and PWC explicitly commits parole decisions to agency discretion. Parole is explicitly within the Secretary's "discretion." 8 U.S.C. § 1182(d)(5)(A). "Congress has delegated remarkably broad discretion to executive officials under the [INA]" and its grants of authority "are nowhere more sweeping than in the context of parole." *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985); *see Jean v. Nelson*, 727 F.2d 957, 966 & n.8 (11th Cir. 1984). Indeed, one

clause of the statute relied on by Florida calls for noncitizens to be returned to custody "when the purposes of such parole shall, *in the opinion* of the [Secretary], have been served." 8 U.S.C. § 1182(d)(5)(A) (emphasis added).

Further underscoring the unreviewable discretion inherent in parole, and providing a separate bar on APA review, 5 U.S.C. § 701(a)(1), courts lack jurisdiction to review decisions related to parole under 8 U.S.C. § 1252(a)(2)(B)(ii). *See Alonso-Escobar v. USCIS Field Off. Dir. Miami, Fla.*, 462 F. App'x 933, 935 (11th Cir. 2012) (unpublished); *Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1382 (S.D. Fla. 2002), *aff'd*, 321 F.3d 1336 (11th Cir. 2003).

Section 1252(a)(2)(B)(ii)—which bars review of "decision or action[s] … the authority for which is specified under this subchapter to be in the discretion of … the Secretary of Homeland Security"—precludes jurisdiction over Florida's claims because the INA specifically provides that any decision whether to grant parole is "in [the] discretion" of the Secretary. 8 U.S.C. § 1182(d)(5)(A). As the Supreme Court recently explained in construing section 1252(a)(2)(B)(i), that provision, which bars jurisdiction to review "any judgment regarding the granting of relief" under certain INA provisions, bars review of "judgments of whatever kind" covered by the statute, "not just discretionary judgments or the last-in-time judgment," and so "encompasses not just the granting of relief but also any judgment relating to the granting of relief." *Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022). This reasoning

applies also to section 1252(a)(2)(B)(ii). As the Supreme Court explained in *Kucana v. Holder*, 558 U.S. 233, 247 (2010), "[o]ther decisions specified by statute 'to be in the discretion of the Attorney General,' and therefore shielded from court oversight by § 1252(a)(2)(B)(ii), are of a like kind" to those covered by section 1252(a)(2)(B)(i). Accordingly, section 1252(a)(2)(B)(ii)'s jurisdictional bar extends not just to final decisions or actions, but "any [decision or action] relating to the granting of relief." *Patel*, 142 S. Ct. at 1622, such as the decisions to promulgate the Parole+ATD and PWC guidance for making the discretionary parole determination.

In short, "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities," *Heckler*, 470 U.S. at 831-32, and the district court erred in interfering with the agency's resolution of competing enforcement priorities and limited resources.

B. Parole+ATD and PWC are not reviewable final agency actions.

The district court also erred by finding Parole+ATD and PWC were reviewable final agency actions. *See* 5 U.S.C. § 704. Agency action is final if it determines legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Agency action that "does not itself adversely affect" a party but instead "only affects his rights adversely on the contingency of future administrative action" is "nonfinal." *Nat'l Parks Conservation Ass'n*, 324 F.3d at 1237.

Neither the Parole+ATD nor the PWC memorandum create legal rights or obligations or finally determine the issue at hand: whether parole will be granted to a noncitizen. *See id.* at 1236; A2-4; A6-10. Neither memoranda require USBP agents to take a specific action; they neither impose an obligation on officers to detain a noncitizen, nor grant any noncitizen the right to release. A2-4; A5-11; *see Bennett*, 520 U.S. at 178. USBP agents retain discretion to detain or parole noncitizens on a "case-by-case basis," and nothing in the guidance mandates a specific result in any circumstance. A3-4; A5-11. Because both memoranda leave agency officials "free to exercise discretion" to grant or deny parole in particular cases, neither constitutes reviewable final agency action. *See Jean v. Nelson*, 711 F.2d 1455, 1481 (11th Cir. 1983); *Florida v. United States*, 540 F. Supp. 3d 1144, 1157 (M.D. Fla. 2021), *vacated on other grounds*, No. 21-1171, 2021 WL 5910702 (11th Cir. 2021).

The district court nevertheless found final agency action because, it stated, the memoranda instruct agents how to use their discretionary authority, establish "new marching orders" for whether to detain noncitizens, and determined Florida's obligations. A389. But, as explained, the memoranda do not dictate detention or release decisions, and they leave those in the hands of agents to apply the section 1182(d)(5)(A) standard. And neither memorandum regulates Florida. Any obligations Florida might have towards released noncitizens stems from other

sources of law and cannot transform an otherwise non-final agency action into final agency action.

## C. Florida is not in the statutory zone of interests.

The district court also lacked authority to review Florida's challenges to Parole+ATD and PWC because Florida does not fall within the zone of interests of the statutory provisions it is suing to enforce, including section 1182(d)(5)(A).

Ordinarily, a party may sue under the APA only if it asserts an interest "arguably within the zone of interests to be protected or regulated by the statute" at issue. *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396 (1987). But nothing in the parole or detention statutes evinces a concern with state sovereigns. Moreover, the INA prescribes a scheme of judicial review of these "particular issues" only for the noncitizens who are subject to it, *see* 8 U.S.C. §§ 1252(a)(2)(B)(ii), 1252(a)(2)(D), 1252(a)(5), (b)(9), (g), demonstrating that Congress did not intend for "judicial review of those issues at the behest of other persons," much less States, to occur. *Block v. Community Nutrition Inst.*, 467 U.S. 340, 349 (1984).

## III. The District Court Erroneously Held that Parole+ATD and PWC Are Contrary to Law.

### A. The memoranda are consistent with Section 1182(d)(5).

Section 1182(d)(5)(A) provides that the Secretary of Homeland Security may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or

significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). The noncitizen "shall return or be returned to the custody from which he was paroled . . . when the purposes of such parole shall, in the opinion of the [Secretary], have been served," and "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission." *Id*. The challenged memoranda fully comply with these requirements.

Pursuant to the memoranda, parole is available only where there is an urgent humanitarian reason or significant public benefit for an individual exercise of parole during high-encounter periods. During these periods, the memoranda authorize a case-by-case analysis to prioritize individuals for parole based on the significant public benefit that results from paroling individuals who are a low priority for detention to allow for the continued detention of higher-risk individuals. The memoranda also authorize officers to parole noncitizens based on the significant public benefit and urgent humanitarian reason of ensuring the safety and health of both noncitizens and USBP officers in potentially overcrowded facilities. The agency correctly determined that the memoranda comport with the statutory standard by allowing USBP to maximize its limited detention space, and therefore benefit the public, while avoiding the significant humanitarian concerns associated with attempting to detain all encountered individuals during high-encounter periods.

Congress did not define "urgent humanitarian reasons or significant public benefit," and therefore delegated to the agency the role of determining those terms' appropriate contours. *See, e.g.*, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); 8 U.S.C. § 1103(a)(1), (3); 6 U.S.C. § 202(4). DHS's interpretation of "urgent humanitarian reasons or significant public benefit" as articulated in the memoranda are reasonable and therefore entitled to deference. *See INS v. Aguirre-Aguirre,* 526 U.S. 415, 424-25 (1999). The regulations implementing section 1182(d)(5)(A) have long recognized a significant public benefit to paroling noncitizens whose continued detention is not in the public interest due to the need to prioritize agency enforcement resources and the need to prevent disease and other health and safety concerns created by overcrowding in congregate settings. *See* 8 C.F.R. § 212.5(b)(1), (5); 87 Fed. Reg. 18,078, 18,107-08 & nn.46-49 (2022). The agency's interpretation, as reflected in both memoranda and longstanding regulatory authority, is consistent with the views of this Court and others. *E.g.*, *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (noting "it doubtlessly advances the public interest to stem the spread of COVID-19"); *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (identifying the promotion of "public health" as a "significant public interest[]"). It is also consistent with the understanding of every Administration since the current version of the statute was enacted in 1996 that parole serves an urgent humanitarian reason and/or significant

public benefit when it permits immigration officials to prioritize physical space and personnel for higher priority enforcement needs. A623-67; *see also* Gene McNary, *Parole Project for Asylum Seekers at Ports of Entry and INS Detention* (Apr. 20, 1992), 9 Immigration Law Service 2d PSD Selected DHS Document 4110, at 1.

Both the Parole+ATD and PWC memoranda require consideration of these factors in individualized, case-by-case assessments to determine whether parole is appropriate for a noncitizen based on a significant public benefit or urgent humanitarian reason. A9, A3-4. Each applicant is individually considered for parole and prioritized, in part, based on the benefit of their continued detention as compared to other individuals encountered during the same period. Although DHS may consider general background factors such as whether a sector is experiencing crowding and overcapacity, the reasons for parole may not be based solely on general factors with no connection to the noncitizen's individual circumstances. *See, e.g.*, A6, A442-43.

Finally, a noncitizen's release under both memoranda may be reassessed, and the noncitizen may be taken into detention if warranted, upon receipt of their NTA *at the latest*. Regulations provide that parole automatically terminates upon service of the NTA, and the noncitizen is restored to the status they had prior to parole. 8 C.F.R. § 212.5(e)(2)(i), (ii). Thus, by providing for issuance of an NTA to

32

Parole+ATD recipients, the Parole+ATD memorandum guarantees that parole will terminate upon receipt of that NTA, setting the stage for a custody redetermination. The same would result from PWC, although that memorandum provides that parole terminates after 60 days even if service of the NTA has not yet occurred. A10.

B. The memoranda satisfy the "return to custody" and "case" clauses.

The district court erroneously held that Parole+ATD and PWC failed to acknowledge the "return to custody" and "case" clauses of section 1182(d)(5)(A). A411-12; A468, A497-98.

At the outset, the "return to custody" requirement could not provide a basis for challenging DHS's *releases* under Parole+ATD or PWC. If the Secretary determines that "the purposes of such parole have been served," 8 U.S.C. § 1182(d)(5)(A), DHS may then take enforcement action against the noncitizen. But the decision to take a noncitizen back into custody after parole has terminated involves a separate enforcement decision not governed by either policy.

Further, the plain text of this clause in section 1182(d)(5)(A) cannot be read to impose an obligation on DHS to take noncitizens into custody. Instead, the statute addresses two distinct obligations. First, "the alien shall forthwith return"—this imposes an obligation on the noncitizen first and foremost to return at the end of their parole. The alternative provision, that "the alien shall … be returned" to DHS custody, creates an obligation on an entity that has custody of the noncitizen—for

33

example, other federal, state or local law enforcement agencies to whom the noncitizen was paroled for the purpose of attending court or serving as a witness. *See Matter of R--*, 3 I. & N. Dec. 45, 46 (B.I.A. 1947) (noting "the power to parole has been used to permit inadmissible aliens…to defend criminal prosecutions, to testify in criminal cases for the Government" among other uses). The House Report accompanying the 1952 amendment to section 1182 in which the "return to custody" language was added described the "broader discretionary authority [] necessary" to permit the parole of inadmissible noncitizens into the United States for "medical attention," to act as "a witness," or "for purposes of prosecution." H.R. Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S. Code Cong. & Ad. News 1653, 1706. Regulations enacted since 1952 reflect the common practice of paroling a noncitizen into a third party's custody for such purposes. *Compare* 8 C.F.R. § 212.5(b)(4) (parole to another's custody), *with id.* at 212.5(b)(1)-(3), (5) (parole into own custody).

If Congress had intended for the "to be returned" language to apply to the federal government, it would have done so using the active voice and language identifying the governmental actor subject to the clause, as it did in other INA provisions concerning custody. *See, e.g.*, 8 U.S.C. § 1226(c) ("The Attorney General shall take into custody any [covered] alien" "when the alien is released."). To hold otherwise is contrary to the rule that where Congress includes particular language in

34

one section of an Act but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely. *Duncan v. Walker*, 533 U.S. 167, 173 (2001).

In any event, even if the text of the statute could conceivably be read to apply to DHS, nothing in the statute suggests congressional intent to displace background principles of enforcement discretion and require DHS to undertake enforcement actions against particular noncitizens. See *Town of Castle Rock*, 545 U.S. at 761. Numerous features of the statutory text reflect congressional solicitude for DHS's discretion in ending parole. The statute explicitly grants the Secretary the discretion to determine when parole should be terminated. *See* 8 U.S.C. § 1182(d)(5)(A) (providing that the noncitizen shall return to custody "when the purposes of such parole shall, in the opinion of the [Secretary], have been served").[3] It would be exceedingly odd for the statute to grant the Secretary unfettered discretion to determine when parole should be terminated, but then *mandate* that the Secretary expend resources to apprehend any noncitizen whose parole the Secretary had decided to terminate.

---

[3] To the extent the district court purported to make a finding that "the purpose of the parole is served when the alien has his first encounter with ICE," A412, the court lacked the jurisdiction to do so given the statute's express commitment of that decision to the Secretary's discretion. *See* 8 U.S.C. § 1252(a)(2)(B)(ii).

The district court also erred in suggesting the "return to custody" and "case" requirements permit noncitizens to be on parole *only* during the pendency of removal proceedings. A412. Unlike other statutes addressing conditional release of noncitizens, nothing limits parole to the period "pending a determination on whether the [noncitizen] is to be removed from the United States." *Compare* 8 U.S.C. § 1182(d)(5)(A) *with* 8 U.S.C. § 1226(a). Thus, noncitizens with final removal orders (who are no longer in removal proceedings) are still eligible for parole under section 1182(d)(5)(A). *See Clark v. Martinez*, 543 U.S. 371, 386 (2005); *Ahrens v. Rojas*, 292 F.2d 406, 407-08 (5th Cir. 1961). For the same reason, noncitizens who have not yet been issued NTAs—and thus are not in removal proceedings—are also eligible for parole.

Imposing requirements that limit parole to the pendency of removal proceedings or requiring detention at a definitive endpoint would be contrary to over half a century of immigration agency practice, long ratified by Congressional acquiescence. For decades, the government has offered parole on a programmatic basis to noncitizens sharing a particular humanitarian or public interest. *See, e.g.*, Written Testimony of Joseph Langois to Senate Subcomm., U.S. Dep't of Homeland Sec., Apr. 23, 2015, https://www.dhs.gov/news/2015/04/23/written-testimony-uscis-senate-judiciary-subcommittee-immigration-and-national; Shalini Bhargava Ray, The Emerging Lessons of Trump v. Hawaii, 29 Wm. & Mary Bill Rts. J. 775,

795 (2021) (discussing cases challenging programmatic humanitarian parole rescissions "on a mass scale"). These programs did not address a return to custody.

Congress has amended the INA during this period, *see, e.g.*, REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, but taken no effort to clarify the "return to custody" or "case" parts of section 1182(d)(5)(A), or any others, to indicate any disagreement with agency practice. *See Bob Jones Univ. v. United States,* 461 U.S. 574, 599 (1983) (Congress's clear awareness of, but failure to address, widely known agency action "when enacting other and related legislation make out an unusually strong case of legislative acquiescence"). In fact, Congress has amended the INA repeatedly to offer lawful status or refugee benefits for paroled groups, affirmatively indicating its approval of programmatic uses of parole that did not require a return to custody. *See, e.g.*, Pub. L. 117-128 (2022); Pub. L. 117-43 (2021); Pub. L. 104-208 (1996).

C. <u>The memoranda meet the case-by-case requirement.</u>

The district court erred in concluding that the individualized parole assessments explicitly called for by the Parole+ATD and PWC memoranda would be too cursory, too non-comprehensive, or too focused on general considerations to satisfy the "case-by-case" requirement of section 1182(d)(5)(A). A413, A497, A470.

The district court focused on an estimate in the record that Parole+ATD processing takes, on average, 15 to 30 minutes. A414. But the parole statute imposes

no minimum amount of time for the "case-by-case" analysis. *See* 8 U.S.C. § 1182(d)(5)(A). Thus, the actual amount of time that CBP officers spent granting parole under either memoranda could not serve as a basis for vacating or enjoining the memoranda themselves, which, on their face, require case-by-case consideration. A6; A3-4.

Regardless, this data does not indicate that the entirety of the process to interview a noncitizen and determine whether he or she is eligible for Parole+ATD takes 15 to 30 minutes; instead, the record provides only that the ministerial *processing* necessary to release the individual on Parole+ATD takes 15 to 30 minutes. A5. Much of the individualized inquiry into Parole+ATD eligibility will have occurred before processing begins. A3-4 (requiring biometric identity verification and security safety screening be performed "*[p]rior* to a noncitizen's processing via Parole+ATD") (emphasis added). Hence, the individualized consideration of a noncitizen's security and flight risks, urgent humanitarian reason or significant public benefit for parole, and biometric verification have already occurred before BP agents begin the 15-to-30-minute processing phase. *Id*. USBP agents are entitled to a presumption of regularity that they are performing the individualized vetting required by the guidance memoranda, and nothing in the record indicates agents are not conducting this case-by-case inquiry to rebut this presumption. *See Latif v. Obama*, 666 F.3d 746, 748 (D.C. Cir. 2011).

Finally, the district court suggested both Parole+ATD and PWC's case-by-case requirements were pretextual or insufficient because the considerations take into account DHS's operational situations such as overcrowding in facilities and limited space. A413; A469-70. However, the statute does not preclude considering such background factors along with their particularized impact on an individual noncitizen, and the district court offered no support for the conclusion that that particularization is not occurring. The statute expressly provides that "benefit" to the "public," that is, a larger group or community than simply the one noncitizen at issue, may form the basis for granting parole. *See* 8 U.S.C. § 1182(d)(5)(A) ("significant public benefit"); "Public," Oxford English Dictionary, https://www.oed.com. As long as USBP agents determine that there is a significant public benefit or urgent humanitarian reason to release each noncitizen they parole, the statutory requirements are satisfied. In short, the district court's apparent conclusion that agents making parole decisions may not consider circumstances that affect more than one noncitizen is entirely atextual.

Nor is a case-by-case assessment pretextual, or the exercise of parole unauthorized, simply because it may result in more parole grants when there is a significant increase in encounters. Congress did not set any numerical limitation on the Secretary's exercise of his parole authority, and instead entrusted it to the Secretary's "discretion." 8 U.S.C. § 1182(d)(5)(a). The district court lacks any legal

39

support for its criticism of the memoranda on these grounds. A413-15, A497, A469-71.

### D. Parole + ATD and PWC do not violate the "urgent humanitarian reasons or significant public benefit" requirement.

The district court's conclusion that Parole+ATD and PWC violate the substantive "urgent humanitarian reasons or significant public benefit" requirement was also erroneous. The district court held that Parole+ATD violated this requirement because it created "an entirely new processing pathway" that was "inconsistent with the narrow language in § 1182(d)(5)," as it, like 8 C.F.R. § 212.5(b)(5), made release presumptive, according to the court. A415-17.

The court was mistaken. The parole memoranda did not create a "new processing pathway" presumptively releasing all applicants for admission, but rather simply explained how the agency intended to use a particular release mechanism that Congress expressly provided in sector-specific overcapacity conditions. Rhetoric aside, the district court did not dispute that decompressing overcrowded facilities—to prioritize the detention of, *inter alia*, dangerous noncitizens and to reduce dangers to the health and safety of noncitizens and CBP agents alike—may produce a significant public benefit and safeguard urgent humanitarian concerns. And again, nothing in the statute limits the number of grants of parole.

Further, Florida did not challenge the validity of 8 C.F.R. § 212.5(b)(5), an interpretation of section 1182(d)(5)(A) entitled to deference. *See Chevron*, 467 U.S.

40

at 842. Regardless, the memoranda do not create a presumption of release, but instead require that parole be granted only a case-by-case basis when there is an urgent humanitarian interest or significant public benefit.

Further, the district court's ruling would invalidate decades of agency application of the statute on a programmatic scale. *Supra* 36-37. As noted, Congress has affirmatively and through acquiescence ratified these group-based uses of parole. *Supra* 37; *Bob Jones Univ.*, 461 U.S. at 599.

The district court also suggested that the national security and public safety inquiries for both Parole+ATD and PWC were defective because extra-record testimony indicated that Border Patrol agents would generally not know whether a noncitizen had a criminal record in a foreign country unless that country or the noncitizen himself reported it. A357, A416; A469. This conclusion was improperly based on extra-record evidence from the trial regarding the "non-detention policy" claims. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). Moreover, neither the parole statute nor any applicable regulation imposes a requirement that DHS verify foreign criminal history via official documents in determining a noncitizen's security risk or safety threat. *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(b). Parole+ATD and PWC cannot be contrary to law for failing to require agents to make an additional background search that no law requires.

41

**IV.    The District Court Erroneously Held the Parole+ATD Memorandum is Arbitrary and Capricious.**

The memoranda are reasonable and reasonably explained, and thus satisfy the highly deferential APA review standard. *Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996). The memoranda provided DHS the flexibility to address the health and public safety exigencies caused by increased border encounters at the southwest border. A6-8, A2-3. They explain that in some limited circumstances the federal government is unable to process noncitizens by issuing an NTA and that without a mechanism for expedited processing of low-risk noncitizens, government employees, noncitizens, and the public would face serious health and safety risks from massive overcrowding in CBP facilities. A6-9, A2-3. The memoranda allowed DHS to safely address increased border encounter numbers as they arose. *Id.*

The district court's contrary ruling, which addressed Parole+ATD only, was erroneous.[4] First, the district court held that the Parole+ATD memorandum failed to adequately consider the "backlog caused by earlier iterations of the policy." A413-20. This conclusion disregards the significant evidence in the administrative record acknowledging and addressing the issue, A503-622, including data showing how the backlog developed, A519-600 (including capacity rates at individual ICE offices),

---

[4] The district court did not rule on the PWC arbitrary-and-capricious claim. A498 at n.4.

and analyses of the cost of clearing the backlog, including through ICE efforts to serve NTAs on noncitizens to bring down the backlog in "Operation Horizon," A514-18, A601-03, A606-20. The Parole+ATD memorandum and supporting record reflects DHS's conclusion based on the evidence before it that the costs attributable to addressing the NTA-processing backlog are outweighed by the urgent humanitarian reasons and significant public benefit justifying the release of some individuals prior to NTA issuance in exigent overcapacity situations.

Second, the district court held the agency ignored evidence of the numbers of noncitizens released on Parole+ATD, which it deemed contrary to the July 18, 2022 memorandum's precatory admonition that Parole+ATD be "used sparingly" and not as a "primary processing tool." A421-21. The court's conclusion, for which it relied upon a single month's encounter data taken out of context, was improperly premised on extra-record evidence, the very evidence the district court rejected as improper when it ruled that review of Parole+ATD was limited to the administrative record. A420; A81-85. The policy provides it "should" be used sparingly, A2, and an exhortation of that kind, by definition, cannot be "untrue" or "contrary to the evidence before the agency." A420. The district court also selectively quoted the memorandum, which indicates "spare" use includes use as necessary to allow "disease-mitigation" and to the extent needed to provide "a safety valve to address overcrowding." A2. The district court did not explain how the "sparingly"

exhortation creates a judicially enforceable mandate limiting Parole+ATD to a certain number of uses.

Finally, the court held the July 18, 2022 memorandum was arbitrary and capricious for failing "to acknowledge its decision to expand Parole+ATD to include single adults rather than only family units." A421. This purported "expansion" of Parole+ATD did not represent an agency reversal of position requiring explanation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Parole under the terms of section 1182(d)(5) and enrollment in ICE ATD, the two pre-existing features that constitute Parole+ATD, have never been options limited to family units. A434-36. Parole+ATD was designed to be used only in exigent overcapacity circumstances, which from its inception were defined in terms of the size of the population of *individuals* being encountered or detained, not just family units. A435.

 Regardless, the district court erred by "second-guessing" the government's "weighing of risks and benefits" as contained in the Parole+ATD memorandum. *Dep't of Commerce*, 139 S. Ct. at 2571.

## V.    The District Court Erroneously Held That Parole+ATD and PWC Require Notice-and-Comment Rulemaking.

Both memoranda are exempt from notice-and-comment rulemaking because they are statements of policy. For PWC, good cause also excused notice-and-comment rulemaking.

44

Both memoranda are "general statement[s] of policy," because they do not establish any "binding norm," and instead "leave[] the agency free to exercise its discretion to follow or not follow that general policy in an individual case," such that "the agency remains free to consider the individual facts in the various cases that arise." *Nat'l Min. Ass'n*, 589 F.3d 1368, 1371 (11th Cir. 2009). Both memoranda track the discretionary language of the parole statute, 8 U.S.C. § 1182(d)(5), providing, for example, that release may only be granted "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," if certain criteria, as assessed by individual line agents, are present. A8, A3-4. Nothing in either memorandum requires any individual agent to release any individual noncitizen; each agent remains free to consider facts on a case-by-case basis. A7-9, A3-4; *see Nat'l Min. Ass'n*, 589 F.3d at 1371; *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019) (policy directing officers to consider whether they "may return" noncitizen to Mexico was statement of policy "because immigration officers designate applicants for return on a discretionary case-by-case basis"); *Jeanty*, 204 F. Supp. 2d at 1383 (INS parole policy constituted general statement of policy because it did not establish a "binding norm").

The district court nevertheless concluded that the memoranda are legislative rules subject to notice and comment because they "establish[] a generally applicable policy to determine whether aliens are detained or paroled, [they] instruct[] agents

how to exercise their discretionary authority under § 1182(d)(5), [they] set[] criteria for granting parole, and [they] affect Florida's obligations to paroled aliens." A421-24; A467-68, A497-98. Both memoranda, however, defer to USBP agents to determine, without any preordained result, whether to parole individual noncitizens. The memoranda have no "binding effect" on Florida because they do not govern Florida. *Nat'l Min. Ass'n*, 589 F.3d at 1371. Any obligations that Florida has concerning released noncitizens stem from other sources of law. Nor does it matter that the memoranda include "threshold requirements" concerning overcapacity conditions that trigger their use. Nothing in the memoranda compels a specific result, and the "ultimate decision" is discretionary. *See Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 599-601 (5th Cir. 1995).

With respect to PWC, notice-and-comment procedures were also not required because the agency, for "good cause," found "that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B), (d)(3). "Emergencies, though not the only situations constituting good cause, are the most common." *Dean*, 604 F.3d at 1281. "[E]mergency situation[s]" include those in which delayed implementation would pose "a possible imminent hazard to [] persons, and property." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004). PWC meets that standard. The memorandum provides that the sustained high border encounters that occurred immediately before May 11 were "quickly evolving

46

into exigent circumstances," with encounters at "an all-time high," averaging nearly 9,000 a day in the week leading up to the memorandum's issuance. A11. That increase significantly challenged limited enforcement resources, created dangerous overcrowding in CBP facilities, and stretched capacity and staffing past reasonable limits. A441-42.

The district court found this argument "unpersuasive because defendants have known . . . when the Title 42 Order was going to expire and what was likely to happen," and therefore had time "to go through notice and comment." A467-77 n.5. DHS undertook a variety of enforcement and policy actions in the months leading up to Title 42's termination to prepare for an expected increase in border encounters. A439-40. The sustained increased border encounters in the days before the termination of the Title 42 order, however, necessitated further action to ensure that USBP had the ability to parole noncitizens to decompress severely overcrowded facilities. Despite DHS's extensive efforts, the number of individuals in CBP custody as of May 9, 2023 was approximately 27,000, with the potential to increase to 45,000, both well beyond CBP capacity. A441-42; *see* A3 (defining overcapacity as more than 15,000 noncitizens in USBP custody). Notice-and-comment rulemaking was excused for good cause under these circumstances.

## VI.    Equitable Factors Did Not Support the District Court's Injunction of PWC.

In addition to failing to show a likelihood of success on the merits with respect to PWC, Florida did not demonstrate that the equitable factors favored a preliminary injunction. For PWC, the governmental and public interest factors[5] significantly outweigh any speculative harm to Florida. Accordingly, the district court should not have enjoined the policy.

The district court's injunction undermines the Executive Branch's constitutional and statutory authority to implement its immigration priorities and secure the border based on its "[p]redictive judgment[s]." *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988). The injunction blocks the government's chosen means of addressing increased border encounters, thereby frustrating the "public interest in effective measures to prevent the entry" of unauthorized noncitizens at the Nation's borders, *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). In particular, the injunction significantly limits the government's options for releasing individuals posing no threat to public safety or national security in order to decompress detention facilities when overcrowding reaches a level that endangers the health and safety of noncitizens and employees. It also inhibits DHS's ability to deploy resources from processing to more pressing public safety and national

---

[5] The opposing party's interest and public-interest factors merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

security threats. This injury is compounded by the vacatur of Parole+ATD, which further limits the government's options for addressing overcapacity border conditions. The public interest is served by allowing CBP officials to employ their experience and judgment during exigent situations and use all lawful tools at their disposal to ensure the continued safe, effective, and humane enforcement and administration of U.S. immigration law, including through the government's well-settled discretionary parole authority under 8 U.S.C. § 1182(d)(5)(A).

The injunction blocks an emergency parole option deemed necessary by DHS to address unprecedented encounters at the Southwest border that could strain USBP capacity beyond its limits. A5-11. PWC allows USBP to expeditiously process noncitizens for release by avoiding the significantly more time-consuming process of issuing a NTA consistent with legally required, regimented documentary and notice requirements. A1-4. The availability of PWC on an emergent basis allows CBP to safely address future increases in encounters, recognizing they can occur without warning, creating dangerous opportunities for transnational criminal organizations and smugglers to take advantage of CBP's focusing its limited resources on processing NTAs to reduce overcrowding at the expense of other border-security priorities. *Id.* From this perspective, Parole+ATD and PWC, with their provision for subsequent NTA issuance and accountability measures, are far preferable to other possible alternatives if USBP reaches exigent overcapacity

49

circumstances, such as being forced to decline to apprehend some noncitizens altogether.

The harm the United States potentially faces because of the unavailability of PWC as an emergency processing option significantly outweighs any harm Florida may face from the absence of preliminary injunctive relief. Florida asserts only speculative injuries from possible public-service expenditures. An alleged error from not engaging in notice-and-comment rulemaking is likewise insufficient. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Even if Florida's alleged harms were certain, they would not outweigh the harm imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), undermining "efficient administration of the immigration laws at the border," *Innovation Law Lab*, 924 F.3d at 510, explained *supra*.

The district court failed to credit these interests. Instead, the court abused its discretion by determining Florida had an irreparable injury. "[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely a "possibility." *Winter*, 555 U.S. at 22 (emphasis in original). The district court held Florida would suffer irreparable injury to its public fisc (presumably from funding public services noncitizens might use) and to its state sovereignty (because Florida cannot "exclude aliens who were improperly 'paroled'

from its territory") from the release of noncitizens at the border under PWC. A471-72.

This reasoning relies on several legal errors. First, the district court erred by holding that injury to Florida's public fisc is categorically irreparable because sovereign immunity precludes Florida from obtaining monetary relief against the United States. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990). That is a feature of our federalist system. Congress has chosen to waive sovereign immunity for specific, limited purposes, *see, e.g.*, 28 U.S.C. § 1491, but has not chosen to do so on behalf of States—or anyone else—through the APA. That deliberate choice by Congress means the inability to recoup financial costs from the United States in this context cannot be irreparable injury.

Second, whether based on sovereignty or financial harm, the district court's finding of harm rested on speculation that PWC would result in noncitizens who "should not" have been paroled ending up in Florida and making use of state-funded services. Florida did not show it is *likely* that PWC would lead to such a result, which turns on a string of contingencies and depends on the independent choices of third parties. *See Winter*, 555 U.S. at 22. Irreparable injury "must be neither remote nor speculative, but actual and imminent." *Northeast Fla. Chapter,* 896 F.2d at 1285. The district court made this determination based on no evidence concerning

PWC, but merely based on its prior finding that Florida would suffer injury to support standing from Parole+ATD in that separate case. A471. As explained, *supra*, the determination of injury from Parole+ATD was impermissibly speculative and based on conjecture that some of the noncitizens using Florida's services were Parole+ATD releases. Florida had no evidence affirmatively connecting its expenditures to Parole+ATD recipients. Any inferences regarding Parole+ATD cannot be imputed to PWC, for which the court had no data regarding its potential use to support the court's conclusion. The district court's speculation is insufficient to establish an irreparable injury here. *See Northeast Fla. Chapter,* 896 F.2d at 1285.

Third, the district court abused its discretion by determining that any possible harm to Florida from PWC outweighed the harm (outlined above) that enjoining the policy would have on the federal government and the American public's border-management interests. Such interests include DHS's ability to respond to exigent situations arising from peak border encounters that other otherwise would overwhelm CBP facilities, risking widespread health and safety risks to noncitizens, and government employees, and divert personnel from other critical border-security tasks. A441-46. As noted above, Parole+ATD and PWC are far preferable to other possible alternatives with fewer accountability measures.

52

The balance of equities tips overwhelmingly against a preliminary injunction against PWC. The district court abused its discretion in imposing one.

## VII. The District Court's Orders are Impermissibly Overbroad.

The nationwide scope of the orders exceeded the district court's constitutional, equitable, and APA authority. Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018); *see Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (same, rule in equity). Immigration law is not a special context warranting a different rule. All injunctions—even those involving "national rules and policies"—must be narrowly tailored to remedy the specific harm shown. *Georgia v. President of the United States*, 46 F.4th 1283, 1304 (11th Cir. 2022).

Similarly, the APA does not affirmatively authorize universal vacatur or nationwide relief. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J. concurring) ("No statute expressly grants district courts the power to issue universal injunctions."). The APA provides that a court may "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). But section 706(2) does not authorize universal vacatur; indeed, it does not pertain to remedies at all. Remedies are governed by Section 703—a form of relief that is limited to redressing a particular plaintiff's

specific injury.[6]

The district court erred by ordering nationwide relief (injunctive and vacatur) that went beyond the scope of the alleged injury it found conferred standing for Parole+ATD and PWC—that at least some of the noncitizens released on Parole+ATD made their way to Florida and enrolled their children in school or used other state-funded services. A368. Given the court's basis for standing, any relief issued by the court should have been limited to noncitizens with children who provided a final address in Florida. *See DaimlerChrysler Corp.*, 547 U.S. at 352 (A "plaintiff must demonstrate standing for each claim he seeks to press" and "each form of relief sought."). The district court's orders provide a remedy well beyond the confines of Florida and the injury allegedly sustained.

The district court erroneously concluded that limiting relief to those noncitizens providing a Florida address was insufficient to remedy Florida's injury because noncitizens would "figure out how to ensure their own release"—presumably by offering false addresses despite heading to Florida. A427. The Court's conclusion is speculative and has no support in the record. The court assumes: noncitizens would learn of and understand the *Florida* decision, noncitizens would willingly lie to DHS officers and risk being ordered removed *in*

---

[6] These arguments concerning the proper remedies under the APA are also presently pending in *United States v. Texas*, No. 22-58.

*absentia* (because DHS generally places noncitizens in removal proceedings in the location in which they indicate they will be staying), and DHS would have to have no way of determining if a noncitizen misrepresented their destination address. There are no facts in the record to support any of these links in the causal chain. *Cf. Arpaio*, 27 F. Supp. 3d at 203 (court cannot conclude an immigration action will cause increased crime in a locale since that requires assuming independent third parties will choose to move to that locale *and* engage in criminal conduct there). Such unsupported speculation does not offer a valid reason to ignore the traditional party-specific limitations on equitable and APA relief.

## CONCLUSION

The Court should reverse the district court's orders vacating Parole+ATD and preliminary enjoining PWC. At a minimum, the Court should narrow the orders to remedy Florida's demonstrated injuries.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney*
      *General*
WILLIAM C. PEACHEY
   *Director*
EREZ REUVENI
   *Assistant Director*
*/s/ Joseph A. Darrow*
JOSEPH A. DARROW
ELISSA P. FUDIM
ERIN T. RYAN
   *Trial Attorneys*
   U.S. Dep't of Justice, Civil Division
   Office of Immigration Litigation,
   District Court Section
   P.O. Box 868, Ben Franklin Station
   Washington, DC 20044

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,465 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Joseph A. Darrow*
JOSEPH A. DARROW

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system. Plaintiffs' counsel was also notified of this motion by email.

*/s/ Joseph A. Darrow*
JOSEPH A. DARROW

## RULE 28(f) STATUTORY ADDENDUM

8 U.S.C. 1182(d)(5)(A) provides:

The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.