Nos. 23-11528, 23-11644

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

### STATE OF FLORIDA,

*Plaintiff-Appellee,*

v.

### UNITED STATES OF AMERICA, et al.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of Florida
Nos. 3:21-cv-01066-TKW-ZCB, 3:23-cv-09962-TKW-ZCB

---

## BRIEF FOR *AMICUS CURIAE* IMMIGRATION REFORM
## LAW INSTITUTE IN SUPPORT OF PLAINTIFF-APPELLEE

---

MATT A. CRAPO
CHRISTOPHER J. HAJEC
**Immigration Reform Law Institute**
**25 Massachusetts Ave., NW, Suite 335**
**Washington, DC 20001**
**Telephone: (202) 232-5590**
**Email: litigation@irli.org**

**Attorneys for *Amicus Curiae***

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

Pursuant to 11th Cir. R. 26.1-2 and Fed. R. App. P. 26.1, *amicus curiae*

Immigration Reform Law Institute makes the following disclosures:

1) For non-governmental corporate parties please list all parent

corporations: None.

2) For non-governmental corporate parties please list all publicly held

companies that hold 10% or more of the party's stock: None.

3) In addition to those persons listed in Defendants-Appellants' Statement of

Interested Persons, the following persons and entities have an interest in this case:

- Crapo, Matt A., attorney for *amicus curiae* Immigration Reform Law Institute

- Hajec, Christopher J., attorney for *amicus curiae* Immigration Reform Law Institute

- Immigration Reform Law Institute, *amicus curiae*

Dated:  June 29, 2023

Respectfully submitted,

/s/ Matt Crapo
MATT A. CRAPO
Counsel for *Amicus Curiae*

## STATEMENT OF *AMICUS CURIAE*

All parties have consented to the filing of this *amicus curiae* brief. No party or party's counsel authored any part of this brief. No person or entity, other than *amicus*, its members, or its counsel, has made a monetary contribution to this brief's preparation or submission.

Respectfully submitted,

/s/ Matt Crapo
MATT A. CRAPO
Counsel for *Amicus Curiae*

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

STATEMENT OF *AMICUS CURIAE*

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF *AMICUS CURIAE*............................................................1

SUMMARY OF THE ARGUMENT ........................................................1

ARGUMENT .........................................................................................4

I.      *United States v. Texas* is distinguishable because the parole policies challenged here deal only with detention determinations and confer substantial legal benefits upon parolees .........................................4

II.     Because paroling any individual alien under the challenged policies does not address an urgent humanitarian concern and produces no significant public benefit, Defendants' parole programs violate 8 U.S.C. § 1182(d)(5)(A)........6

III.    Legislative history confirms that Congress intended the parole authority to be exercised only on an individual basis .......................................9

IV.     Contemporaneously-enacted agency rules comported with a narrow, individualized approach to parole, particularly with respect to aliens amenable to expedited removal, and other, current regulations still take that approach......................................................................................10

CONCLUSION ....................................................................................14

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Linda R.S. v. Richard D.*,
　410 U. S. 614 (1973)...................................................................4

*Matter of Silva-Trevino*,
　26 I&N Dec. 826 (BIA 2016) ....................................................1

*Texas v. Biden (MPP)*,
　20 F.4th 925 (5th Cir. 2021) .....................................................6

*Texas v. United States (DACA)*,
　549 F. Supp. 3d 572 (S.D. Tex. 2021) ......................................5

*Trump v. Hawaii*,
　138 S. Ct. 2392 (2018)...............................................................1

*United States v. Texas*,
　No. 22-58, slip op. (U.S. June 23, 2023) .........................1, 4, 6

*Wash. All. Tech Workers v. U.S. Dep't Homeland Security*,
　50 F.4th 164 (D.C. Cir. 2022)....................................................1

## STATUTES

8 U.S.C. § 1182(a)(7).......................................................................5

8 U.S.C. § 1182(d)(5).....................................................................12

8 U.S.C. § 1182(d)(5)(A) ...................................................... 6, *passim*

8 U.S.C. § 1182(d)(5)(B) .................................................................6

8 U.S.C. § 1225(b) ...........................................................................3

8 U.S.C. § 1225(b)(1)(A)(i) .............................................................5

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) .............................................................11

8 U.S.C. § 1255(a) ....................................................................................5

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
   § 602(a), Pub. L. No. 104-208, 110 Stat. 3009....................................6

Refugee Act of 1980,
   § 203(f), Pub. L. No. 96-212, 94 Stat. 102 ...........................................6

## REGULATIONS

7 C.F.R. § 273.4(a)(6)(i)(D).........................................................................4

8 C.F.R. § 212.5(a) (1998).....................................................................11, 12

8 C.F.R. § 212.5(b) (2023)..........................................................................12

8 C.F.R. § 212.5(c) (2023)..........................................................................12

8 C.F.R. § 212.19(d) ...................................................................................13

8 C.F.R. § 235.3(b) .....................................................................................12

8 C.F.R. § 235.3(b)(2)(iii)......................................................................11, 12

8 C.F.R. § 235.3(b)(4)..................................................................................11

8 C.F.R. § 235.3(b)(4)(ii).......................................................................11, 12

8 C.F.R. § 235.3(b)(5)(i)..............................................................................11

8 C.F.R. § 235.3(c)................................................................................11, 12

8 C.F.R. § 274a.12(c)(11) .............................................................................4

## MISCELLANEOUS

H.R. Rep. No. 104-469, pt. 1 (1996) ............................................................9

Implementation of Changes to the Parole Process for Venezuelans,
    88 Fed. Reg. 1279 (Jan. 9, 2023) .........................................................................8

Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens;
    Conduct of Removal Proceedings; Asylum Procedures,
    62 Fed. Reg. 10312 (Mar. 6, 1997) .......................................................10, 11, 12

International Entrepreneur Rule,
    82 Fed. Reg. 5238 (Jan. 17, 2017) .....................................................................13

Procedures for Credible Fear Screening and Consideration of Asylum,
    Withholding of Removal, and CAT Protection Claims by Asylum Officers,
    87 Fed. Reg. 18078 (Mar. 29, 2022) ..................................................................12

S. Rep. No. 104-249 (1996) .....................................................................................10

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases in the interests of United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law.  IRLI has litigated or filed *amicus curiae* briefs in a wide variety of cases, including: *Wash. All. Tech Workers v. U.S. Dep't Homeland Security*, 50 F.4th 164 (D.C. Cir. 2022), *petition for cert. filed*, No. 22-1071 (S. Ct. May 1, 2023); *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); and *Matter of Silva-Trevino*, 26 I&N Dec. 826 (BIA 2016).

## SUMMARY OF THE ARGUMENT

The Supreme Court's recent decision in *United States v. Texas*, No. 22-58 (U.S. June 23, 2023), is distinguishable from this case. As Florida observes, in contrast to *Texas*, the parole policies challenged here do not solely involve decisions about which illegal aliens to arrest or prosecute, but instead concern both the ongoing detention of those to be charged with removal and the conferral of legal benefits. In addition to the work-authorization and nutritional-assistance benefits identified by Florida, parolees are also eligible for adjustment of status, which if granted would put them on a path to citizenship itself. Even if Florida would lack standing to challenge the executive's exercise of discretion to choose

1

which aliens to arrest or charge with removability, under *Texas* there is no bar to its standing to challenge the conferral of such benefits as these.

On the merits, this Court should affirm the district court orders vacating the Parole+ATD policy and enjoining the Parole with Conditions ("PWC") policy because those policies are incompatible with the parole statute. The text of the governing statute requires that parole be given "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." The Department of Homeland Security ("DHS") claims that paroling numerous low-priority aliens under the challenged policies meets this standard because it would purportedly help "safeguard the health and safety of individual noncitizens in DHS's custody and employees by expediting processing and thereby reducing overcrowding and the harms caused by overcrowding." Appellant's Brief at 8; *see also id.* at 30 (identifying overcrowding and detention prioritization as public benefits supporting both PWC and Parole+ATD).

Even if the parole policies tend to alleviate overcrowding, the parole of any specific alien would not significantly serve that purpose. At best, the parole of any particular alien, *in addition* to the parole of numerous other similarly situated "low-priority" aliens, would be necessary to attain the alleged public benefit. Thus, parole of any particular alien by itself does not significantly increase the alleged public benefit. It is only *en masse* parole that does so. In short, the government is

not paroling any particular alien on the basis that doing so will significantly benefit the public or meaningfully address an urgent humanitarian concern.

DHS's justification for its parole program also runs counter to the text and structure of the statute, legislative history, contemporary interpretations by the agency charged with enforcing the provision, and other regulations interpreting the statute. Since the parole statute was amended in 1996, regulations have contemplated that parole of aliens subject to mandatory detention under 8 U.S.C. § 1225(b) is only available in cases of medical emergencies or for law enforcement purposes (such as parole for prosecution or to testify). The test for parole has been whether a specific alien is in circumstances, or has qualities, that would render his or her presence in the United States, by itself, either of urgent humanitarian concern or of significant benefit to the public. For example, the rule governing parole for entrepreneurs properly construes the parole statute as requiring a particular alien to demonstrate that his presence in the United States would provide a significant public benefit. Because DHS's parole programs do not comport with the statutory requirements for parole, this Court should affirm the orders below.

**ARGUMENT**

I.    *United States v. Texas* **is distinguishable because the parole policies challenged here deal only with detention determinations and confer substantial legal benefits upon parolees.**

The Supreme Court recently held that a State does not have standing to challenge the government's decision about whether to arrest or charge an alien with removability under the Immigration and Nationality Act. *See United States v. Texas*, No. 22-58, slip op. at 4-9 (U.S. June 23, 2023). The Court held that "a party 'lacks a judicially cognizable interest in the prosecution . . . of another.'" *Id.* at 5 (quoting *Linda R. S. v. Richard D.*, 410 U. S. 614, 619 (1973)).

Nevertheless, the Court acknowledged that its decision does not necessarily govern situations in which a challenged policy involves the conferral of a legal benefit or the continued detention of an alien who has already been arrested and for whom removal is sought. *See id.* at 11-12. Under the parole policies challenged here, parolees are eligible for certain legal benefits, and parole itself merely affects whether the alien will remain in detention pending removal proceedings. Accordingly, this case falls outside the reach of *Texas*.

Florida identifies two legal benefits that parolees are eligible for: work authorization and nutritional assistance. Appellee's Brief at 4 (citing 8 C.F.R. § 274a.12(c)(11) (work authorization) and 7 C.F.R. § 273.4(a)(6)(i)(D) (nutritional assistance)). In addition to those benefits, parolees are eligible to adjust status

4

within the United States. *See* 8 U.S.C. § 1255(a) ("The status of an alien who was inspected and admitted *or paroled* into the United States … may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence ….") (emphasis added). Only aliens who enter the United States legally (that is, are "admitted or paroled") are eligible to adjust their status within the United States.

Aliens who attempt to enter the United States without proper entry documents are ineligible to adjust their status and are generally only eligible for asylum-related relief or protection. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (requiring the expedited removal of any alien who is inadmissible under § 1182(a)(7)—that is, an alien without proper entry documents—"without further hearing or review unless the alien indicates either an intention to apply for asylum … or a fear of persecution"); *see also Texas v. United States (DACA)*, 549 F. Supp. 3d 572, 612-14 (S.D. Tex. 2021) (explaining how parole enables otherwise ineligible aliens to become eligible for adjustment of status). The challenged parole policies therefore circumvent the general bar to adjustment of status otherwise applicable to aliens who enter the country illegally and provide parolees with a pathway to adjustment of status and ultimately citizenship. In other words, parole opens an entirely new pathway to relief from removal that would otherwise be unavailable to the aliens subject to the challenged parole policies.

In addition, whatever prosecutorial discretion DHS exercises in choosing which aliens to arrest or charge with removability, that type of prosecutorial decision is not at issue in this case. Because DHS currently seeks the removal of every alien that is subject to the parole policies challenged here, Florida is not seeking an order directing DHS "to alter its arrest policy" or to seek removal of "more noncitizens." *Texas*, slip op. at 4. Only challenges to such prosecutorial policies give rise to the standing problems the Court found in that case.

## II. Because paroling any individual alien under the challenged policies does not address an urgent humanitarian concern and produces no significant public benefit, Defendants' parole programs violate 8 U.S.C. § 1182(d)(5)(A).

The current language in 8 U.S.C. § 1182(d)(5)(A) authorizing parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" was added by section 602(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")[1] "'to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool.'" A413 (quoting *Texas v. Biden (MPP)*, 20 F.4th 925, 947 (5th Cir.

---

[1] Title VI of division C of Pub. L. No. 104-208, 110 Stat. 3009, 3009-689; *see also* § 203(f) of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, 107-08 (codified at 8 U.S.C. § 1182(d)(5)(B)) (providing that DHS "may not parole into the United States an alien who is a refugee unless [DHS] determines that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled into the United States rather than be admitted as a refugee") (emphasis added).

6

2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022)). The statute's "only on a case-by-case basis" language calls for an individualized determination that the parole of "any [individual] alien applying for admission to the United States" serves an "urgent humanitarian" purpose or that the presence of *that particular alien* would provide a "significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

This individualized understanding of the parole authority is buttressed by the text that follows, which directs that "*the* alien" temporarily paroled "shall forthwith return or be returned to the custody from which *he* was paroled and thereafter *his* case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States" "when the purposes of such parole shall … have been served[.]" *Id.* (emphasis added). This language makes it abundantly clear that any applicant for parole must show that his or her own presence in the United States satisfies either the "urgent humanitarian" reason or "significant public benefit" standard for parole.

In contrast to an individualized test for parole, DHS attempts to justify the Parole+ATD and PWC programs by suggesting that *en masse* parole of "low-priority" aliens would help "safeguard the health and safety of individual noncitizens in DHS's custody and employees by expediting processing and thereby reducing overcrowding and the harms caused by overcrowding." Appellant's Brief at 8; *see also id.* at 30 (identifying overcrowding and detention prioritization as

7

public benefits supporting both PWC and Parole+ATD). But the purported benefits of the parole programs can only be attained if a sufficient number of aliens are paroled *en masse* to relieve overcrowding.[2] Because the public benefit of paroling any particular alien depends on the aggregate effect of paroling many similarly-situated aliens *en masse*, the public benefit of paroling an individual alien is marginal and insignificant; if any particular alien were not paroled, the public benefit allegedly produced by paroling numerous other aliens would not be appreciably lessened. In other words, there is no significant public benefit in paroling any particular alien; at best, the alleged significant benefit only comes from paroling that alien *in addition to* numerous other aliens *en masse*. And the *significant* public benefit only comes from the *en masse* parole, not from the parole of any individual alien.

---

[2]  Indeed, in another context relating to another mass parole program, the government has found the parole of tens of thousands of purportedly low-priority aliens was insufficient to stem the tide at the border. *See*, *e.g.*, Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279, 1280 (Jan. 9, 2023) (finding a one-time parole limit of 24,000 was insufficient to provide an adequate alternative to crossing the border illegally and replacing that limit with a *monthly* limit of 30,000 travel authorizations spread across four countries so that the program may "serve[] as a meaningful alternative to irregular migration.").

**III.    Legislative history confirms that Congress intended the parole authority to be exercised only on an individual basis.**

The legislative history leading up to the enactment of IIRIRA reflects Congress's disapproval of the Executive Branch's overuse of the parole authority. For example, the House Judiciary Committee Report complained of "recent abuse of the parole authority" by the Clinton administration "to admit up to 20,000 Cuban nationals *annually*." H.R. Rep. No. 104-469, pt. 1 at 140 (1996) (emphasis added). Here, the district court found that the Parole+ATD program was used to parole tens of thousands of aliens. *See* A356-57 (finding that 39,918 aliens were released under Parole+ATD in April 2022 and almost 89,000 aliens in November 2022). Thus, the parole programs challenged here are more than an order of magnitude larger than the parole abuse complained of by the House Judiciary Committee in 1996.

Further, the House Judiciary Committee report included examples of what sorts of situations would warrant humanitarian or public interest parole:

> Parole should only be given on a case-by-case basis for specified urgent humanitarian reasons, *such as life-threatening humanitarian medical emergencies*, or for specified public interest reasons, *such as assisting the government in a law-enforcement-related activity*. It should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories.

H.R. Rep. No. 104-469, pt. 1 at 141 (emphasis added). The Senate Judiciary Committee Report similarly stated that its parole reform provision was intended to

9

"reduce[] the abuse of parole" and "[t]ighten[] the Attorney General's parole authority," and that "[t]he committee bill is needed to address ... the abuse of humanitarian provisions such as asylum and parole." S. Rep. No. 104-249 at 2 (1996).

In sum, the legislative history supports reading 8 U.S.C. § 1182(d)(5)(A) as requiring an individual and particularized showing of an "urgent humanitarian" need or a "significant public benefit" resulting from the parole of any particular alien. Nothing in the legislative history indicates that Congress intended to authorize the very *en masse* parole "abuse" it decried.

## IV. Contemporaneously-enacted agency rules comported with a narrow, individualized approach to parole, particularly with respect to aliens amenable to expedited removal, and other, current regulations still take that approach.

Within six months of the passage of IIRIRA, the Department of Justice, which preceded DHS as the agency charged with enforcement of the Immigration and Nationality Act, amended the regulations governing parole to comport with the newly enacted law. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312 (Mar. 6, 1997). In that rulemaking, the agency restricted parole for aliens who (like those covered by DHS's parole programs) are subject to expedited removal:

because section 235(b)(1)(B)(iii)(IV) of the Act [8 U.S.C. § 1225(b)(1)(B)(iii)(IV)] requires that an alien in expedited removal proceedings "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed," the Department feels that parole is appropriate only in the very limited circumstances specified in § 235.3(b)(4).

62 Fed. Reg. at 10320. As first promulgated in 1997, 8 C.F.R. § 235.3(b)(4) permitted parole of aliens awaiting a credible fear interview only where "parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 62 Fed. Reg. at 10356 (setting forth 8 C.F.R. § 235.3(b)(4)(ii)).[3]

These medical-emergency and law-enforcement-objective restrictions on parole remained in place for aliens subject to expedited removal (and who had not established a credible fear of persecution,[4] like the aliens covered by DHS's parole programs) until March 29, 2022, when DHS issued an interim final rule removing the "medical emergency" or "legitimate law enforcement objective" language and replacing it with the following: "Parole of such alien shall only be considered in

---

[3] The same restrictions on parole applied to aliens subject to expedited removal who did not make a claim of asylum. *See id.* at § 235.3(b)(2)(iii), (5)(i).

[4] The agency explained that only those "aliens found to have a credible fear will be subject to the generally applicable detention and parole standards contained in the Act," *i.e.*, those standards set forth in 8 C.F.R. § 212.5(a) (1998). 62 Fed. Reg. at 10320. "[P]arole authority is specifically limited while a credible fear determination is pending under § 235.3(b)(4), [but] those found to have a credible fear and referred for a hearing under section 240 of the Act will be subject to the rule generally applicable to arriving aliens in § 235.3(c)." 62 Fed. Reg. at 10320.

11

accordance with [8 U.S.C. § 1182(d)(5)] and § 212.5(b) of this chapter."

Procedures for Credible Fear Screening and Consideration of Asylum,

Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed.

Reg. 18078, 18220 (Mar. 29, 2022) (revising 8 C.F.R. § 235.3(b)(2)(iii), (b)(4)(ii),

and (c)).

Under the regulation promulgated soon after the enactment of IIRIRA,

parole is generally deemed appropriate only for: (1) aliens who have a serious

medical condition; (2) women who are pregnant; (3) juvenile aliens; (4) witnesses

in judicial, administrative, or legislative proceedings; and (5) aliens whose

continued detention is not in the public interest. *See* 62 Fed. Reg. at 10348

(8 C.F.R. § 212.5(a)). Even now, under the more general parole regulations

applicable to detained arriving aliens, similar restrictions remain for aliens subject

to mandatory detention under current 8 C.F.R. § 235.3(b) or (c). *See* 8 C.F.R.

§ 212.5(b) (2023). And the regulations still require that parole be granted "in

accordance with" 8 U.S.C. § 1182(d)(5)(A), and include some circumstances in

which denial of parole is mandatory. *See id.*; *see also* 8 C.F.R. § 212.5(c) (2023).

Other regulations reflect DHS's acknowledgment that parole is only justified

where a particular alien's *presence in the United States* provides a significant

public benefit. For example, when DHS promulgated the International

Entrepreneur Rule in 2017, it explained that its adjudicators would be required to

12

determine, *inter alia*, "whether the specific applicant's parole would provide a significant public benefit[.]" 82 Fed. Reg. 5238, 5239 (Jan. 17, 2017); *see also id.* at 5250 (providing that DHS will evaluate "whether granting parole to a particular individual would provide a significant public benefit"); *id.* at 5260 ("Imposing a limit on the number of entrepreneurs who may be granted parole based on the same start-up entity is thus consistent with ensuring that *each* entrepreneur's parole will provide a significant public benefit.") (emphasis added). Indeed, the regulation governing parole for entrepreneurs requires DHS to find "that an applicant's presence in the United States will provide a significant public benefit[.]" 8 C.F.R. § 212.19(d).

In sum, the agency's contemporaneous interpretation of 8 U.S.C. § 1182(d)(5)(A) required an individual and particularized showing of an "urgent humanitarian" need or a "significant public benefit" resulting from the parole of any specific alien. Nothing in the contemporaneous interpretations suggested that an insignificant or marginal public benefit aggregated with the purported benefit of *en masse* parole would be sufficient to meet the statutory standard for parole under § 1182(d)(5)(A). Other, current regulations, such as the International Entrepreneur Rule, reaffirm that there must be something particular about the specific alien's presence in the United States that would provide a significant public benefit in order to satisfy the standard under the parole statute. DHS's Parole+ATD and

13

PWC programs, which weigh the purported public benefit in the aggregate and do not depend on any particular humanitarian concern or public benefit attributable to a specific alien's presence, stand in stark contrast with these prior and current regulatory interpretations of the requirements of 8 U.S.C. § 1182(d)(5)(A).

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgments below.


DATED: June 29, 2023              Respectfully submitted,


                                  /s/ Matt Crapo
                                  MATT A. CRAPO
                                  CHRISTOPHER J. HAJEC
                                  Immigration Reform Law Institute
                                  25 Massachusetts Ave., NW, Suite 335
                                  Washington, DC 20001
                                  Telephone: (202) 232-5590

                                  Attorneys for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1.      The foregoing brief complies with the word limitation of Fed. Fed. R.

App. P. 29(a)(5) because:

This brief contains 3,174 words, including footnotes, but excluding the parts

of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using

Microsoft Word 2016 in Times New Roman 14-point font.

DATED: June 29, 2023          Respectfully submitted,

                              /s/ Matt Crapo
                              Matt A. Crapo
                              Counsel for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on June 29, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Matt Crapo
Matt A. Crapo
Counsel for *Amicus Curiae*