Nos. 23-11528, 23-11644

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

————————————

STATE OF FLORIDA,

*Plaintiff-Appellee*,

v.

UNITED STATES OF AMERICA, *et al.*

*Defendants-Appellants*.

————————————

On Appeal from the United States District Court
for the Northern District of Florida

————————————

**BRIEF OF THE COMMONWEALTH OF VIRGINIA AND 25 OTHER STATES AS *AMICI CURIAE* IN SUPPORT OF APPELLEE**

————————————

JASON S. MIYARES
*Attorney General*

ANDREW N. FERGUSON
*Solicitor General*

KEVIN M. GALLAGHER
*Deputy Solicitor General*

M. JORDAN MINOT
*Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile

June 30, 2023

*Counsel for* Amici Curiae

*Florida v. United States*, Nos. 23-11528, 23-11644

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(1) and 26.1-2(b), the undersigned counsel certifies that, beyond the persons and entities included in the Certificates of Interested Persons contained in *Amici States*' first brief and in the other briefs filed in these cases, the following listed persons and entities may have an interest in the outcome of this case:

1. Formella, John

2. New Hampshire, State of

3. Scott, John

4. Skrmetti, Jonathan

5. Tennessee, State of

6. Texas, State of

Respectfully submitted this 30th day of June 2023.


_____
*/s/ Andrew N. Ferguson*
Andrew N. Ferguson
*Counsel for* Amici Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

INTERESTS OF *AMICI CURIAE* AND INTRODUCTION....................1

STATEMENT OF THE ISSUE.................................................................3

BACKGROUND ....................................................................................3

SUMMARY OF ARGUMENT ................................................................8

ARGUMENT ........................................................................................10

    I.    The Administration has pursued an illegal policy that contradicts the directives of Congress and usurps Congress's constitutional authority.......................................10

    II.    The Administration cannot shield its injurious policies via threshold challenges to the district court's opinions........17

CONCLUSION ......................................................................................29

COUNSEL FOR ADDITIONAL AMICI STATES ...................................31

CERTIFICATE OF COMPLIANCE.........................................................33

CERTIFICATE OF SERVICE.................................................................34

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Arevalo v. Ashcroft,*
344 F.3d 1 (1st Cir. 2003) .................................................................... 12

*Arizona v. United States,*
567 U.S. 387 (2012).................................................................... 10, 19

*Azar v. Allina Health Servs.,*
139 S. Ct. 1804 (2019) ........................................................................ 28

*Biden v. Texas,*
142 S. Ct. 2528 (2022)......................................................................... 28

*Cruz-Miguel v. Holder,*
650 F.3d 189 (2d Cir. 2011) .............................................................. 13

*Department of Commerce v. New York,*
139 S. Ct. 2551 (2019)......................................................................... 26

*ETSI Pipeline Project v. Missouri,*
484 U.S. 495 (1988).............................................................................. 15

*Farmworker Justice Fund, Inc. v. Brock,*
811 F.2d 613 (D.C. Cir. 1987), *vacated as moot,* 817 F.2d
890 (D.C. Cir. 1987) ........................................................................... 27

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000)....................................................................... 15, 16

*Galvan v. Press,*
347 U.S. 522 (1954)............................................................................. 10

*Heckler v. Chaney,*
470 U.S. 821 (1985)............................................................................. 29

*Hernandez v. Ashcroft,*
345 F.3d 824 (9th Cir. 2003).............................................................. 27

*Jennings v. Rodriguez,*
   138 S. Ct. 830 (2018) ................................................................ 11, 12, 14

*Kleindienst v. Mandel,*
   408 U.S. 753 (1972) .............................................................................. 10

*Leng May Ma v. Barber,*
   357 U.S. 185 (1958) ........................................................................ 11, 12

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ........................................................................ 25, 26

*Louisiana v. Centers for Disease Control & Prevention,*
   603 F. Supp. 3d 406 (W.D. La. 2022) ................................................. 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
   *Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................................................................ 17

*Ortega-Cervantes v. Gonzales,*
   501 F.3d 1111 (9th Cir. 2007) ............................................................ 13

*Parker v. State Bd. of Pardons & Paroles,*
   275 F.3d 1032 (11th Cir. 2001) .......................................................... 18

*Ponce Flores v. U.S. Att'y Gen.,*
   64 F.4th 1208 (11th Cir. 2023) .......................................................... 25

*Schwab v. Crosby,*
   451 F.3d 1308 (11th Cir. 2006) .......................................................... 27

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) .............................................................................. 17

*Swain v. Junior,*
   958 F.3d 1081 (11th Cir. 2020) .......................................................... 18

*Texas v. Biden,*
   20 F.4th 928 (5th Cir. 2021), *rev'd in part on other*
   *grounds, Biden v. Texas,* 142 S. Ct. 2528 (2022) .......................... 13, 27

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) ............................................................ 19

*United States v. Texas*,
599 U.S. __, 2023 WL 4139000 (2023) .......................................... 29

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ................................................................... 16

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
139 S. Ct. 361 (2018) ...................................................................... 25

*Whitman v. American Trucking Associations*,
531 U.S. 457 (2001) ........................................................................ 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................................................ 15

## Statutes

5 U.S.C. § 553 ................................................................................... 4

5 U.S.C. § 706 ............................................................................... 4, 16

8 U.S.C. § 1182 ....................................................................... *passim*

8 U.S.C. § 1225 ....................................................................... *passim*

Illegal Immigration Reform and Immigrant Responsibility
Act of 1996....................................................................... 12, 13, 14, 16

Pub. L. No. 104-208, 110 Stat. 3009, § 602 (Sept. 30, 1996) ................. 12

## Other Authorities

7News Staff, *'Humanitarian Crisis': Bowser Calls for
National Guard to Help with Migrants Bused to DC*, ABC
News (July 28, 2022), https://tinyurl.com/bdd68dk9 ......................... 20

*Clarifying Eligibility for a Qualified Health Plan Through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, a Basic Health Program, and for Some Medicaid and Children's Health Insurance Programs*, 88 Fed. Reg. 25,313, 25,314 (proposed April 26, 2023) ................................................................................. 20

Evelyn Holmes & Eric Horng, *Mayor Lightfoot Issues emergency declaration in response to surge of Chicago migrants*, ABC7 News (May 9, 2023), https://tinyurl.com/bdfmxmn8 ........................................................ 21

Federation for American Immigration Reform Research, *The Fiscal Burden of Illegal Immigration on United States Taxpayers 2023* (last accessed June 27, 2023), https://tinyurl.com/ynrpjzrm ........................................................ 19

H. Comm. on the Judiciary, H.R. Rep. No. 104-469(I), (1996) ............... 13

Jeffery C. Mays, *Mayor Adams Walks a Tightrope in Lashing Out at Migrant Influx*, The New York Times (May 2, 2023) ...................................................................... 21

*Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42,828, 42,830 (Aug. 5. 2021) ................................................ 6

Selene Rodriguez, *How Porous Borders Fuel Human Trafficking in the United States*, Texas Policy Institute (Jan. 11, 2022), https://tinyurl.com/msbv5czr .................................. 22

Southwest Land Border Encounters, U.S. Customs and Border Protection (last visited June 27, 2023), https://tinyurl.com/226b29dn ........................................................ 23

Todd Rokita, *Stop human trafficking by fixing border, raising public awareness,* Fox News (Jan. 20, 2023) ......................... 23

U.S. Drug Enforcement Administration, *Fentanyl Deaths Climbing, DEA Washington Continues the Fight* (Feb. 16, 2022), https://tinyurl.com/2vz7rwn6 .................................................. 22

U.S. Immigration and Customs Enforcement, *ICE Annual Report Fiscal Year 2020*, 4–5 (Dec. 23, 2020), https://tinyurl.com/2b7k4yxw .......................................................... 21

## INTERESTS OF *AMICI CURIAE* AND INTRODUCTION

*Amici curiae* are the Commonwealth of Virginia, the State of Alabama, the State of Alaska, the State of Arkansas, the State of Georgia, the State of Idaho, the State of Indiana, the State of Iowa, the State of Kansas, the Commonwealth of Kentucky, the State of Louisiana, the State of Mississippi, the State of Missouri, the State of Montana, the State of Nebraska, the State of New Hampshire, the State of North Dakota, the State of Ohio, the State of Oklahoma, the State of South Carolina, the State of South Dakota, the State of Tennessee, the State of Texas, the State of Utah, the State of West Virginia, and the State of Wyoming (collectively, the *Amici* States). *Amici* States submit this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) in support of Plaintiff-Appellee.

*Amici* States have a compelling interest in this case. The Administration's *en masse* parole of aliens into the interior violates federal immigration law and abdicates its responsibility to secure the nation's borders. Congress has mandated that, with few exceptions, aliens arriving at the border must be detained and can be paroled into the country only on a case-by-case basis for urgent humanitarian reasons

1

or significant public benefit. The Administration, however, has flouted that statutory mandate and instituted an *en masse* parole system. In doing so, it has defied Congress's command to detain excludable aliens and has paroled more than a million aliens directly into the United States. This is exactly what Congress has forbidden the Executive Branch from doing.

The challenged policies exacerbate the ongoing uncontrolled influx of aliens into *Amici* States, causing them immense harms. The States are left footing the bill for education, law enforcement, and emergency medical care for the more than one million illegal immigrants that the Administration has unlawfully released into the interior. The resulting migrant crisis is causing immense strain to the States' public infrastructures, hampering their ability to provide vital services to their citizens, and throwing their labor markets into chaos.

The district court correctly halted these policies, and this Court should affirm. *Amici* States submit this brief to illuminate the serious legal and equitable concerns that confirm the district court's holdings.

## STATEMENT OF THE ISSUE

Whether this Court should affirm the district court's orders vacating and enjoining the Administration's unlawful border policies.

## BACKGROUND

The Administration has willfully violated Congress's directive that aliens arriving at the border "shall be detained" while their applications for admission are processed. 8 U.S.C. § 1225(b). "[I]nstead of detaining them until their immigration proceedings are concluded as required by 8 U.S.C. § 1225(b)," the Department of Homeland Security (DHS) implemented "a series of policies . . . to expedite the release of aliens arriving at the Southwest Border into the country." A0013. The Administration has released more than one million aliens into the nation's interior since 2021. A0364.

The "unprecedented 'surge' of aliens that started arriving at the Southwest Border almost immediately after President Biden took office and that has continued unabated over the past two years was a predictable consequence of these actions." A0340–41. Because "migrant populations believe[d] they will be released into the country," illegal

3

immigration surged, increasing more than tenfold in the first six months of the Biden Administration. A0341.

In March 2021, the Administration implemented "immigration enforcement by the honor system," releasing aliens at the border with "nothing more than a piece of paper that said 'go find somebody at ICE.'" A0346 (quotation marks omitted). The Administration then "doubled down on that approach" by adopting the "indistinguishable" Parole + Alternatives to Detention Policy (Parole+ATD) in November 2021. A0347–50. Despite Parole+ATD being purportedly necessary due to the COVID-19 pandemic, however, the Administration did not eliminate it in 2022 when the public health emergency waned. A0352.

Florida challenged Parole+ATD, contending, among other things, that it violated Congress's directive that aliens arriving at the border "shall be detained," 8 U.S.C. § 1225(b), that it was arbitrary and capricious, and that it was issued without the prior notice and opportunity for comment required by the Administrative Procedure Act (APA), 5 U.S.C. §§ 706(2)(A), 553. Following a bench trial, the district court found that "aliens arriving at the Southwest Border are no longer being detained as a matter of course unless they are deemed to be a public

safety risk or flight risk." A0359. Further, "[a]lthough DHS says it is screening arriving aliens released on Parole+ATD to determine if they are a public safety threat, the more persuasive evidence establishes that DHS cannot reliably make that determination." A0357. Indeed, "according to [the Administration's] own witnesses, DHS has no way to determine if an alien has a criminal history in his home country." *Ibid.* Thus, for most aliens, "DHS has no idea whether they have criminal histories or not." *Ibid.*

In light of its detailed factual findings, the district court held that Parole+ATD was unlawful and vacated the policy on March 8, 2023. A0430. It explained that Parole+ATD violated the requirement of 8 U.S.C. § 1182(d)(5) that the Administration parole aliens only after a "case-by-case" "individualized assessment of each alien." A0413–15. Parole+ATD further violated § 1182(d)(5) because DHS paroled aliens *en masse* "without initiating an immigration proceeding against them," whereas § 1182(d)(5) authorized parole only where there is a "'case' pending." A0412. The district court also held the policy to be arbitrary and capricious because, among other things, DHS failed to consider that it created an "ever-worsening backlog" of immigration cases. A0418–20.

5

And the policy also violated the APA because it was issued without the required prior notice and opportunity for public comment. A0421–24.

The Administration did not seek a stay of that order, nor did it design a different, valid policy and submit it for public comment, even as the expiration of the Centers for Disease Control and Prevention's Title 42 public health order[1] approached. The Title 42 order permitted immigration officials to turn away aliens at the border without initiating asylum or immigration proceedings as a response to the COVID-19 pandemic. A0460 n.1. The President originally announced in January 2023 that he would terminate the COVID-19 public health emergency, which would in turn terminate the Title 42 order. But the Administration did not even file a notice of appeal until a day before the filing deadline— fifty-nine days after the district court's injunction and merely five days before the Title 42 order expired. A0494.

Instead, the Administration did nothing until May 10, hours before the expiration of the Title 42 order, when it imposed a policy functionally

---

[1] See *Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42,828, 42,830 (Aug. 5. 2021).

identical to the one the district court enjoined and gave it a new name: Parole with Conditions (PWC). PWC was "indistinguishable" from the vacated policy "both in its purpose (reducing overcrowding at border patrol facilities) and manner of operation (releasing aliens into the country without first issuing a charging document placing them in immigration proceedings . . . .)." A0467.

Florida sued again, and the district court granted its motion for a temporary restraining order. A0460. Although the stated purpose of PWC was to "relieve overcrowding" at DHS detention facilities, the district court found that the overcrowding problem was "largely one of [the Administration's] own making through the adoption an[d] implementation of policies that have encouraged" the ongoing crisis at the border. See A0468–69, A4073. And PWC failed to consider "the additional backlog that will likely be created by releasing aliens into the country without initiating immigration proceedings and then having to track them down to do so if they do not report to ICE." A0470. A few days later, the district court converted the temporary restraining order into a preliminary injunction. A0020.

The Administration appealed and sought a stay of the orders vacating Parole+ATD and enjoining PWC. This Court denied the Administration's motion for a stay. ECF No. 38. Specifically, this Court held that the Administration had not met its burden to show that it would suffer an irreparable injury absent a stay. *Id.* at 5. The Administration's claims of irreparable injury due to overcrowding at border facilities "ring somewhat hollow on this record, considering the department's track record of overstating similar threats in the underlying proceedings." *Id.* at 6. Further, "the timing of [the Administration's] appeals and motion for stay undermines [its] assertions of irreparable injury": the Administration "operated for approximately five months without either of the challenged policies before seeking relief from this Court." *Id.* at 7.

## SUMMARY OF ARGUMENT

The *en masse* parole of aliens through Parole+ATD and PWC violates federal immigration law and abdicates the Administration's responsibility to secure the nation's borders. The law requires detention of almost all aliens arriving at the border; an *en masse* invocation of the government's parole policy is not a lawful workaround of this mandatory detention requirement. Nor can DHS hide behind claims that it is

8

exercising "discretion," as the executive branch cannot exercise "discretion" to ignore the unambiguous commands of a statute. The district court correctly concluded that the Administration's abdication of its immigration responsibilities was unlawful.

The Administration also attempts to hide behind various justiciability arguments and flimsy claims that its rushed policymaking is somehow comprised of non-binding policy statements regarding existing discretion. But those arguments gloss over the Administration's responsibility for the crisis it says that PWC is needed to address and the irreparable injury to Florida and *Amici* States that would occur if the policies were to become effective. The *en masse* parole of aliens imposes huge, unrecoverable costs on Florida and *Amici* States, including surging expenses for education, law enforcement, and emergency medical care. It also threatens to overwhelm their public infrastructure and degrade their ability to provide critical services to their own citizens. Further, the Administration's failure to secure the border has greatly exacerbated the severe problems of transnational crime, including the smuggling of Chinese-manufactured fentanyl that is killing more than 100,000

Americans per year, human trafficking, and the exploitation of minors. This Court should affirm.

## ARGUMENT

### I. The Administration has pursued an illegal policy that contradicts the directives of Congress and usurps Congress's constitutional authority

"Defendants have effectively turned the Southwest Border into a meaningless line in the sand and little more than a speedbump for aliens flooding into the country," by "releasing more than a million aliens into the country" on "parole" and "without even initiating removal proceedings." A0327–28. These policies are unlawful.

Congress, not the President, enjoys the "plenary . . . power to make policies and rules for exclusion of aliens." *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972); see also *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]hat the formulation of [immigration policies] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government."). Congress's plenary immigration power includes the power to "specif[y] which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 567 U.S. 387, 396 (2012). Relevant

here, Congress has "unequivocally mandate[d] that aliens" arriving at the border "'shall' be detained," subject to limited exceptions. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (quoting 8 U.S.C. § 1225(b)). Congress has also directed that the Secretary of DHS may "parole [an alien] into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Parole+ATD and PWC violate § 1225's mandatory detention requirement and exceed the Administration's narrow discretion under § 1182(d)(5)(A).

1. First, the Administration's *en masse* parole policy violates Congress's mandatory-detention requirement. The Administration's *amici* rely on a decades-old Supreme Court opinion for the proposition that parole allows for "needless confinement [to be] avoided while administrative proceedings are conducted," such that "[p]hysical detention of aliens is now the exception, not the rule." *Amici* Br. of Legal Service Providers for Cuban Refugee Diaspora, at 37 (ECF No. 44) (citing *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958)). This argument is deeply misplaced. Just five years ago, the Supreme Court held that the current immigration statutes "*mandate detention* of aliens throughout

11

the completion of applicable proceedings." *Jennings*, 138 S. Ct. at 845 (emphasis added).

Indeed, federal immigration law has been thoroughly overhauled since *Leng May Ma*. Congress severely restricted the executive branch's parole authority in adopting the current version of 8 U.S.C. § 1182(d)(5) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Before those reforms, federal immigration law granted unusually open-ended discretionary parole authority to the Attorney General "under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest." 8 U.S.C. § 1182(d)(5) (1995). IIRIRA severely circumscribed that discretion. In a section entitled "Limitation on Use of Parole," see IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009, § 602 (Sept. 30, 1996), IIRIRA struck from the statute the phrase "for emergent reasons or for reasons deemed strictly in the public interest" and replaced it with "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

"Congress enacted [IIRIRA] in a comprehensive effort to strengthen and tighten the immigration laws." *Arevalo v. Ashcroft*, 344 F.3d 1, 4 (1st Cir. 2003). "Congress, in IIRIRA, specifically narrowed the executive's

discretion under § 1182(d)(5)(A) to grant parole into the United States." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 (2d Cir. 2011) (quotation marks omitted). "The legislative history indicates that this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Id.* at 199 n.15 (citing H.R. Rep. No. 104-169(I), at 140–41 (1996)). "Congress responded in IIRIRA by narrowing the circumstances in which aliens could qualify for parole into the United States under § 1182(d)(5)(A)." *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1119 (9th Cir. 2007) (quotation marks omitted).

Accordingly, an *en masse* parole program violates the text of the statute and commits the very act Congress intended to prohibit when it circumscribed the parole authority—using it to "admit entire categories of aliens who do not qualify for admission" under the laws Congress enacted. H. Comm. on the Judiciary, H.R. Rep. No. 104-469(I), at 140 (1996). "Deciding to parole aliens *en masse* is the opposite of . . . case-by-case decisionmaking." *Texas v. Biden*, 20 F.4th 928, 942 (5th Cir. 2021), *rev'd in part on other grounds*, *Biden v. Texas*, 142 S. Ct. 2528 (2022). Indeed, "the whole point of the 'case-by-case' requirement that Congress

added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse.*" *Id.* at 997.

Section 1225(b) requires DHS to detain illegal aliens that it encounters until removal proceedings have concluded. See *Jennings*, 138 S. Ct. at 842 ("Read most naturally, [§ 1225(b)(2)] thus mandate[s] detention of applicants for admission until certain proceedings have concluded."). Congress has thus mandated detention of applicants for admission and limited the exercise of the parole power to a "case-by-case basis." The Administration's policy is not a lawful workaround of these requirements. Indeed, as the district court found, there is simply no way that DHS officials are meaningfully making individualized determinations when they decide to parole an alien under Parole+ATD or PWC. A0470. Instead, DHS is paroling aliens *en masse* into the interior without first initiating removal proceedings. That is precisely what § 1225(b) forbids.

2. DHS also cannot hide behind claims that it is exercising its "discretion" under § 1182(d)(5)(A). Appellants Br. 24. The President and his executive agencies may not exercise "discretion" to ignore the unambiguous commands of a statute. See *Youngstown Sheet & Tube Co.*

14

*v. Sawyer*, 343 U.S. 579, 642 (1952) (Jackson, J., concurring) ("[N]o doctrine that the Court could promulgate would seem to me more sinister and alarming than that a President whose conduct of foreign affairs is so largely uncontrolled, and often even is unknown, can vastly enlarge his mastery over the internal affairs of the country . . . ."). Here, Congress unambiguously requires DHS to detain aliens pending removal proceedings. 8 U.S.C. § 1225(b). The President and DHS may not invoke "discretion" to implement a policy that directly defies Congress's clear mandate and "paroles" *en masse* millions of unvetted aliens into the interior. See *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988))).

And the Administration's contortion of "discretion" in § 1182(d)(5)(A) is especially unreasonable in light of the substantial consequences that befall States as they absorb potentially millions of unvetted, untraceable illegal aliens. See pp.18–23, *infra*. It cannot

15

possibly be that Congress hid in the parole statute the "discretion" utterly to disregard the detention mandate of § 1225(b)(1) and require the States to bear these costs. See *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) ("[O]ur precedent teaches that there are 'extraordinary cases' that call for a different approach—cases in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159–60)); see also *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not . . . hide elephants in mouseholes."). Congress in IIRIRA intended to do exactly the opposite and prevent the executive branch from using parole authority to circumvent the immigration laws.

The Administration's parole policies thus violate the APA. The district court properly "h[e]ld unlawful and set aside" the Parole+ATD policy as "arbitrary and capricious." 5 U.S.C. § 706(2)(A); A0421. The district court weighed the evidence presented at trial and found that the Administration failed adequately to consider the ballooning backlog of

16

unprocessed aliens being released into the interior, and that the Administration "ignored the evidence when it concluded that Parole+ATD will only be 'used sparingly'" while expanding the program to include single adults, not just family units. A0419. Those conclusions apply with full force to the Administration's "indistinguishable" PWC policy. A0458. Far from "cogently explain[ing] why it has exercised its discretion in a given manner," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983), the Administration decided simply to expand progressively its policy of releasing aliens into the interior with little explanation. That purported "discretion" has not been "used sparingly" as Congress intended, and the States are suffering the consequences of the Administration's capricious policies.

## II.    The Administration cannot shield its injurious policies via threshold challenges to the district court's opinions

The Administration's failure to enforce federal immigration law and secure the border has imposed severe and irreparable harm on Florida, as well as *Amici* States. This both provides Florida with standing, see, *e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (Article III standing requires an "injury in fact"), and establishes that the

17

district court correctly preliminarily enjoined PWC because the injunction was "necessary to prevent irreparable injury," *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034–35 (11th Cir. 2001). And the remaining equitable factors for preliminary injunctions—the balance of the equities and public interest, see *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)—cannot favor the Administration because it presents these appeals with unclean hands. The Administration's attempts to evade review through jurisdictional and procedural arguments thus fail.

1. The Administration's parole policies have caused concrete and serious harms to Florida and *Amici* States. The Administration contends that "Florida asserts indirect injuries premised on the speculative actions of third parties—migrants." Appellants Br. 17. But the harms caused by the Administration's unfettered parole policies are hardly "speculation." *Id.* at 22. As the Administration concedes, more than 100,000 aliens that it deliberately released have entered Florida alone. *Ibid.* And the influx stands to add substantially to the more than 400,000 illegal aliens

18

already residing in Virginia.[2] The massive influx has been felt across the country and has caused significant harms to Florida and *Amici* States, "both to [their] sovereignty and [their] public fisc." A0471.

Florida and the *Amici* States do not enforce the federal immigration laws, see *Arizona*, 567 U.S. at 401, and are therefore at the mercy of federal enforcers. The Administration's abject failure to secure the border and enforce the immigration laws has shifted the huge expense of dealing with the migrant surge from the federal government, where it belongs, directly onto the backs of the States. Like Florida, *Amici* States have suffered enormous costs and disruptions as a result, hampering their ability to serve the needs of their own citizens and taxpayers.

Those costs include thousands of dollars per student who must be educated in *Amici* States' public schools; hundreds of thousands of dollars to provide emergency medical care for uninsured aliens; and costs to provide other state services—such as housing assistance, or costs resulting from a surge in the homeless population. See, *e.g.*, *Texas v. United States*, 40 F.4th 205, 216–17 (5th Cir. 2022); A0367–69; see also

---

[2] Federation for American Immigration Reform Research, *The Fiscal Burden of Illegal Immigration on United States Taxpayers 2023,* 40 (last accessed June 27, 2023), https://tinyurl.com/ynrpjzrm.

*Louisiana v. Centers for Disease Control & Prevention*, 603 F. Supp. 3d 406, 420 (W.D. La. 2022) (detailing costs for Missouri). And, indeed, the Administration intends to increase those costs further, having recently issued a rule that would make large categories of illegal aliens eligible for Medicaid benefits.[3] Multiplied by the massive numbers of aliens the Administration is releasing, these costs are substantial for *Amici* States' limited budgets.

Not only *Amici* States are feeling the effects of this crisis. Cities that once proudly declared themselves "sanctuaries" for illegal aliens have complained bitterly about the influx. For example, the mayor of the District of Columbia last year requested National Guard assistance to deal with fewer than 5,000 aliens entering the city, asking for "a robust, federal response" on top of the Federal Emergency Management Agency assistance the city was already receiving.[4] The mayors of New York and

---

[3] See *Clarifying Eligibility for a Qualified Health Plan Through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, a Basic Health Program, and for Some Medicaid and Children's Health Insurance Programs*, 88 Fed. Reg. 25,313, 25,314 (proposed April 26, 2023).

[4] 7News Staff, *'Humanitarian Crisis': Bowser Calls for National Guard to Help with Migrants Bused to DC*, ABC News (July 28, 2022), https://tinyurl.com/bdd68dk9.

20

Chicago have similarly bemoaned the effects of the crisis on their cities, with the mayor of New York claiming that "the city was being 'destroyed by the migrant crisis.'"[5]

The Administration's failure to secure the border also increases the *Amici* States' law enforcement costs and exacerbates the public safety issues they face. As the district court held, for most of the released aliens, "DHS has no idea whether they have criminal histories or not." A0469. Some doubtless do pose public safety threats. In 2020, for example, ICE removed over 185,000 aliens; almost two-thirds of them had criminal convictions or pending criminal charges at the time of their removal.[6] Thousands were known or suspected gang members.[7]

---

[5] Jeffery C. Mays, *Mayor Adams Walks a Tightrope in Lashing Out at Migrant Influx*, The New York Times (May 2, 2023), https://tinyurl.com/5ekwm476; see also Evelyn Holmes & Eric Horng, *Mayor Lightfoot Issues emergency declaration in response to surge of Chicago migrants*, ABC7 News (May 9, 2023), https://tinyurl.com/bdfmxmn8 ("'We don't have any more space. I cannot emphasize that enough,' Lightfoot said in a news conference Tuesday afternoon.").

[6] U.S. Immigration and Customs Enforcement, *ICE Annual Report Fiscal Year 2020*, 4–5 (Dec. 23, 2020), https://tinyurl.com/2b7k4yxw.

[7] *Ibid.*

Indeed, Mexican drug cartels, including the Sinaloa Cartel and the Jalisco New Generation Cartel, use the open border to import deadly fentanyl made from raw materials from China into the United States.[8] The fentanyl is mixed into a wide range of drugs, including "counterfeit prescription pills" that are "sold to unsuspecting buyers."[9] Fentanyl overdose deaths in the United States have "surged dramatically" since 2020, topping 100,000 deaths last year, and "disproportionately impacting black residents and communities."[10] Again, *Amici* States are left to bear the enormous costs and irreparable harm of this crisis to their citizens. See A0367–69.

Further, aliens seeking entry to the United States are often coerced by human traffickers into modern-day slavery, including "forced sex exploitation" as well as other forced labor.[11] Migrant women "make up

---

[8] U.S. Drug Enforcement Administration, *Fentanyl Deaths Climbing, DEA Washington Continues the Fight* (Feb. 16, 2022), https://tinyurl.com/2vz7rwn6.

[9] *Ibid.*

[10] *Ibid.*

[11] See Selene Rodriguez, *How Porous Borders Fuel Human Trafficking in the United States*, Texas Policy Institute (Jan. 11, 2022), https://tinyurl.com/msbv5czr.

the largest portion of trafficking victims."[12] Victims also include children "being abused in child pornography or drug trafficking."[13] The Administration's failures have thus imposed severe and irreparable harm on both Florida and *Amici* States.

2. Further, the equities cannot favor the Administration because of its unclean hands. As Florida demonstrated at trial, "over a million aliens have been released rather than detained at the Southwest Border since January 2021." A0341. The surge is only worsening, as Customs and Border Protection has apprehended—however temporarily—more than 1.6 million aliens crossing the southwest land border thus far in Fiscal Year 2023, on pace to shatter last year's total of nearly 2.4 million.[14] And the challenged policies themselves are largely driving this surge, as migrants cross the border because they correctly "believe they will be released into the country." A0341; see also A0472 ("[T]his problem is largely one of Defendants' own making through the adoption an

---

[12] See Todd Rokita, *Stop human trafficking by fixing border, raising public awareness,* Fox News (Jan. 20, 2023), https://tinyurl.com/55uhxfcd.

[13] *Ibid.*

[14] Southwest Land Border Encounters, U.S. Customs and Border Protection (last visited June 27, 2023), https://tinyurl.com/226b29dn.

implementation of policies that have encouraged the so-called 'irregular migration' that has become fairly regular over the past 2 years."). Further, as the district court found, DHS is failing to locate and process the paroled aliens for removal, instead facing an ever-multiplying backlog. A0418–20.

The history of PWC also reeks of bad faith, with the Administration having forced Florida into a years-long game of "whack-a-mole" by doing its best "to avoid review of its actions by discontinuing its reliance on a policy only to replace it with another policy that has a different name but operates functionally the same." A0486 n.11; see pp.4–7, *supra*. The Administration's brief does not even try to explain its decision to reimplement the enjoined Parole+ATD policy and slap a new label on it mere hours before the Title 42 order expired.

The Administration has known about the looming post-Title 42 crisis for a long time. The President originally announced in January 2023 that he would terminate the COVID-19 public health emergency, which would have in turn terminated the Title 42 order. See p.6, *supra*. Yet, when the district court enjoined Parole+ATD on March 8, the Administration neither sought a stay nor designed a new policy. See

24

pp.6–7, *supra*. It did not even file a notice of appeal until a day before the filing deadline and only five days before the Title 42 order expired. A0013. Instead, mere hours before the Title 42 order expired, the Administration reimplemented the enjoined Parole+ATD policy and called it something else. This Court should not reward this behavior.

3. Finally, the Administration's other procedural arguments miss the mark. The Administration contends that "its parole authority . . . is committed to agency discretion by law and, therefore[,] . . . unreviewable." Appellants Br. 23; see also *Amici* Br. 31 (arguing that the question in this case "is a 'garden variety abuse of discretion argument' that 'does not amount to a legal question'" (quoting *Ponce Flores v. U.S. Att'y Gen.*, 64 F.4th 1208, 1226 (11th Cir. 2023))). That exception to the presumption of judicial review is, however, "quite narrow[]" and applies only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). It is "generally limited to certain categories of administrative decisions that courts traditionally have regarded as

25

committed to agency discretion, such as a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (cleaned up).

The statutory scheme set up by Congress by no means grants that sort of broad discretion, nor are parole decisions among those "traditionally regarded as committed to agency discretion." To the contrary, the Administration's unjustified expansion of the "discretion" granted by Congress places its conduct well beyond what is permitted by the immigration statutes. See pp.14–17, *supra*. Further, Congress has directed that the Secretary of DHS may "parole [an alien] into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). That directive provides at least a "meaningful standard against which to judge the agency's exercise of discretion." *Lincoln*, 508 U.S. at 191.

And no matter how much discretion is committed to the Administration on parole matters, no agency may exercise "discretion" to carry out the opposite of a statute's textual mandate—in this case,

26

invoking parole authority expressly limited by Congress to "case-by-case" decisionmaking to admit whole categories of aliens subject to mandatory detention. See *Farmworker Justice Fund, Inc. v. Brock*, 811 F.2d 613, 619–20 (D.C. Cir. 1987) ("The scope of an agency's discretion is bounded by law; an agency cannot justify a decision by reference to its discretionary authority, if the decision lies beyond the scope of the agency's discretion."), *vacated as moot*, 817 F.2d 890 (D.C. Cir. 1987); *Hernandez v. Ashcroft*, 345 F.3d 824, 847 (9th Cir. 2003) ("Because the decision made by the [agency] was contrary to law, it was not discretionary and jurisdiction exists to review the determination.").

Indeed, the Supreme Court has indicated in dicta that DHS's use of the parole authority in § 1182(d)(5) is not categorically exempt from judicial review because the "exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden*, 142 S. Ct. at 2543. As this Court has previously held, "there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). Dicta from the Supreme Court "is not something to be lightly cast aside." *Ibid.*

27

Finally, the Administration cannot evade the requirements of the APA based on an emergency it created. The Administration has attempted to circumvent Congress's statutory directives by ad hoc agency action, unlawfully dispensing with the required notice-and-comment processes. Parole+ATD and PWC set policy. See A0422. The Administration cannot plausibly assert that they "do not establish any 'binding norm,'" Appellants Br. 45, when they set out a parole system that flies in the face of the system mandated by Congress, see pp.10–17, *supra*. "Notice and comment gives affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019). The Administration had none of those goals in mind when it rushed to implement policies that effectively "post[ed] a flashing 'Come In, We're Open' sign on the southern border." A0340.

In short, the Administration's abject failure to enforce federal immigration law and secure the border has imposed severe and irreparable harms on *Amici* States. The district court was correct to hold Florida has standing to challenge the lawfulness of the Administration's

abdication of its statutory duties and to block the Administration's actions in contravention of those duties.[15]

## CONCLUSION

This Court should affirm the district court's orders vacating Parole+ATD and enjoining preliminarily PWC.

Respectfully submitted,

COMMONWEALTH OF VIRGINIA

By: _____ */s/ Andrew N. Ferguson* _____

ANDREW N. FERGUSON
*Solicitor General*

---

[15] *Amici* States agree with Florida that the Supreme Court's recent holding in *United States v. Texas*, 599 U.S. __, 2023 WL 4139000 (2023), does not undermine the district court's standing analysis. See Florida Br. 20, 22, 25–26. That decision does not apply for another reason: the Executive Branch has abandoned its statutory responsibility to detain all aliens arriving at the border. See *supra*, pp.11–14. As the Court explained, a plaintiff can obtain "review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Texas*, 2023 WL 4139000, at *7 (quoting *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). Such an "extreme case of non-enforcement" "exceed[s] the bounds of enforcement discretion and support[s] Article III standing." *Ibid.*

JASON S. MIYARES
  *Attorney General*

KEVIN M. GALLAGHER
  *Deputy Solicitor General*

M. JORDAN MINOT
  *Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile

June 30, 2023

*Counsel for* Amici Curiae

30

## COUNSEL FOR ADDITIONAL AMICI STATES

STEVE MARSHALL
Attorney General
State of Alabama

TREG TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

JEFF LANDRY
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

JOHN FORMELLA
Attorney General
State of New Hampshire

DREW WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY J. JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General and Reporter
State of Tennessee

SEAN D. REYES
Attorney General
State of Utah

BRIDGET HILL
Attorney General
State of Wyoming

JOHN SCOTT
Provisional Attorney General
State of Texas

PATRICK MORRISEY
Attorney General
State of West Virginia

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains 5,566 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century typeface.

*/s/ Andrew N. Ferguson*
Andrew N. Ferguson

33

## CERTIFICATE OF SERVICE

I certify that on June 30, 2023, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Andrew N. Ferguson*
_____
Andrew N. Ferguson