Nos. 23-11528, 23-11644

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

STATE OF FLORIDA,

Plaintiff-Appellee,

v.

ALEJANDRO MAYORKAS, Secretary
of Homeland Security, in his official
capacity; et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of Florida

———————————

## APPELLANTS' SUPPLEMENTAL BRIEF

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

WILLIAM C. PEACHEY
  *Director*

EREZ REUVENI
  *Counsel*

BRIAN WARD
  *Senior Litigation Counsel*

JOSEPH A. DARROW
ELISSA P. FUDIM
ERIN T. RYAN
  *Trial Attorneys*
  U.S. Dep't of Justice, Civil Division
  Office of Immigration Litigation,
  District Court Section
  P.O. Box 868, Ben Franklin Station
  Washington, DC 20044

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendants-Appellants

certify that the following have an interest in the outcome of this appeal:

<u>Natural Persons</u>

Bell, Daniel W.

Boynton, Brian M.

Brodeen, Karen A.

Butler, Steven

Christmas, Natalie

Coody, Jason R.

Crapo, Matt A.

Darrow, Joseph A.

DeSantis, Ronald

Fabian, Sarah B.

Faruqui, Bilal A.

Fudim, Elissa P.

Garland, Merrick

Guard, John M.

Hart, Joseph E.

Hudak, Matthew

Jaddou, Ur M.

Johnson, Tae D.

Mayorkas, Alejandro

Miller, Troy

Monson, Darrick

Moody, Ashley

Moyle, Marie A.

Ortiz, Raul

Patel, Anita J.

Peachey, William C.

Percival, James H.

Reuveni, Erez

Ryan, Erin T.

Ward, Brian C.

Wetherell, T. Kent

Whitaker, Henry C.

Entities

Immigration Reform Law Institute

State of Florida

Florida Office of the Attorney General

United States of America

U.S. Attorney's Office, Northern District of Florida

U.S. Citizenship and Immigration Services

U.S. Customs and Border Protection

U.S. Department of Homeland Security

U.S. Immigration and Customs Enforcement

U.S. Department of Justice, Civil Division

Dated:  May 6, 2024          */s/ Elissa P. Fudim*
                                   ELISSA P. FUDIM

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

ARGUMENT .......................................................................................5

    **A.** **The Present Case and *Texas priorities* Concern Policies Vested with Discretion** ...................................................................5

    **B.** **There is no History or Tradition of Cases Challenging Parole Policies or Based on Similarly Indirect Injuries** ...................9

    **C.** **Florida's Asserted Quasi-Sovereign Interest is not Meaningfully Different than in *Texas priorities* and Special Solicitude Does Not Apply** ....................................................................15

    **D.** **Florida's Injury is not Redressed by Vacatur** ..................21

    CONCLUSION .............................................................................23

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ................................................................ 18, 19, 21

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................. 18

*Arpaio v. Obama*,
    27 F. Supp. 3d 185 (D.D.C. 2014) ................................................... 14, 21

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ............................................................................. 11

*Biden v. Texas*,
    597 U.S. 785 (2022) .............................................................................. 8, 9

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) ............................................................................. 10

*Castle Rock v. Gonzales*,
    545 U.S. 748, 760–761, 767, n.13 (2005) ....................................... 6-7

*California v. Texas*,
    141 S. Ct. 2104 (2021) ..................................................................... 17, 19

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ......................................................................... 14-15

*DOC v. New York*,
    139 S. Ct. 2551 (2019) ................................................................ 12, 17, 19

*Florida v. Mellon*,
    273 U.S. 12 (1927) ...................................................................... 13, 15, 17-18

*Haaland v. Brackeen*,
    143 S. Ct. 1609 (2023) ..................................................................... 13, 23

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................. 8

*Loa-Herrera v. Trominski*,
    231 F.3d 984 (5th Cir. 2000) ................................................................. 10

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................... 21

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .................................................... *passim*

*Raines v. Byrd,*
    521 U.S. 811 (1997) ................................................................... 13

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ..................................................................... 22

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ...................................................... 17, 18

*Texas v. United States,*
    106 F.3d 661 (5th Cir. 1997) ................................................... 8, 14

*Trump v. New York,*
    141 S. Ct. 530 (2020) ................................................................. 17, 19

*Texas v. United States,*
    809 F.3d 134 (2022) ................................................................... 19

*United States v. Texas,*
    599 U.S. 670 (2023) ................................................... *passim*

*Warth v. Seldin,*
    422 U.S. 490 (1975) .................................................................. 12-13

*West Virginia v. U.S. Dep't of the Treasury,*
    59 F.4th 1124 (11th Cir. 2023) ................................................. 20

## STATUTES

8 U.S.C. § 1103 ................................................................................. 8

8 U.S.C. § 1182 .................................................................. 2, 6, 7, 22

8 U.S.C. § 1226 ........................................................................... 6, 7

8 U.S.C. 1231(a)(2) ......................................................................... 6

42 U.S.C. § 7607 ............................................................................ 19

## MISCELLANEOUS

Administrative Procedure Act Section 703 ....................................... 23

Administrative Procedure Act Section 706 .......................................................... 23

Ann Woolhandler & Michael G. Collins, *State Standing*,
    81 Va. L. Rev. 387, 415–16 (1995) .................................................... 18

8 C.F.R. § 212.5 ................................................................................... 22

## <u>CONSTITUTIONS</u>

U.S. Const., Art. I, § 8, cl. 4 .................................................................... 21

INTRODUCTION

On April 8, 2024, the Court directed the parties to brief whether, in light of *United States v. Texas*, 599 U.S. 670 (2023) (Texas priorities), Florida has Article III standing in this case. The answer is no. Appellants' Reply Brief, Dkt. 54 at 3-8.

In *Texas priorities*, the Supreme Court held that two states lacked standing to challenge DHS's discretionary immigration enforcement policies because their alleged injury of indirect costs associated with having more noncitizens in their states was not "legally and judicially cognizable." *Texas priorities*, 599 U.S. at 670, 676. This case is closely similar to *Texas priorities*. Here, as in *Texas priorities*, the plaintiff state claims that the Executive's discretionary immigration policy choices will increase the number of noncitizens in the state and lead to higher social service costs to the state. *Compare* Complaint, Dkt. 1 at ¶ 51 (alleging many noncitizens released on parole under the challenged policies will move to Florida, causing the state to incur health care, law enforcement, education and other social services costs), *with Texas priorities*, 599 U.S. at 670 (alleging harm from costs to "supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government"). Accordingly, just as the plaintiff states in *Texas priorities* lacked standing, so too does Florida.

On remand, the district court found *Texas priorities* distinguishable from this case because *Texas priorities* dealt with arrest and prosecution policies, whereas this

1

case concerns parole policies. Dkt. 180 at 4. In this context, the distinction is immaterial. Although the Supreme Court stated that "policies governing the continued detention of noncitizens who have already been arrested arguably might raise a different standing question than arrest or prosecution policies," *Texas priorities*, 599 U.S. at 683, nothing in the Supreme Court's reasoning suggests a different outcome is appropriate here.

In *Texas priorities*, the Supreme Court concluded states lacked standing to challenge the Executive's discretionary choices concerning arrest and prosecution of noncitizens, notwithstanding certain arguably mandatory language related to detention of noncitizens in the statute, because decisions on arrest and prosecution have historically been subject to prosecutorial discretion. *Id*. at 678-79, 684. Here, Florida challenges the Executive's application of parole under 8 U.S.C. § 1182(d)(5), which contains no language mandating detention and instead expressly grants the Secretary discretion for parole decisions. *See* Point A, *infra*. The case for Executive discretion is therefore, if anything, even stronger in this case than in *Texas priorities*. In addition, the factors the Supreme Court addressed in confirming prosecutorial discretion to the immigration context, including the complicated balancing of factors the agency must consider such as resource constraints and foreign policy implications, 599 U.S. at 680, apply equally to the parole policies at issue in this case.

2

And in any event, the broader principles that guided the Supreme Court's decision in *Texas priorities* apply with equal force here:

First, the Supreme Court clarified that, in assessing Article III standing, the Court must consider whether the case is judicially cognizable by looking to "history and tradition" to determine if the "asserted injury" is the type that has "traditionally" been "redressable in federal court" as opposed to the type of dispute that should instead be resolved through the political process. *Id*. at 676-78. Here, there is no history or tradition of courts resolving disputes based on parole policies or Florida's claimed injury, such that changes in such policies might lead to more noncitizens in the state. This is true notwithstanding any arguable distinction between arrest and prosecution policies and parole policies. *See* Point B, *infra*.

Second, the Supreme Court held that states will have greater difficulty establishing Article III standing based on allegations of indirect injuries, such as social-service costs attributed to noncitizens who are the subjects of the agency action. *See id.* at 680, n.3. Here, as in *Texas priorities*, Florida alleges an indirect injury and failed to provide sufficient evidence of harm. The problem the Supreme Court identified with basing standing on indirect harms applies equally here. *See* Point C, *infra*.

Third, *Texas priorities* confirmed that, when a state alleges financial injuries resulting from an increase in people within their borders, it cannot satisfy the

standing requirements by invoking the doctrine of special solicitude. *Texas priorities*, 599 U.S. at 685. Here, Florida invokes special solicitude by claiming "quasi sovereign interests," but its quasi-sovereign interests are not meaningfully different from those alleged by Texas in *Texas priorities*. Just as the Supreme Court rejected the application of special solicitude in that case based on such alleged injuries, the doctrine should likewise be rejected here. *See* Point D, *infra*.

*Texas priorities* and this case are thus similar in four crucial respects: both cases involve State challenges to the Executive's discretionary decision-making; the plaintiff states in both cases were unable to establish any history or tradition of justiciability for their alleged injuries; plaintiffs in both suits allege only indirect injuries based on the speculative conduct of third parties; and in both, plaintiffs argued they could avoid the traditional mandates of Article III standing by relying upon their quasi-sovereign interest and special solicitude. Because this case and *Texas priorities* are similar in these critical respects, this Court should reach the same conclusion here as the Supreme Court did in *Texas priorities*: Florida lacks Article III standing to pursue its claims.

Finally, Florida also lacks standing because its alleged injury is not redressable by the court's orders enjoining (or even vacating) the Parole Plus Alternatives to Detention (PATD) and Parole with Conditions (PWC) policies. The government's authority to parole noncitizens on a discretionary basis is grounded not in the PATD

and PWC policies, but rather by statute—a statute that Florida does not challenge in this lawsuit. Because the government may parole individuals at its discretion under the statute, vacatur of the policies cannot remedy Florida's alleged injury premised on indirect costs from paroling individuals, and so Florida lacks standing. *Texas priorities*, 599 U.S. at 687 (Gorsuch, J., concurring).

<u>ARGUMENT</u>

**A. The Present Case and *Texas priorities* Concern Policies Vested with Discretion.**

As noted above, the Supreme Court made four separate points clear in *Texas priorities*: (1) states generally lack standing to challenge the Executive's discretionary choices, particularly with respect to decisions concerning arrest and prosecution; (2) history and tradition matter, and where there is no history or tradition of justiciability, there likely is no standing; (3) where a state alleges indirect social services costs, standing is more difficult to establish; and (4) special solicitude does not apply where states allege indirect injury from population growth. On remand, the district court focused primarily on the Supreme Court's holding with respect to challenges to the Executive's discretionary choices. The Court concluded that *Texas priorities* is distinguishable from this case because *Texas priorities* dealt with arrest and prosecution policies, whereas this case does not. According to the district court, the fact that the Supreme Court said that "policies governing the continued detention of noncitizens who have already been arrested arguably might

5

raise a different standing question than arrest or prosecution policies," Dkt. 180 at 4 (quoting *Texas priorities*, 599 U.S. at 683), "establishes that Texas does not control the resolution of the standing issue in these cases." Dkt. 180 at 4. Appellants respectfully disagree.

This case is substantially more like *Texas priorities* than different from it. Both cases involve Article II discretion. The States alleged that the memorandum at issue in *Texas priorities* concerned enforcement actions that federal statutes provided DHS "shall" take. *See* 8 U.S.C. §§ 1226(c), 1231(a)(2). The Court explained that the States' challenge nevertheless was not cognizable because it interfered with the Executive's inherent Article II discretion over enforcement actions. *Texas priorities*, 599 U.S. at 684. This case concerns a statute in which Congress expressly placed the authority for granting parole in the "discretion" of the Secretary. 8 U.S.C. § 1182(d)(5)(A). The statutory basis for parole expressly provides discretion unlike the statutes at issue in *Texas priorities*. Thus, a judicial order that would force the Executive to exercise its discretion in a particular way would interfere not only with the Executive's inherent Article II discretion (as in *Texas priorities*) but also with the express discretion Congress granted in the statute. Under the logic of *Texas priorities*, Florida's challenge to the parole policies is not fit for judicial resolution.

The Court in *Texas priorities* gave several reasons why states lack standing for challenges to the Executive's exercise of discretion. The Court first cited *Castle*

*Rock v. Gonzales*, 545 U.S. 748, 760–761, 767, n.13 (2005), which held that executive discretion exists "even in the presence of seemingly mandatory legislative commands." *Texas priorities*, 599 U.S. at 677. The Supreme Court applied that holding to the statutes at issue there, 8 U.S.C. §§ 1226(c) and 1231(a)(2), which states that the Government "shall" arrest certain noncitizens and held the states could not assert injury because the Executive retained discretion to enforce those provisions. *Id.* Given that the states in *Texas priorities* lacked standing to challenge the Executive's enforcement discretion, notwithstanding statutes containing seemingly mandatory legislative commands, Florida also lacks standing here because it challenges the Executive's exercise of the parole power authorized by a statute that is facially *discretionary*. *See* 8 U.S.C. §1182(d)(5) (providing authority to "in his discretion parole [noncitizens] into the United States").

This case is similar to *Texas priorities* in another way that led the Supreme Court to find no standing. Both cases concern a "complicated balancing" of various factors, including "inevitable resource constraints and regularly changing public-safety and public-welfare needs." *Texas priorities*, 599 U.S. at 680. The Supreme Court held these types of factors weigh against finding standing under Article III or the Administrative Procedure Act (APA) because "federal courts" are not "the proper forum for resolving" such disputes. *Id*. Here, DHS's parole policies reflected decisions about how to best use its limited resources to process and detain

noncitizens who unlawfully entered the United States during particular periods of time. Such difficult policy questions are not susceptible to judicial resolution because there are no "meaningful standards for assessing those policies," which "explain[s] why federal courts have not traditionally entertained lawsuits of this kind." *Id*. at 671 (*citing Heckler v. Chaney*, 470 U.S. 821, 830-32 (1985)); *see also Texas*, 106 F.3d at 667 (noting that 8 U.S.C. § 1103 "commits enforcement of the Immigration and Nationality Act (INA) to" the Secretary's "discretion" and "is unreviewable under the Administrative Procedure Act because a court has no workable standard against which to judge the agency's exercise of discretion").

While the Supreme Court acknowledged certain factors might affect the standing analysis in "cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions," and reserved resolution of those questions for another day, 599 U.S. at 681, there is no logical reason to draw a distinction between this case and *Texas priorities*. Citing *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490–491 (1999), the Court in *Texas priorities* noted that it is precisely because arrest and prosecution decisions in the immigration context implicate not only domestic law enforcement priorities, but also foreign policy objectives, that the "principle of enforcement discretion over arrests and prosecutions extends to the immigration context." 599 U.S. at 679. *See also Biden v. Texas*, 597 U.S. 785, 805 (2022); *id*. at 816 (Kavanaugh, J., concurring). That

enforcement discretion extends not only to decisions about whether to arrest or detain, but also whether to pursue removal. *Id*. (citing *Reno*, 525 U.S. at 490-91).

In *Reno*, the Court emphasized that the "Executive has discretion to abandon the endeavor," such as pursuing removal, "[a]t each stage" and stressed that the Executive may "exercise[e] that discretion for humanitarian reasons or simply for its own convenience." 525 U.S. at 483-84. The *Reno* Court held, and the *Texas priorities* Court reaffirmed, that Executive discretion applies fully in the immigration context. The principles underlying that discretion apply equally to the release of noncitizens based on limited agency resources or agency priorities.

Even if this Court disagrees and concludes the Executive's discretionary choices with regard to arrest and prosecution are meaningfully different, that distinction does not dilute the Court's other holdings.

## B. There is no History or Tradition of Cases Challenging Parole Policies or Based on Similarly Indirect Injuries.

In *Texas priorities*, the Supreme Court made clear that courts must examine "history and tradition" as "a meaningful guide to the types of cases that Article III empowers federal courts to consider." 599 U.S. at 676-77. In doing so, courts must consider whether the "asserted injury" is the type that has "traditionally" been "redressable in federal court," and if the dispute is one that "is traditionally thought to be capable of resolution through the judicial process." *Id*. Here, neither the challenged policies nor the asserted injury satisfies these requirements. For decades,

the Executive has offered parole to certain classes of noncitizens who share particular urgent humanitarian reasons or for whom there is a shared significant public benefit.[1] And yet, Florida "ha[s] not cited any precedent, history or tradition" of judicial review of the Executive's use of its discretionary parole authority. *Id.* at 67; *see also Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022) (Kavanaugh, J., concurring) (noting that "[n]othing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment" with respect to the use of parole); *cf. Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) (holding where the Secretary's "discretionary judgment regarding the application of parole … is not subject to review," "the manner in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints" is also not subject to review).

The *Texas priorities* decision also reaffirms that states will have greater difficulty establishing standing when a theory of harm is based solely on indirect costs that may result from changes in federal policy that could affect a state's population. Indeed, *Texas priorities* calls into serious question whether indirect costs related to driver's licenses, education, health care, or law enforcement can ever satisfy Article III. 599 U.S. at 680 n.3. As the Supreme Court noted, "in our system

---

[1] *See* Appellants' Brief, Dkt. 45 at 31-32, 36-37.

of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending," and "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id*. In such circumstances, "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id*.

Florida alleged that it would suffer increased law enforcement, healthcare, education, and social service costs from the presence of more noncitizens in its state. Complaint, Dkt. 1 at ¶ 51. And the district court held that Florida had standing to challenge the PATD and PWC policies based on Florida's public education expenses associated with more noncitizen children in the state. A370-81, A467-68, A497. However, like the guidance at issue in *Texas priorities*, the parole policies challenged in this case, PATD and PWC, do not direct states or state agencies to take any particular action with respect to law enforcement or social services costs. As a result, the Florida's injuries are indirect. By contrast, the Supreme Court discussed direct injuries one week after it decided *Texas priorities* and explained that the challenged student-loan-forgiveness policy would, by its terms, directly "cut … revenues" of a state entity that the Court viewed as "necessarily a *direct* injury to Missouri itself." *Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) (emphasis added). The Supreme Court reasoned that the challenged policy would have eliminated a sizeable portion

of loans serviced by a state entity, costing it approximately "$44 million a year" as a direct result, and eliminating the portion of those revenues used to fund education in Missouri. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019), cited to by Appellee in its brief, *see* Dkt. 50 at 20, n.8, is also distinguishable because the injuries there were far more direct. There, the Supreme Court held the plaintiff states had shown changes to the census would undercount their population such that they would "lose out on federal funds that are distributed on the basis of state population." *Id.* at 2565. Unlike in *Nebraska* and *Dep't of Commerce*, the alleged injury here is indirect because it involves a more attenuated theory of harm that was found insufficient in *Texas priorities*.

Florida faces a substantially heavier burden to prove standing here than in *Nebraska* and *Department of Commerce* because its alleged injury is based on indirect costs. Florida did not allege that it is directly regulated by PATD or PWC. The Supreme Court has consistently held that "when the plaintiff is not himself the object of the government action or inaction he challenges"—in other words where the plaintiff is arguing standing based on indirect injuries—plaintiffs face a "substantially more difficult" burden to establish standing. *Id.*; *see also Warth v. Seldin*, 422 U.S. 490, 504-05 (1975) (noting that where "the harm to petitioners may have resulted indirectly" because they are "a third party" not directly regulated by the challenged policy "the indirectness of the injury" may "make it substantially

more difficult to meet the minimum requirement of Art. III"). And as the Supreme Court has long held, an indirect theory of harm alleging a change in federal policy will affect a state's population and revenue is insufficient to satisfy Article III. *See Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (rejecting standing where State argued change in federal policy would "have the result of inducing potential taxpayers to withdraw property from the state," negatively affecting State revenue). Such injuries are "at most, only remote and indirect" and insufficient to show the type of more "direct injury" required for standing. *Id.* at 18; *see also Texas priorities*, 599 U.S. at 680, n.3 (citing these same cases, *Florida v. Mellon* and *Lujan*, in noting that standing arguments premised on "indirect effects" and "attenuated" harms may not satisfy "bedrock Article III constraints").

As noted above, the *Texas priorities* decision clarifies that courts must consider "history and tradition" as "a meaningful guide to the types of cases that Article III empowers federal courts to consider." 599 U.S. at 676-77. The absence of similar cases to this one is powerful evidence they are incompatible with our constitutional structure, which "contemplates a more restricted role for Article III courts." *Raines v. Byrd*, 521 U.S. 811, 828 (1997); *cf. Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (noting limits on state standing to raise claims against the Federal government). "Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty," and a "State's allegation

that defendants have failed to enforce the immigration laws and refuse to pay the costs resulting therefrom is not subject to judicial review." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015) (A "state official has not suffered an injury in fact to a legally cognizable interest" even if "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources" because this is simply a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws.").

Following *Texas priorities*, it is no longer sufficient for a state to argue that a change in federal policy may increase population and indirectly change state expenditures with respect to driver's licenses, education, health care, or law enforcement. 599 U.S. at 680, n.3.

Finding standing whenever a change in federal policy would cause some incidental costs to states would allow any state to challenge any change in immigration policy, and improperly draw courts into generalized grievances on behalf of states that were unable to obtain their preferred policy outcomes through the political process. "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches" in this manner. *Clapper v. Amnesty Int'l USA*,

14

568 U.S. 398, 408 (2013). A theory of standing that would allow any state to sue the Federal government any time it changed federal immigration policy merely by saying the change might affect its population would vitiate the rule that "[t]he mere fact that a state is the plaintiff is not enough" to establish Article III standing unless the State has suffered a concrete harm of the sort that has traditionally "furnish[ed a] ground for judicial redress." *Mellon*, 273 U.S. at 17.

**C. Florida's Asserted Quasi-Sovereign Interest is not Meaningfully Different than in *Texas priorities* and Special Solicitude Does Not Apply.**

In the order for supplemental briefing, this Court asked the parties to address whether the quasi-sovereign interest asserted by Florida is meaningfully different than the quasi-sovereign interest asserted by the States in *Texas priorities*. Dkt. 87. There is no difference; the interests are the same. Florida's alleged sovereign injury—the presence of more noncitizens within its State—is virtually identical to the injury alleged in *Texas priorities*.

The Supreme Court's decision in *Texas priorities* confirmed that the special solicitude concept has no application when a state asserts standing based on the type of indirect costs Florida has asserted in this suit. On remand, the district court incorrectly noted that "Justice Gorsuch's views on 'special solicitude' only garnered three votes on the Supreme Court," Dkt. 180 at 2, n.1. In fact, the majority rejected the application of special solicitude in *Texas priorities*. The majority noted that Plaintiffs based "part of their argument for standing" on *Massachusetts v. EPA*, 549

U.S. 497 (2007), *see* 599 U.S. at 685 n.6, and then held that ultimately, "none of the various theories of standing asserted by the States … overcomes the fundamental Article III problem with this lawsuit." *Id*. at 680 n.3. Lest there be any doubt, the majority clearly stated that *Massachusetts* "does not control this case." *Id*. at 685 n. 6.

Plaintiffs in *Texas priorities* argued standing was based on the same theory of indirect costs that Florida raises in this case—that immigration policy might affect the number of people in the state, which might in turn affect state expenditures with respect to law enforcement or "social services such as healthcare and education." *Id*. at 674. Rejecting the plaintiffs' theory of harm, the Supreme Court emphasized that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer," and "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* at 680 n.3. Special solicitude did not save the plaintiffs' arguments that they had standing to challenge the agency guidance, a point the concurrence also noted while explaining the limited historical application of the doctrine overall. *Id*. at 688-89 (Gorsuch, J., concurring). As Justice Gorsuch, writing for himself and two other Justices, explained: "Before *Massachusetts v. EPA*, the notion that States enjoy relaxed standing rules 'ha[d] no basis in our jurisprudence.' … Nor has 'special solicitude' played a meaningful role

in this Court's decisions in the years since." *Id*. (citation omitted). As the concurrence warned, "it's hard not to think … that lower courts should just leave that idea on the shelf in future" cases. *Id*. Indeed, the Supreme Court has never afforded States "special solicitude" in any other case. To the contrary, the Court's decisions since *Massachusetts* have consistently analyzed State standing without granting States favorable treatment simply because they are States. *See, e.g.,* C*alifornia v. Texas,* 141 S. Ct. 2104, 2116-20 (2021); *Trump v. New York*, 141 S. Ct. 530, 534-37 (2020) (per curiam); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).

And in any event, even when courts have relied on the special solicitude doctrine, they have not relieved states of the obligation to meet the basic requirements of Article III by showing a concrete and particularized injury traceable to the challenged agency action. *Massachusetts*, 549 U.S. at 522. At most, courts have suggested that special solicitude may lower the threshold for establishing redressability. *Id.* at 517-18; *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022). But a looser standard for redressability cannot overcome the failure to establish a concrete harm that is the unalterable requirement of Article III standing. It is, therefore, of no use to Florida, which is alleging indirect, unsubstantiated costs that are insufficient to satisfy "bedrock Article III constraints." *Texas priorities*, 599 U.S. at 680, n.3; *see Mellon*, 273 U.S. at 17-18 (states may sue the United States

only if they have suffered a "direct injury," not where the alleged harm is "only remote and indirect"). Special solicitude thus has no place in a case predicated on indirect costs.

*Massachusetts*, in contrast, involved a direct harm to a state, namely the threatened loss of territory owned by and subject to the sovereignty of the State. *Massachusetts*, 549 U.S. at 521. The Supreme Court has long treated the loss of territory as a distinct and legally cognizable harm. *See* Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 415–16 (1995) (discussing 19th-century cases). Florida's challenge to PATD and PWC involve only alleged "indirect fiscal burdens"—a "humdrum feature" of many federal policies, including many policies with respect to immigration. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J.). "The key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States." *Id.* at 386-87 (citing *Arizona v. United States*, 567 U.S. 387, 394-97 (2012)). "The States have distinctly less, not more, solicitude in this area." 40 F.4th at 387.

Special solicitude does not apply in this case for additional reasons. A state invoking special solicitude must also show, among other things, a procedural right to challenge the action in question. *Texas*, 50 F.4th at 514. *Massachusetts* attached "critical importance" to the State's "procedural right" provided by the Clean Air Act to submit a petition for rulemaking and challenge the denial of such a petition related

to emissions standards. *Massachusetts*, 549 U.S. at 516, 518; *see also id*. at 527 (noting case dealt with the denial of a petition "for rulemaking which (at least in the circumstances here) the affected party had an undoubted procedural right to file"); 42 U.S.C. § 7607(b)(1); *Texas priorities*, 599 U.S. at 685, n.6 (noting that in *Massachusetts*, "[t]he issue there involved a challenge to the denial of a statutorily authorized petition for rulemaking," rather than a challenge to an exercise of the Executive's discretion). The INA creates no similar procedural right for Florida to challenge use of the discretionary authority in the parole statute. To invoke special solicitude, an agency action must also be "imposing substantial pressure on" the State's "quasi-sovereign" interests." *Texas*, 809 F.3d at 153. Florida does not contend that PATD or PWC have placed any pressure on them to change state laws. *See also Arizona*, 40 F.4th at 386-87 (finding this type of quasi-sovereign interest requires showing actual "regulation of" the State or "preemption of local lawmaking authority"). And to the extent Florida may argue that raising an APA claim is sufficient, it is wrong. The Supreme Court has never held that an APA claim alone is sufficient to satisfy this requirement, and the Court has not applied special solitude in cases where it might otherwise have been implicated if an APA claim alone were enough. *See*, *e.g.*, *California*, 141 S. Ct. at 2116-20; *Trump*, 141 S. Ct. at 534-37; *Dep't of Commerce*, 139 S. Ct. at 2565.

On remand, the district court noted that its application of special solicitude was based not so much upon the financial injuries allegedly sustained by Florida, but rather upon the alleged injury to the State's sovereignty, "since it could not exclude from its territory the aliens who were released into the country under the challenged policies but should have been detained pending completion of their immigration proceedings." Dkt. 180 at 7. The district court based its conclusion upon *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023). *Id.* But *West Virginia* did not address special solicitude; it concerned garden-variety traceability. *See* App. Br., Dkt. 45 at 20. Notably, *West Virginia* involved direct effects on state tax revenue arising out of a quasi-contractual relationship between the states and the Federal government. *See* 59 F.4th at 1133-34. The Court found standing there because the challenged guidance "restricts the way in which states may reduce tax receipts or change tax rates …." *Id.* at 1136.

Moreover, the comparison between Florida's alleged quasi-sovereign injury and that in *Massachusetts* is strained. *Massachusetts* dealt with the literal loss of territory. *See* 549 U.S. at 522-23. By contrast, Florida's alleged sovereign injury—the presence of more noncitizens—is virtually identical to the injury alleged in *Texas priorities*. Furthermore, a state does not suffer an injury to its sovereignty by virtue of the presence of noncitizens whom the Federal government permitted to enter the country. That is because the states agreed to cede the authority to determine which

20

noncitizens may enter the country to the federal government when they ratified the Constitution and gave the federal government the power to "establish a uniform Rule of Naturalization." *See* U.S. Const., Art. I, § 8, cl. 4. "The key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States." *Arizona*, 40 F.4th at 386–87. Thus, a state "has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources." *Arpaio*, 27 F. Supp. 3d at 202 .

### D. Florida's Injury is not Redressed by Vacatur.

The Court asked the parties to address how, if at all, Florida's injury is redressed by vacatur of the challenged policies. Dkt. 87. In short, Florida's injury is not redressable by an injunction or vacatur of the challenged policies, and for this additional reason, Florida lacks standing.

"To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable by a court order." *Texas priorities*, 599 U.S.  at 676 (citing *Lujan*, 504 U.S. at 560–561). In other words, the court's judgment must actually "remedy the plaintiff's harms." *Id.* at 691 (Gorsuch, J., concurring). An injury is not redressable where federal officials would have the same underlying discretion even without the challenged policy. *Lujan*, 504 U.S. at 569-71; *see also Texas priorities*, 599 U.S. at 690-91 (Gorsuch, J., concurring). Here, Florida's alleged injury is not

redressable because DHS's parole authority is derived from a statute, 8 U.S.C. § 1182(d)(5), and implemented by a regulation, 8 C.F.R. § 212.5—neither of which Florida challenges in this case. Thus, immigration officers may exercise discretionary parole authority whenever the officer concludes in his or her discretion that an urgent humanitarian reason or significant public benefit justifies parole as to any noncitizen, and that authority will continue to be available regardless of the outcome in this case. App. Reply Br., Dkt. 54 at 7-8. As a result, the district court's orders enjoining and vacating the PATD and PWC policies does not restrain the Executive's discretion over paroling migrants at the border. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998) (finding no redressability where relief sought would not address the harms suffered).

On remand, the district court rejected this argument, noting that "DHS clearly understood that it could not continue to use 'parole' as a 'processing pathway' for aliens arriving at the Southwest Border," because "the data maintained by DHS reflects that it essentially stopped paroling aliens into the country in response to the orders in these cases." Dkt. 180 at 3, n. 3. But as DHS previously argued, its data does not show what it "believes." App. Reply Br. at Dkt. 54, at 7-8. And more importantly, a party's beliefs about the effect of a judicial decision do not determine redressability. It is "the federal court's judgment," not the voluntary compliance or beliefs of the parties, "that remedies an injury," and it is to the judgment that one

must look to assess redressability. *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023); *Texas priorities*, 599 U.S. at 691 (Gorsuch, J., concurring).[2] The district court's judgment does not and cannot enjoin or vacate DHS's authority under the parole statute and regulation, and so the orders do not redress any alleged injury caused by paroling noncitizens.

<u>CONCLUSION</u>

For the foregoing reasons and those in Appellants' brief, this Court should vacate the district court's injunctions.

---

[2] Moreover, as the government has argued, App. Br., Dkt. 45 at 53-55, and as articulated by Justice Gorsuch in his concurrence, vacatur is not even a remedy authorized under the APA. As Justice Gorsuch correctly explained, courts that have granted vacatur have misread Section 706 of the APA, which is concerned with the scope of review, not remedies. *Texas*, 599 U.S. at 690-91 (Gorsuch, J., concurring). Section 703 of the APA, which addresses the remedies available for APA claims, does not authorize vacatur either. Rather, absent the applicability of a special statutory review provision, it limits courts to traditional party-specific remedies like injunctions and declaratory relief. *Texas priorities*, 599 U.S. at 698. Although the Court in *Texas priorities* did not ultimately resolve this question, multiple justices signed on to the view that the grounds for vacatur in the APA are questionable. *Id.* (Gorsuch, J., concurring). Accordingly, if Florida were entitled to any remedy—which the government disputes—the proper remedy would have been an order setting aside the policies as to individuals providing a Florida address—though that remedy also would not address Florida's alleged injuries for the reasons discussed above. *See* Dkt. 45 at 53-55 (addressing scope of relief).

May 6, 2024                    Respectfully submitted,

                               BRIAN M. BOYNTON
                                    *Principal Deputy Assistant Attorney*
                                    *General*

                               WILLIAM C. PEACHEY
                                    *Director*

                               EREZ REUVENI
                                    *Counsel*

                               BRIAN C. WARD
                                    *Senior Litigation Counsel*

                               */s/ Elissa Fudim*
                               ELISSA P. FUDIM
                               JOSEPH A. DARROW
                               ERIN T. RYAN
                                    *Trial Attorneys*
                               U.S. Dep't of Justice, Civil Division
                               Office of Immigration Litigation,
                               District Court Section
                               P.O. Box 868, Ben Franklin Station
                               Washington, DC 20044

## CERTIFICATE OF COMPLIANCE

This supplemental brief complies with the type-volume limit the Court set in Docket Entry No. 87 because it contains 5,503 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font, a proportionally spaced typeface.


*/s/ Elissa P. Fudim*
ELISSA P. FUDIM

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system. Plaintiffs' counsel was also notified of this motion by email.

*/s/ Elissa P. Fudim*
ELISSA P. FUDIM