Nos. 23-11528, 23-11644

# In the United States Court of Appeals for the Eleventh Circuit

---

STATE OF FLORIDA,
*Plaintiff-Appellee,*

v.

UNITED STATES OF AMERICA, ET AL.,
*Defendants-Appellants.*

---

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Nos. 3:21-cv-1066, 3:23-cv-9962

---

## APPELLEE'S SUPPLEMENTAL BRIEF

---

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
henry.whitaker@myfloridalegal.com

ASHLEY MOODY
*Attorney General of Florida*

HENRY C. WHITAKER
*Solicitor General*
DANIEL W. BELL
*Chief Deputy Solicitor General*
DARRICK W. MONSON
*Assistant Solicitor General*
JAMES H. PERCIVAL
*Chief of Staff*
NATALIE P. CHRISTMAS
*Counselor to the Attorney General*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Florida certifies that, to the best of its knowledge, the following is a complete

list of interested persons:

Americans for Immigrant Justice, Inc.

Bailey, Andrew

Bell, Daniel

Bird, Brenna

Boynton, Brian M.

Brodeen, Karen

Butler, Steven

Cameron, Daniel

Canizares Law Group LLC

Carr, Christopher M.

Catholic Charities Legal Services, Archdiocese of Miami, Inc.

Christmas, Natalie

Commonwealth of Kentucky

Commonwealth of Virginia

Coody, Jason R.

Crapo, Matt A.

Darrow, Joseph A.

Drummond, Genter F.

Fabian, Sarah B.

Faruqui, Bilal A.

Ferguson, Andrew N.

Fitch, Lynn

Florida Office of the Attorney General

Fudim, Elissa P.

Gallagher, Kevin M.

Garcia, Miranda & Gonzalez-Rua, P.A

Garland, Merrick

Griffin, Tim

Guard, John

Gurian Group, P.A.

Hilgers, Michael T.

Hill, Bridget

Hudak, Matthew

Immigration Reform Law Institute

Jaddou, Ur M.

Jackley, Marty J.

Johnson, Tae D.

Knudsen, Austin

Kobach, Kris

Labrador, Raúl

Landry, Jeff

Marshall, Stephen

Mayorkas, Alejandro

Miller, Troy

Minot, Martin J.

Miyares, Jason S.

Moody, Ashley

Monson, Darrick

Morrisey, Patrick

Moyle, Marie A.

Owens, Jason

Patel, Anita

Peachey, William C.

Percival, James H. II

Prada, Mark A.

Reuveni, Erez R.

Reyes, Sean D.

Rokita, Theodore E.

Ryan, Erin

State of Alabama

State of Alaska

State of Arkansas

State of Florida

State of Georgia

State of Idaho

State of Indiana

State of Iowa

State of Kansas

State of Louisiana

State of Mississippi

State of Missouri

State of Montana

State of Nebraska

State of North Dakota

State of Ohio

State of Oklahoma

State of South Carolina

State of South Dakota

State of Utah

State of West Virginia

State of Wyoming

Taylor, Treg

United States of America

U.S. Attorney's Office, Northern District of Florida

U.S. Citizenship and Immigration Services

U.S. Customs and Border Protection

U.S. Department of Homeland Security

U.S. Immigration and Customs Enforcement

U.S. Department of Justice, Civil Division

Ward, Brian C.

Wenski, Thomas G.

Wetherell, T. Kent II

Wilson, Alan

Wilson, Sarah

Whitaker, Henry C.

Wrigley, Drew

Yost, Dave

# TABLE OF CONTENTS

Table of Citations ........................................................................................ ii

Introduction ................................................................................................ 1

Standard of Review .................................................................................... 4

Argument..................................................................................................... 4

    I. *Texas* does not apply because the challenged policies are not exercises of traditional enforcement discretion.................................................. 4

        A. The parole policies confer legal status and other benefits beyond mere nonenforcement. ........................................................................ 5

        B. The parole policies govern only the continued detention of aliens DHS has already arrested. ............................................................ 9

    II. Florida has standing to challenge the parole policies........................... 12

        A. Florida suffered an injury in fact traceable to DHS's parole policies. ..... 12

        B. Florida's injuries are redressable. ................................................. 18

Conclusion................................................................................................... 22

Certificate of Compliance............................................................................ 24

Certificate of Service ................................................................................... 25

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Am.'s Health Ins. Plans v. Hudgens,*
   742 F.3d 1319 (11th Cir. 2014) ............................................................ 4

*Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.,*
   571 F.3d 1143 (11th Cir. 2009) .......................................................... 14

*Bazile v. Fin. Sys. of Green Bay, Inc.,*
   983 F.3d 274 (7th Cir. 2020) .............................................................. 14

*Biden v. Texas,*
   597 U.S. 785 (2022) ..................................................................... 7, 10

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,*
   781 F.3d 1271 (11th Cir. 2015) .......................................................... 14

*Campaign Legal Ctr. v. Scott,*
   49 F.4th 931 (5th Cir. 2022) .............................................................. 14

*Chafin v. Chafin,*
   568 U.S. 165 (2013) .......................................................................... 21

*Chiles v. Thornburgh,*
   865 F.2d 1197 (11th Cir. 1989) ...................................................... 3, 10

*Cruz-Miguel v. Holder,*
   650 F.3d 189 (2d Cir. 2011) ............................................................ 3, 7

*Ctr. for Sustainable Coast v. U.S. Army Corps of Eng'rs,*
   — F.4th —, 2024 WL 1918733 (11th Cir. 2024) ............................... 22

*Del Valle v. Trivago GMBH,*
   56 F.4th 1265 (11th Cir. 2022) .......................................................... 21

*Dep't of Com. v. New York,*
   139 S. Ct. 2551 (2019) ...................................................................... 15

*Dep't of Educ. v. Brown,*
   600 U.S. 551 (2023) .......................................................................... 22

*DHS v. Regents of the Univ. of Cal.,*
   140 S. Ct. 1891 (2020) .............................................................. 3, 7–8

*Gonzalez v. McHenry County,*
   40 F.4th 824 (7th Cir. 2022) ............................................................. 11

*Jean v. Nelson,*
   727 F.2d 957 (11th Cir. 1984) ............................................................ 6

*Keohane v. Fla. Dep't of Corr. Sec'y,*
   952 F.3d 1257 (11th Cir. 2020) .................................................. 10, 15

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ................................................................................ 6
*Louisiana v. Nat'l Oceanic & Atmospheric Admin.*,
    70 F.4th 872 (5th Cir. 2023) ............................................................... 17
*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ............................................................................. 16
*Miller v. Thurston*,
    967 F.3d 727 (8th Cir. 2020) ............................................................... 14
*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................................................. 12
*United States v. Kaley*,
    579 F.3d 1246 (11th Cir. 2009) ............................................................. 3
*United States v. Lawson*,
    686 F.3d 1317 (11th Cir. 2012) ........................................................... 10
*United States v. Texas*,
    599 U.S. 670 (2023) ..................................... 1–2, 5, 8–12, 15, 17–18
*United States v. Watkins*,
    10 F.4th 1179 (11th Cir. 2021) ........................................................... 14
*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021) ........................................................................... 19
*West Virginia v. U.S. Dep't of Treasury*,
    59 F.4th 1124 (11th Cir. 2023) .....................................................16–17

**Statutes**

8 U.S.C. § 1182(a) ..............................................................................5–6
8 U.S.C. § 1182(d) ...............................................................................5, 7
8 U.S.C. § 1225(b) ................................................................................. 11
8 U.S.C. § 1226(a) ...........................................................................11, 20
8 U.S.C. § 1226(c) ................................................................................. 11
18 U.S.C. § 3142 .................................................................................... 11

**Regulations**

7 C.F.R. § 273.4(a) .................................................................................. 7
8 C.F.R. § 1.2 ......................................................................................... 19
8 C.F.R. § 212.5(b) ................................................................................ 19
8 C.F.R. § 212.5(c) ................................................................................ 19
8 C.F.R. § 274a.12(c) ..........................................................................7–8

**Other Authorities**

H.R. Rep. No. 104-469 ................................................................................. 7

U.S. Customs and Border Prot.,
   *Custody and TransferStatistics FY2023*, https://tinyurl.com/7fsdzyf3 ......................... 20

William Blackstone,
   *Commentaries on the Laws of England* (1769) .................................................. 11

## INTRODUCTION

In this case, Florida challenges two materially identical parole policies—Parole Plus Alternatives to Detention ("Parole+ATD") and Parole with Conditions ("PWC")—that have resulted in the release of untold millions of inadmissible aliens into the interior of the United States. This Court has requested supplemental briefing on whether, "[i]n light of *United States v. Texas*, 599 U.S. 670 (2023), . . . Florida ha[s] standing to challenge the parole policies at issue in these cases?" Supp. Br. Order 3. The district court, on a fully developed record following a bench trial, faithfully applied Supreme Court and Eleventh Circuit precedent and concluded that Florida has standing and that the United States' parole policies are blatantly unlawful. *United States v. Texas* does not call the district court's standing ruling into question. The Court should reject the United States' latest effort to evade any judicial review of its unlawful immigration policies and affirm the district court.

In *Texas*, the Supreme Court considered a challenge by Texas and Louisiana to DHS's interior-immigration-enforcement policy known as the Guidelines for Enforcement of Civil Immigration Law. 599 U.S. at 674. That policy directed DHS officials engaged in interior enforcement—that is, the arrest and removal of aliens already in the country—to prioritize the use of DHS resources on suspected terrorists, violent criminals, and aliens who had recently entered the country illegally. *Id.* at 673. The plaintiff states sued, arguing that the policy violated the INA because it excluded from its priorities, and thus implicitly directed officials not to arrest, certain categories of aliens that

1

DHS is required to arrest under 8 U.S.C. §§ 1226(c) and 1231(a)(2). *Id.* at 674. The states alleged that they suffered injury from the policy in the form of increased financial costs sufficient to support standing. *Id.*

The Supreme Court did not deny that the policy caused the states injury that would be redressed by the requested relief. To the contrary, the Court acknowledged that the monetary costs found by the district court to injure the state plaintiffs were "of course an injury." *Id.* at 676. But the Court held that those injuries were not "judicially cognizable." *Id.* at 676–77. The Court reached that conclusion because of unique "Article II problems raised by judicial review of the Executive Branch's arrest and prosecution policies," not because the states failed any of the three traditional elements of standing. *Id.* at 679.

In so concluding, the Supreme Court emphasized that its holding was "narrow." *Id.* at 686. The Court confined its holding to a "discrete" sort of policy: those governing the Executive Branch's traditional enforcement discretion to decide whether to make an arrest or initiate enforcement proceedings. *Id.* at 684–85. The Court distinguished and declined to consider whether it would extend its holding to suits challenging other types of policies, including policies like the parole policies at issue here that confer on aliens "legal status" or other "legal benefits" or that "govern[] the continued detention of noncitizens who have already been arrested." *Id.* at 683.

Because the Supreme Court expressly declined to address policies like the parole policies here, this Court remains bound by precedent predating *Texas* holding that such

2

policies are subject to judicial review. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906–07 (2020) (holding that a policy that conferred benefits like work authorization went beyond mere enforcement discretion and was thus subject to judicial review under the APA); *Chiles v. Thornburgh*, 865 F.2d 1197, 1209–10 (11th Cir. 1989) (holding that a governmental entity has standing to challenge policies governing detention of aliens already in custody when policies result in release of aliens into the government's jurisdiction); *see also United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009) (explaining that precedent remains binding unless "the intervening Supreme Court case actually abrogate[s] or directly conflict[s] with, as opposed to merely weaken[s], the holding of the prior panel").

Even apart from precedent, there is no basis to extend *Texas*' standing bar to the challenged policies here. *Texas* involved the Executive Branch's historic discretion to enforce federal law. But here, the challenged policies are much more than a mere failure to enforce the law. They instead confer temporary legal status and other statutory benefits in the form of parole. Grants of immigration status and benefits are exercises of statutory authority, not exercises of Article II enforcement discretion. And in the statute at issue here, Congress has carefully circumscribed that authority. *See Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that the current parole statute reflects limits added by Congress in 1996 due to a "concern that parole . . . was being used by the executive to circumvent congressionally established immigration policy").

3

Nor does Florida's challenge here implicate the Executive Branch's discretion over whether to arrest and remove aliens. The aliens subject to the challenged policies here are those the United States has already arrested and decided to remove. While the Executive Branch may enjoy a long history of discretion over whether to enforce the law, there is no similar historical tradition of exclusive Executive discretion over whether to detain persons subject to enforcement proceedings. That has historically been a judicial function.

Because the *Texas* exception to ordinary Article III standing principles does not apply, Florida has standing if it satisfies the traditional test: an injury traceable to the policies that would be redressed by the requested relief. The district court did not clearly err in finding Florida's evidence sufficient to establish such an injury.

## STANDARD OF REVIEW

This Court reviews jurisdictional issues such as standing de novo but reviews any factual findings underlying the jurisdictional determination for clear error. *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1326 (11th Cir. 2014).

## ARGUMENT

**I.    *Texas* does not apply because the challenged policies are not exercises of traditional enforcement discretion.**

In *Texas*, the Supreme Court denied Texas and Louisiana standing to challenge the United States' enforcement priorities governing the arrest and removal of aliens. That holding is inapplicable here for two basic, independent reasons. First, the parole

4

policies that Florida challenges represent the exercise of delegated statutory authority to confer temporary legal status and accompanying benefits through parole, not Article II enforcement discretion. Second, the challenged policies involve the continued detention of aliens whom DHS has already arrested and decided to remove, and so this suit does not interfere with any arrest or removal decision. *See* App. 1–2, 5 (both memoranda explaining that they apply to aliens in CBP custody who will be subject to removal proceedings).

## A. The parole policies confer legal status and other benefits beyond mere nonenforcement.

In *Texas*, the Supreme Court noted that policies that govern the "provision of legal benefits or legal status" present a different issue than those that govern the Executive Branch's enforcement priorities because such policies "implicate more than simply the Executive's traditional enforcement discretion." 599 U.S. at 683. Conferring legal status or providing benefits like work authorization to aliens is not a core executive function. So the Article II concerns that prevented the plaintiffs from establishing standing in *Texas* do not apply.

1. The parole policies here do not govern the Executive Branch's exercise of enforcement discretion; they govern DHS's provision of temporary legal status through parole, which is accompanied by additional benefits like work authorization. Congress created parole as a mechanism to confer temporary lawful presence in the United States under limited circumstances. *See* 8 U.S.C. § 1182(a)(6)(A)(i), (d)(5). When DHS grants

parole, the beneficiaries of that decision enjoy not merely temporary reprieve from enforcement, but an actual change in their legal status: They become lawfully present in the United States, albeit temporarily. *See* 8 U.S.C. § 1182(a)(6)(A)(i) (defining an inadmissible alien as one "present in the United States without being admitted *or paroled*" (emphasis added)). By contrast, *Texas* involved decisions to decline to pursue enforcement action against unlawfully present aliens. When DHS declines to do that, nothing about the aliens' legal status changes—they remain unlawfully present in the United States.

The distinction is significant because, unlike its authority to exercise enforcement discretion, the Executive Branch has no inherent Article II authority to grant legal status to unlawfully present aliens. Quite the opposite, regulating the legal status of aliens is a core *Article I* function. *See Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) ("Over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens."). The Executive Branch's power to confer legal status upon an alien is the result of "sweeping delegations of congressional authority" rather than inherent Article II power. *Jean v. Nelson*, 727 F.2d 957, 965 (11th Cir. 1984) (en banc). And here, Congress has constrained DHS's delegated discretion to grant temporary legal status through parole. As explained in Florida's merits brief, Congress amended the parole statute in 1996, adding the case-by-case requirement and narrowing the criteria under which parole may be granted. Fla. Br. 33–34. Congress did so to restrain the Executive Branch's widespread use of parole "to admit entire categories of aliens" and

6

to "end the use of parole authority to create an ad hoc immigration policy." Fla. Br. 34 (quoting H.R. Rep. No. 104-469, at 140, 175 (1996)); *see also Cruz-Miguel*, 650 F.3d at 199 n.15 (Congress amended the parole statute out of "concern that parole . . . was being used by the executive to circumvent congressionally established immigration policy."). Indeed, the Supreme Court recently acknowledged in *Biden v. Texas* that DHS's use of parole is subject to statutory restraints and reviewable under the APA. 597 U.S. 785, 806–07 (2022) ("[U]nder the APA, DHS's [use of parole] within that statutory framework must be reasonable and reasonably explained.").

Unlike in *Texas*, then, DHS is not exercising enforcement discretion when it grants legal status in the form of parole; it is exercising a carefully circumscribed delegated legislative power. *See* 8 U.S.C. § 1182(d)(5). Challenging the Executive's use of delegated legislative authority is a black-letter example of a proper APA lawsuit, to which the APA's "basic presumption of judicial review" should attach, *Regents*, 140 S. Ct. at 1905, rather than the exception to Article III standing principles recognized in *Texas*.

2. Not only does granting parole confer temporary legal status. It also renders parolees potentially eligible for additional benefits like work authorization or supplemental nutrition assistance. 8 C.F.R. § 274a.12(c)(11); 7 C.F.R. § 273.4(a)(6)(i)(D). A policy that results in benefits to aliens like the ability to "request work authorization" is "more than simply a non-enforcement policy." *Regents*, 140 S. Ct. at 1906. In *Regents*, DHS argued that its Deferred Action for Childhood Arrivals policy—like the policy at

issue in *Texas*—was merely an exercise of enforcement discretion and thus that the decision to rescind the policy was unreviewable under the APA. *Id.* The Supreme Court rejected that argument because DACA went beyond the exercise of traditional enforcement discretion in that it granted access to additional benefits like eligibility for work authorization.[1] *Id.*

In its reply brief on the merits in this Court, DHS did not dispute that policies that grant benefits like work authorization fall outside the scope of the *Texas* standing bar. DHS instead argued that the parole policies do not grant such benefits because a separate regulation rather than the policies themselves allows parolees to request work authorization. Reply Br. 5 n.1. But that was also true of the DACA policy challenged in *Regents*. The DACA memorandum instructed immigration officials to defer enforcement against certain childhood arrivals who were then eligible to request work authorization "under regulations long predating DACA's creation." *Regents*, 140 S. Ct. at 1902. In fact, it is *the same regulation* that authorized DACA recipients to request work authorization that authorizes parolees to do the same. *See* 8 C.F.R. § 274a.12(c)(11), (14). By rendering aliens eligible to request work authorization under that regulation, the parole

---

[1] True, *Regents* considered only whether the policy recission was reviewable under the APA and not whether the plaintiffs had standing to challenge it. But the Supreme Court indicated in *Texas* that the same analysis applies "in both Article III cases and Administrative Procedure Act cases," 599 U.S. at 680, and cited *Regents* to support its assertion that policies that grant benefits present a distinct standing question, *id.* at 683. There is thus no basis for this Court to declare that, because of *Texas*, the Supreme Court acted without jurisdiction in *Regents* when *Texas* itself distinguished *Regents*.

memoranda like the DACA memorandum are subject to judicial review.[2] And even if the separate regulation made a difference, DHS cannot dispute that the parole memoranda directly confer the benefit of parole—i.e., temporary "legal status"—and on that basis alone are not enforcement policies. *Texas*, 599 U.S. at 683.

### B. The parole policies govern only the continued detention of aliens DHS has already arrested.

*Texas* not only distinguished policies that confer legal status and other affirmative benefits, but also policies "governing the continued detention of noncitizens who have already been arrested." 599 U.S. at 683. DHS does not dispute that the parole memoranda are examples of such policies. They authorize release on parole for aliens arrested after unlawfully crossing the border and against whom DHS plans to initiate removal proceedings. *See* App. 1–2, 5. Unlike the policy at issue in *Texas*, then, the parole policies do not govern DHS's decisions about when to take enforcement action. They govern what DHS will do with aliens after it has already initiated enforcement.

In its reply, DHS hung its hat on the fact that *Texas* said only that a detention policy "arguably might" be different than an enforcement policy for purposes of Article III standing. Reply Br. 5 n.1. That argument overlooks binding precedent of this Court,

---

[2] That is not to say that Florida's injury necessarily stems from the policies' provision of work authorization. *But see* App. 368 (finding that the challenged policies likely caused Florida to spend additional resources on unemployment benefits). The point is simply that, in providing benefits like work authorization, the parole policies are not exercises of executive enforcement discretion and thus are not subject to *Texas'* standing bar.

which the Supreme Court's statement did not even arguably disturb. In *Chiles*, this Court held that Dade County had standing to sue the federal government to challenge its immigration-detention policies when those policies allegedly enabled the escape of detainees, causing the county to expend law-enforcement resources. 865 F.2d at 1209–10. So too here, Florida challenges two of the federal government's immigration-detention policies because they have resulted in detainees leaving federal custody to Florida, causing Florida to expend resources. At the very least, *Texas* does not "clearly" and "actually" conflict" with *Chiles*, and panels of this Court must therefore continue to apply it. *United States v. Lawson*, 686 F.3d 1317, 1319 (11th Cir. 2012). Ignoring *Chiles* because of *Texas'* "reasoning," Supp. Br. Order 3, would be "less an application of existing precedent than a prediction of what the Supreme Court will hold should it choose to address this issue in the future" and akin to the panel's "tak[ing] the en banc court's role for itself." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1289 & n.12 (11th Cir. 2020) (Wilson, J., dissenting). And it would be an odd prediction indeed considering that the Supreme Court recently reached the merits of a challenge to an immigration-detention policy in *Biden*, 597 U.S. 785, and then cited that case in *Texas* to support distinguishing enforcement and detention policies for purposes of standing. 599 U.S. at 683.

That distinction makes sense. In *Texas*, the Court was concerned that Texas' lawsuit would intrude on the Executive's constitutional discretion to decide "whether to remove [an alien] from the United States." *Id.* at 679. The enforcement guidelines at issue in that case governed DHS's decision whether to arrest and initiate removal

10

proceedings in the first place, but they did not authorize the release of aliens already in custody pending removal proceedings. *Id.* at 683 n.5. Here, by contrast, Florida challenges only detention policies applicable to aliens whom the United States has already arrested for the purpose of initiating removal proceedings. And while the Executive enjoys a long historical tradition of enforcement discretion, it enjoys no similar tradition of discretion over detention pending enforcement proceedings.

On the contrary, since before the Founding, the judiciary has decided when and under what circumstances persons will be detained pending enforcement proceedings even though the Executive decides whether to pursue those enforcement proceedings in the first place. *See* 4 William Blackstone, *Commentaries on the Laws of England* 293–97 (1769) (explaining that courts either set bail or committed criminal defendants to confinement pending trial); 18 U.S.C. § 3142 (requiring federal courts to determine whether criminal defendants will be detained or released pending trial); *Gonzalez v. McHenry County*, 40 F.4th 824, 829 (7th Cir. 2022) ("[C]ourts, not sheriffs, make pretrial detention decisions."). So any authority the Executive Branch enjoys over what is akin to pretrial detention in the immigration context is a creature of statute, not inherent historical or constitutional authority. *See* 8 U.S.C. §§ 1225(b)(1)(B)(ii), (2)(A); 1226(a), (c). Because detention policies like the parole policies do not implicate a longstanding Article II tradition of Executive Branch discretion in the same way that enforcement priorities do, *Texas* does not bar plaintiffs injured by unlawful detention policies from establishing standing to challenge them.

11

**II. Florida has standing to challenge the parole policies.**

Because *Texas* is inapplicable, Florida can establish standing by showing that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The district court correctly concluded that Florida met its burden.

**A. Florida suffered an injury in fact traceable to DHS's parole policies.**

The district court correctly concluded that DHS's policies authorizing the mass parole of aliens into Florida impose financial costs on Florida as well as injure Florida's quasi-sovereign interest in its territory and the presence and movement of unauthorized aliens within its borders.

1. The district court did not clearly err in finding that the challenged policies imposed monetary costs on Florida, which "are of course an injury." *Texas*, 599 U.S. at 676. As explained in Florida's brief on the merits, the undisputed evidence before the district court showed that in just the first nine months after adopting the first iteration of the challenged policies, DHS used the policies to parole around 80,000 aliens into Florida.[3] Fla. Br. 16 & n.5. The evidence also showed that the number of "immigrant

---

[3] As explained in Florida's merits brief, the 80,000 figure comes from DHS's own data and refers to the number of aliens who were released *specifically under Parole+ATD* during the first nine months of that policy and either had pending proceedings at ICE's Miami field office or had reported a Florida address and failed to later report for immigration proceedings. Fla. Br. 16 n.5 (citing Doc. 85-10 in No. 3:21-cv-1066). The 80,000 figure is thus directly attributable to Parole+ATD.

12

students" in Florida public schools—a category that includes parolees released under the challenged policies—increased by 17,000 over that time. Fla. Br. 18. Additional students require additional funding, which comes to roughly $8,000 per student to provide public education. Fla. Br. 18–19. Presented with this evidence, the district court found that Florida had shown by a preponderance of the evidence that the parole policies caused at least some increase in state education expenditures. App. 367–68. The court also found by a preponderance of the evidence that at least some of the more than 80,000 parolees released into Florida under the policies would commit crimes, seek unemployment benefits, and obtain Medicaid-funded emergency medical care, further causing the State to expend resources. App. 368–69.

In resisting the district court's factual findings, DHS attempts to evade clear-error review, ratchet up the burden of proof to an unheard-of beyond-all-doubt standard, and prohibit the factfinder from drawing any inferences from the evidence whatsoever. According to DHS, the district court could not find traceability unless Florida named a specific public-school student who came to Florida under the challenged policies and pointed to a specific expenditure that was made because of that student. *See* Reply Br. 6.

But plaintiffs have never been required to establish standing to that degree of certainty. In *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, for instance, this Court rejected as not a "serious argument" the claim that an environmental plaintiff needed to identify specific molecules of pollutants released by the defendants that

13

contributed to the injury; all the plaintiff needed to show was that the defendants "discharge[d] a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." 781 F.3d 1271, 1280 (11th Cir. 2015). And that makes sense because, as with proving any aspect of a civil claim, the burden of proof to establish standing is a preponderance of the evidence. *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 935 (5th Cir. 2022); *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020); *Miller v. Thurston*, 967 F.3d 727, 735 (8th Cir. 2020). To prove a fact by a preponderance of the evidence, a plaintiff need only convince the factfinder that "the existence of a fact is more probable than its nonexistence" or, in other words, that the fact "is more likely true than not true." *United States v. Watkins*, 10 F.4th 1179, 1184–85 (11th Cir. 2021) (en banc). And in determining whether a fact is more likely true than not true, the factfinder may of course "draw reasonable and logical inferences from the evidence." *Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*, 571 F.3d 1143, 1155 (11th Cir. 2009).

That is exactly what the district court did. The evidence showed that more than 80,000 aliens, including many family units,[4] were paroled into Florida under the challenged policies, that immigrant-student enrollment in public schools correspondingly increased by 17,000, and that Florida spends around $8,000 per student on public education. Thus, the only inference left for the district court to draw was that it was more

---

[4] The first iteration of Parole+ATD was purportedly limited to family units. App. 511–12.

14

likely than not that at least some of the 17,000 immigrant students were part of the more than 80,000 parolees released into Florida under the policies.[5] That inference was reasonable, and because of the "unchallenged superiority of the district court's factfinding ability," this Court owes it "great deference." *Keohane*, 952 F.3d at 1279 (Wilson, J., dissenting) (citation omitted). The opposite conclusion—that it is more likely that not one of the more than 80,000 parolees released into Florida under the policies was part of the corresponding 17,000 immigrant-student spike in public schools—would be so implausible as to be unreasonable. But even if DHS somehow believes that to be the better inference, it cannot have this Court "usurp[] the role of the district court," "reweigh the facts," and "supplant the district court's findings with [its] own." *Id.* The district court did not err—let alone clearly so—by inferring the obvious.[6] And as a matter of law, such financial injuries are fully adequate to support state standing to sue. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (holding that New York had standing to challenge a census question because the question could lead to lower

---

[5] Although the district court determined that Florida was entitled to special solicitude in establishing traceability and redressability, it made clear in both its original order and its indicative ruling requested by this Court that its conclusion did not depend on that. App. 377; Doc. 86-2 at 2 n.1 in No. 23-11528. In finding that Florida met its burden to establish traceability and redressability, the district court simply applied this Court's decision in *Black Warrior Riverkeeper,* which was not a special-solicitude case. App. 377.

[6] In *Texas*, the Supreme Court observed that a "State's claim for standing can become more attenuated" when asserting an indirect financial injury from a federal policy. 599 U.S. at 680 n.3. But that simply means that such injuries can be more difficult to prove. Here, the district court found that Florida met its burden.

participation in the census, which could lead to a population undercount, which could lead to New York's receiving less funding from the federal government).

2. Although Florida's financial injuries are sufficient to establish standing, the district court also correctly concluded that the challenged policies inflict on Florida a quasi-sovereign injury. By virtue of their sovereign status, sovereigns have interests that other entities do not and can suffer harms to those unique interests that amount to injury. These sovereign and quasi-sovereign injuries can be "intangible" but are "none-theless concrete." *West Virginia v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023).

One such example is the quasi-sovereign interest states have in the federal government's exercise of sovereign authority ceded to it by the states. States cede certain sovereign prerogatives to the federal government when they join the union. *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007). But as the Supreme Court has made clear, ceding power does not mean that the state cedes the interest that the power protects. *See id.* It simply means that states must rely on the federal government to protect those interests. And when the federal government unlawfully exercises that ceded authority in a manner that harms rather than protects the states' interests, the states suffer a cognizable injury. *See id.* at 519–20 & n.17. As explained in Florida's brief on the merits, regulating migration is a sovereign power, many aspects of which Florida ceded to the federal government by joining the union. Fla. Br. 16–17. But that does not mean that Florida ceded its interest in preventing the unlawful presence of persons in its borders. By issuing

16

policies that permit DHS officials to unlawfully grant temporary legal status en masse and release hundreds of thousands of aliens into Florida, DHS injured that quasi-sovereign interest.

In its reply brief, DHS misunderstood Florida's assertion of a quasi-sovereign injury as invoking special solicitude in the standing analysis. Reply Br. 3–4. Those are not the same. Special solicitude merely relaxes the burden to show immediacy and redressability of the asserted injury when a state asserts a quasi-sovereign injury, but it has no effect on the state's burden to show a cognizable injury, sovereign or otherwise. *Louisiana v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882 (5th Cir. 2023). The recognition that states can suffer cognizable injuries that are intangible is not an application of special solicitude. It simply reflects that sovereigns have intangible interests that non-sovereign entities lack and that those interests can still be harmed. *See West Virginia*, 59 F.4th at 1136 (not mentioning special solicitude). Florida's assertion of a quasi-sovereign injury therefore does not depend on receiving special solicitude.

In this Court's order requesting supplemental briefing, it asked "whether Florida's quasi-sovereign interest is meaningfully different than the one asserted by Texas." Supp. Br. Order 3. It is. The states lacked standing in *Texas* because "a party lacks a judicially cognizable interest in the prosecution . . . of another." *Texas*, 599 U.S. at 687 (Gorsuch, J., concurring in judgment) (alteration in original) (quoting the fundamental holding of the majority). As explained above, Florida does not challenge DHS's failure to prosecute anyone. It challenges the DHS's willful failure to comply with Congress's

17

parole statute as to aliens DHS has independently decided should be removed, which has resulted in the release of millions of inadmissible aliens into the interior of the United States.

The Supreme Court in *Texas* never questioned that states suffer grave injury, quasi-sovereign and otherwise, when the federal government violates its obligations to enforce federal immigration law. To the contrary, the Court accepted the district court's finding that the states suffered a factual injury but then explained that not all factual injuries are judicially cognizable. *Texas*, 599 U.S. at 676. The states' injuries in *Texas* were not judicially cognizable only because of the nature of the policy they were challenging. *See id.* at 685 n.6. For that reason, the Supreme Court explained that the states' asserted injuries may have been sufficient to support standing had the states—like Florida here—challenged different kinds of immigration policies. *See id.* at 681–83.

**B. Florida's injuries are redressable.**

In *Texas*, three Justices concluded that the plaintiff states lacked standing not because they failed to assert a judicially cognizable injury, but because vacating the challenged guidelines would not redress their injuries. 599 U.S. at 689–90 (Gorsuch, J., concurring in judgment). They reasoned that the guidelines governing which aliens to arrest and remove merely advised immigration officials on how to exercise their enforcement discretion and that officials could continue to exercise their discretion in the same way even in the absence of the formal policy. *Id.* at 691. A majority of Justices did not sign

18

onto those separate views, which have no precedential effect. But in any event, those concerns are not present here.

1. Florida has at minimum established partial redressability, which is sufficient to establish standing. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021). The concurring Justices in *Texas* thought that vacating the challenged policy would not redress the states' injuries because the Justices believed that immigration officials could simply continue enforcing immigration law in the manner prescribed by the policy even in its absence. That is not the case with the parole policies here.

DHS's current regulatory regime for granting parole does not authorize parole for the category of aliens for which the challenged memoranda authorize it: namely, aliens who are apprehended after crossing the border between ports of entry and have not yet been placed in removal proceedings. Parole is governed by 8 C.F.R. § 212.5. Section 212.5(b) authorizes granting parole only to aliens detained under section 235.3(b) and (c), i.e., aliens who are already in removal proceedings. Section 212.5(c) authorizes granting parole to "all other arriving aliens," which is defined in 8 C.F.R. § 1.2 to mean only aliens arriving at a port of entry or interdicted on international or United States waters, i.e., not aliens who are apprehended after crossing between ports of entry on land. The challenged parole memoranda, on the other hand, authorize parole for aliens who crossed between ports of entry who have not yet been placed in removal proceedings—a category of aliens for whom existing regulations do not

authorize parole. Thus, without the challenged memoranda, DHS officials lack authority to grant parole to this category of aliens.[7]

True, without the memoranda authorizing mass grants of parole at the southern border, DHS may still rely on its other preferred method of unlawfully releasing aliens with pending removal proceedings: purporting to release them under 8 U.S.C. § 1226(a).[8] But as the district court explained, DHS's theory of release under section 1226(a) requires that DHS first initiate removal proceedings by issuing a notice to appear before releasing the alien. App. 403–04; *see also* § 1226(a) (applying to aliens who have been "detained pending a decision on whether the alien is to be removed from the United States"). That is a significant difference from release on parole under the parole memoranda, which occurs before the initiation of removal proceedings. App. 2, 5. The district court found that by releasing aliens on parole before issuing a notice to appear,

---

[7] DHS's publicly available data also reflect that the challenged memoranda are necessary to grant mass parole to aliens apprehended at the border prior to initiating removal proceedings. While Parole+ATD was in effect from October to December 2022, Border Patrol granted parole to an average of around 100,000 aliens encountered at the border per month. And in the two days PWC was in effect in May 2023, Border Patrol granted parole to around 9,000 aliens apprehended at the border. But after the district court's entry of a preliminary injunction against implementing PWC, those numbers immediately plummeted to an average of five parole grants per month. *See* U.S. Customs and Border Prot., *Custody and Transfer Statistics FY2023*, https://tinyurl.com/7fsdzyf3 (under tab titled "U.S. Border Patrol – Disposition and Transfers"). DHS apparently agrees that without the challenged memoranda, it cannot grant parole on anywhere near the same scale.

[8] Florida also challenged DHS's use of section 1226(a), and the district court agreed that it was unlawful but concluded that there was no final agency action implementing section 1226(a) as a release mechanism that could be subject to APA review. App. 406–07.

the parole policies were creating an exponentially increasing backlog that could lead to years of delay before a notice to appear is ever issued. App. 419. But aliens purportedly released under section 1226(a) will already be in removal proceedings and thus will not remain in Florida for as long as those granted parole under the challenged memoranda. App. 380, 419. Invalidating the parole policies thus at least provides Florida partial redress. It means that, at the very least, aliens would be removed more quickly than they are currently being processed under DHS's unlawful use of the parole authority.

2. Even if DHS officials had legal authority to continue to grant mass parole in the same manner without the policies, that would not defeat standing. Redressability means that the judgment is capable of providing relief from the asserted injury, not that "the practical impact of [the] decision is . . . assured." *Chafin v. Chafin*, 568 U.S. 165, 175 (2013). Otherwise, one would never have standing to sue a foreign government or an insolvent person because it would never be clear that the court could provide any redress as a practical matter. *See id.* at 175–76. The source of Florida's current injuries is the parole memoranda. Vacating or enjoining their implementation redresses that injury. That DHS could hypothetically inflict the same injury in a different manner in response to the Court's judgment does not change that. And if DHS did continue paroling aliens en masse in the same manner without the policies, that would be every bit as unlawful as that practice is with them. *See Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1278 (11th Cir. 2022) (When evaluating standing, the Court must "assume that the

plaintiff[] would be successful on the merits."). As the district court aptly put it, "[j]udicial review . . . should not be a game of 'whack-a-mole.'" App. 486 n.11.

3. Even if there were otherwise problems with establishing redressability for Florida's substantive claims, Florida would still have standing to bring its procedural claims under the APA: claims that the parole memoranda were arbitrary and capricious and unlawfully issued without notice and comment. When a plaintiff asserts a concrete injury along with a procedural claim, the plaintiff can establish standing "without meeting the usual standards for redressability and immediacy." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023); *accord Ctr. for Sustainable Coast v. U.S. Army Corps of Eng'rs*, — F.4th —, 2024 WL 1918733, at *1 (11th Cir. 2024). For example, someone who lives next to a proposed dam-construction site would have standing to sue the licensing agency for failure to create an environmental impact statement even though the license may still be approved after the impact statement is created. *Brown*, 600 U.S. at 561. In other words, the fact that a defendant may inflict the injury anyway after going through the required procedures does not deprive the plaintiff of standing to sue for failure to go through those procedures. *Id.* at 561–62. Therefore, at minimum, Florida has standing to bring its arbitrary-and-capricious and notice-and-comment claims.

## CONCLUSION

Florida has standing to challenge DHS's parole policies.

Dated: May 6, 2024                    Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER
  *Solicitor General*
DANIEL W. BELL
  *Chief Deputy Solicitor General*
DARRICK W. MONSON
  *Assistant Solicitor General*

JAMES H. PERCIVAL
  *Chief of Staff*
NATALIE P. CHRISTMAS
  *Counselor to the Attorney General*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limits of the Court's order for supplemental briefing because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,985 words.

2.    This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Henry C. Whitaker*
Solicitor General

24

## CERTIFICATE OF SERVICE

I certify that on May 6, 2024, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Henry C. Whitaker*
Solicitor General